**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC D/B/A | ) | |
| BRAZOS LICENSING AND | ) | |
| DEVELOPMENT, | ) | |
| | ) | C.A. No. 1:21-1119-MN-CJB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| NETGEAR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT NETGEAR, INC.'S OPENING
<u>BRIEF IN SUPPORT OF ITS MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

I.  NATURE AND STATE OF THE PLEADINGS ................................................................. 1

II.  SUMMARY OF THE ARGUMENT ............................................................................... 1

III.  FACTUAL BACKGROUND ........................................................................................... 3

    A.  The '171 Patent Describes Technological Problems of Prior Art Networking Devices .................................................................................................. 3

    B.  The '171 Patent Teaches Specific Technological Solutions to Problems Associated with Prior Art Conventional Network Systems .................................. 5

IV.  LEGAL STANDARDS ................................................................................................... 9

    A.  Motion to Dismiss ................................................................................................ 9

    B.  Patentable Subject Matter Under 35 U.S.C. § 101 ............................................ 10

V.  ARGUMENT ................................................................................................................. 11

    A.  *ALICE* STEP 1:  The Asserted Claims Are Not Directed To An Abstract Idea ...................................................................................................................... 11

        1.  The Patent Claims Provide Technical Solutions To Problems Associated With Prior Art Networking Device ...................................... 11

        2.  Netgear's Characterization of the '171 Patent Should Be Rejected ........ 14

    B.  *ALICE* STEP 2:  The '171 Patent Claims Have An Inventive Concept That Transforms Them Into A Patentable Invention. .................................................. 16

    C.  Netgear's Motion Should Be Denied Because Netgear Has Failed To Satisfy Its Heavy Burden Of Showing By Clear And Convincing Evidence That The '171 Patent Is Invalid And Discovery And Even Claim Construction Are Necessary. ............................................................................... 19

VI.  CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018)....................................................................................10, 19

*Alice Corp. Pty. v. CLS Bank Int'l*,
   134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014) .................................................................. *passim*

*Ancora Techs., Inc. v. HTC America, Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018)..............................................................................11, 12, 13

*BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016)....................................................................2, 11, 16, 18

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed, Cir. 2018).................................................................................10, 19

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019).................................................................................16, 20

*CosmoKey Solutions GmbH & Co KG v. Duo Security LLC*,
   No. 2020-2043, 2021 WL 4515279 (Fed. Cir. Oct. 4, 2021)...............................................2, 17

*DDR Holdings, LLC v. Hotels.com, LP*,
   773 F.3d 1245 (Fed. Cir. 2014)........................................................................................11

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
   815 Fed. App'x 529 (Fed. Cir. 2020)...............................................................................16

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed Cir. 2016)..........................................................................10, 11, 13, 18

*Ericcson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
   955 F.3d 1317 (Fed. Cir. 2020).......................................................................................16

*Execware, LLC v. BJ's Wholesale Club, Inc.*,
   No. CV 14-233-LPS, 2015 WL 5734434 (D. Del. Sept. 30, 2015)........................................20

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. Jan. 10, 2018) ...................................................................11, 12, 13

*Groove Digital, Inc. v. Jam City, Inc.*,
   No. 1:18-cv-01331, 2019 WL 351254 (D. Del. Jan. 29, 2019) ........................................15, 18

*JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*,
   No. 16-cv-212-GMS, 2016 WL 4639140 (D. Del. Sept. 6, 2016)..........................................10

*Kroy IP Holdings, LLC v. Groupon, Inc.*,
   No. CV 17-1405-MN-SRF, 2018 WL 4905595 (D. Del. Oct. 9, 2018) ................................19

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 ...........................................................................................................................10

*Microsoft Corp. v. i4i LP*,
   564 U.S. 91 (2011)....................................................................................................................19

*Mod Stack LLC v. Aculab, Inc.*,
   No. 18-cv-332, 2019 WL 3532185 (D. Del. Aug. 2, 2019)....................................................15

*Nexstep, Inc. v. Comcast Cable Commc'n., LLC*,
   No. CV 19-1031-RGA, 2021 WL 4943627 (D. Del. Sept. 17, 2021) ....................................12

*Peloton Interactive, Inc. v. Echelon Fitness, LLC*,
   No. 19-CV-1903-RGA, 2020 WL 3640064 (D. Del. July 6, 2020) .......................................19

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008).......................................................................................................9

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
   696 Fed. App'x 1014 (Fed. Cir. 2017)....................................................................................16

*Shopify Inc. v. Express Mobile, Inc.*,
   No. CV 19-439-RGA, 2021 WL 4288113 (D. Del. Sept. 21, 2021) ......................................15

*SRI Int'l, Inc. v. Cisco Systems, Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019)..........................................................................................12, 13

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020)................................................................................................15

*Verint Sys. Inc. v. Red Box Recorders Ltd.*,
   226 F. Supp. 3d 190 (S.D.N.Y. 2016)......................................................................................18

**Statutes**

35 U.S.C. § 101 ............................................................................................................... *passim*

35 U.S.C. § 282(a) ...................................................................................................................19

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ...............................................................................1, 9

## I.   <u>NATURE AND STATE OF THE PLEADINGS</u>

Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development ("Plaintiff" or "WSOU") filed the action on July 30, 2021 alleging that Defendant Netgear, Inc. ("Netgear") infringes U.S. Patent No. 9,338,171 ("'171 patent").  Netgear has moved to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), under 35 U.S.C. § 101 ("Motion").  WSOU submits this brief in opposition to Netgear's Motion along with WSOU's Amended Complaint.[1]

## II.   <u>SUMMARY OF THE ARGUMENT</u>

Netgear has not and cannot come close to meeting its heavy burden on this motion by showing through clear and convincing evidence that WSOU's patent claims are ineligible.  To the contrary, as shown below, the '171 patent claims are clearly patentable under both governing § 101 tests set forth in the Supreme Court's controlling decision in *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014) ("*Alice*").

Under *Alice's* Step 1 test, the '171 patent claims are not abstract; they are directed to distributed systems and methods that include wireless access points that further include access control platform for security authentication that is based upon (i) social networking group designation and (ii) the limit of the number of users or traffic load information to prevent unauthorized access and performance degradation.  Prior art systems required that individual user names and/or passwords be manually generated and distributed for each user or device and to prevent an authorized user from future access, a new password must be created and distributed to each of the other authorized users using the same password.  The '171 patent solved those problems

---

[1]   Submitted herewith and expressly relied upon in opposition to Netgear's Motion is the Declaration of Jonathan K. Waldrop, dated November 9, 2021 ("Waldrop Declaration" or "Waldrop Decl.").  The '171 patent is attached to the Waldrop Declaration as Exhibit 1 and the Amended Complaint ("Am. Compl.") is attached as Exhibit 2.  And "Netgear's Brief" or "Op. Br." refers to Netgear's Opening Brief in Support of Its Motion to Dismiss.  D.I. 10.

by automatically updating the authentication information using social networking group membership and information from the third-party social networking platforms to ensure that if a user is not a member of the required group that user could not be authenticated and granted access to the patented networking system.

Even assuming *arguendo* that the '171 patent does not satisfy *Alice's* Step 1 test, the '171 patent adds numerous inventive concepts that satisfy *Alice's* Step 2 test. For example, as the Federal Circuit recently found in *CosmoKey* (discussed below), the '171 patent claims and specification teach an improved networking system that includes an improved authentication scheme that uses an association between the users or their device and social networking group information and limits based on the number of user or traffic loads to authenticate and grant access to wireless access points. Similar to *CosmoKey*, the '171 patent specification makes clear that the authentication scheme was an improvement over prior art systems. Moreover, like in *Bascom*, the '171 patent is used in a distributed architecture, where the claimed wireless access point can receive automatic updates of a user's membership in the requisite social networking groups from third-party social networking platforms to authenticate users' devices to grant them access to the wireless access point. Accordingly, the '171 patent recites "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."

At minimum, the Amended Complaint and the '171 patent specification raise factual disputes concerning whether the '171 patent claims recite "conventional" and "well-known" components or functions and teach technological advancements over the prior art. Netgear's Motion is premature unless and until these factual disputes (among others) are resolved through fact and expert discovery and claim construction and thus, Netgear's Motion should be denied.

### III.    FACTUAL BACKGROUND

#### A.    The '171 Patent Describes Technological Problems of Prior Art Networking Devices

Networking device manufacturers are continually challenged to deliver technological advancements over prior products in order to provide value and convenience to consumers. '171 patent at 1:14-16. One such product is a system for sharing networking resources among various users. *Id*. at 1:16-17. By way of example, a user may wish to allow other users to access a networking resource, such as a wireless access point, when the designated users are within range of the access point. *Id*. at 1:17-21. Juxtaposed with the ability to enable users to share resources is the need to maintain security with respect to those resources, and to enable sharing of the resources without degradation of performance of the resources. *Id*. at 1:20-24. For example, a user that shares a wireless access point among designated users may wish to maintain a certain level of (i) security and (ii) performance of the wireless access point. *Id*. at 1:24-27.

While certain network resources may include security features, such security features were technologically limited. *Id*. at 1:28-30. For example, wireless access points were capable of being password protected. *Id*. at 4:14-17. The password protection is used to prevent unauthorized users from accessing the wireless access point without permission and eavesdropping on communications associated with other users connected to the access point. *Id.* at 4:17-23. Thus, although security associated with wireless access points is needed, it makes sharing wireless access points between family members, friends, and other users complex. *Id*. at 4:26-29.

For example, in prior art conventional networking devices, a password for accessing the access point must be generated and distributed among all of the users that are authorized to access the access point. *Id*. at 4:30-32. In other words, if a user walked into a coffee shop and wanted to connect a laptop or mobile phone to a wireless access point to use the Internet, then that user would

need to request a username and password from the coffee shop owner and then manually enter the username and password in order to be granted access.  Conversely, for example, in order to revoke that user's permission to access an access point, the coffee shop owner would need to manually access the security settings for the access point to change the security settings (*e.g.*, password, revocation of a MAC address, etc.).  *Id*. at 1:28-30.  Even worse, to prevent a previously authorized user from accessing the access point, a new password must be created and distributed to each of the other authorized users, assuming they all shared the same password.  *Id*. at 4:32-35.  In fact, other even more complex processes may be necessary to prevent a previously authorized user from accessing the access point beyond merely changing the password.  *Id*. at 4:35-38.

Further, beyond preventing unauthorized users from accessing an access point, prior art convention networking devices also suffered from problems associated with degradation of services based on, for example, the number of users associated with a wireless access point may exist.  *Id*. at 4:38-42.  Exacerbating these technical problems in prior art conventional networking devices are problems in controlling the wireless access points directly through, for example, the configuration settings associated with the access point.  *Id*. at 4:42-45.  For example, the configuration settings of the wireless access point must be accessible otherwise the settings cannot be changed.  *Id*. at 4:45-47.  Further, prior art conventional networking devices was limited to changing the settings only in a static way for controlling access to an access point and did not automatically update the user's credentials based on information or group memberships maintained in third-party networks.  *Id*. at 4:47-50.  Similar issues concern other types of resources, such as a database accessible over a network.  *Id*. at 4:50-52.  Thus, as of the date of the '171 patent, there was no system to control users' access to networking resources, such as wireless access points, through security a authentication mechanism using social networking information

associated with a user that could be independent of controlling the resource settings directly to maintain the security and performance of the resources.

> **B.**    **The '171 Patent Teaches Specific Technological Solutions to Problems Associated with Prior Art Conventional Network Systems**

To address the above-described technological problems in the prior art conventional networking systems, the inventors of the '171 patent created distributed networking systems and methods that include an access control platform for controlling access to a wireless access point based upon social connections and the performance of the wireless access point(s). *Id*. at 4:53-56. To that end, the inventors of the novel systems developed and included an access control platform that determines whether to grant a user access to a wireless access point based on that user's social networking group information. *See, e.g.*, *id*. at 7:26-30. More specifically, depending on the social connections associated with other users and/or other devices associated with the other users as compared, for example, to the host user of the resources, the system grants, revokes or prevents access to wireless access points. *Id*. at 4:56-61. The system also introduces the capability to control the security and performance of wireless access point independently from directly controlling the configuration of the resources by remotely controlling access to the wireless access point at the device level. *Id*. at 5:1-5, 5:50-6:2, 6:41-45, 13:45-14:8.

For example, the host of the novel wireless access point may remotely confirm the system to grant access to an entire membership of a Facebook group. The novel wireless access points' access control platform is capable of controlling the device's security and grant access to the entirety of the membership without manually creating and distributing individual credentials for each of the members. *See, e.g.*, *id*. at 5:6-32, 7:26-30, 8:5-42; Figs. 1-4, 6A-6D, 7. The novel system maintains, among other things, information (*e.g.*, profile information) about the members and their connection to the host, or requisite social networking groups. *See id*. The access control

platform utilizes the social networking information to authenticate a user that seeks to connect to the wireless access point. *See, e.g.*, *id*. at 8:9-20. The authentication process may include determining the ability of the user's device to actually login based on the social networking information. *See, e.g.*, *id*. In addition, the authentication process includes the novel wireless access point continuing to monitor the status of the membership list with respect to, for example, the host's social networking contacts or social networking platform groups. *See, e.g.*, *id*. By monitoring the list of members of groups associated with the host or indicated as "friends" of the host, the access control platform is able to associate users and user devices with the wireless access point. *See, e.g.*, *id*. at 8:16-20.

Additionally, the access control platform determines what access rights are made available to the one or more members of an associated group. *See, e.g.*, *id*. at 8:21-23. Access rights may be based on, for example, whether a relationship identifier is family, friend, friend of a friend, acquaintance, other, etc. *See, e.g.*, *id*. at 8:23-25. In other instances, the indicator may relate to some other level of closeness, familiarity or priority of the host relative to the member. *See, e.g.*, *id*. at 8:25-28. In that same vein, the novel wireless access point includes a configuration to set a hierarchy of priority for access by different groups depending upon social networking information. *See, e.g.*, *id*. at 6:49-56. For example, if a user that is classified within the social networking group of family is currently accessing the wireless access point, if another user that is classified within the social networking group of friends attempt to access the same access point, the latter may be prevented from accessing the resource based on the former user having a higher priority. *See, e.g.*, *id*. at 6:56-63. Similarly, if the friend user has access to the wireless access point and a family user attempts to access the same access point, the friend user may have their access revoked to ensure security of the family user using the wireless access point. *See, e.g.*, *id*. at 6:63-66. Accordingly,

6

lower-priority users, and devices associated with lower-priority users, have their access to the wireless access point revoked or barred based on access to the same by higher-priority users based on the social networking groups. *See, e.g.*, *id*. at 6:66-7:3. By controlling the revocation and prevention of access to the wireless access point based on the priority hierarchy of users or their devices, hosts that maintain the wireless access point may open them to a wider range of users while maintaining a level of security for more trusted users or users that have a closer social relationship to the host. *See, e.g.*, *id*. at 16:4-10.

Further, the access control platform includes an additional security feature for preventing a malicious or unauthorized user from tampering with the novel wireless access point. *See, e.g.*, *id*. at 8:43-47, 12:27-59. Such a malicious user may obtain the security credentials for accessing the wireless access point and disable the credentials effectively enabling the malicious user to use wireless access point even if not intended by the host of the resources. *See, e.g.*, *id*. at 8:48-52, 12:27-59. To implement additional security, the access control platform monitors for the user and user's device that attempts to access the wireless access point to ensure that user or user's device are accessing the wireless access point according to the established hierarchies and/or the characteristics of the wireless access point. *See, e.g.*, *id*. at 8:52-56, 12:27-59. For example, the access control platform will monitor for the user and user device accessing an access point and determine whether the user has actual authority to access the access point according to the hierarchy as compared to other user devices currently accessing the access point. *See, e.g.*, *id*. at 8:56-61, 12:27-59. If the access control platform determines that unauthorized user device is accessing the wireless access point, the access control platform may act to eliminate access rights by the malicious user or device to the wireless access point. *See, e.g.*, *id*. at 8:61-56, 12:27-59.

7

Moreover, the access control platform also controls access to the wireless access point based on either or both of (i) the number of users accessing the wireless access point and (ii) the traffic load of the wireless access point(s), which may be the bandwidth of the same.  *See, e.g.*, *id.* at 4:61-5:5, 7:4-25, 16:11-32, Figs. 4, 5.  For example, the access control platform will not grant or will prevent a user's access to a wireless access point if that the inclusion of an additional user exceeds the limit users for the access point.  *See, e.g.*, *id.* at 16:11-32, Figs. 4, 5.  These limitations are to ensure that the performance of the wireless access points remains and do not degrade.  *See, e.g.*, *id.* at 4:61-5:5, 5:33-37, 7:4-25, 16:11-32.[2]

These specific technological improvements are required by the claims.

10. An apparatus comprising:

    at least one processor; and

    at least one memory including computer program code for one or more programs,

    the at least one memory and the computer program code configured to, with the at least one processor, cause the apparatus to perform at least the following,

    determine one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof;

    process and/or facilitate a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups; and

    cause, at least in part, a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on (a) membership in the one or more social networking groups, and (b) one or more characteristics associated with the one or more resources,

    wherein the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more wireless access points, or a combination thereof.[3]

---

[2]  An instructive example of an implementation of the '171 patented system is discussed in paragraph 19 of the Amended Complaint, ¶ 19.
[3]  Claim 1 is similar but is directed to a method rather than an apparatus claim.

Claims 11-15 depend, at least in part, on claim 10, and further require the use of priority hierarchy with respect to the user or users' devices attempting to access the network resources, including wireless access point(s).[4]   Claim 16 also depends on claim 10 and further requires the monitoring of number of access times of at least one user or one other user device and causing the elimination of access rights to one or more resources for at least one user or user device based on the same.[5]   Claim 17 also depends on claim 10 and further requires that one or more social networking groups include at least one of a family group, a friends group, a friends of friends group and an others group.[6]

Thus, the '171 patent claims and specification recite specific technological improvements to wireless access points where control of user's access is based on a security authentication mechanism using social networking information and resource performance to prevent unauthorized access that is remotely and efficiently implemented and can advantageously be carried out with mobile devices of low complexity.

## IV.   <u>LEGAL STANDARDS</u>

### A.   **Motion to Dismiss**

When deciding Rule 12(b)(6) motions, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."   *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).   "At the motion to dismiss stage[,] a patent claim can be found directed towards patent-ineligible subject matter if the only plausible reading

---

[4] Claims 2-6 are similar but are directed to a method rather than apparatuses.   Netgear contends that WSOU has not asserted these claims because they were not included in the Complaint. However, WSOU intends to assert these claims and will seek discovery from Netgear concerning the same.

[5] Claim 7 is similar but is directed to a method rather than an apparatus.

[6] Claim 8 is similar but is directed to a method rather than an apparatus.

of the patent must be that there is clear and convincing evidence of ineligibility." *See JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*, No. 16-cv-212-GMS, 2016 WL 4639140 at *1 (D. Del. Sept. 6, 2016).  If the allegations "raise factual disputes underlying the § 101 analysis," the Complaint should not be dismissed.  *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126 (Fed. Cir. 2018).

### B.      Patentable Subject Matter Under 35 U.S.C. § 101

Patent eligibility under § 101 is a question of law, based on underlying facts.  *See Id.* at 1125; *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1354-65 (Fed, Cir. 2018).  Courts analyze whether a patent is directed to an "abstract idea" under 35 U.S.C. § 101 under a two-step process (*Alice* Step 1 and *Alice* Step 2).  *Alice*, 134 S. Ct. at 2355.  Claims are presumed valid unless Defendant can prove by clear and convincing evidence that they fail both steps.  In *Alice* Step 1, the inquiry focuses on the characterization of the claims – *i.e.*, what the claims, considered as a whole and in light of the specification, are "directed to."  *Enfish*, *LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed Cir. 2016).  In asking this threshold question, courts focus on *the specific claimed solution*, rather than high-level simplification, because "[a]t some level, 'all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'"  *Alice*, 134 S. Ct. at 2354 (emphasis added).  Indeed, the Federal Circuit has cautioned against oversimplification when attempting to articulate the abstract idea.  *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 ("[C]ourts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.")  And a patent's description of technological shortcomings in the prior art supports the conclusion that the claims are directed to a specific, patent-eligible invention, rather than to an abstract idea.  *See Enfish*, 822 F.3d. at 1337.  If the claims are not directed to an abstract idea under *Alice* Step 1, the Court does "not need to proceed to step two of that analysis."  *See id*. at 1339.

Under *Alice* Step 2, claims directed to abstract ideas under Alice step-one are still valid if they recite "an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. For example, claims that specify *how* interactions between computers may be manipulated in a way that overrides routine, conventional computer activity recite an invention concept. *See DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (emphasis added). The claims as a whole must be considered as an ordered combination rather than simply isolating elements or focusing on whether only certain elements recite a patentable invention. *See BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

## V.   <u>ARGUMENT</u>

### A.   *ALICE* STEP 1:  The Asserted Claims Are Not Directed To An Abstract Idea.

#### 1.   The Patent Claims Provide Technical Solutions To Problems Associated <u>With Prior Art Networking Device</u>

The '171 patent claims are directed to distributed systems and methods that include wireless access points that further include an access control platform for security authentication that is based upon (i) social networking group designation and (ii) the limit of the number of users or traffic load information to prevent unauthorized access and performance degradation. *See, e.g.*, *supra* at 1, 5-9; Am. Compl. ¶¶ 14-21. The claimed systems and methods reflect a patent-eligible improvement to computer functionality, such as network security authentication, and is not an abstract idea. *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. Jan. 10, 2018); *Enfish*, 822 F.3d at 1336, 1339 (ruling that the "self-referential table recited in the claims [was] a specific type of data structure designed to improve the way a computer stores and retrieves data in memory"); *Ancora Techs., Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1347–49 (Fed. Cir.

2018) (claims were not ineligible because they require use of a modifiable portion of particular computer capacity to prevent running software on an unauthorized computer); *Nexstep, Inc. v. Comcast Cable Commc'n., LLC*, No. CV 19-1031-RGA, 2021 WL 4943627, at *2 (D. Del. Sept. 17, 2021).

For example, in *Finjan*, the Federal Circuit held that claims directed to a method for virus scanning were directed to patent eligible subject matter under *Alice* Step 1 because they "employ[] a new kind of file that enables a computer security system to do things it could not do before," including "accumulat[ing] and utiliz[ing] newly available, behavior-based information about potential threats." 879 F.3d at 1305. The Federal Circuit concluded that such claims recite specific "steps -- generating a security profile that identifies suspicious code and linking it to a downloadable -- that accomplish the desired result." *Id.*

In *SRI Int'l, Inc. v. Cisco Systems, Inc.*, the Federal Circuit held claims drawn to a method of hierarchical computer network monitoring to be patent-eligible. 930 F.3d 1295, 1301 (Fed. Cir. 2019). The *SRI* claims recited a series of steps, including "deploying" network monitors, which detect "suspicious network activity based on analysis of network traffic data," and generating and integrating "reports of ... suspicious activity." *Id.* The Federal Circuit held that the claims were not directed to an abstract idea because they were "necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks." *Id.* at 1303. The Federal Circuit recognized that the claims were not using a computer as a tool but, instead, recited a specific technique for improving computer network security. *Id.* In informing the court's understanding of the technology and its relationship to the art, the court relied on statements in the specification that the claimed invention purported to solve weaknesses in the prior art by providing a framework for recognition of global threats to interdomain connectivity. *Id.* at 1303-04.

The '171 patent claims are similar and even go beyond the claims in *Finjan*, *SRI*, and *Enfish* by teaching a very specific solution to the technical problems faced by prior art networking authentication systems and methods.  *See* Am. Compl. ¶¶ 14-21.  More specifically, the '171 patent claims teach new wireless access point(s) that includes an access control platform to perform authenticate a user or a user's device in order to grant access based on (i) "membership in one or more social networking groups", and (ii) limits to either (a) the number of users accessing the wireless access point(s) or (b) the traffic load associated with the same.  *See, e.g.*, *supra* at 5-9; *see* Am. Compl. ¶¶ 14-21.  More importantly, unlike in the prior art, the '171 patent claims require an association between users or their devices and social networking group information and the use of the user's membership in a social networking group to authenticate and grant access to the wireless access point.  *See, e.g.*, *supra* at 5-9; *see* Am. Compl. ¶¶ 14-21.  Such an association and use of a social networking group membership is a new, specific technique to authenticate users or devices to provide either or both with access to a wireless access point similar to those techniques or new data structure that were previously found to be non-abstract in *Finjan*, *SRI*, *Ancora*, and *Enfish*, among others.  *See supra* at 11-12.  These features are important technological advancements because prior art networking systems required that individual user names and/or passwords be manually generated and distributed for a user or device; or even worse, to prevent a previously authorized user from future access, a new password must be created and distributed to each of the other authorized users, if they all used the same password.  *See, e.g.*, '171 patent at 4:30-32; Am. Compl. ¶¶ 10-21.  However, the '171 patent claim solved this problem because, among other things, if a user is no longer a member of a social networking group then the user or its device will not pass the security authentication mechanism and will not be granted access to the

wireless access point because the novel system updates the social networking group membership automatically.

Further, the fact that the '171 patent systems and methods are directed to new wireless access points that additionally limit access based on user or traffic load limits is another basis that removes the patent claims from the realm of abstraction. *See supra* at 8-9; Am. Compl. ¶ 18.

Moreover, the dependent claims require additional specific elements and steps required by improved systems and methods claimed by the '171 patent that further remove the claims from the realm of abstraction.  For example, dependent claims 2-6 and 11-15 further require the use of priority hierarchy with respect to the user or users' devices attempting to access the network resources, including wireless access point(s).  Use of the priority hierarchy is another new data point for association of used with respect to the users or their devices that access control platform uses to grant access to a novel wireless access point, similar to the new techniques found to be non-abstract in other cases. *See supra* at 8-9; Am. Compl. ¶ 16.

As another example, claims 7 and 16 further require that wireless access point monitor the number of access times of at least one user or one other user device and cause the elimination of access rights to one or more resources for at least one user or user device based on the same.  And dependent claims 8 and 17 further require that one or more social networking groups include at least one of a family group, a friends group, a friends of friends group and an others group. *See supra* at 5-9.  Accordingly, each of these claims require additional specific elements and steps that remove the claims from the realm of abstraction.

> 2.    Netgear's Characterization of the '171 Patent Should Be Rejected

Netgear contends that the '171 patent claims are directed to the abstract idea of "controlling access to resources." *See* Op. Br. at 1-5, 7-9.   But that proposed abstract idea is an oversimplification, which the Supreme Court, Federal Circuit and this Court have warned against.

*See, e.g.*, *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) ("And we have reiterated the Supreme Court's caution against 'overgeneralizing claims' in the § 101 analysis, explaining that characterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'") (citations omitted); *Shopify Inc. v. Express Mobile, Inc.*, No. CV 19-439-RGA, 2021 WL 4288113, at *22 (D. Del. Sept. 21, 2021) (same).  Indeed, Netgear's characterization grossly fails to capture the substance of the claims, and, on that basis alone, the motion should be denied.  *See Mod Stack LLC v. Aculab, Inc.*, No. 18-cv-332, 2019 WL 3532185, at *3 (D. Del. Aug. 2, 2019) (denying defendant's motion to dismiss because defendant's proposed abstract idea did not "satisfactorily capture[] the substance of the claims"); *Groove Digital, Inc. v. Jam City, Inc.*, No. 1:18-cv-01331, 2019 WL 351254, at *3 (D. Del. Jan. 29, 2019) (same).

More specifically, Netgear fails to demonstrate that its proposed abstract idea is tethered to the '171 patent claims.  *See* Op. Br. at 1-5, 7-9.  Netgear's characterization fails to mention anything about the limitations that require (i) the processing of social networking information associated with users or their devices, and (ii) the grant of access to the wireless access point based on (a) the social networking group membership status, and (b) limit on either users or traffic load. *See supra* at 5-9; Am. Compl. ¶¶ 14-21.  Instead, Netgear attempts to address these limitations separately as if they were not part of the independent claims and inventive concepts of the novel networking devices and methods.  That is improper.  Indeed, Netgear does not even attempt to demonstrate that the remainder of the '171 patent's dependent claims are directed to an abstract idea.  Each of those limitations are concrete concepts, and Netgear's omission of them is fatal to its argument that the claims are directed to an abstract idea.  *See Mod Stack*, 2019 WL 3532185, at *3.

Further, Netgear improperly downplays the novelty of the claimed invention, comparing it to a human mind and librarians. Op. Br. at 7-9. But that is an improper oversimplification. Human minds and librarians are not capable of maintaining social networking information from various social networks and associating such information with hundreds or thousands of users and their devices. Additionally, neither could use such information as bases to authenticate users to access wireless access points. Nor could they grant or prevent access based on the traffic load of wireless access point. Netgear's analogies do not reflect the realities of the network devices and security authentication over said devices. Indeed, the '171 patent claims specifically address drawbacks of prior art networking devices. *See supra* at 3-9.[7]

**B.**     *ALICE* **STEP 2:  The '171 Patent Claims Have An Inventive Concept That Transforms Them Into A Patentable Invention.**

Under *Alice* Step 2, the existence of an inventive concept can be demonstrated where the patent claim limitations are "an ordered combination" such that they "transform" the invention "into a patent eligible application". *Bascom*, 827 F.3d at 1347; *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317-19 (Fed. Cir. 2019) (concluding that *Cellspin* sufficiently alleged an inventive concept where the claims required the establishment of "a paired connection between the mobile device and the data capture device *before* data is transmitted" since the sequence was not employed

---

[7] The cases that Netgear primarily relies upon are distinguishable. Unlike the '171 patent claims, which, as previously discussed, provide technical improvements over the prior art, the claims in these other cases were clearly not directed to an improvement in the functioning of a computer, as evident from the court's description of the "abstract idea" in each case. *See Ericcson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1325-26, 1328 (Fed. Cir. 2020) (the claims merely make generic functional recitations that requests are made and then granted); *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 Fed. App'x 1014, 1016-18 (Fed. Cir. 2017) (claims were abstract because the claims recited "receiving" a user identity, "authenticating" the user identity, "authorizing" the user, and "permitting access" to the user); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 Fed. App'x 529,532-33 (Fed. Cir. 2020) (claims are directed to an "access filter" that is treated like a blackbox in the specification).

in the prior art); *CosmoKey Solutions GmbH & Co KG v. Duo Security LLC*, No. 2020-2043, 2021 WL 4515279, at \*5-6 (Fed. Cir. Oct. 4, 2021).

For example, the patent in *CosmoKey* disclosed a method for authenticating the identity of a user performing a transaction at a computer, including activating the authentication function on the user's mobile phone. *Id.* at \*1. The Federal Circuit found that the patent specification recognized that "when a user communicates with a remote transaction partner (e.g., a bank, a store, or a secure database) via a communication channel like the Internet, 'it is important to assure that an individual that identifies itself as an authorized user is actually the person it alleges to be.'" *Id.* The Federal Circuit found that the focus of the claimed invention is the "activation of the authentication function, communication of the activation within a predetermined time, and automatic deactivation of the authentication function." *Id.* at \*4. The Federal Circuit concluded that the patent specification describes the particular authentication technique as technical improvement over the conventional prior art authentication methods that prevents unauthorized access by third parties, and therefore is an inventive concept. *Id.* at \*6-7.

Here, like in *CosmoKey*, the patent claims and specification teach an improved networking system that include an improved authentication scheme that uses an association between the users or their device and social networking group information and limits based on the number of user or traffic loads to authenticate and grant access to wireless access points. *See supra* at 5-9; Am. Compl. ¶¶ 14-21. As explained, this authentication scheme was not used in prior art systems and was improved upon to prevent access by unauthorized third parties. *See supra* at 5-9; Am. Compl. ¶¶ 10-21. Indeed, the dependent claims provide further improvements, including the use of a prioritization hierarchy, to the claims networking systems that were also not used in prior art systems. *See supra* at 6-9; Am. Compl. ¶¶ 14-21.

Further, like in *Bascom*, the '171 patent claims cover networking systems arranged in a distributed architecture, where an access control platform, which is used to set security parameters based on the social networking group information, can be located on the wireless access point or some other place in the networking system, and access to the wireless access point is obtained through a user's devices based upon the social networking group membership. *See supra* at 5-9; Am. Compl. ¶¶ 15, 21. In such an instance, like in *Bascom*, social networking group member information either on the wireless access point or the user's device can be updated remotely and efficiently without disruption to the user or networking system, which also ensures that the security authentication for each individual user is up to date so that an unauthorized third party user cannot access the wireless access point if the user is no longer a member of a social networking group. *See supra* at 5-9; Am. Compl. ¶¶ 14-21. Therefore, the '171 patent claims constitute a new arrangement sufficient to pass *Alice* Step 2.

Netgear contends that the '171 patent claims do not teach an inventive concept because they recite only "conventional" and "well known" components and techniques. Op. Br. 1, 3-5, 9-11. However, the fact that claims recite some generic components or functions does not render the claims ineligible. *See, e.g.*, *Enfish*, 822 F.3d at 1336 (finding software-based claims containing "data storage," "memory," and "data" valid under *Alice*); *see also supra* at 11-12 (collecting cases). Indeed, Netgear's repeated assertion that the claims merely recite the use of generic networking hardware and software is a gross oversimplification of the claims, which courts have regularly warned against. *See, e.g.*, *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 226 F. Supp. 3d. 190, 192-93 (S.D.N.Y. 2016) ("Many recent motions seeking determinations of patent ineligibility suffer from such reductionist simplicity -- from characterizing as simply a mousetrap that which is in fact a better mousetrap."); *see also Groove Digital*, 2019 WL 351254, at *3. Netgear's Brief is devoid

of any analysis of the claim limitations themselves. Op. Br. at 9-11. To the contrary, the '171 patent claims recite specific requirements that provide a "technology-based solution" that improves the function of the prior art systems. *See supra* at 5-9, 11-14; Am. Compl. ¶¶ 14-21. Thus, the '171 patent claims teach inventive concepts sufficient to pass *Alice* Step 2.

### C.   Netgear's Motion Should Be Denied Because Netgear Has Failed To Satisfy Its Heavy Burden Of Showing By Clear And Convincing Evidence That The '171 Patent Is Invalid And Discovery And Even Claim Construction Are Necessary.

The '171 patent claims, like all issued claims, are "presumed valid" and the "burden of establishing invalidity . . . rest[s] on the party asserting such invalidity." 35 U.S.C. § 282(a). The Supreme Court clarified that the presumption of validity applies to patent-eligibility challenges under § 101. *See Microsoft Corp. v. i4i LP*, 564 U.S. 91 (2011). To overcome that presumption, Netgear, as the patent challenger, must prove by clear and convincing evidence that the '171 patent claims were well-understood, routine and conventional to a skilled artisan in the relevant field, and thus invalid under § 101. *See Berkheimer*, 881 F.3d at 1368. Here, Netgear falls far short of satisfying its heavy burden under the clear and convincing standard. Op. Br. at 9-11. In fact, Netgear proffers no evidence, much less evidence sufficient to show clearly and convincingly that the '171 patent claims recite only conventional and well-known components or techniques. *Id.* Nor does Netgear even point to any admissions in the '171 patent specification. Thus, Netgear's motion should be denied as premature because, at minimum, factual disputes exist regarding the problems solved by the '171 patent claims, the state of the technology, and the existence of prior art. *Berkheimer*, 881 F.3d at 1369; *Aatrix Software*, 882 F.3d at 1128.[8]

---

[8] *See also Peloton Interactive, Inc. v. Echelon Fitness, LLC*, No. 19-CV-1903-RGA, 2020 WL 3640064, at *3 (D. Del. July 6, 2020) ("Accepting the allegations in Plaintiff's amended complaint as true, Plaintiff has made 'specific, plausible factual allegations about why aspects of its claimed inventions were not conventional.'") *Kroy IP Holdings, LLC v. Groupon, Inc.*, No. CV 17-1405-MN-SRF, 2018 WL 4905595, at *16 (D. Del. Oct. 9, 2018) ("questions of fact remain as to whether the asserted claims of the '660 patent were conventional at the time of the patent, and unresolved

Here, the Amended Complaint alleges that the '171 patent teaches specific solutions to the technological problems of prior art systems, and that such solutions were not conventional or well known in the prior art and satisfies Steps 1 and 2 under *Alice*.  *See* Am. Compl. ¶¶ 10-21.  Those factual allegations should be accepted as true, and alone are sufficient to preclude dismissal.  *See, e.g.*, *id.*; *see also Cellspin*, 927 F.3d at 1318-19. As stated above, Netgear fails to proffer any evidence that demonstrates otherwise; but rather has merely proffered oversimplified characterizations of the claims that, at best, present issues of fact over their scope and thus will require discovery and may necessitate claim construction, which may impact the Court's § 101 inquiry.  *See Execware, LLC v. BJ's Wholesale Club, Inc.*, No. CV 14-233-LPS, 2015 WL 5734434, at *1, 4-5 (D. Del. Sept. 30, 2015).

Moreover, claim construction of certain terms, which will undoubtedly require expert testimony, is necessary prior to deciding this motion.  For example, WSOU proposes that the claim term "cause, at least in part, a controlling of access to the one or more resources for one or more other users . . ." and similar term in claim 10 be construed to "cause, at least in part, by an access control platform a controlling access to the one or more resources for one or more other users . . . ."  Without claim construction, Netgear cannot meet its clear and convincing evidence burden.

## VI.    **CONCLUSION**

WSOU respectfully requests that this Court deny Netgear's motion to dismiss, or, alternatively, defer its ruling until after discovery.

---

issues of claim construction could potentially bear on the analysis.").

Dated:  November 9, 2021

OF COUNSEL:

Jonathan K. Waldrop
Darcy L. Jones
Marcus A. Barber
ThucMinh Nguyen
John W. Downing
Heather S. Kim
Jack Shaw
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
(650) 453-5170

Shelley Ivan
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

Paul G. Williams
KASOWITZ BENSON TORRES LLP
1230 Peachtree Street, N.E., Suite 2445
Atlanta, GA 30309
(404) 260-6080

Respectfully submitted,

DEVLIN LAW FIRM LLC

By:  */s/ James Michael Lennon*

James Michael Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com

*Attorneys for WSOU Investments, LLC d/b/a*
*Brazos Licensing and Development*

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing instrument was served or delivered electronically

to all counsel of record, on this 9th day of November, 2021.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP          *VIA ELECTRONIC MAIL*
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market S treet
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com
*Attorneys for Defendant*

Amr O. Aly                                     *VIA ELECTRONIC MAIL*
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600
*Attorneys for Defendant*

Lisa M. Schoedel                               *VIA ELECTRONIC MAIL*
Yusuf Esat
Mitchell L. Denti
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60656-3456
(312) 222-9350
*Attorneys for Defendant*