# Exhibit 1

US007512096B2

(12) **United States Patent**
Kuzminskiy et al.

(10) Patent No.: **US 7,512,096 B2**
(45) Date of Patent: **Mar. 31, 2009**

(54) **COMMUNICATING DATA BETWEEN AN ACCESS POINT AND MULTIPLE WIRELESS DEVICES OVER A LINK**

(75) Inventors: **Alexandr Kuzminskiy**, Swindon (GB); **Hamid Reza Karimi**, Swindon (GB); **Kin Leung**, London (GB)

(73) Assignee: **Alcatel-Lucent USA Inc.**, Murray Hill, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 786 days.

(21) Appl. No.: **10/996,617**

(22) Filed: **Nov. 24, 2004**

(65) **Prior Publication Data**

US 2006/0109814 A1     May 25, 2006

(51) **Int. Cl.**
*H04Q 7/24* (2006.01)
(52) **U.S. Cl.** ........................ **370/329**; 370/468; 370/338
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,006,529 B2 * | 2/2006 | Alastalo et al. | 370/468 |
| 2003/0231700 A1 | 12/2003 | Alamouti et al. | 375/144 |
| 2006/0164969 A1 * | 7/2006 | Malik et al. | 370/203 |

FOREIGN PATENT DOCUMENTS

EP     1263168     12/2002

OTHER PUBLICATIONS

European Search Report EP 05257051 dated Feb. 8, 2006.
"Downlink SDMA For Legacy IEEE 802.11A/G Mobile Stations: Acknowledgement Recovery and Channel Estimation" by Alexandr Kuzminskiy and Constantinos Papadias, Bell Laboratories, Lucent Technologies, 2005.

* cited by examiner

*Primary Examiner*—Erika A Gary

(57) **ABSTRACT**

The present invention provides a method and an apparatus for communicating data over a network between a communication node, for example, an access point having a first and a second antenna and a first and a second mobile station. The method comprises weighting a first data at the access point to transmit the first data using the first and second antennas so that the first mobile station only receives the first data and weighting a second data at the access point to transmit the second data using the first and second antennas so that the second mobile station only receives the second data. A space division multiple access (SDMA) module may cause a transmission protocol to transmit the first data to the first mobile station on the downlink and transmit the second data to the second mobile station in parallel to the transmission of the first data on the downlink. In a telecommunication system, this substantially simultaneous transmission of the first and second data using a similar carrier frequency in a radio frequency communication over a wireless local area network (WLAN) may increase throughput of a downlink, for example, by a factor nominally equal to the number of antennas at an access point.

**13 Claims, 10 Drawing Sheets**





**FIGURE 1**

**FIGURE 2**

FIGURE 3



START
Prepare data to communicate over a network between an access point having a first and a second antenna and a first and a second mobile station
400
Weight a first data at the access point to transmit the first data using the first and second antennas on a downlink so that the first mobile station only receives the first data
405
Weight a second data at the access point to transmit the second data using the first and second antennas on the downlink during transmission of the first data so that the second mobile station only receives the second data
410
END

# FIGURE 4

**FIGURE 5**

FIGURE 6



FIGURE 7

FIGURE 8



**FIGURE 9**

Case 1:21-cv-01119-MN-CJB   Document 101-1   Filed 09/29/22   Page 12 of 586 PageID #: 2280



**FIGURE 10**

**1**

## COMMUNICATING DATA BETWEEN AN ACCESS POINT AND MULTIPLE WIRELESS DEVICES OVER A LINK

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates generally to telecommunications, and more particularly, to wireless communications.

2. Description of the Related Art

Service providers are constantly exploring various ways to generate more revenue while meeting demands of customers in different network environments including Intranet, Extranet, and e-commerce applications. For instance, telecommunication service providers exchange fee-based wireless and wireline traffic between mobile users and communication nodes, such as access points (APs) over a network to provide a variety of services to residential and business customers. An access point may be a transceiver that connects devices on a wireless local area network (WLAN) to the wired infrastructure. While an access point may be used by service providers to assure end-to-end quality of service and bandwidth guarantees over different network environments, a telecommunication service provider may offer Internet Protocol (IP) telephony and other network enhanced communication services to these customers. In doing so, these providers may employ optical and wireless networks, Internet infrastructure, communications software to enable, for example, Web-based enterprise solutions that link private and public networks.

One well-known standard, i.e., the Institute of Electrical and Electronics Engineers (IEEE) 802.11 specification describes the operation of mobile stations (MSs) and access points in a Wireless Local Area Network (WLAN). For a layered communication network protocol, this specification identifies both the physical layer (PHY), which details the nature of the transmitted signals, as well as the medium access control (MAC) layer, which defines a complete management protocol for interaction between mobile stations and access points. For more detailed discussion on the IEEE 802.11 standard (std.), one may refer to "Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) specifications," published as IEEE std. 802.11, in 1999.

Specifically, at least three versions of the IEEE 802.11 standard exist, all sharing the same MAC 802.11b layer which operates in the 2.4 Giga Hertz (GHz) frequency band and has a PHY layer based on code division multiple access (CDMA), offering a peak data rate of 11 Mega bit per second (Mbits/s). The 802.11a and 802.11g versions operate in the 5.2 and 2.4 GHz bands respectively, both sharing a PHY layer based on orthogonal frequency division multiplexing (OFDM), offering a peak data rate of 54 Mbits/s. The IEEE 802.11 specification allows interoperability between wireless communication equipment from multiple vendors, and is commercially marketed as "Wi-Fi."

Space Division Multiple Access (SDMA) has been studied extensively over the past few decades as a tool that uses spatial dimension to simultaneously transmit to, or receive from, multiple radios at the same carrier frequency. For more detailed discussion on the use of the spatial dimension to allow discrimination among multiple radio, one may refer to A. T. Alastalo, M. Kahola, "Smart-antenna operation for indoor wireless local-area networks using OFDM", IEEE Transactions on Wireless Communications, vol. 2, no. 2, pp. 392-399, March 2003 and P. Vandenameele, L. Van Der Perre, M. G. E. Engels, B. Gyselinckx, H. J. De Man, "A combined

**2**

OFDM/SDMA approach", IEEE Journal on Select Areas of Communications, vol. 18, no. 11 pp. 2312-2321, November 2000.

However, the application of SDMA to wireless mobile communication systems, especially to cellular systems, such as Global System of Mobile Communications (GSM), cdma2000 and Universal Mobile telecommunication Systems (UMTS) has not always been successful. While simple implementations in the form of a fixed sectorization have been found to be effective, more sophisticated schemes, such as dynamic beam-forming, have been difficult to implement due to serious incompatibilities with the multiple access protocols in the above-cited cellular systems. Therefore, the application of sophisticated techniques for increasing the data rates available to mobile stations on a downlink that both may comply with the IEEE 802.11a/g standard specifications has not been adequately addressed in the literature for many reasons.

One reason for a lack of a high throughput downlink is that in most wireless LANs, the radio conditions are different at a transmitter and a receiver. As shown, FIG. **3** illustrates a stylized representation of a transmission protocol defined at least in part by IEEE 802.11 standard between a transmitter and a receiver where the transmitter transmits a MAC protocol data unit (MPDU) following listening and backoff, and in turn, the receiver transmits an acknowledgment (ACK) frame subject to a successful reception of the MPDU. The transmitter has no way of knowing whether the transmitted data was received correctly at the receiver. To this end, the IEEE 802.11 specifications state that upon a successful reception of a data burst (i.e., an MPDU), the receiver should send an acknowledgment frame (ACK) to the transmitter as confirmation. Should the transmitter not receive an ACK frame, it will assume a lost MPDU and will attempt re-transmission. The time interval between the last symbols of the MPDU and the first symbol of the ACK frame is referred to as a Short Inter-frame Space (SIFS) interval and is fixed at 16 µs in IEEE 802.11 networks. While the duration of a MPDU is arbitrary, the duration of an ACK frame is between 24 and 44 µs, depending upon the modulation and coding PHY parameters.

More specifically, the IEEE 802.11 standard MAC protocol is based on carrier-sense multiple-access with collision-avoidance (CSMA/CA). This MAC protocol essentially describes a "listen before you talk" access mechanism, whereby a IEEE 802.11 radio (mobile or access point) listens to the communication medium before starting a transmission. If the communication medium is already carrying a transmission (i.e., the measured background signal level is above a specified threshold), the radio will not begin its transmission. In such circumstances, the radio enters a deferral mode, where it has to wait for a period over which the medium is idle before attempting to transmit. This period is the sum of a Deterministic Inter-frame Space (DIFS) interval (34 µs in 802.11a and g) and a stochastic backoff interval (a re-transmission delay) with discrete values uniformly distributed over a range. The value of this range doubles with every unacknowledged transmission, until a maximum limit is reached. Once a transmission is successfully received and acknowledged, the range is reduced to its minimum value for the next transmission.

Providing increased downlink throughputs to legacy IEEE 802.11 mobile stations is an important distinguishing feature and marketing tool. However, multiple acknowledgement (ACK) bursts from different mobile stations may cause a reception problem upon their arrival at an access point. Likewise, accurate channel estimations may severely impact on successfully increasing the downlink throughputs. Therefore,

US 7,512,096 B2

**3**

without requiring a modification to the legacy IEEE 802.11 compliant mobile stations, a substantial increase in data rates using a single carrier frequency is not readily apparent on a downlink from an access point to the mobile stations in a WLAN.

The present invention is directed to overcoming, or at least reducing, the effects of, one or more of the problems set forth above.

SUMMARY OF THE INVENTION

In one embodiment of the present invention, a method is provided for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station. The method comprises weighting a first data at the access point to transmit the first data using the first and second antennas so that the first mobile station only receives the first data and weighting a second data at the access point to transmit the second data using the first and second antennas so that the second mobile station only receives the second data.

In another embodiment, a communication node is associated with a network to communicate data to and from a first and a second mobile station. The communication node comprises a first and a second antenna, a controller and a memory storing instructions. The instructions cause the controller to weight a first data at the communication node to transmit the first data using the first and second antennas so that the first mobile station only receives the first data and weight a second data at the communication node to transmit the second data using the first and second antennas so that the second mobile station only receives the second data.

In yet another embodiment, a telecommunication system comprises an access point associated with a network to communicate data to and from a first and a second mobile station. The access point comprises a first and a second antenna, a controller and a memory storing instructions. The instructions cause the controller to weight a first data at the access point to transmit the first data using the first and second antennas so that the first mobile station only receives the first data and weight a second data at the access point to transmit the second data using the first and second antennas so that the second mobile station only receives the second data.

In still another embodiment, an article comprises a computer readable storage medium storing instructions that, when executed cause a telecommunication system to create a communication node having a first and a second antenna to associate with a network to communicate data to and from a first and a second mobile station, weight a first data at the access point to transmit the first data using the first and second antennas so that the first mobile station only receives the first data and weight a second data at the access point to transmit the second data using the first and second antennas so that the second mobile station only receives the second data.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention may be understood by reference to the following description taken in conjunction with the accompanying drawings, in which like reference numerals identify like elements, and in which:

FIG. **1** illustrates a telecommunication system including a communication node (e.g., an access point) having multiple antennas for simultaneous wireless communications of corresponding data over a network to a plurality of mobile users on a downlink according to one illustrative embodiment of the present invention;

**4**

FIG. **2** illustrates a WLAN communication system including a SDMA downlink defined at least in part by IEEE 802.11 standard from the communication node (e.g., an access point) shown in FIG. **1** in accordance with one embodiment of the present invention;

FIG. **3** illustrates a stylized representation of a transmission protocol defined at least in part by IEEE 802.11 standard between a transmitter and a receiver where the transmitter transmits a MAC protocol data unit (MPDU) following listening and backoff, and in turn, the receiver transmits an acknowledgment (ACK) frame subject to a successful reception of the MPDU;

FIG. **4** illustrates a stylized representation of a flow chart implementing a method for communicating a first and a second data from a first and a second antenna at the communication node (e.g., an access point) to a first and a second mobile station on the SDMA downlink shown in FIG. **2** consistent with one embodiment of the present invention;

FIG. **5** illustrates a stylized representation for SDMA transmissions based on the IEEE 802.11 standard on the SDMA downlink shown in FIG. **2** to the first and second mobile stations with the first and second antennas at the communication node (e.g., an access point) according to one illustrative embodiment of the present invention;

FIG. **6** illustrates a stylized representation of a timing chart to initialize the SDMA downlink for the SDMA transmissions shown in FIG. **5** according to one illustrative embodiment of the present invention;

FIG. **7** illustrates a stylized representation of a timing chart that depicts overlap of two synchronization segments for simultaneous SDMA transmission of MPDUs to the first and second mobile stations during the SDMA transmissions shown in FIG. **5** in accordance with one illustrative embodiment of the present invention;

FIG. **8** illustrates a stylized representation of a timing chart to impose a time-offset between the SDMA transmitted MPDUs for the SDMA transmissions shown in FIG. **5** in accordance with one illustrative embodiment of the present invention;

FIG. **9** illustrates a stylized representation of a timing chart for channel estimation and alternating time-offset on the SDMA downlink to estimate a first radio channel associated with a reliably-recovered non-delayed first acknowledgement frame (ACK) such that identity of a user associated with the non-delayed MPDUs and ACKs be switched for successive SDMA transmissions shown in FIG. **5** consistent with an embodiment of the present invention; and

FIG. **10** illustrates a stylized representation of a timing chart for channel reservation for the SDMA transmissions shown in FIG. **5** that uses time division multiple access (TDMA) to partition a radio resource across SDMA and non-SDMA modes of the communication node (e.g., an access point) operation in accordance with an embodiment of the present invention.

While the invention is susceptible to various modifications and alternative forms, specific embodiments thereof have been shown by way of example in the drawings and are herein described in detail. It should be understood, however, that the description herein of specific embodiments is not intended to limit the invention to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equiva-

US 7,512,096 B2

5

lents, and alternatives falling within the spirit and scope of the invention as defined by the appended claims.

DETAILED DESCRIPTION OF SPECIFIC EMBODIMENTS

Illustrative embodiments of the invention are described below. In the interest of clarity, not all features of an actual implementation are described in this specification. It will of course be appreciated that in the development of any such actual embodiment, numerous implementation-specific decisions must be made to achieve the developers' specific goals, such as compliance with system-related and business-related constraints, which will vary from one implementation to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking for those of ordinary skill in the art having the benefit of this disclosure.

Generally, a communication node, e.g., an access point includes a plurality of antennas that simultaneously transmit information on a plurality to a plurality of mobile stations, e.g., laptops or wireless personal digital assistants (PDAs), in a cell over a network including a wireless local area network (WLAN). Essentially, an access point may weight a first data at the access point to transmit a first data using a first and a second antenna so that the first mobile station only receives the first data and weight a second data at the access point to transmit a second data using the first and second antennas so that the second mobile station only receives the second data. In some embodiments, advantageously the present invention may be adopted at the access point for substantially increasing a SDMA downlink throughput in an IEEE 802.11 cell such that the increase in the throughput involve no modification to IEEE 802.11 standard compliant mobile stations. For example, a near doubling of the throughput via two antennas at the access point $105a$ may be obtained. In other embodiments, the use of the present invention may reduce the overlap of the mobile station acknowledgement (ACK) bursts upon their arrival at the access point, providing increased throughputs to IEEE 802.11 mobile stations. Furthermore, a doubling of data rates using a single carrier frequency may be obtained on the SDMA downlink for the IEEE 802.11 mobile stations. In this manner, the access point may provide an improved throughput on the SDMA downlink for a WLAN network in a telecommunication system.

Referring to FIG. 1, a telecommunication system 100 includes a communication node 105 having a first antenna 110(1) and a second antenna 110(m) for a simultaneous wireless communication of data over a network including a wireless local area network (WLAN) 115 to a plurality of mobile users on a downlink 120 according to one illustrative embodiment of the present invention. In one embodiment, the communication node 105 may be an access point. For example, the access point may be a transceiver or a radio component in the WLAN 115 that operates as a transfer point between a wired and a wireless signal, and vice versa as a communication hub for users of a wireless device to connect to the WLAN 115. In other embodiment, the access point may be a base station that plugs into an Ethernet hub or to a server for a WLAN system cell, so that users may roam between access points. In another embodiment, the access point may operate as a bridge in a peer-to-peer connection.

Being an interface between a wireless mobile communication network 125 and a wired network, e.g., a local area network (LAN) 130 of the WLAN 115, in one embodiment, the communication node 105, i.e., the access point may support multiple radio cells. These cells may enable roaming of

6

a plurality of mobile devices, e.g., WLAN personal digital assistants, throughout a service area, such as in a facility. In this manner, according to one embodiment, the communication node 105 may transmit information to and receive information from mobile users to provide a service. Examples of the service include wireless data services, cellular services, Internet Protocol (IP) telephony and other communication services. Using the communication node 105, i.e., the access point, service providers may offer a full spectrum of service solutions that can address their customers' needs in provisioning services over Intranet, Extranet, and e-commerce solutions.

In operation, at the communication node 105, i.e., the access point (AP), may weight a first data 135(1) at the communication node 105 to transmit the first data 135(1) using the first and second antennas 110(1-m) so that a first mobile station (MS) 145(1) only receives the first data 135(1) over a first radio channel (CH (1)) 140(1). The communication node 105 may weight a second data 135(k) to transmit the second data 135(k) in parallel to the first data 135(1) over a second radio channel (CH(k)) 140(1) to a second mobile station (MS) 145(k) during transmission of the first data 135 (1) using the first and second antennas 110(1-m) so that the second mobile station 145(k) only receives the second data 135(k). The first mobile station 145(1) may include a first mobile antenna 147(1) to communicate with the communication node 105 and likewise, second mobile station 145(k) may include a second mobile antenna 147(k).

While an example of the first mobile station 145(1) may include a laptop computer, an example of the second mobile station 145(k) may include a wireless personal digital assistant (PDA). In one embodiment, the communication node 105 may transmit the first and said second data 135(1-k) substantially simultaneously at a same carrier frequency in a radio frequency communication. This substantially simultaneous transmission of the data 135(1-k) may increase throughput of the downlink 120 by a factor nominally equal to the number of antennas, i.e., "m", at the communication node 105 or the access point.

According to one embodiment, the communication node 105 may comprise a controller 150 and a memory 155. The memory 155 may store instructions to cause the controller 150 to weight the first data 135(1) at the communication node 105 to transmit the first data 135(1) using the first and second antennas 110(1-m) so that the first mobile station 145(1) only receives the first data 135(1). The memory 155 may further store instructions to cause the controller 150 to weight the second data 135(k) at the communication node 105 to transmit the second data 135(k) using the first and second antennas 110(1-m) so that the second mobile station 145(k) only receives the second data 135(k).

A communication interface 160 may be coupled to the controller 150 and the memory 155 to transmit the first and second data 135(1-k) substantially simultaneously. To this end, the memory 155 may further store a transmission protocol 160 and a space division multiple access (SDMA) module 170. The transmission protocol 160 may be responsible for forming data connections between the communication node 105 and the first and second mobile stations 145(1-k). The SDMA module 170 may cause the transmission protocol 160 to transmit the first data 135(1) to the first mobile station 145(1) on the downlink 120 and transmit the second data 135(k) to the second mobile station 145(k) in parallel to the transmission of the first data 135(1) on the downlink 120.

The SDMA module 170 may increase the capacity of the telecommunication system 100, e.g., a WLAN radio system by taking advantage of spatial separation between users. The

US 7,512,096 B2

**7**

communication node **105**, e.g., a base station may not transmit a transmission signal to an entire cell area, rather concentrate power of the transmission signal for parallel transmission of the first and second data **135(1**-$k$) on the downlink **120** in the direction of the first and second mobile stations **145(1**-$k$), respectively. By taking advantage of a spatial characteristic pertaining to space on Earth's surface (e.g., referring to distances, directions, areas and other aspects of space) of the first and second antennas **110(1**-$m$) at the communication node **105**, the SDMA module **170** may provide simultaneous access to multiple users, such as in radio frequency (RF) communications.

Turning now to FIG. **2**, a WLAN communication system **200** is shown to include a SDMA downlink **120**$a$ defined at least in part by the IEEE 802.11 standard from an access point **105**$a$ shown in FIG. **1** in accordance with one embodiment of the present invention. Using a multiplicity of antennas, i.e., a first and a second antenna **110**$a$(**1**-$m$), the access point **105**$a$ may transmit data including the first and second data **135(1**-$k$) in parallel (e.g., simultaneously and at a same or single carrier frequency) to multiple IEEE 802.11a/g standard compliant wireless devices, i.e., a first and a second mobile station **145**$a$(**1**-$k$) to first and a second antenna **147**$a$(**1**-$k$), respectively. In this way, the SDMA downlink **120**$a$ may effectively double the throughput of the SDMA downlink **120**$a$.

In operation, the SDMA downlink **120**$a$ may use the spatial dimension to allow discrimination among a first and a second radio frequency transmission **205(1**-$k$) at a data rate of 54 Mbits/s based on space division multiple access in the context of the IEEE 802.11 standard. The access point **105**$a$ may apply the transmission protocol **165** based on the SDMA module **170** to the first and second radio frequency transmissions **205(1**-$k$) to transmit the first and said second data **135** (**1**-$k$) substantially simultaneously from the access point **105**$a$ to the first and second mobile stations **145(1**-$k$), respectively.

To couple the access point **105**$a$ to the first and second mobile stations **145(1**-$k$) through the WLAN **115**, at least one of the access point **105**$a$, the first and second mobile stations **145(1**-$k$), and the SDMA downlink **120**$a$ may be defined at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish the network. The SDMA module **170** may estimate the first radio channel **140** (**1**) from the access point **105**$a$ to the first mobile station **145(1**) over a pilot interval and estimate the second radio channel **140(**$k$) from the access point **105**$a$ to the second mobile station **145(**$k$) over the pilot interval. A pilot interval may be a predetermined time period for transmission of a signal, either at a single frequency or several independent frequencies, for supervisory purposes including control, equalization, continuity, synchronization, or reference. For example, the access point **105**$a$ may transmit one or more pilot frequencies associated with a carrier frequency over the pilot interval.

Before starting the first and second radio frequency transmissions **205(1**-$k$) of the first and second data **135(1**-$k$) over the SDMA downlink **120**$a$, the transmission protocol **165** may be initialized. This initialization may entail exchanging one or more protocol data units, such as MAC layer protocol or packet data units (MPDUs) and one or more acknowledgement (ACK) frames between the access point **105**$a$ and the first mobile station **145(1**) and the second mobile station **145(**$k$). For example, a PDU may be a data object exchanged by the transmission protocol **165** within a given layer of a communication network protocol stack. A PDU may comprise both protocol control information and user data. Likewise, an ACK frame may be an acknowledgement portion of the transmission protocol **165** responsible for acknowledging

**8**

the receipt of a transmission. An ACK frame may be either a separate packet or a piggy back packet on reverse link traffic. An ACK frame may be sent to indicate that a block of data arrived at its destination without error. For example, an ACK frame may be used for an end-to-end flow control to verify receipt of one or more frames in a service.

As shown, FIG. **4** illustrates a stylized representation of a flow chart implementing a method for communicating the first and second data **135(1**-$k$) from the first and second antennas **110**$a$(**1**-$m$) at the access point **105**$a$ to the first and second mobile stations **145**$a$(**1**-$k$) on the SDMA downlink **120**$a$ shown in FIG. **2** consistent with one embodiment of the present invention. At block **400**, the SDMA module **170** may prepare data to communicate over the WLAN **115** between the access point **105**$a$ and the first and second mobile stations **145**$a$(**1**-$k$).

The access point **105**$a$ may weight the first data **135(1**) to transmit same using the first and second antennas **110**$a$(**1**-$m$) so that the first mobile station **145**$a$(**1**) only receives the first data **135(1**) on the SDMA downlink **120**$a$, as depicted in block **405**. Similarly, as indicated at block **410**, the access point **105**$a$ may weight the second data **135(**$k$) for transmitting the same on the SDMA downlink **120**$a$. That is, the access point **105**$a$ may transmit the second data **135(**$k$) using the first and second antennas **110**$a$(**1**-$m$) so that the second mobile station **145**$a$(**$k$**) only receives the second data **135(**$k$) during the transmission of the first data **135(1**) to the first mobile station **145**$a$(**1**) on the SDMA downlink **120**$a$, as shown in block **410**.

Referring to FIG. **5**, a stylized representation is depicted for SDMA transmissions based on the IEEE 802.11 standard over the SDMA downlink **120**$a$ shown in FIG. **2** to the first and second mobile stations **145**$a$(**1**-$k$) with the first and second antennas **110**$a$(**1**-$m$) at the access point **105**$a$ according to one illustrative embodiment of the present invention. The access point **105**$a$ may comprise a first weighter **500(1**) to weight the first data **135(1**) based on channel estimates of the first and second radio channels **140(1**-$k$) as "w1(CH (1), CH (k))." Likewise, the access point **105**$a$ may comprise a second weighter **500(**$k$) to weight the second data **135(**$k$) based on channel estimates of the first and second radio channels **140** (**1**-$k$) as "wk (CH (1), CH (k))."

In operation, the weighted first and second data **135**$a$(**1**-$k$) may be transmitted by both the antennas **110**$a$(**1**-$k$) at the access point **105**$a$ over the associated first and second radio channels **140(1**-$k$) to the first and the mobile stations **145**$a$(**1**-$k$) for selective reception. The MAC layer protocol or packet data units, MPDU (**1**-$k$), and the acknowledgement (ACK) frames, ACK (**1**-$k$) may be exchanged between the access point **105**$a$ and the first mobile station **145**$a$(**1**) and the second mobile station **145**$a$(**$k$**), respectively.

For simultaneous and co-channel transmission of independent data to the first and second mobile stations **145**$a$(**1**-$k$), respectively, the access point **105**$a$ may obtain up-to-date estimates of the first and second radio channels **140(1**-$k$) from the access point **105**$a$ to the first and second mobile stations **145**$a$(**1**-$k$), respectively. That is, for the SDMA transmissions of the weighted first and second data **135**$a$(**1**-$k$) to the first and second mobile stations **145**$a$(**1**-$k$), respectively, with two (or more) antennas, i.e., the first and second antennas **110**$a$(**1**-$m$) at the access point **105**$a$, an initialization procedure for the SDMA downlink **120**$a$, as shown in FIG. **2**, based, at least in part, on the IEEE 802.11 standard may be initiated.

Referring to FIG. **6**, a stylized representation of a timing chart is illustrated to initialize the SDMA downlink **120**$a$ for the SDMA transmissions shown in FIG. **5** according to one illustrative embodiment of the present invention. To this end,

US 7,512,096 B2

9

a "SDMA initialization" procedure is initiated prior to commencement of a SDMA mode of operation at the access point 105$a$. In one embodiment, this "SDMA initialization" procedure involves that:

(i). The access point 105$a$ may transmit an MPDU to the first mobile station 145$a$(1) using equal weights at each antenna of the first and second antennas 110$a$(1-$m$).

(ii). Upon successful reception of the MPDU, the first mobile station 145$a$(1) may respond with an ACK frame burst. The access point 105$a$ may use a pilot segment of the received ACK frame to compute a fresh estimate of the first radio channel 140(1).

(iii). The access point 105$a$ may transmit an MPDU to the second mobile station 145$a$(k) using equal weights at each antenna of the first and second antennas 110$a$(1-$m$).

(iv). Upon successful reception of the MPDU, the second mobile station 145$a$(k) may respond with an ACK frame burst. The access point 105$a$ may use the pilot segment of the received ACK frame to compute a fresh estimate the second radio channel 140($k$).

(v). Channel estimates of the first and second radio channels 140(1-$k$) may then be used for SDMA transmissions, by the access point 105$a$, of the two independent MPDUs to the first and second mobile stations 145$a$(1-$k$), respectively.

An unsuccessful reception of the MPDUs or ACK frames at any stage (i) to (iv) would indicate that the radio conditions are unsuitable for the SDMA transmissions for the first and second mobile stations 145$a$(1-$k$) at this time. As a result, the current SDMA initialization procedure may then be abandoned, and a new SDMA initialization procedure may be commenced for a different pair of mobile stations.

Turning now to FIG. 7, a stylized representation of a timing chart is illustrated that depicts overlap of two synchronization segments for simultaneous SDMA transmissions of MPDUs to the first and second mobile stations 145$a$(1-$k$) during the SDMA transmissions shown in FIG. 5 in accordance with one illustrative embodiment of the present invention. A simultaneous SDMA transmission of MPDUs (MPDU 1 and MPDU k) to the first and second mobile stations 145$a$(1-$k$) may result in each mobile responding, after a period of time called SIFS, such as 16 $\mu$s, with an ACK burst. However, the two ACK bursts (ACK 1 frame and ACK k frame) may substantially overlap in time and mutually interfere upon arrival at the access point 105$a$. Each ACK burst may comprise a synchronization (S), pilot (P) and data segments. Apart from confirming a successful reception of the MPDUs, the pilot segments of the ACK bursts may be used to derive fresh channel estimates of the first and second radio channels 140(1-$k$) in preparation for the next SDMA transmissions. While the overlap of the two pilot segments may severely impede channel estimation, the overlap of the two synchronization segments may also severely degrade synchronization, as depicted in FIG. 7.

To this end, FIG. 8 illustrates a stylized representation of a timing chart to impose a time-offset ($T_o$) between the SDMA transmitted MPDUs (MPDU 1 and MPDU k) for the SDMA transmissions shown in FIG. 5 in accordance with one illustrative embodiment of the present invention. The time-offset, $T_o$, between the SDMA transmitted MPDUs (MPDU 1 and MPDU k) may result in a similar time-offset in the ACK responses (ACK 1 frame and ACK k frame) of the first and second mobile stations 145$a$(1-$k$). This time-offset reduces the interference between the two ACK frames, in particular during the critical synchronization and pilot intervals of the ACK 1 frame. Ideally, in one embodiment, a maximum value of this time-offset is 16 $\mu$s with no simultaneous transmission (Tx) and reception (Rx) at the access point 105$a$ or the first

10

and second mobile stations 145$a$(1-$k$). However, to account for finite Tx/Rx switching times, a time-offset of 12 $\mu$s is used, as depicted in FIG. 8.

Consistent with one embodiment, the ACK responses (ACK 1 frame and ACK k frame) may be recovered via interference cancellation at the access point 105$a$. Specifically, the two partially overlapping ACK bursts may be recovered via a procedure described below.

i) Sample a received signal (e.g., at a Nyquist rate) synchronously with respect to the ACK 1 frame symbols. Synchronization may be achieved via the synchronization segment of ACK 1 frame.

ii) Compute an over-sampled replica of a filtered second radio channel 140($k$) synchronization and pilot segments of the ACK 2 frame, with samples synchronous with respect to the ACK 2 frame symbols.

iii) Compute the contribution of the synchronization and pilot segments of the ACK 2 frame to the Nyquist-sampled received signal, e.g., by searching for the appropriate Nyquist-sampled polyphase component of the over-sampled signal and an associated appropriate time-offset.

iv) Subtract the contribution of the synchronization and pilot segments of the ACK 2 frame at stage (iii) from the Nyquist-sampled received signal at stage (i). This results in a "cleaned-up" Nyquist-sampled received signal with contributions from the ACK 1 frame only.

v) Estimate the ACK 1 frame symbols via conventional beam-forming using the first radio channel 140(1) estimates derived from previous ACK frames. If the detected ACK 1 frame symbols are in error, then the corresponding SDMA packet is lost.

vi) Over-sample the received signal and create an over-sampled replica of a filtered first radio channel 140(1) ACK 1 frame.

vii) Subtract the over-sampled replica of the ACK 1 frame from the over-sampled received signal and select the appropriate Nyquist-sampled polyphase component based on the result derived in stage (iii). This results in a "cleaned-up" Nyquist-sampled received signal with contributions from the ACK 2 frame only.

viii) Estimate the ACK 2 frame symbols by applying a conventional beam-forming to the result of stage (vii) using the second radio channel 140($k$) estimates derived from previous ACK frames.

In this manner, both the first and second radio channels 140(1-$k$) may be estimated via the "cleaned" ACK frames at the output of a detector. However, since a non-delayed ACK 1 frame may be cleaned with a relatively more reliability than a delayed ACK 2 frame, the estimate of the first radio channel 140(1) derived from the ACK 1 frame may be a relatively more reliable than the estimate of the second radio channel 140($k$) derived from the ACK 2 frame.

One of the reasons for this difference in channel estimates is that while pilot symbols are generally transmitted on all 52 OFDM sub-carriers, according to the IEEE 802.11 specifications, synchronization symbols are generally transmitted only on 12 (roughly equi-spaced) sub-carriers out of the total of 52 OFDM sub-carriers. This means that the synchronization segment of the ACK 2 frame may interfere only with 12 sub-carriers of the pilot segment of the ACK 1 frame. In contrast, the 52 sub-carriers of the data segment of the ACK 1 frame may interfere with all 52 sub-carriers of the pilot segment of the ACK 2 frame. However, a poor quality of the second radio channel 140($k$) estimates may have a severe impact on a successful application of the SDMA module 170 shown in FIG. 1 to the transmission protocol 165.

US 7,512,096 B2

**11**

According to one exemplary embodiment of the present invention, FIG. 9 illustrates a stylized representation of a timing chart for channel estimation and alternating time-offset on the SDMA downlink 120a to estimate the first radio channel 140(1) associated with a reliably-recovered non-delayed first acknowledgement frame (ACK 1) such that identity of a user associated with the non-delayed MPDUs and ACK frames be switched for successive SDMA transmissions shown in FIG. 5. Using channel estimation and alternating time-offset, the above issue of difference in channel estimates may be addressed by estimating only the first radio channel 140(1) associated with the reliably-recovered non-delayed ACK 1 frame. The identity of the user associated with the non-delayed MPDUs and ACK frames may then be switched for successive SDMA transmissions. This technique of channel estimates is depicted in FIG. 9 for the first and second mobile stations 145a(1-k), shown as mobiles A and B.

As illustrated above, estimation of the first radio channel 140(1) via the pilot segment of the ACK 1 frame is subject to interference from the strong synchronization or overlap segment of the ACK 2 frame. This interference may result in inadequate estimates of the first radio channel 140(1), subsequently affecting the recovery of the ACK frame. In one embodiment, the quality of the channel estimates may be improved by exploiting the characteristics of the synchronization (S) segment.

More specifically, while pilot symbols are generally transmitted on all 52 OFDM sub-carriers, according to the IEEE 802.11 specifications, synchronization symbols are transmitted only in 12 (roughly equi-spaced) sub-carriers out of the total of 52 OFDM sub-carriers. This means that the synchronization segment of the ACK 2 frame may interfere only with 12 sub-carriers of the pilot segment of the ACK 1 frame. Thus, the remaining 40 sub-carriers of the pilot segment of the ACK 1 frame may be uncorrupted. This feature may be used to improve the quality of the first radio channel 140(1) estimates by avoiding the use of the corrupted ACK 1 frame pilot symbols on the 12 sub-carriers.

As examples, two different techniques are described below. A first technique for channel estimates involves interpolation in the frequency domain. In the first technique, to compute estimates of the first radio channel 140(1) at the corresponding sub-carrier frequencies, the pilot symbols of the ACK 1 frame transmitted on the 40 uncorrupted sub-carriers may be used. Due to the absence of interference from the synchronization segment of the ACK 2 frame at these sub-carriers, a relatively higher quality of channel estimates may be obtained. Using the computed channel estimates interpolation in the frequency domain may be applied to compute estimates of the first radio channel 140(1) at the 12 remaining sub-carriers.

A second technique for channel estimates involves channel estimation via synchronization symbols. Again, by using the pilot symbols of the ACK 1 frame transmitted on the 40 uncorrupted sub-carriers, channel estimates of the first radio channel 140(1) may be computed at the corresponding sub-carrier frequencies. Due to the absence of interference from the synchronization segment of the ACK 2 frame at these sub-carriers, a significantly better quality of channel estimates may be obtained. By using the strong synchronization symbols of the ACK 1 frame (rather than the pilot symbols), channel estimates of the first radio channel 140(1) may be computed at the 12 remaining sub-carriers. The synchronization segment of the ACK 1 frame may not at all overlap with the ACK 2 frame, resulting in a relatively higher quality channel estimates.

**12**

In scenarios where a sequence of the SDMA transmissions on the SDMA downlink 120a may be interrupted by other IEEE 802.11 mobiles or access points contending for a same channel, a reservation process may be performed via the point coordination function (PCF) specified in the IEEE 802.11 standard. As a result, an SDMA initialization process would not be initiated every interruption. Thus, any associated overhead with an interruption would not impact the throughput gains achieved by the relatively higher quality channel estimates on the SDMA downlink 120a.

To this end, FIG. 10 illustrates a stylized representation of a timing chart for channel reservation for the SDMA transmissions shown in FIG. 5 that uses time division multiple access (TDMA) to partition a radio resource across SDMA and non-SDMA modes of the communication node (e.g., an access point) operation in accordance with one illustrative embodiment of the present invention. The non-SDMA mode may represent a conventional IEEE 802.11 mode that services uplink (UL)/downlink (DL) real-time traffic. When the access point 105a contends for the SDMA mode, the access point 105a reserves a channel for the SDMA mode. The SDMA downlink 120a may carry non-real-time traffic for multiple mobile pairs since many scheduling options may be possible. A reservation interval may depend upon the mix of traffic, for example, 5-10 ms may allow efficient SDMA transmissions on the SDMA downlink 120a. Upon completion of the SDMA mode, the access point 105a may release the channel and revert back to conventional IEEE 802.11 non-SDMA mode, servicing remaining uplink (UL)/downlink (DL) real-time traffic.

In some embodiments, advantageously the present invention may be adopted at the access point 105a for substantially increasing the SDMA downlink 120a throughput in an IEEE 802.11 cell such that the increase in the throughput involve no modification to IEEE 802.11 standard compliant mobile stations. For example, a near doubling of the throughput via two antennas at the access point 105a may be obtained. In other embodiments, the use of the present invention may avoid the overlap of the mobile station acknowledgement (ACK) bursts upon their arrival at the access point 105a, providing increased throughputs to IEEE 802.11 mobile stations. Furthermore, a doubling of data rates using a single carrier frequency may be obtained on the SDMA downlink 120a for the IEEE 802.11 mobile stations.

While the invention has been illustrated herein as being useful in a telecommunications network environment, it also has application in other connected environments. For example, two or more of the devices described above may be coupled together via device-to-device connections, such as by hard cabling, radio frequency signals (e.g., 802.11(a), 802.11(b), 802.11(g), Bluetooth, or the like), infrared coupling, telephone lines and modems, or the like. The present invention may have application in any environment where two or more users are interconnected and capable of communicating with one another.

Those skilled in the art will appreciate that the various system layers, routines, or modules illustrated in the various embodiments herein may be executable control units. The control units may include a microprocessor, a microcontroller, a digital signal processor, a processor card (including one or more microprocessors or controllers), or other control or computing devices as well as executable instructions contained within one or more storage devices. The storage devices may include one or more machine-readable storage media for storing data and instructions. The storage media may include different forms of memory including semiconductor memory devices such as dynamic or static random

US 7,512,096 B2

13

access memories (DRAMs or SRAMs), erasable and programmable read-only memories (EPROMs), electrically erasable and programmable read-only memories (EEPROMs) and flash memories; magnetic disks such as fixed, floppy, removable disks; other magnetic media including tape; and optical media such as compact disks (CDs) or digital video disks (DVDs). Instructions that make up the various software layers, routines, or modules in the various systems may be stored in respective storage devices. The instructions, when executed by a respective control unit, causes the corresponding system to perform programmed acts.

The particular embodiments disclosed above are illustrative only, as the invention may be modified and practiced in different but equivalent manners apparent to those skilled in the art having the benefit of the teachings herein. Furthermore, no limitations are intended to the details of construction or design herein shown, other than as described in the claims below. It is therefore evident that the particular embodiments disclosed above may be altered or modified and all such variations are considered within the scope and spirit of the invention. Accordingly, the protection sought herein is as set forth in the claims below.

We claim:

1. A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:

weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and

weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;

increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;

discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;

applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;

defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;

coupling said access point to said first and second mobile stations through said wireless local area network;

estimating a first radio channel from said access point to said first mobile station over a pilot interval; and

estimating a second radio channel from said access point to said second mobile station over said pilot interval.

2. A method, as set forth in claim 1, further comprising:

initializing said transmission protocol before starting said transmissions of said first and second data over said downlink.

3. A method, as set forth in claim 2, wherein initializing said transmission protocol further comprising:

exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station.

14

4. A method, as set forth in claim 3, wherein initializing said transmission protocol further comprising:

offsetting transmission of a first protocol data unit of said one or more protocol data units from said access point to said first mobile station relative to transmission of a second protocol data unit of said one or more protocol data units from said access point to said second mobile station by a predetermined time.

5. A method, as set forth in claim 3, wherein initializing said transmission protocol further comprising:

shifting transmission of said first data relative to transmission of said second data; and

canceling an interference based on synchronization between a first and a second acknowledgement frame of said one or more acknowledgement frames at said access point to recover said first acknowledgement frame that at least partially overlaps said second acknowledgement frame based on the shifted transmissions of said first and second data.

6. A method, as set forth in claim 5, further comprising:

re-estimating said first radio channel associated with the recovered said first acknowledgement frame.

7. A method, as set forth in claim 6, further comprising:

receiving one or more pilot symbols and one or more synchronization symbols of said first acknowledgement frame on a set of uncorrupted sub-carriers of a multiplicity of sub-carriers;

computing estimates of said first radio channel at the uncorrupted sub-carrier frequencies based on at least one of the pilot symbols and the synchronization symbols of said first acknowledgement frame received on the multiplicity uncorrupted sub-carriers; and

computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies.

8. A method, as set forth in claim 7, wherein computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies further comprises:

applying interpolation in a frequency domain based on the computed channel estimates to compute estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers.

9. A method, as set forth in claim 7, wherein computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies further comprises:

computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers based on the synchronization symbols of said first acknowledgement frame.

10. A method, as set forth in claim 3, further comprising:

using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and

reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.

11. A method, as set forth in claim 3, wherein initializing said transmission protocol further comprises:

delaying transmission of a first one of the protocol data units from said access point to said first mobile station

US 7,512,096 B2

15

relative to transmission of a second one of the protocol data units from said access point to said second mobile station by a predetermined time during a first period of operation; and

delaying transmission of a third one of the protocol data units from said access point to said second mobile station relative to transmission of a fourth one of the protocol data units from said access point to said first mobile station by a predetermined time during a second period of operation.

**12**. A method, as set forth in claim **3**, wherein initializing said transmission protocol further comprises:

16

alternately delaying transmissions of the protocol data units from the access point to the first and second mobile stations, respectively.

**13**. A method, as set forth in claim **3**, wherein initializing said transmission protocol further comprises:

transmitting the protocol data units to the first and second mobile stations in a first preselected order during a first period of time and a second preselected order during a second period of time.

\* \* \* \* \*

# **Exhibit 2**

US007551630B2

## (12) United States Patent
### De Boeck

(10) **Patent No.:** **US 7,551,630 B2**
(45) **Date of Patent:** **Jun. 23, 2009**

(54) **ROUTER TO ROUTE PACKETS**

(75) Inventor: **Hendrik Jan Rosalie De Boeck**, Londerzeel (BE)

(73) Assignee: **Alcatel**, Paris (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 858 days.

(21) Appl. No.: **10/863,275**

(22) Filed: **Jun. 9, 2004**

(65) **Prior Publication Data**

US 2005/0002377 A1      Jan. 6, 2005

(30) **Foreign Application Priority Data**

Jun. 13, 2003      (EP) .................................. 03291427

(51) **Int. Cl.**
**H04L 12/28**      (2006.01)
(52) **U.S. Cl.** ...................................... **370/401**; 370/419
(58) **Field of Classification Search** ......... 370/229–235, 370/351, 389, 392, 401, 402, 232, 359, 395.5, 370/411, 419; 709/238, 249
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,970,426 B1 * 11/2005 Haddock ................. 370/235.1
7,027,395 B2 * 4/2006 Elloumi et al. .............. 370/231

2002/0012348 A1 * 1/2002 Mizuhara et al. ............ 370/392
2002/0089931 A1   7/2002 Takada et al.
2003/0081624 A1 * 5/2003 Aggarwal et al. ........... 370/412
2004/0100901 A1 * 5/2004 Bellows ...................... 370/230
2004/0125796 A1 * 7/2004 Reader ...................... 370/359

* cited by examiner

*Primary Examiner*—Brenda Pham
(74) *Attorney, Agent, or Firm*—Sughrue Mion, PLLC

(57)      **ABSTRACT**

A router for routing packets in a telecommunication network is provided. The router comprises a plurality of inputs for receiving packets and a common processor coupled to the inputs for processing at least part of the packets i.e. the control packets according to one or more routing protocols. At least one packet marker is coupled between a first plurality of inputs of the plurality of inputs and the common processor. The marker marks at least part of the incoming control packets. The marking is provided according to a receiving rate of control packets that are received at the first plurality of inputs and that are to be processed according to a first routing protocol. The incoming control packets are received at one of the first plurality of inputs and are processed according to the first routing protocol. The marker therefore provides marked control packets. The common processor comprises a discarder for discarding or dropping, before the processing of the control packets, one or more of the marked control packets. The discarding is based upon the kind of marking of the marked control packets and is provided according to predefined rules and conditions.

**15 Claims, 1 Drawing Sheet**





Figure 1

US 7,551,630 B2

1

## ROUTER TO ROUTE PACKETS

The present invention relates to a router to route packets, and to a telecommunication network that comprises such a router and to a method to route packets to be executed by such a router.

Such a router is already known in the art. Indeed, a router for routing packets in a telecommunication network usually comprises a plurality of inputs for receiving the packets.

It has to be explained that the received packets in a telecommunication network are two kinds of packets. The first kind is called the transit traffic. These are data packets that are not leaving the forwarding path. The second kind of packet is called the control traffic. These packets comprise the required control data to create the required forwarding path and might possibly be adapted. The control packets are routed to a processor called hereafter, common processor.

It has to be clear that the present invention is dealing with this second kind of control packets that are called hereafter shortly 'packets' since only these packets are to be routed from the different inputs to the common processor in order to be processed by this common processor. In the event when this application describes a data packet that only has to follow the forwarding data-path, it will be mentioned explicitly.

The control packets received by the common processor are processed by the common processor according to its specific routing protocol such as e.g. the Border Gateway Protocol or shortly BGP protocol, the Protocol Independent Multicast or shortly the PIM protocol, the Open Shortest Path First protocol or shortly OSPF protocol, the Label Distribution Protocol or shortly the LDP protocol or in order to be general a protocol called shortly PROTn.

It has to be explained that the control packets are received at the different inputs with a certain receiving rate. In the event when this receiving rate exceeds a predefined receiving rate, the processing capacity of the common processor might as well be exceeded. In such a case, the common processor is not able to process all received packets anymore. According to prior art solutions, received control packets need to be dropped in order to relieve the common processor.

Such a dropping of received control packets is provided by prior art solutions at the different inputs. According to this prior art solution, a buffer that is coupled to the different inputs is used to buffer the received packets. It has to be remarked that, the part of the data-path that comprises the common processor and its associated buffer is called hereafter the common control-point. In the event when the filling level of the buffer exceeds a predefined buffer threshold the different inputs of the router will drop the next received control packets according to a random sequence or according to a one-by-one sequence. It has to be explained that the predefined threshold of the buffer is defined at design time of the router based on the known processing capacity of the common processor. This dropping step is executed during a predefined period or until the filling level is again below the threshold.

Another way of dropping control packets in order to relieve the common processor is dropping packets or also called hereafter discarding packets at the common control point itself. At the common control point the received control packets coming from the different inputs are dropped until the common processor is able to follow the receiving rate again.

It has to be explained that the packets are dropped regardless of the content of the different packets. Such a straightforward discarding of excess traffic at the common control point protects the common processor from a too high load but doesn't guarantee that only packets from the violating stream

2

are throttled. Indeed, dropping packets randomly impacts streams running at a very low rate such as keep-alive traffic, too. In this way, the minimum number of packets that is needed to keep these other services running doesn't reach the application and are interpreted as a timeout from the remote peers. The remote peers are closed and the services are stopped.

An object of the present invention is to provide a router to execute a routing method, of the above known type, to relieve the common processor of the common control point in the event of an excess of incoming control packets to be processed by the common processor.

According to the invention, this object is achieved with the router of claim **1** and the routing method of claim **2**.

Indeed, in order to realize this object, the router comprises at least one control packet marker that is coupled to a first subset of inputs and the common processor. The marker is comprised for marking incoming control packets according to a receiving rate of control packets that are received at this subset of inputs and that are moreover to be processed according to a first routing protocol e.g. the BGP protocol. The incoming control packets that are to be marked are received at one of this subset of inputs and are also to be processed according to this first routing protocol. The marker provides hereby marked control packets. Furthermore, at the common control point, the common processor comprises a discarder for discarding control packets before the control packets are to be processed by the common processor. The discarding of the control packets is based on the kind of marking of the marked control packets and on predefined rules and conditions.

So, due to the marking of the incoming control packets based on the stream it belongs to, in times of high load, only those control packets are dropped by the discarder at the common processor which are marked as excess traffic and which have to be dropped according to the predefined rules and conditions such as e.g. an implementation of RED. This doesn't imply that all packets being marked as excess traffic needs to be dropped. Indeed, only those packets which are marked and wherefore the implemented algorithm generates a drop decision, needs to be discarded.

The marking of packets is also called coloring of packets. This means that the packets are marked according to a predefined color code e.g. green in the event of no excess traffic, yellow in the event of minor excess traffic and red in the event of highly excess traffic.

The marking is defined in function of the receiving rate of control packets being received at an identical subset of inputs and being to be processed by the common processor according to an identical protocol. This means that when e.g. two control packets, which are received at one of the inputs of a same subset but which ought to be processed by the common processor according to different protocols, are taking part in the determination of different receiving rates of control packets. Although both packets are received at one of the inputs of a same subset of inputs, one control packet is counted for keeping track of the receiving rate for the first protocol and the other control packet is counted for keeping track of the receiving rate for the second protocol.

On the other hand, when two control packets are to be processed by the common processor under the same protocol rules e.g. OSPF protocol, but both packets are received at one of an input of different subsets of inputs, both packets are counted for keeping track of different receiving rate of packets. So, a stream of control packets which are taken into account for keeping track of the same receiving rate of control

US 7,551,630 B2

**3**

packets, is defined as a packet flow belonging to the same protocol and the same subset of incoming interfaces i.e. inputs.

The aim of the present invention is the co-operation between the ingress i.e. the different subsets of inputs and the common control point i.e. the discarding at the common processor.

It is to be noticed that the term 'comprising', used in the claims, should not be interpreted as being limitative to the means listed thereafter.

Thus, the scope of the expression 'a device comprising means A and B' should not be limited to devices consisting only of components A and B. It means that with respect to the present invention, the only relevant components of the device are A and B.

Similarly, it is to be noticed that the term 'coupled', also used in the claims, should not be interpreted as being limitative to direct connections only. Thus, the scope of the expression 'a device A coupled to a device B' should not be limited to devices or systems wherein an output of device A is directly connected to an input of device B. It means that there exists a path between an output of A and an input of B which may be a path including other devices or means.

The above and other objects and features of the invention will become more apparent and the invention itself will be best understood by referring to the following description of an embodiment taken in conjunction with the accompanying drawings wherein FIG. 1 represents a router according to the present invention.

The working of the device according to the present invention in accordance with its telecommunication environment that is shown in figure 1 will be explained by means of a functional description of the different blocks shown therein. Based on this description, the practical implementation of the blocks will be obvious to a person skilled in the art and will therefore not be described in details. In addition, the principle working of the routing method according to the present invention will be described in further detail

FIG. 1 describes a router ROUT for routing packets in a telecommunication network. The router ROUT comprises a plurality of inputs IN**11**, IN**12**, IN**13**, . . . , IN**1p**, IN**21**, IN**22**, IN**23**, IN**2p**, IN**q**, IN**q2**, IN**q3**, . . . , IN**qp**. Furthermore the router ROUT comprises a plurality of network processors NP**1**, NP**2**, . . . , NPm each coupled to a subset of inputs and to a common processor CP of the router ROUT.

The common processor CP comprises a Central Processing Unit CPU and a discarder DIS(RED). The discarder DIS is coupled to an input of the common processor CP that is coupled to the different network processors NPqp and the Central Processing Unit is coupled to the discarder DIS.

It has to be remarked that once the packets are processed by the central processor, the network processors are able to clear their forwarding data-path and are able to receive new control packets. However this goes beyond the aim of the present invention.

Hereby it becomes clear that FIG. 1 shows only the traffic in the router ROUT of the control packets towards the common control point. It is to be noticed that the traffic of the data packets i.e. first kind of packets explained above, is not shown in order not to overload the Figure.

The network processors NP**1**, NP**2**, . . . , NPm each comprises a plurality of marking-sets such as M**11**, M**12**, . . . , M**1q** on the network processor NP**1**.

Each marking-set such as M**11**, M**12**, . . . and M**1Q** comprises a marker such as M_BGP, M_PIM, . . . and M_PROTn for each protocol that can be handled by the common proces-

**4**

sor CP. In this way comprises each marking-set e.g. M**12** a plurality of markers M**12**(M_BGP), M**12**(M_PIM), . . . and M**12**(M_PROTn).

The inputs are physical sorted in different kind of subsets.

A first division is the division of the plurality of inputs according to the different network processors NP**1**, NP**2**, . . . , NPm. Each input of the plurality of inputs of the router ROUT is an interface to one of the network processors. In this way one or more inputs IN**11**, IN**12**, IN**13**, . . . , IN**1p** of the plurality of inputs IN**11**, IN**12**, IN**13**, . . . , IN**1p**, IN**21**, IN**22**, IN**23**, . . . , IN**2p**, IN**q1**, IN**q2**, IN**q3**, . . . , IN**qp**, are coupled to the first network processor NP**1**; and one or more inputs of the plurality of inputs are coupled to the second network processor NP**2**; . . .

A second division of inputs is the division of all inputs coupled to a same network processor into subsets of inputs according to a set of markers e.g. M**11**. In this way a first subset of inputs or also called a first plurality of inputs is IN**11**, IN**12** and IN**13**. This first subset of inputs IN**11**, IN**12** and IN**13** is associated to a first set of markers M**11**(M_BGP), M**11**(M_PIM), . . . , M**11**(M_PROTn) being comprised in the marking-set M**11**.

Hereby is a stream of packets defined as all packets received by the router ROUT

a) via one subset or called a first plurality of inputs e.g. subset IN**14**, IN**15**, IN**16** and IN**17** which are associated to one marking-set e.g. M**12**; and

b) wherefore a same routing protocol e.g. PIM is to be used by the common processor CP.

In this way the marker M**12**(M_PIM) uniquely associated to the stream of packets of the above example i.e. the stream of packets received via one of the inputs IN**14**, IN**15**, IN**16** and IN**17**; and wherefore the PIM protocol is to be used by the common processor CP.

Upon reception of an incoming packet at one of the inputs of the router ROUT, and during the determination of the required service related to the packet also the target common processor CP is determined. It has to be remarked here that although the description of this embodiment describes the presence of only one common processor CP in the router ROUT, the present invention is not limited to application with only one common processor CP in a router ROUT. According to such an implementation, the router ROUT comprises a determining functional block in order to determine upon reception of an incoming packet at one of the inputs of the router ROUT the associated common processor to process this control packet. It has to be understood that in the event of such an implementation excess traffic for one common processor is handled according to an application of the present invention and excess traffic for a second common processor is handled according to a second time the application of the present invention.

The protocol to be used for the processing of the control packet is determined upon reception of the control packet at the input of the router ROUT. Based on this kind of protocol the stream of packets whereto the received control packet belongs to is also determined. Furthermore, the uniquely associated marker of this stream of packets is also determined. The control packet is forwarded from the input of the router ROUT to the uniquely associated marker of the control packet.

It has to be explained that it is preferred for this particular description of an embodiment to encode the receiving rate in a color field. Every marker e.g. M**11**(M_BGP) comprises a color-blind two-rate three-color marker. It has to be remarked that other kind of markers might be implemented in the different functional block markers of the present invention. The

US 7,551,630 B2

**5**

kind of marker used to mark the incoming control packets goes beyond the aim of the present invention. The aim of the present invention is the fact that the control packets are marked in function of a receiving rate of the control packet stream whereto this control packet belongs.

It is preferred for this particular embodiment to execute a periodic sampling of the marker in a period of one second. The first number of received control packet bytes is marked green, the next up to a second number are marked yellow and the remainder re marked red.

A preferred embodiment of the present application comprises also a dropper (not shown in the FIG. 1) at the ingress level. Any colored red packet is immediately discarded at the ingress. Such a functional block that drops excess control packets at the ingress of the router ROUT is already known in the art. Indeed, as described above, received control packets needs to be dropped in order to relieve the common processor. However, according to the implementation of this preferred embodiment the control packets are first colored at the ingress level of the router ROUT. Hereafter the colored packets are forwarded to a dropper also called a discarder. This dropper is enabled to drop the colored control packets being colored with the color red immediately. The green and yellow packets from every network processor are further forwarded to the common control point i.e. to the common processor CP.

The discarder DIS of the common processor CP first receives the green and yellow packets. This discarder DIS drains the packets to the central processing unit CPU at a predefined draining rate. This predefined draining rate can be implemented as a constant value or can as well be defined as a variable parameter.

The installed discarding algorithm i.e. discarding according to the marking and according to predefined rules and conditions will now be explained by means of an example. Presume an actual situation whereby the above mentioned predefined draining rate is lower as the actual arrival rate at the discarder DIS of the green and yellow control packets. In such an event the buffer i.e. the queue of the common control point starts filling. From a certain filling level of the buffer a discarding algorithm is applied. For this particular embodiment it is preferred to use the known Random Early Detection mechanism or shortly called RED. The RED algorithm is applied to the yellow marked packets. The 100% drop rate for the yellow packets occurs when the filling level keeps on increasing. Green packets are not to be discarded.

No packets are dropped during normal operation although some traffic might be colored yellow during reception of some bursty traffic.

So, at the time when the common control point gets overwhelmed by an excess of control traffic i.e. reception of too much control packets during a same period, the common processor CP has still enough information based upon the different colors of the control packets to discard/drop only violating packet streams. The other services i.e. the other control packet streams will keep on receiving a guaranteed minimum flow.

The present invention provides due to the presence of the marking step at the ingress of the router ROUT and due to the step of discarding based upon this marking at the common control point of the router ROUT an improved behavior during e.g. Denial of Service attacks or shortly DoS attacks and a guaranteed performance of the central processing unit CPU of the common processor CP at the common control point.

It has to be remarked that the mentioned protocols such as BGP, PIM, OSPF and LDP are only mentioned as a matter of example. It is clear to a person skilled in the art that other

**6**

protocols might be used by the processor to process the control packets and that, with minor changes, the above description of an embodiment might be adapted to a router ROUT for routing control packets which is enabled to receive control packets and to process with its common processor CP these control packets that belong to a stream of control packets that applies another routing protocol.

A final remark is that embodiments of the present invention are described above in terms of functional blocks. From the functional description of these blocks, given above, it will be apparent for a person skilled in the art of designing electronic devices how embodiments of these blocks can be manufactured with well-known electronic components. A detailed architecture of the contents of the functional blocks hence is not given.

While the principles of the invention have been described above in connection with specific apparatus, it is to be clearly understood that this description is made only by way of example and not as a limitation on the scope of the invention, as defined in the appended claims.

The invention claimed is:

**1**. A router for routing packets in a telecommunication network, said router comprises a plurality of inputs for receiving said packets and a common processor (CP) coupled to said plurality of inputs for processing at least part of said packets according to one or more routing protocols, wherein said router comprises at least one packet marker (M11 (M_BGP)), coupled between a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and said common processor (CP), for marking incoming control packets of said at least part of said packets, according to a receiving rate of control packets received at said first plurality of inputs (IN11, IN12, IN13) and to be processed according to a first routing protocol, said incoming control packets being received at one of said first plurality of inputs (IN11, IN12, IN13) and to be processed according to said first routing protocol, said marker (M11(M_BGP)) provides thereby marked control packets; and said common processor (CP) comprises a discarder (DIS) for discarding, before said processing, one or more of said marked control packets according to said marking and according to predefined rules and conditions.

**2**. A routing method to route packets in a telecommunication network, comprising the steps of:

receiving said packets by a plurality of inputs of said router; and processing at least part of said packets according to one or more routing protocols by a common processor (CP) coupled to said plurality of inputs, wherein said routing method further comprises a step of marking incoming control packets of said at least part of said packets by a packet marker (M11(M_BGP)) according to a receiving rate of control packets received at a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and to be processed according to a first routing protocol and providing thereby marked control packets, said incoming control packets being received at one (IN12) of a first plurality (IN11, IN12, IN13) of said plurality of inputs and to be processed according to said first routing protocol; and said routing method further comprises, before said step of processing, a step of discarding by a discarder (DIS) associated to said common processor (CP) one or more of said marked control packets according to said marking and according to predefined rules and conditions.

**3**. A telecommunication network that comprises a router for routing packets, wherein said router is a router according to claim **1**.

US 7,551,630 B2

7

**4**. A router according to claim **1**, wherein said router comprises a plurality of common processors each for processing a different part of said packets, each common processor including a respective discarder for discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions.

**5**. A router according to claim **1**, wherein said packet marker comprises a color-blind two-rate three-color marker.

**6**. A router according to claim **1**, wherein each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs.

**7**. A router according to claim **1**, wherein said marker designates a first number of control packets received within a predetermined period of time with a first designation, a second number of control packets received after said first number of packets during said predetermined period of time with a second designation, and a third number of control packets received after said second number of packets during said predetermined period of time with a third designation.

**8**. A router according to claim **7**, wherein control packets with said third designation are immediately discarded.

**9**. A router according to claim **8**, wherein said discarder discards packets with said second designation when a number of control packets waiting to be processed reaches a predetermined level.

8

**10**. A method according to claim **2**, wherein there are a plurality of common processors each for processing a different part of said packets, said method comprising the step of discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions separately for each control processor.

**11**. A method according to claim **2**, wherein said packet marker comprises a color-blind two-rate three-color marker.

**12**. A method according to claim **2**, wherein each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs.

**13**. A method according to claim **2**, wherein said marker designates a first number of control packets received within a predetermined period of time with a first designation, a second number of control packets received after said first number of packets during said predetermined period of time with a second designation, and a third number of control packets received after said second number of packets during said predetermined period of time with a third designation.

**14**. A method according to claim **13**, wherein control packets with said third designation are immediately discarded.

**15**. A method according to claim **14**, wherein said discarder discards packets with said second designation when a number of control packets waiting to be processed reaches a predetermined level.

\* \* \* \* \*

# **Exhibit 3**

US009338171B2

(12) **United States Patent**
    Kiukkonen et al.

(10) **Patent No.:** **US 9,338,171 B2**
(45) **Date of Patent:** **May 10, 2016**

(54) **METHOD AND APPARATUS FOR CONTROLLING ACCESS TO RESOURCES**

(71) Applicants: **Niko Tapani Kiukkonen**, Veikkola (FI); **Janne Marin**, Espoo (FI); **Sverre Slotte**, Esbo (FI)

(72) Inventors: **Niko Tapani Kiukkonen**, Veikkola (FI); **Janne Marin**, Espoo (FI); **Sverre Slotte**, Esbo (FI)

(73) Assignee: **NOKIA CORPORATION**, Espoo (FI)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 351 days.

(21) Appl. No.: **13/720,439**

(22) Filed: **Dec. 19, 2012**

(65) **Prior Publication Data**

US 2013/0174277 A1      Jul. 4, 2013

**Related U.S. Application Data**

(60) Provisional application No. 61/581,910, filed on Dec. 30, 2011.

(51) **Int. Cl.**
    **H04L 29/06**       (2006.01)
    **H04W 4/08**        (2009.01)
(52) **U.S. Cl.**
    CPC ............... **H04L 63/104** (2013.01); *H04W 4/08* (2013.01)
(58) **Field of Classification Search**
    CPC ..... H04L 63/104; H04L 63/102; H04W 4/08; G06F 21/10; G06F 21/31; G06F 21/6218
    USPC .......................................................... 726/28
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,377,548 | B1 | 4/2002 | Chuah |
| 7,263,076 | B1 | 8/2007 | Leibovitz et al. |
| 2002/0124053 | A1 | 9/2002 | Adams et al. |
| 2005/0048983 | A1 | 3/2005 | Abraham et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 03/028313 A2 | 4/2003 |
| WO | 03/029916 A2 | 4/2003 |

(Continued)

OTHER PUBLICATIONS

Adnan Ahmad et al., "Distributed Access Control for Social Networks", Conference Publication, 2011 7th International Conferences on Information Assurance and Security (IAS), pp. 68-73.

(Continued)

*Primary Examiner* — Kambiz Zand
*Assistant Examiner* — Benjamin Kaplan
(74) *Attorney, Agent, or Firm* — Ditthavong & Steiner, P.C.

(57) **ABSTRACT**

An approach is provided for controlling access to resources according to social connections and/or characteristics of the resources. An access control platform determines one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof. The access control platform further processes and/or facilitates a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups. The access control platform also causes, at least in part, a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups.

**17 Claims, 10 Drawing Sheets**

300

**US 9,338,171 B2**

Page 2

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| 2007/0033197 | A1 | 2/2007 | Scherzer et al. |
| 2007/0067853 | A1 | 3/2007 | Ramsey |
| 2008/0008140 | A1 | 1/2008 | Rorssell |
| 2008/0141348 | A1 | 6/2008 | Hovnanian et al. |
| 2008/0195741 | A1 | 8/2008 | Wynn et al. |
| 2008/0320576 | A1 | 12/2008 | Curling |
| 2009/0292814 | A1 | 11/2009 | Ting et al. |
| 2010/0157850 | A1 | 6/2010 | Horn et al. |
| 2011/0258303 | A1 | 10/2011 | Nath et al. |
| 2012/0030734 | A1 | 2/2012 | Wohlert |
| 2012/0066259 | A1 | 3/2012 | Huber et al. |
| 2012/0204221 | A1 | 8/2012 | Monjas Llorente et al. |

FOREIGN PATENT DOCUMENTS

| WO | 2006/047879 | A1 | 5/2006 |
| WO | 2011/006231 | A1 | 1/2011 |

OTHER PUBLICATIONS

International Search Report corresponding to Application No. PCT/FI2012/051297, mailed on Jun. 3, 2013.

Written Opinion of the International Searching Authority corresponding to Application No. PCT/FI2012/051297, mailed on Jun. 3, 2013.

Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration corresponding to Application No. PCT/FI2012/051297, mailed on Jun. 3, 2013.



FIG. 1



FIG. 2



FIG. 3

300

START

301 — DETERMINE ONE OR MORE RESOURCES ASSOCIATED WITH AT LEAST ONE USER, AT LEAST ONE DEVICE ASSOCIATED WITH THE AT LEAST ONE USER, OR A COMBINATION THEREOF

303 — PROCESS SOCIAL NETWORKING INFORMATION ASSOCIATED WITH THE AT LEAST ONE USER, THE AT LEAST ONE DEVICE, OR A COMBINATION THEREOF TO DETERMINE ONE OR MORE SOCIAL NETWORKING GROUPS

305 — CAUSE A CONTROLLING OF ACCESS TO THE ONE OR MORE RESOURCES FOR ONE OR MORE OTHER USERS AND/OR ONE OR MORE OTHER DEVICES ASSOCIATED WITH THE ONE OR MORE OTHER USERS BASED ON MEMBERSHIP IN THE ONE OR MORE SOCIAL NETWORKING GROUPS

END



FIG. 4

400

**START**

401 — DETERMINE A PRIORITY HIERARCHY ASSOCIATED WITH THE AT LEAST ONE USER, THE AT LEAST ONE DEVICE, THE ONE OR MORE SOCIAL NETWORKING GROUPS, OR A COMBINATION THEREOF

403 — MONITOR USERS/ CHARACTERISTICS

USERS

405 — CAUSE A REVOCATION AND/OR A PREVENTION OF THE ACCESS TO THE ONE OR MORE RESOURCES BASED ON THE PRIORITY HIERARCHY

CHARACTERISTICS

407 — CAUSE A CONTROLLING OF THE ACCESS TO THE ONE OR MORE RESOURCES BASED ON ONE OR MORE CHARACTERISTICS ASSOCIATED WITH THE ONE OR MORE RESOURCES

409 — CAUSE A PREVENTION AND/OR A REVOCATION OF ACCESS TO THE ONE OR MORE RESOURCES BASED THE PRIORITY HIERARCHY

**END**

500



FIG. 5

FIG. 6B



FIG. 6A



FIG. 6D



FIG. 6C





FIG. 7



FIG. 8

FIG. 9



US 9,338,171 B2

**1**

## METHOD AND APPARATUS FOR CONTROLLING ACCESS TO RESOURCES

### RELATED APPLICATIONS

This application claims the benefit of the earlier filing date under 35 U.S.C. §119(e) of U.S. Provisional Application Ser. No. 61/581,910 filed Dec. 30, 2011, entitled "Method and Apparatus for Controlling Access to Resources," the entirety of which is incorporated herein by reference.

### BACKGROUND

Service providers and device manufacturers (e.g., wireless, cellular, etc.) are continually challenged to deliver value and convenience to consumers by, for example, providing compelling network services. One such service includes sharing resources among users. By way of example, a user may wish to allow other users to access a resource, such as a wireless access point when the designated users are within range of an access point. Juxtaposed with the ability to enable users to share resources is the need to maintain security with respect to the resources, and to enable sharing of the resources without degradation of performance of the resources. By way of example, a user that shares a wireless access point among designated users may wish to maintain a certain level of security and performance of the wireless access point. Although certain resources, such as wireless access points, have built-in security features, the security features may make sharing the resources complex. For example, to revoke the permission of one user to access an access point, the security settings with respect to the access point must be accessed to change the security settings (e.g., password, revocation of a MAC address, etc.). Unfortunately, there is currently no method that controls the access users have to resources that is independent of controlling the resource settings directly to maintain the security and performance of the resources.

### SOME EXAMPLE EMBODIMENTS

Therefore, there is a need for an approach for controlling access to resources according to social connections and/or characteristics of the resources.

According to one embodiment, a method comprises determining one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof. The method also comprises processing and/or facilitating a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups. The method further comprises causing, at least in part, a controlling of access to the one or more resources for one or more other devices associated with the one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups.

According to another embodiment, an apparatus comprises at least one processor, and at least one memory including computer program code for one or more computer programs, the at least one memory and the computer program code configured to, with the at least one processor, cause, at least in part, the apparatus to determine one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof. The apparatus is also caused to process and/or facilitate a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof

**2**

to determine one or more social networking groups. The apparatus is further caused to control access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups.

According to another embodiment, a computer-readable storage medium carries one or more sequences of one or more instructions which, when executed by one or more processors, cause, at least in part, an apparatus to determine one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof. The apparatus is also caused to process and/or facilitate a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups. The apparatus is further caused to control access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups.

According to another embodiment, an apparatus comprises means for determining one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof. The apparatus also comprises means for processing and/or facilitating a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups. The apparatus further comprises means for causing, at least in part, a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups.

In addition, for various example embodiments of the invention, the following is applicable: a method comprising facilitating a processing of and/or processing (1) data and/or (2) information and/or (3) at least one signal, the (1) data and/or (2) information and/or (3) at least one signal based, at least in part, on (or derived at least in part from) any one or any combination of methods (or processes) disclosed in this application as relevant to any embodiment of the invention.

For various example embodiments of the invention, the following is also applicable: a method comprising facilitating access to at least one interface configured to allow access to at least one service, the at least one service configured to perform any one or any combination of network or service provider methods (or processes) disclosed in this application.

For various example embodiments of the invention, the following is also applicable: a method comprising facilitating creating and/or facilitating modifying (1) at least one device user interface element and/or (2) at least one device user interface functionality, the (1) at least one device user interface element and/or (2) at least one device user interface functionality based, at least in part, on data and/or information resulting from one or any combination of methods or processes disclosed in this application as relevant to any embodiment of the invention, and/or at least one signal resulting from one or any combination of methods (or processes) disclosed in this application as relevant to any embodiment of the invention.

For various example embodiments of the invention, the following is also applicable: a method comprising creating and/or modifying (1) at least one device user interface element and/or (2) at least one device user interface functionality, the (1) at least one device user interface element and/or (2)

US 9,338,171 B2

**3**

at least one device user interface functionality based at least in part on data and/or information resulting from one or any combination of methods (or processes) disclosed in this application as relevant to any embodiment of the invention, and/or at least one signal resulting from one or any combination of methods (or processes) disclosed in this application as relevant to any embodiment of the invention.

In various example embodiments, the methods (or processes) can be accomplished on the service provider side or on the mobile device side or in any shared way between service provider and mobile device with actions being performed on both sides.

For various example embodiments, the following is applicable: An apparatus comprising means for performing the method of any claims.

Still other aspects, features, and advantages of the invention are readily apparent from the following detailed description, simply by illustrating a number of particular embodiments and implementations, including the best mode contemplated for carrying out the invention. The invention is also capable of other and different embodiments, and its several details can be modified in various obvious respects, all without departing from the spirit and scope of the invention. Accordingly, the drawings and description are to be regarded as illustrative in nature, and not as restrictive.

BRIEF DESCRIPTION OF THE DRAWINGS

The embodiments of the invention are illustrated by way of example, and not by way of limitation, in the figures of the accompanying drawings:

FIG. **1** is a diagram of a system capable of controlling access to resources, according to one embodiment;

FIG. **2** is a diagram of the components of an access control platform, according to one embodiment;

FIG. **3** is a flowchart of a process for controlling access to resources, according to one embodiment;

FIG. **4** is a flowchart of a process for controlling access to resources according to social connections and/or characteristics of the resources, according to one embodiment;

FIG. **5** is a flowchart of a process for eliminating access rights to one or more resources, according to one embodiment;

FIGS. **6A-6D** are diagrams of user interfaces utilized in the processes of FIGS. **3-5**, according to various embodiments;

FIG. **7** is a diagram of hardware that can be used to implement an embodiment of the invention;

FIG. **8** is a diagram of a chip set that can be used to implement an embodiment of the invention; and

FIG. **9** is a diagram of a mobile terminal (e.g., handset) that can be used to implement an embodiment of the invention.

DESCRIPTION OF SOME EMBODIMENTS

Examples of a method, apparatus, and computer program for controlling access to resources according to social connections and/or characteristics of the resources are disclosed. In the following description, for the purposes of explanation, numerous specific details are set forth in order to provide a thorough understanding of the embodiments of the invention. It is apparent, however, to one skilled in the art that the embodiments of the invention may be practiced without these specific details or with an equivalent arrangement. In other instances, well-known structures and devices are shown in block diagram form in order to avoid unnecessarily obscuring the embodiments of the invention.

**4**

Although various embodiments are described with respect to wireless access points as exemplary resources, it is contemplated that the approach described herein may be used with any other type of resource accessible over a network.

FIG. **1** is a diagram of a system capable of controlling access to resources according to social connections and/or characteristics of the resources, according to one embodiment. As discussed above, service providers and device manufacturers are providing users with the ability to share resources among various users and devices. One such resource may be a wireless access point. Wireless access points allow an owner (e.g., host user) of the wireless access point to share a wireless connection to, for example, the Internet with other users. As the popularity of wireless access points and devices compatible with accessing the access points has increased, most of the access points are password protected. The password protection is used to prevent unauthorized people from connecting through the access point to, for example, the Internet or to other resources on a network without permission. The password protection is also used to prevent unauthorized users from accessing the access point and eavesdropping on communications associated with another user connected to the access point. Indeed, in some countries, such as Germany, there are legal obligations for owners of access points to protect and monitor the Internet access provided through access points they own. Thus, although security associated with access points is needed, it makes sharing the access point between family members, friends, and other users complex.

For example, a password for accessing the access point must be distributed among all of the users that are authorized to access the access point. In which case, to prevent a previously authorized user from accessing the access point, a new password must be created and distributed to the other authorized users. Alternatively, other even more complex processes may be used to prevent a previously authorized user from accessing the access point beyond merely changing the password. Further, beyond preventing unauthorized users from accessing an access point, issues concerning eavesdropping among authorized users may exist, or issues concerning degradation of services based on, for example, the number of users associated with an access point may exist. Exacerbating these issues are issues relating to the difficulties in controlling the access points directly through, for example, the configuration settings associated with the access point. For example, the configuration settings of the access point must be accessible otherwise the settings cannot be changed. Further, changing the settings is only a static way of controlling access to an access point is not as dynamic as the dynamic changing of users accessing the access point. Similar issues concern other types of resources, such as database accessible over a network.

To address these problems, a system **100** of FIG. **1** introduces the capability to control access to resources according to social connections associated with the host of the resources and/or characteristics of the resources. Depending on the social connections associated with other users and/or other devices associated with the other users as compared to the host user of the resources, the system **100** revokes or prevents access to the resources by the other users and/or the other devices. Further, depending on one or more characteristics associated with the one or more resources, such as, for example, a number of users accessing the one or more resources, a traffic load associated with the one or more resources, or a combination thereof, the system **100** revokes or prevents access to the resources by the other users and/or the other devices to maintain a quality of service provided by

US 9,338,171 B2

5

the one or more resources. The system **100** also introduces the capability to control the security and performance of resources independently from directly controlling the configuration of the resources by remotely controlling access to the resources at the device level.

The system **100** introduces the capability to determine one or more resources associated with a user, a device associated with the user, or a combination thereof. In one embodiment, the user or the device associated with the user may be considered a host and a host device. In one embodiment, the user may be considered the owner of the resource, and the device may be considered the resource (e.g., a wireless router). Further, the system **100** introduces the capability to process social networking information associated with the user, the device associated with the user, or the combination thereof to determine one or more social networking groups. The social networking groups define other users and their associations with the host user that owns and/or controls the one or more resources. By way of example, the social networking groups may include family members, friends, friends of friends, acquaintances, etc. Each of these groups may be further segmented into smaller groups, such as immediate family members, distant family members, close friends, long-lost friends, etc. The system **100** further introduces the capability to control access to the one or more resources for the other users, other devices associated with the other users, or a combination there based on a membership in the one or more social networking groups. For example, the control may be based on the social connections between the users that are associated with the resources and the host user of the resources based on, for example, the users' memberships in the one or more social networking groups. The control may also be based on one or more characteristics associated with a resource. By way of example, for a wireless access point, the characteristics may be the current load on the wireless access point such that the access of one or more users at the wireless access point is revoked to lessen the load.

As shown in FIG. **1**, the system **100** comprises one or more user equipment (UE) **101a-101n** (collectively referred to as UE **101**) having connectivity to an access control platform **103** via a communication network **105**. The access control platform **103** controls access to one or more resources **115** within the system **100** according to social connections and/or characteristics of the resources **115**. The UE **101** may execute one or more applications **111a-111n** (collectively referred to as applications **111**). The applications may include, for example, one or more Internet browsing applications, navigational applications, calendar applications, etc. In one embodiment, the UE **101** may include an access control client application **111a** that communicates with the access control platform **103**. The access control platform **103** may then remotely configure and manage the connectivity options of the UE **101** through the access control client application **111a** for accessing one or more resources. The access control client application **111a** may also report status and/or measurement data to the access control platform **103** for the access control platform **103** to control the access by the UE **101** to the resources **115**. As illustrated, the UE **101** may connect directly to the communication network **105**, or may connect to the communication network **105** through, for example, one or more resources **115a-115n** (collectively referred to as resources **115**). Resources **115** that allow for one or more UE **101** to connect to the communication network **105** may include, for example, a wireless access point. In one embodiment, one or more resources **115** may be a part of the system **100** independent from providing access to the communica-

6

tion network **105**. Rather, the UE **101** may connect to the resources **115** through the communication network **105**.

In one embodiment, the access control platform **103** may be associated with, or connected to, a profiles database **117**. The profiles database **117** may include access information associated with the resources **115**, as well as access information associated with the UE **101**. By way of example, the profiles database **117** may include security credentials for accessing one or more of the resources **115**. The profiles database **117** may also include information regarding the social networking groups, and the association of one or more other users with respect to the social networking groups, associated with a host user of one or more resources **115** that are used to determine accessibility to the one or more resources **115**.

The system **100** further includes a services platform **107** that includes one or more services **109a-109n** (collectively referred to as services **109**). The one or more services **109** may include, for example, one or more social networking services (SNS) **109a** (e.g., Facebook, MySpace, Linkedin, etc.). The system **100** further includes one or more content providers **113a-113n** (collectively referred to as content providers **113**). The content providers **113** may provide content to any component of the system **100**.

In one embodiment, the host user associated with one or more resources **115** adds the one or more resources to the access control platform **103** by uploading the security credentials associated with the one or more resources **115**, along with identification information associated with the resources **115**. The host user may also associate a hierarchy of groups of users that may access the one or more resources **115**. The hierarchy may be based on, for example, the social distances one or more other users have with the host user. Such social distances may be defined by, for example, the relationship the other users have with the host user. By way of example, the host user may specify that users associated with the social networking groups of family, friends, friends of friends, and others may access one or more resources **115**. The host user may further specify that family has priority over friends, friends have priority over friends of friends, and friends of friends have priority over other users. Accordingly, the access control platform **103** will provide users that are associated with the host user according to the social networking groups with the security credentials to access to the one or more resources **115**. The host user may also add information associated with one or more devices associated with the host user to create another class of devices that may access the one or more resources **115**, such as the group host user devices.

Accordingly, the access control platform **103** may control access to one or more resources **115** by one or more other users and/or one or more other devices associated with the other users, based on the social networking groups. The access may be controlled by revoking and/or preventing access to the one or more resources for one or more other users, one or more other devices, or a combination thereof based on the priority hierarchy. By way of example, if a user that is classified within the social networking group of family is currently accessing a resource **115a**, if another user that is classified within the social networking group of friends attempt to access the same resource **115a**, the user may be prevented from accessing the resource **115a** based on a user of a higher priority currently user the resource **115a**. Further, if the friend user has access to the resource and a family user accesses the resource **115a**, the friend user may have their access revoked. The access of the friend is revoked to ensure security of the family user using the resource **115a**. As such, lower-priority users, and devices associated with lower-pri-

US 9,338,171 B2

7                                                                    8

ority users have their access to the resources **115** revoked or barred based on access to the resources **115** by higher-priority users based on the social networking groups.

In one embodiment, the host user may also specify characteristics associated with the one or more resources for the access control platform **103** to monitor and control access by one or more other users and/or one or more other devices based on the characteristics. The characteristics may consist of, for example, performance characteristics. By way of example where the one or more resources **115** include access points, the performance characteristics may include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more access points, or a combination thereof. Accordingly, the access control platform **103** may control access to one or more access points by one or more other users and/or one or more other devices associated with the other users based on the social networking groups and the resource characteristics to maintain a certain level of the characteristics. As the characteristics of the resources change such that the characteristics satisfy or no longer satisfy one or more thresholds established by the host user of the resources **115**, access to the resources **115** by one or more lower-priority users is revoked prior to one or more higher-priority users to have the characteristics again satisfy the thresholds.

In one embodiment, the access control platform **103** interacts with a service such as a SNS, a customer resource management service, a directory service, or any other service for determining and maintaining data regarding one or more users (e.g., contacts) associated with a host user. By way of example, a SNS **113a** maintains a listing of various members, social networking group affiliations of said members, or a combination thereof as related to the host user. Each member of the SNS **109a** registers with the SNS **109a** by creating a profile for specifying personal details, interests, information sharing restrictions, marketing preferences, etc. In addition, the members are assigned or create a user name, a login password, a security question and the like as access credentials for the SNS **109a**.

Still further, the host user may be associated with other members via group affiliation, i.e., a group comprising one or more other members of the SNS **109a**. For example, a group entitled the "Wisconsin Badgers" may be formed at the SNS **109a** for supporting the sharing of information between members based on their common interests. In this example, the host user may interact exclusively with members of this group to engage in discussions regarding activities associated with the Wisconsin Badgers. Similarly, other interest groups may also be associated with the host user, where the participating other members represent a portion of the entire list of members associated with the host. Alternatively, a group may also include the overall list of members (contacts) associated with the specific profile of the host user. It is noted, therefore, that a group may include an overall/global listing of all members associated with the host or a sub-grouping of members representing only a portion of the overall/global listing.

The host user communicates with and recognizes various other members of the SNS **109a** by way of social networking information, including a username, alias, group reference, user reference, icon or other identifier. It is noted that the social networking information includes that which is specified by the host regarding the one or more other members, that which is specified by the one or more other members relative to the host, or a combination thereof.

In certain embodiments, the access control platform **103** relies upon the SNS **109a** to verify and/or authenticate a user and/or UE **101** as belonging to a social networking group.

Under this approach, the access control platform **103** is able to readily cross reference requesting users of UE **101** against one or more groups specified by the host user to access the resources **115**.

The host user enters information regarding the social networking information related to the host user, such as a login name or other identifier. The access control platform **103** utilizes the social networking information as entered to authenticate the user against the SNS **109a**. The authentication process may include determining an ability of the user device to actually login and access the host's SNS profile page based on the provided social networking information. In addition, the authentication process may include monitoring of the status of the current contacts lists (e.g., in the case of a private wireless access point), members of a group, fans of a page, or users who associated with the host. By monitoring the list of members indicated as friends as well as group affiliation with the host, the access control platform **103** is able to associate users and user devices with resources **115** accordingly.

Furthermore, the access control platform **103** determines what access rights are made available to the one or more members of an associated group. Access rights may be based on, for example, whether a relationship identifier is family, friend, friend of a friend, acquaintance, other, etc. In other instances, the indicator may relate to some other level of closeness, familiarity or priority of the host relative to the member. It is noted that the host user of the resource may be an individual person, a group, a company or organization, a website, etc.

When the access rights are confirmed, the access control platform **103** then provisions the one or more users of UE **101** with access credentials associated with the one or more resources **115**. The provisioning is done utilizing existing mechanisms implemented in the mobile devices for remotely managing and configuring the resources **115**. For example, the access credentials may be pushed to UE **101** by way of a push service, synchronized at the UE **101** via a synchronization service with the access control platform **103**, etc. It is noted that provisioning of the credentials enables the UE **101** to access the one or more resources **115** when a request for access to the resources **115** is made.

In one embodiment, the access control platform **103** includes an additional security feature for preventing a malicious or unauthorized user from tampering with the access control client application **111a** that interfaces with the access control platform **103** for accessing one or more resources **115**. Such a malicious user may obtain the security credentials for accessing a resource **115a** and disable the access control client application **111a** effectively enabling the user to use the resources **115** even if not intended by the host of the resources **115**. To implement this additional security, the access control platform **103** monitors UE **101** accessing the one or more resources **115** to ensure that the UE **101** are accessing the resources **115** according to the established hierarchies and/or the characteristics of the resources **115**. By way of example, the access control platform **103** will monitor for UE **101** accessing an access point and determine whether the UE **101** has actual authority to access the access point according to the hierarchy of the UE **101** as compared to other UE **101** currently accessing the access point. If the access control platform **103** determines that unauthorized UE **101** are accessing the resources **115**, the access control platform **103** may cause the UE **101** to eliminate access rights to the one or more resources.

By way of example, the communication network **105** of system **100** includes one or more networks such as a data

US 9,338,171 B2

9

network, a wireless network, a telephony network, or any combination thereof. It is contemplated that the data network may be any local area network (LAN), metropolitan area network (MAN), wide area network (WAN), a public data network (e.g., the Internet), short range wireless network, or any other suitable packet-switched network, such as a commercially owned, proprietary packet-switched network, e.g., a proprietary cable or fiber-optic network, and the like, or any combination thereof. In addition, the wireless network may be, for example, a cellular network and may employ various technologies including enhanced data rates for global evolution (EDGE), general packet radio service (GPRS), global system for mobile communications (GSM), Internet protocol multimedia subsystem (IMS), universal mobile telecommunications system (UMTS), etc., as well as any other suitable wireless medium, e.g., worldwide interoperability for microwave access (WiMAX), Long Term Evolution (LTE) networks, code division multiple access (CDMA), wideband code division multiple access (WCDMA), wireless fidelity (WiFi), wireless LAN (WLAN), Bluetooth®, near field communication (NFC), Internet Protocol (IP) data casting, digital radio/television broadcasting, satellite, mobile ad-hoc network (MANET), and the like, or any combination thereof.

The UE **101** is any type of mobile terminal, fixed terminal, or portable terminal including a mobile handset, station, unit, device, mobile communication device, multimedia computer, multimedia tablet, Internet node, communicator, desktop computer, laptop computer, notebook computer, netbook computer, tablet computer, personal communication system (PCS) device, personal navigation device, personal digital assistants (PDAs), audio/video player, digital camera/camcorder, positioning device, television receiver, radio broadcast receiver, electronic book device, game device, or any combination thereof, including the accessories and peripherals of these devices, or any combination thereof. It is also contemplated that the UE **101** can support any type of interface to the user (such as "wearable" circuitry, etc.).

By way of example, the UE **101**, the access control platform **103**, the services platform **107**, the content providers **113**, and the resources **115** communicate with each other and other components of the communication network **105** using well known, new or still developing protocols. In this context, a protocol includes a set of rules defining how the network nodes within the communication network **105** interact with each other based on information sent over the communication links. The protocols are effective at different layers of operation within each node, from generating and receiving physical signals of various types, to selecting a link for transferring those signals, to the format of information indicated by those signals, to identifying which software application executing on a computer system sends or receives the information. The conceptually different layers of protocols for exchanging information over a network are described in the Open Systems Interconnection (OSI) Reference Model.

Communications between the network nodes are typically effected by exchanging discrete packets of data. Each packet typically comprises (1) header information associated with a particular protocol, and (2) payload information that follows the header information and contains information that may be processed independently of that particular protocol. In some protocols, the packet includes (3) trailer information following the payload and indicating the end of the payload information. The header includes information such as the source of the packet, its destination, the length of the payload, and other properties used by the protocol. Often, the data in the payload for the particular protocol includes a header and payload for a different protocol associated with a different, higher layer of

10

the OSI Reference Model. The header for a particular protocol typically indicates a type for the next protocol contained in its payload. The higher layer protocol is said to be encapsulated in the lower layer protocol. The headers included in a packet traversing multiple heterogeneous networks, such as the Internet, typically include a physical (layer 1) header, a data-link (layer 2) header, an internetwork (layer 3) header and a transport (layer 4) header, and various application (layer 5, layer 6 and layer 7) headers as defined by the OSI Reference Model.

FIG. **2** is a diagram of the components of an access control platform **103**, according to one embodiment. By way of example, the access control platform **103** includes one or more components for controlling access to resources. It is contemplated that the functions of these components may be combined in one or more components or performed by other components of equivalent functionality. In this embodiment, the access control platform **103** includes a resource module **201**, a user module **203**, a social networking module **205**, an access module **207**, a security module **209** and a user interface (UI) module **211**.

The resource module **201** registers and identifies the resources **115** that are recognized by the access control platform **103** and that the access control platform **103** provides access control over. The UI module **211** creates one or more user interfaces for users that own or control resources (e.g., host users) to interface with the resource module **201** to input information associated with the resources **115**. The information may include, for example, some type of identification of the resources **115**, such as a uniform resource indicator (URI), a uniform resource locator (URL), an Internet protocol (IP) address, etc. The information may also include the security credentials associated with accessing the resources **115**, such as passwords, secret keys, an encryption key, etc. In one embodiment, the resource module **201** may interface with the profiles database **117** for generating one or more profiles associated with the resources **115** based on the information inputted regarding the resources **115**. In such an embodiment, the resource module **201** may access the profiles database **117** for the information for the resources **115**.

The user module **203** registers and identifies the users and/or user devices that are recognized by the access control platform **103** and that are controlled in providing access to one or more resources **115**. The user module **203** may also register and identify the users and/or the devices associated with the users that own and/or host the resources **115**. The user module **203** may associate the host users and the host devices with the resources **115** that the host users and/or the host devices own and/or control. In one embodiment, the UI module **211** creates one or more user interfaces for the host users to interface with the user module **203** to input information associated with one or more users and/or devices that have authority to access one or more resources **115**. The host users may also input information associated with the social networking groups the users are associated with, such as family, friends, friends of friends, and others. Thus, in one embodiment, the host user of a resource **115**a may manually enter information into the user module **203** regarding the users and/or devices that may access a resource. In one embodiment, the user module **203** may interface with the profiles database **117** for generating one or more profiles with respect to users and/or devices that are registered with the access control platform **103** as both host users that own or control one or more resources and other users and/or other devices that may access one or more resources. In such an embodiment, the resource module **201** may access the profiles database **117** for the information for the resources **115**.

US 9,338,171 B2

**11**

In one embodiment, the social networking module **205** may access one or more services **109** and/or content providers **113** for automatically determining social networking information with respect to a host user and one or more other users and/or other devices. The social networking module **205** may interface with the user module **203** and or the resource module **201** to determine a host user and/or a device associated with a host user. Further, the social networking module **205** may then search various services **109**, such as social networking services **109**a, and content providers **113** for other users and/or other devices associated with the users and the social connections of the other users and/or other devices with respect to the host user. Included within the social connections is information pertaining to the type of connection, such as, for example, family, friend, friend of friend, and other, that may be used to classify the other user and/or other device into a hierarchy established by a host user for a resource **115**a. The information that the social networking module **205** determines may be included in one or more resource profiles and/or one or more user profiles stored within the profiles database **117**, as described above.

The access module **207** controls the access of one or more devices to the resources **115**. The access module **207** monitors the users and/or user devices that are currently accessing the resources **115** and that are attempting to access the resources **115**. Based on whether the control of the resources **115** is based on a hierarchy of users, the characteristics of the resources **115**, or both, the access module **207** revokes or prevents users and/or user devices from accessing the resources **115**. In one embodiment, the access module **207** interfaces with the access control client applications **111**a running on the UE **101** to monitor whether the UE **101** are currently accessing one or more resources **115** or attempting to access one or more resources **115**. When a UE **101** or a user associated with a UE **101** attempts to access a resource **115**a, the access module **207** will determine the priority of the user and/or the UE **101** and will determine the priority of other users and/or UE **101** currently accessing the resource **115**a to determine whether the user or UE **101** attempting to access the resource **115**a has the priority to access the resource **115**a. When the access module **207** is monitoring users and/or devices accessing the resource **115**a, the user or the UE **101** will have the priority to access the resource **115**a when the user or the UE **101** has a priority that is equal to or greater than the other users and/or UE **101** currently accessing the resource **115**a. Upon the user or the UE **101** accessing the resource **115**a, the access module **207** further determines whether other users or UE **101** currently accessing the resource have a priority that is lower than the new user or the new UE **101** to the resource **115**a. If there is a user or a UE **101** that is accessing the resource **115**a that has a lower priority, the access module **207** will interface with the access control client application **111**a of the lower-priority users or the lower-priority UE **101** to revoke the access to the resource **115**a. The access to the resource is revoked until the higher-priority users and/or higher-priority UE **101** no longer are accessing the resource **115**a. In which case, the lower-priority user and/or lower-priority UE **101** may again access the resource **115**a.

When the access control platform **103** controls access to resources **115** based on the characteristics of the resources **115**, the access module **207** determines the characteristics of the resources **115** when one or more users and/or UE **101** attempt to access the resources **115**. If the one or more characteristics of the resources **115** do not satisfy one or more thresholds associated with the characteristics, the access module **207** prevents the users and/or the UE **101** from

**12**

accessing the resources **115**. By way of example, a resource **115**a may have a characteristic associated with the number of devices that may be connected to the resource **115**a at the same time. A UE **101** attempting to connect to the resource **115**a may cause the number of devices connected to the resource **115**a to exceed the threshold number of devices. In which case, the access module **207** will prevent the UE **101** from accessing the resource **115**a. The access module **207** will also monitor the characteristics associated with the resources **115** independently from merely monitoring users and/or UE **101** attempting to access the resources **115** and will control access to the resources based on the monitored characteristics. By way of example, the access module **207** may monitor the bandwidth associated with a resource **115**a (e.g., wireless access point). When the bandwidth exceeds a threshold, such that the quality of service provided by the resource **115**a drops below acceptable levels, the access module **207** may act to revoke access to the resource **115**a to one or more UE **101** currently accessing the resource **115**a. Access to the resource **115**a is revoked, for example, to adjust the bandwidth of the resource **115**a to acceptable levels. The access module **207** may revoke access to the resource **115**a according to the hierarchy of users and/or UE **101** currently accessing the resource **115**a, such that lower-priority user and/or lower-priority devices have their access revoked prior to higher-priority users and higher-priority devices.

In one embodiment, the security module **209** prevents malicious or unauthorized users from tampering with the access control client application **111**a that interfaces with the access control platform **103** for accessing one or more resources **115**. The security module **209** monitors UE **101** accessing the resources **115** to ensure that the UE **101** are accessing the resources **115** according to the established hierarchies and/or the characteristics of the resources **115**. The security module **209** may interface with the access control client application **111**a executed at the UE **101**, or may interface with, for example, a secondary application **111**b executed at the UE **101** that acts as a backup security application that monitors for the expected communications between the access control client application **111**a and the access control platform **103** when a UE **101** attempts to access a resource **115**a. If the expected communications do not occur, such as the access control client application **111**a not communicating with the access control platform **103** to determine the priority of the UE **101** accessing the resource, or to determine the characteristics of the resource **115**a, the security module **209** may eliminate the security credentials at the UE **101** to prevent the UE **101** from accessing the resource **115**a. The elimination of the security credentials is different than the revocation of access because the revocation of access is temporary based on, for example, the priority of users accessing a resource **115**a or the characteristics of the resources **115**. The elimination of the security credentials is permanent such that the UE **101** no longer has the security credentials (e.g., password, security key, etc.) that are necessary to access the resource **115**a. Thus, the security module prevents malicious users from bypassing the access control platform **103** and/or the access control client application **111**a to access one or more resources **115** without permission.

FIG. **3** is a flowchart of a process for controlling access to resources, according to one embodiment. In one embodiment, the access control platform **103** performs the process **300** and is implemented in, for instance, a chip set including a processor and a memory as shown in FIG. **8**. In step **301**, the access control platform **103** determines one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof.

US 9,338,171 B2

13

The at least one user may be a user that owns or controls the one or more resources 115 (e.g., a host user). The at least one device may be one or more devices that are associated with the host user. The one or more resources may be resources 115 that are accessible by the host user/host device, as well as other users and/or other devices associated with the host user. By way of example, one or more resources may include wireless access points that provide access to one or more networks to devices that connect to the wireless access point.

In step 303, the access control platform 103 processes social networking information associated with the at least one user (e.g., host user), the at least one device associated with the at least one user (e.g., host user's device), or a combination thereof to determine one or more social networking groups. The one or more social networking groups define social connections between the host user and/or the host device and other users and/or other devices. The social connections may be based on a hierarchy of social distances, such as the relationship of the host user to other specific users. As discussed above, the social distances that define the social networking groups may be, for example, family, friends, friends of friends, and others. Although the provided example includes four social networking groups, the number of social networking groups is practically unlimited. Further, each social networking group may be broken down into smaller groups, such as immediate family and distant relatives for the social networking group of family, and close friends and distant friends for the group of friends.

The social networking information may be provided directly to the access control platform 103 by the host user through one or more user interfaces created by the access control platform 103. By way of example, the host user may select one or more social networking groups defined by the access control platform 103 when registering a resource 115a at the access control platform 103. Further, the host user may provide credentials to one or more social information providers that the access control platform 103 may access to retrieve the social information. The social information providers may include one or more services 109, such as social networking services 109a, and one or more content providers 113. Thus, the access control platform 103 may access the social information providers to obtain the social information and process the social information to determine the social networking groups.

In step 305, the access control platform 103 causes a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based on membership in the one or more social networking groups. The access control platform 103 controls the access independently from controlling the configuration settings associated with the one or more resources. Rather, the access control platform 103 controls the access remotely at a device level of the devices and/or users attempting to access or currently accessing the one or resources 115. The access control platform 103 remotely configures and manages the one or more other devices attempting to access or currently accessing the one or more resources based on the membership in the social networking groups. As discussed in more detail below, the control may be based on prioritizing users and/or devices that have access to the resources based on the hierarchy of social networking groups. The control may also be based on one or more characteristics associated with the one or more resources. In one embodiment, the remote control is based on the access control platform 103 interfacing with the access control client applications 111a on the various user devices (e.g., UE 101) that access the resources 115. The access

14

control platform 103 communicates with the access control client applications 111a when determining whether to prevent or revoke access to one or more devices to the resources 115. By remotely access the UE 101 based on the access control client applications 111a, the access control platform 103 can provide control over the resources 115 without directly controlling the configuration settings of the resources 115.

In one embodiment, the access control platform 103 may be configured to cause a device that has had its access to a resource 115a revoked to access one or more other resources 115. By way of example, a UE 101a may be currently accessing a wireless access point. Upon a higher-priority user accessing the wireless access point, the access to the wireless access point for the UE 101a may be revoked. Accordingly, the UE 101 may be automatically connected to a cellular network in response to the access to the wireless access point being revoked. In such a case, where the UE 101 was accessing the wireless access point for access to, for example, the Internet, the UE 101 may still connect to the Internet after having the access revoked but instead through the cellular network.

FIG. 4 is a flowchart of a process for controlling access to resources according to social connections and/or characteristics of the resources, according to one embodiment. In one embodiment, the access control platform 103 performs the process 400 and is implemented in, for instance, a chip set including a processor and a memory as shown in FIG. 8. In step 401, the access control platform 103 determines a priority hierarchy associated with the host user, the host device, the one or more social networking groups, or a combination thereof. The priority hierarchy determines what social networking groups have priority over other social networking groups. The priority hierarchy may also determine what priority the host user or the host device has over the social networking groups. By way of example, the hierarchy may be based on giving the host user and the host user's device the highest priority over all other users and other devices. Next, other users and other devices that have membership in the family social networking group may have priority over all other users and other devices. Further, other users and other devices that have membership in the friends social networking group may have priority over all other users and other devices, and so forth until the social networking groups have been assigned priority according to the priority hierarchy.

Next, in step 403, the access control platform 103 determines whether to monitor resources 115 based on the users associated with the resources 115 and/or the characteristics associated with the resources 115. In one embodiment, the access control platform 103 monitors the users or the characteristics associated with a resource 115a. In one embodiment, the access control platform 103 may monitor both the users and the characteristics associated with a resource 115a. If the access control platform 103 monitors the users and/or devices associated with a resource 115a, the process 400 proceeds to step 405. If the access control platform 103 monitors the characteristics associated with a resource, the process 400 proceeds to step 407. If the access control platform 103 monitors both the users and/or devices associated with a resource 115a and the characteristics associated with a resource 115a, the process 400 concurrently proceeds to steps 405 and 407.

In step 405, the access control platform 103 causes a revocation, a prevention, or a combination thereof of access by one or more users, one or more devices, or a combination thereof to one or more resources 115 based, at least in part, on the priority hierarchy determined in step 401. The access control platform 103 controls the revocation and/or the pre-

US 9,338,171 B2

15

vention of the access to ensure the security of the one or more resources 115 by controlling the users and/or devices that may access the resources 115 at any given. The revocation and the prevention of access to the one or more resources may be based on limiting lower-priority users and lower-priority devices from using the resources 115 while higher-priority users and higher-priority devices use the resources 115. Thus, higher-priority users and higher-priority devices may use the resources 115 while ensuring that, for example, lower-priority users and lower-priority devices do not comprise the security of the resources 115 by, for example, eavesdropping on the higher-priority users.

By way of example, if a higher-priority user is currently accessing a resource 115a, the access control platform 103 may prevent access by a lower-priority user to the resource 115a to maintain the security level of the resource 115a for the higher-priority user. Further, if a lower-priority user is currently accessing a resource 115a when a higher-priority user attempts to access the resource 115a, the access control platform 103 may revoke the access by the lower-priority user to the resource 115a to ensure a secure session by the higher-priority user using the resource 115a. In one embodiment, the access control platform 103 controls the revocation and prevention by interfacing with the access control client applications 111a associated with the devices of the users accessing and attempting to access the resources 115. The access control platform 103 instructs the access control client applications 111a to prevent access to a resource 115a by a lower-priority user if a higher-priority user is currently accessing the resource 115a. Similarly, the access control platform 103 instructs the access control client applications 111a to revoke access to a resource 115a by a lower-priority user if a higher-priority user is attempting to access the resource 115a. In one embodiment, the access control platform 103 controls the revocation and prevention of the access based on a granularity of the hierarchy, but ignores finer granularity of the hierarchies; such as allowing close friends and distant friends of the host user to use a resource 115a at the same time, but not allowing close friends to use the resource at the same time distant family members are using the resource 115a. In one embodiment, the access control platform 103 controls the revocation and prevention of the access based on all levels of granularity of the hierarchy. Further, in one embodiment, the access control platform 103 provides the option to higher-priority users and devices to allow lower-priority users and devices to concurrently access the one or more resources. By way of example, the access control platform 103 may notify a higher-priority user that a lower-priority user is attempting to access resource 115a currently being accessed by the higher-priority user. Thus, for example, if the higher-priority user is using the resource 115a for non-private tasks, the higher-priority user may allow the lower-priority user to concurrently use the resource 115a.

In one embodiment, the access control platform 103 may allow certain combinations of social networking groups to concurrently access a resource despite the groups having different priorities. For example, the access control platform 103 may allow the host user and family members of the host user to concurrently access a resource 115a. Further, the access control platform 103 may allow family and friends of the host user to concurrently access a resource 115a. Additionally, the access control platform 103 may allow friends and friends of friends of the host user to concurrently access a resource 115a. However, once a member of a social networking group attempts to access a resource that would combine two combinations of social networking groups, the

16

access control platform 103 will revoke or prevent access to the resource 115a to avoid combining two combinations of social networking groups.

Accordingly, by controlling the revocation and prevention of access to resources 115 based on the priority hierarchy of one or more users and/or one or more devices, host users that own or maintain one or more resources may open the resources to a wider range of users while maintaining a level of security for more trusted users, or users that have a closer social relationship to the host user.

In step 407, the access control platform 103 determines to control one or more resources 115 according to the characteristics of the one or more resources 115. Accordingly, the access control platform 103 causes a controlling of the access to the one or more resources 115 based, at least in part, on one or more characteristics associated with the one or more resources 115. As discussed above, the characteristics may include, for example, a number of users associated with a resource 115a, performance characteristics associated with a resource 115a, etc. Where the resource 115a is a wireless access point, one of the performance characteristics may be the bandwidth associated with the resource 115a. The access control platform 103 may control the access of one or more users and/or one or more devices to the resource 115a to control the characteristics associated with the resource 115a. For example, if a characteristic is a number of users currently accessing a resource 115a, the access control platform 103 may prevent additional users from accessing the resource 115a. Further, if a characteristic is the bandwidth of a resource 115a, the access control platform 103 may revoke the access by one or more users to the resource 115a to lessen the bandwidth.

In step 409, the access control platform 103 causes a revocation, a prevention, or a combination thereof of the access to one or more resources based, at least in part, on the priority hierarchy of the users and the devices. For example, where a lower-priority user attempting to access a resource 115a would increase the number of users beyond a set threshold, the access control platform 103 may prevent the user from accessing the resource 115a. Where a higher-priority user is attempting to access a resource as compared to one or more lower-priority users that are currently accessing the resource 115a, the access control platform 103 may revoke the access of one or more of the lower-priority users from the resource 115a to allow the higher-priority user to access the resource 115a. Further, where the bandwidth decreases to below a threshold level, the access control platform 103 may revoke the access of a lower-priority user as compared to other, higher-priority users that are currently using the resource 115a, to increase the bandwidth to above the threshold level.

Accordingly, by controlling the revocation and prevention of access to resources 115 based on the characteristics of the one or more resources 115 according to the priority hierarchy of one or more user and/or one or more devices, host users that own or maintain one or more resources 115 may open the resources 115 to a wider range of users while maintaining a level of quality of service for more trusted users, or users that have a closer social relationship to the host user.

FIG. 5 is a flowchart of a process for eliminating access rights to one or more resources, according to one embodiment. In one embodiment, the access control platform 103 performs the process 500 and is implemented in, for instance, a chip set including a processor and a memory as shown in FIG. 8. In step 501, the access control platform 103 causes a monitoring of a number of access times at least one other user, at least one other device, or a combination thereof accesses one or more resources 115. For example, each time a user

US 9,338,171 B2

**17**

attempts to access a resource 115*a*, the access control client application 111*a* associated with the device of the user should interface with the access control platform 103 to determine whether the user has permission to access the resource 115*a*. If the access control client application 111*a* does not interface with the access control platform 103, this may indicate that the user of the device may have corrupted the security procedures implemented using the access control platform 103 and may be able to improperly access the resource 115*a*.

In step 503, the access control platform 103 causes an elimination of the access rights to the one or more resources for one or more users and/or one or more devices based, at least in part, on the number of access times determined in step 501. Thus, if the number of access times the access control client application 111*a* interfaces with the access control platform 103 is less than the number of times the device associated with the access control client application 111*a* interfaces with a resource 115*a*, the access control platform 103 eliminates the security credentials to the resource so the device can no longer access the resource 115*a*. The access control platform 103 removes the ability of the device to access the resource to prevent a malicious user from reducing the security and/or the quality of service of the resource 115*a*. In one embodiment, the access control platform 103 logs identification information (e.g., IP address, MAC address, etc.) of the device associated with the unauthorized access to prevent the device from reacquiring the security credentials in the future. Thus, the access control platform 103 offers the additional security of permanently removing users and/or users that are associated with unauthorized access to one or more resources 115.

FIGS. 6A-6D are diagrams of user interfaces utilized in the processes of FIGS. 3-5, according to various embodiments. FIG. 6A illustrates a user interface 601*a* associated with a social networking service 109*a* that includes one or more contacts 603 that may be processed by the access control platform 103 to determine one or more users and/or devices associated with a host user that may access a resource owned or maintained by the host user. By way of example, the contacts 603 may be contacts of the host user within the social networking service 109*a*. Further, as illustrated with respect to the contacts 603, each one of the contacts is identified as belonging to a social networking group, such as Friend, Acquaintance, and Family. Thus, in one embodiment, the contacts 603 identified by a social networking service 109*a* may also include information that the access control platform 103 may use to determine the social distances between the contacts 603 and the host user that are used to determine the priority hierarchy of the users when accessing one or more resources 115.

FIG. 6B illustrates a user interface 601*b* associated with a UE 101 that had its access to a resource 115*a* revoked based on a higher-priority user accessing the same resource 115*a*. By way of example, the user interface 601*b* may include an indicator 605 that indicates the resource 115*a* associated with the access that was revoked (e.g., Grandma's WiFi) and the reason the access was revoked (e.g., a priority user). In one embodiment, the indicator 605 may also indicate, or in the alternative indicate, that access was revoked based on one or more characteristics of the resource 115*a*.

FIG. 6C illustrates the user interface 601*c* associated with a UE 101 that had it access rights to a resource eliminated based on use violations associated with the security credentials as illustrated based on the indicator 607. For example, the user associated with the UE 101 may have changed the process of the access control client application 111*a* communicating with the access control platform 103 such that the

**18**

application 111*a* does not communicate with the access control platform 103 to control the access to one or more resources. In one embodiment, the access control platform 103 logs identification information associated with the device (e.g., MAC address) to ensure that the device is not provided the security credentials again in the future, as illustrated by the indicator 607.

FIG. 6D illustrates the user interface 601*d* associated with a UE 101 used by a host user to register and configure a resource 115*a* (e.g., a wireless access point) with the access control platform 103. The user interface 601*d* may include one or more parameters 609 used to identify the resource (e.g., SSID: Grandma's WiFi), used for security credentials (e.g., Password: 1121KG0109AC), and one or more social networking groups that are used to create the priority hierarchy. In one embodiment, as illustrated, the order in which the social networking groups are listed provides the priority ranking. In one embodiment, the host user may assign the priority hierarchy based on, for example, one or more rating systems (e.g., numbers, starts, etc.). The user interface 6D associated with the configuration of the resource 115*a* may also include information associated with how many users and/or devices are currently connected to the resource 115*a* (e.g., the numbers next to the social networking groups), or any other additional information associated with the users and/or devices currently associated with the resource 115*a*.

The processes described herein for controlling access to resources according to social connections and/or characteristics of the resources may be advantageously implemented via software, hardware, firmware or a combination of software and/or firmware and/or hardware. For example, the processes described herein, may be advantageously implemented via processor(s), Digital Signal Processing (DSP) chip, an Application Specific Integrated Circuit (ASIC), Field Programmable Gate Arrays (FPGAs), etc. Such exemplary hardware for performing the described functions is detailed below.

FIG. 7 illustrates a computer system 700 upon which an embodiment of the invention may be implemented. Although computer system 700 is depicted with respect to a particular device or equipment, it is contemplated that other devices or equipment (e.g., network elements, servers, etc.) within FIG. 7 can deploy the illustrated hardware and components of system 700. Computer system 700 is programmed (e.g., via computer program code or instructions) to control access to resources according to social connections and/or characteristics of the resources as described herein and includes a communication mechanism such as a bus 710 for passing information between other internal and external components of the computer system 700. Information (also called data) is represented as a physical expression of a measurable phenomenon, typically electric voltages, but including, in other embodiments, such phenomena as magnetic, electromagnetic, pressure, chemical, biological, molecular, atomic, subatomic and quantum interactions. For example, north and south magnetic fields, or a zero and non-zero electric voltage, represent two states (0, 1) of a binary digit (bit). Other phenomena can represent digits of a higher base. A superposition of multiple simultaneous quantum states before measurement represents a quantum bit (qubit). A sequence of one or more digits constitutes digital data that is used to represent a number or code for a character. In some embodiments, information called analog data is represented by a near continuum of measurable values within a particular range. Computer system 700, or a portion thereof, constitutes a means for performing one or more steps of controlling access to resources according to social connections and/or characteristics of the resources.

US 9,338,171 B2

**19**

A bus **710** includes one or more parallel conductors of information so that information is transferred quickly among devices coupled to the bus **710**. One or more processors **702** for processing information are coupled with the bus **710**.

A processor (or multiple processors) **702** performs a set of operations on information as specified by computer program code related to controlling access to resources according to social connections and/or characteristics of the resources. The computer program code is a set of instructions or statements providing instructions for the operation of the processor and/or the computer system to perform specified functions. The code, for example, may be written in a computer programming language that is compiled into a native instruction set of the processor. The code may also be written directly using the native instruction set (e.g., machine language). The set of operations include bringing information in from the bus **710** and placing information on the bus **710**. The set of operations also typically include comparing two or more units of information, shifting positions of units of information, and combining two or more units of information, such as by addition or multiplication or logical operations like OR, exclusive OR (XOR), and AND. Each operation of the set of operations that can be performed by the processor is represented to the processor by information called instructions, such as an operation code of one or more digits. A sequence of operations to be executed by the processor **702**, such as a sequence of operation codes, constitute processor instructions, also called computer system instructions or, simply, computer instructions. Processors may be implemented as mechanical, electrical, magnetic, optical, chemical or quantum components, among others, alone or in combination.

Computer system **700** also includes a memory **704** coupled to bus **710**. The memory **704**, such as a random access memory (RAM) or any other dynamic storage device, stores information including processor instructions for controlling access to resources according to social connections and/or characteristics of the resources. Dynamic memory allows information stored therein to be changed by the computer system **700**. RAM allows a unit of information stored at a location called a memory address to be stored and retrieved independently of information at neighboring addresses. The memory **704** is also used by the processor **702** to store temporary values during execution of processor instructions. The computer system **700** also includes a read only memory (ROM) **706** or any other static storage device coupled to the bus **710** for storing static information, including instructions, that is not changed by the computer system **700**. Some memory is composed of volatile storage that loses the information stored thereon when power is lost. Also coupled to bus **710** is a non-volatile (persistent) storage device **708**, such as a magnetic disk, optical disk or flash card, for storing information, including instructions, that persists even when the computer system **700** is turned off or otherwise loses power.

Information, including instructions for controlling access to resources according to social connections and/or characteristics of the resources, is provided to the bus **710** for use by the processor from an external input device **712**, such as a keyboard containing alphanumeric keys operated by a human user, a microphone, an Infrared (IR) remote control, a joystick, a game pad, a stylus pen, a touch screen, or a sensor. A sensor detects conditions in its vicinity and transforms those detections into physical expression compatible with the measurable phenomenon used to represent information in computer system **700**. Other external devices coupled to bus **710**, used primarily for interacting with humans, include a display device **714**, such as a cathode ray tube (CRT), a liquid crystal display (LCD), a light emitting diode (LED) display, an

**20**

organic LED (OLED) display, a plasma screen, or a printer for presenting text or images, and a pointing device **716**, such as a mouse, a trackball, cursor direction keys, or a motion sensor, for controlling a position of a small cursor image presented on the display **714** and issuing commands associated with graphical elements presented on the display **714**. In some embodiments, for example, in embodiments in which the computer system **700** performs all functions automatically without human input, one or more of external input device **712**, display device **714** and pointing device **716** is omitted.

In the illustrated embodiment, special purpose hardware, such as an application specific integrated circuit (ASIC) **720**, is coupled to bus **710**. The special purpose hardware is configured to perform operations not performed by processor **702** quickly enough for special purposes. Examples of ASICs include graphics accelerator cards for generating images for display **714**, cryptographic boards for encrypting and decrypting messages sent over a network, speech recognition, and interfaces to special external devices, such as robotic arms and medical scanning equipment that repeatedly perform some complex sequence of operations that are more efficiently implemented in hardware.

Computer system **700** also includes one or more instances of a communications interface **770** coupled to bus **710**. Communication interface **770** provides a one-way or two-way communication coupling to a variety of external devices that operate with their own processors, such as printers, scanners and external disks. In general the coupling is with a network link **778** that is connected to a local network **780** to which a variety of external devices with their own processors are connected. For example, communication interface **770** may be a parallel port or a serial port or a universal serial bus (USB) port on a personal computer. In some embodiments, communications interface **770** is an integrated services digital network (ISDN) card or a digital subscriber line (DSL) card or a telephone modem that provides an information communication connection to a corresponding type of telephone line. In some embodiments, a communication interface **770** is a cable modem that converts signals on bus **710** into signals for a communication connection over a coaxial cable or into optical signals for a communication connection over a fiber optic cable. As another example, communications interface **770** may be a local area network (LAN) card to provide a data communication connection to a compatible LAN, such as Ethernet. Wireless links may also be implemented. For wireless links, the communications interface **770** sends or receives or both sends and receives electrical, acoustic or electromagnetic signals, including infrared and optical signals, that carry information streams, such as digital data. For example, in wireless handheld devices, such as mobile telephones like cell phones, the communications interface **770** includes a radio band electromagnetic transmitter and receiver called a radio transceiver. In certain embodiments, the communications interface **770** enables connection to the communication network **105** for providing remote management controlling access to resources according to social connections and/or characteristics of the resources at the UE **101**.

The term "computer-readable medium" as used herein refers to any medium that participates in providing information to processor **702**, including instructions for execution. Such a medium may take many forms, including, but not limited to computer-readable storage medium (e.g., non-volatile media, volatile media), and transmission media. Non-transitory media, such as non-volatile media, include, for example, optical or magnetic disks, such as storage device **708**. Volatile media include, for example, dynamic memory

US 9,338,171 B2

21

**704**. Transmission media include, for example, twisted pair cables, coaxial cables, copper wire, fiber optic cables, and carrier waves that travel through space without wires or cables, such as acoustic waves and electromagnetic waves, including radio, optical and infrared waves. Signals include man-made transient variations in amplitude, frequency, phase, polarization or other physical properties transmitted through the transmission media. Common forms of computer-readable media include, for example, a floppy disk, a flexible disk, hard disk, magnetic tape, any other magnetic medium, a CD-ROM, CDRW, DVD, any other optical medium, punch cards, paper tape, optical mark sheets, any other physical medium with patterns of holes or other optically recognizable indicia, a RAM, a PROM, an EPROM, a FLASH-EPROM, an EEPROM, a flash memory, any other memory chip or cartridge, a carrier wave, or any other medium from which a computer can read. The term computer-readable storage medium is used herein to refer to any computer-readable medium except transmission media.

Logic encoded in one or more tangible media includes one or both of processor instructions on a computer-readable storage media and special purpose hardware, such as ASIC **720**.

Network link **778** typically provides information communication using transmission media through one or more networks to other devices that use or process the information. For example, network link **778** may provide a connection through local network **780** to a host computer **782** or to equipment **784** operated by an Internet Service Provider (ISP). ISP equipment **784** in turn provides data communication services through the public, world-wide packet-switching communication network of networks now commonly referred to as the Internet **790**.

A computer called a server host **792** connected to the Internet hosts a process that provides a service in response to information received over the Internet. For example, server host **792** hosts a process that provides information representing video data for presentation at display **714**. It is contemplated that the components of system **700** can be deployed in various configurations within other computer systems, e.g., host **782** and server **792**.

At least some embodiments of the invention are related to the use of computer system **700** for implementing some or all of the techniques described herein. According to one embodiment of the invention, those techniques are performed by computer system **700** in response to processor **702** executing one or more sequences of one or more processor instructions contained in memory **704**. Such instructions, also called computer instructions, software and program code, may be read into memory **704** from another computer-readable medium such as storage device **708** or network link **778**. Execution of the sequences of instructions contained in memory **704** causes processor **702** to perform one or more of the method steps described herein. In alternative embodiments, hardware, such as ASIC **720**, may be used in place of or in combination with software to implement the invention. Thus, embodiments of the invention are not limited to any specific combination of hardware and software, unless otherwise explicitly stated herein.

The signals transmitted over network link **778** and other networks through communications interface **770**, carry information to and from computer system **700**. Computer system **700** can send and receive information, including program code, through the networks **780**, **790** among others, through network link **778** and communications interface **770**. In an example using the Internet **790**, a server host **792** transmits program code for a particular application, requested by a

22

message sent from computer **700**, through Internet **790**, ISP equipment **784**, local network **780** and communications interface **770**. The received code may be executed by processor **702** as it is received, or may be stored in memory **704** or in storage device **708** or any other non-volatile storage for later execution, or both. In this manner, computer system **700** may obtain application program code in the form of signals on a carrier wave.

Various forms of computer readable media may be involved in carrying one or more sequence of instructions or data or both to processor **702** for execution. For example, instructions and data may initially be carried on a magnetic disk of a remote computer such as host **782**. The remote computer loads the instructions and data into its dynamic memory and sends the instructions and data over a telephone line using a modem. A modem local to the computer system **700** receives the instructions and data on a telephone line and uses an infra-red transmitter to convert the instructions and data to a signal on an infra-red carrier wave serving as the network link **778**. An infrared detector serving as communications interface **770** receives the instructions and data carried in the infrared signal and places information representing the instructions and data onto bus **710**. Bus **710** carries the information to memory **704** from which processor **702** retrieves and executes the instructions using some of the data sent with the instructions. The instructions and data received in memory **704** may optionally be stored on storage device **708**, either before or after execution by the processor **702**.

FIG. **8** illustrates a chip set or chip **800** upon which an embodiment of the invention may be implemented. Chip set **800** is programmed to control access to resources according to social connections and/or characteristics of the resources as described herein and includes, for instance, the processor and memory components described with respect to FIG. **7** incorporated in one or more physical packages (e.g., chips). By way of example, a physical package includes an arrangement of one or more materials, components, and/or wires on a structural assembly (e.g., a baseboard) to provide one or more characteristics such as physical strength, conservation of size, and/or limitation of electrical interaction. It is contemplated that in certain embodiments the chip set **800** can be implemented in a single chip. It is further contemplated that in certain embodiments the chip set or chip **800** can be implemented as a single "system on a chip." It is further contemplated that in certain embodiments a separate ASIC would not be used, for example, and that all relevant functions as disclosed herein would be performed by a processor or processors. Chip set or chip **800**, or a portion thereof, constitutes a means for performing one or more steps of providing user interface navigation information associated with the availability of functions. Chip set or chip **800**, or a portion thereof, constitutes a means for performing one or more steps of controlling access to resources according to social connections and/or characteristics of the resources.

In one embodiment, the chip set or chip **800** includes a communication mechanism such as a bus **801** for passing information among the components of the chip set **800**. A processor **803** has connectivity to the bus **801** to execute instructions and process information stored in, for example, a memory **805**. The processor **803** may include one or more processing cores with each core configured to perform independently. A multi-core processor enables multiprocessing within a single physical package. Examples of a multi-core processor include two, four, eight, or greater numbers of processing cores. Alternatively or in addition, the processor **803** may include one or more microprocessors configured in tandem via the bus **801** to enable independent execution of

US 9,338,171 B2

23                                                    24

instructions, pipelining, and multithreading. The processor **803** may also be accompanied with one or more specialized components to perform certain processing functions and tasks such as one or more digital signal processors (DSP) **807**, or one or more application-specific integrated circuits (ASIC) **809**. A DSP **807** typically is configured to process real-world signals (e.g., sound) in real time independently of the processor **803**. Similarly, an ASIC **809** can be configured to performed specialized functions not easily performed by a more general purpose processor. Other specialized components to aid in performing the inventive functions described herein may include one or more field programmable gate arrays (FPGA), one or more controllers, or one or more other special-purpose computer chips.

In one embodiment, the chip set or chip **800** includes merely one or more processors and some software and/or firmware supporting and/or relating to and/or for the one or more processors.

The processor **803** and accompanying components have connectivity to the memory **805** via the bus **801**. The memory **805** includes both dynamic memory (e.g., RAM, magnetic disk, writable optical disk, etc.) and static memory (e.g., ROM, CD-ROM, etc.) for storing executable instructions that when executed perform the inventive steps described herein to control access to resources according to social connections and/or characteristics of the resources. The memory **805** also stores the data associated with or generated by the execution of the inventive steps.

FIG. **9** is a diagram of exemplary components of a mobile terminal (e.g., handset) for communications, which is capable of operating in the system of FIG. **1**, according to one embodiment. In some embodiments, mobile terminal **901**, or a portion thereof, constitutes a means for performing one or more steps of controlling access to resources according to social connections and/or characteristics of the resources. Generally, a radio receiver is often defined in terms of front-end and back-end characteristics. The front-end of the receiver encompasses all of the Radio Frequency (RF) circuitry whereas the back-end encompasses all of the base-band processing circuitry. As used in this application, the term "circuitry" refers to both: (1) hardware-only implementations (such as implementations in only analog and/or digital circuitry), and (2) combinations of circuitry and software (and/or firmware) (such as, if applicable to the particular context, to a combination of processor(s), including digital signal processor(s), software, and memory(ies) that work together to cause an apparatus, such as a mobile phone or server, to perform various functions). This definition of "circuitry" applies to all uses of this term in this application, including in any claims. As a further example, as used in this application and if applicable to the particular context, the term "circuitry" would also cover an implementation of merely a processor (or multiple processors) and its (or their) accompanying software and/or firmware. The term "circuitry" would also cover if applicable to the particular context, for example, a baseband integrated circuit or applications processor integrated circuit in a mobile phone or a similar integrated circuit in a cellular network device or other network devices.

Pertinent internal components of the telephone include a Main Control Unit (MCU) **903**, a Digital Signal Processor (DSP) **905**, and a receiver/transmitter unit including a microphone gain control unit and a speaker gain control unit. A main display unit **907** provides a display to the user in support of various applications and mobile terminal functions that perform or support the steps of controlling access to resources according to social connections and/or characteristics of the

resources. The display **907** includes display circuitry configured to display at least a portion of a user interface of the mobile terminal (e.g., mobile telephone). Additionally, the display **907** and display circuitry are configured to facilitate user control of at least some functions of the mobile terminal. An audio function circuitry **909** includes a microphone **911** and microphone amplifier that amplifies the speech signal output from the microphone **911**. The amplified speech signal output from the microphone **911** is fed to a coder/decoder (CODEC) **913**.

A radio section **915** amplifies power and converts frequency in order to communicate with a base station, which is included in a mobile communication system, via antenna **917**. The power amplifier (PA) **919** and the transmitter/modulation circuitry are operationally responsive to the MCU **903**, with an output from the PA **919** coupled to the duplexer **921** or circulator or antenna switch, as known in the art. The PA **919** also couples to a battery interface and power control unit **920**.

In use, a user of mobile terminal **901** speaks into the microphone **911** and his or her voice along with any detected background noise is converted into an analog voltage. The analog voltage is then converted into a digital signal through the Analog to Digital Converter (ADC) **923**. The control unit **903** routes the digital signal into the DSP **905** for processing therein, such as speech encoding, channel encoding, encrypting, and interleaving. In one embodiment, the processed voice signals are encoded, by units not separately shown, using a cellular transmission protocol such as enhanced data rates for global evolution (EDGE), general packet radio service (GPRS), global system for mobile communications (GSM), Internet protocol multimedia subsystem (IMS), universal mobile telecommunications system (UMTS), etc., as well as any other suitable wireless medium, e.g., microwave access (WiMAX), Long Term Evolution (LTE) networks, code division multiple access (CDMA), wideband code division multiple access (WCDMA), wireless fidelity (WiFi), satellite, and the like, or any combination thereof.

The encoded signals are then routed to an equalizer **925** for compensation of any frequency-dependent impairments that occur during transmission though the air such as phase and amplitude distortion. After equalizing the bit stream, the modulator **927** combines the signal with a RF signal generated in the RF interface **929**. The modulator **927** generates a sine wave by way of frequency or phase modulation. In order to prepare the signal for transmission, an up-converter **931** combines the sine wave output from the modulator **927** with another sine wave generated by a synthesizer **933** to achieve the desired frequency of transmission. The signal is then sent through a PA **919** to increase the signal to an appropriate power level. In practical systems, the PA **919** acts as a variable gain amplifier whose gain is controlled by the DSP **905** from information received from a network base station. The signal is then filtered within the duplexer **921** and optionally sent to an antenna coupler **935** to match impedances to provide maximum power transfer. Finally, the signal is transmitted via antenna **917** to a local base station. An automatic gain control (AGC) can be supplied to control the gain of the final stages of the receiver. The signals may be forwarded from there to a remote telephone which may be another cellular telephone, any other mobile phone or a land-line connected to a Public Switched Telephone Network (PSTN), or other telephony networks.

Voice signals transmitted to the mobile terminal **901** are received via antenna **917** and immediately amplified by a low noise amplifier (LNA) **937**. A down-converter **939** lowers the carrier frequency while the demodulator **941** strips away the RF leaving only a digital bit stream. The signal then goes

US 9,338,171 B2

25

through the equalizer **925** and is processed by the DSP **905**. A Digital to Analog Converter (DAC) **943** converts the signal and the resulting output is transmitted to the user through the speaker **945**, all under control of a Main Control Unit (MCU) **903** which can be implemented as a Central Processing Unit (CPU).

The MCU **903** receives various signals including input signals from the keyboard **947**. The keyboard **947** and/or the MCU **903** in combination with other user input components (e.g., the microphone **911**) comprise a user interface circuitry for managing user input. The MCU **903** runs a user interface software to facilitate user control of at least some functions of the mobile terminal **901** to control access to resources according to social connections and/or characteristics of the resources. The MCU **903** also delivers a display command and a switch command to the display **907** and to the speech output switching controller, respectively. Further, the MCU **903** exchanges information with the DSP **905** and can access an optionally incorporated SIM card **949** and a memory **951**. In addition, the MCU **903** executes various control functions required of the terminal. The DSP **905** may, depending upon the implementation, perform any of a variety of conventional digital processing functions on the voice signals. Additionally, DSP **905** determines the background noise level of the local environment from the signals detected by microphone **911** and sets the gain of microphone **911** to a level selected to compensate for the natural tendency of the user of the mobile terminal **901**.

The CODEC **913** includes the ADC **923** and DAC **943**. The memory **951** stores various data including call incoming tone data and is capable of storing other data including music data received via, e.g., the global Internet. The software module could reside in RAM memory, flash memory, registers, or any other form of writable storage medium known in the art. The memory device **951** may be, but not limited to, a single memory, CD, DVD, ROM, RAM, EEPROM, optical storage, magnetic disk storage, flash memory storage, or any other non-volatile storage medium capable of storing digital data.

An optionally incorporated SIM card **949** carries, for instance, important information, such as the cellular phone number, the carrier supplying service, subscription details, and security information. The SIM card **949** serves primarily to identify the mobile terminal **901** on a radio network. The card **949** also contains a memory for storing a personal telephone number registry, text messages, and user specific mobile terminal settings.

While the invention has been described in connection with a number of embodiments and implementations, the invention is not so limited but covers various obvious modifications and equivalent arrangements, which fall within the purview of the appended claims. Although features of the invention are expressed in certain combinations among the claims, it is contemplated that these features can be arranged in any combination and order.

What is claimed is:

**1**. A method comprising facilitating a processing of and/or processing (1) data and/or (2) information and/or (3) at least one signal, the (1) data and/or (2) information and/or (3) at least one signal based, at least in part, on the following:

    one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof;

    a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups; and

26

    a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on (a) membership in the one or more social networking groups, and (b) one or more characteristics associated with the one or more resources,

    wherein the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more wireless access points, or a combination thereof.

**2**. A method of claim **1**, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

    a priority hierarchy associated with the at least one user, the at least one device, the one or more social networking groups, or a combination thereof; and

    a controlling of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

**3**. A method of claim **2**, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

    a revocation, a prevention, or a combination thereof of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

**4**. A method of claim **3**, wherein access of one or more lower-priority other users, one or more lower-priority other devices, or a combination thereof to the one or more resources is revoked, prevented, or a combination thereof based, at least in part, on access by one or more higher-priority users, one or more higher-priority devices, or a combination thereof to the one or more resources.

**5**. A method of claim **2**, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

    a prevention, a revocation, or a combination thereof of access to the one or more resources of the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

**6**. A method of claim **5**, wherein access to the one or more resources is revoked for one or more lower-priority users, one or more lower-priority devices, or a combination thereof prior to access for one or more higher-priority users, one or more higher-priority devices, or a combination thereof.

**7**. A method of claim **1**, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

    a monitoring of a number of access times at least one other user, at least one other device, or a combination thereof accesses the one or more resources; and

    an elimination of access rights to the one or more resources for the at least one other user, the at least one other device, or a combination thereof based, at least in part, on the number of access times.

**8**. A method of claim **1**, wherein the one or more social networking groups include at least one of a family group, a friends group, a friends of friends group, and an others group.

US 9,338,171 B2

27

**9.** A method of claim **1**, wherein the controlling of access to the one or more resources is independent from controlling of configuration settings associated with the one or more resources.

**10**. An apparatus comprising:

at least one processor; and

at least one memory including computer program code for one or more programs,

the at least one memory and the computer program code configured to, with the at least one processor, cause the apparatus to perform at least the following,

determine one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof;

process and/or facilitate a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups; and

cause, at least in part, a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on (a) membership in the one or more social networking groups, and (b) one or more characteristics associated with the one or more resources,

wherein the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more wireless access points, or a combination thereof.

**11**. An apparatus of claim **10**, wherein the apparatus is further caused to:

determine a priority hierarchy associated with the at least one user, the at least one device, the one or more social networking groups, or a combination thereof; and

cause, at least in part, a controlling of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

28

**12.** An apparatus of claim **11**, wherein the apparatus is further caused to:

cause, at least in part, a revocation, a prevention, or a combination thereof of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

**13.** An apparatus of claim **12**, wherein access of one or more lower-priority other users, one or more lower-priority other devices, or a combination thereof to the one or more resources is revoked, prevented, or a combination thereof based, at least in part, on access by one or more higher-priority users, one or more higher-priority devices, or a combination thereof to the one or more resources.

**14.** An apparatus of claim **10**, wherein the apparatus is further caused to:

cause, at least in part, a prevention, a revocation, or a combination thereof of access to the one or more resources of the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

**15.** An apparatus of claim **14**, wherein access to the one or more resources is revoked for one or more lower-priority users, one or more lower-priority devices, or a combination thereof prior to access for one or more higher-priority users, one or more higher-priority devices, or a combination thereof.

**16**. An apparatus of claim **10**, wherein the apparatus is further caused to:

cause, at least in part, a monitoring of a number of access times at least one other user, at least one other device, or a combination thereof accesses the one or more resources; and

cause, at least in part, an elimination of access rights to the one or more resources for the at least one other user, the at least one other device, or a combination thereof based, at least in part, on the number of access times.

**17**. An apparatus of claim **10**, wherein the one or more social networking groups include at least one of a family group, a friends group, a friends of friends group, and an others group.

\* \* \* \* \*

# **Exhibit 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT, | ) ) ) | |
| Plaintiff, | ) | C.A. No. 21-cv-01117-MN-CJB |
| | ) | C.A. No. 21-cv-01119-MN-CJB |
| v. | ) | C.A. No. 21-cv-01120-MN-CJB |
| | ) | |
| NETGEAR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT'S INITIAL INVALIDITY CONTENTIONS</u>

Pursuant to Paragraph 7(b) of the Scheduling Order entered November 2, 2021, Defendant

NETGEAR, Inc. ("NETGEAR") provides its Initial Invalidity Contentions.  These contentions are

based on information reasonably available to NETGEAR at this time, including Plaintiff WSOU

Investments, LLC d/b/a Brazos Licensing and Development's ("WSOU") current assertions that

NETGEAR allegedly infringes:

- C.A. No. 21-1117: Claims 1-3, and 10 of U.S. Patent No. 7,512,096 ("the '096 patent");

- C.A. No. 21-1119: Claims 1, 7-10, and 16-17 of U.S. Patent No. 9,338,171 ("the '171 patent"); and

- C.A. No. 21-1120: Claims 1-4, 6, 10, and 12 of U.S. Patent No. 7,551,630 ("the '630 patent") (collectively, the "Patents-in-Suit").

These contentions are based on prior art references presently identified by NETGEAR.

NETGEAR has not received prior art discovery from WSOU and NETGEAR's search for prior

art continues.  Additionally, NETGEAR has not received WSOU's proposed construction of claim

limitations found in the asserted claims of the Patents-in-Suit and the Court has yet to address any

potential claim construction disputes.

In addition, NETGEAR contends that the asserted claims of the Patents-in-Suit are invalid for failing to comply with the written description, enablement, and definiteness requirements of 35 U.S.C. § 112.  As described in its Motion to Dismiss (C.A. No. 21-1119, D.I. 32-34, 52), NETGEAR also contends that the claims of the '171 patent are invalid under 35 U.S.C. § 101.

NETGEAR further contends that at least the '096 and '171 patents are unenforceable due to inequitable conduct before the United States Patent and Trademark Office ("USPTO").  For example, in its September 16, 2021 letter to WSOU, NETGEAR explained that the inventors and the prosecuting attorney of the '171 patent application had a duty to disclose US Patent Application No. 13/240,310 to the USPTO, but did not.  To date, WSOU has not responded to this letter.

NETGEAR expressly reserves the right to amend or supplement these Initial Invalidity Contentions based on discovery or other circumstances.

## I.     INVALIDITY UNDER 35 U.S.C. § 102/103

### A.   The '096 Patent

NETGEAR identifies the following prior art patents and publications for the '096 patent. NETGEAR reserves the right to rely on any products offered for sale, publicly used, or publicly known that embodied any of the references identified below or that may otherwise become known in the course of discovery and NETGEAR's investigation.

The following items of prior art anticipate and/or render obvious the asserted claims of the '096 patent:

- U.S. Patent No. 7,352,718 to Perahia, "Spatial Division Multiple Access for Wireless Networks," filed July 22, 2003 ("Perahia");

- U.S. Patent No. 8,199,723 to Li, "Parallel Wireless Communication Apparatus, Method, and System," filed December 23, 2003 ("Li");

- U.S. Patent No. 8,014,366 to Wax, "WLAN Capacity Enhancement Using SDM," filed August 13, 2004 ("Wax");

- Christof Farsakh & Josef A. Nossek, *Spatial Covariance Based Downlink Beamforming in an SDMA Mobile Radio System*, 46 IEEE Transactions on Comms. 1497 (Nov. 1998) ("Farsakh");

- U.S. Patent No. 7,352,688 to Perahia, "High Data Rate Wireless Bridging," filed December 31, 2002 ("the '688 patent");

- A. T. Alastalo & M. Kahola, *Smart-antenna operation for indoor wireless local-area networks using OFDM*, 2 IEEE Transactions on Wireless Comms. 392 (Mar. 2003) ("Alastalo"); and

- P. Vandenameele, L. Van Der Perre, M. G. E. Engels, B. Gyselinckx, & H. J. De Man, *A Combined OFDM/SDMA Approach*, 18 IEEE J. on Select Areas Comms. 2312 (Nov. 2000) ("Vandenameele").

Exhibit 1 contains claim charts that demonstrate the correspondence between the references listed above and the asserted claims.  In addition, NETGEAR incorporates the petition for *Inter Partes* Review, IPR2022-00516, which demonstrates that the asserted claims of the '096 patent are invalid.

B.  The '171 Patent

NETGEAR identifies the following prior art patents and publications for the '171 patent. NETGEAR reserves the right to rely on any products offered for sale, publicly used, or publicly known that embodied any of the references identified below or that may otherwise become known in the course of discovery and NETGEAR's investigation.

The following items of prior art anticipate and/or render obvious the asserted claims of the '171 patent:

- U.S. Patent Publication No. 2012/0110643 to Schmidt, "System and Method for Transparently Providing Access to Secure Networks," filed November 1, 2010 ("Schmidt");

- U.S. Patent Publication No. 2013/0080520 to Kiukkonen, "Method and Apparatus for Provisioning Resource Credentials Based on Social Networking Data," filed September 22, 2011 ("Kiukkonen");

- U.S. Patent No. 8,515,434 to Narendran, "Methods and Devices for Limiting Access to Femtocell Radio Access Networks," filed April 8, 2010 ("Narendran");

- U.S. Patent Publication No. 2008/207170 to Khetawat, "Femtocell Integration Into the Macro Network," filed February 6, 2008 ("Khetawat");

- U.S. Patent No. 7,069,587 to Ito, "Electronic Device and Connection Control Method," filed August 23, 2001 ("Ito"); and

- International Publication No. WO 2011/123824 to Adjakple, "Inhibition of Allowed Closed Subscriber Group List," filed April 1, 2011 ("Adjakple").

Exhibit 2 contains claim charts that demonstrate the correspondence between the references listed above and the asserted claims.

### C.  The '630 Patent

NETGEAR identifies the following prior art patents and publications for the '630 patent. NETGEAR reserves the right to rely on any products offered for sale, publicly used, or publicly known that embodied any of the references identified below or that may otherwise become known in the course of discovery and NETGEAR's investigation.

The following items of prior art anticipate and/or render obvious the asserted claims of the '630 patent:

- US Patent Publication No. 2002/0031091 to Michiel van Everdingen, "Method and a Device for Controlling Source Specific Data Flow," filed August 31, 2001 ("Everdingen");

- US Patent No. 7,133,360 to Louis Le Gouriellec et al., "Conditional Bandwidth Subscriptions for Multiprotocol Label Switching (MPLS) Label Switched Paths (LSPS)," filed May 7, 2002 ("Gouriellec");

- U.S. Patent No. 6,463,068 to Arthur Lin et al., "Router With Class of Service Mapping," filed December 31, 1997 ("Lin");

- U.S. Patent No. 6,826,147 to Biswajit B. Nandy et al., "Method and Apparatus for Aggregate Flow Control in a Differentiated Services Network," filed December 19, 2000 ("Nandy");

- E. Rosen et al., RFC 3031, *Multiprotocol Label Switching Architecture* (Jan. 2001) ("RFC 3031");

- David B. Davidson, *A Parallel Processing Tutorial, IEEE Antennas and Propagation Society Magazine*, Apr. 1990, at 6 ("Davidson");

- Sally Floyd & Van Jacobson, *Random Early Detection Gateways for Congestion Avoidance*, 1 IEEE/ACM Transactions on Networking 397 (Aug. 1993) ("Floyd");

- Saleem N. Bhatti & Jon Crowcroft, *QoS-Sensitive Flows: Issues in IP Packet Handling*, 4 IEEE Internet Computing 48 (July-Aug. 2000) ("Bhatti");

- Stefaan De Cnodder et al., *A Rate Based RED Mechanism*, The 10th International Workshop on Network and Operating System Support for Digital and Audio, Chapel Hill, NC (June 26-28, 2000) (https://www.nossdav.org/2000/) ("Cnodder");

- B. Braden et al., RFC 2309, *Recommendations on Queue Management and Congestion Avoidance in the Internet* (Apr. 1998) ("RFC 2309");

- K. Nichols et al., RFC 2474, *Definition of the Differentiated Services Field (DS Field) in the IPv4 and IPv6 Headers* (Dec. 1998) ("RFC 2474");

- RFC 2475, "An Architecture for Differentiated Services," dated December 1998 ("RFC 2475");

- J. Heinanen et al., RFC 2597, *Assured Forwarding PHB Group* (June 1999) ("RFC 2597"); and

- J. Heinanen et al., RFC 2698, *A Two Rate Three Color Marker* (Sep. 1999) ("RFC 2698").

Exhibit 3 contains claim charts that demonstrate the correspondence between the references listed above and the asserted claims.  In addition, NETGEAR incorporates the petition for *Inter Partes* Review, IPR2022-00606, which demonstrates that the asserted claims of the '630 patent are invalid.

## II.      INVALIDITY UNDER 35 U.S.C. § 112

### A.  The '096 Patent

The asserted claims of the '096 patent are invalid as indefinite under 35 U.S.C. § 112, ¶ 2 for failing to particularly point out and distinctly claim the subject matter that the patentee regards as its alleged invention such that one of ordinary skill in the relevant art would be reasonable apprised of the bounds of the asserted claims when read in light of the specification.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).  For example, the limitation "substantially concurrently" in claim 1 is vague and subjective.

In addition, the asserted claims of the '096 patent are invalid for lack of written description and enablement under 35 U.S.C. § 112, ¶ 1 for failing to teach those of ordinary skill in the art how to make and use the full scope of the claimed invention without undue experimentation and to show that the inventors were in possession of the claimed inventions when they filed their applications.  For example, the '096 patent does not disclose how to perform the "weighting" steps of claim 1.

### B.  The '171 Patent

Claim 1 of the '171 patent is invalid under 35 USC § 112, ¶ 2 because it includes both apparatus limitations (one or more resources) and method limitations (processing and controlling). *See IPXL Holdings L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) ("Because claim 25 recites both a system and the method for using that system, it does not apprise a person of ordinary skill in the art of its scope, and it is invalid under section 112, paragraph 2."); *Rembrandt Data Techs., LP v. AOL LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) (holding claim with four apparatus limitations and one method step was indefinite).

In addition, the asserted claims of the '171 patent are invalid for lack of written description and enablement under 35 U.S.C. § 112, ¶ 1 for failing to teach those of ordinary skill in the art how to make and use the full scope of the claimed inventions without undue experimentation and to show that the inventors were in possession of the claimed inventions when they filed their applications.  For example, the '171 patent does not disclose how to perform the "processing of social networking information" step of claims 1 and 10.

Moreover, claims 8 and 17 are invalid 35 U.S.C. § 112, ¶ 4, which requires a dependent claim to further limit the claim on which it depends.  These dependent claims add the limitation "wherein the one or more social networking groups include at least one of a family group, a friends group, a friends of friends group, and an others group."  As this limitation includes "an others group" it does not further limit claims 1 and 10.

C.   The '630 Patent

The asserted claims of the '630 patent are invalid as indefinite under 35 U.S.C. § 112, ¶ 2 for failing to particularly point out and distinctly claim the subject matter that the patentee regards as its alleged invention such that one of ordinary skill in the relevant art would be reasonable apprised of the bounds of the asserted claims when read in light of the specification.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).  For example, the limitation "predefined rules and conditions" found in claims 1 and 2 is vague and subjective.

In addition, the asserted claims of the '630 patent are invalid for lack of written description and enablement under 35 U.S.C. § 112, ¶ 1 for failing to teach those of ordinary skill in the art how to make and use the full scope of the claimed inventions without undue experimentation and to show that the inventors were in possession of the claimed inventions when they filed their

applications.  For example, the '630 patent does not disclose the limitation "a telecommunication network" found in claims 1-3.

Claims 4 and 10 add the additional limitation of "a plurality of common processors." These claims are invalid under 35 U.S.C. § 112, ¶ 1 because the '630 patent specification does not describe what happens if there is more than one common processor.  It only states that "the present invention is not limited to application with only one common processor CP in a router ROUT." ('630 patent, 4:38-42.)  Moreover, these claims are invalid 35 U.S.C. § 112, ¶ 4, which requires a dependent claim to further limit the claim on which it depends.  Claims 1 and 2 have a limitation to a common processor for processing.  Because claims 4 and 10 add a "a plurality of common processors" for processing, they do not further limit claims 1 and 2.

### III.    INVALIDITY UNDER 35 U.S.C. § 101

The claims of the '171 patent are invalid as unpatentable subject matter under 35 U.S.C. § 101.  These claims are directed to an abstract idea of controlling access to resources and recite only generic computer hardware as described in detail in NETGEAR's Motion to Dismiss briefing. NETGEAR incorporates this briefing by reference.  (*See* C.A. No. 21-1119, D.I. 32-34, 52.)

### IV.    UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT

#### A.   The '096 Patent

On information and belief, the '096 patent is unenforceable due to inequitable conduct.  On information and belief, the inventors and the prosecuting attorneys of the '096 patent, engaged in an effort to deceive the examiner who was examining the application leading to the '096 patent in an effort to obtain issuance of the '096 patent.

The background section of the '096 patent cites to two articles, Alastalo and Vandenameele, but neither the inventors nor the prosecuting attorneys provided those articles to

the USPTO during prosecution.  (*See* '096 patent, 1:60-2:3.)  The '096 patent cites to these articles for "a detailed discussion on the use of the spatial dimension to allow discrimination among multiple radio[s]."  (*Id*.)  However, these references describe much more than just using SDMA to discriminate between mobile stations.  For example, these references describe channel estimation.  As the examiner allowed the '096 patent claims because the prior art of record did not teach the "estimating" steps found in claim 1, these articles are material to patentability.

Alastalo describes "a system that is compatible with the physical layer of the 5-GHz IEEE 802.11a wireless-local-area network and utilizes an adaptive antenna array at the access point for single-user smart-antenna operation, as well as for space-division multiple access (SDMA)."  (Alastalo at Abstract.)  Alastalo obtains channel estimates from training symbols.  "For SDMA, the channel estimation is done during [uplink] such that the corresponding [mobile terminals] are served one at a time."  (*Id*. at 394.)

Similarly, Vandenameele "developed an efficient channel estimator."  (Vandenameele at 2314.)  "It allows the base station to estimate the channels of all simultaneous users based on one OFDM training symbol that is transmitted at the start of an OFDM/SDMA communication slot."  (*Id*.)  Vandenameele's channel estimator is provided in the Appendix, which is titled "Channel Estimation for OFDM/SDMA."  (*Id*. at 2319-2320.)

The inventors, Alexandr Kuzminskiy, Hamid Reza Karimi, and Kin Leung, and the prosecuting attorneys, Terry D. Morgan and Mark W. Sincell of Williams, Morgan & Amerson, P.C., had a duty of disclosure, candor, and good faith to the USPTO.  37 C.F.R. § 1.56.  They should have provided copies of Alastalo and Vandenameele to the USPTO and should not have mischaracterized the disclosure of these articles in the '096 patent specification.

B.   The '171 Patent

On information and belief, the '171 patent is unenforceable due to inequitable conduct.  On information and belief, the prosecuting attorneys and the inventors of the '171 patent, engaged in an effort to deceive the examiner who was examining the application leading to the '171 patent in an effort to obtain issuance of the '171 patent.

The '171 patent application was filed on December 19, 2012, claiming priority to a provisional application filed on December 30, 2011, and issued on May 10, 2016.  The provisional application is substantially the same as the non-provisional application.  The inventors listed on the face of the '171 patent are Niko Tapani Kiukkonen, Janne Marin, and Sverre Slotte, employees of Nokia at the time of filing.

On September 22, 2011, just three months before the provisional application was filed, the same applicant as the '171 patent application filed US Patent Application No. 13/240,310 ("the '310 application"), naming these same three inventors, plus Jukka Pekka Reunamäki.  On March 28, 2013, the '310 application published as US Patent Publication No. 2013/0080520.  Applicant did not cite the '310 application, its publication, or all of the art cited during the prosecution of the '310 application to the USPTO during prosecution of the '171 patent.

The '310 application has similar (and sometimes the same) figures and corresponding text.  Both the '310 application and the '171 patent describe controlling access to a resource, such as a wireless access point, based on membership in a social networking group.  Claim 1 of the '310 application as amended on January 12, 2016 is compared with claim 1 of the '171 patent application as amended on May 6, 2015 in the table that follows.

| Claim 1 of '310 application as of January 12, 2016 | Claim 1 of '171 patent application as of May 6, 2015 |
|---|---|
| A method comprising facilitating a processing of or processing, by one or more processors, data or information or at least one signal, the data or information or at least one signal based, at least in part, on the following: | A method comprising facilitating a processing of and/or processing (1) data and/or (2) information and/or (3) at least one signal, the (1) data and/or (2) information and/or (3) at least one signal based, at least in part, on the following: |
| a determining of one or more wireless access points associated with at least one user, at least one device associated with the at least one user, or a combination thereof; | one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof; |
| a processing of social networking information associated with the at least one user, the at least one device associated with the at least one user, or a combination thereof to determine one or more social networking groups; | a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups; and |
| a causing of an association of the one or more wireless access points with the one or more social networking groups; and | |
| a determining of one or more access rights to the one or more wireless access points for one or more other devices based, at least in part, on membership in the respective one or more social networking groups. | a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups. |

As seen above, during prosecution, the claims of both patent applications were similar. However, the examiners of the '171 patent application, Kambiz Zand and Benjamin Kaplan, were never notified of the '310 application, which was examined by Emmanuel Moise and Mahran Abu Roumi. The three inventors of the '171 patent had a duty to disclose the '310 application and associated documents to the USPTO. 37 C.F.R. § 1.56.

In addition, the same law firm, Ditthavong & Steiner, P.C., prosecuted both applications. In particular, Phouphanomketh Ditthavong was identified in the signature block of each response

filed during prosecution of both patent applications.  As a result, Mr. Ditthavong also had a duty to disclose the '310 application and associated documents to the USPTO.  37 C.F.R. § 1.56.

* * *

NETGEAR's investigation and discovery in this case is continuing, and NETGEAR reserves the right to supplement or amend these contentions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Amr O. Aly
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 891-1600

Lisa M. Schoedel
Yusuf Esat
Mitchell L. Denti
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL  60654-3456
(312) 222-9350

March 31, 2022

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jying@morrisnichols.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2022, copies of the foregoing were caused to be served upon the following in the manner indicated:

James M. Lennon, Esquire                         *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiff*

Jonathan K. Waldrop, Esquire                     *VIA ELECTRONIC MAIL*
Darcy L. Jones, Esquire
Marcus A. Barber, Esquire
ThucMinh Nguyen, Esquire
John W. Downing, Esquire
Heather S. Kim, Esquire
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA  94065
*Attorneys for Plaintiff*

Shelley Ivan, Esquire                            *VIA ELECTRONIC MAIL*
Noah P. Dorman, Esquire
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY  10019
*Attorneys for Plaintiff*

Paul G. Williams, Esquire                        *VIA ELECTRONIC MAIL*
KASOWITZ BENSON TORRES LLP
1230 Peachtree Street, NE, Suite 2445
Atlanta, GA  30309
*Attorneys for Plaintiff*


                              */s/ Jennifer Ying*
                              Jennifer Ying (#5550)

# **Exhibit 5**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

NETGEAR, INC.
Petitioner

v.

WSOU INVESTMENTS, LLC
Patent Owner

———————————

IPR2022-00516

U.S. Patent No. 7,512,096
Title: Communicating Data Between an Access Point
and Multiple Wireless Devices Over a Link
Filed: November 24, 2004
Issued: March 31, 2009

———————————

**PETITION FOR *INTER PARTES* REVIEW**
**U.S. PATENT NO. 7,512,096**

*Inter Partes* Review of U.S. Patent No. 7,512,096

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   MANDATORY NOTICES .................................................................2

    A.    Real Party-in-Interest [37 C.F.R. § 42.8(b)(1)].....................2

    B.    Related Matters [37 C.F.R. § 42.8(b)(2)]................................2

    C.    Lead/Back-up Counsel [37 C.F.R. § 42.8(b)(3)] ....................2

    D.    Service Information [37 C.F.R. § 42.8(b)(4)] .........................3

III.   GROUNDS FOR STANDING.............................................................3

IV.  BACKGROUND OF THE '096 PATENT .........................................3

    A.    The '096 Patent ......................................................................3

    B.    Status of the '096 Patent........................................................8

    C.    The Challenged Claims of the '096 Patent ............................8

    D.    The Prosecution of the '096 Patent ......................................10

    E.    Priority Date of the '096 Patent............................................11

    F.    Level of Ordinary Skill .........................................................12

V.   IDENTIFICATION AND OVERVIEW OF PRIOR ART ...............12

    A.    U.S. Patent No. 7,352,718 to Perahia (Ex. 1004) ...............12

    B.    U.S. Patent No. 8,199,723 to Li (Ex. 1005).........................14

    C.    U.S. Patent No. 8,014,366 to Wax (Ex. 1006)....................15

    D.    Other Evidence of the State of the Art (Exs. 1007-1008)....16

VI.  IDENTIFICATION OF CHALLENGE AND RELIEF REQUESTED [37 C.F.R. §§ 42.104(b)(1)-(2)] .............................16

VII. CLAIM CONSTRUCTION [37 C.F.R. § 42.104(b)(3)]................17

*Inter Partes* Review of U.S. Patent No. 7,512,096

VIII. GROUNDS FOR UNPATENTABILITY [37 C.F.R. § 42.104(b)(4)-(5)] ............................................................................. 18

    A.    Ground 1: Perahia Anticipates Claim 1 ........................................ 18

    B.    Ground 2: Li Anticipates Claims 1-3 ........................................... 27

    C.    Ground 3: Li In Combination With Perahia Renders Obvious Claim 10 ..................................................................................... 36

    D.    Ground 4: Wax Anticipates Claims 1-3 ....................................... 40

    E.    Ground 5: Wax In Combination With Perahia Renders Obvious Claim 10 ..................................................................................... 51

IX.    CONCLUSION ................................................................................... 52

*Inter Partes* Review of U.S. Patent No. 7,512,096

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 7,512,096 ("the '096 Patent") |
| 1002 | File History for U.S. Patent No. 7,512,096 |
| 1003 | Declaration of Robert Akl |
| 1004 | U.S. Patent No. 7,352,718 to Perahia, "Spatial Division Multiple Access for Wireless Networks," filed July 22, 2003 ("Perahia") |
| 1005 | U.S. Patent No. 8,199,723 to Li, "Parallel Wireless Communication Apparatus, Method, and System," filed December 23, 2003 ("Li") |
| 1006 | U.S. Patent No. 8,014,366 to Wax, "WLAN Capacity Enhancement Using SDM," filed August 13, 2004 ("Wax") |
| 1007 | "Spatial Covariance Based Downlink Beamforming in an SDMA Mobile Radio System" by Christof Farsakh and Josef A. Nossek, IEEE Transactions on Communications, Vol. 46, No. 11, November 1998 ("Farsakh") |
| 1008 | U.S. Patent No. 7,352,688 to Perahia, "High Data Rate Wireless Bridging," filed December 31, 2002 ("the '688 Patent") |
| 1009 | WSOU's Responses and Objections to NETGEAR's Interrogatories dated January 19, 2022, Case No. 1:21-cv-1117-MN-CJB, District of Delaware |

*Inter Partes* Review of U.S. Patent No. 7,512,096

## I.    INTRODUCTION

Pursuant to 35 U.S.C. §§ 311-319 and 37 C.F.R. Part 42, Petitioner NETGEAR, Inc. ("NETGEAR" or "Petitioner") respectfully requests *Inter Partes* Review of claims 1, 2, 3, and 10 ("Challenged Claims") of U.S. Patent No. 7,512,096 (Ex. 1001, "the '096 Patent"). The '096 Patent is presently assigned to WSOU Investments, LLC ("Patent Owner" or "WSOU").

The '096 Patent is generally directed to increasing data transfer rates in a wireless network employing the IEEE 802.11 standard. (*E.g.*, Ex. 1001 at 2:67-3:8, 5:30-45.) It bemoans that "the application of sophisticated techniques for increasing the data rates available to mobile stations on a downlink that both may comply with the IEEE 802.11a/g standard specifications has not been adequately addressed in the literature." (*Id*. at 2:13-18.) The '096 Patent is wrong.

To the contrary, the three references set forth in this Petition (Perahia, Li, and Wax) all taught the claimed subject matter before the '096 Patent. Specifically, these references disclose the same issue—increased downlink data transfer rates in an IEEE 802.11 network—and the same solution—use of weighted signals in a Space Division Multiple Access framework to permit simultaneous data transfer to multiple mobile units. The Challenged Claims are, therefore, not patentable.

*Inter Partes* Review of U.S. Patent No. 7,512,096

## II.   MANDATORY NOTICES

### A.   Real Party-in-Interest [37 C.F.R. § 42.8(b)(1)]

Petitioner NETGEAR is the real-party-in-interest for this proceeding.  No party other than NETGEAR has controlled, directed, funded, or participated in the preparation of this Petition, and therefore no party other than NETGEAR is understood to be a real-party-in-interest.

### B.   Related Matters [37 C.F.R. § 42.8(b)(2)]

WSOU asserted the '096 Patent against NETGEAR in the Western District of Texas on February 19, 2021 (No. 6:21-cv-00153-ADA), served on February 23, 2021.  On July 30, 2021, after NETGEAR filed a Motion to Dismiss or Transfer, WSOU dismissed the case and filed a new suit against NETGEAR in the District of Delaware (No. 1:21-cv-01117-MN-CJB), again asserting the '096 Patent.  The Delaware suit is pending, in which WSOU asserts the same Challenged Claims at issue here in the district court case.

### C.   Lead/Back-up Counsel [37 C.F.R. § 42.8(b)(3)]

Petitioner is filing a power of attorney designating Amr O. Aly (Reg. No. 50,525, aaly@jenner.com) as lead counsel, of Jenner & Block LLP, 1155 Avenue of the Americas, New York, NY 10036, and Lisa M. Schoedel (Reg. No. 53,564, lschoedel@jenner.com) and Yusuf Esat (Reg. No. 64,057, yesat@jenner.com) as back-up counsel, of Jenner & Block LLP, 353 N. Clark St., Chicago, Illinois 60654.

*Inter Partes* Review of U.S. Patent No. 7,512,096

### D.    Service Information [37 C.F.R. § 42.8(b)(4)]

Petitioner consents to e-mail service at the addresses of lead and back-up counsel and chgoip@jenner.com.  Documents also may be delivered by hand to the address of lead and back-up counsel above.

## III.    GROUNDS FOR STANDING

Petitioner certifies that the '096 Patent is available for *Inter Partes* Review, and Petitioner is not barred or estopped from requesting *Inter Partes* Review challenging the claims on the grounds identified herein.

## IV.    BACKGROUND OF THE '096 PATENT

### A.    The '096 Patent

The '096 Patent relates to simultaneous data transfer between an access point and multiple mobile units in a wireless network.  (Ex. 1001 at 1:9-10, 2:67-3:8.)  An access point "may be a transceiver that connects devices on a wireless network (WLAN) to the wired infrastructure." (*Id.* at 1:19-22.)  Communications from the access point to the mobile units are "downlink"; communications in the opposite direction are "uplink." (*E.g.*, Ex. 1005 at 2:9-12.)

The '096 Patent seeks to facilitate simultaneous communications on the downlink to multiple mobile units.  (Ex. 1001 at 2:67-3:8.)  It contends that the prior art failed to effectively achieve such communications because signal receipt confirmations—called "acknowledgment (ACK) bursts"—from multiple mobile units to the access point "may cause a reception problem upon their arrival at an

*Inter Partes* Review of U.S. Patent No. 7,512,096

access point" and, "[l]ikewise, accurate channel estimations may severely impact on successfully increasing the downlink throughput." (*Id.* at 2:63-67.)  Thus, according to the '096 Patent, simultaneous communications to multiple mobile units suffered from interference among the ACK bursts at the access point and, resultingly, difficulties in determining the precise channel of a given mobile unit.

The '096 Patent purports to address these issues as follows.

***The industry protocols (IEEE 802.11 and SDMA).***  The '096 Patent utilizes two industry protocols: (i) the 802.11 standard of the Institute of Electrical and Electronics Engineers (IEEE); and (ii) Space Division Multiple Access (SDMA). The '096 Patent notes that the IEEE 802.11 standard is a "well known standard" that "describes the operation of mobile stations (MSs) and access points in a Wireless Local Area Network (WLAN)." (*Id.* at 1:31-44.)  The '096 Patent identifies three IEEE 802.11 standards (802.11 a / b / g), with each operating at a specific single frequency.  (*Id.* at 1:45-56.)  As for SDMA, it "has been studied extensively over the past few decades as a tool that uses spatial dimension to simultaneously transmit to, or receive from, multiple radios at the same carrier frequency." (*Id.* at 1:57-2:3.)  The '096 Patent acknowledges that SDMA has been used in wireless networks, but contends that it "has not always been successful." (*Id.* at 2:4-18.)

*Inter Partes* Review of U.S. Patent No. 7,512,096

***The access point and mobile units / stations.***  To communicate with multiple mobile stations, the '096 Patent utilizes an access point with multiple antennas.  (Ex. 1001 at Fig. 1, 3:62-67, 5:19-24.)

***Initializing a transmission protocol.***  To begin communications between the access point and mobile units, a transmission protocol is initialized.  For example, an SDMA initialization procedure entails the following steps:  (i) the access point sends a MAC layer protocol data unit (MPDU) to a first mobile station; (ii) upon receipt of the MPDU, the first mobile unit responds with an acknowledgement (ACK) frame burst; (iii)-(iv) then, steps (i)-(ii) are repeated for a second mobile unit; and (v) the access point "may use a pilot segment of the received ACK frame[s] to compute a fresh estimate" of the radio channels for the mobile stations.  (*Id.* at 8:67-9:25.)  As the '096 Patent notes, the IEEE 802.11 standard similarly describes such an initialization procedure.  (*Id.* at 2:21-33, 11:27-32; Ex. 1003 at ¶¶ 99, 102.)

***Transmitting weighted data.***  To direct data to a particular mobile unit—so that the unit receives only the data intended for it—the access point "weights" the data.  (Ex. 1001 at 6:13-28.)  The '096 Patent does not provide any explanation of how the access point determines the weighting amount, other than to suggest that it may be "based on channel estimates" for the radio channels of the mobile units.  (*Id.* at 8:30-42.)  Yet, the concept of weighting data is a central concept of the '096

*Inter Partes* Review of U.S. Patent No. 7,512,096

Patent—all four embodiments described in the Summary of the Invention center on the access point weighting data "so that the first mobile station only receives the first data" and "the second mobile station only receives the second data." (*Id.* at 3:10-54.)  In the context of the '096 Patent, the weighting of data is also known as "beamforming," and is a routine task in SDMA.  (Ex. 1003 at ¶ 48 ("For example, in 'Spatial Covariance Based Downlink Beamforming in an SDMA Mobile Radio System,' the authors describe 'an approach to jointly calculate weights in such a way that all users receive their signal with a given signal-to-noise-and-interference ratio." (citing Ex. 1007 at Abstract)).)

***Estimating radio channels over a pilot interval.***  The access point estimates the radio channels of the mobile stations during a pilot interval, which is "a predetermined time period for transmission of a signal, either at a single frequency or several independent frequencies, for supervisory purposes including control, equalization, continuity, synchronization, or reference."  (Ex. 1001 at 7:46-50; Ex. 1003 at ¶ 50.)  The '096 Patent discusses the IEEE 802.11 channel estimation procedure as an exemplary estimation technique.  (Ex. 1001 at 11:1-32; Ex. 1003 at ¶ 51.)  The '096 Patent further describes two other known techniques for channel estimation—"interpolation in the frequency domain" and "estimation via synchronization symbols"—though the Challenged Claims do not recite any

*Inter Partes* Review of U.S. Patent No. 7,512,096

particular estimation technique limitations.  (Ex. 1001 at 11:40-67; Ex. 1003 at ¶¶ 53-55.)

**Non-SDMA mode.**  While the '096 Patent is primarily directed to the use of SDMA, it allows that an access point may be partitioned "across SDMA and non-SDMA modes" using time division multiple access (TDMA) because "SDMA transmissions on the SDMA downlink **120***a* may be interrupted by other IEEE 802.11 mobiles or access points contending for a same channel." (Ex. 1001 at 12:1-30.)  As described in the accompanying expert declaration of Dr. Robert Akl, TDMA is "a channel access method that uses the time dimension to allow multiple stations to share and use the same transmission channel," and "predates the '096 Patent by many years." (Ex. 1003 at ¶¶ 104, 105.)

**The resulting features.**  The '096 Patent identifies several attributes that result from the above framework:

- the <u>data rate of transmission increases</u> because SDMA transmits data simultaneously to multiple mobile stations.  (*E.g.*, Ex. 1001 at 7:13-25 ("Using a multiplicity of antennas, i.e., a first and a second antenna **110***a*(1-*m*), the access point **105***a* may transmit data including the first and second data **135**(1-*k*) in parallel . . . .  In this way, the SDMA downlink **120***a* may effectively double the throughput of the SDMA downlink **120***a*.").)  The throughput of the downlink "may increase . . . for example, by a factor nominally equal to the number of antennas at an access point." (*Id.* at Abstract.)

- SDMA "allow[s] <u>discrimination among a first and a second radio</u> frequency transmission . . . ." (*Id.* at 7:26-30.)

*Inter Partes* Review of U.S. Patent No. 7,512,096

- the access point and mobile units are <u>coupled in a network</u> by employing "at least in part [the IEEE] 802.11 standard to establish the network." (*Id*. at 7:36-41.)

* * *

## B.    Status of the '096 Patent

WSOU acquired the '096 Patent on November 26, 2019.  After WSOU filed its first suit (in W.D. Tex.) against NETGEAR for alleged infringement of the '096 Patent, the patent expired due to WSOU's failure to pay the 11.5-year maintenance fee.  (Ex. 1002 at 198-201.)  On August 4, 2021, after WSOU filed its Delaware suit against NETGEAR, it filed a Petition to Accept Unintentionally Delayed Payment of Maintenance Fee in an Expired Patent.  (*Id*.)  To date, the Patent Office has not granted WSOU's petition.

## C.    The Challenged Claims of the '096 Patent

The '096 Patent contains thirteen claims, consisting of the subject matter discussed above.  Claim 1 is the only independent claim.  The Challenged Claims, claims 1-3 and 10, are set out in the table below with the claim limitations labeled for reference.  (Ex. 1001 at cols. 13-14.)

| Challenged Claims of the '096 Patent |
| --- |
| **[1pre]** A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising: |

8

*Inter Partes* Review of U.S. Patent No. 7,512,096

**[1a]** weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and

**[1b]** weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;

**[1c]** increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;

**[1d]** discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;

**[1e]** applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;

**[1f]** defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;

**[1g]** coupling said access point to said first and second mobile stations through said wireless local area network;

**[1h]** estimating a first radio channel from said access point to said first mobile station over a pilot interval; and

**[1i]** estimating a second radio channel from said access point to said second mobile station over said pilot interval.

**[2]** A method, as set forth in claim **1**, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink.

**[3]** A method, as set forth in claim **2**, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one

*Inter Partes* Review of U.S. Patent No. 7,512,096

or more acknowledgement frames between said access point and said first mobile station and said second mobile station.

**[10]** A method, as set forth in claim **3**, further comprising: using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.

## D.    The Prosecution of the '096 Patent

As noted earlier, the '096 Patent's Summary of the Invention focuses on one feature: the use of data weighting "so that the first mobile station only receives the first data and . . . the second mobile station only receives the second data."  (Ex. 1001 at 3:10-55.)  Similarly, original claim 1 of the '096 Patent application recited only claim limitations 1[pre], [a] and [b] (as notated in § IV.C *supra*)—an access point with two antennas in which data is weighted so that the first and second mobile stations receive only their respective data.  (Ex. 1002 at 27.)  Original dependent claim 5 further recited claim limitations 1[c], [d], and [e], and original dependent claim 6 further recited limitations 1[f] and 1[g]—*i.e.*, all but the "estimating a radio channel . . . over a pilot interval" limitations recited in 1[h] and 1[i].  These latter two limitations were recited in original dependent claim 7.  (*Id.* at 27-28.)

The Examiner rejected original claims 1-6 as obvious in light of two references—U.S. Pat. Pub. No. 2006/0164969 ("Malik") and U.S. Patent No.

*Inter Partes* Review of U.S. Patent No. 7,512,096

7,006,529 ("Alastalo").  (*Id*. at 123-129.)  The applicant subsequently amended claim 1 to specify weighting based on a channel estimate and transmission including a protocol data unit (PDU), and that the PDUs to the first and second mobile stations are "offset by a predetermined time."  (*Id*. at 136.)  The applicant argued that amended claim 1 was not obvious in light of Malik and Alastalo because these references did not teach the use of a predetermined offset.  (*Id*. at 148.)  But the Examiner maintained her rejection, and the applicant canceled claims 1-6.  (*Id*. at 152-167.)

Unlike claims 1-6, original claim 7—the claim including the "estimating a radio channel . . . over a pilot interval" limitations—received no substantive rejection from the Examiner.  In her first Office Action, the Examiner stated that claim 7 would be allowable if rewritten in independent form.  (*Id*. at 128.)  The applicant responded by amending claim 7 to be in independent form, and this claim was allowed as claim 1 of the '096 Patent.  (*Id*. at 138, 174-175.)

None of the prior art references raised in this Petition were cited during prosecution of the '096 Patent.

### E.    Priority Date of the '096 Patent

The priority date of the '096 Patent is November 24, 2004, its filing date. The '096 Patent does not claim priority to another patent application.  In the

*Inter Partes* Review of U.S. Patent No. 7,512,096

parties' pending Delaware suit, WSOU has stated that the priority date of the '096

Patent is November 24, 2004.  (Ex. 1009 at 10-11.)

### F.    Level of Ordinary Skill

In this Petition, Petitioner applies the perspective of one of ordinary skill

around the time of the alleged invention of the '096 Patent.  Here, as explained by

Petitioner's expert, a person of ordinary skill in the art (POSITA) would typically

have had a Bachelor's degree in electrical engineering (or a similar degree) and 2-3

years working in the design or development of wireless communication systems, or

the equivalent.  (*See* Ex. 1003 at ¶ 19.)  Additional graduate education could

substitute for professional experience, and vice versa, significant experience in the

field could substitute for formal education.  (*Id.*)

## V.    IDENTIFICATION AND OVERVIEW OF PRIOR ART

### A.    U.S. Patent No. 7,352,718 to Perahia (Ex. 1004)

Perahia was filed on July 22, 2003, before the '096 Patent priority date of

November 24, 2004, and issued on April 1, 2008.  Therefore, it is prior art at least

under pre-AIA § 102(e).  Perahia was not before the Examiner during prosecution

of the '096 Patent.

Cut from the same cloth as the '096 Patent, Perahia identifies interference

challenges that arise "where multiple clients or subscriber units interact with a

central access point."  (Ex. 1004 at 1:37-41.)  Specifically, "it is the case that only

one access point to subscriber unit communication can take place at once on a

*Inter Partes* Review of U.S. Patent No. 7,512,096

given carrier frequency" because "[i]f more than one user attempts to transmit at a time, a packet collision will occur." (*Id.* at 1:35-45.) Thus, "[i]t would be desirable to extend IEEE 802.11a data carrying capacity by allowing for simultaneous multiple transmissions in the same frequency." (*Id.*)

To achieve "simultaneous transmission by multiple users and increased system capacity," Perahia teaches that "[w]hat is needed are systems and methods for applying MIMO and SDMA techniques to 802.11 operation." (*Id.* at 2:11-14.) Perahia employs "MIMO[] technology in conjunction with the IEEE 802.11 standard [to] enable[] simultaneous communication of data packets to or from multiple users in the same frequency"; "[s]pace divisional multiple access (SDMA) is thus provided." (*Id.* at Abstract.) Throughput is enhanced: "[i]n this way, system capacity can be increased to an extent that depends on available antenna resources and the multipath characteristics of the communication channel." (*Id.*)

Mirroring the '096 Patent, Perahia also teaches, among other things, channel estimation ("channel training information on the OFDM signal in a first channel training period," *id.* at 3:4-12); non-SDMA modes ("during a contention period, requesting an access point for permission to switch between an SDMA mode and a non-SDMA mode," *id.* at 3:13-19); and signal weighting ("Beamformer 206 recovers the transmitted spatial subchannel data streams by applying a weighting matrix to the beamformer inputs," *id.* at 5:24-32).

*Inter Partes* Review of U.S. Patent No. 7,512,096

## B.   U.S. Patent No. 8,199,723 to Li (Ex. 1005)

Li was filed on was filed on December 23, 2003, before the '096 Patent priority date of November 24, 2004, and issued on June 12, 2012.  Therefore, it is prior art at least under pre-AIA § 102(e).  Li was not before the Examiner during prosecution of the '096 Patent.

Again, like the '096 Patent and Perahia, Li observes that "[a]n access point may communicate with many different mobile stations, but typically communicates with only mobile station at a time."  (Ex. 1005 at 1:11-14.)  But in Li, as in the '096 Patent and Perahia, the access point "is capable of maintaining simultaneous 802.11 compliant communications with multiple mobile stations" and "may be any type of access point having multiple antennas capable of communicating using spatial-division multiple access (SDMA)."  (*Id.* at 1:62-2:32.)  The use of SDMA "increases both user density and network throughput of wireless systems."  (*Id.* at 2:42-44.)

Li further discloses "zero-forcing beamformers," *i.e.*, signal weighting, and "estimating spatial channels," *i.e.*, radio channels.  (*Id.* at 2:48-56.)  Li also describes the IEEE 802.11 transmission protocol initialization procedure described in the '096 Patent.  (*Id.* at 2:57-3:3.)

*Inter Partes* Review of U.S. Patent No. 7,512,096

## C.   U.S. Patent No. 8,014,366 to Wax (Ex. 1006)

Wax was filed on August 13, 2004, before the '096 Patent priority date of November 24, 2004, and issued on September 6, 2011.  Therefore, it is prior art at least under pre-AIA § 102(e).  Wax was not before the Examiner during prosecution of the '096 Patent.

Echoing the common refrain of the '096 Patent and the other prior art, Wax expresses the interference problem associated with simultaneous downlink transmissions:  "the access point can transmit downlink signals only to one station at a time" because "[o]therwise, the stations would receive multiple, interfering signals, which they would then be unable to decode."  (Ex. 1006 at 1:42-46.)  And in unison with the '096 Patent, Perahia, and Li, the solution is "enhancing the capacity of a WLAN by spatial division multiplexing (SDM)" because "[t]his technique permits an access point to transmit respective downlink signals simultaneously to multiple stations in a spatial multiplexing group (SMG), and to receive uplink signals simultaneously from the stations in the group."  (*Id.* at 1:54-60.)

Wax further discloses that "for this purpose, the access point comprises multiple antennas and a SDM beamforming circuit, which generates a specific beam pattern for each of the stations so as to maximize the signal power."  (*Id.* at 1:60-64.)  The system operates in accordance with IEEE 802.11.  (*Id.* at 12:16-29.)

*Inter Partes* Review of U.S. Patent No. 7,512,096

Wax also provides an initialization routine that includes the access point sending a station a null data packet and, in return, the mobile station responds with an acknowledgement. (*Id*. at 29:17-20.)

### D. Other Evidence of the State of the Art (Exs. 1007-1008)

Exhibits 1007-1008 further reflect the state of the art, level of ordinary skill in the art, common knowledge in the art and/or common sense in the art and are therefore also relevant to the background of the invention and the unpatentability analysis herein.

## VI. IDENTIFICATION OF CHALLENGE AND RELIEF REQUESTED [37 C.F.R. §§ 42.104(b)(1)-(2)]

Petitioner requests *Inter Partes* Review of claims 1-3 and 10 of the '096 Patent and requests that the Board find these claims to be invalid and unpatentable based on the following specific statutory grounds and prior art.

**Ground 1:** U.S. Patent No. 7,352,718 to Perahia (Ex. 1004) anticipates claim 1 under § 102.

**Ground 2:** U.S. Patent No. 8,199,723 to Li (Ex. 1005) anticipates claims 1-3 under § 102.

**Ground 3:** U.S. Patent No. 8,199,723 to Li (Ex. 1005) in combination with U.S. Patent No. 7,352,718 to Perahia (Ex. 1004) renders obvious claim 10 under § 103(a).

*Inter Partes* Review of U.S. Patent No. 7,512,096

**Ground 4:** U.S. Patent No. 8,014,366 to Wax (Ex. 1006) anticipates claims 1-3 under § 102.

**Ground 5:** U.S. Patent No. 8,014,366 to Wax (Ex. 1006) in combination with U.S. Patent No. 7,352,718 to Perahia (Ex. 1004) renders obvious claim 10 under § 103(a).

## VII.   CLAIM CONSTRUCTION [37 C.F.R. § 42.104(b)(3)]

The Board "need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Petitioner is presently unaware of any claim construction disputes between the parties relevant to the unpatentability arguments in this Petition.  Therefore, Petitioner does not ask the Board to construe any claim terms at this time. Petitioner reserves the right to do so if a claim construction dispute arises.

For purposes of this Petition, Petitioner applies the ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc); 37 C.F.R § 42.100(b) (2019).

*Inter Partes* Review of U.S. Patent No. 7,512,096

## VIII. GROUNDS FOR UNPATENTABILITY [37 C.F.R. § 42.104(b)(4)-(5)]

Below, Petitioner explains how the claims are unpatentable and specifies where each limitation of the claim is found in the prior art. Petitioner also provides representative claim charts to illustrate exemplary disclosures of the claimed limitations in the prior art. These grounds are further supported by the expert declaration of Robert Akl. (Ex. 1003.)

### A.    Ground 1: Perahia Anticipates Claim 1

Perahia anticipates claim 1 of the '096 Patent.

#### 1.    1[pre] "A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station"

Perahia discloses a method for communicating over a network between an access point having multiple antennas and two mobile stations. "Access point **102** is equipped with two antennas **106** to support SDMA operations." (Ex. 1004 at 4:53-54.) The access point "may either transmit simultaneously to two or more subscriber units **104** or simultaneously receive upstream transmissions from two or more subscriber units." (*Id*. at 4:66-5:3.) Perahia's "subscriber units" are mobile stations. (Ex. 1003 at ¶ 66.) Perahia's Figure 1, provided below, depicts the access point 102 with two antennas 106 in the center surrounded by five mobile stations 104. (Ex. 1004 at Fig. 1.)

*Inter Partes* Review of U.S. Patent No. 7,512,096



**Fig. 1**

2.    **1[a]  "weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data"**
**&**
**1[b] "weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data"**

"Generating weights, also referred to as beamforming, is a routine function in SDMA." (Ex. 1003 at ¶ 48.)  Perahia discloses the "weighting" limitations.  (*Id.* at ¶¶ 69-70.)  It uses a "beamformer" that "appl[ies] a weighting matrix to the beamformer inputs." (Ex. 1004 at 5:24-27.)  The weighted signals travel to a "decode block" before being "recombined into MAC layer packets." (*Id.* at 5:32-43.)  Like the '096 Patent, Perahia's beamforming may be based on channel estimates.  (*Id.* at 5:28-30.)  Perahia's beamforming ensures that signals are

*Inter Partes* Review of U.S. Patent No. 7,512,096

directed to their respective target—*i.e.*, the first station receives only the first data and the second data receives only the second data.  (Ex. 1003 at ¶ 69 ("A POSITA understands that this data weighting for use in MIMO results in each station only receiving the data that the access point specifically sent to it.").)

> 3. **1[c] "increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol"**

"[T]he first part of this limitation, increasing the data rates, is met by merely using SDMA."  (Ex. 1003 at ¶ 71.)  Perahia's SDMA MIMO technique increases the rates of transmission to the mobile units.  (Ex. 1004 at 6:19-29 ("Using SDMA MIMO techniques provides highly beneficial improvements in system capacity in the IEEE 802.11 context.").)  As both the '096 Patent and Perahia explain, SDMA increases throughput because parallel communications take place.  (Ex. 1001 at 5:40-42; Ex. 1004 at Abstract; *see also* Ex. 1003 at ¶ 72.)

"The second part of this limitation, using a single carrier frequency, is met by complying with most versions of the IEEE 802.11 standard."  (Ex. 1003 at ¶ 73.)  Perahia also employs a single carrier frequency based on a transmission protocol—the IEEE 802.11a protocol operates at a single frequency—5.2 GHz.  (Ex. 1004 at 3:64-4:1; *see also* Ex. 1001 at 1:50-53; Ex. 1003 at ¶¶ 73-74.)

> 4. **1[d] "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension"**

*Inter Partes* Review of U.S. Patent No. 7,512,096

Perahia distinguishes transmissions to the different mobile stations based on a spatial dimension—that is the nature of SDMA.  (Ex. 1003 at ¶ 75.)  Indeed, the '096 Patent describes SDMA as "the use of the spatial dimension to allow discrimination among multiple radio."  (Ex. 1001 at 1:57-2:3.)  Similarly, Perahia discloses "sending a first packet to a first subscriber unit via a first spatial subchannel and sending a second packet to a second subscriber unit via a second spatial subchannel, the first spatial subchannel and the second spatial subchannel occupying the same bandwidth."  (Ex. 1004 at 2:30-35.)  "Perahia's use of SDMA results in the claimed discrimination of the first and second packets."  (Ex. 1003 at ¶ 76.)  Perahia thus discriminates between the first and second data on a downlink based on a spatial dimension.

## 5.   1[e] "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively"

The '096 Patent describes that this limitation is met by SDMA.  (Ex. 1001, 1:57-60; *see also* Ex. 1003 at ¶ 77 ("This limitation is met by applying SDMA.").)  Like the '096 Patent, Perahia applies SDMA to simultaneously, *i.e.*, substantially concurrently, transmit data to multiple mobile stations.  (Ex. 1004 at 4:66-5:3 ("SDMA access point **102** may either transmit simultaneously to two or more of subscriber units **104** or simultaneously receive upstream transmissions from two or

*Inter Partes* Review of U.S. Patent No. 7,512,096

more of subscriber units **104**."); Ex. 1003 at ¶ 78 (explaining that "substantially

concurrently" and "simultaneously" means the same in the SDMA context).)

> ### 6. [1f] "defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network"

Perahia employs the IEEE 802.11 standard to establish a wireless local area

network and incorporates the standards into its disclosure.  (Ex. 1004 at 3:64-4:25

("Although having very broad applicability, the present invention will be described

with reference to a representative network environment, a wireless communication

network based on the IEEE 802.11 standard, and in one particular implementation,

the IEEE 802.11a standard."); Ex. 1003 at ¶ 80.)  For example, Perahia describes

an access point communicating with mobile stations on a downlink "as defined by

the IEEE 802.11 standard."  (Ex. 1004 at 8:19-22.)

> ### 7. 1[g] "coupling said access point to said first and second mobile stations through said wireless local area network"

The access point and mobile stations of Perahia are coupled.  They are in

direct communication within the WLAN network shown in Figure 1.  (Ex. 1004 at

3:64-4:1, 4:47-52, 4:66-5:3, 6:65-67, 7:13-15, Fig. 1.)  Perahia's communications

occur in "a wireless communication network based on the IEEE 802.11 standard."

(*Id*. at 3:64-4:1.)  These communications provide the "coupling" broadly

contemplated by the '096 Patent, which simply provides that, "[t]o couple the

*Inter Partes* Review of U.S. Patent No. 7,512,096

access point to the first and second mobile stations through the WLAN, at least one of the access point, the first and second mobile stations, and the SDMA downlink may be defined at least in part by [IEEE] 802.11 to establish the network."  (Ex. 1001 at 7:36-41 (internal numbering omitted); *see also* Ex. 1003 at ¶¶ 81-82.)

8.   **[1h] "estimating a first radio channel from said access point to said first mobile station over a pilot interval"**
&
**[1i] "estimating a second radio channel from said access point to said second mobile station over said pilot interval"**

"Channel estimation over a pilot channel is a routine process in IEEE 802.11 WLAN."  (Ex. 1003 at ¶ 50.)  Perahia estimates the radio channels from the access point to the mobile stations over a pilot interval.  The '096 Patent defines the "pilot interval" as "a predetermined time period for transmission of a signal … for supervisory purposes including control, equalization, continuity, synchronization, or reference."  (Ex. 1001 at 7:46-50.)  Perahia transmits "channel training information" in a "channel training period"—which is a pilot interval—for one subscriber unit, and then switches "to allow transmission of second channel training information by another subscriber unit."  (Ex. 1004 at 3:4-12; Ex. 1003 at ¶ 87.)

Moreover, Perahia discloses that "the IEEE 802.11a standard also provides for the use of a preamble including special symbols for use in synchronization and carrier estimation."  (Ex. 1004 at 5:66-6:8.)  The preamble "precedes the data-

*Inter Partes* Review of U.S. Patent No. 7,512,096

carrying" portion of the signal and includes a "long symbol" for "channel estimation." (*Id.* at 9:2-5.) "The long symbols are used for channel estimation by the receiver in the manner described in U.S. patent application Ser. No. 10/335,500," which later issued as Pat. No. 7,352,688 ("the '688 Patent"). (*Id.* at 9:14-18; Ex. 1003 at ¶ 86; Ex. 1008.) The '688 Patent, in turn, teaches the use of long symbols during a "channel training period" for channel estimation. (Ex. 1008 at 6:7-45; Ex. 1003 at ¶ 86.)

Furthermore, Perahia also discloses "pilot tones" for the channel estimation practice of "phase synchronization" and "correct[ing] phase offset." (Ex. 1004 at 4:37-39, 5:32-35.) Pilot tones are transmitted over a pilot interval. (Ex. 1003 at ¶ 87.)

\* \* \*

The claim chart below summarizes Perahia's anticipation of claim 1. For brevity, the chart identifies only exemplary disclosures from Perahia.

| '096 Patent Claim 1 | Perahia (exemplary disclosure) (Ex. 1004) |
|---|---|
| **[1pre]** A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising: | "Access point **102** is equipped with two antennas **106** to support SDMA operations." (4:53-54.)<br><br>"SDMA access point **102** may either transmit simultaneously to two or more subscriber units **104** or simultaneously receive upstream transmissions from two or more subscriber units **104**." (4:66-5:3.) |

*Inter Partes* Review of U.S. Patent No. 7,512,096

| | |
|---|---|
| **[1a]** weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and | "Beamformer **206** recovers the transmitted spatial subchannel data streams by applying a weighting matrix to the beamformer inputs." (5:24-27.) |
| **[1b]** weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data; | |
| **[1c]** increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol; | "Multiple Input Multiple Output (MIMO) technology in conjunction with the IEEE 802.11 standard enables simultaneous communication of data packets to or from multiple users in the same frequency.  Spatial divisional multiple access (SDMA) is thus provided.  In this way, system capacity can be increased . . . . Doubling or quadrupling of network throughput can be achieved." (Abstract.) |
| **[1d]** discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; | "The method includes: sending a first packet to a first subscriber unit via a first spatial subchannel and sending a second packet to a second subscriber unit via a second spatial subchannel, the first spatial subchannel and the second spatial subchannel occupying the same bandwidth." (2:30-35.) |
| **[1e]** applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively; | "SDMA access point **102** may either transmit simultaneously to two or more of subscriber units **104** or simultaneously receive upstream transmissions from two or more of subscriber units **104**."  (4:66-5:3.) |
| **[1f]** defining at least one of said access point, said first and second mobile stations, and said downlink at least in | "[T]he present invention will be described with reference to a representative network environment, |

*Inter Partes* Review of U.S. Patent No. 7,512,096

| | |
|---|---|
| part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network; | a wireless communication network based on the IEEE 802.11 standard . . . ."  (3:64-4:1.)<br><br>"Subscriber units **104** communicate data in response to a polling request from access point **102** as defined by the IEEE 802.11 standard and/or they receive downstream data from access point **102**." (8:19-22.) |
| **[1g]** coupling said access point to said first and second mobile stations through said wireless local area network; | "[T]he present invention will be described with reference to a representative network environment, a wireless communication network based on the IEEE 802.11 standard . . . ."  (3:64-4:1.)<br><br>"Included within wireless network **100** are an access point **102** and numerous subscriber units **104**." (4:48-50)<br><br>"SDMA access point **102** may … transmit simultaneously to two or more of subscriber units **104** . . . ." (4:66-5:3.) |
| **[1h]** estimating a first radio channel from said access point to said first mobile station over a pilot interval; and<br><br>**[1i]** estimating a second radio channel from said access point to said second mobile station over said pilot interval. | "The method includes: . . . transmitting first channel training information on the OFDM signal in a first channel training period; and, during a second channel training period, quieting the OFDM signal to allow transmission of second channel training information by another subscriber unit.  (3:4-12.)<br><br>"FIG. 7 depicts preambles 702 and 704 as may be simultaneously transmitted either by two simultaneously transmitting |

26

*Inter Partes* Review of U.S. Patent No. 7,512,096

| | |
|---|---|
| | subscriber units or by a single access point."  (8:61-64.)<br><br>"The long symbols are specified by the 802.11a standard and are used for channel estimation."  (9:4-5.)<br><br>"In 802.11a, some of the [complex subcarrier] values are always zero and others carry pilot tones used for phase synchronization."  (4:37-39.) |

## B.    Ground 2: Li Anticipates Claims 1-3

Li anticipates claims 1-3 of the '096 Patent.

### 1.    Independent Claim 1

#### a.    1[pre] "A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station"

Li discloses a method for communicating data over a network between an access point having multiple antennas and a first and second mobile station.  For example, Li teaches "[a]n access point in a wireless network [that] communicates with multiple mobile stations simultaneously."  (Ex. 1005 at Abstract.)  The access point "may be any type of access point having multiple antennas."  Figure 1 of Li, shown below, depicts an access point 102 with two antennas 104 communicating with three mobile stations 110, 120, 130.  (Ex. 1005 at Fig. 1, 2:17-20.)

*Inter Partes* Review of U.S. Patent No. 7,512,096



*FIG. 1*

> **b.  1[a] "weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data."**
>
> **&**
>
> **1[b] "weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data."**

"Generating weights … is a routine function in SDMA."  (Ex. 1003 at ¶ 48.)

Li weights a first and second data at the access point so that the first and second mobile stations receive only their respective data.  Li teaches a "zero-forcing beamformer for both downlink and uplink of signals to achieve SDMA."  (Ex. 1005 at 2:48-50.)  Beamforming is a type of data weighting.  (Ex. 1003 at ¶¶ 48, 91.)  To ensure that the first and second mobile stations receive only their respective data, the access point defines a "network-allocation-vector (NAV)" for all mobile stations ("STAs" in Li's terminology) "to prevent unintended STAs

28

*Inter Partes* Review of U.S. Patent No. 7,512,096

from interfering with the beamformed signals." (Ex. 1005 at 4:54-56; Ex. 1003 at ¶ 91.)

> **c.    1[c] "increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol"**

Li increases the data rate of transmission for the first and second data using a single carrier frequency. "[T]he first part of this limitation, increasing the data rates, is met by merely using SDMA." (Ex. 1003 at ¶¶ 71, 92.) As with the '096 Patent, Li's "spatial-division multiple access increases both user density and network throughput of wireless systems by utilizing spatial channels in the environment." (Ex. 1005 at 2:42-44; *see also id.* at 2:44-47 ("For example, multiple spatial channels may be formed by a combination of the single path(s) and the antenna patterns between an AP and multiple STAs.").) SDMA allows the access point to "communicate in parallel with multiple 802.11 compliant mobile stations," which increases the data rate of transmission. (Ex. 1005 at 5:6-8; Ex. 1003 at ¶ 92.)

Furthermore, Li uses a single carrier frequency based on the IEEE 802.11 standard. (Ex. 1005 at 1:55-61, 5:6-8, 5:38-44; *see also*, Ex. 1003 at ¶ 73 ("The second part of this limitation, using a single carrier frequency, is met by complying with most versions of the IEEE 802.11 standard.").) For example, IEEE 802.11a

*Inter Partes* Review of U.S. Patent No. 7,512,096

operates at the 5.2 GHz frequency band and IEEE 802.11g operates at the 2.4 GHz frequency band.  (Ex. 1001 at 1:50-53.)

>    **d.    1[d] "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension"**

As the '096 Patent explains, SDMA entails "the use of spatial dimension to allow discrimination among multiple radio."  (Ex. 1001 at 1:57-2:3.)  By employing SDMA, Li discriminates between data transmissions on the downlink based on a spatial dimension.  (Ex. 1003 at ¶ 93 ("[T]his limitation is met by using SDMA").)  SDMA allows Li to "transmit to two or more [] mobile stations simultaneously."  (Ex. 1005 at 2:24-26 (internal numbering omitted).)

>    **e.    1[e] "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively"**

"[T]his limitation is met by applying SDMA and Li applies SDMA."  (Ex. 1003 at ¶ 94.)  Li applies SDMA to transmit, substantially concurrently, first and second data to the first and second mobile stations, respectively.  "By utilizing SDMA, the AP [access point] is able to transmit information in different spatial channels to parallel STAs simultaneously."  (Ex. 1005 at 4:5-6; Ex. 1003 at ¶ 94.)

>    **f.    1[f] "defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics**

*Inter Partes* Review of U.S. Patent No. 7,512,096

>  **Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network"**

Li establishes a wireless local area network by defining its access point and mobile stations according to the IEEE 802.11 standard. In Li's "wireless local area network (WLAN)," its "mobile stations or access point may operate in compliance with a wireless network standard such as ANSI/IEEE Std. 802.11." (Ex. 1005 at 1:51-61; *see also* Ex. 1003 at ¶ 95.)

>  **g.    1[g] "coupling said access point to said first and second mobile stations through said wireless local area network"**

Li's access point and mobile stations are coupled through the wireless local area network in the same way as described in the '096 Patent. (*See supra* § VIII.A.7.) These devices are in direct communication across the WLAN. (*E.g.*, Ex. 1005 at 1:51-54, 1:62-66, 2:12-16.) Figure 1, shown above, is illustrative. (Ex. 1005 at Fig. 1; *see also* Ex. 1003 at ¶ 96.)

>  **h.    1[h] "estimating a first radio channel from said access point to said first mobile station over a pilot interval"**
>  **&**
>  **1[i] "estimating a second radio channel from said access point to said second mobile station over said pilot interval"**

"Channel estimation over a pilot channel is a routine process in IEEE 802.11 WLAN." (Ex. 1003 at ¶ 50.) Li estimates the radio channels from the access point to the first and second mobile stations over a pilot interval. In Li, "FIGS. 2 and 3 show frame sequences to estimate channel state information of communication

*Inter Partes* Review of U.S. Patent No. 7,512,096

channels." (Ex. 1005 at 2:57-3:27.) "[G]athering state information [is] also referred to as 'estimating spatial channels.'" (*Id.* at 2:54-56.) The "channel state information of all STAs in a parallel group may be obtained before SDMA transmission and reception"—this pre-transmission period is a pilot interval as defined by the '096 Patent. (*Id.* at 2:57-61; *see also* Ex. 1003 at ¶ 97; Ex. 1001 at 7:46-50.)

## 2. Dependent Claim 2

**Claim 2** depends from claim 1 and includes the further limitation of "initializing said transmission protocol before starting said transmissions of said first and second data over said downlink." This step is closely related to the "channel estimation" limitation discussed above—channel estimation is used to set up the communication path between the access point and mobile station. (*See, e.g.*, Ex. 1001 at 9:5-25 (describing channel estimation as part of the initialization process).) Initialization of a transmission protocol is a routine process in wireless communications. (Ex. 1003 at ¶ 99.)

Li initializes a transmission protocol before starting transmissions over the downlink. It teaches the same IEEE 802.11 initialization process discussed in the '096 Patent—the exchange of MPDUs and ACK bursts between the access point and mobile stations to establish a connection. (Ex. 1005 at 2:57-3:11.) In Li, the access point sends "IEEE 802.11 Null-data frames" to the mobile stations; these

32

frames are a type of MPDU.  (*Id.*; Ex. 1003 at ¶ 100.)  The mobile stations return

ACK frames, which the access point uses to estimate the stations' respective

channels.  (Ex. 1005 at 2:57-3:11.)  This process is performed "before SDMA

transmission and reception."  (Ex. 1005 at 2:58-61.)

### 3.    Dependent Claim 3

**Claim 3** depends from claim 2.  It recites that the "initializing said

transmission protocol" step further comprises "exchanging one or more protocol

data units and one or more acknowledgement frames between said access point and

said first mobile station and said second mobile station."  "The MPDUs and ACK

frames are part of the IEEE 802.11 standard."  (Ex. 1003 at ¶ 51.)  As discussed

above with respect to claim 2, Li discloses this exchange of MPDUs and ACK

frames.  (Ex. 1005 at 2:57-3:11; Ex. 1003 at ¶¶ 100, 102.)

* * *

The claim chart below summarizes Li's anticipation of claims 1, 2, and 3.

For brevity, the chart identifies only exemplary disclosures from Li.

| '096 Patent Claims 1-3 | Li (exemplary disclosures) (Ex. 1005) |
|---|---|
| **[1pre]** A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising: | "An access point in a wireless network communicates with multiple mobile stations simultaneously using spatial-division multiple access." (Abstract.)<br><br>"Access point **102** includes antennas **104**.  Access point **102** may be any |

*Inter Partes* Review of U.S. Patent No. 7,512,096

| '096 Patent Claims 1-3 | Li (exemplary disclosures) (Ex. 1005) |
|---|---|
| | type of access point having multiple antennas capable of communicating using spatial-division multiple access (SDMA)." (2:17-20.) |
| **[1a]** weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and | "In some embodiments, access point **102** may use zero-forcing beamformers for both downlink and uplink of signals to achieve SDMA." (2:48-50.) |
| **[1b]** weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data; | "The AP sets the network-allocation-vector (NAV) of all STAs in the vicinity to prevent unintended STAs from interfering with the beamformed signals." (4:54-56.) |
| **[1c]** increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol; | "Spatial-division multiple access increases both user density and network throughput of wireless systems by utilizing spatial channels in the environment." (2:42-47.)<br><br>"[E]lectronic system **1000** may be an access point that can communicate in parallel with multiple 802.11 compliant mobile stations." (5:6-8.)<br><br>"For example, PHY **1030** may be a circuit block that implements a physical layer that complies with an IEEE 802.11 standard." (5:38-44.) |
| **[1d]** discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; | "[A]ccess point **102** utilizes SDMA on the downlink to transmit to two or more of mobile stations **110**, **120**, or **130** simultaneously." (2:24-26.) |
| **[1e]** applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and second data | "By utilizing SDMA, the AP is able to transmit information in different spatial channels to parallel STAs simultaneously." (4:5-6.) |

34

*Inter Partes* Review of U.S. Patent No. 7,512,096

| '096 Patent Claims 1-3 | Li (exemplary disclosures) (Ex. 1005) |
|---|---|
| substantially concurrently from said access point to said first and second mobile stations, respectively; | |
| **[1f]** defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network; | "In some embodiments, wireless network **100** is a wireless local area network (WLAN).  For example, one or more of mobile stations **110**, **120**, and **130**, or access point **102** may operate in compliance with a wireless network standard such as ANSI/IEEE Std. 802.11."  (1:53-59.) |
| **[1g]** coupling said access point to said first and second mobile stations through said wireless local area network; | "In some embodiments, wireless network **100** is a wireless local area network (WLAN).  For example, one or more of mobile stations **110**, **120**, and **130**, or access point **102** may operate in compliance with a wireless network standard such as ANSI/IEEE Std. 802.11."  (1:53-59.)<br><br>"[A]ccess point **102** is capable of maintaining simultaneous 802.11 compliant communications with multiple mobile stations.  (1:62-66.) |
| **[1h]** estimating a first radio channel from said access point to said first mobile station over a pilot interval; and **[1i]** estimating a second radio channel from said access point to said second mobile station over said pilot interval. | "In some embodiments, channel state information is gathered by access point **102** during a prior uplink packet reception.  Various embodiments of gathering state information, also referred to as "estimating spatial channels," is described below with reference to FIGS. 2 and 3."  (2:52-56.)<br><br>"[C]hannel state information of all STAs in a parallel group may be obtained before SDMA transmission and reception."  (2:58-61.) |

35

*Inter Partes* Review of U.S. Patent No. 7,512,096

| '096 Patent Claims 1-3 | Li (exemplary disclosures) (Ex. 1005) |
|---|---|
| **[2]** A method, as set forth in claim **1**, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink. | "[C]hannel state information of all STAs in a parallel group may be obtained before SDMA transmission and reception.  Referring now to FIG. 2, an AP sends short frames and forces STAs to send back short frames.  As shown in FIG. 2, in some embodiments, an AP sends IEEE 802.11 Null-data frames in turn to STAs and estimates the STAs' channels from the received acknowledgement (ACK) frames.  For example, as shown in FIG. 2, the AP sends a Null-data frame **210** to STA**1**, which returns ACK frame **212**; the AP sends Null-data frame **220** to STA**2**, which returns ACK frame **222**; and the AP sends Null-data frame **230** to STA**3**, which returns ACK frame **232**."  (2:58-3:3.) |
| **[3]** A method, as set forth in claim **2**, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station. | |
| | Null-data frames are protocol data units.  (Ex. 1003 at ¶ 100.) |

### C.  Ground 3: Li In Combination With Perahia Renders Obvious Claim 10

Li in combination with Perahia renders obvious claim 10 of the '096 Patent.

#### 1.  Dependent Claim 10

**Claim 10** depends from claim 3.  As discussed in Ground 2, Li anticipates claim 3.  Claim 10 further recites using time division multiple access (TDMA) to partition a channel between SDMA and non-SDMA modes:  (1) "using a time division multiple access protocol to partition a radio resource including a channel

*Inter Partes* Review of U.S. Patent No. 7,512,096

across a space division multiple access mode and a non-space division multiple access mode of said access point"; and (2) "reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point."  As explained by Petitioner's expert, "TDMA divides signals into different time slots and users transmit in rapid succession, with each one using its own time slot."  (Ex. 1003 at ¶ 104.)  TDMA was well-known prior to the '096 Patent priority date.  (*Id*. at ¶ 105.)

Perahia discloses the claimed partition of SDMA and non-SDMA modes. (*Id*. at ¶¶ 108-109.)  Perahia teaches "requesting an access point for permission to switch between an SDMA mode and a non-SDMA mode and, upon receiving permission, switching between the SDMA mode and the non-SDMA mode."  (Ex. 1004 at 3:13-19.)  The non-SDMA mode serves mobile stations that are operating in a non-SDMA mode.  (*Id*. at 3:20-30, 8:11-22.)  Perahia maintains "a list of subscriber units operating in an SDMA mode and subscriber units operating in a non-SDMA mode."  (*Id.*)  The two modes operate in "non-overlapping subperiods."  (*Id.*)

Figure 9, shown below, illustrates the operation of Perahia's dual modes— an SDMA period reserved for serving "SDMA clients" and a non-SDMA period serving "standard clients."  (*Id.* at Fig. 9.)  "TDMA (Time Division Multiple

*Inter Partes* Review of U.S. Patent No. 7,512,096

Access) partitions a channel into time slots that are assigned to multiple users."

(Ex. 1003 at ¶ 109.)



### 2. One of Ordinary Skill Would Have Had Reason to Combine Perahia With Li

It would have been obvious to a POSITA to combine the teachings of Li and Perahia.  The two references address the same issue:  enhancing throughput in a wireless network through the use of SDMA.  (*See supra* §§ V.A, V.B; *see also* Ex. 1003 at ¶¶ 110, 113.)  Perahia focuses on the need for "systems and methods for applying MIMO and SDMA techniques to 802.11 operation" to achieve "simultaneous transmissions by multiple users and increased system capacity." (Ex. 1004 at 2:11-14.)  Similarly, Li utilizes SDMA to "increase[] both user density and network throughput of wireless systems."  (Ex. 1005 at 2:42-44.) Indeed, Perahia is listed on the face of Li as a reference cited by Li's examiner. (Ex. 1005 at Cover.)

*Inter Partes* Review of U.S. Patent No. 7,512,096

A POSITA would implement the SDMA / non-SDMA partition of Perahia in Li's network because some mobile stations do not operate in SDMA mode as seen in Figure 1 annotated to highlight the "Non-SDMA Subscriber Unit."  (*Id*., Fig. 1, annotated.)



**Fig. 1**

As Perahia explains, some mobile stations "are capable of employing MIMO processing techniques to participate in SDMA operations whereas others are not." (Ex. 1004 at 4:50-52.)

A POSITA understands that Li needs to continue supporting non-SDMA compatible mobile stations and would be motivated to switch between modes by

implementing the TDMA partition of Perahia to support both types of mobile stations.  (Ex. 1003 at ¶ 111.)  Petitioner's expert confirms that "the implementation details of the software updates for the combination would be minimal and would provide a reasonable expectation of success."  (*Id*. at ¶ 112.)

### D.  Ground 4: Wax Anticipates Claims 1-3

Like Li, Wax anticipates claims 1-3 of the '096 Patent.

#### 1.  Independent Claim 1

##### a.  1[pre] "A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station"

Wax discloses a method for communicating data over a network between a multi-antenna access point and first and second mobile stations.  Wax's "[a]ccess point comprises an array of antennas, which permit the access point to perform spatial division multiplexing (SDM) among the stations."  (Ex. 1006 at 12:4-12 (internal numbering omitted).)  The access point "comprises multiple antennas" so that it is able "to transmit respective downlink signals simultaneously to multiple stations."  (Ex. 1006 at 1:54-64; *see also* Ex. 1003 at ¶ 115.)  Wax's Figure 1, provided below, depicts the access point 28 with an array of antennas 30 (six antennas depicted) communicating with three mobile stations 22, 24, 26.  (Ex. 1006, Fig. 1.)

*Inter Partes* Review of U.S. Patent No. 7,512,096



FIG. 1

**b.  1[a] "weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data"**

**&**

**1[b] "weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data"**

Wax discloses the "weighting" limitations, teaching that "transmitting the downlink signals includes calculating respective beamforming weights for the stations in the set responsively to the respective spatial signatures, and applying the beamforming weights to the downlink signals." (Ex. 1006 at 2:41-57; *see also* Ex. 1003 at ¶ 48 ("Generating weights, also referred to as beamforming, is a routine function in SDMA.").) In particular, the "[w]eight calculation circuit **52** uses the signals received at step **152** and the spatial signatures calculated at step **154** to

41

*Inter Partes* Review of U.S. Patent No. 7,512,096

calculate beamforming weights for all the stations in the SMG, at a weight calculation step **156**." (Ex. 1006 at 31:19-22; *see also id.* at cols. 31-34 (detailed discussion of weight calculations) and Fig. 11.) By weighting the data, Wax directs data to the appropriate mobile station. (*E.g.*, *id.*; *see also id.* at Fig. 9; Ex. 1003 at ¶ 116.)

        c.    **1[c] "increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol"**

By using SDMA, Wax increases the rates of transmission for the first data and second data. (Ex. 1003 at ¶ 71.) "This technique permits an access point to transmit respective downlink signals simultaneously to multiple stations," thereby "enhancing the capacity of a WLAN." (Ex. 1006 at 1:54-64.) The access point in Wax can also "be configured to transmit and receive packets to and from different stations in any given SMG [spatial multiplexing group, *i.e.*, a group of SDMA mobile stations], and to adjust these rates so as to optimize performance." (Ex. 1006 at 37:31-34; *see also* Ex. 1003 at ¶ 118.) In one example, Wax increases the rate to 11 Mbps. (Ex. 1006 at 41:4-5.)

In addition, Wax utilizes a single carrier frequency based on IEEE 802.11. (Ex. 1006 at 1:38-40 ("In 802.11 WLANs, a fixed access point communicates on a

*Inter Partes* Review of U.S. Patent No. 7,512,096

predefined frequency channel with wireless mobile stations."); Ex. 1003 at ¶ 117

("IEEE 802.11 communications use a single carrier frequency").)

> **d.    1[d] "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension"**

Wax discriminates transmissions of first and second data based on a spatial

dimension.  Wax employs SDMA, which meets this limitation.  (Ex. 1006 at 1:54-

64; Ex. 1003 at ¶ 119.)  Wax also teaches "optimizing the transmit beamforming

weights jointly for all of the two or more of the stations so as to reduce an

interference between the downlink signals received by each of the two or more of

the stations."  (Ex. 1006 at 5:64-6:4.)  This interference reduction is also a form of

transmission discrimination.  (Ex. 1003 at ¶ 119.)

> **e.    1[e] "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively"**

The '096 Patent describes that this limitation is met by SDMA.  (Ex. 1001,

1:57-60; ; *see also* Ex. 1003 at ¶ 120 ("[T]his limitation is met by applying

SDMA.").)  Like the '096 Patent, Wax applies SDMA to transmit the first and

second data substantially concurrently from the access point to the first and second

mobile stations, respectively.  (Ex. 1003 at ¶ 120.)  For example, Wax teaches

"communicating with two or more of the stations simultaneously by spatial

*Inter Partes* Review of U.S. Patent No. 7,512,096

division multiplexing (SDM) using the beamforming weights." (Ex. 1006 at 4:50-53.) SDM is another name for SDMA. (Ex. 1003 at ¶ 115.)

> **f.    1[f] "defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network"**

Wax discloses "a method for communication over a wireless local area network (WLAN)." (Ex. 1006 at 4:41-52.) Within this network, Wax defines the access point, mobile stations, and downlink according to IEEE 802.11. In fact, "it is assumed that the access points and mobile stations communicate with one another in accordance with one of the standards in the IEEE 802.11 family and observe the applicable 802.11 physical (PHY) layer and medium access control (MAC) layer conventions." (Ex. 1006 at 12:16-29; Ex. 1003 at ¶ 121.) These conventions establish Wax's wireless local area network. (Ex. 1006 at 11:61-65; Ex. 1003 at ¶ 121.)

> **g.    1[g] "coupling said access point to said first and second mobile stations through said wireless local area network"**

In Wax, the access point and mobile stations are coupled through the WLAN in the same way as described in the '096 Patent. (*See supra* § VIII.A.7.) These devices "communicate with one another" within the WLAN as shown in and

*Inter Partes* Review of U.S. Patent No. 7,512,096

described with reference to Figure 1 provided above. (Ex. 1006 at 12:16-21; *see also, e.g., id.* at Fig. 1, 11:61-67; Ex. 1003 at ¶ 122; *see supra* § VIII.D.1.a.)

> **h.    1[h] "estimating a first radio channel from said access point to said first mobile station over a pilot interval"**
> **&**
> **1[i] "estimating a second radio channel from said access point to said second mobile station over said pilot interval"**

"Channel estimation over a pilot channel is a routine process in IEEE 802.11 WLAN." (Ex. 1003 at ¶ 50.)  Wax estimates radio channels for the mobile stations over a pilot interval.  In the parlance of Wax, it obtains the "spatial signature" of each mobile station.  (Ex. 1006 at 29:44-47.)  This is another term for estimating radio channels.  (Ex. 1003 at ¶ 123.)  Wax's access point obtains the channel estimates by using "standard messaging provided by the 802.11 standard in order to prompt the desired station to transmit an uplink signal," the preamble of which is used "to estimate a spatial signature for the station, at a signature calculation step." (Ex. 1006 at 29:15-47.)

In particular, the access point "may send the station a packet containing null data, which will cause the station to return an acknowledgement (ACK) packet." (*Id.*)  This standard exchange—the same one described in the '096 Patent (Ex. 1001 at 7:41-8:6)—takes place over a pilot interval.  (Ex. 1003 at ¶ 123; *see also* Ex. 1001 at 7:41-53 (defining a pilot interval).)  The access point "prompts each of the stations in the SMG to transmit individually." (Ex. 1006 at 29:4-11.)  While

missing in the '096 Patent, Wax provides detailed teachings on how to calculate the channel estimates from this exchange.  (Ex. 1006 at 29:47-30:65; Ex. 1003 at ¶ 124.)

### 2.      Dependent Claim 2

**Claim 2** depends from claim 1 and further recites "initializing said transmission protocol before starting said transmissions of said first and second data over said downlink."  Wax performs this routine exercise of initializing the transmission protocol before starting transmissions over the downlink.  (Ex. 1003 at ¶ 126.)  For example, as Wax illustrates in Figure 9, shown below, Wax first defines the spatial multiplexing group (SMG) of mobile stations "based on the characteristics of the uplink signals" (Ex. 1006 at 26:48-52), and then disables further uplink signals from these stations while it determines weighting for the stations (*id.* at 27:5-26).  Once that is complete, downlink transmissions to the mobile stations commence.  (*Id.* at 27:32-35.)

*Inter Partes* Review of U.S. Patent No. 7,512,096



### 3.    Dependent Claim 3

**Claim 3** depends from claim 2.  It specifies that the initialization step of claim 2 comprises "exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station."  "The MPDUs and ACK frames are part of the IEEE 802.11 standard."  (Ex. 1003 at ¶ 51.)  Wax discloses the access point and mobile stations exchanging packets containing null data and acknowledgements as part of its initialization process.  (Ex. 1006 at 29:17-20.)  A "packet containing null data" is a type of PDU in the IEEE 802.11 standard.  (Ex. 1003 at ¶ 128.)

\* \* \*

The claim chart below summarizes Wax's anticipation of claims 1, 2, and 3. For brevity, the chart identifies only exemplary disclosures from Wax.

*Inter Partes* Review of U.S. Patent No. 7,512,096

| '096 Patent Claims 1-3 | Wax (exemplary disclosures) (Ex. 1006) |
|---|---|
| **[1pre]** A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising: | "This technique permits an access point to transmit respective downlink signals simultaneously to multiple stations in a spatial multiplexing group (SMG), and to receive uplink signals simultaneously from the stations in the group.  For this purpose, the access point comprises multiple antennas . . . ."  (1:56-64.)  "Access point comprises an array of antennas, which permit the access point to perform spatial division multiplexing (SDM) among the stations."  (12:4-6.) |
| **[1a]** weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and | "Typically, transmitting the downlink signals includes calculating respective beamforming weights for the stations in the set responsively to the respective spatial signatures, and applying the beamforming weights to the downlink signals."  (2:41-45.) |
| **[1b]** weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data; | "Weight calculation circuit **52** uses the signals received at step **152** and the spatial signatures calculated at step **154** to calculate beamforming weights for all the stations in the SMG, at a weight calculation step **156**." (31:19-22; *see also* cols. 31-34 (detailed discussion of weight calculations).) |
| **[1c]** increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol; | "[A]ccess point **28** may be configured to transmit and receive packets to and from different stations in any given SMG at different rates, and to adjust these rates so as to optimize performance of the entire group. Typically, the rate chosen for each station is the highest possible rate . . . ." (37:31-37.)  "In 802.11 WLANs, a fixed access point communicates on a predefined frequency channel with wireless mobile stations . . . ." (1:38-40.) |

*Inter Partes* Review of U.S. Patent No. 7,512,096

| '096 Patent Claims 1-3 | Wax (exemplary disclosures) (Ex. 1006) |
|---|---|
| **[1d]** discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; | "Typically, calculating the second beamforming weights includes computing respective transmit beamforming weights for application to the downlink signals that are to be transmitted to each of the two or more of the stations, and optimizing the transmit beamforming weights jointly for all of the two or more of the stations so as to reduce an interference between the downlink signals received by each of the two or more of the stations." (5:64-6:4.) |
| **[1e]** applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively; | "There is also provided, in accordance with an embodiment of the present invention, a method for communication over a wireless local area network (WLAN), including: receiving first signals from a plurality of stations in the WLAN; responsively to the first signals, determining respective spatial signatures of the stations; calculating beamforming weights based on the spatial signatures; and communicating with two or more of the stations simultaneously by spatial division multiplexing (SDM) using the beamforming weights." (4:41-52.) |
| **[1f]** defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network; | "[I]t is assumed that the access points and mobile stations communicate with one another in accordance with one of the standards in the IEEE 802.11 family and observe the applicable 802.11 physical (PHY) layer and medium access control (MAC) layer conventions." (12:16-29.) |
| **[1g]** coupling said access point to said first and second mobile | "System 20 comprises an access point **28**, which communicates with stations **22**, **24**, **26**, on a given frequency channel." (11:63-65.) |

*Inter Partes* Review of U.S. Patent No. 7,512,096

| '096 Patent Claims 1-3 | Wax (exemplary disclosures) (Ex. 1006) |
|---|---|
| stations through said wireless local area network; | |
| **[1h]** estimating a first radio channel from said access point to said first mobile station over a pilot interval; and | "[A]ccess point **28** prompts each of the stations in the SMG to transmit individually, in sequence, at a transmission prompting step **150**. . . .  In response to the prompt at step **150**, access point receives the expected uplink signal |
| **[1i]** estimating a second radio channel from said access point to said second mobile station over said pilot interval. | from the given station, at a signal reception step **152**.  As noted above, the uplink signal may typically comprise an ACK or CTS message.  Weight calculation circuit **52** uses the known preamble of the uplink message to estimate a spatial signature for the station, at a signature calculation step **154**." (29:9-11, 29:41-47; *see also,* cols. 29-30 (detailed discussion of how to calculate channel estimates).) |
| **[2]** A method, as set forth in claim **1**, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink. | (Fig. 9.) |
| **[3]** A method, as set forth in claim **2**, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station. | "Typically, at step **150**, access point **28** uses standard messaging provided by the 802.11 standard in order to prompt the desired station to transmit an uplink signal.  For example, the access point may send the station a packet containing null data, which will cause the station to return an acknowledgment (ACK) packet." (29:15-20.)  A "packet containing null data" is a type of protocol data unit.  (Ex. 1003 at ¶ 128.) |

*Inter Partes* Review of U.S. Patent No. 7,512,096

### E.    Ground 5: Wax In Combination With Perahia Renders Obvious Claim 10

Wax in combination with Perahia renders obvious claim 10, which depends from claim 3.  As set forth in Ground 4, Wax anticipates claim 3.  Moreover, as discussed in Ground 3, Perahia discloses the limitations recited in claim 10:  the use of TDMA to partition a channel into reserved SDMA and non-SDMA modes. (*Supra* § VIII.C.)

One of ordinary skill would have been motivated to combine Wax with Perahia.  Both references are concerned with achieving multiple simultaneous downlink signals to enhance throughput in an IEEE 802.11 wireless network; both references employ SMDA for this purpose.  (*Supra* §§ V.A, V.C; Ex. 1003 at ¶ 131.)  Indeed, Perahia is listed on the face of Wax as one of just 6 references cited by Wax's examiner.  (Ex. 1006 at Cover.)

It would have been obvious to a POSITA to combine Perahia's SDMA / non-SDMA dual modes with Wax's teachings so that non-SDMA users would not be excluded from the network of Wax.  (Ex. 1003 at ¶ 132.)  As described earlier with respect to the combination of Li and Perahia, some mobile stations "are capable of employing MIMO processing techniques to participate in SDMA operations whereas others are not."  (Ex. 1004 at 4:50-52.)  To serve these non-SDMA mobile stations, a POSITA would combine Wax with the TDMA partition

*Inter Partes* Review of U.S. Patent No. 7,512,096

of Perahia.  (Ex. 1003 at ¶ 132.)  Petitioner's expert confirms that "the implementation details of the software updates for the combination would be minimal and would provide a reasonable expectation of success."  (Ex. 1003 at ¶ 133.)

## IX.    CONCLUSION

As demonstrated above, there is a reasonable likelihood that the Challenged Claims are unpatentable.  Petitioner requests *Inter Partes* Review of claims 1, 2, 3, and 10 of the '096 Patent, and requests that these claims be cancelled.

The required fee under 37 C.F.R. §§ 42.15(a) and 42.103 in the amount of $41,500 is being paid through the Patent Review Processing System.  Please assess any fee deficiency or credit to Deposit Account No. 10-0460.

Respectfully submitted,

Dated: February 9, 2022          ___/Amr Aly/_____
                                 Amr Aly, Reg. No. 50,525
                                 *Lead Attorney for Petitioner*

*Inter Partes* Review of U.S. Patent No. 7,512,096

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6 and 42.105, I hereby certify that I caused to be served by USPS via Priority Mail Express this Petition for *Inter Partes* Review of U.S. Patent No. 7,512,096, including all exhibits, upon the following parties:

> Sean Burdick
> WSOU Investments, LLC
> 11150 Santa Monica Blvd., Suite 1400
> Los Angeles, CA 90025
>
> *Patent Owner's Correspondence Address*
> *of record for U.S. Patent No. 7,512,096*

Dated: February 9, 2022      ___/Amr Aly/_____

                                    Amr Aly, Reg. No. 50,525
                                    *Lead Attorney for Petitioner*

*Inter Partes* Review of U.S. Patent No. 7,512,096

## CERTIFICATE OF COMPLIANCE

In accordance with 37 CFR 42.24, as amended, the undersigned certifies that this Petition complies with the applicable type-volume limitations of 37 CFR 42.24(a)(i). Exclusive of the portions exempted by 37 CFR 42.24(a), this Petition contains 11,841 words as counted by the word processing program used for its preparation (Microsoft Word 2016).

Dated: February 9, 2022          */Amr Aly/*
                                          Amr Aly, Reg. No. 50,525
                                          Jenner & Block LLP
                                          1155 Avenue of the Americas
                                          New York, NY 10036
                                          *Lead Attorney for Petitioner*

# **Exhibit 6**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

NETGEAR, INC.
Petitioner

v.

WSOU INVESTMENTS, LLC
Patent Owner

---

IPR2022-00606

U.S. Patent No. 7,551,630
Title: Router to Route Packets
Filed: June 9, 2004
Issued: June 23, 2009

---

**PETITION FOR *INTER PARTES* REVIEW
U.S. PATENT NO. 7,551,630**

*Inter Partes* Review of U.S. Patent No. 7,551,630

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................1

II.  MANDATORY NOTICES ....................................................................3

    A.  Real Party-in-Interest [37 C.F.R. § 42.8(b)(1)]....................................3

    B.  Related Matters [37 C.F.R. § 42.8(b)(2)]...........................................3

    C.  Lead/Back-up Counsel [37 C.F.R. § 42.8(b)(3)] .................................3

    D.  Service Information [37 C.F.R. § 42.8(b)(4)] ......................................4

III.  GROUNDS FOR STANDING................................................................4

IV.  BACKGROUND OF THE '630 PATENT ...................................................4

    A.  The '630 Patent ...........................................................................4

    B.  The Claims ................................................................................5

    C.  The Prosecution and Family History of the '630 Patent........................7

    D.  Priority Date ...............................................................................8

    E.  Level of Ordinary Skill ..................................................................8

    F.  The State of the Art ......................................................................9

V.  IDENTIFICATION AND OVERVIEW OF PRIOR ART ..........................11

    A.  U.S. Patent Publication No. 2002/0031091 to Everdingen (Ex. 1004)..........................................................................................11

    B.  U.S. Patent No. 7,133,360 to Gouriellec (Ex. 1005)..........................12

    C.  Other Evidence of the State of the Art (Exhibits 1006-1010) ............13

VI.  IDENTIFICATION OF CHALLENGE AND RELIEF REQUESTED [37 C.F.R. §§ 42.104(b)(1)-(2)] ............................................13

VII.  CLAIM CONSTRUCTION [37 C.F.R. § 42.104(b)(3)]...............................14

*Inter Partes* Review of U.S. Patent No. 7,551,630

VIII.  GROUNDS FOR UNPATENTABILITY [37 C.F.R. § 42.104(b)(4)-(5)]..........................................................................14

    A.  Grounds 1-2: Everdingen Anticipates (Ground 1) or Renders Obvious (Ground 2) Claims 1-4, 6, 10, 12..........................15

        1.  Disclosures of Everdingen for Claims 1 and 2 ........................15

        2.  Disclosures of Everdingen for Claim 3....................................24

        3.  Disclosures of Everdingen for Claims 4 and 10 ......................25

        4.  Disclosures of Everdingen for Claims 6 and 12 ......................26

    B.  Grounds 3-4: Gouriellec Anticipates (Ground 3) or Renders Obvious (Ground 4) Claims 1-4, 6, 10, 12..........................30

        1.  Disclosures of Gouriellec for Claims 1 and 2..........................30

        2.  Disclosures of Gouriellec for Claim 3 .....................................39

        3.  Disclosures of Gouriellec for Claims 4 and 10.........................39

        4.  Disclosures of Gouriellec for Claims 6 and 12.........................41

IX.  CONCLUSION..........................................................................45

*Inter Partes* Review of U.S. Patent No. 7,551,630

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 7,551,630 ("the '630 Patent") |
| 1002 | File History for U.S. Patent No. 7,551,630 |
| 1003 | Declaration of Dr. Robert Akl |
| 1004 | U.S. Patent Publication No. 2002/0031091 to Michiel van Everdingen, "Method and a Device for Controlling Source Specific Data Flow," filed August 31, 2001 ("Everdingen") |
| 1005 | U.S. Patent No. 7,133,360 to Louis Le Gouriellec et al., "Conditional Bandwidth Subscriptions for Multiprotocol Label Switching (MPLS) Label Switched Paths (LSPS)," filed May 7, 2002 ("Gouriellec") |
| 1006 | U.S. Patent No. 6,463,068 to Arthur Lin et al., "Router With Class of Service Mapping," filed December 31, 1997 ("Lin") |
| 1007 | U.S. Patent No. 6,826,147 to Biswajit B. Nandy et al., "Method and Apparatus for Aggregate Flow Control in a Differentiated Services Network," filed December 19, 2000 ("Nandy") |
| 1008 | RFC 3031, "Multiprotocol Label Switching Architecture," dated January 2001 ("RFC 3031") |
| 1009 | "A Parallel Processing Tutorial" by David B. Davidson, IEEE Antennas and Propagation Society Magazine, April 1990, ("Davidson") |
| 1010 | "Random Early Detection Gateways for Congestion Avoidance" by Sally Floyd and Van Jacobson, IEEE/ACM Transactions on Networking, August 1993 ("Floyd") |
| 1011 | WSOU's Responses and Objections to NETGEAR's Interrogatories dated January 19, 2022, Case No. 1:21-cv-1120-MN-CJB, District of Delaware |

*Inter Partes* Review of U.S. Patent No. 7,551,630

## I.    INTRODUCTION

Pursuant to 35 U.S.C. §§ 311-319 and 37 C.F.R. Part 42, Petitioner

NETGEAR, Inc. ("Petitioner" or "NETGEAR") respectfully requests *Inter Partes*

Review of claims 1-4, 6, 10, and 12 ("Challenged Claims") of U.S. Patent No.

7,551,630 (Ex. 1001, "the '630 Patent").  The '630 Patent is presently assigned to

WSOU Investments, LLC ("Patent Owner" or "WSOU").

The '630 Patent generally describes a router having to discard or drop

control packets when it is congested.  The '630 Patent acknowledges that such a

router was "already known in the art."  (Ex. 1001 at 1:7-9.)  The '630 Patent

explains that control packets, i.e., the packets that include the "control data to

create the required forwarding path," are "received by [a] common processor" and

then processed "according to its specific routing protocol."  (*Id*. at 1:10-32.)  When

"the common processor is not able to process all received packets," the excess

packets "need to be dropped in order to relieve the common processor."  (*Id*. at

1:33-40.)

The '630 Patent describes how some prior art routers dropped packets.  In

one solution, a router includes a buffer coupled to its inputs "to buffer the received

packets."  (*Id*. at 1:41-44.)  "In the event when the filling level of the buffer

exceeds a predefined buffer threshold the different inputs of the router will drop

the next received control packets according to a random sequence or according to a

one-by-one sequence." (*Id*. at 1:47-51.)  In another solution, the packets are dropped in a similar manner at a common control point, which is "the part of the data-path that comprises the common processor and its associated buffer." (*Id*. at 1:44-47, 1:57-60.)

The '630 Patent identifies a problem with these prior art solutions.  Because "the packets are dropped regardless of the content of the different packets," it is possible that the "packets from the violating stream" are not the ones dropped.  (*Id*. at 1:63-2:1.)  To overcome this problem, the '630 Patent suggests inserting a marker between the inputs and the common processor "for marking incoming control packets according to a receiving rate of [the] control packets" at the router inputs.  (*Id*. at 2:15-25.)  As a result of this marking, packets can now be discarded "based on the kind of marking of the marked control packets and on predefined rules and conditions." (*Id*. at 2:25-31.)

This proposed solution, however, was not new.  Before the '630 Patent's priority date, it was already known to insert a marker in a router to mark packets in this way.  For example, the two references set forth in this Petition (Everdingen and Gouriellec) both recognized the problems associated with routers dropping packets during periods of congestion and proposed solutions that used a marker for marking packets prior to discarding.

*Inter Partes* Review of U.S. Patent No. 7,551,630

## II.    MANDATORY NOTICES

### A.      Real Party-in-Interest [37 C.F.R. § 42.8(b)(1)]

Petitioner NETGEAR is the real-party-in-interest for this proceeding.  No party other than NETGEAR has controlled, directed, funded, or participated in the preparation of this Petition, and therefore no party other than NETGEAR is understood to be a real-party-in-interest.

### B.      Related Matters [37 C.F.R. § 42.8(b)(2)]

WSOU asserted the '630 Patent against NETGEAR in the Western District of Texas on February 19, 2021 (No. 6:21-cv-00155-ADA), served on February 23, 2021.  On July 30, 2021, after NETGEAR filed a Motion to Dismiss or Transfer, WSOU dismissed the case and filed a new suit against NETGEAR in the District of Delaware (No. 1:21-cv-01120-MN-CJB), again asserting the '630 Patent.  The Delaware suit is pending, in which WSOU asserts in the same Challenged Claims at issue here in the district court case.

### C.      Lead/Back-up Counsel [37 C.F.R. § 42.8(b)(3)]

Petitioner is filing a power of attorney designating Amr O. Aly (Reg. No. 50,525, aaly@jenner.com) as lead counsel, of Jenner & Block LLP, 1155 Avenue of the Americas, New York, NY 10036, and Lisa M. Schoedel (Reg. No. 53,564, lschoedel@jenner.com) and Yusuf Esat (Reg. No. 64,057, yesat@jenner.com) as back-up counsel, of Jenner & Block LLP, 353 N. Clark St., Chicago, Illinois 60654.

*Inter Partes* Review of U.S. Patent No. 7,551,630

### D.      Service Information [37 C.F.R. § 42.8(b)(4)]

Petitioner consents to e-mail service at the addresses of lead and back-up counsel and chgoip@jenner.com.  Documents also may be delivered by hand to the address of lead and back-up counsel above.

## III.    GROUNDS FOR STANDING

Petitioner certifies that the '630 Patent is available for *Inter Partes* Review, and Petitioner is not barred or estopped from requesting *Inter Partes* Review challenging the claims on the grounds identified herein.

## IV.    BACKGROUND OF THE '630 PATENT

### A.      The '630 Patent

The '630 patent describes a router that drops excess control packets to relieve a common processor.  (Ex. 1001 at 2:8-12.)  The router includes a marker coupled between the router inputs and the common processor.  (*Id*. at 2:15-17.) The marker marks "incoming control packets according to a receiving rate of control packets that are received at this subset of inputs and that are moreover to be processed according to a first routing protocol e.g. the BGP [Border Gateway Protocol] protocol."  (*Id*. at 2:17-21.)  "The marking of packets is also called coloring of packets" when packets are marked according to a "color code" such as "green in the event of no excess traffic, yellow in the event of minor excess traffic and red in the event of highly excess traffic."  (*Id*. at 2:43-47.)

*Inter Partes* Review of U.S. Patent No. 7,551,630

The common processor includes a discarder that discards packets "based upon the kind of marking" and "predefined rules and conditions." (*Id*. at Abstract.) For example, the marker may mark a first group of control packets as green, a second group as yellow, and a third group as red during a predefined sampling period. (*Id*. at 5:6-10.) In this example, the discarder: (1) does not discard packets marked green; (2) discards packets marked red; and (3) discards packets marked yellow according to predefined rules and conditions. (*Id*. at 5:13-46.)

## B.   The Claims

The '630 patent contains fifteen claims, two of which are independent. Independent claim 1 is a router claim, while independent claim 2 is a routing method claim. These independent claims have similar limitations. Claim 3 is a telecommunication network claim that includes the router of claim 1. Claims 4 and 6 also depend from claim 1, while claims 10 and 12, depend from claim 2. Claims 10 and 12 are substantially the same as claims 4 and 6, respectfully.

The Challenged Claims, claims 1-4, 6, 10, and 12, are set out in the table below with the claim limitations labeled for reference.

| U.S. Patent No. 7,551,630 Claims |
|---|
| **[1pre]** A router for routing packets in a telecommunication network, said router comprises |
| **[1a]** a plurality of inputs for receiving said packets and a common processor (CP) coupled to said plurality of inputs for processing at least part of said packets according to one or more routing protocols, |

*Inter Partes* Review of U.S. Patent No. 7,551,630

| |
|---|
| **[1b]** wherein said router comprises at least one packet marker (M11(M_BGP)), coupled between a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and said common processor (CP), for marking incoming control packets of said at least part of said packets, according to a receiving rate of control packets received at said first plurality of inputs (IN11, IN12, IN13) and to be processed according to a first routing protocol, said incoming control packets being received at one of said first plurality of inputs (IN11, IN12, IN13) and to be processed according to said first routing protocol, said marker (M11(M_BGP)) provides thereby marked control packets; and |
| **[1c]** said common processor (CP) comprises a discarder (DIS) for discarding, before said processing, one or more of said marked control packets according to said marking and according to predefined rules and conditions. |
| **[2pre]** A routing method to route packets in a telecommunication network, comprising the steps of: |
| **[2a]** receiving said packets by a plurality of inputs of said router; and |
| **[2b]** processing at least part of said packets according to one or more routing protocols by a common processor (CP) coupled to said plurality of inputs, |
| **[2c]** wherein said routing method further comprises a step of marking incoming control packets of said at least part of said packets by a packet marker (M11(M_BGP)) according to a receiving rate of control packets received at a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and to be processed according to a first routing protocol and providing thereby marked control packets, said incoming control packets being received at one (IN12) of a first plurality (IN11, IN12, IN13) of said plurality of inputs and are to be processed according to said first routing protocol; and |
| **[2d]** said routing method further comprises, before said step of processing, a step of discarding by a discarder (DIS) associated to said common processor (CP) one or more of said marked control packets according to said marking and according to predefined rules and conditions. |
| **[3]** A telecommunication network that comprises a router for routing packets, wherein said router is a router according to claim 1. |
| **[4]** A router according to claim 1, wherein said router comprises a plurality of common processors each for processing a different part of said packets, each common processor including a respective discarder for discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions. |
| **[6]** A router according to claim 1, wherein each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs. |

*Inter Partes* Review of U.S. Patent No. 7,551,630

**[10]** A method according to claim 2, wherein there are a plurality of common processors each for processing a different part of said packets, said method comprising the step of discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions separately for each control processor.

**[12]** A method according to claim 2, wherein each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs.

## C.    The Prosecution and Family History of the '630 Patent

In a preliminary amendment, the applicant added claims 4-15 to the three originally filed claims that mirrored the claims in the foreign priority application, European Application No. 03291427.  (Ex. 1002 at 50-56.)  During prosecution, the applicant distinguished these claims from the Patent Office's prior art three times.

Twice, the applicant distinguished the claims from US Patent Publication No. 2002/0012348 ("Mizuhara").  First, the applicant argued that Mizuhara did not disclose marking the packets in the router and, when the Patent Office did not find this argument to be persuasive, then the applicant argued that the Patent Office used the same device for both the marker limitation and common processor limitation so the marker could not be between the inputs and the common processor.  (*Id*. at 94, 108, 121.)  The applicant's third argument was that that US Patent Publication No. 2004/0125796 ("Reader") also did not teach "at least one packet marker, coupled between a first plurality of inputs of said plurality of inputs

*Inter Partes* Review of U.S. Patent No. 7,551,630

and said common processor." (*Id*. at 144, emphasis omitted.)  Thereafter, the

Patent Office allowed claims 1-15.  (*Id*. at 153.)

None of the prior art references raised in this Petition were cited during

prosecution of the '630 Patent.

### D.    Priority Date

In the parties' pending Delaware suit, WSOU stated that the priority date of

the '630 Patent is June 9, 2004 and that it "is not presently relying on conception or

reduction to practice dates earlier than the priority dates listed on the patent

applications (including parent or prior applications)."  (Ex. 1011 at 11.)  For

purposes of this Petition, Petitioner assumes that the priority date of the '630

Patent is June 13, 2003, the filing date of European Application No. 03291427.

(Ex. 1001 at Cover (*see* "Foreign Application Priority Data").)

### E.    Level of Ordinary Skill

In this Petition, Petitioner applies the perspective of one of ordinary skill

around the time of the alleged invention of the '630 Patent.  Here, as explained by

Petitioner's expert, a person of ordinary skill in the art (POSITA) would typically

have had a bachelor's degree in electrical engineering (or a similar degree) and 1-2

years working in the design or development of routers, or the equivalent.  (*See* Ex.

1003 at ¶ 19.)  Additional graduate education could substitute for professional

*Inter Partes* Review of U.S. Patent No. 7,551,630

experience, and vice versa, significant experience in the field could substitute for formal education.  (*Id*.)

### F.     The State of the Art

The '630 Patent admits that routers with multiple inputs for receiving packets were known in the prior art.  "[A] router for routing packets in a telecommunication network usually comprises a plurality of inputs for receiving the packets" and that "router is already known in the art."  (Ex. 1001 at 1:7-9.) The '630 Patent also admits that routers that dropped packets during congestion were well-known as "received control packets need to be dropped in order to relieve the common processor."  (*Id*. at 1:38-40.)

The '630 Patent also admits that routers could drop packets at the ingress. "Such a functional block that drops excess control packets at the ingress of the router ROUT is already known in the art."  (*Id*. at 5:13-16.)  A router that drops packets at the ingress uses "a buffer that is coupled to the different inputs [and] is used to buffer the received packets" and "when the filling level of the buffer exceeds a predefined buffer threshold the different inputs of the router will drop the next received control packets according to a random sequence or according to a one-by-one sequence."  (*Id*. at 1:42-51.)  Additionally, the '630 Patent admits that known routers could also "discard[ ] packets at the common control point itself." (*Id*. at 1:57-62.)

9

*Inter Partes* Review of U.S. Patent No. 7,551,630

The '630 Patent also uses known algorithms for discarding packets. In particular, "it is preferred to use the known Random Early Detection mechanism or shortly called RED." (*Id*. at 5:40-42.) This "known" RED algorithm predates the '630 Patent by 10 years. (Ex. 1010 (The "Random Early Detection Gateways for Congestion Avoidance" paper was "[t]o appear in the August 1993 IEEE/ACM Transactions on Networking.").) In addition, the '630 Patent discloses known routing protocols, but acknowledges that the alleged invention is not limited to any type of routing protocol. (Ex. 1001 at 5:65-6:7.)

Nor did the '630 Patent disclose any new electronic components. "A final remark is that embodiments of the present invention are described above in terms of functional blocks. From the functional description of these blocks, given above, it will be apparent for a person skilled in the art of designing electronic devices how embodiments of these blocks can be manufactured with well-known electronic components. A detailed architecture of the contents of the functional blocks hence is not given." (*Id*. at 6:8-15.) Indeed, "[t]he kind of marker used to mark the incoming control packets goes beyond the aim of the present invention." (*Id*. at 4:67-5:2.)

Instead, the '630 Patent's only alleged contribution to router design is "the presence of the marking step at the ingress of the router" and "discarding based upon this marking at the common control point of the router." (*Id*. at 5:58-64.)

*Inter Partes* Review of U.S. Patent No. 7,551,630

"The aim of the present invention is the fact that the control packets are marked in function of a receiving rate of the control packet stream whereto this control packet belongs." (*Id*. at 5:2-5.)

However, this alleged contribution was not new.  Before the '630 Patent's earliest priority date, both Everdingen and Goureillec described a router that marks packets according to their receiving rate and, if necessary, dropping packets based on that marking.

## V.    IDENTIFICATION AND OVERVIEW OF PRIOR ART

### A.    U.S. Patent Publication No. 2002/0031091 to Everdingen (Ex. 1004)

Everdingen was filed on August 31, 2001, claiming priority to a European patent application filed on September 11, 2000, and published on March 14, 2002, before the '630 Patent's earliest priority date of June 13, 2003.  Therefore, it is prior art at least under pre-AIA § 102(a).  Everdingen was not before the Examiner during the '630 Patent prosecution.

Everdingen describes that "[i]f a source specific incoming data rate exceeds a predetermined data rate" or "the switching device becomes congested," then packets are discarded.  (Ex. 1004 at ¶ 0005.)  Recognizing that this is a problem, Everdingen discloses "[a] method for controlling data flow." (*Id*. at ¶¶ 0006, 0008.)  Everdingen's method includes using a marker device to "mark data packets as 'discardable' or 'non-discardable' depending on the result of the metering" that

11

*Inter Partes* Review of U.S. Patent No. 7,551,630

determines "the incoming data rate." (*Id*. at ¶¶ 0023-24.) Once the packets are marked, "[t]he dropper devices 61-68 eliminate data packets depending on the result of the metering, the marking of the packets or if the queues 81-88 become congested." (*Id*. at ¶ 0023.)

## B.   U.S. Patent No. 7,133,360 to Gouriellec (Ex. 1005)

Gouriellec was filed on May 7, 2002, claiming priority to a provisional patent application filed on December 17, 2001, before the '630 Patent's earliest priority date of June 13, 2003, and issued on November 7, 2006. Therefore, it is prior art at least under pre-AIA § 102(e). Gouriellec was not before the Examiner during the '630 Patent prosecution.

Gouriellec describes that "during peak traffic periods," it is possible that "traffic within an LSP's committed bandwidth may be dropped." (Ex. 1005 at 1:53-57.) "Accordingly, there is a need for a system and method for controlling network traffic that … ensure[s] no loss of traffic within an LSP's committed bandwidth." (*Id*. at 1:58-61.) Gouriellec's system includes a marker that "marks [a] packet based on the classification information and the traffic flow information from the meter **42**." (*Id*. at 5:15-17.) "The meter **42** may be any conventional meter known in the art such as, for example, an average rate meter, exponential weighted moving average meter, two-parameter token bucket meter, multi-state token bucket meter, a null meter, or the like." (*Id*. at 4:52-56.) Thereafter,

*Inter Partes* Review of U.S. Patent No. 7,551,630

Gouriellec's system discards the marked packets "in case of congestion."  (*Id*. at 5:17-32.)

## C.    Other Evidence of the State of the Art (Exhibits 1006-1010)

Exhibits 1006-1010 further reflect the state of the art, level of ordinary skill in the art, common knowledge in the art and/or common sense in the art, and are therefore also relevant to the background of the invention and the unpatentability analysis herein.

## VI.   IDENTIFICATION OF CHALLENGE AND RELIEF REQUESTED [37 C.F.R. §§ 42.104(b)(1)-(2)]

Petitioner requests *Inter Partes* Review of claims 1-4, 6, 10, and 12 of the '630 Patent and requests that the Board find these claims to be invalid and unpatentable based on the following specific statutory grounds and prior art.

**Ground 1:** U.S. Patent Publication No. 2002/0031091 to Everdingen (Ex. 1004) anticipates claims 1-4, 6, 10, and 12 under §102.

**Ground 2:** U.S. Patent Publication No. 2002/0031091 to Everdingen (Ex. 1004) renders obvious claims 1-4, 6, 10, and 12 under §103.

**Ground 3:** U.S. Patent No. 7,133,360 to Gouriellec (Ex. 1005) anticipates claims 1-4, 6, 10, and 12 under §102.

**Ground 4:** U.S. Patent No. 7,133,360 to Gouriellec (Ex. 1005) renders obvious claims 1-4, 6, 10, and 12 under §103.

*Inter Partes* Review of U.S. Patent No. 7,551,630

## VII.   CLAIM CONSTRUCTION [37 C.F.R. § 42.104(b)(3)]

The Board "need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'"  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Petitioner is presently unaware of any claim construction disputes between the parties relevant to the unpatentability arguments in this Petition.  Therefore, Petitioner does not ask the Board to construe any claim terms at this time. Petitioner reserves the right to do so if a claim construction dispute arises.

For purposes of this Petition, Petitioner applies the ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Phillips v. AWH Corp.*, F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc); 37 C.F.R § 42.100(b) (2019).

## VIII.  GROUNDS FOR UNPATENTABILITY [37 C.F.R. § 42.104(b)(4)-(5)]

Below, Petitioner explains how the claims are unpatentable and specifies where each element of the claim is found in the prior art.  Petitioner also provides representative claim charts to identify the key features of the claims and compare those features with specific prior art.  These grounds are further supported by the expert declaration of Robert Akl.  (Ex. 1003.)

*Inter Partes* Review of U.S. Patent No. 7,551,630

### A.     Grounds 1-2: Everdingen Anticipates (Ground 1) or Renders Obvious (Ground 2) Claims 1-4, 6, 10, 12

Everdingen anticipates claims 1-4, 6, 10, and 12 of the '630 Patent. However, to the extent it is argued that further evidence is required for particular limitations, a POSITA would have found these claims obvious in view of Everdingen.

Claims 1 and 2 are independent claims, claims 3, 4, and 6 depend from claim 1, and claims 10 and 12 depend from claim 2.  Claims 1 and 2 are addressed together as claim 1 is a router system claim that is substantially the same as claim 2, which is a routing method claim.  In addition, claims 4 and 10 are addressed together and claims 6 and 12 are addressed together as these dependent claim pairs include substantially the same limitations, the difference being that one depends from a system claim and the other depends from a method claim.

### 1.     Disclosures of Everdingen for Claims 1 and 2

**The preamble of claim 1** is "[a] router for routing packets in a telecommunication network."  **The preamble of claim 2** is "[a] routing method to route packets in a telecommunication network."  While the '630 patent does not disclose how packets are routed in a telecommunication network, it does disclose a router with reference to its only figure, Figure 1.  (Ex. 1003 at ¶ 57 ("Figure 1 does not depict the telecommunications network.  Nor does the '630 Patent describe

15

*Inter Partes* Review of U.S. Patent No. 7,551,630

how packets are routed in a telecommunications network.")  Figure 1 is shown below.



Figure 1

(Ex. 1001 at Figure 1.)

Everdingen discloses a router and routing method with respect to its Figure 2 shown below.  In particular, Everdingen's Figure 2 depicts "a switching device," but the switching device could be a "router."  (Ex. 1004 at ¶¶ 0014, 0035.)  In the context of network communications, "the terms 'switching device' and 'router' are interchangeable."  (Ex. 1003 at ¶ 58; *see also*, *id*. ¶ 105; Ex. 1005 at 3:34-37; Ex. 1006 at 1:17-19 ("[T]he term 'router' refers to both switches and routers.")  Everdingen also explains that "in a switching device, data from a number of sources is received and further transmitted."  (Ex. 1004 at ¶ 0011.)

*Inter Partes* Review of U.S. Patent No. 7,551,630



**Limitation [1a] of claim 1** is "said router comprises a plurality of inputs for receiving said packets and a common processor (CP) coupled to said plurality of inputs for processing at least part of said packets according to one or more routing protocols." **Limitations [2a] and [2b] of claim 2** is "receiving said packets by a plurality of inputs of said router" and "processing at least part of said packets according to one or more routing protocols by a common processor (CP) coupled to said plurality of inputs."

These limitations would be met by "any router." (Ex. 1003 at ¶ 63.) Like the '630 Patent, Everdingen's router includes a plurality of inputs, input ports 21-23, that receive packets, and a common processor, the functional block including a

*Inter Partes* Review of U.S. Patent No. 7,551,630

dropper, a queue, and a switching fabric, that process the packets according to a routing protocol.  (*Id*. at ¶¶ 64-67.)

A router, by design, has a plurality of inputs for receiving packets.  (*Id*. at ¶ 59.)  As expected, Everdingen has "multiple" inputs.  (Ex. 1004 at ¶ 0021.)  "[F]or the sake of simplicity," Everdingen only depicts three inputs, but "[t]he invention is of course not limited to the depicted number of input ports 21-23."  (*Id*.)  Moreover, these inputs receive "incoming" packets.  (*Id*. at ¶ 0022.)

With respect to the common processor, the '630 Patent describes that it is a "functional block" and that the details regarding this block are not necessary as "it will be apparent for a person skilled in the art of designing electronic devices how embodiments of these blocks can be manufactured with well-known electronic components."  (Ex. 1001 at 6:8-13.)  This functional block includes a discarder and a central processing unit for processing the packets that are not dropped.  (*Id*. at 3:46-47, 5:20-31, Fig. 1; Ex. 1003 at ¶ 60 ("[T]he '630 Patent's common processor could include several electronic components packaged separately or together.").)

Likewise, Everdingen's common processor includes a discarder and a central processing unit for processing the packets that are not dropped.  (Ex. 1003 at ¶ 65.)  Everdingen's dropper devices 61-64 discard marked packets "depending on the result of the metering, the marking of the packets or if the queues 81-88 become congested."  (Ex. 1004 at ¶ 0023.)  "After metering, marking and possible

*Inter Partes* Review of U.S. Patent No. 7,551,630

dropping, the incoming data packets are transmitted into the switching fabric." (*Id*. at ¶ 0032.) Everdingen's central processing unit, the switching fabric, "determines to which output port **101-103** an incoming data packet has to be sent to and transmits at an output side **52** the incoming data packet to the designated output port **101-103**." (*Id*.) To determine which output port to use, the switching fabric uses routing protocols. (Ex. 1003 at ¶ 66 ("[T]he switching fabric determines which output port to use based on a routing protocol.").)

Moreover, Everdingen's inputs and common processor are coupled in the same manner as disclosed by the '630 Patent. The '630 Patent defines the term "coupled" so broadly that it is not necessary for the router inputs to directly connect to the common processor. (Ex. 1001 at 3:16-23 ("[T]he term 'coupled', also used in the claims, should not be interpreted as being limitative to direct connections only.").) "[A]s long as the inputs to the router, whether modified or not by intermediate processors, eventually reach the inputs to the common processor this limitation is met." (Ex. 1003 at ¶ 61.) Like the '630 Patent, incoming packets to Everdingen's inputs "eventually reach the droppers of the common processor after being marked." (*Id*. at ¶ 65; *see also*, Ex. 1004, ¶¶ 0022-23, Figure 2.)

**Limitation [1b] of claim 1** is "wherein said router comprises at least one packet marker (M11(M_BGP)), coupled between a first plurality of inputs (IN11,

*Inter Partes* Review of U.S. Patent No. 7,551,630

IN12, IN13) of said plurality of inputs and said common processor (CP), for marking incoming control packets of said at least part of said packets, according to a receiving rate of control packets received at said first plurality of inputs (IN11, IN12, IN13) and to be processed according to a first routing protocol, said incoming control packets being received at one of said first plurality of inputs (IN11, IN12, IN13) and to be processed according to said first routing protocol, said marker (M11(M_BGP)) provides thereby marked control packets."

This wherein clause requires a marker coupled between the inputs and the common processor. As described with respect to limitation [1a], the '630 Patent defines the term "coupled" broadly. Inputs to Everdingen's input ports, optionally go through a classifier, then through a meter and a marker, and arrive at a dropper, which is part of the common processor. (Ex. 1004 at ¶¶ 0022-23, Figure 2; Ex. 1003 at ¶¶ 65, 71.) Accordingly, Everdingen's marker is coupled as claimed in limitation [1b]. (Ex. 1003 at ¶ 71.)

This wherein clause also specifies that "control packets" are marked "according to a receiving rate" and "processed according to a first routing protocol." The '630 Patent distinguishes control and data packets according to their functionality. (Ex. 1003 at ¶ 72.) Control packets are packets that include the "control data to create the required forwarding path and might possibly be adapted." (Ex. 1001 at 1:13-16.) Control packets are also referred to as "header

*Inter Partes* Review of U.S. Patent No. 7,551,630

packets" as routers use the packet's header information to determine where to send a packet. (Ex. 1003 at ¶ 72; Ex. 1007, Abstract, 2:52-54 ("A control packet (i.e. a header packet) is injected into the flow for every fixed amount of data belonging to the flow.").)

Everdingen marks packets, including control packets, according to a receiving rate of the packets received at the router's inputs. (Ex. 1003 at ¶ 75 ("[C]ontrol packets received at Everdingen's input ports" are marked "based on their receiving rate.").) Everdingen uses a meter device to determine the receiving rate. (Ex. 1004 at ¶ 0024.) Using this receiving rate information, Everdingen's marker "mark[s] data packets as 'discardable' or 'non-discardable.'" (*Id.* at ¶ 0023.) For example, Everdingen discloses "marking the incoming data packets at the input ports **21-23** with corresponding input port and source address fields," which is one example of marking a control packet. (Ex. 1004 at ¶ 0033; Ex. 1003 at ¶ 74.)

Everdingen also processes packets, including control packets, according to a routing protocol. (Ex. 1003 at ¶ 76.) Everdingen's switching fabric uses a routing protocol to determine which output port to use when routing packets to the next device in the network. (Ex. 1004 at ¶ 0032; Ex. 1003 at ¶ 76.) That is "the nature of a switching fabric." (Ex. 1003 at ¶ 76.) Thus, Everdingen marks control packets according to a receiving rate and processes them according to a routing

*Inter Partes* Review of U.S. Patent No. 7,551,630

protocol.  To the extent it is argued that further evidence is required to show that a switching fabric uses a routing protocol, a POSITA would have found this limitation to be obvious.  (Ex. 1003 at ¶ 76.)

**Limitation [2c] of claim 2** is "wherein said routing method further comprises a step of marking incoming control packets of said at least part of said packets by a packet marker (M11(M_BGP)) according to a receiving rate of control packets received at a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and to be processed according to a first routing protocol and providing thereby marked control packets, said incoming control packets being received at one (IN12) of a first plurality (IN11, IN12, IN13) of said plurality of inputs and are to be processed according to said first routing protocol."  While this limitation does not require the "coupling" found in limitation [1b], it includes the same limitations regarding marking control packets according to a receiving rate and processing them according to a routing protocol, which is taught be Everdingen.  (Ex. 1004 at ¶¶ 0023-24, 32-33; Ex. 1003 at ¶¶ 74-76, 87.)

**Limitation [1c] of claim 1** is "said common processor (CP) comprises a discarder (DIS) for discarding, before said processing, one or more of said marked control packets according to said marking and according to predefined rules and conditions."  **Limitation [2d] of claim 2** is "said routing method further comprises, before said step of processing, a step of discarding by a discarder (DIS)

*Inter Partes* Review of U.S. Patent No. 7,551,630

associated to said common processor (CP) one or more of said marked control packets according to said marking and according to predefined rules and conditions."

"[W]hen a router is congested, it drops packets before processing them to relieve the congestion." (Ex. 1003 at ¶ 79, *see also*, Ex. 1001 at 1:38-60, 5:13-16.) As previously described with limitation [1a], Everdingen's common processor includes a discarder, dropper devices 61-64, that discards marked packets "depending on the result of the metering, the marking of the packets or if the queues 81-88 become congested." (Ex. 1004 at ¶ 0023, *see also*, Ex. 1003 at ¶ 79 ("[T]he dropper devices 61-64 are part of a common processor.").) This dropping occurs before processing, which is performed by the switching fabric to determine which output port to use. (Ex. 1004 at ¶ 0032, Figure 2; Ex. 1003 at ¶ 79 ("Everdingen discloses discarding packets prior to processing.").)

As described in paragraph 23, Everdingen drops packets "depending on the result of … the marking." (Ex. 1004 at ¶ 0023; Ex. 1003 at ¶ 80.) Everdingen also discloses dropping packets "depending on the result of the metering." (Ex. 1004 at ¶ 0023.) In this scenario, Everdingen describes determining the data type, and based on that determination, selecting which metering device to use, which allows the router "to take into account certain transmission priorities" as each meter can use "different settings." (*Id*. at ¶ 0022.) Different meters can use different

23

*Inter Partes* Review of U.S. Patent No. 7,551,630

algorithms to "compare[] this [incoming data] rate with a predetermined data rate." (*Id*. at ¶ 0024.)  For example, the meters could use "a leaky bucket algorithm" and/or "a token bucket algorithm" with "a predetermined threshold value."  (*Id*. at ¶¶ 0024-27.)

In other words, when Everdingen discards marked packets "depending on the result of the metering," the router is dropping packets based on predefined rules and conditions.  (Ex. 1004 at ¶¶ 0023-27; Ex. 1003 at ¶ 81 ("[S]ending packets with different data types to different meters using different algorithms or predetermined threshold values," results in dropping packets "according to '*predefined rules and conditions*.'").)

As previously described with limitation [1b], Everdingen marks control packets according to a receiving rate.  If congestion occurs, "Everdingen also drops control packets according to marking and predefined rules and conditions" as Everdingen does not distinguish between packet types when discarding packets. (Ex. 1003 at ¶ 82.)

### 2.    Disclosures of Everdingen for Claim 3

**Dependent claim 3** depends from claim 1 and includes the further limitation "[a] telecommunication network that comprises a router for routing packets, wherein said router is a router according to claim 1."  The '630 Patent does not describe or depict a telecommunication network.  (Ex. 1003 at ¶¶ 57, 90.)

*Inter Partes* Review of U.S. Patent No. 7,551,630

In addition to disclosing the claimed router (*supra* § VIII.A.1), Everdingen generally discloses two parties communicating in a network and, more specifically, provides an example of an ATM network.  (Ex. 1004 at ¶¶ 0003, 0004-5.)  "[A]n ATM network is a type of telecommunication network."  (Ex. 1003 at ¶ 91.)

### 3.  Disclosures of Everdingen for Claims 4 and 10

**Dependent claim 4** depends from claim 1 and includes the further limitation "said router comprises a plurality of common processors each for processing a different part of said packets, each common processor including a respective discarder for discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions."  **Dependent claim 10** depends from claim 2 and includes the further limitation "there are a plurality of common processors each for processing a different part of said packets, said method comprising the step of discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions separately for each control processor."

The '630 Patent states that "the present invention is not limited to application with only one common processor."  (Ex. 1001 at 4:38-42.)  In a scenario with multiple common processors, "a determining functional block" would select one of the common processors to process an incoming packet.  (*Id*. at 4:42-47.)  "[E]xcess traffic for one common processor is handled" in the same

*Inter Partes* Review of U.S. Patent No. 7,551,630

manner as the others.  (*Id*. at 4:47-52.)  Stated another way, these claims merely duplicate the common processor, which has no patentable weight.  (MPEP § 2144.04 VI.B (The "mere duplication of parts has no patentable significance unless a new and unexpected result is produced.").)

Even if claims 4 and 10 are patentable, Everdingen discloses multiple droppers 61-64 for dropping incoming packets.  (Ex. 1004 at Figure 2, *see also*, claim 23 (including limitation "dropper (61-64) … for dropping incoming packets depending on their marking").)  As the common processor is a functional block that includes a discarder and a central processing unit (Ex. 1001 at 3:46-47, 5:20-31, 6:8-13, Fig. 1), Everdingen's common processor can be functionally created with a single dropper and the switching fabric, and then duplicated.  In other words, Everdingen's common processor includes multiple droppers for claim 1 and a single dropper for multiple common processors for claims 4 and 10.  (Ex. 1003 at ¶ 95.)

### 4.   Disclosures of Everdingen for Claims 6 and 12

**Dependent claims 6 and 12** depend from claims 1 and 2, respectively, and include the further limitation "each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs."  Everdingen discloses packet streams as "incoming data packets" and "packet flow."  (Ex. 1004, Abstract, ¶ 0022, Figure 2;

*Inter Partes* Review of U.S. Patent No. 7,551,630

Ex. 1003 at ¶ 98 (explaining that "incoming data packets means the same as a packet stream").)  As previously described, the packet streams can include control packets.  (*Supra* § VIII.A.1; Ex. 1003 at ¶ 98.)  Moreover, Everdingen processes a packet stream received at each input port separately such that each packet stream is metered and marked according to that stream's receiving rate.  (Ex. 1004, ¶ 0022-23; Ex. 1003 at ¶ 98.)

\* \* \*

The claim chart below summarizes Everdingen's anticipation of claims 1, 3, 4, and 6.  The evidence for claims 2, 10, and 12 is the same as claims 1, 4, and 6, respectively.  For brevity, the chart identifies only exemplary disclosures from Everdingen.

| '630 Patent Claims 1, 3, 4, 6 | Everdingen (Ex. 1004) Exemplary Disclosures |
|---|---|
| **[1pre]** A router for routing packets in a telecommunication network, | FIG. 2 diagrammatically shows an example of a switching device.  (¶ 0014.)<br><br>[I]n a switching device, data from a number of sources is received and further transmitted.  (¶ 0011.)<br><br>[T]he invention can be applied in a router. (¶ 0035.) |
| **[1a]** said router comprises a plurality of inputs for receiving said packets and a common processor (CP) coupled to said plurality of inputs for processing at least part of said packets according to one or more routing protocols, | The switching device **1** has a multiple of input ports **21-23** each connected to one or more sources (not shown).  The invention is of course not limited to the depicted number of input ports **21-23**, but for the sake of simplicity only three are shown.  (¶ 0021.) |

27

| '630 Patent<br>Claims 1, 3, 4, 6 | Everdingen (Ex. 1004)<br>Exemplary Disclosures |
|---|---|
| | "After metering, marking and possible dropping, the incoming data packets are transmitted into the switching fabric. The switching fabric **5** determines to which output port **101-103** an incoming data packet has to be sent to and transmits at an output side **52** the incoming data packet to the designated output port **101-103**." (¶ 0032.) |
| **[1b]** wherein said router comprises at least one packet marker (M11(M_BGP)), coupled between a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and said common processor (CP), for marking incoming control packets of said at least part of said packets, according to a receiving rate of control packets received at said first plurality of inputs (IN11, IN12, IN13) and to be processed according to a first routing protocol, said incoming control packets being received at one of said first plurality of inputs (IN11, IN12, IN13) and to be processed according to said first routing protocol, said marker (M11(M_BGP)) provides thereby marked control packets; and | The meter devices **41-48** are further connected to marker devices **121-128**, which marker devices are further connected to dropper devices **61-68**. These marker devices for example mark data packets as 'discardable' or 'non-discardable' depending on the result of the metering. (¶ 0023.)<br><br>Each of the meter devices **41-44** measures the incoming data rate and compares this rate with a predetermined data rate. (¶ 0024.)<br><br>Such an algorithm might be marking the incoming data packets at the input ports **21-23** with corresponding input port and source address fields. (¶ 0033.)<br><br>The switching fabric **5** determines to which output port **101-103** an incoming data packet has to be sent to and transmits at an output side **52** the incoming data packet to the designated output port **101-103**. (¶ 0032.) |
| **[1c]** said common processor (CP) comprises a discarder (DIS) for discarding, before said processing, one or more of said marked control | The dropper devices **61-68** eliminate data packets depending on the result of the metering, the marking of the packets or if the queues **81-88** become congested. |

*Inter Partes* Review of U.S. Patent No. 7,551,630

| '630 Patent<br>Claims 1, 3, 4, 6 | Everdingen (Ex. 1004)<br>Exemplary Disclosures |
|---|---|
| packets according to said marking and according to predefined rules and conditions. | (¶ 0023.)<br><br>Such discrimination between data types makes it possible to send different types of data via different paths and to take into account certain transmission priorities. (¶ 0022.) |
| **[3.]** A telecommunication network that comprises a router for routing packets, wherein said router is a router according to claim 1. | In a data network (at least) two parties are involved: the user who wants to transport data and the service provider who is responsible for transporting the data towards the intended destination. (¶ 0003.)<br><br>[A] method is described whereby the entrance of a switching device used in an ATM network is monitored for each separate source or user.  (¶ 0005.) |
| **[4.]** A router according to claim 1, wherein said router comprises a plurality of common processors each for processing a different part of said packets, each common processor including a respective discarder for discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions. | The dropper devices 61-68 eliminate data packets depending on the result of the metering, the marking of the packets or if the queues 81-88 become congested. (¶ 0023.)<br><br>**23**. A control device as claimed in claim 22, further including a dropper (**61-64**) connected to said meter (**41-48**), for dropping incoming data packets depending on their marking. |
| **[6.]** A router according to claim 1, wherein each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs. | Directly connected to the input port **21** is a classifier device **31**. The classifier device **31** determines the type (voice, video, computer data, etc.) of the incoming data packets, and, depending on the incoming data packet type, routes the incoming data packet to meter device **41** or a further meter device **42**.  (¶ 0022.) |

*Inter Partes* Review of U.S. Patent No. 7,551,630

| '630 Patent Claims 1, 3, 4, 6 | Everdingen (Ex. 1004) Exemplary Disclosures |
|---|---|
| | The meter devices **41-48** are further connected to marker devices **121-128**, which marker devices are further connected to dropper devices **61-68**. These marker devices for example mark data packets as 'discardable' or 'non-discardable' depending on the result of the metering.  (¶ 0023.) |

## B. Grounds 3-4: Gouriellec Anticipates (Ground 3) or Renders Obvious (Ground 4) Claims 1-4, 6, 10, 12

Gouriellec also anticipates claims 1-4, 6, 10, and 12 of the '630 Patent. However, to the extent it is argued that further evidence is required for particular limitations, a POSITA would have found these claims obvious in view of Gouriellec.

As described *supra* § VIII.A, claims 1 and 2 are discussed together, claims 4 and 10 are discussed together, and claims 6 and 12 are discussed together as these grouped claims have limitations that are substantially the same.

### 1. Disclosures of Gouriellec for Claims 1 and 2

**The preamble of claim 1** is "[a] router for routing packets in a telecommunication network."  **The preamble of claim 2** is "[a] routing method to route packets in a telecommunication network."

Gouriellec discloses a telecommunication network with respect to its Figure 1, and a router and routing method with respect to its Figure 2, both of which are

*Inter Partes* Review of U.S. Patent No. 7,551,630

shown below.  Gouriellec describes that its network includes "edge and core switching nodes" and that these nodes could be routers.  (Ex. 1005 at 3:34-37.)



FIG. 1



FIG. 2

(Ex. 1005 at Figures 1-2.)

Gouriellec's routers route packets in a telecommunication network.  (Ex. 1003 at ¶ 105.)  Gouriellec describes "hosts **10**, **28** seamlessly receiving and

*Inter Partes* Review of U.S. Patent No. 7,551,630

transmitting data packets, also referred to as frames, over an IP tunnel, such as, for example, a label switched path (LSP) **30**." (Ex. 1005 at 3:18-22.) Hosts are end user devices, such as a personal computer. (*Id.* at 3:31-33.) The IP tunnel is "formed from edge switching node **14** to edge switching node **24** over a wide area network (WAN) **16** via one or more core switching nodes **18**, **20**, **22**." (*Id.* at 3:22-25.)

Limitation [1a] of claim 1 is "said router comprises a plurality of inputs for receiving said packets and a common processor (CP) coupled to said plurality of inputs for processing at least part of said packets according to one or more routing protocols." **Limitations [2a] and [2b] of claim 2** is "receiving said packets by a plurality of inputs of said router" and "processing at least part of said packets according to one or more routing protocols by a common processor (CP) coupled to said plurality of inputs."

These limitations would be met by "any router." (Ex, 1003 at ¶ 63.) Gouriellec discloses that its router "receives an inbound traffic flow via an input port." (Ex. 1005 at 5:10-12; Figure 2.) While Gouriellec describes a single input port, a router, by design, has a plurality of inputs for receiving packets. (Ex. 1003 at ¶ 59.) Indeed, the '630 Patent admits "a router for routing packets in a telecommunication network usually comprises a plurality of inputs for receiving the packets" and that "router is already known in the art." (Ex. 1001 at 1:7-9.)

*Inter Partes* Review of U.S. Patent No. 7,551,630

During operation, "Gouriellec's input port is replicated due to the operational nature of this device."  (Ex. 1003 at ¶ 106 ("Gouriellec's router necessarily has more than one input port when put into service.").)  To the extent it is argued that further evidence is required to show that a router has more than one input, a POSITA would have found this limitation to be obvious.  (Ex. 1003 at ¶ 106; *see also*, Ex. 1006 at Figure 2 (depicting numerous inputs to router 16).)

Gouriellec discloses a common processor that includes a discarder and a central processing unit for processing the packets that are not dropped.  In particular, Gouriellec describes a shaper/dropper "for determining whether to forward or discard the packet" and a buffer "for processing" the "non-discarded traffic."  (Ex. 1005 at 5:27-32.)  After the buffer, Gouriellec continues to process the packets "in a similar manner as the CPU shown in Figure 1 of the '630 Patent since Figure 2 is a switching node (router)."  (Ex. 1003 at ¶ 108.)

Like the '630 Patent, Gouriellec's common processor is indirectly coupled to the inputs.  (Ex. 1001 at 3:16-23 ("[T]he term 'coupled', also used in the claims, should not be interpreted as being limitative to direct connections only.").)  In particular, the "inbound packet flow" enters the router "via an input port," is classified, marked, and then "[t]he packet is further transmitted to the shaper/dropper," which is part of the common processor.  (Ex. 1005 at 5:10-28; Ex.

*Inter Partes* Review of U.S. Patent No. 7,551,630

1003 at ¶ 109 ("Gouriellec's common processor is coupled to the inputs in the same manner as described in the '630 Patent.").)

Gouriellec discloses processing packets according to the Multiprotocol Label Switching (MPLS) protocol, which is a routing protocol. (Ex. 1005 at 3:37-39; Ex. 1003 at ¶ 110 ("MPLS is a routing protocol.").)  MPLS works by analyzing a packet's network layer header, i.e., control packet, at the ingress router, assigning a label to the packet, which is then used by subsequent routers.  (Ex. 1005 at 1:33-45; Ex. 1003 at ¶¶ 110-111; Ex. 1008 at 4.)  MPLS works with the routing protocols listed in the '630 Patent.  (Ex. 1003 at ¶ 111; Ex. 1008 at 36-38.)

**Limitation [1b] of claim 1** is "wherein said router comprises at least one packet marker (M11(M_BGP)), coupled between a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and said common processor (CP), for marking incoming control packets of said at least part of said packets, according to a receiving rate of control packets received at said first plurality of inputs (IN11, IN12, IN13) and to be processed according to a first routing protocol, said incoming control packets being received at one of said first plurality of inputs (IN11, IN12, IN13) and to be processed according to said first routing protocol, said marker (M11(M_BGP)) provides thereby marked control packets."

This wherein clause requires a marker coupled between the inputs and the common processor.  The '630 Patent defines the term "coupled" broadly.   (Ex.

*Inter Partes* Review of U.S. Patent No. 7,551,630

1001 at 3:16-23.)  Gouriellec's "ingress switching node **14** receives an inbound traffic flow via an input port **52** and invokes the classifier **40** for classifying a packet in the flow.  The classified packet is transmitted to the meter **42** for checking the traffic flow properties in light of the new inbound packet.  The marker **44** further receives the classified packet. … The packet is further transmitted to the shaper/dropper **46** for determining whether to forward or discard the packet."  (Ex. 1005 at 5:10-28.)  As described, Gouriellec's marker is coupled between the input ports and common processor, which includes the shaper/dropper.  (Ex. 1003 at ¶ 113.)

Gouriellec's marker marks packets according to the receiving rate.  "The marker **44** further receives the classified packet and marks the packet based on the classification information and the traffic flow information from the meter **42**."  (Ex. 1005 at 5:15-26; Ex. 1003 at ¶ 115 ("Gouriellec is describing a method of marking according to a receiving rate.").)  This includes control packets.  "For instance, the marker sets or resets the DSCP fields of the packet."  (Ex. 1005 at 4:61-62.)  The DiffServ codepoints (DSCP) fields are in a packet header and, by setting or resetting these fields, Gouriellec is marking control packets.  (Ex. 1003 at ¶ 114 ("Gouriellec is talking about control packets when its marker changes or 'marks' the information in the header.").)

*Inter Partes* Review of U.S. Patent No. 7,551,630

Gouriellec also processes packets, including control packets, according to a routing protocol, the MPLS protocol.  (Ex. 1003 at ¶ 116.)

**Limitation [2c] of claim 2** is "wherein said routing method further comprises a step of marking incoming control packets of said at least part of said packets by a packet marker (M11(M_BGP)) according to a receiving rate of control packets received at a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and to be processed according to a first routing protocol and providing thereby marked control packets, said incoming control packets being received at one (IN12) of a first plurality (IN11, IN12, IN13) of said plurality of inputs and are to be processed according to said first routing protocol."  While this limitation does not require the "coupling" found in limitation [1b], it includes the same limitations regarding marking control packets according to a receiving rate and processing them according to a routing protocol, which is taught be Gouriellec. (Ex. 1005 at 1:33-45, 3:37-39, 4:44-47, 4:59-62, 5:10-32; Ex. 1003 at ¶¶ 113-116, 124.)

**Limitation [1c] of claim 1** is "said common processor (CP) comprises a discarder (DIS) for discarding, before said processing, one or more of said marked control packets according to said marking and according to predefined rules and conditions."  **Limitation [2d] of claim 2** is "said routing method further comprises, before said step of processing, a step of discarding by a discarder (DIS)

*Inter Partes* Review of U.S. Patent No. 7,551,630

associated to said common processor (CP) one or more of said marked control packets according to said marking and according to predefined rules and conditions."  As previously described, "when a router is congested, it drops packets before processing them to relieve the congestion."  (Ex. 1003 at ¶¶ 79, 117, *see also*, Ex. 1001 at 1:38-60, 5:13-16.)

As previously described with limitation [1a], Gouriellec discloses a common processor that includes a discarder, a shaper/dropper, "for determining whether to forward or discard the packet."  (Ex. 1005 at 5:27-28.)  Gouriellec drops marked packets before processing at the buffer.  (*Id*. at 5:29-32, Figure 2.)  For example, "a packet [that is] 'marked' indicates that the packet is marked as suitable for discarding" and "all traffic over CR+ER is discarded."  (*Id*. at 5:22-30.)

Gouriellec also drops packets according to predefined rules and conditions as described with reference to Figure 4, which depicts two alternatives for "policing and marking of traffic."  (Ex. 1005 at 6:30-47.)  With respect to Figure 4A, Gouriellec describes: "Traffic **86** transmitted within the CR bandwidth **82** is admitted by the ingress node **14** and passed to a next hop.  Traffic **88** transmitted within the CR+ER bandwidth is marked as being suitable for being discarded.  Traffic **90** that exceeds the CR+ER bandwidth is dropped."  (*Id*. at 6:33-38.)  As shown below, this mirrors the '630 Patent's teaching of coloring packets green, yellow, and red.  (Ex. 1005 at Figure 4A (annotated); Ex. 1003 at ¶ 118.)

*Inter Partes* Review of U.S. Patent No. 7,551,630



# FIG. 4A

Then, with respect to Figure 4B shown below, Gouriellec describes that "both the CR **82** and ER **84** bandwidth may take into account a burst rate that is sometimes provided to shape traffic within the burst rate.  Accordingly, traffic within a burst rate **92** for the CR traffic **82** is shaped in a conventional manner instead of being marked for discarding.  Similarly, traffic within a burst rate **94** for the ER traffic is shaped instead of being discarded." (Ex. 1005 at 6:41-47.)  By shaping traffic within the burst rate, Gouriellec discards according to predefined rules and conditions.  (Ex. 1003 at ¶ 119.)

*Inter Partes* Review of U.S. Patent No. 7,551,630



# FIG. 4B

### 2.   Disclosures of Gouriellec for Claim 3

**Dependent claim 3** depends from claim 1 and includes the further limitation "[a] telecommunication network that comprises a router for routing packets, wherein said router is a router according to claim 1." While the '630 Patent does not describe or depict a telecommunication network, Gouriellec discloses a telecommunication network with respect to Figure 1. (Ex. 1005 at Figure 1; Ex. 1003 at ¶¶ 57, 90, 105 (Gouriellec's "data communication network adhering to the MPLS protocol … is a telecommunication network."), 128.) Gouriellec's network includes a router for routing packets, such as ingress switching node 14, as described with respect to claim 1. (*Supra* § VIII.B.1.)

### 3.   Disclosures of Gouriellec for Claims 4 and 10

**Dependent claim 4** depends from claim 1 and includes the further limitation "said router comprises a plurality of common processors each for processing a

*Inter Partes* Review of U.S. Patent No. 7,551,630

different part of said packets, each common processor including a respective discarder for discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions." **Dependent claim 10** depends from claim 2 and includes the further limitation "there are a plurality of common processors each for processing a different part of said packets, said method comprising the step of discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions separately for each control processor."

Gouriellec explains that "[t]he shaper/dropper **46** makes traffic flows conformant to the customer's traffic profile.  (Ex. 1005 at 4:63-64.)  This shaper/dropper is part of Gouriellec's common processor.  (*Supra* § VIII.B.1.) Moreover, "additional elements and/or components" may be added to Gouriellec's router as "well known to those skilled in the art."  (*Id*. at 4:37-43.)

The '630 Patent describes that common processors can be duplicated (Ex. 1001 at 4:38-42), but the "mere duplication of parts has no patentable significance unless a new and unexpected result is produced."  (MPEP § 2144.04 VI.B.)  One skilled in the art would understand that duplicating functional blocks, like the common processor, is a routine process and that "Gouriellec's common processor could be duplicated for parallel processing of excess traffic control."  (Ex. 1003 at ¶ 131.)  Indeed, parallel computing predates the '630 Patent by decades.  (*Id*.

*Inter Partes* Review of U.S. Patent No. 7,551,630

(citing Ex. 1009 ("providing a tutorial, including a history, of parallel processing").)  To the extent it is argued that further evidence is required to show that the common processor could be replicated, a POSITA would have found this limitation to be obvious.

### 4.  Disclosures of Gouriellec for Claims 6 and 12

**Dependent claims 6 and 12** depend from claims 1 and 2, respectively, and include the further limitation "each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs."  Gouriellec discloses "[i]nbound packets 66" with respect to Figure 3 shown below.  (Ex. 1005 at 6:1-3.)  "Inbound packets **66** from different oversubscribed LSPs traversing the node enter the queue either marked (M) **68** or unmarked (U) **70**."  (*Id*.)  As described earlier, the packets are marked based on "the traffic flow information from the meter **42**."  (*Id*. at 5:15-26.)  The inbound packets, which "could include control packets," "form a packet stream."  (Ex. 1003 at ¶ 133.)



## FIG. 3

*Inter Partes* Review of U.S. Patent No. 7,551,630

* * *

The claim chart below summarizes Gouriellec's anticipation of claims 1, 3, 4, and 6.  The evidence for claims 2, 10, and 12 is the same as claims 1, 4, and 6, respectively.  For brevity, the chart identifies only exemplary disclosures from Gouriellec.

| '630 Patent<br>Claims 1, 3, 4, 6 | Gouriellec (Ex. 1005)<br>Exemplary Disclosures |
|---|---|
| **[1pre]** A router for routing packets in a telecommunication network, | The LSP may be a pre-configured IP tunnel formed from edge switching node **14** to edge switching node **24** over a wide area network (WAN) **16** via one or more core switching nodes **18**, **20**, **22**.  (3:22-25.)<br><br>The edge and core switching nodes **14**–**24** may be gateway devices such as, for example, switches, routers, and the like, having network interfaces for forwarding packetized communications originated by the hosts **10**, **28**.  (3:34-37.) |
| **[1a]** said router comprises a plurality of inputs for receiving said packets and a common processor (CP) coupled to said plurality of inputs for processing at least part of said packets according to one or more routing protocols, | In general terms, the ingress switching node **14** receives an inbound traffic flow via an input port **52**.  (5:10-12.)<br><br>The packet is further transmitted to the shaper/dropper **46** for determining whether to forward or discard the packet. According to one embodiment of the invention, all traffic over CR+ER is discarded. All other non-discarded traffic is passed to the buffer **50** for processing by its queuing mechanism.  (5:27-32.)<br><br>According to one embodiment, the edge and core switching nodes support the |

*Inter Partes* Review of U.S. Patent No. 7,551,630

| '630 Patent<br>Claims 1, 3, 4, 6 | Gouriellec (Ex. 1005)<br>Exemplary Disclosures |
|---|---|
| | MPLS protocol as set forth in RFC 3031.  (3:37-39.) |
| **[1b]** wherein said router comprises at least one packet marker (M11(M_BGP)), coupled between a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and said common processor (CP), for marking incoming control packets of said at least part of said packets, according to a receiving rate of control packets received at said first plurality of inputs (IN11, IN12, IN13) and to be processed according to a first routing protocol, said incoming control packets being received at one of said first plurality of inputs (IN11, IN12, IN13) and to be processed according to said first routing protocol, said marker (M11(M_BGP)) provides thereby marked control packets; and | In general terms, the ingress switching node **14** receives an inbound traffic flow via an input port **52** and invokes the classifier **40** for classifying a packet in the flow.  The classified packet is transmitted to the meter **42** for checking the traffic flow properties in light of the new inbound packet.  The marker **44** further receives the classified packet and marks the packet based on the classification information and the traffic flow information from the meter **42**.  (5:10-17.)<br><br>The packet is further transmitted to the shaper/dropper **46** for determining whether to forward or discard the packet.  (5:27-28.)<br><br>The marker **44** marks an unmarked packet or re-marks a previously marked packet based on the results of the classification and metering information.  For instance, the marker sets or resets the DSCP fields of the packet.  (4:59-62.) |
| **[1c]** said common processor (CP) comprises a discarder (DIS) for discarding, before said processing, one or more of said marked control packets according to said marking and according to predefined rules and conditions. | According to one embodiment of the invention, all traffic over CR+ER is discarded.  (5:29-30.)<br><br>Traffic **86** transmitted within the CR bandwidth **82** is admitted by the ingress node **14** and passed to a next hop.  Traffic **88** transmitted within the CR+ER bandwidth is marked as being suitable for being discarded.  Traffic **90** that exceeds the CR+ER bandwidth is dropped.  (6:33-38.) |

*Inter Partes* Review of U.S. Patent No. 7,551,630

| '630 Patent<br>Claims 1, 3, 4, 6 | Gouriellec (Ex. 1005)<br>Exemplary Disclosures |
|---|---|
| | According to this alternative embodiment, both the CR **82** and ER **84** bandwidth may take into account a burst rate that is sometimes provided to shape traffic within the burst rate.  Accordingly, traffic within a burst rate **92** for the CR traffic **82** is shaped in a conventional manner instead of being marked for discarding.  Similarly, traffic within a burst rate **94** for the ER traffic is shaped instead of being discarded.  (6:41-47.) |
| **[3.]** A telecommunication network that comprises a router for routing packets, wherein said router is a router according to claim 1. | FIG. 1 is a schematic block diagram of a data communications network, such as, for example, a data communications network adhering to the MPLS protocol.  (3:15-18.) |
| **[4.]** A router according to claim 1, wherein said router comprises a plurality of common processors each for processing a different part of said packets, each common processor including a respective discarder for discarding one or more of said marked control packets according to said marking and according to predefined rules and conditions. | The shaper/dropper **46** makes traffic flows conformant to the customer's traffic profile.  (4:63-64.)<br><br>It is understood, of course, that FIG. 2 illustrates a block diagram of the nodes without obfuscating inventive aspects of the present invention with additional elements and/or components which may be required for creating the nodes.  These additional elements and/or components, which are not shown in FIG. 2 are well known to those skilled in the art.  (4:37-43.) |
| **[6.]** A router according to claim 1, wherein each control packet belongs to a packet stream and wherein said packet marker designates a receiving rate of the packet stream to which said control packet belongs. | Inbound packets **66** from different oversubscribed LSPs traversing the node enter the queue either marked (M) **68** or unmarked (U) **70**.  (6:1-3.)<br><br>The meter **42** identifies packets as in-profile or out-of-profile based on the comparison with the customer's traffic profiles.  The marker **44** marks an |

*Inter Partes* Review of U.S. Patent No. 7,551,630

| '630 Patent<br>Claims 1, 3, 4, 6 | Gouriellec (Ex. 1005)<br>Exemplary Disclosures |
|---|---|
| | unmarked packet or re-marks a previously marked packet based on the results of the classification and metering information. For instance, the marker sets or resets the DSCP fields of the packet.  (4:56-62.) |

## IX.   CONCLUSION

As demonstrated above, there is a reasonable likelihood that the Challenged Claims are unpatentable.  Petitioner requests *Inter Partes* Review of claims 1-4, 6, 10, and 12 of the '630 Patent, and requests that these claims be cancelled.

The required fee under 37 C.F.R. §§ 42.15(a) and 42.103 in the amount of $ 41,500.00 is being paid through the Patent Review Processing System.  Please assess any fee deficiency or credit to Deposit Account No. 10-0460.


Respectfully submitted,

Dated: February 22, 2022         _/Amr Aly/_____
                                 Amr Aly, Reg. No. 50,525
                                 *Lead Attorney for Petitioner*

*Inter Partes* Review of U.S. Patent No. 7,551,630

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6 and 42.105, I hereby certify that I caused to be served by USPS via Priority Mail Express this Petition for *Inter Partes* Review of U.S. Patent No. 7,551,630, including all exhibits, upon the following parties:

> Sean Burdick
> WSOU Investments, LLC
> 11150 Santa Monica Blvd., Suite 1400
> Los Angeles, CA 90025
>
> *Patent Owner's Correspondence Address*
> *of record for U.S. Patent No. 7,551,630*

Dated: February 22, 2022          ___/Amr Aly/_____
                                                  Amr Aly, Reg. No. 50,525
                                                  *Lead Attorney for Petitioner*

*Inter Partes* Review of U.S. Patent No. 7,551,630

## CERTIFICATE OF COMPLIANCE

In accordance with 37 CFR 42.24, as amended, the undersigned certifies that this Petition complies with the applicable type-volume limitations of 37 CFR 42.24(a)(i). Exclusive of the portions exempted by 37 CFR 42.24(a), this Petition contains 10,299 words as counted by the word processing program used for its preparation (Microsoft Word 2016).

Dated: February 22, 2022        /*Amr Aly*/
Amr Aly, Reg. No. 50,525
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036
*Lead Attorney for Petitioner*

# **<u>Exhibit 4</u>**

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

NETGEAR, INC.,
Petitioner

v.

WSOU INVESTMENTS, LLC
D/B/A BRAZOS LICENSING AND DEVELOPMENT,
Patent Owner

————————————

Case IPR2022-00516
Patent No. 7,512,096

————————————

**DECLARATION OF DR. ROBERT AKL, D.Sc.**

1

**NETGEAR Ex. 1003**
**NETGEAR V WSOU Investments, IPR2022-00516**
JA0182

# TABLE OF CONTENTS

I.    Introduction ...................................................................................................8

II.   Background and Qualifications ....................................................................9

III.  Level of Ordinary Skill in the Art .............................................................15

IV.   Materials Considered and Relied Upon .....................................................16

V.    Legal Standards ..........................................................................................17

     A.    Legal Standards for Prior Art ............................................................18

     B.    Legal Standard for Priority Date .......................................................19

     C.    Legal Standard for Obviousness .......................................................20

VI.   Overview of the '096 Patent .......................................................................23

     A.    Subject Matter Overview ...................................................................23

     B.    File History of the '096 Patent ..........................................................31

     C.    Interpretation of the '096 Patent Challenged Claims .........................32

VII.  Overview of the Cited References ...............................................................33

     A.    Perahia (EX1004) ..............................................................................33

     B.    Li (EX1005) .......................................................................................34

     C.    Wax (EX1006) ...................................................................................34

VIII. Ground 1:  Perahia Anticipates Claim 1 .....................................................35

     A.    Claim 1: .............................................................................................35

        [1P] A method for communicating data over a network between
           an access point having a first and a second antenna and a
           first and a second mobile station, the method comprising: ......35

[1a] weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and ..............36

[1b] weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;................................................................................36

[1c] increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;..................37

[1d] discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; ........................39

[1e] applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;...............................................................40

[1f] defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;..................................41

[1g] coupling said access point to said first and second mobile stations through said wireless local area network; ..................42

[1h] estimating a first radio channel from said access point to said first mobile station over a pilot interval; and ...................43

[1i] estimating a second radio channel from said access point to said second mobile station over said pilot interval.................43

IX.   Ground 2:  Li Anticipates Claims 1-3............................................................45

   A.   Claim 1: ..............................................................................................45

      [1P] A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising: ......45

3

[1a] weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and ..............46

[1b] weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;................................................................................46

[1c] increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;..................47

[1d] discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; ........................47

[1e] applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;.................................................................48

[1f] defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;...................................48

[1g] coupling said access point to said first and second mobile stations through said wireless local area network; ..................48

[1h] estimating a first radio channel from said access point to said first mobile station over a pilot interval; and ...................49

[1i] estimating a second radio channel from said access point to said second mobile station over said pilot interval.................49

B.    Claim 2: ................................................................................50

2. A method, as set forth in claim 1, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink....................................................................................50

C.    Claim 3: ................................................................................52

4

3. A method, as set forth in claim 2, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station. .........52

X.    Ground 3:  Li and Perahia Renders Obvious Claim 10 ...................................53

      A.    Claim 10: ...........................................................................................53

            10. A method, as set forth in claim 3, further comprising: using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.................53

      B.    Motivation to Combine Li and Perahia ...............................................56

XI.   Ground 4:  Wax Anticipates Claims 1-3........................................................57

      A.    Claim 1: ...........................................................................................58

            [1P] A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising: ......58

            [1a] weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and ..............58

            [1b] weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data; ...........................................................................................58

            [1c] increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;...................59

5

[1d] discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; .........................60

[1e] applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;.................................................60

[1f] defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;....................................61

[1g] coupling said access point to said first and second mobile stations through said wireless local area network; ...................61

[1h] estimating a first radio channel from said access point to said first mobile station over a pilot interval; and ...................62

[1i] estimating a second radio channel from said access point to said second mobile station over said pilot interval..................62

B.   Claim 2: .........................................................................................63

2. A method, as set forth in claim 1, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink....................................................................63

C.   Claim 3: .........................................................................................64

3. A method, as set forth in claim 2, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station. .........64

XII.  Ground 5:  Wax and Perahia Renders Obvious Claim 10 ..............................65

A.   Claim 10: .......................................................................................65

10. A method, as set forth in claim 3, further comprising: using a time division multiple access protocol to partition a

6

radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.................65

B.     Motivation to Combine Wax and Perahia...........................................65

XIII. Additional Remarks .......................................................................67

I, Robert Akl, D.Sc. of Dallas, Texas, declare that:

## I.    Introduction

1.      My name is Robert Akl, and I have been retained by counsel for Petitioner NETGEAR, Inc. ("NETGEAR" or "Petitioner") as an expert witness to provide assistance regarding U.S. Patent No. 7,512,096 ("the '096 Patent"). Specifically, I have been asked to consider the validity of claims 1, 2, 3, and 10 of the '096 Patent (the "Challenged Claims") in view of prior art, anticipation and obviousness considerations, and understanding of a person of ordinary skill in the art at the time of the invention ("POSITA") as it relates to the '096 Patent.  I have personal knowledge of the facts and opinions set forth in this declaration and believe them to be true.  If called upon to do so, I would testify competently thereto.

2.      I am being compensated for my time at my standard consulting rate.  I am also being reimbursed for expenses that I incur during the course of this work. My compensation is not contingent upon the results of my study, the substance of my opinions, or the outcome of any proceeding involving the challenged claims.  I have no financial interest in the outcome of this matter or on the pending litigation between Petitioner and Patent Owner.

3.      My analysis here is based on my years of education, research and experience, as well as my investigation and study of relevant materials, including those cited herein.

4.     I may rely upon these materials, my knowledge and experience, and/or additional materials to rebut arguments raised by the Patent Owner.  Further, I may also consider additional documents and information in forming any necessary opinions, including documents that may not yet have been provided to me.

5.     My analysis of the materials produced in this proceeding is ongoing and I will continue to review any new material as it is provided.  This declaration represents only those opinions I have formed to date.  I reserve the right to revise, supplement, and/or amend my opinions stated herein based on new information and on my continuing analysis of the materials already provided.

## II.     Background and Qualifications

6.     I am an expert in the field of wireless communication systems.  I have studied, taught, practiced, and researched this field for over 27 years.  I have summarized in this section my educational background, work experience, and other relevant qualifications.  Attached hereto as Appendix A, is a true and correct copy of my curriculum vitae describing my background and experience.

7.     I earned my Bachelor of Science degrees in Electrical Engineering and Computer Science *summa cum laude* with a grade point average of 4.0/4.0 and a ranking of first in my undergraduate class from Washington University in St. Louis in 1994.  In 1996, I earned my Master of Science degree in Electrical Engineering from Washington University in St. Louis with a grade point average of 4.0/4.0.  I

9

earned my Doctor of Science in Electrical Engineering from Washington University in St. Louis in 2000, again with a grade point average of 4.0/4.0, with my dissertation being on "Cell Design to Maximize Capacity in Cellular Code Division Multiple Access (CDMA) Networks."

8.      While a graduate student, from 1996 through 2000, I worked at MinMax Corporation in St. Louis, where I designed software packages that provided tools to flexibly allocate capacity in a CDMA communications network and maximize the number of subscribers.  I also analyzed and simulated different audio compression schemes.  I also validated the hardware architecture for an Asynchronous Transfer Mode (ATM) switch capable of channel group switching, as well as performed logical and timing simulations, and developed the hardware architecture for the ATM switch.  I also worked with Teleware Corporation in Seoul, South Korea, where I designed and developed algorithms that were commercially deployed in a software package suite for analyzing the capacity in a CDMA network implementing the IS-95 standard to maximize the number of subscribers.

9.      After obtaining my Doctor of Science degree, I worked as a Senior Systems Engineer at Comspace Corporation from October of 2000 to December of 2001.  At Comspace, I designed and developed advanced data coding and modulation methods for improving the reliability and increasing the available data rates for cellular communications.  I coded and simulated different encoding

10

schemes (including Turbo coding, Viterbi decoding, trellis coded modulation, and Reed-Muller codes) and modulation techniques using amplitude and phase characteristics and multi-level star constellations.  This work further entailed the optimization of soft decision parameters and interleavers for additive white Gaussian and Rayleigh faded channels.  In addition, I also extended the control and trunking of Logic Trunked Radio (LTR) to include one-to-one and one-to-many voice and data messaging.

10.     In January of 2002, I joined the faculty of the University of New Orleans in Louisiana as an Assistant Professor in the Department of Electrical Engineering.  While in this position, I designed and taught two new courses called "Computer Systems Design I and II."  I also developed a Computer Engineering Curriculum with a strong hardware-design emphasis, formed a wireless research group, and advised graduate and undergraduate students.

11.     In September of 2002, I received an appointment as an Assistant Professor in the Department of Computer Science and Engineering at the University of North Texas (UNT), in Denton, Texas.  In May of 2008, I became a tenured Associate Professor in the Department of Computer Science and Engineering.  As a faculty member, I have taught courses and directed research in networking and telecommunications, including 2G, 3G, 4G, 5G, CDMA/WCDMA, GPS, GSM, UMTS, LTE, ad-hoc networks, antenna design and beamforming, Bluetooth, call

11

admission control, channel coding, communication interfaces and standards, compression, computer architecture, MIMO systems, multi-cell network optimization, network security, packet-networks, telephony, VoIP, Wi-Fi (802.11), 802.15.4, Zigbee, wireless communication, and wireless sensors. I am also the director of the Wireless Sensor Lab ("WiSL") at UNT. I am a member of the Center for Information and Cyber Security (CICS). It is the only program in the U.S. to be federally certified by the National Security Agency as a Center of Academic Excellence in Information Assurance Education and Research *and* Cyber Defense Research. I am also a member of the NSF Net-Centric & Cloud Software & Systems: Industry-University Cooperative Research Center (I/UCRC). Several of my research projects are funded by industry. In January of 2015, I was promoted to Associate Chair of Graduate Studies in the Department of Computer Science and Engineering.

12. In addition to advising and mentoring students at UNT, I was asked to join the faculty of the University of Arkansas in Little Rock as an Adjunct Assistant Professor from 2004 to 2008 in order to supervise the research of two Ph.D. graduate students who were doing research in wireless communications. At UNT, I have advised and supervised more than 250 undergraduate and graduate students, several of whom received a master's or doctorate degree under my guidance.

13. Further, since 2005, I have received over a million dollars in funding

12

from the State of Texas, Texas Higher Education Coordination Board, the National Science Foundation, and industry to design and conduct robotics, video, and mobile gaming (*e.g.*, Xbox, PC, mobile device) programming summer camps for middle and high school students at UNT.  By using video and mobile gaming as the backdrop, participants have learned coding and programming principles and developed an understanding of the role of physics and mathematics in video game design.

14.    In addition to my academic work, I have remained active in the communication industry through my consulting work.  In 2002, I consulted for Input/Output Inc. and designed and implemented algorithms for optimizing the frequency selection process used by sonar for scanning the bottom of the ocean.  In 2004, I worked with Allegiant Integrated Solutions in Ft. Worth, Texas, to design and develop an integrated set of tools for fast deployment of wireless networks, using the 802.11 standard.  Among other features, these tools optimize the placement of Access Points and determine their respective channel allocations to minimize interference and maximize capacity.  I also assisted the Collin County Sheriff's Office (Texas) in a double homicide investigation, analyzing cellular record data to determine user location.

15.    I have authored and co-authored over 90 journal publications, conference proceedings, technical papers, book chapters, and technical presentations

13

in a broad array of communications-related technologies, including networking and wireless communication.  I have also developed and taught over 100 courses related to communications and computer systems, including several courses on signals and systems, 4G/LTE and 5G/NR, OFDM, VoIP, Wi-Fi (802.11), 802.15.4, Zigbee, wireless communication, antenna design and beamforming, communications systems, communication interfaces and standards, sensor networks, source coding and compression, network security, computer systems design, game and app design, and computer architecture.  These courses have included introductory courses on communication networks and signals and systems, as well as more advanced courses on wireless communications.  A complete list of my publications and the courses I have developed and/or taught is also contained in my *curriculum vitae*.

16.    My professional affiliations include services in various professional organizations and serving as a reviewer for a number of technical publications, journals, and conferences.  I have also received a number of awards and recognitions, including the IEEE Professionalism Award (2008), UNT College of Engineering Outstanding Teacher Award (2008), and Tech Titan of the Future (2010) among others, which are listed in my *curriculum vitae*.

17.    I have also served as an expert in certain legal proceedings.  A list of cases in which I have testified at trial, hearing, or by deposition (including those during the past five years) is provided in my *curriculum vitae*.  Over the years, I have

14

been retained by both patent owners and petitioners.

## III.   Level of Ordinary Skill in the Art

18.   In rendering the opinions set forth in this declaration, I was asked to consider the patent claims and the prior art through the eyes of a person of ordinary skill in the art ("POSITA") at the time of the alleged invention, which I understand is asserted to be November 24, 2004—the filing date of the patent application.  I understand that the factors considered in determining the ordinary level of skill in a field of art include the level of education and experience of persons working in the field; the types of problems encountered in the field; the teachings of the prior art, and the sophistication of the technology at the time of the alleged invention. I understand that a POSITA is not a specific real individual, but rather is a hypothetical individual having the qualities reflected by the factors above. I understand that a POSITA would also have knowledge from the teachings of the prior art, including the art cited below.

19.   Taking these factors into consideration, on or before November 24, 2004, a POSITA of the '096 Patent would have had a Bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and 2-3 years of experience in the design or development of wireless communication systems, or the equivalent.  Additional graduate education could substitute for professional experience, or significant experience in the field could substitute for

15

formal education.

20.    Before November 24, 2004, my level of skill in the art was at least that of a POSITA.  I am qualified to provide opinions concerning what a POSITA would have known and understood at that time, and my analysis and conclusions herein are from the perspective of a POSITA as of that date.

## IV.    Materials Considered and Relied Upon

21.    In reaching the conclusions described in this declaration, I have relied on the documents and materials cited herein as well as those identified in this declaration, including the '096 Patent, the prosecution history of the '096 Patent, and prior art references cited herein.  These materials comprise patents, related documents, and printed publications.  Each of these materials is a type of document that experts in my field would have reasonably relied upon when forming their opinions.

22.    In the cited references, all emphasis is added unless otherwise noted.

23.    I have also relied on my education, training, research, knowledge, and personal and professional experience in the relevant technologies and systems that were already in use prior to, and within the timeframe of the earliest priority date of the claimed subject matter in the '096 Patent, which is November 24, 2004.

- EX1001: U.S. Patent No. 7,512,096 ("the '096 Patent")
- EX1002: Prosecution History of the '096 Patent

16

- EX1004: U.S. Patent No. 7,352,718 to Perahia, "Spatial Division Multiple Access for Wireless Networks," filed July 22, 2003 ("Perahia")

- EX1005: U.S. Patent No. 8,199,723 to Li, "Parallel Wireless Communication Apparatus, Method, and System," filed December 23, 2003 ("Li")

- EX1006: U.S. Patent No. 8,014,366 to Wax, "WLAN Capacity Enhancement Using SDM," filed August 13, 2004 ("Wax")

- EX1007: "Spatial Covariance Based Downlink Beamforming in an SDMA Mobile Radio System" by Christof Farsakh and Josef A. Nossek, IEEE Transactions on Communications, Vol. 46, No. 11, November 1998, ("Farsakh")

- EX1008: U.S. Patent No. 7,352,688 to Perahia, "High Data Rate Wireless Bridging," filed December 31, 2002 ("the '688 Patent")

## V.   Legal Standards

24.    I am not a lawyer and do not provide any legal opinions, but I have been advised that certain legal standards are to be applied by technical experts in forming opinions regarding meaning and validity of patent claims.  I have applied the legal standards described below, which were provided to me by counsel for the Petitioner.

25.    It is my understanding that assessing the validity of a U.S. patent based on a prior art analysis requires two steps.  First, one must construe the terms of the patent claims to understand what meaning a POSITA would have given the terms. Second, after the claim terms have been construed, one may then assess validity by comparing a patent claim to the "prior art."  I understand that the teaching of the

17

prior art is viewed through the eyes of a POSITA at the time the invention was made. My analysis as to what constitutes a relevant a POSITA is set forth above.

### A.    Legal Standards for Prior Art

26.    I understand that a patent or other publication must first qualify as prior art before it can be used to invalidate a patent claim.

27.    I understand that a U.S. or foreign patent qualifies as prior art to a patent if the date of issuance of the U.S. or foreign patent is prior to the invention of the patent.  I further understand that a printed publication, such as an article published in a magazine or trade publication, qualifies as prior art to a patent if the date of publication is prior to the invention of the patent.  My understanding is that, for such prior art references, a patentee may attempt to show that the claimed invention was conceived prior to the issuance of the U.S. foreign patent or publication of the printed materials.  To do so, it is my understanding that patentee must prove with corroborating evidence that the named inventors conceived of the complete claimed invention before the prior art and were diligent in reducing the claimed inventions to practice.

28.    I understand that, regardless of the date of invention of the patent, a U.S. or foreign patent qualifies as prior art to a patent if the date of issuance of the U.S. or foreign patent is more than one year before the earliest effective filing date of the patent.  I further understand that a printed publication, such as an article published

18

in a magazine or trade publication, constitutes prior art to a patent if the publication occurs more than one year before the earliest effective filing date of the patent, again regardless of the date of invention of the patent.

29.     I understand that a U.S. patent or published U.S. application qualifies as prior art to a patent if the application for that patent was filed in the United States before the invention of the patent.  My understanding is that, for such prior art references, a patentee may attempt to show that the claimed invention was conceived prior to the filing in the United States of the purported prior art U.S. patent or application.  To do so, it is my understanding that patentee must prove with corroborating evidence that the named inventors conceived of the complete claimed invention before the prior art and were diligent in reducing the claimed inventions to practice.

30.     I understand that to qualify as prior art, a reference must contain an enabling disclosure that allows a POSITA to practice the claims without undue experimentation.

31.     I understand that documents and materials that qualify as prior art can be used to invalidate a patent claim as anticipated or as obvious.

## B.     Legal Standard for Priority Date

32.     I understand that the "priority date" or "earliest effective filing date" of a patent is the date on which it is filed, or the date on which an earlier-filed U.S. or

international patent application was filed if the patentee claims the benefit of priority to that earlier-filed U.S. or international patent application. I further understand that although a foreign priority document may be used to try to overcome certain prior art references, the effective filing date is not the filing date of a foreign priority document. The '096 Patent was filed on November 24, 2004 and does not claim priority to an earlier filed application.

### C.    Legal Standard for Obviousness

33.    My understanding is that a patent claim is invalid as obvious only if the subject matter of the claimed invention "as a whole" would have been obvious to a POSITA at the time the invention was made. To determine the differences between a prior art reference (or a proposed combination of prior art references) and the claims, the question of obviousness is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. Also, obviousness grounds cannot be sustained by mere conclusory statements. Rather, it is necessary to provide some articulated reasoning with rational underpinning to support the legal conclusion of obviousness.

34.    I understand that a patent claim that comprises several elements is not proved obvious by simply showing that each of its elements was independently known in the prior art. In my evaluation of whether any claim of the '096 Patent would have been obvious, I considered whether the Petition, or any evidence

20

submitted in this proceeding, presented an articulated reason with a rational basis that would have motivated a POSITA to combine the elements or concepts from the prior art in the same way as in the claimed invention.

35.    It is my understanding that there is no single way to define the line between true inventiveness on one hand—which is patentable—and the application of common sense and ordinary skill to solve a problem on the other hand—which is not patentable.  For instance, factors such as market forces or other design incentives may be the source of what produced a change, rather than true inventiveness.

36.    I understand that the decision-maker may consider whether the change was merely the predictable result of using prior art elements according to their known functions, or whether it was the result of true inventiveness.   And, the decision-maker may also consider whether there is some teaching or suggestion in the prior art to make the modification or combination of elements recited in the claim at issue.  Also, the decision-maker may consider whether the innovation applies a known technique that had been used to improve a similar device or method in a similar way.  The decision-maker may also consider whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem with a reasonable expectation of success by those skilled in the art.

37.    I have been instructed by counsel that if any of these considerations are

relied upon to reach a conclusion of obviousness, the law requires that the analysis of such a consideration must be made explicit.  I understand that the decision-maker must be careful not to determine obviousness using the benefit of hindsight and that many true inventions might seem obvious after the fact.  I understand that the decision-maker should consider obviousness from the position of a POSITA at the time the claimed invention was made, and that the decision-maker should not consider what is known today or what is learned from the teaching of the patent.

38.    I understand that in order to determine whether a patent claim is obvious, one must make certain factual findings regarding the claimed invention and the prior art.  Specifically, I understand that the following factors must be evaluated to determine whether a claim is obvious: the scope and content of the prior art; the difference or differences, if any, between the claim of the patent and the prior art; the level of ordinary skill in the art at the time the claimed invention was made; and, if available, the objective indicia of non-obviousness, also known as "secondary considerations."

39.    I understand that the secondary considerations include: commercial success of a product due to the merits of the claimed invention; a long felt need for the solution provided by the claimed invention; unsuccessful attempts by others to find the solution provided by the claimed invention; copying of the claimed invention by others; unexpected and superior results from the claimed invention;

22

acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention; teaching away from the conventional wisdom in the art at the time of the invention; independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it; and other evidence tending to show obviousness.

40.    I understand that, to establish a secondary consideration, the evidence must demonstrate a nexus between that secondary consideration and the claimed invention.

## VI.    Overview of the '096 Patent

### A.    Subject Matter Overview

41.    The '096 Patent is titled "COMMUNICATING DATA BETWEEN AN ACCESS POINT AND MULTIPLE WIRELESS DEVICES OVER A LINK." The '096 Patent issued on March 13, 2009, from U.S. Patent Application No. 10/996,617 ("the '617 Application"), filed on November 24, 2004.  (*See* EX1001, Cover.)

42.    The '096 Patent contains thirteen claims.  I have been asked to opine on the validity of the Challenged Claims, claims 1, 2, 3, and 10, which are listed in the table below.

| Challenged Claims of U.S. Patent No. 7,512,096 |
|---|
| [1P] A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising: |
| [1a] weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and |
| [1b] weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data; |
| [1c] increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol; |
| [1d] discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; |
| [1e] applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively; |
| [1f] defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network; |
| [1g] coupling said access point to said first and second mobile stations through said wireless local area network; |
| [1h] estimating a first radio channel from said access point to said first mobile station over a pilot interval; and |
| [1i] estimating a second radio channel from said access point to said second mobile station over said pilot interval. |

24

> 2. A method, as set forth in claim 1, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink.

> 3. A method, as set forth in claim 2, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station.

> 10. A method, as set forth in claim 3, further comprising: using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.

43.     The '096 Patent describes wireless communications between an access point and multiple mobile stations in a wireless local area network ("WLAN") using Space Division Multiple Access ("SDMA").   (EX1001, Abstract.)   In the background section, the '096 Patent explains that communications between an access point and multiple mobile stations in a WLAN was not new.   "One well-known standard, i.e., the Institute of Electrical and Electronics Engineers (IEEE) 802.11 specification describes the operation of mobile stations (MSs) and access points in a Wireless Local Area Network (WLAN)."   (*Id*., 1:32-35.)  IEEE 802.11 was first published in 1999 and is commonly referred to as the Wi-Fi standard.  (*Id*., 1:41-56.)

44.     The background section also explains that SDMA, which "uses spatial

25

dimension to simultaneously transmit to, or receive from, multiple radios at the same carrier frequency," was not a new technique as it had been studied for "decades" at the time of the '096 Patent application filing.  (*Id.*, 1:57-60.)  SDMA allows a single transmitter to provide multiple communication channels by dividing the radio coverage into focused radio beams that reuse the same frequency.  To allow multiple access, each mobile station is assigned to a focused radio beam.  The '096 Patent also acknowledges that SDMA had been used in WLANs, but not always successfully.  (*Id.*, 2:4-13.)

45.    The inventors of the '096 Patent did not invent wireless communications between an access point and multiple mobile stations in a WLAN, IEEE 802.11, or SDMA.  Nor did the inventors invent wireless communications between an access point and multiple mobile stations in a WLAN complying with IEEE 802.11 and using SDMA.  The '096 Patent simply describes certain problems may arise when using SDMA with mobile stations that comply with IEEE 802.11.

46.    In particular, the '096 Patent describes that it is difficult to provide a high throughput downlink because the IEEE 802.11 transmission protocol requires a handshaking routine, which the '096 Patent describes with respect to Figure 3.

> [T]he transmitter transmits a MAC protocol data unit (MPDU) following listening and backoff, and in turn, the receiver transmits an acknowledgment (ACK) frame subject to a successful reception of the MPDU. The transmitter has no way of knowing whether the transmitted data was received correctly at the receiver. To this end, the IEEE 802.11 specifications state that upon a successful reception of a data burst (i.e.,

26

an MPDU), the receiver should send an acknowledgment frame (ACK) to the transmitter as confirmation.

(*Id*., 2:21-33, Figure 3.)   The "multiple acknowledgement (ACK) bursts from different mobile stations may cause a reception problem upon their arrival at an access point.   Likewise, accurate channel estimations may severely impact on successfully increasing the downlink throughputs." (*Id*., 2:63-67.)

47.    To overcome these problems, the '096 Patent weights the data so that the access point transmits first data to a first mobile station and second data to a second mobile station.  (*Id*., 3:12-54.)  The '096 Patent, however, does not provide a weighting algorithm.  At most, the '096 Patent provides the following description regarding weighting data with respect to Figure 5 shown below.

> The access point 105*a* may comprise a first weighter 500(1) to weight the first data 135(1) based on channel estimates of the first and second radio channels 140(1-k) as "w1(CH (1), CH (k))." Likewise, the access point 105*a* may comprise a second weighter 500(k) to weight the second data 135(k) based on channel estimates of the first and second radio channels 140(1-k) as "wk (CH (1), CH (k))."

(*Id*., 8:35-42.)  This description simply provides that the weight applied to the data is based on channel estimates, but it does not provide any details regarding how the channel estimates are used to generate the weights.

27



**FIGURE 5**

48.    Generating weights, also referred to as beamforming, is a routine function in SDMA.   For example, in "Spatial Covariance Based Downlink Beamforming in an SDMA Mobile Radio System," the authors describe "an approach to jointly calculate weights in such a way that all users receive their signal with a given signal-to-noise-and-interference ratio."  (EX1007, Abstract; *see also*, EX1006, 31:38-34:50.)

49.    The USPTO also found that the "weighting limitations" were insufficient for patentability.  The USPTO rejected claim 1 as originally filed, in part, because US Patent No. 7,006,529 ("Alastalo") teaches "that the first and second data is weighted at said access point."  (EX1002, 126.)  As described in the next section, the USPTO allowed the claims of the '096 Patent based on the last two limitations found in claim 1 (labeled as [1h] and [1i] in the claim table above).

50.    The '096 Patent describes that channel estimation occurs over a pilot

28

interval.  (*Id.*, 7:41-46.)  The '096 Patent defines pilot interval as "a predetermined time period for transmission of a signal, either at a single frequency or several independent frequencies, for supervisory purposes including control, equalization, continuity, synchronization, or reference."  (*Id.*, 7:46-50.)  Channel estimation over a pilot channel is a routine process in an IEEE 802.11 WLAN.

51.   The '096 Patent describes the IEEE 802.11 channel estimation procedure with respect to Figure 9 shown below.  "FIG. 9 illustrates a stylized representation of a timing chart for channel estimation and alternating time-offset on the SDMA downlink 120*a* to estimate the first radio channel 140(1) associated with a reliably-recovered non-delayed first acknowledgement frame (ACK 1) such that identity of a user associated with the non-delayed MPDUs and ACK frames be switched for successive SDMA transmissions shown in FIG. 5."  (*Id.*, 11:1-9.)  The MPDUs and ACK frames are part of the IEEE 802.11 standard.  As described in the '096 Patent, "the transmitter transmits a MAC protocol data unit (MPDU) following listening and backoff, and in turn, the receiver transmits an acknowledgment (ACK) frame subject to a successful reception of the MPDU."  (*Id.*, 2:21-27.)

29



**FIGURE 9**

52.   According to the '096 Patent, this procedure exploits "the characteristics of the synchronous (S) segment" as defined by IEEE 802.11.  (*Id.*, 11:24-27.)  "More specifically, while pilot symbols are generally transmitted on all 52 OFDM sub-carriers, according to the IEEE 802.11 specifications, synchronization symbols are transmitted only in 12 (roughly equi-spaced) sub-carriers out of the total of 52 OFDM sub-carriers.   This means that the synchronization segment of the ACK 2 frame may interfere only with 12 sub-carriers of the pilot segment of the ACK 1 frame.   Thus, the remaining 40 sub-carriers of the pilot segment of the ACK 1 frame may be uncorrupted."  (*Id.*, 11:28-36.)

53.   The '096 Patent then describes two different techniques for channel estimation.   The first technique "involves interpolation in the frequency domain."

30

(*Id.*, 11:40-42.)  With this technique, the access point estimates the channel using "the pilot symbols of the ACK 1 frame transmitted on the 40 uncorrupted subcarriers." (*Id.*, 11:42-46.)  "Using the computed channel estimates interpolation in the frequency domain may be applied to compute estimates of the first radio channel 140(1) at the 12 remaining sub-carriers." (*Id.*, 11:49-52.)

54.     The second technique "involves channel estimation via synchronization symbols." (*Id.*, 11:53-54.)  This technique also uses "the pilot symbols of the ACK 1 frame transmitted on the 40 uncorrupted sub-carriers." (*Id.*, 11:54-58.)  With this method, however, the access point uses "the strong synchronization symbols of the ACK 1 frame (rather than the pilot symbols)" to compute estimates of the first radio channel 140(1) at the 12 remaining sub-carriers.  (*Id.*, 11:61-64.)

55.     I note that the Challenged Claims do not include limitations directed towards these two channel estimation techniques.

**B.     File History of the '096 Patent**

56.     I reviewed the File History of the '096 Patent.  The USPTO did not allow all of the claims as originally filed.  The USPTO said claims 1-6 and 17-26 as filed were not patentable, but that dependent claims 7-16 and 27-29 would be patentable if they were rewritten in independent format. (EX1002, 123-129 and 152-159.)  Dependent claim 7 included the estimating limitations now found in claim 1 (labeled as [1h] and [1i] in the claim table above).  (*Id.*, 28.)  The other allowable

31

claims, claims 8-16 and 27-29, depended from claim 7.  (*Id.*, 28-31, 49.)

57.    The Applicant amended claim 7 to be in independent format and canceled claims 1-6 and 17-26.   (EX1002, 134-149, 160-167.)   With these amendments, the USPTO issued the '096 Patent with claims 7-16 and 27-29 renumbered as claims 1-13.  (*Id.*, 174-175.)

**C.      Interpretation of the '096 Patent Challenged Claims**

58.    For purposes of my analysis in this IPR proceeding, I understand that the terms that appear in the claims of the '096 Patent should be interpreted according to their plain and ordinary meaning under the *Phillips* standard.  In determining the ordinary and customary meaning, I understand that the words of a claim are first given their plain meaning that those words would have had to a POSITA at the time of the alleged invention.  I also understand that the structure of the claims, the specification and file history also may be used to better construe a claim insofar as the plain meaning of the claims cannot be understood.  Moreover, I understand that even treatises and dictionaries may be used, albeit under limited circumstances, to determine the meaning attributed by a POSITA to a claim term at the time of filing. I have followed this approach in my analysis, and for all of the claim terms considered in this declaration, I have applied the plain and ordinary meaning of those terms.  I followed this approach in my analysis.

59.    I also understand that the words of the claims should be interpreted as

they would have been interpreted by a POSITA at the time the invention was made (not today).  For purposes of my analysis here, I have used the November 24, 2004, priority date of the '096 Patent as the date of invention.  Without exception, however, my analysis of the proper meaning of the recited claim elements (under the *Phillips* standard) in this declaration would be correct if the date of invention was anywhere in the early-to-mid 2000s.

## VII.   Overview of the Cited References

60.    General descriptions provided for the following references and combinations thereof are incorporated into each subsection and mapping of the claims that includes citations to these references.

### A.    Perahia (EX1004)

61.    Perahia addresses the same problem as the '096 Patent: providing SDMA in a WLAN comprising access points and mobile devices complying with IEEE 802.11.  Perahia "incorporate[s] Multiple Input Multiple Output (MIMO) technology in conjunction with the IEEE 802.11 standard to enable simultaneous communication of data packets to or from multiple users in the same frequency.  Spatial divisional multiple access (SDMA) is thus provided."  (EX1004, 2:18-23.)  As described by Perahia, "MIMO (Multiple Input Multiple Output) techniques" can be used "to provide SDMA (Spatial Division Multiple Access)."  (*Id.*, 1:46-49.)  Perahia's  access  point  and  mobile  devices,  referred  to  as  subscriber  units,

33

communicate using the IEEE 802.11 standard.  "Subscriber units 104 communicate data in response to a polling request from access point 102 as defined by the IEEE 802.11 standard and/or they receive downstream data from access point 102."  (*Id.*, 8:19-22.)

**B.    Li (EX1005)**

62.    Li also discloses "[a]n access point in a wireless network [that] communicates with multiple mobile stations simultaneously using spatial-division multiple access … in an IEEE 802.11 compatible network."  (EX1005, Abstract.) "For example, one or more of mobile stations 110, 120, and 130, or access point 102 may operate in compliance with a wireless network standard such as ANSI/IEEE Std. 802.11."  (*Id.*, 1:55-59.)

**C.    Wax (EX1006)**

63.    Wax also discloses "enhancing the capacity of a WLAN by spatial division multiplexing (SDM).  This technique permits an access point to transmit respective downlink signals simultaneously to multiple stations in a spatial multiplexing group (SMG), and to receive uplink signals simultaneously from the stations in the group." (EX1006, 1:54-60.)   "In the exemplary embodiments described hereinbelow, it is assumed that the access points and mobile stations communicate with one another in accordance with one of the standards in the IEEE 802.11 family and observe the applicable 802.11 physical (PHY) layer and medium

access control (MAC) layer conventions."  (*Id*., 12:16-21.)

## VIII.  Ground 1:  Perahia Anticipates Claim 1

64.    As described in the following paragraphs, Perahia discloses all of the limitations found in claim 1 of the '096 Patent.

### A.    Claim 1:

*[1P] A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:*

65.    The preamble of claim 1 is "[a] method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station."  Figure 1 of the '096 Patent depicts an access point 105 with two antennas 110(1), 110(m) that communicates data 135(1), 135(k) over a wireless local area network (WLAN) 115 to two mobile stations 145(1), 145(k). (EX1001, Figure 1, 5:46-6:28.)

66.    Perahia also discloses an access point 102 with two antennas 106 communicating data over a network to subscriber units 104 (five units depicted in Figure 1).  "FIG. 1 depicts a wireless network 100 suitable for implementing one embodiment of the present invention.  Included within wireless network 100 are an access point 102 and numerous subscriber units 104.  Some of subscriber units 104 are capable of employing MIMO processing techniques to participate in SDMA operations whereas others are not.  Access point 102 is equipped with two antennas

35

106 to support SDMA operations." (EX1004, 4:47-54.) In the context of Perahia, the term "subscriber unit" means the same as a mobile station.

> **[1a] weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and**
> **[1b] weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;**

67.     The first and second limitations of claim 1 are the "weighting" limitations. The first limitation is "weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data." The second limitation is "weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said first data."

68.     The '096 Patent does not provide an algorithm or other detailed description regarding how the weighting occurs. At most, the '096 Patent refers to Figure 5 and states: "The access point 105*a* may comprise a first weighter 500(1) to weight the first data 135(1) based on channel estimates of the first and second radio channels 140(1-k) as 'w1(CH (1), CH (k)).' Likewise, the access point 105*a* may comprise a second weighter 500(k) to weight the second data 135(k) based on channel estimates of the first and second radio channels 140(1-k) as 'wk (CH (1), CH (k)).'" (EX1001, 8:35-42.) This statement and Figure 5 only disclose that the calculated weights are dependent on the estimating steps (the last two limitations of

36

claim 1 labeled as [1h] and [1i] in the claim table above).

69.     Perahia also describes weighting data so that the access point transmits the first data to the first mobile station and the second data to the second mobile station.   Perahia uses a weighting matrix to perform the weighting steps.   Like the '096 Patent, "[t]he weighting matrix may be based on a matrix channel estimate." (EX1004, 5:28-30.)  Also like the '096 Patent, Perahia does not provide a particular weighting algorithm explaining "[t]here are many suitable ways of implementing the weighting matrix."  (*Id.*, 5:30-32.)  A POSITA understands that this data weighting for use in MIMO results in each station only receiving the data that the access point specifically sent to it.

70.     The '096 Patent weighters and Perahia's weighting matrix are not discussed in detail as weighting data is a standard function in SDMA.  For example, in "Spatial Covariance Based Downlink Beamforming in an SDMA Mobile Radio System," the authors describe "an approach to jointly calculate weights in such a way that all users receive their signal with a given signal-to-noise-and-interference ratio."  (EX1007, Abstract; *see also* EX1006, 31:38-34:50.)

> ***[1c] increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;***

71.     The third limitation of claim 1 is "increasing a first data rate of transmission of said first data and a second data rate of transmission of said second

37

data using a single carrier frequency in a radio frequency communication based on a transmission protocol."   According to the '096 Patent, the first part of this limitation, increasing the data rates, is met by merely using SDMA.  For example, "a doubling of data rates using a single carrier frequency may be obtained on the SDMA downlink for the IEEE 802.11 mobile stations." (EX1001, 5:40-42, *see also*, 12:36-37.)  This data rate increase occurs because the access point can communicate with both mobile stations at the same time.

72.   Perahia describes this data rate increase as well.  Perahia explains that "Multiple Input Multiple Output (MIMO) technology in conjunction with the IEEE 802.11 standard enables simultaneous communication of data packets to or from multiple users in the same frequency.  …   In this way, system capacity can be increased to an extent that depends on available antenna resources and the multipath characteristics of the communication channel.   Doubling or quadrupling of network throughput can be achieved."  (EX1004, Abstract.)  Perahia describes a "SDMA MIMO example 404" with respect to Figure 4 explaining that in this example "throughput is improved since two packets are sent simultaneously."  (*Id*., 6:34-37.)

73.   The second part of this limitation, using a single carrier frequency, is met by complying with most versions of the IEEE 802.11 standard.  Many versions of IEEE 802.11 operate at a single carrier frequency.  For example, as described in the '096 Patent, IEEE 802.11a operates at the 5.2 GHz frequency band and IEEE

38

802.11g operates at the 2.4 GHz frequency band.  (EX1001, 1:50-53.)

74.    Perahia also describes using a single carrier frequency in a radio frequency communication based on a transmission protocol.  Perahia describes that "the present invention will be described with reference to a representative network environment, a wireless communication network based on the IEEE 802.11 standard." (EX1004, 3:64-4:1.)  Like the '096 Patent, Perahia also identifies 802.11a and 802.11g as relevant transmission protocols.  (*Id.*, 3:64-4:8.)

> ### [1d] discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;

75.    The fourth limitation of claim 1 is "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension."  According to the '096 Patent, the "discriminating" limitation is met by merely using SDMA.  The '096 Patent explains that SDMA "has been studied extensively over the past few decades" because "the spatial dimension [allows] discrimination among multiple radio[s]."  (EX1001, 1:57-2:3.)  "In operation, the SDMA downlink 120*a* may use the spatial dimension to allow discrimination among a first and a second radio frequency transmission 205(1-k) at a data rate of 54 Mbits/s based on space division multiple access in the context of the IEEE 802.11 standard."  (*Id.*, 7:26-30.)  A POSITA understands that the nature of SDMA is to distinguish transmissions to different mobile stations based on a

spatial dimension.

76.     Perahia also describes using SDMA with the same result of discriminating first and second data based on a spatial dimension.  In particular, Perahia discloses "sending a first packet to a first subscriber unit via a first spatial subchannel and sending a second packet to a second subscriber unit via a second spatial subchannel, the first spatial subchannel and the second spatial subchannel occupying the same bandwidth." (EX1004, 2:30-35.)  A POSITA would understand that Perahia's use of SDMA results in the claimed discrimination of the first and second packets.

> ***[1e] applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;***

77.     The fifth limitation of claim 1 is "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively."  This limitation is met by applying SDMA. SDMA "uses spatial dimension to simultaneously transmit to, or receive from, multiple radios at the same carrier frequency." (EX1001, 1:57-60.)

78.     Perahia also discloses applying SDMA.  "According to embodiments of the present invention, SDMA access point 102 may either transmit simultaneously to two or more of subscriber units 104 or simultaneously receive upstream

40

transmissions from two or more of subscriber units 104." (EX1004, 4:66-5:3.) While the '096 Patent uses the term "substantially concurrently" and Perahia uses the term "simultaneously," a POSITA understands that these terms mean the same in the SDMA context.

> ***[1f] defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;***

79.     The sixth limitation of claim 1 is "defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network." As the '096 Patent describes, "[t]o couple the access point 105*a* to the first and second mobile stations 145(1-*k*) through the WLAN 115, at least one of the access point 105*a*, the first and second mobile stations 145(1-*k*), and the SDMA downlink 120*a* may be defined at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish the network." (EX1001, 7:36-41.)

80.     Perahia also describes that "the present invention will be described with reference to a representative network environment, a wireless communication network based on the IEEE 802.11 standard." (EX1004, 3:64-4:1.) In particular, the "[s]ubscriber units 104 communicate data in response to a polling request from access point 102 as defined by the IEEE 802.11 standard and/or they receive

41

downstream data from access point 102." (*Id.*, 8:19-22.) Perahia also incorporates

by reference the IEEE 802.11 standards documents. (*Id.*, 4:11-27.)

> ### *[1g] coupling said access point to said first and second mobile stations through said wireless local area network;*

81.     The seventh limitation of claim 1 is "coupling said access point to said

first and second mobile stations through said wireless local area network." The '096

Patent describes coupling broadly. For example, "[t]he present invention may have

application in any environment where two or more users are interconnected and

capable of communicating with one another." (EX1001, 12:52-55.) With more

particularity, the '096 Patent describes that the access point is coupled to the mobile

stations through the WLAN, by "at least one of the access point 105*a*, the first and

second mobile stations 145(1-*k*), and the SDMA downlink 120*a* … defined at least

in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard

to establish the network." (*Id.*, 7:36-41.)

82.     Perahia describes communications between the access point and

subscriber units via a WLAN like the '096 Patent. For example, Perahia's "wireless

network 100" includes "an access point 102 and numerous subscriber units 104."

(EX1004, 4:48-50.) Perahia's "FIG. 5 depicts the simultaneous downstream

transmission of multiple packets (502 and 504) from the access point to multiple

subscriber units," while Perahia's "FIG. 6 depicts the simultaneous upstream

transmission of multiple packets (602 and 604) from multiple subscriber units to the

42

access point." (*Id.*, 6:65-67, 7:13-15.)  These communications occur in "a wireless communication network based on the IEEE 802.11 standard."  (*Id.*, 3:64-4:1.)

> **[1h] estimating a first radio channel from said access point to said first mobile station over a pilot interval; and**
> **[1i] estimating a second radio channel from said access point to said second mobile station over said pilot interval.**

83.    The last two limitations of claim 1 are the "estimating" limitations.  The eighth limitation is "estimating a first radio channel from said access point to said first mobile station over a pilot interval."  The ninth and last limitation is "estimating a second radio channel from said access point to said second mobile station over said pilot interval."

84.    The '096 Patent discloses that "[t]he SDMA module 170 may estimate the first radio channel 140(1) from the access point 105*a* to the first mobile station 145(1) over a pilot interval and estimate the second radio channel 140(k) from the access point 105*a* to the second mobile station 145(k) over the pilot interval.  A pilot interval may be a predetermined time period for transmission of a signal, either at a single frequency or several independent frequencies, for supervisory purposes including control, equalization, continuity, synchronization, or reference.  For example, the access point 105*a* may transmit one or more pilot frequencies associated with a carrier frequency over the pilot interval."  (EX1001, 7:41-53.)

85.    Perahia also discloses channel estimation.  Perahia describes channel estimation with respect to Figure 7 shown below.    "FIG. 7 depicts

43

preambles 702 and 704 as may be simultaneously transmitted either by two simultaneously transmitting subscriber units or by a single access point." (EX1004, 8:61-64.) "The long symbols are specified by the 802.11a standard and are used for channel estimation." (*Id.*, 9:4-5, *see also* 9:29-30 (referring to Fig. 8).)



**Fig. 7**

86.   Perahia explains that "[t]he long symbols are used for channel estimation by the receiver in the manner described in U.S. patent application Ser. No. 10/335,500; filed Dec. 31, 2002, entitled HIGH DATA RATE WIRELESS BRIDGING." (*Id.*, 9:14-18.) Perahia incorporates this application by reference, and it ultimately issued as US Patent No. 7,352,688 (EX1008, the '688 Patent). (*Id.*, 1:13-17.) The '688 Patent describes modifying "a channel training preamble provided by the IEEE 802.11a standard" to perform channel estimation. (EX1008, 2:11-14.) The preambles shown in Perahia's Figure 7 shown above are also depicted in Figure 5 of the '688 Patent. The '688 Patent teaches:

> … The transmitter antenna elements do not send identical preambles but rather the preamble structure is differentiated between them to facilitate estimation of the MIMO channel. In FIG. 5, the top preamble

44

is for a transmitter antenna element referred to as antenna element 1 while the bottom preamble refers to an antenna element 2. The two preambles are transmitted simultaneously … During a first portion of the channel training period, one antenna element transmits a guard interval 504 followed by two long symbols 506 while the other antenna element is quiet during this period. Then the first antenna element goes into a quiet period while the second antenna element, following a guard interval 508, also transmits two long symbols 510.

(*Id*., 6:26-45.)

87.     Perahia also discloses channel estimation over a pilot interval.  As Perahia describes "In 802.11a, some of the [complex subcarrier] values are always zero and others carry pilot tones used for phase synchronization."  (EX1004, 4:37-39.)  A POSITA would understand that pilot tones are transmitted over a pilot interval.

88.     Thus, it is my opinion that Perahia discloses all of the limitations of claim 1 of the '096 Patent.

## IX.     Ground 2:  Li Anticipates Claims 1-3

89.     As described in the following paragraphs, Li discloses all of the limitations found in claims 1-3 of the '096 Patent.

### A.     Claim 1:

*[1P] A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:*

90.     Like the '096 Patent, Li discloses "[a] method for communicating data over a network between an access point having a first and a second antenna and a

45

first and a second mobile station."  For example, Li describes "[a]n access point in a wireless network [that] communicates with multiple mobile stations simultaneously using spatial-division multiple access."  (EX1005, Abstract.)  The "[a]ccess point 102 includes antennas 104."  (*Id.*, 2:17, *see also* Figure 1 depicting two antennas.)

> *[1a] weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and*
> *[1b] weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;*

91.     Like the '096 Patent, Li discloses weighting first and second data to transmit the data using the antennas to the first and second mobile stations, respectively.  Li's "access point 102 may use zero-forcing beamformers for both downlink and uplink of signals to achieve SDMA.  The zero-forcing beamformer is a known technique for SDMA interference cancellation using known channel state information."  (*Id.*, 2:48-52.)  A POSITA understands that beamforming is a type of data weighting.  Each mobile station receives only its data as "[t]he AP sets the network-allocation-vector (NAV) of all STAs in the vicinity to prevent unintended STAs from interfering with the beamformed signals."  (*Id.*, 4:54-56.)  The term "AP" as Li uses here means access point.  The term "STA" as Li uses here means mobile station.

46

> **[1c] *increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;***

92.     Like the '096 Patent, Li discloses "increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol."  As previously described, this limitation is met by using SDMA with most versions of the IEEE 802.11 standard.  As disclosed in Li, "[s]patial-division multiple access increases both user density and network throughput of wireless systems by utilizing spatial channels in the environment." (*Id.*, 2:42-44.)  Additionally, Li's "access point that can communicate in parallel with multiple 802.11 compliant mobile stations" and may include "a physical layer that complies with an IEEE 802.11 standard." (*Id.*, 5:6-8, 5:38-44.)

> **[1d] *discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;***

93.     Like the '096 Patent, Li discloses "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension."  As previously described, this limitation is met by using SDMA.  Li uses SDMA.  For example, "access point 102 utilizes SDMA on the downlink to transmit to two or more of mobile stations 110, 120, or 130 simultaneously." (*Id.*, 2:24-26.)

47

> ***[1e] applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;***

94.     Like the '096 Patent, Li discloses "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively." As previously described, this limitation is met by applying SDMA and Li applies SDMA.

> ***[1f] defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;***

95.     Like the '096 Patent, Li discloses "defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network." Li discloses that "one or more of mobile stations 110, 120, and 130, or access point 102 may operate in compliance with a wireless network standard such as ANSI/IEEE Std. 802.11." (*Id.*, 1:55-59.)

> ***[1g] coupling said access point to said first and second mobile stations through said wireless local area network;***

96.     Like the '096 Patent, Li discloses "coupling said access point to said first and second mobile stations through said wireless local area network." This can

48

be seen in Li's Figure 1, which "shows a diagram of a wireless network.  Wireless network 100 includes access point (AP) 102 and mobile stations (STA) 110, 120, and 130.   In some embodiments, wireless network 100 is a wireless local area network (WLAN)."  (*Id.*, 1:51-54, Figure 1.)

> **[1h] estimating a first radio channel from said access point to said first mobile station over a pilot interval; and**
> **[1i] estimating a second radio channel from said access point to said second mobile station over said pilot interval.**

97.    Like the '096 Patent, Li discloses the "estimating" limitations.   In particular, Li discloses "[v]arious embodiments of gathering state information, also referred to as 'estimating spatial channels,'" which are "described … with reference to FIGS. 2 and 3.  FIGS. 2 and 3 show frame sequences to estimate channel state information of communications channels."   (*Id.*, 2:54-58.)   As the '096 Patent defines and POSITA understands, estimating spatial channels occurs over a pilot interval, i.e., the time period where a signal is transmitted "for supervisory purposes including control, equalization, continuity, synchronization, or reference." (EX1001, 7:46-50.)

98.    Thus, it is my opinion that Li discloses all of the limitations of claim 1 of the '096 Patent.

49

### B.    Claim 2:

*2. A method, as set forth in claim 1, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink.*

99.     Claim 2 depends from claim 1 and provides the further limitation of "initializing said transmission protocol before starting said transmissions of said first and second data over said downlink."  Accordingly, I incorporate my discussion of claim 1.   This dependent claim is directed to a routine process in wireless communications.  The '096 Patent describe initializing the transmission protocol with reference to Figure 6.  (EX1001, 8:64-67.)  The '096 Patent provides an initialization procedure that includes the following five steps.

(i). The access point 105$a$ may transmit an MPDU to the first mobile station 145a(1) using equal weights at each antenna of the first and second antennas 110a(1-m).

(ii). Upon successful reception of the MPDU, the first mobile station 145a(1) may respond with an ACK frame burst. The access point 105$a$ may use a pilot segment of the received ACK frame to compute a fresh estimate of the first radio channel 140(1).

(iii). The access point 105$a$ may transmit an MPDU to the second mobile station 145a(k) using equal weights at each antenna of the first and second antennas 110a(1-m).

(iv). Upon successful reception of the MPDU, the second mobile station 145a(k) may respond with an ACK frame burst. The access point 105$a$ may use the pilot segment of the received ACK frame to compute a fresh estimate the second radio channel 140(k).

(v). Channel estimates of the first and second radio channels 140(1-k) may then be used for SDMA transmissions, by the access point 105$a$,

50

of the two independent MPDUs to the first and second mobile stations 145a(1-k), respectively.

(*Id.*, 9:5-25.)  MPDU is a "MAC protocol data unit."  (*Id.*, 2:21-27.)  "[T]he IEEE 802.11 specifications state that upon a successful reception of a data burst (i.e., an MPDU), the receiver should send an acknowledgment frame (ACK) to the transmitter as confirmation."  (*Id.*, 2:29-33.)

100.   Like the '096 Patent, Li discloses this initialization process with respect to Figure 2.  Li describes that "an AP sends IEEE 802.11 Null-data frames in turn to STAs and estimates the STAs' channels from the received acknowledgement (ACK) frames.  For example, as shown in FIG. 2, the AP sends a Null-data frame 210 to STA1, which returns ACK frame 212; the AP sends Null-data frame 220 to STA2, which returns ACK frame 222; and the AP sends Null-data frame 230 to STA3, which returns ACK frame 232."  (EX1005, 2:62-3:3.)  The IEEE 802.11 Null data frames are one type of MPDU.  Li performs this initialization process "before SDMA transmission and reception."  (*Id.*,  2:58-61.)

101.   As Li discloses the same initialization procedure as the '096 Patent, it is my opinion that Li discloses the limitation of claim 2.

51

C.     **Claim 3:**

**3. A method, as set forth in claim 2, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station.**

102.    Claim 3 depends from claim 2 and includes the additional limitation of "wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station." Accordingly, I incorporate my discussion of claim 2.  As previously described with claim 2, both the '096 Patent and Li disclose exchanging protocol data units and acknowledgement frames between the access point and the mobile stations.  This is part of the IEEE 802.11 standard.

103.    Thus, it is my opinion that Li discloses all of the limitations of claim 3 of the '096 Patent.

## X.   Ground 3:  Li and Perahia Renders Obvious Claim 10

### A.   Claim 10:

**10. A method, as set forth in claim 3, further comprising: using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.**

104.   Claim 10 depends from claim 3 and includes the further limitations of "using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point" and "reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point."   Accordingly, I incorporate my discussion of claim 3.   Time division multiple access (TDMA) is a channel access method that uses the time dimension to allow multiple stations to share and use the same transmission channel.   TDMA divides signals into different time slots and users transmit in rapid succession, with each one using its own time slot.   Thus, multiple mobile stations can share the same frequency channel but only use part of its capacity.

105.   Like SDMA, the inventors did not invent TDMA, which also predates the '096 Patent by many years.   For example, TDMA is used in the Global System

of Mobile Communications ("GSM"), which the '096 Patent cites as an example wireless mobile communication system.  (EX1001, 2:4-8.)

106.   The '096 Patent discloses this limitation with respect to Figure 10. "FIG. 10 illustrates a stylized representation of a timing chart for channel reservation for the SDMA transmissions shown in FIG. 5 that uses time division multiple access (TDMA) to partition a radio resource across SDMA and non-SDMA modes of the communication node (e.g., an access point) operation."  (*Id.*, 12:11-17.)  "The non-SDMA mode may represent a conventional IEEE 802.11 mode that services uplink (UL)/downlink (DL) real-time traffic."  (*Id.*, 12:17-19.)  Figure 10 is shown below.



**FIGURE 10**

107.   In addition, "[w]hen the access point 105*a* contends for the SDMA mode, the access point 105*a* reserves a channel for the SDMA mode."  (*Id.*, 12:19-21.)  The '096 Patent explains that "[a] reservation interval may depend upon the mix of traffic, for example, 5-10 ms may allow efficient SDMA transmissions on the SDMA downlink 120*a*.  Upon completion of the SDMA mode, the access

54

point 105*a* may release the channel and revert back to conventional IEEE 802.11 non-SDMA mode, servicing remaining uplink (UL)/downlink (DL) real-time traffic." (*Id.*, 12:24-30.)

108.   Perahia also discloses partitioning between space division multiple access and a non-space division multiple access modes with respect to Figure 9 shown below.   Like the '096 Patent, Perahia describes "switching between the SDMA mode and the non-SDMA mode." (EX1004, 3:15-19.)  Like the '096 Patent, the non-SDMA mode, depicted in Figure 9 as the "Standard" mode, represents the conventional IEEE 802.11 mode.  (*Id.*, 7:57-61.)



**Fig. 9**

109.   Like the '096 Patent, Perahia uses the contention process to reserve a channel for communicating in SDMA mode.

Access point 102 maintains lists of subscriber units operating in SDMA

55

mode and subscriber units operating in SISO mode (including non-SDMA-capable subscriber units.) The [contention free period] CFP is divided into two subperiods. A time T2 separates the subperiods. In a first subperiod, access point 102 communicates with the subscriber units that are operating in SDMA mode. In a second subperiod, access point 102 communicates with the subscriber units that are operating in SISO mode. Subscriber units 104 communicate data in response to a polling request from access point 102 as defined by the IEEE 802.11 standard and/or they receive downstream data from access point 102.

(*Id.*, 8:11-22.) A POSITA would understand that TDMA (Time Division Multiple Access) partitions a channel into time slots that are assigned to multiple users.

## B.    Motivation to Combine Li and Perahia

110.   It would be obvious for a POSITA to combine Li and Perahia as they both integrate SDMA into an IEEE 802.11 compliant WLAN and anticipate claim 1 as I described above with reference to Grounds 1 and 2. Li explicitly discloses initialization process as claimed in dependent claims 2-3 as I described with reference to Ground 2 above. While Perahia does not disclose an initialization process, Perahia's system would also implement the claimed initialization process as it is part of the IEEE 802.11 standard.

111.   Moreover, a POSITA would understand that Li's system would have to continue to work with mobile stations that could not communicate via SDMA. As Li describes "[a]n access point may communicate with many different mobile stations, but typically communicates with only one mobile station at a time." (EX1005, 1:12-14.) A POSITA understands that not all of the mobile stations will

56

be able to support SDMA operations.  (*See, e.g.,* EX1004, 4:50-52 ("Some of subscriber units 104 are capable of employing MIMO processing techniques to participate in SDMA operations whereas others are not.").)  Thus, a POSITA would be motivated to switch between an SDMA mode and a non-SDMA mode as taught by Perahia so that Li's wireless communication system would continue to support all mobile devices.

112.  A POSITA would be motivated to combine the teachings of Li and Perahia because the implementation details of the software updates for the combination would be minimal and would provide a reasonable expectation of success.

113.  In summary, it is my opinion that Li discloses all the limitations of claims 1-3, Perahia discloses all of the limitations of claims 1 and 10, and a POSITA would be motivated to combine these two references because they are in the same field of art, are solving the same problem of how to incorporate SDMA into an IEEE 802.11 WLAN, and a POSITA would understand the need to maintain network operations for mobile stations that were not compatible with SDMA.

## XI.   Ground 4:  Wax Anticipates Claims 1-3

114.  As described in the following paragraphs, Wax discloses all of the limitations found in claims 1-3 of the '096 Patent.

### A.   Claim 1:

*[1P] A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:*

115.   Like the '096 Patent, Wax discloses "[a] method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station."  Wax discloses "methods and devices for enhancing the capacity of a WLAN by spatial division multiplexing (SDM)." (EX1006, 1:54-56.)  A POSITA understands that SDM is another term for SDMA. Wax's "technique permits an access point to transmit respective downlink signals simultaneously to multiple stations in a spatial multiplexing group (SMG), and to receive uplink signals simultaneously from the stations in the group.  For this purpose, the access point comprises multiple antennas and a SDM beamforming circuit, which generates a specific beam pattern for each of the stations so as to maximize the signal power while suppressing interference from other signals." (*Id.*, 1:56-64.)

*[1a] weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and*
*[1b] weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;*

116.   Like the '096 Patent, Wax discloses weighting first and second data to transmit the data using the antennas to the first and second mobile stations,

58

respectively.   As Wax describes, "transmitting the downlink signals includes calculating respective beamforming weights for the stations." (*Id.*, 2:41-45.)  In one example, "calculating the beamforming weights includes orthogonalizing the spatial signatures of two or more of the stations." (*Id.*, 5:32-34.)  Wax discloses a method for calculating the weights with respect to Figure 11. (*Id.*, 11:43-45.)  Wax provides details regarding its weighting method in columns 31-34.  (*Id.*, 31:38-34:50.)

> ***[1c] increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;***

117.   Like the '096 Patent, Wax discloses "increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol."   As Wax explains "[i]n 802.11 WLANs, a fixed access point communicates on a predefined frequency channel with wireless mobile stations (also referred to simply as 'stations') in its vicinity." (*Id.*, 1:38-40.)  Thus, a POSITA understands that IEEE 802.11 communications use a single carrier frequency.

118.   Wax also describes increasing the data rates.  Wax describes that the "access point 28 may be configured to transmit and receive packets to and from different stations in any given SMG at different rates, and to adjust these rates so as to optimize performance of the entire group.  Typically, the rate chosen for each station is the highest possible rate among all supported rates (i.e., supported by both

59

the access point and the station) that can still provide reliable data transfer." (*Id.*, 37:31-37.) Wax's Example 3 describes increasing the rate. (*Id.*, 40:50-41:16 ("Thus, the rate of the next second order SDM transmission to that station will be increased to 11 Mbps.").)

### *[1d] discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;*

119.   Like the '096 Patent, Wax discloses "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension."   In addition to this limitation being met by using SDMA, Wax describes reducing interference between the two transmissions, which also meets the discriminating transmissions limitation.   In particular, Wax describes "optimizing the transmit beamforming weights jointly for all of the two or more of the stations so as to reduce an interference between the downlink signals received by each of the two or more of the stations." (*Id.*, 5:64-6:4.)

### *[1e] applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;*

120.   Like the '096 Patent, Wax discloses "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively."   As previously described, this limitation

60

is met by applying SDMA and Wax applies SDMA.  For example, Wax discloses "a method for communication over a wireless local area network (WLAN)" that includes "communicating with two or more of the stations simultaneously by spatial division multiplexing (SDM) using the beamforming weights." (*Id.*, 4:41-52.)

> ***[1f] defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;***

121.   Like the '096 Patent, Wax discloses "defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network."  As described for [1e], Wax establishes a WLAN.  Wax's WLAN includes "access points and mobile stations [that] communicate with one another in accordance with one of the standards in the IEEE 802.11 family and observe the applicable 802.11 physical (PHY) layer and medium access control (MAC) layer conventions." (*Id.*, 12:16-21, 26:37-40.)

> ***[1g] coupling said access point to said first and second mobile stations through said wireless local area network;***

122.   Like the '096 Patent, Wax discloses "coupling said access point to said first and second mobile stations through said wireless local area network."  Wax depicts this coupling in Figure 1, which depicts three mobile stations.  "FIG. 1 is a block diagram that schematically illustrates a wireless LAN (WLAN) 20, in

61

accordance with an embodiment of the present invention.  System 20 comprises an access point 28, which communicates with stations 22, 24, 26, on a given frequency channel.  The mobile stations typically comprise computing devices, such as desktop, portable or handheld devices." (*Id.*, 11:61-67.)

> **[1h] estimating a first radio channel from said access point to said first mobile station over a pilot interval; and**
> **[1i] estimating a second radio channel from said access point to said second mobile station over said pilot interval.**

123.    Like the '096 Patent, Wax discloses the "estimating" limitations.  Wax explains that before weighting the data, it obtains the "spatial signature" of each mobile station. (*See, e.g.*, EX1006, 2:38-45.)  A POSITA would understand that this is another term for estimating a radio channel.  With respect to Figure 11, Wax describes that the "access point 28 prompts each of the stations in the SMG to transmit individually, in sequence, at a transmission prompting step 150." (*Id.*, 29:9-11.)  The "access point 28 uses standard messaging provided by the 802.11 standard in order to prompt the desired station to transmit an uplink signal.  For example, the access point may send the station a packet containing null data, which will cause the station to return an acknowledgment (ACK) packet." (*Id.*, 29:15-20.)  "In response to the prompt at step 150, access point receives the expected uplink signal from the given station, ... typically [ ] an ACK or CTS message." (*Id.*, 29:41-44.)  A POSITA understands that this communication occurs over the pilot interval and is the same communication procedure described in the '096 Patent. (EX1001, 7:41-8:6.)

62

124.   Wax "uses the known preamble of the uplink message to estimate a spatial signature for the station, at a signature calculation step 154."   (EX1006, 29:44-47.)   Wax provides several methods for calculating the spatial signature, which may be expressed as a column vector.   (*Id*., 29:47-51.)   While the '096 Patent does not provide a detailed description regarding how to calculate channel estimates, Wax provides details regarding how to calculate channel estimates in column 29, line 51 to column 30, line 65.

125.   Thus, it is my opinion that Wax discloses all of the limitations of claim 1 of the '096 Patent.

**B.     Claim 2:**

> ***2. A method, as set forth in claim 1, further comprising: initializing said transmission protocol before starting said transmissions of said first and second data over said downlink.***

126.   Claim 2 depends from claim 1.   Accordingly, I incorporate my discussion of claim 1.   Like the '096 Patent, Wax discloses "initializing said transmission protocol before starting said transmissions of said first and second data over said downlink."   As I mentioned in Ground 2, initializing a transmission protocol is a routine process.   Wax discusses initialization with respect to Figure 9. Wax's access point initially defines a spatial multiplexing group (SMG) "based on the characteristics of the uplink signals received from the stations in the WLAN." (*Id*., 26:48-52.)   Then, "the access point transmits a special downlink message that

63

causes all stations receiving the message to refrain from uplink transmissions for a predetermined period." (*Id.*, 27:5-8.)  The access point "now performs a negotiation process with the stations in the selected SMG, in order to determine SDM weights for the members of the group, at a weight negotiation step 134." (*Id.*, 27:23-26.) Once the access point has determined the weights as described above with respect to limitations [1a] and [1b], it can begin communicating with the mobile stations. (*Id.*, 27:32-35.)

127.   Thus, it is my opinion that Wax discloses all of the limitations of claim 2 of the '096 Patent.

**C.**    **Claim 3:**

> *3. A method, as set forth in claim 2, wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station.*

128.   Claim 3 depends from claim 2.   Accordingly, I incorporate my discussion of claim 2.  Like the '096 Patent, Wax discloses "wherein initializing said transmission protocol further comprising: exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station."   Wax describes that in one embodiment of determining the weights, "the access point may send the station a packet   containing   null   data,   which   will   cause   the   station   to   return   an

64

acknowledgment (ACK) packet." (*Id.*, 29:17-20.)  A POSITA would recognize that the null data packet is a protocol data unit as defined in IEEE 802.11 standard.

129.  Thus, it is my opinion that Wax discloses all of the limitations of claim 3 of the '096 Patent.

## XII.  Ground 5:  Wax and Perahia Renders Obvious Claim 10

### A.  Claim 10:

> ***10. A method, as set forth in claim 3, further comprising: using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.***

130.  Claim 10 depends from claim 3.  Accordingly, I incorporate my discussion of claim 3.  As described with respect to Ground 3, Perahia discloses "using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point."

### B.  Motivation to Combine Wax and Perahia

131.  It would be obvious for a POSITA to combine Wax and Perahia as they both as they both integrate SDMA into IEEE 802.11 compliant wireless

communication networks and anticipate claim 1 as I described above with reference to Grounds 1 and 4.  Wax explicitly discloses initialization process as claimed in dependent claims 2-3 as I described with reference to Ground 4 above.  While Perahia does not disclose an initialization process, Perahia's system would also implement the claimed initialization process as it is part of the IEEE 802.11 standard.

132.    Moreover, a POSITA would understand that Wax's system would have to continue to work with mobile stations that could not communicate via SDMA. As Wax describes "[g]enerally, with the exception of certain broadcast messages, the access point can transmit downlink signals only to one station at a time." (EX1006, 1:42-44.)  A POSITA understands that not all of the mobile stations will be able to support SDMA operations.  (*See, e.g.,* EX1004, 4:50-52 ("Some of subscriber units 104 are capable of employing MIMO processing techniques to participate in SDMA operations whereas others are not.).)  Thus, a POSITA would be motivated to switch between an SDMA mode and a non-SDMA mode as taught by Perahia so that Wax's wireless communication system would continue to support all mobile devices.

133.    A POSITA would be motivated to combine the teachings of Wax and Perahia because the implementation details of the software updates for the combination would be minimal and would provide a reasonable expectation of success.

134.   In summary, it is my opinion that Wax discloses all the limitations of claims 1-3, Perahia discloses all of the limitations of claims 1 and 10, and a POSITA would be motivated to combine these two references because they are in the same field of art, are solving the same problem of how to incorporate SDMA into an IEEE 802.11 WLAN, and a POSITA would understand the need to maintain network operations for mobile stations that were not compatible with SDMA.

## XIII.  Additional Remarks

135.   I currently hold the opinions expressed in this declaration.  But my analysis may continue, and I may acquire additional information and/or attain supplemental insights that may result in added observations.

136.   I have reviewed the accompanying Petition for *Inter Partes* Review of the '096 Patent and, given the information set forth in this declaration, I agree with the reasoning and conclusions of the grounds of challenge in the petition.  Based on my own analysis, I agree that: (1) Perahia discloses all of the limitations of and renders unpatentable claim 1; (2) Li discloses all of the limitations and renders unpatentable claims 1-3; (3) Li and Perahia disclose all the limitations and render unpatentable claim 10; (4) Wax discloses all of the limitations and renders unpatentable claims 1-3; and (5) Wax and Perahia disclose all the limitations and render unpatentable claim 10.

*      *      *

67

I hereby declare that all statements made are of my own knowledge are true and that all statements made on information and belief are believed to be true.  I further declare that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this proceeding.

Dated: 2/08/2022         By: _____

Dr. Robert Akl, D.Sc.
Dallas, Texas

68

# APPENDIX A

# Robert Akl, D.Sc.



## Professional Summary

Dr. Akl has over 27 years of industry and academic experience. He is currently a Tenured Associate Professor at the University of North Texas and a Senior Member of IEEE. He has designed, implemented, and optimized both hardware and software aspects of several wireless communication systems for CDMA, Wi-Fi, and sensor networks. Dr. Akl has broad expertise in wireless communication, Bluetooth, CDMA/WCDMA network optimization, GSM, LTE, VoIP, telephony, computer architecture, and computer networks. He is a very active researcher and is well published and cited. He has been awarded many research grants by leading companies in the industry and the National Science Foundation. He has developed and taught over 100 courses in his field. Dr. Akl has received several awards and commendations for his work, including the 2008 IEEE Professionalism Award and was the winner of the 2010 Tech Titan of the Future Award.

Dr. Akl has extensive experience with patents in the wireless and networking industry. In the past ten years, he has worked as a technical expert in dozens of patent related matters, involving thousands of hours of research, investigation, and study. He has repeatedly been qualified as an expert by Courts, and has provided numerous technology tutorials to Courts, and given testimony by deposition and at trial. He has worked with companies large and small, both for and against the validity and infringement of patents, and has also helped counsel and Courts understand technology that often seems complex. In doing so, he has become familiar with, and actively worked with, the legal principles that underlie patentability and validity and claim interpretation in the wireless and networking industries.

## Areas of Expertise

2G, 3G, 4G, 5G, CDMA/WCDMA, GPS, GSM, UMTS, LTE, Ad-hoc Networks, Antenna Design, Bluetooth, Call Admission Control, Channel Coding, Communication Interfaces and Standards, Compression, Computer Architecture, MIMO Systems, Multi-cell Network Optimization, Network Security, Packet-networks, Telephony, VoIP, Wi-Fi, Wireless Communication, Wireless Sensors.

## Education

| Year | College/University | Degree | GPA |
|------|--------------------|--------|-----|
| 2000 | Washington University in Saint Louis | D.Sc. in Electrical Engineering | **4.0 / 4.0** |
| 1996 | Washington University in Saint Louis | M.Sc. in Electrical Engineering | **4.0 / 4.0** |
| 1994 | Washington University in Saint Louis | B.Sc. in Electrical Engineering | **4.0 / 4.0** |
| 1994 | Washington University in Saint Louis | B.Sc. in Computer Science | **4.0 / 4.0** |

Graduated *summa cum laude* and ranked first in undergraduate class.

Dissertation: "Cell Design to Maximize Capacity in Cellular Code Division Multiple Access (CDMA) Networks." Advisors: Dr. Manju Hegde and Dr. Paul Min.

## Litigation Support and Expert Witness Experience

| | | |
|---|---|---|
| L1. | 2022 | **Jenner & Block LLP** |
| | Case: | <u>Netgear, Inc.</u> v. WSOU Investments, LLC<br>IPR2022-00516; IPR2022-*To be assigned* |
| | Matter: | *Inter Partes* Review, telecommunication systems |
| | Project: | Two declarations to support 2 IPR petitions |

| | | |
|---|---|---|
| L2. | 2022 | **Calfee, Halter & Griswold LLP** |
| | Case: | <u>BoxCast  Inc.</u> v. Resi Media LLC<br>Eastern district of Texas, Marshall division, Case No. 2:21-cv-00217-JRG |
| | Matter: | Patent infringement, autonomous broadcasting |
| | Project: | Source code review, declaration regarding claim construction, declaration regarding validity, declaration regarding infringement, deposition |

| | | |
|---|---|---|
| L3. | 2021 | **Fish & Richardson, P.C.** |
| | Case: | <u>Apple Inc.</u> v. Ericsson Inc.<br>IPR2022-00341; IPR2022-00346;<br>IPR2022-*To be assigned*; IPR2022-*To be assigned* |
| | Matter: | *Inter Partes* Review, wireless communication systems |
| | Project: | Four declarations to support 4 IPR petitions |

| | | |
|---|---|---|
| L4. | 2022 | **Ropes & Gray LLP** |
| | Case: | <u>Godo Kaisha IP Bridge 1</u> v. Nokia Corporation, Ericsson Inc. et al.<br>Eastern district of Texas, Marshall division, Case No. 2:21-CV-213-JRG; Case No. 2:21-CV-215-JRG |
| | Matter: | Patent infringement, wireless communication systems |
| | Project: | Declaration to support claim construction |

| | | |
|---|---|---|
| L5. | 2022 | **Fish & Richardson, P.C.** |
| | Case: | <u>Apple Inc.</u> v. XR Communication Inc<br>IPR2022-00367 |
| | Matter: | *Inter Partes* Review, adaptive antennas |
| | Project: | Declaration to support IPR petition |

| | | |
|---|---|---|
| L6. | 2021 | **Fitch, Even, Tabin & Flannery** |
| | Case: | <u>L2 Mobile Technologies LLC</u> v. Google LLC, Ford Motor Company<br>Western district of Texas, Waco division, Case No. 6:21-cv-00358-ADA |
| | Matter: | Patent infringement, wireless communication systems |
| | Project: | Claim construction consulting |

| L7. | 2021 | **Morgan Lewis** |
| | Case: | Intellectual Tech LLC v. <u>Zebra Technologies Corporation</u> |
| | | Western district of Texas, Waco division, Case No. 6:19-cv-00628-ADA |
| | Matter: | Patent infringement, RFID tags |
| | Project: | Source code review, claim construction consulting |

| L8. | 2021 | **Carter Arnett** |
| | Case: | <u>Correct Transmission LLC</u> v. Adtran, Inc. |
| | | Northern district of Alabama, Northeastern division, Case No. 5:21-cv-00690-LCB |
| | Matter: | Patent infringement, telecommunication systems |
| | Project: | Declaration to support claim construction |

| L9. | 2021 | **Carter Arnett** |
| | Case: | Juniper Networks, Inc. v. <u>Correct Transmission, LLC</u> |
| | | IPR2021-00463; IPR2021-00682 |
| | Matter: | *Inter Partes* Review, network communication systems |
| | Project: | Two declarations to support 2 Patent Owner's responses, deposition |

| L10. | 2018 | **King & Wood Mallesons LLP** |
| | Case: | <u>ToT Power Control, S.L.</u> v. AT&T Mobility et al.; <u>ToT Power Control, S.L.</u> v. T-Mobile USA, Inc. et al. |
| | | Western district of Texas, Waco division, Case No. 6:21-CV-00107-ADA; 6:21-CV-00109-ADA |
| | Matter: | Patent infringement, WCDMA cellular systems |
| | Project: | Declaration regarding claim construction |

| L11. | 2021 | **Finnegan Henderson Farabow Garrett & Dunner LLP** |
| | Case: | <u>Xiaomi Communications Co., Ltd.</u> v. Koninklijke KPN N.V. |
| | | IPR2022-00025 |
| | Matter: | *Inter Partes* Review, network communication systems |
| | Project: | Declaration to support IPR petition |

| L12. | 2021 | **Carter Arnett** |
| | Case: | Juniper Networks, Inc. v. <u>Smart Path Connections, LLC</u> |
| | | IPR2021-001170 |
| | Matter: | *Inter Partes* Review, network communication systems |
| | Project: | Declaration to support Patent Owner's preliminary response |

| L13. | 2021 | **Devlin Law Firm** |
| | Case: | <u>Dyfan LLC</u> v. Target Corporation |
| | | District of Delaware, Case No. 6:19-cv-00179-ADA |
| | Matter: | Patent infringement, network communications |
| | Project: | Declaration to support summary judgement, deposition |

L14.    2021    **Alston & Bird LLP**
        Case:    Stingray IP Solutions v. <u>Signify N.V., et al.</u>
                 Eastern district of Texas, Marshall division, Case No. 2:21-cv-00043-JRG; Case No. 2:21-cv-00044-JRG
        Matter:  Patent infringement, mobile ad-hoc networks
        Project: Declaration to support claim construction

L15.    2021    **Cole Schotz P.C.**
        Case:    <u>SkyBell Technologies, Inc.</u> v. Vivint Smart Home, Inc., SimpliSafe, Inc., and Arlo Technologies Inc
                 In the Matter of Certain IP Camera Systems Including Video Doorbells and Components Thereof, ITC Investigation No. 337-TA-1242
        Matter:  Patent infringement, wireless telecommunication systems
        Project: Source code review, expert report infringement and domestic industry, rebuttal expert report, three-day deposition

L16.    2021    **Axinn, Veltrop & Harkrider LLP**
        Case:    Koninklijke Philips N.V. v. <u>Thales DIS AIS USA, LLC et al.</u>
                 In the Matter of Certain UMTS and LTE Cellular Communication Modules and Products Containing the Same, ITC Investigation No. 337-TA-1240
        Matter:  Patent infringement, wireless communication systems
        Project: Expert report regarding non-infringement and no domestic industry, deposition, ITC hearing testimony

L17.    2021    **Morgan, Lewis & Bockius LLP**
        Case:    SIPCO, LLC v. <u>Aruba Networks, LLC and Hewlett Packard Enterprise Company</u>
                 District of Delaware, Case No. 1:20-cv-00537-MN
        Matter:  Patent infringement, wireless communication systems
        Project: Declaration regarding claim construction

L18.    2021    **Ropes & Gray LLP**
        Case:    <u>Palo Alto Networks Inc.</u> v. Centripetal Networks, Inc.
                 IPR2021-01150, IPR2021-01151, IPR2021-01155, IPR2021-01156, IPR2021-01270, PGR2021-00108, IPR2021-01520, IPR2021-01521
        Matter:  *Inter Partes* Review, network security systems
        Project: Seven declarations to support 7 IPR petitions, declaration to support post grant review

L19.   2021   **Devlin Law Firm**
       Case:   <u>CDN Innovations, LLC</u> v. Grande Communications Networks, LLC
               Eastern district of Texas, Sherman division, Case No. 4:20-cv-653-SDJ
       Matter:  Patent infringement, telecommunication systems
       Project:  Declaration to support infringement contentions

L20.   2021   **Banner Witcoff**
       Case:   Sisvel International S.A., 3G Licensing S.A. v. <u>ZTE (USA) Inc.</u> et al.
               Northern district of Texas, Case No. 3:20-cv-01289-M
       Matter:  Patent infringement, wireless communication systems
       Project:  Declaration to support claim construction, deposition

L21.   2021   **Paul Hastings LLP**
       Case:   G. Holdings Ltd. v. <u>Samsung Electronics Co., et al.</u>
               Eastern district of Texas, Marshall division, Case No. 2:20-cv-00342-JRG
       Matter:  Patent infringement, electronic payment systems
       Project:  Declaration to support claim construction

L22.   2021   **Morgan, Lewis & Bockius LLP**
       Case:   <u>Aruba Networks, LLC and Hewlett Packard Enterprise Company</u> v. SIPCO, LLC
               IPR2021-00787
       Matter:  *Inter Partes* Review, wireless communication systems
       Project:  Declaration to support IPR petition

L23.   2021   **Jenner & Block LLP**
       Case:   Virentem Ventures LLC D/B/A Enounce v. <u>TiVo Corp and Xperi Holding Corporation</u>
               District of Delaware, Case No. 20-787-MN
       Matter:  Patent infringement, telecommunication systems
       Project:  Declaration to support claim construction

L24.   2021   **Carter Arnett**
       Case:   <u>Correct Transmission LLC</u> v. Adtran, Inc. and Juniper Networks, Inc.
               Western district of Texas, Waco division, Case No. 6:20-cv-669-ADA
       Matter:  Patent infringement, telecommunication systems
       Project:  Source code review, declaration to support claim construction

L25.   2021   **Fish & Richardson, P.C.**
       Case:   <u>Quectel Wireless Solutions Co. Ltd.</u> v. Koninklijke Philips N.V.
               IPR2021-00558, IPR2021-00559, IPR2021-00561
       Matter:  *Inter Partes* Review, wireless communication systems
       Project:  Three declarations to support 3 IPR petitions

L26.  2021     **Goldberg Kohn Ltd**
       Case:   United States ex. rel. <u>Todd Heath</u> v. Wisconsin Bell, Inc
               District of Columbia, Case No. 11-cv-01897
       Matter:  Networking systems
       Project:  Technology consulting

L27.  2021     **Fish & Richardson, P.C.**
       Case:   <u>Samsung Electronics Co. Ltd.</u> v. Ericsson Inc.
               IPR2021-00447, IPR2021-00588, IPR2021-00613, IPR2021-00614,
               IPR2021-00643, IPR2021-00645, IPR2021-00684
       Matter:  *Inter Partes* Review, wireless communication systems
       Project:  Seven declarations to support 7 IPR petitions

L28.  2020     **Kilpatrick Townsend & Stockton LLP**
       Case:   <u>GREE Inc.</u> v. Supercell Oy
               Eastern district of Texas, Marshall division, Case No. 2:19-cv-00413-
               JRG-RSP
       Matter:  Patent infringement, mobile gaming
       Project:  Source code review, infringement expert report, supplemental expert
               report, validity expert report, deposition

L29.  2020     **Banner Witcoff**
       Case:   Sisvel International S.A., 3G Licensing S.A. v. <u>ZTE (USA) Inc.</u> et al.
               Northern district of Texas, Case No. 3:19-cv-01694-N
       Matter:  Patent infringement, wireless communication systems
       Project:  Declaration to support claim construction, deposition

L30.  2020     **Fish & Richardson, P.C.**
       Case:   Cellco Partnership D/B/A Verizon Wireless v. <u>Huawei Technologies
               Co., Ltd</u>
               IPR2020-01352, IPR202-01356, IPR2020-01357
       Matter:  *Inter Partes* Review, network communication systems
       Project:  Three declarations to support 3 Patent Owner responses

L31.  2020     **Kilpatrick Townsend & Stockton LLP**
       Case:   <u>GREE Inc.</u> v. Supercell Oy
               Eastern district of Texas, Marshall division, Case No. 2:20-cv-00113-
               JRG-RSP
       Matter:  Patent infringement, mobile gaming
       Project:  Source code review, declaration supporting claim construction,
               infringement expert report, validity expert report, supplemental report,
               deposition

L32.    2020    **Kilpatrick Townsend & Stockton LLP**
Case:    GREE Inc. v. Supercell Oy
Eastern district of Texas, Marshall division, Case No. 2:19-cv-00200-JRG-RSP, Case No. 2:19-cv-00237-JRG-RSP, Case No. 2:19-cv-00310-JRG-RSP; Case No. 2:19-cv-00311-JRG-RSP
Matter:    Patent infringement, mobile gaming
Project:    Source code review, four infringement expert reports, two supplemental infringement expert reports, four validity expert reports, two supplemental expert reports, two second supplemental expert reports, 3-day deposition, jury trial testimony

L33.    2020    **Sheridan Ross P.C.**
Case:    Justservice.net LLC v. Dropbox, Inc.
Western district of Texas, Waco division, Case No. 6:20-CV-00070-ADA
Matter:    Patent infringement, computer systems and networking
Project:    Source code review, declaration regarding claim construction

L34.    2020    **Perkins Coie LLP**
Case:    Huizhou TCL Mobile Communication Co. Ltd., TCT Mobile (US) Inc., and TCL Mobile Communication (HK) Co., Ltd. v. Wi-LAN Inc.
Matter:    *Ex Partes* Reexamination, QoS enhancements for wireless IP networks
Project:    Declaration to support Requesters

L35.    2020    **Perkins Coie LLP**
Case:    Intel Corporation v. UNM Rainforest Innovations
IPR2020-01576, IPR2020-01578, IPR2020-*to be assigned*
Matter:    *Inter Partes* Review, wireless broadband
Project:    Three declarations to support three IPR petitions

L36.    2020    **Calfee, Halter & Griswold LLP**
Case:    Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd. et al.
Northern district of Illinois, Case No. 1:17-cv-01972
Matter:    Patent infringement, two-way radios
Project:    Declaration regarding claim construction, deposition

L37.    2020    **Fish & Richardson, P.C.**
Case:    Huawei Technologies Co., Ltd et al. v. Verizon Communications, Inc. et al.
Western district of Texas, Waco division, Case No. 6-20-cv-00090
Matter:    Patent infringement, video communication
Project:    Source code review, declaration regarding claim construction, infringement expert report, validity expert report, deposition

L38.   2020   **Kilpatrick Townsend & Stockton LLP**
       Case:    GREE Inc. v. Supercell Oy
                Eastern district of Texas, Marshall division, Case No. 2:19-cv-00070-
                JRG-RSP, Case No. 2:19-cv-00071-JRG-RSP
       Matter:  Patent infringement, mobile gaming
       Project: Source code review, two infringement expert reports, two
                supplemental infringement expert reports, two second supplemental
                infringement expert reports, two rebuttal expert reports on validity,
                two-day deposition, seven declarations supporting Gree's opposition
                to Supercell's motions for summary judgement, jury trial testimony

L39.   2020   **Cooley LLP**
       Case:    Saint Lawrence Communications, LLC v. Amazon.com, Inc., et al.
                Eastern district of Texas, Marshall division, Case No. 2:19-cv-00027-
                JRG
       Matter:  Patent infringement, AMR-WB, speech compression, coding and
                decoding
       Project: Invalidity expert report

L40.   2020   **Prince Lobel Tye LLP**
       Case:    Intellectual Ventures I and II LLC v. VMware, Inc.
                Western district of Texas, Austin division, Case No. 1:19-cv-01075-
                ADA
       Matter:  Patent infringement, networking systems
       Project: Declaration to support claim construction

L41.   2020   **Gibson, Dun & Crutcher LLP**
       Case:    Cellular Evolution LLC v. T-Mobile US, Inc. et al.
                Eastern district of Texas, Marshall division, Case No. 2:19-cv-232-JRG
       Matter:  Patent infringement, cellular systems
       Project: Invalidity consulting

L42.   2020   **Faegre Baker Daniels LLP**
       Case:    CommScope, Inc. v. Rosenberger Technology, et al.
                District of New Jersey, Case No. 19-cv-15962-MCA-LDW
       Matter:  Trade secret software, base station antenna design
       Project: Declaration, deposition

L43.   2020   **Ropes & Gray LLP**
       Case:    Canon, Inc. v. TCL Electronics Holdings Ltd., et al.
                Eastern district of Texas, Marshall division, Case No. 2:18-cv-546-
                JRG
       Matter:  Patent infringement, communication interfaces
       Project: Source code review, declaration to support claim construction,
                deposition

L44.   2019   **Perkins Coie LLP**
       Case:   <u>Huizhou TCL Mobile Communication Co. Ltd., TCT Mobile (US) Inc., and TCL Mobile Communication (HK) Co., Ltd.</u> v. Wi-LAN Inc. IPR2020-00302, IPR2020-00303
       Matter:  *Inter Partes* Review, QoS enhancements for wireless IP networks
       Project:  Two declarations to support two IPR petitions

L45.   2019   **Fish & Richardson**
       Case:   Bell Northern Research v. <u>Huawei</u>, et al.
               Southern district of California, Case No. 3:18-cv-1784-CAB-BLM
       Matter:  Patent infringement, wireless networks
       Project:  Invalidity consulting

L46.   2019   **K & L Gates LLP**
       Case:   EVS CODEC Technologies, LLC and Saint Lawrence Communications, LLC v. <u>ZTE Corporation, et al.</u>
               Northern district of Texas, Dallas division, Case No. 3:19-cv-00385-MBH
       Matter:  Patent infringement, EVS, speech compression, coding and decoding
       Project:  Invalidity expert report

L47.   2019   **Feinberg Day Alberti Lim & Belloli LLP**
       Case:   <u>Uniloc 2017 LLC</u> v. AT&T Mobility LLC, et al.
               Eastern district of Texas, Marshall division, Case No. 2:18-cv-00514-JRG
       Matter:  Patent infringement, wireless frequency bands and devices
       Project:  Two declarations to support claim construction, deposition

L48.   2019   **Susman Godfrey LLP**
       Case:   <u>Sol IP, LLC</u> v. AT&T Mobility LLC, et al.
               Eastern district of Texas, Marshall division, Case No. 2:18-cv-00526; 2:18- cv-00527; and 2:18-cv-00528
       Matter:  Patent infringement, Wi-Fi and LTE
       Project:  Validity consulting

L49.   2019   **Ropes & Gray LLP**
       Case:   <u>Huawei Technologies Co. Ltd.</u> v. Harris Global Communications, Inc. IPR2019-01512, IPR2019-01631
       Matter:  *Inter Partes* Review, routing and security in wireless networks
       Project:  Two declarations to support two IPR petitions

L50.   2019   **Ropes & Gray LLP**
       Case:   Harris Corporation v. <u>Huawei Device USA, Inc. et al.</u>
               Eastern district of Texas, Marshall division, Case No. 2:18-cv-00439-JRG
       Matter:  Patent infringement, routing and security in wireless networks

|  | Project: | Declaration to support claim construction |
|---|---|---|

L51.   2019   **Erise IP**
Case:   Semcon IP Inc. v. <u>ASUSTeK Computer Inc.</u>
Eastern district of Texas, Marshall division, Case No. 2:18-cv-00193-JRG
Matter:   Patent infringement, adaptive power control
Project:   Non-infringement expert report

L52.   2019   **Cooley LLP**
Case:   <u>Facebook Inc.</u> v. BlackBerry Corp. et al.
Northern District of California, Oakland division, Case No. 4:18-cv-05434-JSW
Matter:   Patent infringement, mobile computing
Project:   Declaration to support claim construction

L53.   2019   **Sidley Austin LLP**
Case:   Semcon IP Inc. v. <u>Amazon.com, Inc.</u>
Eastern district of Texas, Marshall division, Case No. 2:18-cv-00192-JRG
Matter:   Patent infringement, adaptive power control
Project:   Expert report regarding patent marking, rebuttal report regarding patent marking, deposition

L54.   2019   **Oblon, McClelland, Maier & Neustadt, LLP**
Case:   MV3 Partners LLC v. <u>Roku, Inc.</u>
Western district of Texas, Waco division, Case No. 6:18-cv-308-ADA
Matter:   Patent infringement, mobile set top box
Project:   Declaration to support claim construction, deposition, Markman hearing testimony

L55.   2019   **Banner & Witcoff, LTD.**
Case:   <u>Kathrein USA, Inc.</u> v. Fractus S.A.
IPR2019-00954, IPR2019-00955, IPR2019-00956, IPR2019-00957
Matter:   *Inter Partes* Review, multiband antenna arrays
Project:   Four declarations to support four IPR petitions

L56.   2019   **Fish & Richardson, P.C.**
Case:   <u>LG Electronics Inc.</u> v. Saint Lawrence Communications LLC
Southern district of New York, Case No. 1:18-cv-11082-DLC
Matter:   Patent infringement, EVS, speech compression, coding and decoding
Project:   Declaration relating to motion for summary judgment, expert report, deposition

L57.  2019        **Ropes & Gray LLP**
      Case:       SIPCO, LLC v. <u>Emerson Electric Co.</u>
                  In the Matter of Certain Wireless Mesh Networking Products and
                  Related Components Thereof, ITC Investigation No. 337-TA-1131
      Matter:     Patent infringement, links in wireless networks and remote monitoring
      Project:    Source code review, declaration to support claim construction,
                  invalidity expert report, rebuttal expert report regarding non-
                  infringement and no domestic industry

L58.  2019        **Fish & Richardson, P.C.**
      Case:       Maxell Ltd. v. <u>Huawei Technologies Co. Ltd.</u>, <u>ZTE</u>, et al.
                  Eastern district of Texas, Texarkana division, Case No. 5:18-cv-0033-
                  RWS
      Matter:     Patent infringement, portable computing devices
      Project:    Declaration regarding claim construction

L59.  2019        **Ropes & Gray LLP**
      Case:       <u>Emerson Electric Co.</u> v. SIPCO, LLC
                  IPR2019-00548, IPR2019-00549
      Matter:     *Inter Partes* Review, routing in wireless networks
      Project:    Two declarations to support two IPR petitions

L60.  2018        **Mishcon de Reya New York LLP; King & Wood Mallesons LLP**
      Case:       <u>ChanBond, LLC</u> v. Cox Communications, Inc.
                  District of Delaware, Case No. 1:15-cv-00849-RGA
      Matter:     Patent infringement, wideband signal distribution system
      Project:    Validity expert report, deposition, sur-reply expert report, second sur-
                  reply expert report, second deposition, jury trial with settlement mid-
                  trial

L61.  2018        **Fish & Richardson, P.C.**
      Case:       In re: Qualcomm Antitrust Litigation (Client: <u>Apple</u>)
                  Southern district of California, Case No. 3:17-cv-00108-GPC-MDD
      Matter:     Qualcomm antitrust litigation
      Project:    Two expert rebuttal reports, deposition

L62.  2018        **Susman Godfrey LLP**
      Case:       In re: Qualcomm Antitrust Litigation (Client: <u>Class Action</u>)
                  Northern district of California, Case No. 5:17-md-02773-LHK
      Matter:     Qualcomm antitrust litigation
      Project:    Expert declaration on standard essential patents, expert report on
                  deemed essential patents, rebuttal expert report, deposition

L63.   2018   **284 Partners**
     Case:    Federal Trade Commission. v. Qualcomm Incorporated
               Northern district of California, Case No. 5:17-cv-00220
     Matter:   Qualcomm antitrust litigation
     Project:  Expert report on standard essential patents, expert rebuttal report, deposition

L64.   2018   **Vorys, Sater, Seymour and Pease LLP**
     Case:    Route1 Inc. v. Airwatch LLC
                District of Delaware, Case No. 17-331-RGA
     Matter:   Patent infringement, remote access
     Project:  Source code review, declaration regarding claim construction, infringement expert report, validity expert report, reply expert report, deposition, three declarations regarding re-exam

L65.   2018   **Sidley Austin LLP**
     Case:    Samsung Electronics Co., Ltd v. Huawei Technologies Co., Ltd.
                IPR2017-01471, IPR2017-01474, IPR2017-01475
     Matter:   *Inter Partes* Review, 4G/LTE
     Project:  Three declarations to support three Patent Owner responses, supplemental declaration, deposition

L66.   2018   **Fitzpatrick Cella Harper & Scinto**
     Case:    IPC Systems, Inc. v. Cloud9 Technologies, LLC
                District of Delaware, Case No. 16-cv-443-GMS
     Matter:   Patent infringement, telephone stations and trading turrets
     Project:  Source code review, declaration regarding claim construction, supplemental declaration regarding claim construction

L67.   2018   **Haynes and Boone, LLP**
     Case:    LG Electronics Inc., et al. v. Wi-LAN Inc., et al.
                IPR2018-00673, IPR2018-00674, IPR2018-00704, IPR2018-00705, IPR2018-00709, IPR2018-00710
     Matter:   *Inter Partes* Review, bandwidth allocation
     Project:  Six declarations to support six IPR petitions, two depositions, two reply declarations

L68.   2018   **Pillsbury Winthrop Shaw Pittman LLP**
     Case:    Cellular Communications Equipment v. ZTE, HTC Corporation, et al.
                Eastern district of Texas, Case No. 6:16-cv-475-RWS
     Matter:   Patent infringement, LTE, power control, emergency notification
     Project:  Invalidity expert report, deposition

L69.   2018   **Finnegan Henderson Farabow Garrett & Dunner LLP**
       Case:   FanDuel, Inc. DraftKings, Inc., and Bwin.Party Digital Entertainment
               PLC. v. <u>CG Technology Development, LLC</u>
               IPR2017-00902, IPR2017-01333, IPR2017-01491, IPR2017-01532
       Matter:   *Inter Partes* Review, location-based gaming
       Project:   Four declarations to support four Patent Owner responses, two
               supplemental declarations, four depositions

L70.   2018   **Calfee, Halter & Griswold LLP**
       Case:   <u>Hytera Communications Corp. Ltd.</u> v. Motorola Solutions, Inc.
               Northern district of Ohio, Case No. 1:17-cv-01794-DNC
       Matter:   Patent infringement, two-way radios
       Project:   Source code review, declaration regarding claim construction, rebuttal
               declaration regarding claim construction, deposition, infringement
               expert report, validity expert report, two-day deposition

L71.   2017   **Covington & Burling LLP**
       Case:   Sharp Corporation, et al. v. <u>Hisense Co., Ltd., et al.</u>
               In the Matter of Certain Wi-Fi Enabled Electronic Devices and
               Components Thereof, ITC Investigation No. 337-TA-1072
       Matter:   Patent infringement, Wi-Fi, OFDMA
       Project:   Declaration regarding claim construction

L72.   2017   **Vorys, Sater, Seymour and Pease LLP**
       Case:   Airwatch LLC and VMWare Inc. v. <u>Route1 Inc.</u>
               IPR2017-02145
       Matter:   *Inter Partes* Review, remote access
       Project:   Declaration to support Patent Owner response

L73.   2017   **Arnold & Porter Kaye Scholer**
       Case:   Uniloc USA, Inc. v. <u>Google, Inc.</u>
               Eastern district of Texas, Marshall division, Case No. 2:17-cv-0214-
               JRG, 2:17-cv-0224-JRG, 2:17-cv-0231-JRG, 2:17-cv-0465-JRG,
               2:17-cv-0466-JRG, 2:17-cv-0467JRG
       Matter:   Patent infringement, VoIP messaging
       Project:   Invalidity consulting

L74.   2017   **Simpson Thacher & Bartlett LLP**
       Case:   XR Communications, LLC. v. <u>Ubiquiti Networks, Inc.</u>
               Central district of California, Case No. 2:17-cv-02968-AG(JCGx)
       Matter:   Patent infringement, Wi-Fi and adaptive antennas
       Project:   Declaration regarding claim construction, deposition

L75.   2017   **Covington & Burling LLP**
      Case:   <u>Huawei Device USA Inc.</u> v. Hitachi Maxell, Ltd.
             IPR2018-00209, IPR2018-00210
      Matter:   *Inter Partes* Review, base station selection, GPS/Cellular location
      Project:   Two declarations to support two IPR petitions

L76.   2017   **Calfee, Halter & Griswold LLP**
      Case:   <u>Hytera Communications Corp. Ltd.</u> v. Motorola Solutions, Inc.
             IPR2018-00128, IPR2017-02183
      Matter:   *Inter Partes* Review, two-way radios
      Project:   Declaration to support IPR petition, deposition, two supplemental declarations, two depositions

L77.   2017   **Finnegan Henderson Farabow Garrett & Dunner LLP**
      Case:   <u>Hytera Communications Corp. Ltd.</u> v. Motorola Solutions, Inc.
             IPR2017-02179, IPR2017-02183
      Matter:   *Inter Partes* Review, two-way radios
      Project:   Two declarations to support two IPR petitions, deposition

L78.   2017   **Mayer Brown LLP**
      Case:   <u>Silver Spring Networks, Inc.</u> v. Sunrise Technologies, Inc.
             <u>Silver Spring Networks, Inc.</u> v. Weatherproof Wireless, LLC
             IPR2017-*To Be Assigned*, IPR2017-*To Be Assigned*
      Matter:   *Inter Partes* Review, power meter
      Project:   Two declarations to support two IPR petitions

L79.   2017   **Covington & Burling LLP**
      Case:   Hitachi Maxell, Ltd. v. <u>Huawei Device USA Inc. et al.</u>
             Eastern district of Texas, Texarkana division, Case No. 5:16-cv-00178-RWS
      Matter:   Patent infringement, 3G/4G
      Project:   Source code review, declaration regarding claim construction, invalidity expert report, non-infringement expert report, non-infringing alternatives expert report, two depositions

L80.   2017   **Finnegan Henderson Farabow Garrett & Dunner LLP**
      Case:   <u>LG Electronics, Inc. et al</u>. v. BLU Products, Inc. and CT Miami, LLC
             In the Matter of Certain LTE Wireless Communication Devices and Components Thereof, ITC Investigation No. 337-TA-1051
      Matter:   Patent infringement, 4G/LTE
      Project:   Declaration regarding claim construction, second declaration regarding claim construction

L81.  2017  **Sidley Austin LLP**
Case:  Huawei Technologies Co., Ltd. v. Samsung Electronics Co., Ltd.
IPR2017-01979, IPR2017-01980, IPR2017-01986
Matter:  *Inter Partes* Review, 4G/LTE
Project:  Three declarations to support three IPR petitions, deposition

L82.  2017  **Finnegan Henderson Farabow Garrett & Dunner LLP**
Case:  Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd. et al.
In the Matter of Certain Two-way Radio Equipment Systems, Related
Software and Components Thereof, ITC Investigation No. 337-TA-1053
Matter:  Patent infringement, two-way radio
Project:  Source code review, declaration regarding claim construction,
invalidity expert report, non-infringement expert report, deposition,
ITC hearing testimony

L83.  2017  **Haynes and Boone, LLP**
Case:  Rackspace US, Inc. v. Realtime Data LLC
IPR2017-01691
Matter:  *Inter Partes* Review, data compression
Project:  Declaration to support IPR petition

L84.  2017  **Pillsbury Winthrop Shaw Pittman LLP**
Case:  ZTE (USA), HTC Corporation, et al. v. Cellular Communications
Equipment
IPR2017-01508, IPR2017-01509
Matter:  *Inter Partes* Review, LTE, power control, emergency notification
Project:  Two declarations to support two IPR petitions, two depositions

L85.  2017  **Alston & Bird LLP; Womble Carlyle Sandridge & Rice LLP**
Case:  Itron, Inc. and Duke Energy Corp. v. Smart Meter Technologies
IPR2017-01199
Matter:  *Inter Partes* Review, power meter
Project:  Declaration to support IPR petition, deposition

L86.  2017  **Haynes and Boone, LLP**
Case:  Ericsson Inc. v. Regents of the University of Minnesota
IPR2017-01186, IPR2017-01200, IPR2017-01213
Matter:  *Inter Partes* Review, OFDM and MIMO
Project:  Three declarations to support three IPR petitions

L87.  2017  **Quinn Emanuel Urquhart & Sullivan, LLP**
Case:  GENBAND US, LLC v. Metaswitch Networks Ltd, et al.
Eastern district of Texas, Marshall division, Case No. 2:16-cv-582-JRG-RSP
Matter:  Patent infringement, Internet protocols and VoIP

|  | Project: | Expert report regarding essentiality |
|--|--|--|

**L88.** 2017    **Mayer Brown LLP**

| | Case: | Uniloc USA, Inc. et al. v. <u>Avaya Inc.</u>, <u>ShoreTel, Inc.</u>, et al. |
| | | Eastern district of Texas, Tyler division, Case Nos. 6:15-cv-1168-JRG |
| | Matter: | Patent infringement, instant messaging and conference calling |
| | Project: | Source code review, non-infringement consulting |

**L89.** 2017    **Fish & Richardson P.C.**

| | Case: | Nokia Solutions and Networks US LLC, et al. v. <u>Huawei Technologies Co. Ltd., et al.</u> |
| | | Eastern district of Texas, Marshall division, Case Nos. 2:16-cv-753-JRG-RSP, 2:16-cv-754 |
| | Matter: | Patent infringement, 4G/LTE |
| | Project: | Claim construction, two declarations |

**L90.** 2017    **Rothwell Figg Ernst & Manbeck, PC; Pepper Hamilton LLP**

| | Case: | Samsung Electronics, et al. v. <u>Rembrandt Wireless Technologies, LP</u> IPR2015-00555 |
| | Matter: | *Ex Parte* Reexamination, Bluetooth |
| | Project: | Two declarations to support two Patent Owner responses, supplemental declaration to support Patent Owner reply |

**L91.** 2016    **Sidley Austin LLP**

| | Case: | <u>Huawei Technologies Co., et al.</u> v. Samsung Electronics Co, et al. and Samsung Research America v. <u>Hisilicon Technologies Co, LTD</u> |
| | | Northern district of California, San Francisco division, Case No. 3:16-cv-2787-WHO |
| | Matter: | Patent infringement, 3G/4G/LTE |
| | Project: | Source code review, declaration regarding claim construction, declaration opposing summary judgement, infringement expert report, invalidity expert report, non-infringement expert report, validity expert report, two depositions |

**L92.** 2016    **Bragalone Conroy PC**

| | Case: | <u>Securus Technologies, Inc.</u> v. Global Tel*Link Corporation CBM2017-00034 |
| | Matter: | Covered Business Method Review, call monitoring and recording |
| | Project: | Declaration to support CBM petition, deposition |

**L93.** 2016    **Braxton, Hilton & Perrone PLLC**

| | Case: | <u>Biosonix, LLC.</u> v. Hydrowave, LLC et al. |
| | | Eastern district of Texas, Case No. 2:16-cv-139-RC |
| | Matter: | Patent infringement, underwater transceivers |
| | Project: | Claim construction, Markman hearing testimony |

L94.   2016   **Gray Reed & McGraw**
       Case:   <u>Optis Cellular Technology, LLC and PanOptis Patent Management, LLC.</u> v. Blackberry Corporation, et al.
               Eastern district of Texas, Marshall division, Case No. 2:16-cv-59-JRG-RSP, Case No. 2:16-cv-61-JRG-RSP, Case No. 2:16-cv-62-JRG-RSP
       Matter:   Patent infringement, LTE
       Project:   Claim construction, three declarations regarding claim construction, deposition

L95.   2016   **Ropes & Gray LLP; Davidson Berquist Jackson & Gowdey**
       Case:   SIPCO, LLC et al v. <u>Emerson Electric Co. et al</u>
               Eastern district of Texas, Tyler division, Case No. 6:15-cv-907
               <u>Emerson Electric Co. et al</u> v. SIPCO, LLC et al.
               Northern district of Georgia, Atlanta division, Case No. 1:15-cv-00319-AT
       Matter:   Patent infringement, links in wireless networks and remote monitoring
       Project:   Source code review, invalidity consulting

L96.   2016   **McKool Smith**
       Case:   Regents of University of Minnesota v. <u>AT&T Mobility LLC</u>, et al.
               District of Minnesota, Case No. 0:14-cv-04666-JRT-TNL
       Matter:   Patent infringement, LTE and MIMO
       Project:   Non-infringement and invalidity consulting

L97.   2016   **EIP US LLP**
       Case:   GENBAND US, LLC et al. v. <u>Metaswitch Networks Ltd</u>
               IPR2015-01456, IPR2015-01457
       Matter:   *Inter Partes* Review, media gateways
       Project:   Two declarations to support Patent Owner responses, two depositions

L98.   2016   **Haynes and Boone, LLP**
       Case:   Cox Communications, Inc. v. <u>AT&T Intellectual Property I, II, LP</u>
               IPR2015-01187, IPR2015-01227, IPR2015-01273, IPR2015-01536
       Matter:   *Inter Partes* Review, cable networks
       Project:   Four declarations to support Patent Owner responses, four depositions

L99.   2016   **Mayer Brown LLP**
       Case:   Odyssey Wireless v. <u>Motorola Mobility LLC</u>
               Eastern district of North Carolina, Western division, Case No. 5:14-cv-491-D
               Southern district of California, Case No. 3:15-cv-01741-H-RBB
       Matter:   Patent infringement, LTE
       Project:   Source code review, non-infringement consulting

L100.   2016   **Cooley LLP; Finnegan LLP**
         Case:   Saint Lawrence Comm. LLC v. <u>Motorola Mobility LLC</u>, <u>ZTE (USA)</u>
                 <u>Inc.</u>, et al.
                 Eastern district of Texas, Marshall division, Case No. 2:15-cv-
                 000351-JRG, Case No. 2:15-cv-000349-JRG
         Matter:   Patent infringement, speech compression, coding and decoding
         Project:   Invalidity expert report, expert report regarding AMR-WB standard,
                 expert report regarding Opus and Silk, supplemental expert report
                 regarding invalidity, two-day depositions, jury trial testimony for
                 Motorola

L101.   2015   **Sidley Austin LLP**
         Case:   Evolved Wireless, LLC v. <u>Microsoft Corp, et al.</u>
                 District of Delaware, Case No. 15-cv-546
         Matter:   Patent infringement, LTE
         Project:   Prior art and invalidity consulting

L102.   2015   **McKool Smith**
         Case:   <u>Optis Wireless Technology, LLC and PanOptis Patent Management,</u>
                 <u>LLC.</u> v. ZTE Corporation and ZTE (USA) Inc.
                 Eastern district of Texas, Marshall division, Case No. 2:15-cv-300-
                 JRG-RSP
         Matter:   Patent infringement, cellular messages and multimedia attachments
         Project:   Source code review, claim construction, declaration

L103.   2015   **Fish & Richardson, P.C.**
         Case:   Saint Lawrence Comm. LLC v. <u>LG Elec., Inc. et al.</u>
                 Eastern district of Texas, Marshall division, Case No. 2:14-cv-1055-
                 JRG
         Matter:   Patent infringement, speech compression, coding and decoding
         Project:   Invalidity expert report

L104.   2015   **Finnegan Henderson Farabow Garrett & Dunner LLP**
         Case:   <u>LG Electronics, Inc.</u> v. Cellular Communications Equipment LLC
                 IPR2016-00178
         Matter:   *Inter Partes* Review, LTE
         Project:   Declaration to support IPR petition

L105.   2015   **McKool Smith**
         Case:   <u>AT&T, et al.</u> v. Cox Communication, Inc., et al.
                 District of Delaware, Case No. 14-1106-GMS
         Matter:   Patent infringement, cable networks
         Project:   Claim construction, declaration

L106. 2015 **McKool Smith**
      Case: Ericsson Inc., et al. v. TCL Communication, et al.
            Eastern district of Texas, Marshall division, Case No. 2:15-cv-00011-RSP
      Matter: Patent infringement, wireless devices and systems
      Project: Source code review, claim construction, declaration, infringement expert report, validity expert report, two-day depositions

L107. 2015 **Foley & Lardner LLP**
      Case: Kyocera Communications, Inc. v. Cellular Communications Equipment LLC
            IPR2015-01559, IPR2015-01564
      Matter: *Inter Partes* Review, LTE, power control, emergency notification
      Project: Two declarations to support two IPR petitions

L108. 2015 **Fish & Richardson, P.C.**
      Case: Fairfield Industries Inc. v. Wireless Seismic, Inc.
            Southern district of Texas, Case No. 4:14-cv-02972-KPE
      Matter: Patent infringement, wireless sensor networks
      Project: Non-infringement expert report

L109. 2015 **Quinn Emanuel Urquhart & Sullivan, LLP**
      Case: GENBAND US, LLC v. Metaswitch Networks Ltd, et al.
            Eastern district of Texas, Marshall division, Case No. 2:14-cv-33-JRG-RSP
      Matter: Patent infringement, Internet protocols and VoIP
      Project: Expert report regarding essentiality, non-infringement expert report, rebuttal expert report regarding non-practice, supplemental rebuttal expert report, three-day depositions, jury trial testimony

L110. 2015 **Duane Morris LLP; Foley & Lardner LLP**
      Case: Mobile Telecommunications Technologies, LLC v. Leap Wireless International, Cricket Communications, Inc.
            Eastern district of Texas, Marshall division, Case No. 2:13-cv-00885-RSP
      Matter: Patent infringement, OFDM and MIMO
      Project: Non-infringement expert report, deposition

L111. 2015 **Hogan Lovells US LLP; Kenyon & Kenyon LLP**
      Case: One-E-Way v. Beats Electronics, LLC, Sony Corporation, et al.
            In the Matter of Certain Wireless Headsets, ITC Investigation No. 337-TA-943
      Matter: Patent infringement, wireless communication
      Project: Claim construction, declaration

L112.  2015  **McKool Smith**
       Case:    Solocron Media, LLC v. <u>AT&T Inc.</u>, et al.
                Eastern district of Texas, Marshall division, Case No. 2:13-cv-1059-JRG
       Matter:  Patent infringement, ringtone download
       Project: Claim construction, invalidity expert report

L113.  2015  **EIP US LLP**
       Case:    <u>Good Technology Software, Inc.</u> v. Mobile Iron, Inc.
                IPR2015-00833, IPR2015-00836, IPR2015-01090
       Matter:  *Inter Partes* Review, software management in wireless devices
       Project: Three declarations to support three IPR petitions

L114.  2015  **McKool Smith**
       Case:    AirWatch LLC v. <u>Good Technology Corp</u>
                Northern district of Georgia, Case No. 1:14-cv-02281-SCJ
       Matter:  Patent infringement, software management in wireless devices
       Project: Claim construction, declaration

L115.  2015  **Simpson Thacher & Bartlett LLP**
       Case:    IXI Mobile (R&D) Ltd. et al. v. <u>Apple Inc.</u>
                Southern district of New York, Case No. 14-cv-7594-RJS
       Matter:  Patent infringement, PDA and Bluetooth
       Project: Invalidity consulting

L116.  2014  **Bragalone Conroy PC**
       Case:    Global Tel*Link Corporation v. <u>Securus Technologies, Inc.</u>
                IPR2014-00785, IPR2014-00810, IPR2014-00824, IPR2014-00825,
                IPR2014-01278, IPR2014-01282, IPR2014-01283
       Matter:  *Inter Partes* Review, VoIP call monitoring and recording, allocating
                telecommunication resources and information systems
       Project: Seven declarations to support seven Patent Owner responses, five
                depositions

L117.  2014  **Orrick, Herrington & Sutcliffe LLP**
       Case:    <u>Shopkick, Inc.</u> v. Novitaz, Inc.
                IPR2015-00277, IPR2015-00278
       Matter:  *Inter Partes* Review, wireless customer service management
       Project: Two declarations to support two IPR petitions

L118.  2014  **Paul Hastings LLP**
       Case:    Cellular Communications Equipment LLC v. <u>AT&T, et al.</u>
                Eastern district of Texas, Tyler division, Case No. 6:13-cv-507-LED
                (Lead Case for Consolidation)
       Matter:  Patent infringement, 3G cellular communication
       Project: Claim construction, declaration

L119. 2014 **Baker Botts LLP**
Case: Orlando Communications LLC v. <u>AT&T</u>, et al.
M.D. Florida, Case No. 6:14-cv-01021
Matter: Patent infringement, 3G/4G cellular communication
Project: Non-infringement and claim construction consulting

L120. 2014 **EIP US LLP**
Case: <u>Good Technology Software, Inc.</u> v. AirWatch, LLC
IPR2015-00248, IPR2015-00875
Matter: *Inter Partes* Review, software management in wireless devices
Project: Two declarations to support two IPR petitions

L121. 2014 **Bragalone Conroy PC**
Case: <u>Securus Technologies, Inc.</u> v. Global Tel*Link Corporation
IPR2015-00153, IPR2015-00155, IPR2015-00156
Matter: *Inter Partes* Review, VoIP call monitoring and recording
Project: Three declarations to support three IPR petitions, two depositions

L122. 2014 **Andrews Kurth LLP**
Case: <u>Sony Mobile Communications (USA)</u> v. Adaptix Inc.
IPR2014-01524, IPR2014-01525
Matter: *Inter Partes* Review, subcarrier selection in LTE
Project: Two declarations to support two IPR petitions, deposition

L123. 2014 **Steptoe & Johnson LLP; Baker & McKenzie LLP**
Case: <u>VTech Communications, Inc. and Uniden America Corporations</u> v.
Spherix Incorporated
IPR2014-01432
Matter: *Inter Partes* Review, IP telephony
Project: Declaration to support IPR petition, deposition, reply declaration, deposition

L124. 2014 **Steptoe & Johnson LLP; Baker & McKenzie LLP**
Case: Spherix Inc. v. <u>VTech Telecommunications Ltd., et al.</u>
Spherix Inc. v. <u>Uniden Corp, et al.</u>
Northern district of Texas, Dallas Division, Case No. 3:13-cv-3494
and 3:13-cv-3496
Matter: Patent infringement, IP telephony
Project: Claim construction, declaration, deposition

L125. 2014 **McKool Smith**
Case: <u>Good Technology Corp.</u> v. MobileIron, Inc.
Northern district of California, Case No. 5:12-cv-05826-PSG
Matter: Patent infringement, software management in wireless devices

|  | Project: | Claim construction, three declarations, claim invalidity expert report, non-infringement expert report, deposition, jury trial testimony |
|---|---|---|

L126. 2014 **Lee & Hayes**
Case:  Broadcom Corp. v. <u>Ericsson, Inc.</u>
IPR2013-00601, IPR2013-00602, and IPR2013-00636
Matter:  *Inter Partes* Review, ARQ protocols
Project:  Three declarations to support Patent Owner responses, two declarations to support Patent Owner Motion to Amend, deposition, two reply declarations

L127. 2014 **Sidley Austin LLP**
Case:  Adaptix, Inc. v. <u>Huawei Technologies Co.</u>, et al.
Eastern district of Texas, Case No. 6:13-cv-00438, 439, 440 and 441
Matter:  Patent infringement, subcarrier selection in LTE
Project:  Source code review, non-infringement consulting

L128. 2014 **Finnegan Henderson Farabow Garrett & Dunner LLP**
Case:  Cell and Network Selection LLC v. <u>Huawei Technologies Co.</u>, et al.
Eastern district of Texas, Case No. 6:13-cv-00404-LED-JDL
Matter:  Patent infringement, base station selection in LTE
Project:  Non-infringement consulting

L129. 2014 **Feinberg Day Alberti & Thompson LLP**
Case:  DSS Technology Management, Inc. v. <u>Apple Inc.</u>
Eastern district of Texas, Tyler division, Case No. 6:13-cv-00919-JDL
Matter:  Patent infringement, PDA and Bluetooth
Project:  Claim construction and invalidity consulting

L130. 2014 **Sheppard Mullin Richter & Hampton LLP**
Case:  Digcom Inc. v. <u>ZTE (USA), Inc.</u>
District of Nevada, Case No. 3:13-cv-00178-RCJ-WGC
Matter:  Patent infringement, cellular communication
Project:  Claim construction consulting

L131. 2014 **Lott & Fischer**
Case:  Zenith Electronics, LLC, et al. v. <u>Craig Electronics, Inc.</u>
Southern district of Florida, Case No. 9:13-cv-80567-DMM/DLB
Matter:  Patent infringement, HDTV transmission and reception
Project:  Opening expert report regarding nonessentiality

L132. 2013 **McKool Smith**
Case:  Zenith Electronics, LLC, et al. v. <u>Curtis International Ltd.</u>
Southern district of Florida, Case No. 9:13-cv-80568-DMM/DLB
Matter:  Patent infringement, HDTV transmission and reception
Project:  Claim construction, declaration, deposition

L133.  2013    **Gibson Dunn**
       Case:    Straight Path IP Group v. <u>Sharp Corp. and Sharp Electronics Corp.</u>
                In the Matter of Certain Point-to-Point Network Communication
                Devices and Products Containing Same, ITC Investigation No. 337-
                TA-892
       Matter:  Patent infringement, point-to-point network communication
       Project: Non-infringement consulting

L134.  2013    **Kilpatrick Townsend & Stockton LLP; Cooley LLP**
       Case:    Monec Holding AG v. <u>Motorola Mobility LLC</u>, <u>HTC</u>, et al.
                District of Delaware, Case No. 1:11-cv-798-LPS-SRF
       Matter:  Patent infringement, displaying books on tablets
       Project: Non-infringement expert report for Motorola, non-infringement expert
                report for HTC, deposition

L135.  2013    **Gartman Law Group**
       Case:    <u>Lone Star WiFi LLC</u> v. Legacy Stonebriar Hotel, Ltd; et al.
                Eastern district Of Texas, Tyler, Case No. 6:12-cv-957
       Matter:  Patent infringement, levels of access in Wi-Fi networks
       Project: Claim validity consulting

L136.  2013    **White & Case, LLP**
       Case:    Nokia Corp and Nokia, Inc. v. <u>HTC Corp and HTC America, Inc. and
                Google, Inc.</u>
                In the Matter of Certain Portable Electronic Communication Devices,
                Including Mobile Phones and Components Thereof, ITC Investigation
                No. 337-TA-885
       Matter:  Patent infringement, App download and installation
       Project: Non-infringement consulting

L137.  2013    **Heim, Payne & Chorush, LLP**
       Case:    <u>Rembrandt Wireless</u> v. Samsung Electronics Co., et al.
                Eastern district of Texas, Marshall, Case No. 2:13-cv-213-JRG-RSP
       Matter:  Patent infringement, Bluetooth
       Project: Expert report regarding validity, deposition, jury trial

L138.  2013    **Baker Hostetler; Davis Polk & Wardwell LLP**
       Case:    <u>Comcast</u> v. Sprint; and Nextel Inc.
                Eastern district of Pennsylvania, Case No. 2:12-cv-00859-JD
       Matter:  Patent infringement, SMS/MMS in Cellular Networks
       Project: Infringement expert report, validity expert report, reply expert report,
                declaration, two-day depositions, jury trial testimony

L139. 2013     **McKool Smith**
Case:     Samsung Electronics America v. <u>Ericsson Inc.</u>
In the Matter of Certain Wireless Communications Equipment and Articles Therein, ITC Investigation No. 337-TA-866
Matter:     Patent infringement, LTE uplink and downlink
Project:     Source code review, prior art research, claim construction, claim invalidity expert report, non-infringement expert report, ITC hearing testimony

L140. 2012     **DLA Piper US LLP**
Case:     <u>CSR Technology Inc.</u> v. Freescale Semiconductor, Inc.
USDC-San Francisco, Case No. 3:12-cv-02619-RS
Matter:     Patent infringement, radio transceivers
Project:     Claim construction, declaration

L141. 2012     **Fish & Richardson P.C.**
Case:     GPNE Corp. v. <u>Apple, Inc.;</u> et al.
USDC-ND California, Case No. 5:12-cv-02885-LHK
Matter:     Patent infringement, resource allocation in wireless networks
Project:     Prior art research consulting

L142. 2012     **Polsinelli Shughart PC**
Case:     <u>Single Touch Interactive, Inc.</u> v. Zoove Corporation
Northern district of California, Case No. 3:12-cv-00831-JSC
Matter:     Patent infringement, abbreviated dialing, information delivery
Project:     Claim construction, Markman hearing testimony, two declarations

L143. 2012     **K & L Gates**
Case:     EON Corp. IP Holdings, LLC v. <u>Novatel Wireless, Inc.;</u> et al.
DC-Tyler, Texas, Case No. 6:11-cv-00015-LED-JDL
Matter:     Patent infringement, wireless modem and 3G services
Project:     Non-infringement expert report, deposition

L144. 2012     **Simpson Thacher & Bartlett LLP**
Case:     <u>CSR Technology, Inc.</u> v. Bandspeed, Inc.
Western district of Texas, Case No. 1:12-cv-297-LY
Matter:     Patent infringement, packet identification in 2.4 GHz and 5 GHz
Project:     Source code review, Markman hearing testimony, infringement expert report

L145. 2012     **Sheppard Mullin Richter & Hampton LLP**
Case:     Wi-LAN v. <u>HTC America, Inc.</u>, et al.
Eastern district of Texas, Case No. 6:10-cv-521-LED
Matter:     Patent infringement, CDMA, Orthogonal Codes
Project:     Source code review, non-infringement expert report, deposition, jury trial testimony

L146. 2012     **Dechert LLP**
Case:     <u>Hitachi</u> v. TPV and Vizio, Inc.; and Vizio v. <u>Hitachi, LTD.</u>
      Eastern district of Texas, Case No. 2:10-cv-260
Matter:    Patent infringement, HD television transmission and reception
Project:    Prior art research, claim invalidity consulting

L147. 2012     **Fish & Richardson P.C.; Covington & Burling; Alston & Bird; Brinks Hofer Gilson & Lione**
Case:     InterDigital Commc'n, LLC v. <u>Huawei Tech. Co. LTD</u>; <u>LG Electronics, Inc.</u>; <u>Nokia, Inc.</u>; and <u>ZTE (USA) Inc.</u>
      Certain Wireless Devices With 3G Capabilities and Components Thereof, ITC Investigation No. 337-TA-800
Matter:    Patent infringement, channel coding in UMTS, HSDPA
Project:    Non-infringement consulting

L148. 2012     **Fish & Richardson P.C.; Covington & Burling; Alston & Bird; Brinks Hofer Gilson & Lione**
Case:     InterDigital Commc'n, LLC v. <u>Huawei Tech. Co. LTD</u>; <u>LG Electronics, Inc.</u>; <u>Nokia, Inc.</u>; and <u>ZTE (USA) Inc.</u>
      District of Delaware, Case No. 1:11-cv-00654-UNA
Matter:    Patent infringement, channel coding in UMTS, HSDPA
Project:    Non-infringement consulting

L149. 2011     **O'Melveny & Myers LLP**
Case:     MobileMedia Ideas, LLC v. <u>Apple, Inc.</u>
      District of Delaware, Case No. 1:10-cv-00258-SLR-MPT
Matter:    Patent infringement, voice control, call rejection in mobile phones
Project:    Source code review, prior art research, declaration, claim invalidity expert report, non-infringement expert report, deposition, jury trial testimony

L150. 2011     **Wilmer Cutler Pickering Hale and Dorr**
Case:     <u>Apple, Inc.</u> v. Samsung Electronics Co.
      Northern district of California, Case No. 5:11-cv-01846-LHK
Matter:    Patent infringement, channel coding in CDMA, E-AGCH, TFCI
Project:    Prior art research, claim construction consulting

L151. 2011     **Weil, Gotshal & Manges LLP**
Case:     Vizio, Inc. v. <u>Renesas Electronics America, Inc.</u>
      ITC Investigation No. 337-TA-789
Matter:    Patent infringement, HD television transmission and reception
Project:    Claim invalidity consulting

L152.   2011        **Shapiro Cohen**
        Case:       TenXc Wireless Inc. v. Andrew LLC
                    TenXc Wireless Inc. v. Mobi Antenna Technologies Ltd.
        Matter:     Patent infringement, antenna design, sectorized cellular network
        Project:    Claim validity consulting

L153.   2010        **Fish & Richardson P.C.**
        Case:       Vizio, Inc., v. LG Electronics, Inc.
                    ITC Investigation No. 337-TA-733
        Matter:     Patent infringement, HD television transmission and reception
        Project:    Claim charts, claim construction expert report, deposition

L154.   2010        **Fish & Richardson P.C.**
        Case:       Vizio, Inc., v. LG Electronics, Inc.
                    District of Maryland, Case No. 1:09-cv-1481-BEL
        Matter:     Patent infringement, HD television transmission and reception
        Project:    Claim charts, claim construction expert report, deposition

L155.   2008        **Kaye Scholer LLP**
        Case:       eBay Inc. v. IDT
                    Western district of Arkansas, Case No. 4:08-cv-4015-HFB
        Matter:     Patent infringement, long distance communication using Internet
        Project:    Prior art research, claim construction consulting

L156.   2008        **Simpson Thacher & Bartlett LLP**
        Case:       Commil USA, LLC v. Cisco Systems, Inc.
                    Eastern district of Texas, Case No. 2:07-cv-00341-DF-CE
        Matter:     Patent infringement, two-level wireless protocol
        Project:    Prior art research

L157.   2006        **Woodfill and Pressler**
        Case:       Charles Russell v. Interinsurance Exchange of the Auto Club
                    Harris County, Texas, Case No. 2005-19706
        Matter:     House fire and insurance claim
        Project:    Determining user location using cellular phone records, expert report,
                    deposition, jury trial testimony

## Consulting History

From:   8/2021      **Carter Arnett**
To:     8/2021      Dallas, TX
        Duties:     Analyze patents for essentiality to 4G and 5G standards.

From:   2/2021      **ExpertsDirect Pty Ltd**
To:     3/2021      Australia
        Duties:     Analyze antenna arrays.

| From: | 11/2020 | **Licks Attorneys** |
| To: | 1/2021 | Brazil |
| | Duties: | Analyze patents for essentiality to 4G standards. |

| From: | 6/2019 | **Fish & Richardson, P.C.** |
| To: | present | Dallas, TX |
| | Duties: | Analyze patents for essentiality to 3G, 4G, and 5G standards. |

| From: | 1/2013 | **Heim, Payne & Chorush, LLP** |
| To: | 3/2013 | Houston, TX |
| | Duties: | Analyze patents on wireless technologies. |

| From: | 4/2007 | **Collin County Sheriff's Office** |
| To: | 5/2007 | McKinney, TX |
| | Duties: | Analyzed cellular record data and determined user location in a double-homicide investigation. |

| From: | 4/2004 | **Allegiant Integrated Solutions** |
| To: | 5/2004 | Fort Worth, TX |
| | Duties: | Designed and developed an integrated set of tools for fast deployment of wireless networks. The tools optimize the placement of Access Points and determine their respective channel allocations to minimize interference and maximize capacity. |

| From: | 3/2002 | **Input/Output Incorporated** |
| To: | 4/2002 | New Orleans, LA |
| | Duties: | Designed and implemented an algorithm in MATLAB for optimizing the frequency selection process used by sonar for scanning the bottom of the ocean. |

| From: | 6/1998 | **Teleware Corporation** |
| To: | 7/1998 | Seoul, South Korea |
| | Duties: | Designed and developed a software package for analyzing the capacity in a CDMA network to maximize the number of subscribers. |

## Employment History

| From: | 1/2015 | **University of North Texas** |
| To: | Present | Denton, TX |
| | Position: | *Associate Chair of Graduate Studies Department of Computer Science and Engineering* |
| | | In charge of all administrative duties related to the Master's and Ph.D. programs in the department. |

| From: | 5/2008 | **University of North Texas** |
|---|---|---|
| To: | Present | Denton, TX |
| | Position: | *Tenured Associate Professor Department of Computer Science and Engineering* |

Conducting research on cellular networks and wireless sensor networks. Teaching wireless communication courses. Advising graduate and undergraduate students.

| From: | 9/2002 | **University of North Texas** |
|---|---|---|
| To: | 5/2008 | Denton, TX |
| | Position: | *Assistant Professor Department of Computer Science and Engineering* |

Conducting research on WCDMA/UMTS wireless networks. Teaching wireless communication and computer architecture courses. Advising graduate and undergraduate students.

| From: | 1/2002 | **University of New Orleans** |
|---|---|---|
| To: | 8/2002 | New Orleans, LA |
| | Position: | *Assistant Professor Department of Electrical Engineering* |

Designed and taught two new courses "Computer Systems Design I and II". Developed a Computer Engineering Curriculum with strong hardware-design emphasis. Formed a wireless research group. Advised graduate and undergraduate students.

| From: | 10/2000 | **Comspace Corporation** |
|---|---|---|
| To: | 12/2001 | Coppell, TX |
| | Position: | *Senior Systems Engineer* |

Designed, coded (in Matlab), and simulated Viterbi decoding, Turbo coding, trellis coded modulation (TCM), and Reed-Muller codes. Optimized soft decision parameters and interleavers for additive white Gaussian and Rayleigh faded channels. Extended the control and trunking of push-to-talk Logic Trunked Radio (LTR) to include one-to-one and one-to-many voice and data messaging.

| From: | 8/1996 | **MinMax Corporation** |
|---|---|---|
| To: | 8/2000 | Saint Louis, MO |
| | Position: | *Research Associate* |

Designed software packages that provide the tools to flexibly allocate capacity in a CDMA network and maximize the number of subscribers. Analyzed and simulated different audio compression schemes. Validated, simulated (logical and timing), and developed the hardware architecture for an ATM switch capable of channel group switching.

| From: | 8/1994 | **Washington University** |
|---|---|---|
| To: | 8/2000 | Saint Louis, MO |
| | Position: | *Research and Teaching Assistant* |

Taught, consulted, and graded Circuit Analysis at the undergraduate level and Network Design at the graduate level.

## Publications

### Conference Proceedings

C1.  U.K. Dey, **R. Akl**, R. Chataut, M. Robaei, "Modified PHY Layer for High Performance V2X Communication using 5G NR," *IEEE UEMCON 11th IEEE Annual Ubiquitous Computing, Electronics & Mobile Communication Conference*, October 2020, paper no. 1570681534, 6 pgs.

C2.  R. Chataut, **R. Akl**, "An Efficient and Fair Scheduling for Downlink 5G Massive MIMO Systems," *IEEE Texas Symposium on Wireless and Microwave Circuits and Systems*, June 2020, paper no.TSWMCS2020-39, 8 pgs.

C3.  R. Chataut, **R. Akl**, "Efficient and Low-Complexity Iterative Detectors for 5G Massive MIMO Systems," *IEEE DCOSS 2020 International Conference on Distributed Computing in Sensor Systems*, May 2020, pp. 442-449, 8 pgs.

C4.  U.K. Dey, **R. Akl**, R. Chataut, "High Throughput Vehicular Communication Using Spatial Multiplexing MIMO," *IEEE CCWC 2020 The 10th Annual Computing and Communication Workshop and Conference*, January 2020, paper no. 1570613408, 6 pgs.

C5.  R. Chataut, **R. Akl**, M. Robaei, "Accelerated and Preconditioned Refinement of Gauss-Seidel Method for Uplink Signal Detection in 5G Massive MIMO Systems," *IEEE CCWC 2020 The 10th Annual Computing and Communication Workshop and Conference*, January 2020, paper no. 1570605343, 7 pgs.

C6.  M. Robaei, **R. Akl**, "Examining Spatial Consistency for Millimeter-Wave Massive MIMO Channel Estimation in 5G-NR," *IEEE ICCE 2020 The 38th International Conference on Consumer Electronics*, January 2020, paper no. 1570596880, 6 pages.

C7.  R. Chataut, **R. Akl**, "Channel Gain Based User Scheduling for 5G Massive MIMO Systems," *IEEE HONET-ICT 2019 The 16th International Conference on Smart Cities: Improving Quality of Life Using ICT & IoT and AI*, October 2019, paper no. 1570565594, 5 pgs.

C8.  M. Robaei, **R. Akl**, "Time-Variant Broadband mmWave Channel Estimation Based on Compressed Sensing," *IEEE UEMCON 2019 The 10th Annual Ubiquitous Computing, Electronics & Mobile Communication Conference*, October 2019, paper no. 1570577430, 7 pages.

C9.   R. Chataut, **R. Akl**, U. Dey, "Least Square Regressor Selection Based Detection for Uplink 5G Massive MIMO Systems," *IEEE WAMICON 2019 The 20th Annual IEEE Wireless and Microwave Technology Conference*, April 2019, paper no. 1570524727, 6 pgs.

C10.   R. Chataut, **R. Akl**, "Huber Fitting Based ADMM Detection for Uplink 5G Massive MIMO Systems," *IEEE UEMCON 2018 The 9th Annual Ubiquitous Computing, Electronics & Mobile Communication Conference*, November 2018, paper no. 1570492416, 5 pgs.

C11.   R. Chataut, **R. Akl**, "Efficient and Low Complex Uplink Detection for 5G Massive MIMO Systems," *IEEE WAMICON 2018 The 19th Annual Wireless and Microwave Technology Conference*, April 2018, paper no. 1570431593, 6 pgs.

C12.   R. Chataut, **R. Akl**, "Optimal Pilot Reuse Factor Based on User Environments in 5G Massive MIMO," *IEEE CCWC 2018 The 8th Annual Computing and Communication Workshop Conference*, January 2018, paper no. 1570413394, 6 pgs.

C13.   S. Alotaibi, **R. Akl**, "Radio Resource Management in LTE Femtocell Networks," *IEEE NCA '17 International Symposium on Network Computing and Applications*, November 2017, paper no. 117, 5 pgs.

C14.   U. Sawant, **R. Akl**, "Subcarrier Allocation in LTE Network Deployment with Mobility," *IEEE UEMCON 2017 8th Annual Ubiquitous Computing, Electronics and Mobile Communication Conference*, October 2017, paper no. 1570349184, 8 pgs.

C15.   S. Alotaibi, **R. Akl**, "Packet Scheduling Bandwidth Type-Based Mechanism for LTE," *IEEE UEMCON 2017 8th Annual Ubiquitous Computing, Electronics and Mobile Communication Conference*, October 2017, paper no. 1570394639, 6 pgs.

C16.   S. Alotaibi, **R. Akl**, "Dynamic Fractional Frequency Reuse (FFR) Scheme for Two-Tier Network in LTE," *IEEE UEMCON 2017 8th Annual Ubiquitous Computing, Electronics and Mobile Communication Conference*, October 2017, paper no. 1570394969, 6 pgs.

C17.   U. Sawant, **R. Akl**, "Evaluation of Adaptive and Non Adaptive LTE Fractional Frequency Reuse Mechanisms," *IEEE WOCC 2017 The 26th Annual Wireless and Optical Communications Conference*, April 2017, paper no. 1570341174, 6 pgs.

C18.   S. Alotaibi, **R. Akl**, "Range-Based Scheme for Adjusting Transmission Power for Femtocells in Co-Channel Deployment," *IEEE WTS 2017 The 16th Annual Wireless Telecommunications Symposium*, April 2017, paper no. 1570334744, 5 pgs.

C19. U. Sawant, **R. Akl**, "A Novel Metric to Study the Performance of Sectorized Fractional Frequency Reuse Techniques in LTE," *IEEE WTS 2017 The 16th Annual Wireless Telecommunications Symposium*, April 2017, paper no. 1570338498, 7 pgs.

C20. S. Alotaibi, **R. Akl**, "Dynamic Frequency Partitioning Scheme for LTE HetNet Networks Using Fractional Frequency Reuse," *IEEE WCNC '17 Wireless Communications and Networking Conference*, March 2017, paper no. 1570332420, 5 pgs., demo and poster.

C21. U. Sawant, **R. Akl**, "Performance Evaluation of Network Productivity for LTE Heterogenous Networks with Reward-Penalty Weights Assessment," *IEEE CCWC 2017 The 7th Annual Computing and Communication Workshop Conference*, January 2017, paper no. 1570328396, 6 pgs.

C22. S. Alotaibi, **R. Akl**, "Self-Adjustment Downlink Transmission Power for Femtocells in Co-Channel Deployment in Heterogeneous Networks," *IEEE CCWC 2017 The 7th Annual Computing and Communication Workshop Conference*, January 2017, paper no. 1570326815, 6 pgs.

C23. U. Sawant, **R. Akl**, "Performance Evaluation of Sectorized Fractional Frequency Reuse Techniques Using Novel Metric," *IEEE ISCC 2016 The Twenty-First IEEE Symposium on Computers and Communications*, June 2016, paper no. 1570275270, 7 pgs.

C24. R. Tidwell, S. Akumalla, S. Karlaputi, **R. Akl**, K. Kavi, and D. Struble, "Evaluating the Feasibility of EMG and Bend Sensors for Classifying Hand Gestures," *1st International Conference on Multimedia and Human Computer Interaction*, July 2013, paper no. 63, 8 pgs.

C25. **R. Akl**, K. Pasupathy, and M. Haidar, "Anchor Nodes Placement for Effective Passive Localization," *2011 IEEE International Conference on Selected Topics in Mobile and Wireless Networks (iCOST)*, October 2011, paper no. 1569490799, pp. 127 - 132.

C26. **R. Akl**, P. Kadiyala, and M. Haidar, "Non-Uniform Grid-Based Routing in Sensor Networks," *9th IEEE Malaysia International Conference on Communications*, December 2009, paper no. 1569243649, pp. 536 - 540.

C27. M. Haidar, M. Al-Rizzo, Y. Chan, **R. Akl**, M. Bouharras, "Throughput Validation of an Advanced Channel Assignment Algorithm in IEEE 802.11 WLAN," *ICCSN 2009 – International Conference on Communication Software and Networks*, February 2009, paper no. P385, pp. 801 - 806.

C28. **R. Akl** and D. Keathly, "Robocamp: Encouraging Young Women to Embrace STEM," 4th Annual TETC Best Practices Conference, February 2009, 13 pgs.

C29. M. Haidar, R. Ghimire, M. Al-Rizzo, **R. Akl**, Y. Chan, "Channel Assignment in an IEEE 802.11 WLAN Based on Signal-to-interference Ratio," *IEEE CCECE – Canadian Conference on Electrical and Computer Engineering: Communications and Networking*, May 2008, paper no. 1569092894, pp. 1169 - 1174.

C30. H. Al-Rizzo, M. Haidar, **R. Akl**, and Y. Chan, "Enhanced Channel Assignment and Load Distribution in IEEE 802.11 WLANs," *IEEE International Conference on Signal Processing and Communication*, November 2007, paper no. 1569042132, pp. 768 - 771.

C31. **R. Akl** and Y. Saravanos, "Hybrid Energy-Aware Synchronization Algorithm in Wireless Sensor Networks," *18th Annual IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, September 2007, paper no 692, 5 pgs.

C32. M. Haidar, **R. Akl**, and H. Al-Rizzo, "Channel Assignment and Load Distribution in a Power-Managed WLAN," *18th Annual IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, September 2007, paper no. 463, 5 pgs.

C33. D. Keathly and **R. Akl,** "Attracting and Retaining Women in Computer Science and Engineering: Evaluating the Results," *Proceedings of American Society for Engineering Education: ASEE Annual Conference*, June 2007, paper no. AC 2007-1229, 10 pgs.

C34. M. Haidar, **R. Akl**, H. Al-Rizzo, Y. Chan, R. Adada, "Optimal Load Distribution in Large Scale WLAN Networks Utilizing a Power Management Algorithm," *Proceedings of IEEE Sarnoff Symposium*, May 2007, 5 pgs.

C35. R. Dantu, P. Kolan, **R. Akl,** and K. Loper, "Classification of Attributes and Behavior in Risk Management Using Bayesian Networks," *Proceedings of IEEE Intelligence and Security Informatics Conference*, May 2007, pp. 71-74.

C36. **R. Akl** and A. Arepally, "Dynamic Channel Assignment in IEEE 802.11 Networks," *Proceedings of IEEE Portable 2007: International Conference on Portable Information Devices*, March 2007, pp 309-313.

C37. **R. Akl** and U. Sawant, "Grid-based Coordinated Routing in Wireless Sensor Networks," *Proceedings of IEEE CCNC 2007: Consumer Communications and Networking Conference*, January 2007, pp. 860-864.

C38. **R. Akl** and A. Arepally, "Simulation of Throughput in UMTS Networks with Different Spreading Factors," *Proceedings of IEEE VTC Fall 2006: Vehicular Technology Conference,* September 2006, pp. C1-5.

C39. A. Alhabsi, H. Al-Rizzo, and **R. Akl,** "Parity Assisted Decision Making for QAM Modulation," *International Conference on Mobile Computing and Wireless Communications*, September 2006, paper no. 1568988776, 5 pgs.

C40. **R. Akl** and R. Garlick**,** "Retention and Recruitment of Women in Computer Engineering," *ICEE 2006: International Conference on Engineering Education,* July 2006, paper no. 3318, 5 pgs.

C41. R. Garlick and **R. Akl,** "Intra-Class Competitive Assignments in CS2: A One-Year Study," *ICEE 2006: International Conference on Engineering Education,* July 2006, paper no. 3325, 5 pgs.

C42. **R. Akl**, D. Tummala, and X. Li, "Indoor Propagation Modeling at 2.4 GHz for IEEE 802.11 Networks," *WNET 2006: Wireless Networks and Emerging Technologies,* July 2006, paper no. 510-014, 6 pgs.

C43. P. Chen, K. Kavi, and **R. Akl,** "Performance Enhancement by Eliminating Redundant Function Execution," *Proceedings of IEEE: 39th Annual Simulation Symposium*, April 2006, pp. 143-150.

C44. **R. Akl** and S. Nguyen, "Capacity Allocation in Multi-cell UMTS Networks for Different Spreading Factors with Perfect and Imperfect Power Control," *Proceedings of IEEE CCNC 2006: Consumer Communications and Networking Conference*, January 2006, vol. 2, pp. 928-932.

C45. W. Li, K. Kavi, and **R. Akl**, "An Efficient Non-Preemptive Real-Time Scheduling," *18th International Conference on Parallel and Distributed Computing Systems*, Las Vegas, NV, September 2005, pp. 154-160.

C46. S. Nguyen and **R. Akl**, "Approximating User Distributions in WCDMA Networks Using 2-D Gaussian," *CCCC20T 05: International Conference on Computing, Communications, and Control Technologies*, July 2005, 5 pgs.

C47. **R. Akl** and S. Park, "Optimal Access Point Selection and Traffic Allocation in IEEE 802.11 Networks," *Proceedings of 9th World Multiconference on Systemics, Cybernetics and Informatics (WMSCI 2005): Communication and Network Systems, Technologies and Applications*, July 2005, vol. 8, pp. 75-79.

C48. **R. Akl**, M. Naraghi-Pour, M. Hegde, "Throughput Optimization in Multi-Cell CDMA Networks," *IEEE WCNC 2005 - Wireless Communications, and Networking Conference*, March 2005, vol. 3, pp. 1292-1297.

C49. **R. Akl**, "Subscriber Maximization in CDMA Cellular Networks," *Proceedings of CCCT 04: International Conference on Computing, Communications, and Control Technologies*, August 2004, vol. 3, pp. 234-239.

C50. **R. Akl** and A. Parvez, "Global versus Local Call Admission Control in CDMA Cellular Networks," *Proceedings of CITSA 04: Communications, Information and Control Systems, Technologies and Applications*, July 2004, vol. 2, pp. 283-288.

C51. **R. Akl** and A. Parvez, "Impact of Interference Model on Capacity in CDMA Cellular Networks," *Proceedings of SCI 04: Communication and Network Systems, Technologies and Applications*, July 2004, vol. 3, pp. 404-408. Selected as **best paper** of those presented in the session: Tele-Communication Systems, Technologies and Application II.

C52. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Call Admission Control Scheme for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Wireless Communications and Networking Conference*, September 2000, vol. 1, pp. 465-470.

C53. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Cell Placement in a CDMA Network," *IEEE Wireless Communications and Networking Conference*, September 1999, vol. 2, pp. 903-907.

C54. **R.G. Akl**, M.V. Hegde, P.S. Min, "Effects of Call Arrival Rate and Mobility on Network Throughput in Multi-Cell CDMA," *IEEE International Conference on Communications*, June 1999, vol. 3, pp. 1763-1767.

C55. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Flexible Allocation of Capacity in Multi-Cell CDMA Networks," *IEEE Vehicular Technology Conference*, May 1999, vol. 2, pp. 1643-1647.

## Journal Publications

J1. R. Chataut, **R. Akl**, "Massive MIMO Systems for 5G and Beyond Networks – Overview, Recent Trends, Challenges, and Future Research Direction," *Sensors 2020*, 20(10), 2753, May 2020.

J2. R. Chataut, **R. Akl**, "Massive MIMO Systems for 5G," *Encyclopedia 2020*, doi:10.32545, 2020, (ISSN 2309-3366).

J3. S. Alotaibi, **R. Akl**, "Range-Based Scheme for Adjusting Transmission Power of Femtocell in Co-Channel Deployment," *International Journal of Interdisciplinary Telecommunications and Networking*, IJITN Vol. 10, No. 4, pgs. 14-24, 2018.

J4. U. Sawant, **R. Akl**, "Adaptive and Non Adaptive LTE Fractional Frequency Reuse Mechanisms Mobility Performance," *Advances in Science, Technology and Engineering Systems Journal*, ASTES Vol. 3, No. 3, 02-11, 11 pgs., 2018.

J5. M. Haidar, H.M. Al-Rizzo, **R. Akl**, and Z. Elbazzal, "The Effect of an Enhanced Channel Assignment Algorithm in an IEEE 802.11 WLAN," *World Scientific and*

*Engineering Academy and Society Transactions on Communications*, WSEAS, Vol. 8, Issue 12, December 2009.

J6.   **R. Akl**, P. Kadiyala, and M. Haidar, "Non-Uniform Grid-Based Coordinated Routing in Wireless Sensor Networks," *Journal of Sensors*, article ID 491349, volume 2009, 11 pages.

J7.   M. Haidar, M. Al-Rizzo, Y. Chan, **R. Akl**, "User-Based Channel Assignment Algorithm in a Load-Balanced IEEE 802.11 WLAN," *International Journal of Interdisciplinary Telecommunications & Networking (IJITN)*, April-June 2009, 1(2), pp. 66-81.

J8.   **R. Akl**, D. Keathly, and R. Garlick, "Strategies for Retention and Recruitment of Women and Minorities in Computer Science and Engineering," *iNEER Special Volume: Innovations 2007- World Innovations in Engineering Education and Research*, 9 pgs., 2007.

J9.   R. Garlick and **R. Akl**, "Motivating and Retaining CS2 Students with a Competitive Game Programming Project," *iNEER Special Volume: Innovations 2007- World Innovations in Engineering Education and Research*, 9 pgs., 2007.

J10.  **R. Akl** and S. Nguyen, "UMTS Capacity and Throughput Maximization for Different Spreading Factors," *Journal of Networks*, July 2006, vol. 1, issue 3, pp. 40-49. ISSN: 1796-2056

J11.  W. Li, K. Kavi, and **R. Akl**, "A Non-preemptive Scheduling Algorithm for Soft Real-time Systems," *Journal of Computer and Electrical Engineering,* 2006, vol. 32, 18 pgs. ISSN: 0045-7906

J12.  **R. Akl**, A. Parvez, and S. Nguyen, "Effects of Interference on Capacity in Multi-Cell CDMA Networks," *Journal of Systemics, Cybernetics and Informatics*, 2006, vol. 3, no. 1, p825612, 7 pgs. ISSN: 1690-4524

J13.  **R.G. Akl**, M. Hegde and M. Naraghi-Pour, "Mobility-based CAC Algorithm for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Transactions on Vehicular Technology,* March 2005*,* vol. 54, no. 2, pp. 639-651.

J14.  **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Multi-Cell CDMA Network Design," *IEEE Transactions on Vehicular Technology*, May 2001, vol. 50, no. 3, pp. 711-722.

**Technical Papers**

T1.   J. Williams, **R. Akl,** et al, "Flight Control Subsystem," *The Eagle Feather*, Special Section: Undergraduate Research Initiative in Engineering, University of North

Texas, Vol. 7, 2010.

T2.   **R.G. Akl**, M.V. Hegde, A. Chandra, P.S. Min, "CDMA Capacity Allocation and Planning," Technical Document, Washington University Department of Electrical Engineering WUEE-98, April 1998.

## Book Chapters

B1.   R. Akl, Y. Saravanos, and M. Haidar, "Chapter 18: Hybrid Approach for Energy-Aware Synchronization in Sensor Networks," *Sustainable Wireless Sensor Networks*, December 2010, pgs. 413-429, ISBN: 978-953-307-297-5.

B2.   K. Kavi, **R. Akl** and A. Hurson, "Real-Time Systems: An Introduction and the State-of-the-Art," *Encyclopedia of Computer Science and Engineering*, John Wiley & Sons, Volume 4, January 2009, pgs. 2369-2377.

B3.   **R. Akl** and K. Kavi, "Chapter 12: Modeling and Analysis using Computational Tools," *Introduction to Queuing Theory: Modeling and Analysis*, Birkhauser Boston, December 2008, pgs. 295-320.

## Technical Presentations

P1.   "Bio-Com Project," Raytheon, Richardson TX, May 2012, (invited).

P2.   "Bio-Com Project," Net-Centric Software and Systems I/UCRC Meeting, Denton TX, December 2011, (invited).

P3.   "Student Outreach Report: Robocamp," College of Engineering Advisory Board Meeting, Denton TX, May 2011, (invited).

P4.   "Robocamp: Encouraging Young Women to Embrace STEM," 4th Annual TETC Best Practices Conference, Austin TX, February 2009, (invited).

P5.   "Self-Configuring Wireless MEMS Network (demo)," Southern Methodist University, Dallas TX, January 2008, (invited).

P6.   "Energy-aware Routing and Hybrid Synchronization in Sensor Networks," *Southern Methodist University,* Dallas TX, September 2007, (invited).

P7.   "Retention and Recruitment of Women in Computer Engineering," *ICEE 2006: International Conference on Engineering Education,* Puerto Rico, July 2006, (refereed).

P8.   "Capacity Allocation in Multi-cell UMTS Networks for Different Spreading Factors with Perfect and Imperfect Power Control," *IEEE CCNC 2006: Consumer Communications and Networking Conference*, Las Vegas, NV, January 2006,

(refereed).

P9.   "Research, Teaching, and Outreach," CSE Advisory Council Meeting, *UNT Research Park*, Denton, TX, December 2005, (invited).

P10.  "Wi-Fi and WCDMA Network Design," *University of Arkansas*, Little Rock, AR, April 2005, (invited).

P11.  "Wi-Fi and WCDMA Network Design," *Southern Methodist University*, Dallas, TX, March 2005, (invited).

P12.  "Current Research in Wireless at UNT," *Nortel Networks*, Richardson, TX, October 2004, (invited).

P13.  "Subscriber Maximization in CDMA Cellular Networks," *International Conference on Computing, Communications, and Control Technologies*, Austin, TX, August 2004, (refereed).

P14.  "Global versus Local Call Admission Control in CDMA Cellular Networks," *International Conference on Cybernetics and Information Technologies, Systems and Applications*, Orlando, FL, July 2004, (refereed).

P15.  "Impact of Interference Model on Capacity in CDMA Cellular Networks," *8th World Multi-Conference on Systemics, Cybernetics, and Informatics*, Orlando, FL, July 2004, (refereed).

P16.  "CDMA Network Design," IEEE Communications Society – New Orleans Chapter, New Orleans, LA, May 2002, (invited).

P17.  "Cell Design to Maximize Capacity in CDMA Networks," Louisiana State University, Baton Rouge, LA, April 2002, (invited).

P18.  "Call Admission Control Scheme for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Wireless Communications and Networking Conference*, Chicago, IL, September 2000, (refereed).

P19.  "Cell Placement in a CDMA Network," *IEEE Wireless Communications and Networking Conference*, September 1999, (refereed).

P20.  "Effects of Call Arrival Rate and Mobility on Network Throughput in Multi-Cell CDMA," *IEEE International Conference on Communications*, June 1999, (refereed).

P21.  "Flexible Allocation of Capacity in Multi-Cell CDMA Networks," *IEEE Vehicular Technology Conference*, May 1999, (refereed).

P22. "CCAP: A Strategic Tool for Managing Capacity of CDMA Networks," Teleware Co. Ltd., Seoul, South Korea, 1998, (invited).

## Courses Developed

- CSCE 5933: LTE Physical Layer Using MATLAB.
  Research issues in the design of LTE physical layer and simulate using MATLAB. Topics include modulation and coding, OFDM, channel modeling, MIMO, and link adaption.

- CSCE 6590: Advanced Topics in Wireless Communications & Networks: 4G/LTE.
  Research issues in the design of next generation wireless networks: cellular systems, medium access techniques, signaling, mobility management, control and management for mobile networks, wireless data networks, Internet mobility, quality-of-service for multimedia applications, caching for wireless web access, and ad hoc networks.

- CSCE 5933: Fundamentals of VoIP.
  Fundamentals of VoIP, with emphasis on network infrastructure implementation and security. Topics include IP protocol suite, SS7, speech-coding techniques, quality of service, session initiation protocol, and security issues.

- CSCE 5540: Introduction to Sensor Networks.
  Topics include: design implications of energy (hardware and software), and otherwise resource-constrained nodes; network self-configuration; services such as routing under network dynamics, localization, time-synchronization and calibration; distributed data management, in-network aggregation and collaborative signal processing, programming tools and language support.

- CSCE 5510. Wireless Communication.
- Point-to-point signal transmission through a wireless channel, channel capacity, channel encoding, and multi-user transmissions. First, second, and third generation cellular systems, and mobility management.

- CSCE 3510. Introduction to Wireless Communication.
  Fundamentals of wireless communications and networking, with emphasis on first, second, and third generation cellular systems. Topics include point-to-point signal transmission through a wireless channel, cellular capacity, multi-user transmissions, and mobility management.

- CSCE 3020. Communications Systems.
  Introduction to the concepts of transmission of information via communication channels. Amplitude and angle modulation for the transmission of continuous-time signals. Analog-to-digital conversion and pulse code modulation. Transmission of digital data. Introduction to random signals and noise and their effects on communication. Optimum detection systems in the presence of noise.

- ENEE 3583. Computer Systems Design I (UNO).
  The design process of digital computer systems is studied from the instruction set level, system architecture level, and digital logic level. Topics include machine organization, register transfer notation, processor design, memory design, and input/output considerations. Includes semester project.

- ENEE 3584. Computer Systems Design II (UNO).
  The design and evaluation of contemporary computer systems are analyzed to compare the performance of different architectures. Topics include performance metrics, computer arithmetic, pipelining, memory hierarchies, and multiprocessor systems.

- ENEE 3514. Computer Architecture Laboratory (UNO).
  Selected experiments examining programmable logic, VHDL and logic synthesis, and including a final design project, to accompany and complement the lecture course ENEE 3584. Three hours of laboratory.

## Courses Taught

Fall 2021
- CSCE 3010.1: Signals and Systems (no evaluation yet)
- CSCE 5933.1: LTE Physical Layer Using MATLAB (no evaluation yet)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2021
- CSCE 2610.2: Computer Organization (4.0 / 5.0)
- CSCE 3020.1: Communication Systems (4.2 / 5.0)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2020
- CSCE 3010.1: Signals and Systems (4.1 / 5.0)
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2020
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2019
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.3 / 5.0)
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2019
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6940.743: Software Defined Radios (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2018
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.8 / 5.0)

- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2018
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6940.743: Jitter-buffer Management and Interference in VoIP (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2017
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.9 / 5.0)
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6940.743: VoLTE and VoWiFi (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2017
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2016
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.7 / 5.0)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2016
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2015
- CSCE 3010.1: Signals and Systems (5.7 / 7.0)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2015
- CSCE 5934.743: Directed Study (no evaluation done)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2014
- CSCE 3010.1: Signals and Systems (3.32 / 4.00)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)
- CSCE 6590.1: Advanced Topics in Wireless Communications & Networks: 4G/LTE (3.79 / 4.00)

Spring 2014
- CSCE 3510.1: Intro to Wireless Communication (808 – Highly Effective)
- CSCE 5510.1: Wireless Communications (808 – Highly Effective)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2013
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)
- CSCE 6590.1: Advanced Topics in Wireless Communications & Networks: 4G/LTE (804 – Highly Effective)

Spring 2013

- CSCE 4890.743: Directed Study (no evaluation done)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6940.743: Individual Research (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2012
- CSCE 3010.1: Signals and Systems (793 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (814 – Highly Effective)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2012
- CSCE 3020.1: Communication Systems (809 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (811 – Highly Effective)
- CSCE 5510.1: Wireless Communications (817 – Highly Effective)
- EENG 3810.1: Communication Systems (801 – Highly Effective)

Fall 2011
- CSCE 3010.1: Signals and Systems (793 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (824 – Highly Effective)

Spring 2011
- CSCE 3020.1: Communication Systems (820 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (812 – Highly Effective)
- CSCE 5510.1: Wireless Communications (812 – Highly Effective)
- EENG 3810.1: Communication Systems (826 – Highly Effective)

Fall 2010
- CSCE 3010.1: Signals and Systems (857 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (831 – Highly Effective)

Spring 2010
- CSCE 3020.1: Communication Systems (792 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (793 – Highly Effective)
- CSCE 5510.1: Wireless Communications (834 – Highly Effective)
- EENG 3810.1: Communication Systems (854 – Highly Effective)

Fall 2009
- CSCE 3010.1: Signals and Systems (4.40 / 5.00)
- CSCE 5540.1: Intro to Sensor Networks (4.70 / 5.00)
- EENG 2620.1: Signals and Systems (4.40 / 5.00)

Spring 2009
- CSCE 3020.1: Communication Systems (4.87 / 5.00)
- CSCE 3510.1: Intro to Wireless Communication (4.65 / 5.00)
- CSCE 5510.1: Wireless Communications (4.79 / 5.00)

Fall 2008
- CSCE 3010.1: Signals and Systems (4.91 / 5.00)
- CSCE 5540.2: Intro to Sensor Networks (4.10 / 5.00)
- EENG 2620.3: Signals and Systems (4.91 / 5.00)

Spring 2008
- CSCE 3020.1: Communication Systems (4.68 / 5.00)

- CSCE 3510.1: Intro to Wireless Communication (3.96 / 5.00)
- CSCE 5510.1: Wireless Communications (4.75 / 5.00)

Fall 2007
- CSCE 3010.1: Signals and Systems (4.57 / 5.00)
- CSCE 5540.2: Intro to Sensor Networks (4.01 /5.00)

Summer 2007
- CSCE 3020.1: Fund. of Communication Theory (no evaluation done)
- EENG 3810.1: Communication Systems (no evaluation done)

Spring 2007
- CSCE 5510.2: Wireless Communications (4.75 / 5.00)
- CSCE 5933.6: Fundamentals of VoIP (4.70 / 5.00)

Fall 2006
- CSCE 3010.1: Signals and Systems (4.58 / 5.00)
- CSCE 5540.1: Intro to Sensor Networks (4.70 / 5.00)
- EENG 2620.1: Signals and Systems (4.58 / 5.00)

Summer 2006
- CSCE 3020.1: Fund. of Communication Theory (no evaluation done)
- CSCE 3510.21: Intro to Wireless Communications (no evaluation done)
- CSCE 5510.21: Intro to Wireless Communications (no evaluation done)
- EENG 3810.1: Communication Systems (no evaluation done)

Spring 2006
- CSCE 2610.2: Computer Organization (3.69 / 5.00)
- CSCE 3010.1: Signals and Systems (4.41 / 5.00)
- EENG 2620.1: Signals and Systems (4.41 / 5.00)

Fall 2005
- CSCE 3510.1: Intro to Wireless Communications (4.52 / 5.00)
- CSCE 5510.1: Wireless Communications (4.46 / 5.00)
- CSCE 5933.6: Intro to Sensor Networks (4.60 / 5.00)

Summer 2005
- CSCE 3010.21: Signals and Systems (no evaluation done)
- CSCE 3510.21: Intro to Wireless Communications (no evaluation done)

Spring 2005
- CSCE 3510.02: Intro to Wireless Communications (4.46 / 5.00)
- CSCI 3100.02: Computer Organization (4.14 / 5.00)

Fall 2004
- CSCE 3510.01: Intro to Wireless Communications (4.15 / 5.00)
- CSCI 4510.01: Machine Structures (4.55 / 5.00)
- CSCI 5330.02: Intro to Wireless Communications (4.05 / 5.00)

Summer 2004
- CSCI 4330.22: Intro to Wireless Communications (no evaluation done)
- CSCI 4330.23: Intro to Wireless Communications (no evaluation done)
- CSCI 5330.22: Intro to Wireless Communications (no evaluation done)

Spring 2004
- CSCI 3100: Computer Organization (4.64 / 5.00)

- CSCI 4330: Intro to Wireless Communications (4.22 / 5.00)

Fall 2003
- CSCI 4510: Machine Structures (4.49 / 5.00)
- CSCI 5330: Intro to Wireless Communications (4.83 / 5.00)

Summer 2003
- CSCI 3100: Computer Organization (no evaluation done)

Spring 2003
- CSCI 3100: Computer Organization (3.84 / 5.00)

Fall 2002
- CSCI 4510: Machine Structures (4.38 / 5.00)

## Funded Proposals

R1.  "I/UCRC Industrial Membership - Ashum Corp," 2020. Krishna Kavi (PI), Robert Akl (co-PI), **$52,000.**

R2.  "I/UCRC Industrial Membership - Ashum Corp," 2019. Krishna Kavi (PI), Robert Akl (co-PI), **$60,900.**

R3.  "I/UCRC Industrial Membership - Ashum Corp," 2018. Krishna Kavi (PI), Robert Akl (co-PI), **$57,700.**

R4.  "Robotics and App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $11,727. Submitted 5/5/17. Robert Akl (PI), **$11,727.**

R5.  "I/UCRC Industrial Membership - Ashum Corp," 2017. Krishna Kavi (PI), Robert Akl (co-PI), **$50,000.**

R6.   "UNT GenCyber Summer Program: Inspiring the Next Generation of Cyber Stars in North Texas," National Security Agency (NSA). Requested amount is $85,000. Submitted 11/4/2016. Robert Akl (co-PI), **$85,000.**

R7.  "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $12,900. Submitted 5/6/16. Robert Akl (PI), **$12,900.**

R8.  "I/UCRC Industrial Membership - Ashum Corp," 2016. Krishna Kavi (PI), Robert Akl (co-PI), **$65,000.**

R9.  "Robotics, Game and App Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 11/16/15. Robert Akl (PI), **$63,000**.

R10. "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $13,998. Submitted 5/1/15.

Robert Akl (PI), **$13,988**.

R11.  "I/UCRC Industrial Membership - Ashum Corp," 2015. Krishna Kavi (PI), Robert Akl (co-PI), **$40,000.**

R12.  "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $12,500. Submitted 5/2/14. Robert Akl (PI), **$12,500**.

R13.  "I/UCRC Industrial Membership - Ashum Corp," 2014. Krishna Kavi (PI), Robert Akl (co-PI), **$46,000.**

R14.  "I/UCRC Industrial Membership - Ashum Corp," 2013. Krishna Kavi (PI), Robert Akl (co-PI), **$38,500.**

R15.  "Robotics, Game and App Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 12/14/12. Robert Akl (PI), **$63,000**.

R16.  "Bio-Com Project," funded by Raytheon under Net-Centric Software and Systems I/UCRC 2nd year. Requested amount is $30,000. Submitted 5/12/12. Krishna Kavi (PI), Robert Akl (co-PI), **$30,000.**

R17.  "Bio-Com Project," funded by Raytheon under Net-Centric Software and Systems I/UCRC. Requested amount is $30,000. Submitted 5/12/11. Krishna Kavi (PI), Robert Akl (co-PI), **$30,000.**

R18.  "Game Programming for Xbox 360 Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $20,000. Submitted 3/21/11. Robert Akl (PI), **$20,000**.

R19.  "RoboCamps and Game Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 2/17/11. Robert Akl (PI), **$63,000**.

R20.  "Game Programming for Xbox 360 Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $13,000. Submitted 2/22/10. Robert Akl (PI), **$18,000.**

R21.  "Robotics and Game Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 10/16/09. Robert Akl (PI), **$63,000**.

R22.  "Micro Air Vehicle Design: A Collaborative Undergraduate Project for Electrical Engineering, Computer Engineering, and Computer Science Students," under UNT Undergraduate Research Initiative. Submitted 9/25/2009.  Robert Akl (co-

PI), **$8,000**.

R23. "Summer Merit Program" under Texas Workforce Commission. Requested amount is $42,000. Submitted 3/20/09. Robert Akl (PI), **$42,000**.

R24. "Robocamp at Stewpot" under Dallas Women's Foundation. Requested amount is $20,000. Submitted 2/23/09. Robert Akl (PI), **$18,600**.

R25. "Robocamp Jump Start" under Motorola Foundation Innovation Generation Grant. Requested amount is $29,852. Submitted 2/12/09. Robert Akl (PI), **$30,700**.

R26. "Engineering Summer Program" under Texas Higher Education Coordinating Board. Requested amount is $7,944. Submitted 2/13/09. Robert Akl (PI), **$11,111**.

R27. "Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $152,393. Submitted 11/10/08. Robert Akl (PI), **$152,393**.

R28. "I/UCRC Center Proposal: Net-Centric Software and Systems," under NSF-07-537: Industry/University Cooperative Research Centers. Requested amount is $349,482. Submitted 9/26/08. Krishna Kavi (PI), Robert Akl (co-PI), **$60,000 per year for 5 years**.

R29. "Robocamp and Beyond" under Motorola Foundation Innovation Generation Grant. Requested amount is $30,000. Submitted 6/20/08. Robert Akl (PI), **$30,000**.

R30. Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $30,000. Submitted 2/27/08. Robert Akl (PI), **$31,500**.

R31. "Robocamp Program for Young Women" under RGK foundation. Requested amount is $30,000. Submitted 11/5/07. Robert Akl (PI), **$15,000**.

R32. "Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $102,514. Submitted 10/22/07. Robert Akl (PI), **$102,514**.

R33. "Women Art Technology" under Hispanic and Global Studies Initiatives Fund. Requested amount is $14,125. Submitted 9/30/07. Jennifer Way (PI), Robert Akl (co-PI), **$12,785**.

R34. "Robocamp Mobile Unit" under Motorola Foundation Innovation Generation Grant. Requested amount is $35,000. Submitted 6/20/07. Robert Akl (PI), **$30,000**.

R35. "ICER: UNT Engineering Challenge Camps" under NSF 0547299. Requested amount is $35,000. Submitted 4/27/07. Oscar Garcia (PI), Robert Akl (senior

personnel), **$32,792**.

R36. "I/UCRC-Planning Proposal: UNT Research Site Proposal to join Embedded Systems I/UCRC," under NSF-01-116: Industry/University Cooperative Research Centers. Requested amount is $10,000. Submitted 3/31/07. Krishna Kavi (PI), Robert Akl (co-PI), **$10,000**.

R37. "High-assurance NCCS: Ultra Dependability Integration Engineering," Department of Defense. Requested amount is $20,000. Submitted 3/12/07. Krishna Kavi (PI), Robert Akl (co-PI), **$20,000**.

R38. "Recruiting and Retention Strategies for Computer Science at UNT" under Texas Technology Workforce Development Grant Program – 2005. Requested amount is $163,322. Submitted 3/17/05. Robert Akl (PI), **$125,322**.

R39. UNT Faculty Research Grant for Fall 2003, Robert Akl (PI), $5,000, **$4,000**.

R40. UNT Junior Faculty Summer Research Fellowship for Summer 2003, Robert Akl (PI), $5,000, **$5,000**.

## Professional Associations and Achievements

### Membership in Professional Organizations

- Senior Member IEEE
- Member, Federation Council of North Texas Universities
- Member, Eta Kappa Nu Electrical Engineering Honor Society
- Member, Golden Key National Honor Society
- Member, Tau Beta Pi Engineering Honor Society

### Offices and Committee Assignments in Professional Organizations

- Technical Program Committee Member, IEEE Wireless Communications and Networking Conference, IEEE WCNC
- Technical Program Committee Member, International Wireless Symposium, IWS
- Technical Program Committee Member, IEEE International Conference on Computational Science, IEEE ICCS
- Technical Program Committee Member, IASTED International Conference on Wireless Communications, WC
- Technical Program Committee Member, WTS Wireless Telecommunications Symposium
- Technical Program Committee Member, Mosharaka International Conference on Computer Science and Engineering, Amman
- Invitation to serve as an NSF reviewer/panelist for Engineering Research Centers (ERC) proposals

- Technical Program Committee Member, 18th IEEE International Symposium on Personal, Indoor and Mobile Radio Communication, Greece
- International Program Committee, IASTED International Conference on Wireless and Optical Communication, Canada
- Program Committee Member, Fifth Annual Wireless Telecommunications Symposium, CA
- Technical Publications Chair, IEEE Vehicular Technology Conference, Dallas TX
- Session Chair, International Conference on Computing, Commun. and Control Tech., Austin TX
- Session Chair, International Conference on Cybernetics and Information Technologies, Orlando FL
- Session Chair, 8th World Multi Conference on Systemics, Cybernetic, and Informatics, Orlando FL

**Additional Responsibilities and Activities**

- Reviewer, *Wireless Communications and Mobile Computing*, 2012 – present
- Reviewer, *Journal of Sensor and Actuator Networks*, 2012 – present
- Reviewer, *IEEE Transactions on Vehicular Technology*, 2011 – present
- Reviewer, *Elsevier Journal of Computers & Electrical Engineering*, 2008 – present
- Reviewer, *IEEE Globecom*, 2007 – present
- Reviewer, *IEEE International Conference on Advanced Networks and Telecommunication Systems (ANTS)*, 2008 – present
- Reviewer, *The International Wireless Communications and Mobile Computing Conference*, 2007 – present
- Reviewer, *Journal on Wireless Communications and Networking*, 2007 – present
- Reviewer, *IEEE Transactions on Communications*, 2007 - present
- Reviewer, *International Journal of Communication Systems*, 2007 – present
- Reviewer, *IEEE Communications Magazine*, 2005 – present
- Reviewer, *Journal of Wireless Networks*, 2004 – present
- Reviewer, *IEEE Transactions on Mobile Computing*, 2004 – present
- Reviewer, *IEEE Transactions on Wireless Communications*, 2004 – present
- Reviewer, *ACM Crossroads*, 2004 – present

**Honors and Awards**

- Who's Who in America, 2012 Edition
- Winner of Tech Titan of the Future – University Level Award for UNT Robocamps for Girls, Metroplex Technology Business Council, 2010 with **$15,000 cash prize**.
- IEEE Professionalism Award, Ft Worth Chapter, 2008
- UNT College of Engineering Outstanding Teacher Award, 2008
- Certificate of Appreciation: IEEE Vehicular Technology Conference, Dallas, TX, 2005
- Certificate of Appreciation: Denton County Boosting Engineering, Science and

Technology (BEST) Robotics Competition, 2004
- Summa Cum Laude Graduate, Ranked First in Undergraduate Class
- The Computer Science Departmental Award for Academic Excellence, Washington University, 1993
- The Dual Degree Engineering Award for Outstanding Senior, Washington University, 1993
- The 1992 Technical Writing Competition Award, The Society for Technical Communication

# **Exhibit 5**

Case 1:21-cv-01119-MN-CJB   Document 101-1   Filed 09/29/22   Page 300 of 586 PageID #: 2568

# Smart-Antenna Operation for Indoor Wireless Local-Area Networks Using OFDM

Ari T. Alastalo and Mika Kahola

*Abstract*—This paper reports link-level Monte Carlo simulations for a system that is compatible with the physical layer of the 5-GHz IEEE 802.11a wireless-local-area network and utilizes an adaptive antenna array at the access point for single-user smart-antenna operation, as well as for space-division multiple access (SDMA). For the spatial indoor radio propagation channel, complex impulse-response recordings are used. These are obtained in wideband channel-sounder measurements in three different buildings at 5.3 GHz. Thus, no unrealistic assumptions about channel conditions are involved. The paper studies how the packet-error-rate performance for downlink (DL) is affected by time evolution of the radio channel that takes place after the uplink operation in which channel estimation is performed, and before DL operation in which the estimated channel information is utilized. Based on simulations two-user SDMA is possible with four-antenna elements under indoor propagation conditions and with six antennas three users can simultaneously be served. Delay spreads, coherence bandwidths, and correlation properties (in space, frequency, and polarization) of the radio channels obtained in the measurements are also discussed. The results suggest that indoor time-division-duplex systems with access-point-controlled scheduling are desirable communication systems which can benefit from SDMA.

*Index Terms*—Adaptive arrays, indoor radio communication, radio propagation, space-division multiplexing, wireless local-area network (LAN).

## I. INTRODUCTION

ADAPTIVE antennas offer several, widely recognized benefits for wireless communication systems [1]. The directivity of the antenna helps to reduce the delay spread of the radio channel and the diversity of the antenna guards against fading. Due to spatial gain, the output powers of mobile terminals (MT) can be decreased which results in longer battery lifetimes. Array antennas also serve to increase the range of the base stations (BSs)[1] and interference power from (and to) neighboring cells (service areas) can be significantly lowered. Finally, MTs served

by the same access point (AP) can be identified according to their spatial signatures, i.e. spatial characteristics of the radio channel between an MT and an access point (AP). This enables an AP to serve several MTs within the same timeslot (space-division multiple-access [SDMA] operation [2]) and, thus, increase capacity. Although in practice, one is not fully able to simultaneously benefit from all the above smart-antenna aspects, an optimal combination is the goal.

In time-division duplex (TDD) systems, the same carrier frequency is used for uplink (UL) and downlink (DL). This is convenient for smart-antenna solutions since one does not have to make a frequency transformation [3] to the spatial signatures, measured during UL, in order to find the weighting vectors to be used in the DL as in frequency-division duplex (FDD) systems such as GSM. In other words, apart from time evolution of the radio channel, the smart-antenna AP can utilize as much channel information in DL as in UL. In slowly varying radio environments, one would expect coherent reception and transmission schemes to more optimally utilize the spatial domain compared with approaches based on assumption of no channel knowledge in transmission [4].

Current standards for wireless local-area networks (WLAN) at 5 GHz, such as IEEE 802.11a [5], ETSI BRAN HIPERLAN/2 [6], and MMAC WATM/WETH are TDD systems utilizing orthogonal frequency-division multiplexing (OFDM) with 48 subcarriers and four pilot subcarriers. At the physical (PHY) layer, these standards are harmonized with each other to a large extent; while, at the medium-access control (MAC) layer, there are significant differences. These systems are designed to offer high data rates of up to 54 Mb/s in indoor and near-outdoor environments with stationary and slowly moving mobile terminals. For such applications, smart antennas would be desirable in order to offer the highest data rates to users. This paper focuses on IEEE 802.11a with stationary terminals; however, the results are also relevant for other 5 GHz WLAN systems due to similarities of the PHY layers.

The rest of this paper is organized as follows. Section II discusses the indoor radio-channel measurements that were performed in three different buildings at a carrier frequency of 5.3 GHz. In this section, estimated values for statistical parameters characterizing the propagation environments are presented. Section III describes details of the link simulations. Section IV is devoted to packet-error rate (PER) simulation results. In Section V, conclusions are presented. The Appendix collects the basic mathematical details relevant for single-user smart-antenna operation, as well as for SDMA in an OFDM system.

Manuscript received June 6, 2001; revised September 24, 2001; accepted November 16, 2001. The editor coordinating the review of this paper and approving it for publication is R. Murch. This work was supported in part by Tekes, the National Technology Agency.

A. T. Alastalo was with the Nokia Research Center (NRC), Radio Communications Laboratory, Nokia Group, FIN-00180 Helsinki, Finland. He is now with VTT Technical Research Center of Finland, VTT Information Technology, FIN-02044 VTT, Finland (e-mail: ari.alastalo@vtt.fi).

M. Kahola is with the Nokia Research Center (NRC), Radio Communications Laboratory, Nokia Group, FIN-00180 Helsinki, Finland (e-mail: mika.kahola@nokia.com).

Digital Object Identifier 10.1109/TWC.2003.809451

[1]Terms BS, AP, MT, and station (STA) are used here as synonyms. In this paper, the terminals are considered to be stationary during the time interval of interest.

1536-1276/03$17.00 © 2003 IEEE

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore.  Restrictions apply.

JA0300



Fig. 1.   Floor plan of Heikkiläntie, the office environment of the second set of measurements.

## II. MEASURED INDOOR RADIO CHANNELS

In order to test the reliability of different channel models (see, for example, [7] and [8]) in link-level simulations using simulations with channel recordings, wideband measurements of the complex radio channel are required. Such measurements were performed at 5.3 GHz in two office buildings in the Helsinki area and at the Helsinki airport, during office hours, using the channel sounder of Helsinki University of Technology (HUT), Institute of Radio Communications (IRC) [9]. The environment, antenna configuration, settings of the sounder, as well as measurement and data-processing procedures are described in [10] for the first building (Ruoholahti) with a measurement area of about 40 m in diameter. For the other buildings, essentially the same settings and approaches were used.

The second set of measurements were taken in a more conventional office environment (Heikkiläntie) shown in Fig. 1. The transmitter (TX) positions were selected in most of the offices and in the cubicles (not shown in Fig. 1) in the open-space area. Due to the walls of the cubicles, most of the TX positions did not have a clear line-of-sight (LOS) to the receiver (RX). The diameter of the measurement area (approximately 20 m) was smaller than in Ruoholahti.

The third and fourth measurement sites, considered in this paper are parts of the gate area of the international terminal of the Helsinki airport. During the measurements, there were many more people walking than in the previous two sites. Thus, one might expect the radio channel to vary somewhat faster. However, more than half of the TX positions did have a LOS to the RX, perhaps only temporarily blocked by people walking nearby. The fourth site (Airport 2) was in the main hall (high open space with a glass wall on one side toward the landing strips) of the airport with TX positions in a cross separated by approximately 0.5 m from each other. The receiver was located in a balcony of a restaurant approximately 4 m above the floor level. In this setup, there was line of sight from TX to RX and a lot of people walking in the vicinity of the TX.

### A. Channel Properties

Table I lists some of the properties of the measured channels. Number of TX positions is shown in the second column of Table I. For Ruoholahti there are 123 measurements with only vertical polarization used in the RX antenna array and 78

TABLE I
MEAN VALUES ($\langle \cdot \rangle$), AND STANDARD DEVIATIONS ($\Delta$) OF RMS DELAY SPREAD ($\tau_{\mathrm{RMS}}$), POLARIZATION CORRELATION ($C_{\mathrm{POL}}$) AND COHERENCE BANDWIDTH ($B_c$) IN EACH SITE, AVERAGED OVER TX POSITIONS. ALSO, AN LMS ESTIMATE FOR THE PARAMETER $\beta$ IN (1)

| | #TX | $\langle \tau_{\mathrm{rms}} \rangle$ ($\Delta$) /[ns] | $\langle C_{\mathrm{pol}} \rangle$ ($\Delta$) | $\langle B_c \rangle$ ($\Delta$) /[MHz] | $\beta_{\mathrm{LMS}}$ |
|---|---|---|---|---|---|
| Ruoholahti | 123 (78) | 130 (34) | 0.23 (0.18) | 2.9 (1.5) | 1.4 |
| Heikkiläntie | 38 | 26 (6) | 0.38 (0.25) | 6.1 (1.2) | 0.7 |
| Airport | 22 | 50 (12) | 0.25 (0.16) | 4.3 (1.3) | 0.97 |
| Airport 2 | 20 | 85 (15) | 0.14 (0.1) | 4.0 (1.0) | 1.7 |



Fig. 2.   (a) Subcarrier-correlation coefficients averaged over TX positions for the measured sites. (b) Spatial-envelope-correlation coefficients averaged over TX positions for the measured sites.

TX locations where both vertical and horizontal polarizations of the patches in two adjacent eight-element rows were used. For the other sites both polarizations were always measured. Fig. 2 shows the mean (averaged over TX positions) subcarrier correlation of the impulse response [11], as well as spatial envelope correlation coefficient [12] for each site. The subcarrier correlation is first averaged over the antenna elements of the array and the spatial correlation over different pairs of antennas having the same element separation. Since the frequency correlation is relatively short ranged, interleaving the data to the whole frequency band is expected to provide a good protection against fading. The spatial correlation does not noticeably depend on distance above half a wavelength, which is in agreement with the results of [13] and [14] for 10 GHz and 900 MHz, respectively. The mean narrowband [12] polarization correlations (averaged over antennas and TX positions) are summarized in Table I. For each site, the polarization correlation is smaller than the spatial correlation (see also [13]). Thus, available polarization-diversity gain should be of the same order as spatial-diversity gain. The root mean square (rms) delay spreads are much smaller than the intersymbol guard period which is 800 ns [5], [6]. Thus, problematic intersymbol interference is not expected in the receiver.

Considering the coherence bandwidth ($B_c$) and rms delay spread ($\tau_{\mathrm{rms}}$) for each TX position of a site, a relation [11]

$$B_c = C\tau_{\mathrm{rms}}^{-\beta} \qquad (1)$$

can be tested. Here $C$ and $\beta$ are parameters to be estimated. Fig. 3 shows that based on the measurements, (1) seems reasonable when the coherence bandwidth is defined based on the 3-dB width of the frequency-correlation as usual. Least mean square (LMS) estimates for $\beta$ in (1) are shown in Table I. As expected, one observes that the coherence bandwidth is smaller

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore.  Restrictions apply.

Case 1:21-cv-01119-MN-CJB   Document 101-1   Filed 09/29/22   Page 302 of 586 PageID #: 2570



Fig. 3.   Testing validity of (1). The coherence bandwidth is determined as a 3-dB width of the frequency-correlation curve. The linear LMS fits are also illustrated with numerical values of $\beta$ in the titles.

for the sites for which the rms delay spread is larger. It should be noted that the level of correlation, defining the coherence bandwidth, affects the estimate of $\beta$ to some extent. Furthermore, if one plots Fig. 3 using a higher level of correlation to define the coherence band, one obtains a much better linear fit.

## III. LINK-LEVEL SIMULATIONS

A link-level simulator was implemented in MATLAB following the PHY-layer specification of the IEEE 802.11a standard [5]. For the results of this paper, the short $B$ symbols [5] in the packet preamble were not implemented. The timing and frequency-offset estimations were based on $C$ symbols alone. By using the $C$ symbols alone, good conclusions can still be made about the gain achieved with smart antennas. In the simulations, relatively modest frequency offsets were used (up to 10 kHz). In order to simulate higher frequency offsets, correction algorithms using $B$ symbols would need to be introduced. It is important to note that the residual frequency error that remains in the received signal after correction has more effect on the higher modulations. Moreover, this frequency error is lowered by averaging over the spatial domain when more than one antenna is in use.

The channel estimates obtained from the training symbols at every subcarrier, are used for the payload-data symbols. The four pilots in the payload data [5], [6] are only used to update the frequency-offset estimation. This is reasonable, as there are only a few pilots with a separation larger than the coherence bandwidth of the channel.

For each simulated burst, a bit sequence (512 bits) was selected at random. The bits were coded, punctured, interleaved, and modulated to form a time-domain transmitter signal together with the training sequence. The transmitter signal was then convolved with the impulse responses (IRs) of the radio channel corresponding to the different AP antenna elements. An

interfering signal (in $C/I$ simulations) was constructed in the same manner (using a different channel) and added to the desired-user signal together with white Gaussian noise to form a received signal. The position of the training symbols of the interfering signal with respect to those of the desired-user signal was randomized since the different APs are not synchronized. The channel and the original bit sequence of the desired user were estimated from the received signal to calculate the PER. To simulate DL performance in a later frame, the interfering content of the signal was changed and a time-evolved version (later measurement) of the desired-user channel was convolved with a new transmitter signal. The channel estimate was not updated but left to reflect the earlier UL version of the desired-user channel. Furthermore, the SA weighting was taken directly from the receiver to the transmitter subroutine prior to transmission across the channel. Since the DL interferer is unknown to the AP and generally not the same as in UL, nulling cannot be used in DL. In UL, nulling according to (9) is shown to provide a gain of about 1–2 dB for array sizes up to eight antennas. However, a strong interferer can in some cases manifest itself in the desired-user channel estimate even after nulling. In such a situation, DL can perform better than UL since the same interferer is not present in DL (see Fig. 5).

For SDMA, the channel estimation is done during UL such that the corresponding MTs are served one at the time. The SDMA operation takes place in a later frame using the earlier channel estimates. Thus, the channels, even in the UL, are not trained during SDMA as opposed to [2]. For the relatively stationary channels that are considered, this is advantageous for short time intervals since interpolation in frequency is avoided. Furthermore, this mode of operation can more easily be fitted to the existing WLAN standards since MTs always transmit the same training signal.

In UL, the frequency offset is estimated separately for each of the antenna-branch-specific signals. Assuming synchronized antenna branches, frequency-offset correction can be performed by averaging the estimates. In DL, the same offset is generated on all antenna-specific signals before channel propagation, but the offset is estimated only once from the summed signal at the MT side. It appears that the variance of the coarse frequency-offset estimate actually becomes smaller for the DL. In particular, the distribution of the UL estimator seems to have long tails unlike the DL that cannot be removed by further frequency-domain correction. This phenomenon can explain some of the results showing better performance for DL than for UL (see Fig. 5).

The timing-offset estimation can be done separately for all antennas in UL but not in DL. For UL reception, it is best to correct the timing-offsets independently for each antenna. On the other hand, the DL weight calculation during UL burst achieves better results on signals with timing-offset corrections that are equal for all antennas. This is easy to understand since different timing-offset corrections for different antennas in DL weight calculation results in phase error.

STA-AP links were the only links measured. A STA-STA link which is thought to cause the primary interference in DL is taken from the measured STA-AP links for one of the AP antenna elements. This is a reasonable approach since the neighborhoods

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore.  Restrictions apply.





Fig. 4. Results for UL (solid line) and DL (dashed lines, one for each UL-DL time separation ($\Delta_T$) and for each ($N$)) against noise with $N \in \{1, 2, 4, 8\}$ and $\Delta_T \in \{1, 5, 10, 25, 50, 100\}$ ms.

Fig. 5. Same as Fig. 4, but against a single cochannel interferer. For the lower modulations, DL performs better than UL. Some suggestions for the reason of this are made in the text.



Fig. 6. Same as Fig. 4, but for Heikkiläntie (left) and Airport (right) with 16-QAM modulation. For Airport, aging effects are more pronounced.

## IV. SIMULATION RESULTS

In what follows, the results for single-user smart-antenna operation and for SDMA using the channel recordings described earlier are presented. Different values for the UL-DL time separation ($\Delta_T$) are considered using one, two, four, and eight elements in the AP antenna array. The total transmitted power is kept the same for all array sizes. In this paper, mainly uniform linear arrays having half-a-wavelength element separation and vertical polarization (same as used in MT) are considered. Analysis is restricted to the coderate 3/4 of binary phase-shift keying (BPSK), quaternary phase-shift keying (QPSK), 16 quadrature amplitude modulation (QAM), and 64 QAM modulations corresponding to datarates of 9, 18, 36, and 54 Mb/s, respectively. The other coderates specified in the standard for these modulations are not considered here. For each $E_b/N_0$ or $C/I$ value about 2300 independent bursts (independent transmissions of 512-bit packets) were simulated. For PER levels above 1% this has been tested to yield essentially the same results as larger numbers of bursts. The simulations were run on a unix workstation where one SDMA burst with $N$ antennas took about $N$ seconds for the 16 QAM modulation. Out of the recorded channels for each TX position, the 2300 to be used in simulations (all TX positions, having a dynamic range more than 6 dB in the measurement, are used) were randomly selected. For single-user $C/I$ simulations nulling is utilized according to (9) with $\gamma = 0.01$ and have set a noise level to $E_b/N_0 = 30$ dB.

### A. Single-User Results for UL and DL

Simulation results for single-user smart-antenna operation with measurements from Ruoholahti are shown in Figs. 4 and 5 against noise and interference, respectively. One observes that the smart-antenna gain is higher for the higher modulations

and that the performance difference for different modulations decreases for increasing number of antennas ($N$). Thus, for larger $N$, it becomes easier to switch to using a higher modulation in a link and, consequently, to increase the datarate. This is understandable since although the signal strengths in different antennas do not differ significantly in the time domain (differences of only few decibels are seen), in the frequency domain, there are large differences (up to tens of decibels) in signal strength between antennas around an arbitrarily selected subcarrier (frequency-selective fading). This increases the maximum achievable maximum-ratio gain [15] for the higher modulations for which interleaving leaves the data more local in the frequency domain. The change in slope of the PER curve for eight antennas at $C/I \approx 8$ dB with 16 QAM and at $C/I \approx 12$ dB with 64 QAM is due to the matrix inversion of the nulling in (9) being improperly regularized with a small value of $\gamma$, such as $\gamma = 0.01$, for a weak interferer.

It is important to note that the results are not susceptible to time evolution of the radio channel. This is also true for Heikkiläntie as shown in Fig. 6 (left) for 16 QAM modulation against noise with $N \in \{1, 2, 4, 8\}$ and $\Delta_T \in \{5, 25\,100\,200\}$ ms for UL (solid) and DL (dashed). For the airport site where there was much more movement in the environment aging effects are stronger. This is illustrated

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore. Restrictions apply.

IEEE TRANSACTIONS ON WIRELESS COMMUNICATIONS, VOL. 2, NO. 2, MARCH 2003



Fig. 7. Comparing frequency-domain and time-domain algorithms for four antennas in Ruoholahti (left) and Heikkiläntie (right) against noise with 16-QAM 3/4 modulation.



Fig. 8. Results of the DL SDMA simulation for two simultaneous users and one interferer with $N \in \{2, 4, 8\}$. Time difference between channel estimation and SDMA operation is: $\Delta_T \in \{1, 5, 10, 25, 50, 100\}$ ms for $N \in \{4, 8\}$ and $\Delta_T = 5$ ms for $N = 2$.

in Fig. 6 (right). One observes, for example, that for four antennas the difference in noise results between $\Delta_T = 5$ ms and $\Delta_T = 200$ ms is about 2 dB at PER =10%.

*1) Different Smart-Antenna Algorithms:* The single-user results obtained above for the frequency-domain combining scheme of Appendix A are now compared with three time-domain approaches that use the same weight vector for all the subcarriers. First, the Wiener-optimum [16] solution is considered. Second, out of a set of predefined beam patterns that can be generated with a Buttler matrix, the one is selected that gives the best signal-to-noise ratio (SNR) or C/I ratio after combining. Third, the combining is done with the generalized eigenvector of the matrix pair $[R, Q]$ that corresponds to the largest generalized eigenvector of the same pair [17]. Here, $R$ and $Q$ are the spatial correlation matrices of the desired signal and interference, respectively. The matrix $Q$ can be substituted with the identity matrix if one only wants to fight against noise in the absence of interference or in order to use the same weight vector in DL, where the interference situation is different. This corresponds to time-domain maximum-ratio combining [15]. The comparison between Ruoholahti and Heikkiläntie is shown in Fig. 7. Here, the modulation is 16 QAM and four antennas ($N = 4$) are considered. It should be noted that the time-domain results for different algorithms are within 2 dB. In Ruoholahti, where the coherence bandwidth is smaller, the difference in performance between the frequency-domain approach and the time-domain algorithms is larger than for Heikkiläntie. The airport behavior is close to that of Heikkiläntie. For lower modulations, the difference in time-domain and frequency-domain results is smaller. This is, again, because for lower modulations the frequency-selective fading effects are less significant.

*2) Polarization Diversity:* As shown in Table I and Fig. 2, correlation of orthogonal polarizations in a single patch element is smaller than correlation of the same polarizations in spatially separated antennas. One would expect polarization diversity to perform as good as spatial diversity in maximum-ratio combining, at least for single-user operation. However, the measurements were performed such that the TX antenna was vertically polarized and the RX polarizations were vertical and horizontal. Consequently, if the radio channel does not redistribute enough energy between polarizations, the horizontally polarized RX signal remains weaker than its vertically polarized counterpart and, thus, SNR is lower in horizontally polarized recep-

tions. For Ruoholahti an average of 2.9 dB difference in signal strengths of vertical (same as transmitted) and horizontal polarizations can be seen. For Heikkiläntie, Airport and Airport 2, on the other hand, even higher values of 4.9, 4.4, and 3.8 dB, respectively, are obtained. These values are of the same order as those reported for 900 MHz in [14]. For this reason, if the noise level is tuned according to the vertical polarization, the PER performance of 16 QAM in Ruoholahti with four vertically polarized antennas is about 2 dB better than in the case, where half of the diversity branches use horizontal polarization. On the other hand, if the transmitted polarization varies the situation is different since the power ratio of the received polarizations changes.

### B. DL SDMA Results

Fig. 8 shows results for two-user DL SDMA in Ruoholahti with two, four, and eight antennas. The SDMA users and interferers are randomly selected among the measurements with no regard to the fact that some pairs are more easily separable in SDMA operation than others. The same values for the UL-DL time separation are considered as above in Figs. 4 and 5 for single-user operation. It should be noted that for $\Delta_T > 10$ ms, the effects of aging of the channel estimates become apparent, unlike the case for single-user operation. This is due to the nulling that causes SDMA to be more easily affected by errors in channel estimates than maximizing the power to the desired user in single-user operation. Increasing the number of antennas or lowering the modulation decreases the aging effects. Differences between Ruoholahti and the other sites are similar to the ones for single-user operation. For example, the results in Heikkiläntie are close to those obtained for Ruoholahti while for Airport the aging effects are far more pronounced. In Fig. 8, contrary to [2], there is a high error floor with small time separations when the number of antennas is the same as the number of simultaneous users. However, for the Heikkiläntie channels

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore.  Restrictions apply.





Fig. 9. Results for DL SDMA in Ruoholahti with $M = 3$ simultaneous users using $N \in \{4, 5, 6, 8\}$ and having $\Delta_T = 1$ ms. PER curves for all three users are shown. The result with $N = 2\,M$ is practically the same as in Fig. 8.

which have a smaller delay spread, the PER falls with $N = 2$ for the whole range of $C/I$ values that is considered.

The three-user DL SDMA performance for Ruoholahti is illustrated in Fig. 9 against noise and interference for 16 QAM modulation with $\Delta_T = 1$ ms using four, five, six, and eight antennas. The interference result with $N = 6$ is almost equal to the $N = 4$ curve with two users in Fig. 8.

## V. DISCUSSION AND CONCLUSION

Link simulations were performed for smart antennas in a 5 GHz WLAN, such as IEEE 802.11a or HIPERLAN/2 with measured spatial indoor channels. This provides a more accurate model of radio propagation compared with the limited number of indoor channel models derived from the literature which include angle-of-arrival information. Link simulations with measured channels also allow one to make a comparison to channel models with respect to PER performance level. First results of such a comparison with the model of [8] were presented in [10] showing good agreement. A more detailed comparison is currently being done. In addition time evolution of the radio channel is readily addressed through the channel measurements which is important for simulations considering DL beamforming and SDMA operation.

Radio channels were measured in three separate buildings with very different environments during office hours when normal walking traffic is present. Differences between the environments are clearly shown in the statistical channel properties such as delay spreads and coherence bandwidth estimated based on the measurements, and simulation results with varying UL–DL time separations. In this paper it is shown that frequency-domain coherent combining works well for a wide range of indoor channel conditions and for high datarates. The smart-antenna gain is shown to be larger for the higher datarate modulations decreasing the performance difference between different modulations with a constant array size. This makes switching to higher datarates easier.

In terms of receiver processing, coherent combining is the most efficient way to utilize spatial diversity from a performance point of view. For the transmitter processing, the central issue is whether the transmitter has knowledge of the radio channel. In TDD systems, the transmitter has such knowledge provided that the radio channel has not changed significantly

Fig. 10. Single-user smart-antenna operation in UL (top) and DL (bottom) with frequency-domain combining. Removal and insertion of the 0.8-$\mu$s cyclic prefix [5] is not shown here.

from reception to transmission for a given station. Under such circumstances, the gain of coherent transmission approaches that of coherent reception. In FDD systems, this can also be the case if the propagation environment is simple enough. The results suggest that for the 5-GHz WLANs with stationary terminals the radio channel is stable enough over fairly long times ($> 100$ ms) for successful single-user UL and DL operation. However, in order to use SDMA, more frequent channel estimation is needed. In addition, in order to utilize SDMA operation, one has to cope with the problems arising from the acknowledgment and carrier-sense mechanisms of IEEE 802.11a or consider other systems of more centrally controlled scheduling such as HIPERLAN/2. The single-user operation can be implemented in APs without changing the standards. However, in order to use coherent transmission in DL based on UL channel estimates, an array-calibration system has to be implemented. One solution for this is described in [18].

## APPENDIX A
## SINGLE-USER SMART-ANTENNA OPERATION

Consider a MT with a single antenna and an AP using an array of $N$ antenna elements (same as in [2]) as illustrated in Fig. 10, where all the variables are shown in frequency domain. The same antenna arrangement also applies here for SDMA. In Fig. 10 (top) (UL), MT sends a symbol $t[k, p]$ at the $k$th subcarrier of the $p$th OFDM symbol of the current data packet. The transmitted signal propagates through the frequency-dependent radio channel $H_n[k]$ to the $n$th AP antenna. After digital time-domain operations, such as timing- and frequency-offset corrections (not shown) and Fourier transformation (FFT), the received frequency-domain signals $x_n[k, p]$, at antenna $n$, subcarrier $k$ and OFDM symbol $p$, are combined with

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore. Restrictions apply.

the frequency-dependent antenna weights (spatial signature), $\vec{w}[k] = (w_1[k], w_2[k], \ldots, w_N[k])^T$, to form a combined signal

$$y[k, p] = \sum_{n=1}^{N} w_n^*[k] \times x_n[k, p]. \qquad (2)$$

Here, superscript $T$ denotes transpose and $*$ complex conjugation. The combined signal (2) is then subject to further frequency-domain and bit-domain processing, such as equalization, demodulation, deinterleaving, depuncturing, and decoding (Viterbi algorithm).

In DL [Fig. 10 (bottom)], the signal transmitted from AP to MT $t^{\text{DL}}[k, p]$ is weighted for the different antennas using weights $\vec{w}[k]$, that are obtained based on a former UL period

$$x_n^{\text{DL}}[k, p] = w_n[k]^* \times t^{\text{DL}}[k, p]. \qquad (3)$$

These may, however, not be the same weights as above for UL.

With interferers and noise, one has for UL [Fig. 10 (top)]

$$x_n[k, p] = H_n[k] \times t[k, p] + s_n[k, p] + n_n[k, p] \qquad (4)$$

where $s_n[k, p]$ is the sum of all interfering signals at antenna element $n$ and $n_n[k, p]$ is noise. The desired-user radio channel $H_n[k]$ is estimated based on the two consecutive, equal, and full (all subcarriers carrying known reference data) OFDM training symbols $d[k]$ ($C$ symbols in [5]) that precede each data packet ($t[k, 1] = t[k, 2] = d[k]$). One can, for example, determine a channel estimate $\hat{H}_n[k]$ by minimizing

$$\varepsilon_n[k] = \sum_{p=1}^{2} \left| x_n[k, p] - \hat{H}_n[k] \times d[k] \right|^2 \qquad (5)$$

separately for each subcarrier and antenna element.[2] Straightforward derivation of (5) with respect to $\hat{H}_n^*[k]$ yields

$$\hat{H}_n[k] = \left( \frac{1}{2} \sum_{p=1}^{2} x_n[k, p] \right) \times d[k]^* \qquad (6)$$

where the sum is over the training symbols. The frequency-domain maximum-ratio [15] weighting vector is now $\vec{w}[k] = (\hat{H}_1[k], \hat{H}_2[k], \hat{H}_3[k], \ldots, \hat{H}_N[k])^T$, which is applicable both for UL (2) and DL (3).

### A. Nulling

One can construct a residual representing the interfering content in the received signal

$$r_n[k, p] = x_n[k, p] - \hat{H}_n[k] \times d[k], \qquad p \in \{1, 2\}. \qquad (7)$$

For UL, one can thus, further suppress interferences using the spatial covariance matrix (SCM) of the residual: $Q[k, p] = \vec{r}[k, p]\vec{r}[k, p]^H$, where $\vec{r}[k, p] = (r_1[k, p], r_2[k, p], \ldots, r_N[k, p])^T$, as well as with a corresponding SCM of the received signal [17], [20]. Here, superscript $H$ denotes hermitian transpose (complex conjugate transpose). Nulling is done here separately for each subcarrier

$$\vec{w}[k]_{\text{opt}} = (Q[k, p] + \gamma I)^{-1} \vec{w}[k] \qquad (8)$$

[2]A first-order channel-estimation approach is adopted [19] assuming that the channel is independent for different AP antennas, as well as for different subcarriers. It is also assumed that the radio channel does not change during the data packet. Thus, there is no OFDM-symbol index $p$ in $H_n[k]$ or $\hat{H}_n[k]$.

where $I$ is a unit matrix and the diagonal load factor $\gamma$ [20] should be small (in simulations, $\gamma = 0.01$ and $\gamma = 0.1$ has been used). In (8) one can, for example, take $p = 1$, $p = 2$, average $Q[k, p]$ over $p \in \{1, 2\}$ or use an average of the inverse matrices calculated for both training symbols. In simulations the best nulling performance has been found by averaging the spatial covariance matrix of the residual over frequency separately for both received training symbols, calculating the inverses according to (8), and finally, averaging over the training symbols

$$\vec{w}[k]_{\text{opt}} = \left[ \frac{1}{2} \sum_{p=1}^{2} \left( \frac{1}{52} \sum_{k=1}^{52} Q[k, p] + \gamma I \right)^{-1} \right] \vec{w}[k]. \qquad (9)$$

The frequency averaging in (9) reduces the condition number of the resulting covariance matrix making it invertible even with $\gamma = 0$. However, a nonzero $\gamma$ is still needed here.

### Appendix B
### SDMA Operation

For SDMA, it is necessary to modify the weight vectors of different users, applicable in the single-user smart-antenna operation of Appendix A, for example as [2], [21]

$$A'[k] = (A[k]^+)^\dagger \qquad (10)$$

where matrix $A[k]$ has the original spatial signatures of different simultaneously served users as columns, $A[k] = (\vec{w_1}[k]\vec{w_2}[k]\ldots)$, $A'[k]$ contains the modified weights $\vec{w_m}'$ and superscript $+$ denotes pseudoinverse. The above SDMA approach gives practically the same results as the MMSE-OFDM/SDMA of [2].

### Acknowledgment

The authors would like to thank K. Kalliola, M. Ermutlu, A. Brehonnet, K. Skog, and P. Sinisalo for participating in the measurements, the Institute of Radio Communications at HUT for the opportunity to use their measurement equipment, and K. Leppänen, M. Escartin, M. Kasslin, J. Laurila, J. Heiskala, S. Gray, and D. McCain for their helpful discussions.

### References

[1] L. C. Godara, "Application of antenna arrays to mobile communications, Part I: Performance improvement, feasibility, and system considerations," *Proc. IEEE*, vol. 85, pp. 1031–1060, July 1997.

[2] P. Vandenameele, L. Van Der Perre, M. G. E. Engels, B. Gyselinckx, and H. J. De Man, "A combined OFDM/SDMA approach," *IEEE J. Select. Areas Commun.*, vol. 18, pp. 2312–2321, Nov. 2000.

[3] K. Hugl, J. Laurila, and E. Bonek, "Downlink beamforming for frequency division duplex systems," in *Proc. Global Telecommunications Conf., GLOBECOM*, vol. 4, 1999, pp. 2097–2101.

[4] G. J. Foschini and M. J. Gans, "On limits of wireless communications in a fading environment when using multiple antennas," *Wireless Pers. Commun.*, vol. 6, pp. 311–335, 1998.

[5] International Standard ISO/IEC 8802-11: 1999(E) ANSI/IEEE Standard 802.11, 1999 Edition; IEEE Standard 802.11a-1999 (Supplement to IEEE Standard 802.11-1999), 1999.

[6] *Broadband Radio Access Networks* (BRAN), HIPERLAN Type 2 Standard, 2000.

[7] T. S. Rappaport, Ed., *Smart Antennas: Adaptive Arrays, Algorithms, & Wireless Position Location (Selected Readings)*. Piscataway, NJ: IEEE Press, 1998.

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore.  Restrictions apply.

[8] Q. Spencer, M. Rice, B. Jeffs, and M. Jensen, "A statistical model for angle of arrival in indoor multipath propagation," in *Proc. IEEE Vehicular Technology Conf.*, 1997, pp. 1415–1419.

[9] J. Kivinen, T. O. Korhonen, P. Aikio, R. Gruber, P. Vainikainen, and S.-G. Häggman, "Wideband radio channel measurement system at 2 GHz," *IEEE Trans. Instrum. Meas.*, vol. 48, pp. 39–44, 1999.

[10] A. T. Alastalo, A. Väisänen, K. Leppänen, K. Kalliola, M. Emre Ermutlu, and A.Arnaud Brehonnet, "Adaptive antennas for wireless local area networks," in *Proc. ESA AP2000*, 2000, pp. 1712–1716.

[11] S. J. Howard and K. Pahlavan, "Autoregressive modeling of wideband indoor radio propagation," *IEEE Trans. Commun.*, vol. 40, pp. 1540–1552, Sept. 1992.

[12] P. C. F. Eggers, J. Toftgård, and A. M. Oprea, "Antenna systems for base station diversity in urban small and micro cells," *IEEE J. Select. Areas Commun.*, vol. 11, pp. 1046–1056, Sept. 1993.

[13] A. F.. Abou-Raddy and S. M. Elnoubi, "Propagation measurements and channel modeling for indoor mobile radio at 10 GHz," in *Proc. IEEE Vehicular Technology Conf.*, vol. 3, 1997, pp. 1395–1399.

[14] J.-F. Lemieux, M. S. El-Tanany, and H. M. Hafez, "Experimental evaluation of space/frequency/polarization diversity in the indoor wireless channel," *Trans. Veh. Technol.*, vol. 40, pp. 569–574, Aug. 1991.

[15] W. C. Jakes, Ed., *Microwave Mobile Communications*. Piscataway, NJ: IEEE Press, 1994, ch. 5.

[16] J. Litva and T. Lo, (Contributor), *Digital Beamforming in Wireless Communications*. Norwood, MA: Artech House, 1997.

[17] F. W. Vook and K. L. Baum, "Adaptive antennas for OFDM," in *Proc. IEEE Vehicular Technology Conf.*, 1998, pp. 606–610.

[18] K. Nishimori, K. Cho, Y. Takatori, and T. Hori, "A new calibration method of adaptive array for TDD systems," in *Proc. Int. Symp. IEEE Antennas and Propagation Society*, vol. 2, 1999, pp. 1444–1447.

[19] Y. G. Li, L. J. Cimini Jr., and N. R. Sollenberger, "Robust channel estimation for OFDM systems with rapid dispersive fading channels," *IEEE Trans. Commun.*, vol. 46, pp. 902–915, July 1998.

[20] Y. G. Li and N. R. Sollenberger, "Adaptive antenna arrays for OFDM systems with cochannel interference," *IEEE Trans. Commun.*, vol. 47, pp. 217–229, Feb. 1999.

[21] G. T. Okamoto, *Smart Antenna Systems and Wireless Lans*. Norwell, MA: Kluwer, 1999.

**Ari Alastalo** was born in Kotka, Finland, in 1971. He received the M.Sc. degree (with distinction) in technical physics from Helsinki University of Technology (HUT), Helsinki, Finland, in 1997.

From 1997 to 1998, he was a Teaching Assistant and Researcher in the Materials Physics Laboratory, HUT. In 1998, he joined with the Nokia Research Center, Helsinki, Finland, where he worked as a Research Scientist in the adaptive antennas research group. He is currently with VTT Technical Research Center of Finland. His present research interests include radio channel properties, adaptive-antenna techniques, and link simulations.

**Mika Kahola** was born in Eno, Finland, in 1974. He received the M.Sc. degree in technology from Tampere University of Technology (TUT), Tampere, Finland, in 1999.

Since 2000, he has been with the Nokia Research Center (NRC), Helsinki, Finland, where he is currently working as a Research Engineer in the Wireless Routing Radio Group. His research interests include adaptive-antenna techniques, link simulations, and network capacity studies.

Authorized licensed use limited to: Lara Yaverian. Downloaded on September 07,2022 at 18:30:11 UTC from IEEE Xplore.  Restrictions apply.

# Exhibit NTG-1

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Application of: | Conf. No. 5617 |
|    ALEXANDR KUZMINSKIY | Examiner:  ERIKA A. GARY |
| Serial No.:  10/996,617 | Group Art Unit:  2617 |
| Filed:  November 24, 2004 | Att'y Docket:  2100.013600 |
| For:  COMMUNICATING DATA BETWEEN | Customer No. 46290 |
|    AN ACCESS POINT AND MULTIPLE | |
|    WIRELESS DEVICES OVER  LINK | |

**RESPONSE TO OFFICE ACTION DATED MARCH 20, 2008**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

     This paper is submitted in response to the Office Action dated March 20, 2008, for which the three-month date for response is June 20, 2008.  This response is being filed on June 20, 2008 before the due date, therefore, it is timely filed.

     If an extension of time is required to enable this paper to be timely filed and there is no separate Petition for Extension of Time filed herewith, this paper is to be construed as also constituting a Petition for Extension of Time Under 37 CFR § 1.136(a) for a period of time sufficient to enable this document to be timely filed.

Serial No. 10/996,617

It is believed that no fee is due; however, should any fees under 37 C.F.R. §§ 1.16 to 1.21 be required for any reason, the Commissioner is authorized to deduct said fees from Williams, Morgan & Amerson's P.C. Deposit Account 50-0786/2100.013600.

**Amendments to the Claims** are reflected in the listing of claims that begins on page 3 of this paper.

**Remarks** begin on page  14 of this paper.

Reconsideration of the application is respectfully requested.

**AMENDMENTS TO THE CLAIMS**

1.      (Currently Amended) A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:

weighting a first data based on a channel estimate of a first radio channel to said first mobile station at said access point to transmit said weighted first data using at least one protocol data unit from said first and second antennas so that said first mobile station only receives said first data; and

weighting a second data based on a channel estimate of a second radio channel to said second mobile station at said access point to transmit said weighted second data using at least one protocol data unit from said first and second antennas so that said second mobile station only receives said second data, wherein the relative transmission times of the protocol data units to said first and second mobile stations is offset by a predetermined time.

2.      (Original) A method, as set forth in claim 1, further comprising:

transmitting said first data to said first mobile station on a downlink; and

transmitting said second data to said second mobile station in parallel to the transmission of said first data on said downlink.

3.      (Original) A method, as set forth in claim 1, further comprising:

transmitting said first and said second data substantially simultaneously at a substantially similar carrier frequency in a radio frequency communication.

4.      (Original) A method, as set forth in claim 3, further comprising:

causing an increase in a downlink throughput by a factor nominally equal to the number of antennas at said access point.


5.      (Original) A method, as set forth in claim 1, further comprising:

increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;

discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension; and

applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially simultaneously from said access point to said first and second mobile stations, respectively.


6.      (Original) A method, as set forth in claim 5, further comprising:

defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network; and

coupling said access point to said first and second mobile stations through said wireless local area network.

7.     A ~~method, as set forth in claim 6, further comprising:~~ method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:

weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and

weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;

increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;

discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;

applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;

defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;

coupling said access point to said first and second mobile stations through said wireless local area network

estimating a first radio channel from said access point to said first mobile station over a pilot interval; and

estimating a second radio channel from said access point to said second mobile station over said pilot interval.

8.      (Original) A method, as set forth in claim 7, further comprising:

initializing said transmission protocol before starting said transmissions of said first and second data over said downlink.

9.      (Original) A method, as set forth in claim 8, wherein initializing said transmission protocol further comprising:

exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station.

10.      (Original) A method, as set forth in claim 9, wherein initializing said transmission protocol further comprising:

offsetting transmission of a first protocol data unit of said one or more protocol data units from said access point to said first mobile station relative to transmission of a second protocol data unit of said one or more protocol data units from said access point to said second mobile station by a predetermined time.

11.      (Original) A method, as set forth in claim 9, wherein initializing said transmission protocol further comprising:

shifting transmission of said first data relative to transmission of said second data; and

canceling an interference based on synchronization between a first and a second acknowledgement frame of said one or more acknowledgement frames at said access point to recover said first acknowledgement frame that at least partially overlaps said second acknowledgement frame based on the shifted transmissions of said first and second data.

12.    (Original) A method, as set forth in claim 11, further comprising:

re-estimating said first radio channel associated with the recovered said first acknowledgement frame.

13.    (Original) A method, as set forth in claim 12, further comprising:

receiving one or more pilot symbols and one or more synchronization symbols of said first acknowledgement frame on a set of uncorrupted sub-carriers of a multiplicity of sub-carriers;

computing estimates of said first radio channel at the uncorrupted sub-carrier frequencies based on at least one of the pilot symbols and the synchronization symbols of said first acknowledgement frame received on the multiplicity uncorrupted sub-carriers; and

computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies.

14.    (Original) A method, as set forth in claim 13, wherein computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies further comprises:

applying interpolation in a frequency domain based on the computed channel estimates to compute estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers.

15. (Original) A method, as set forth in claim 13, wherein computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies further comprises:

computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers based on the synchronization symbols of said first acknowledgement frame.

16. (Original) A method, as set forth in claim 9, further comprising:

using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and

reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.

17. (Currently Amended) A communication node associated with a network to communicate data to and from a first and a second mobile station, said communication node comprising:

a first and a second antenna;

a controller including means to weight first and second data; and

a memory storing instructions to cause said controller to weight [[a]] the first data based on a channel estimate of a first radio channel to said first mobile station at said communication node to transmit said weighted first data using at least one protocol data unit from said first and second antennas so that said first mobile station only receives said first data and weight [[a]] the second data based on a channel estimate of a second radio channel to said second mobile station at said communication node to transmit said weighted second data using at least one protocol data unit from said first and second antennas so that said second mobile station only receives said second data, wherein the relative transmission times of the protocol data units to said first and second mobile stations are offset by a predetermined time.

18.     (Original) A communication node, as set forth in claim 17, wherein said communication node is an access point that transmits said first data to said first mobile station on a downlink and transmits said second data to said second mobile station in parallel to the transmission of said first data on said downlink.

19.     (Original) A communication node, as set forth in claim 17, wherein said memory further storing:

a transmission protocol; and

a module to cause said transmission protocol to transmit said first data to said first mobile station on a downlink and transmit said second data to said second mobile station in parallel to the transmission of said first data on said downlink.

20.     (Original) A communication node, as set forth in claim 17, further comprising:

a communication interface coupled to said controller and said memory to transmit said first and said second data substantially simultaneously at a same carrier frequency in a radio frequency communication to increase a downlink throughput by a factor nominally equal to the number of antennas at said communication node.

21.     (Original) A communication node, as set forth in claim 18, wherein said access point is coupled to said first and second mobile stations through said network including a wireless local area network and at least one of said access point, said first and second mobile stations, and said downlink are defined at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard.

22.     (Currently Amended) A telecommunication system comprising:

an access point associated with a network to communicate data to and from a first and a second mobile station, said access point including:

        a first and a second antenna,

        a controller including means to weight first and second data, and

        a memory storing instructions to cause said controller to weight [[a]] the first data based on a channel estimate of a first radio channel to said first mobile station at said communication node to transmit said weighted first data using at least one protocol data unit from said first and second antennas so that said first mobile station only receives said first data and weight [[a]] the second data based on a channel estimate of a second radio channel to said second mobile station at said communication node to transmit said

weighted second data using at least one protocol data unit from said first and second antennas so that said second mobile station only receives said second data, wherein the relative transmission times of the protocol data units to said first and second mobile stations are offset by a predetermined time.

23.    (Original) A telecommunication system, as set forth in claim 22, wherein said access point transmits said first data to said first mobile station on a downlink and transmits said second data to said second mobile station in parallel to the transmission of said first data on said downlink to increase throughput on said downlink by a factor nominally equal to the number of antennas at said access point.

24.    (Original) A telecommunication system, as set forth in claim 23, wherein said memory further storing:

a transmission protocol; and

a module to cause said transmission protocol to transmit said first and said second data substantially simultaneously at a same carrier frequency in a radio frequency communication and increase a first data rate of transmission of said first data and a second data rate of transmission of said second data.

25.    (Original) A telecommunication system, as set forth in claim 24, wherein said access point is coupled to said first and second mobile stations through said network including a wireless local area network and at least one of said access point, said first and second mobile

stations, and said downlink are defined at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard.

26.    (Currently Amended) ~~An article comprising a computer readable storage medium storing instructions~~ A computer readable storage medium encoded with instructions capable of being executed by a computer that [[,]] when executed cause a telecommunication system to:

enable an access point ~~a communication node~~ having a first and a second antenna to associate with a network to communicate data to and from a first and a second mobile station;

weight a first data based on a channel estimate of a first radio channel to said first mobile station at said access point to transmit said weighted first data using at least one protocol data unit from said first and second antennas so that said first mobile station only receives said first data; and

weight a second data based on a channel estimate of a second radio channel to said second mobile station at said access point to transmit said weighted second data using at least one protocol data unit from said first and second antennas so that said second mobile station only receives said second data, wherein the relative transmission times of the protocol data units to said first and second mobile stations is offset by a predetermined time.

27.    (Previously Presented)  A method, as set forth in claim 9, wherein initializing said transmission protocol further comprises:

delaying transmission of a first one of the protocol data units from said access point to said first mobile station relative to transmission of a second one of the protocol data units from

said access point to said second mobile station by a predetermined time during a first period of operation; and

delaying transmission of a third one of the protocol data units from said access point to said second mobile station relative to transmission of a fourth one of the protocol data units from said access point to said first mobile station by a predetermined time during a second period of operation.

28.    (Previously Presented)  A method, as set forth in claim 9, wherein initializing said transmission protocol further comprises:

alternately delaying transmissions of the protocol data units from the access point to the first and second mobile stations, respectively.

29.    (Previously Presented)  A method, as set forth in claim 9, wherein initializing said transmission protocol further comprises:

transmitting the protocol data units to the first and second mobile stations in a first preselected order during a first period of time and a second preselected order during a second period of time .

**REMARKS**

Claims 1-29 are pending in the present application.  Claims 1, 17, 22, and 26 have been amended.  Support for the proposed amendments may be found at least in Figure 8 and related discussion in the text of the Patent Application.  No new matter has been added.

In the Office Action, the Examiner indicated that claims 7-16 and 27-29 include allowable subject matter but objected to these claims for being dependent upon a rejected base claim.  Claim 7 has been rewritten in independent form including all the limitations of the base claim and any intervening claims.  Claims 8-16 and 27-29 depend from rewritten independent claim 7.  Applicants therefore respectfully submit that claims 7-16 and 27-29 are in condition for allowance and request that the Examiner's objections to these claims be withdrawn.

In the Office Action, claims 1-6 and 17-26 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Malik (U.S. Patent Application Publication No. 2006/0164969) in view of Alastalo (U.S. Patent No. 7,006,529).  Pursuant to the amendments indicated herein, the Examiner's rejections are respectfully traversed.

A finding of obviousness under 35 U.S.C. § 103 requires a determination of the scope and content of the prior art, the level of ordinary skill in the art, the differences between the claimed subject matter and the prior art, and whether the differences are such that the subject matter as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made.  *Graham v. John Deere Co.*, 148 USPQ 459 (U.S. S.Ct. 1966).  To determine whether the subject matter as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made, one should determine whether the prior art reference (or references when combined) teach or suggest all the claim limitations.  Furthermore, it is necessary for the Examiner to identify the reason why a person of ordinary skill in the art

would have combined the prior art references in the manner set forth in the claims.  Teaching away by the prior art may constitute *prima facie* evidence that the claimed invention is not obvious.

Malik describes techniques for medium access control in wireless communication networks.  In particular, Malik describes an access point equipped with a multi-beam antenna that implements space division multiple access (SDMA).  The access point is configured to provide services <u>simultaneously</u> to a plurality of users on channels of the same frequency by utilizing the spatial selectivity of the antenna.  See Malik, paragraph [0011].  However, Malik does not describe or suggest transmitting packet data units to different mobile stations using a predetermined offset in the transmission times.

Alastalo also describes a communication system that includes an access point that implements SDMA.  The access point described by Alastalo also implements time division multiple access technology.  The access point is configured so that <u>simultaneous</u> time slots can be allocated to multiple terminals.  See Alastalo, Abstract.  However, Alastalo also fails to describe or suggest transmitting packet data units to different mobile stations using a predetermined offset in the transmission times.

Applicants therefore respectfully submit that the cited references fail to teach or suggest all the limitations set forth in the pending claims (as amended herein).  Applicants also submit that the Examiner has not provided a reason why a person of ordinary skill in the art would have been motivated to modify and/or combine the cited references to arrive at the claimed invention.  To the contrary Malik and Alastalo are both concerned with allowing an access point to provide services simultaneously to a plurality of users.  Consequently, Applicants respectfully submit

that Malik and Alastalo teach away from transmitting packet data units to different mobile stations using a predetermined offset in the transmission times.

For at least the aforementioned reasons, Applicants respectfully submit that the pending claims (as amended herein) would not have been obvious over Malik and Alastalo, either alone or in combination.  Applicants respectfully request that the Examiner's rejections of claims 1-6 and 17-26 under 35 U.S.C. § 103(a) be withdrawn.

For the aforementioned reasons, it is respectfully submitted that all claims pending in the present application are in condition for allowance. The Examiner is invited to contact the undersigned at (713) 934-4052 with any questions, comments or suggestions relating to the referenced patent application.

Respectfully submitted,

Date:  June 20, 2008                              /Mark W. Sincell/
                                                  Mark W. Sincell, Ph.D.
                                                  Reg. No. 52,226
                                                  Williams Morgan & Amerson, P.C.
                                                  10333 Richmond Avenue, Suite 1100
                                                  Houston, TX 77042
                                                  (713) 934-7000
                                                  (713) 934-7011 (Fax)

                                                  AGENT FOR APPLICANTS

# Exhibit NTG-2



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/996,617 | 11/24/2004 | Alexandr Kuzminskiy | 2100.013600 KARIMI 14-7-1 | 5617 |

46290          7590          09/22/2008
WILLIAMS, MORGAN & AMERSON
10333 RICHMOND, SUITE 1100
HOUSTON, TX 77042

| EXAMINER |
|---|
| GARY, ERIKA A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2617 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/22/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

JA0326

Application/Control Number: 10/996,617                                      Page 2
Art Unit: 2617

## DETAILED ACTION

### *Claim Rejections - 35 USC § 112*

1.      The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

2.      Claims 1-3, 5, 17-20, and 22-24 rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.  Specifically, independent claims 1, 17, and 22 recite that the transmission times to the first and second mobile stations is offset by a predetermined time.  However, their respective dependent claims recite that the transmission is performed in parallel or substantially simultaneously.  The Examiner is uncertain of Applicant's intent as data cannot be sent offset by a predetermined time *and* simultaneously.  Further, Applicant is requested to point out support from the Specification for the amendments to independent claims 1, 17, 22, and 26.

### *Claim Rejections - 35 USC § 103*

3.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Application/Control Number: 10/996,617                                    Page 3
Art Unit: 2617

4.      Claims 1-6, and 17-26 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Malik et al., US Patent Application Publication Number

2006/0164969 (hereinafter Malik) in view of Alastalo et al., US Patent Number

7,006,529 (hereinafter Alastalo).

        Regarding claims 1, 17, 22, and 26, Malik discloses a method for communicating

data over a network between an access point having a first and a second antenna and a

first and a second mobile station, the method comprising: having a first data at said

access point to transmit said first data using at least one protocol data unit from said

first and second antennas so that said first mobile station only receives said first data;

and having a second data at said access point to transmit said second data using at

least one protocol data unit from said first and second antennas so that said second

mobile station only receives said second data [paragraphs 0001, 0011, 0013-0015].

        What Malik does not specifically suggest is that the first and second data is

weighted at said access point based on a channel estimate.  However, Alastalo teaches

this limitation [col. 5: lines 41-60; col. 8: lines 42-52; col. 10: lines 44-66].  Malik also

does not specifically teach that the relative transmission times to the first and second

mobile stations are offset by a predetermined time.  However, Alastalo also teaches this

limitation [col. 9: lines 24-29; col. 10: lines 1-3; col. 16: lines 18-20].

        At the time of the invention, it would have been obvious to one of ordinary skill in

the art to modify Malik to include Alastalo.  Malik teaches sending data to two separate

receivers.  Alastalo specifically teaches weighting data at the access point.  The

Application/Control Number: 10/996,617                                                    Page 4
Art Unit: 2617

motivation for the modification would have been to specifically point out how the data is

sent to two different recipients via the same carrier.

Regarding claims 2-4, 18-20, 23 and 24, Malik discloses transmitting said first

data to said first mobile station on a downlink; and transmitting said second data to said

second mobile station in parallel to the transmission of said first data on said downlink

[paragraph 0011]; transmitting said first and said second data substantially

simultaneously at a substantially similar carrier frequency in a radio frequency

communication [paragraph 0011, 0101]; and causing an increase in a downlink

throughput by a factor nominally equal to the number of antennas at said access point

[paragraph 0001].

Regarding claim 5, Malik discloses increasing a first data rate of transmission of

said first data and a second data rate of transmission of said second data using a single

carrier frequency in a radio frequency communication based on a transmission protocol;

discriminating transmissions of said first and said second data on a downlink in said

radio frequency communication based on a spatial dimension; and applying a space

division multiple access based on said transmission protocol to said transmissions to

transmit said first and said second data substantially simultaneously from said access

point to said first and second mobile stations, respectively [paragraphs 0001, 0011,

0013-0015].

Regarding claims 6, 21, and 25, Malik discloses defining at least one of said

access point, said first and second mobile stations, and said downlink at least in part by

Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish

Application/Control Number: 10/996,617                                         Page 5
Art Unit: 2617

said network including a wireless local area network; and coupling said access point to

said first and second mobile stations through said wireless local area network

[paragraph 0003].


### *Allowable Subject Matter*

5.      Claims 7-16 and 27-29 are allowed based on Applicant's amendment to claim 7

incorporating the allowable subject matter noted in the previous office action and the

intervening claims.


### *Response to Arguments*

6.      Applicant's arguments with respect to claims 1-6 and 17-26 have been

considered but are moot in view of the new ground(s) of rejection as additional portions

of Alastalo are relied upon to teach the added claim limitations.


### *Conclusion*

7.      Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP

§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

         A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

Application/Control Number: 10/996,617                          Page 6
Art Unit: 2617

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.


8.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Erika A. Gary whose telephone number is 571-272-

7841.  The examiner can normally be reached on Monday-Thursday.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Dwayne Bost can be reached on 571-272-7023.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

        Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

Application/Control Number: 10/996,617                                    Page 7

Art Unit: 2617

/EAG/
September 16, 2008

/Erika A. Gary/
Primary Examiner, Art Unit 2617

# Exhibit NTG-3

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:
    ALEXANDR KUZMINSKIY

Serial No.:  10/996,617

Filed:  November 24, 2004

For:  COMMUNICATING DATA BETWEEN
    AN ACCESS POINT AND MULTIPLE
    WIRELESS DEVICES OVER  LINK

Conf. No. 5617

Examiner:  ERIKA A. GARY

Group Art Unit:  2617

Att'y Docket:  2100.013600

Customer No. 46290

**RESPONSE TO FINAL OFFICE ACTION DATED SEPTEMBER 22, 2008**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

This paper is submitted in response to the Office Action dated September 22, 2008, for which the two-month date for response is November 22, 2008.  This response is being filed on November 13, 2008 before the due date, therefore, it is timely filed.

If an extension of time is required to enable this paper to be timely filed and there is no separate Petition for Extension of Time filed herewith, this paper is to be construed as also constituting a Petition for Extension of Time Under 37 CFR § 1.136(a) for a period of time sufficient to enable this document to be timely filed.

Serial No. 10/996,617

JA0334

It is believed that no fee is due; however, should any fees under 37 C.F.R. §§ 1.16 to 1.21 be required for any reason, the Commissioner is authorized to deduct said fees from Williams, Morgan & Amerson's P.C. Deposit Account 50-0786/2100.013600.

**Amendments to the Claims** are reflected in the listing of claims that begins on page 3 of this paper.

**Remarks** begin on page 8 of this paper.

Reconsideration of the application is respectfully requested.

Serial No. 10/996,617                                                         2

## AMENDMENTS TO THE CLAIMS

1-6.    (Canceled)


7.      (Previously Presented A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:

weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and

weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;

increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;

discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;

applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;

defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;

coupling said access point to said first and second mobile stations through said wireless local area network;

estimating a first radio channel from said access point to said first mobile station over a pilot interval; and

estimating a second radio channel from said access point to said second mobile station over said pilot interval.

8.      (Original) A method, as set forth in claim 7, further comprising:

initializing said transmission protocol before starting said transmissions of said first and second data over said downlink.

9.      (Original) A method, as set forth in claim 8, wherein initializing said transmission protocol further comprising:

exchanging one or more protocol data units and one or more acknowledgement frames between said access point and said first mobile station and said second mobile station.

10.      (Original) A method, as set forth in claim 9, wherein initializing said transmission protocol further comprising:

offsetting transmission of a first protocol data unit of said one or more protocol data units from said access point to said first mobile station relative to transmission of a second protocol data unit of said one or more protocol data units from said access point to said second mobile station by a predetermined time.

11.      (Original) A method, as set forth in claim 9, wherein initializing said transmission protocol further comprising:

shifting transmission of said first data relative to transmission of said second data; and

canceling an interference based on synchronization between a first and a second acknowledgement frame of said one or more acknowledgement frames at said access point to recover said first acknowledgement frame that at least partially overlaps said second acknowledgement frame based on the shifted transmissions of said first and second data.

12.    (Original) A method, as set forth in claim 11, further comprising:

re-estimating said first radio channel associated with the recovered said first acknowledgement frame.

13.    (Original) A method, as set forth in claim 12, further comprising:

receiving one or more pilot symbols and one or more synchronization symbols of said first acknowledgement frame on a set of uncorrupted sub-carriers of a multiplicity of sub-carriers;

computing estimates of said first radio channel at the uncorrupted sub-carrier frequencies based on at least one of the pilot symbols and the synchronization symbols of said first acknowledgement frame received on the multiplicity uncorrupted sub-carriers; and

computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies.

14.    (Original) A method, as set forth in claim 13, wherein computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies further comprises:

applying interpolation in a frequency domain based on the computed channel estimates to compute estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers.

15.    (Original) A method, as set forth in claim 13, wherein computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers using the computed estimates at the uncorrupted sub-carrier frequencies further comprises:

computing estimates of said first radio channel at a set of corrupted sub-carriers of said multiplicity of sub-carriers based on the synchronization symbols of said first acknowledgement frame.

16.    (Original) A method, as set forth in claim 9, further comprising:

using a time division multiple access protocol to partition a radio resource including a channel across a space division multiple access mode and a non-space division multiple access mode of said access point; and

reserving a portion of said channel for a transmission based on said space division multiple access protocol in said space division multiple access mode of said access point.

17-26.  (Canceled)

27.     (Previously Presented) A method, as set forth in claim 9, wherein initializing said transmission protocol further comprises:

delaying transmission of a first one of the protocol data units from said access point to said first mobile station relative to transmission of a second one of the protocol data units from said access point to said second mobile station by a predetermined time during a first period of operation; and

delaying transmission of a third one of the protocol data units from said access point to said second mobile station relative to transmission of a fourth one of the protocol data units from said access point to said first mobile station by a predetermined time during a second period of operation.

28.     (Previously Presented)  A method, as set forth in claim 9, wherein initializing said transmission protocol further comprises:

alternately delaying transmissions of the protocol data units from the access point to the first and second mobile stations, respectively.

29.     (Previously Presented)  A method, as set forth in claim 9, wherein initializing said transmission protocol further comprises:

transmitting the protocol data units to the first and second mobile stations in a first preselected order during a first period of time and a second preselected order during a second period of time .

## REMARKS

Claims 1-6 and 17-26 have been canceled.  Therefore, claims 7-16 and 27-29 are pending in the present application.  In the Office Action, the Examiner allowed claims 7-16 and 27-29. Applicants therefore respectfully submit that all claims pending in the present application are in condition for allowance. The Examiner is invited to contact the undersigned at (713) 934-4052 with any questions, comments or suggestions relating to the referenced patent application.

Respectfully submitted,

Date:  November 13, 2008              /Mark W. Sincell/
                                     Mark W. Sincell, Ph.D.
                                     Reg. No. 52,226
                                     Williams Morgan & Amerson, P.C.
                                     10333 Richmond Avenue, Suite 1100
                                     Houston, TX 77042
                                     (713) 934-7000
                                     (713) 934-7011 (Fax)

                                     AGENT FOR APPLICANTS

# Exhibit NTG-4

# Oxford English Dictionary | The definitive record of the English language

---

# social, *adj*. and *n*.

**Pronunciation:** ⓘ Brit. /ˈsəʊʃl/, U.S. /ˈsoʊʃ(ə)l/

**Forms:** Middle English (1500s *Scottish*) **sociale**, late Middle English **socialle** , late Middle English **socyal**, late Middle English– **social**, 1500s–1600s **sociall**, 1800s **soshal** (*English regional*).

**Frequency (in current use):**

**Origin:** Of multiple origins. Partly a borrowing from French. Partly a borrowing from Latin. **Etymons:** French *social*; Latin *sociālis*.

**Etymology:** < (i) Middle French, French *social* allied militarily (1355), civil, in a society, appropriate to a citizen (*a*1380 in *vie sociale* ), sociable, agreeable (*a*1473), of or relating to a society (1557),

and its etymon (ii) classical Latin *sociālis* of or involving a partner or partners, living in partnership with others, belonging to a fellowship, of or relating to an ally or allies (sometimes with reference to Roman provinces), designating the war fought between Rome and its Italian allies from 91–87 B.C., of or belonging to marriage partners, conjugal, in post-classical Latin also relating to life in society, forming part of the same society (5th cent.) < *socius* SOCIUS *n*. + -*ālis* -AL *suffix*ⁱ.

Compare Spanish *social* (late 14th cent.), Portuguese *social* (1597), Italian *sociale* (14th cent.); also German *sozial* (late 18th cent.). Compare SOCIABLE *adj*., and also CIVIL *adj*.

With sense A. 1a(b) compare Hellenistic Greek συμμαχικοˋς πόλεμος war involving the allies (Polybius).

**A. *adj*.**
**1.** Designating a war fought between allies. Cf. CIVIL *adj*. 1.
**a.** Usually with capital initial.

(a) *Roman History*. Designating the war fought between Rome and its Italian allies from 91–87 B.C.

- ‣ *a*1387   J. TREVISA tr. R. Higden *Polychron*. (St. John's Cambr.) (1872) IV. 155   Silla þe consul wente into Campania aȝenst Metridas and was in Campania forto destroye al þe relif of þe bataille þat heet sociale [?*a*1475 anon tr. the batelle sociallie; L. *socialis belli*].

1679   J. DAVIES tr. Appian *Hist*. II. i. 16   Mean while began the Social War, by the conspiracy of all the Nations of Italy.

1765   W. BLACKSTONE *Comm. Laws Eng*. I. 159   When, after the social war, all the burghers of Italy were admitted free citizens of Rome.

1842   W. C. TAYLOR *Student's Man. Anc. Hist*. (ed. 3) xv. §6. 436   A much more dangerous war, called the Marsic, the Social, or the Italic, was provoked by the injustice with which the Romans treated their Italian allies.

1949   *Oxf. Classical Dict*. 541/2   The Marsi..took the initiative in demanding Roman citizenship in the Social War.

2002   C. AMERY & B. CURRAN *Lost World of Pompeii* 18   The colonization of Pompeii after the Social War essentially became its Romanization.

(b) *Ancient Greek History*. Designating the war fought between Athens and its allies, from 357–355 B.C.

The rebellious allies included Cos, Rhodes, and Chios.

1559   T. Lanquet et al. *Epitome of Chron.* f. 59ᵛ   In Grece, the warre, called Sociall, beganne among the cities.

1633   E. Grimeston tr. Polybius *Hist.* I. 2   As for the Actions, and first of the Grecians, wee will begin with the sociall warre.

1732   T. Dawson in tr. Aeschines & Demosthenes *Orations conc. Crown* Pref. sig. a8   At this Time, the Social War, frequently mentioned by our Orators, broke out, which gave Philip [of Macedon] great Advantages for the carrying on his Designs.

1838   C. Thirlwall *Hist. Greece* V. xliii. 259   Philip seems to have kept aloof from the Social War.

1902   H. C. Butler *Story of Athens* x. 340   The Social War saw the end of Timotheus's brilliant career.

2003   J. Buckler *Aegean Greece in 4th Cent.* ix. 379   Although Mausolos usually receives the blame for starting the Social War, he instead far more likely took personal advantage of Greek disaffection.

†**b.** *gen.* Of a war: fought between members of a political alliance. *Obsolete. rare.*

c1550   *Complaynt Scotl.* (1979) xx. 132   There vas ane vthir sort of battelis amang the romans callit battellis socialis, that is quhen tounis of ane cuntre makkis veyr contrar vthirs.

1665   T. Manley tr. H. Grotius *De Rebus Belgicis* 1   I Intend to Discourse the most famous Warre of our Times, and which may not improperly be called Sociall, or a Warre of Confederates.

1700   T. Southerne *Fate of Capua* I. i   Is there a worthier than a social war?

†**2.** Devoted to home life; domestic. *Obsolete.*

c1484   J. de Caritate tr. *Secreta Secret.* (Takamiya) 190   He is hardy as a lyon..and meke as a turtyl, malycious as a leenes, homely and socyal [L. *domesticus*] as a dowe.

a1500   (‣ c1410)   *Dives & Pauper* (Hunterian) (1976) I. 339 (*MED*)   Þe soget owith to obeyyn to his souereyn..þe wif to hyr housebonde in þingis þat longyn to matrimonye & social lyuynge.

**3.**

**a.** Of a person: friendly or affable in company; disposed to conversation and sociable activities; sociable. Also of a person's general disposition. Also with *to*, *with*.

1562   N. Winȝet *Last Blast Trompet* in *Wks.* (S.T.S.) I. 45   The proude schismatikis and obstinat heretikis, na wayis sociale to the companie of Christiane Catholiks.

a1600   (‣ ?c1535)   tr. H. Boece *Hist. Scotl.* (Mar Lodge) (1946) f. 199   Vnder coloure of amyte he was slane be tresson of Alect..feneȝeing to be sociale with Carance in all his affaris.

1601   R. Johnson *Ess.* f. 51   It is best to bee sociall in shew, but precise in effect.

1698   R. Ferguson *View Ecclesiastick* 35   Their Irreligious Opinion, that Preaching..is..no ways upheld and Practic'd for the making People either better Men, more social Neighbours, or firmer in their Loyalty to their Prince.

1730   A. Pope *On General Withers* in *Grub-St. Jrnl.* 17 Dec.   Withers, adieu! yet not with thee remove Thy martial spirit, or thy social love!

1776   T. Paine *Common Sense* iv. 65   A few able and social sailors will soon instruct a sufficient number of active landmen in the common work of a ship.

1790   A. Adams *Let.* 3 Apr. (1947) 44   The Genll is always very civil polite and social with me.

1816   J. Austen *Emma* I. ii. 26   His own friendly and social disposition.

1878   M. E. Braddon *Eleanor's Victory* ii   He was very happy and social.

1901   *Virginia Law Reg.* **7** 12   He was extremely social in disposition, friendly with everybody, and universally popular.

1950   *Post-Register (*Idaho*)* 6 Apr. 21/2   Any number of 'charm schools' thrive on transforming backwoodsy newcomers into highly desirable social characters.

1972   *Asian Folklore Stud.* **31** 54   The social temperament of the Baiga makes him adorable to the people.

2002   G. M. Campbell *Bulletproof Presentations* ix. 85   She is a very social person, and for her to be alone was quite unusual.

  **b.** Of a group of people, an organization, etc.: consisting or composed of people associated together for friendly interaction or companionship.

1737   H. Hyde *Ode to Earl of Chesterfield* 9   Persuasion decks your Words with ev'ry Art, To lead the social Band in sportive Wit.

1792   N. Webster in E. E. Ford *Notes on Life of N. Webster* (1912) I. 363   A number of Gentlemen meet at my house for the purpose of forming a social Club.

1832   J. Taylor *Rec. my Life* I. xx. 249   There was one very extraordinary character who used to join the literary and social set at the Turk's Head Coffee-house.

1866   *Month* **4** 54   The social body at Balliol was strengthened between 1830 and 1840 by three important additions.

1892   *Photogr. Ann.* II. 652   The club is strictly a 'social' one.

1935   *Burlington Mag.* Apr. 161/2   All social circles allied to the Court.

1966   J. Cleary *High Commissioner* ix. 185   He..belonged to none of the social clubs. He played golf..at a public course.

2004   *Gay Times* Feb. 241   But we aren't a nocturnal caravan-hopping club. We're strictly a social group.

  **c.** Of a building or room: used for communal and recreational activities; (also) characterized by friendly interaction. Cf. *social centre n.* at Compounds 2.

1762   C. Johnstone *Reverie* II. xiv. 66   Trophies, won by feats of hardiest prowess, graced our social halls.

1823   *Blackwood's Edinb. Mag.* **13** 329/1   At once was hush'd the social Hall.

1861   *Congregational Q.* Apr. 181/1   The lecture-room is occupied by the main body of the Sabbath School; the social rooms by the Infant Department.

1950   D. Thomas *Let.* c11 Mar. (1987) 751   I am writing to you now, lying in bed, in the Roman Princess's sister's rich social house, in a posh room that is hell on earth.

1975   C. Potok *In Beginning* (1976) iv. 234   After the service we all went to the social hall downstairs and there was wine and whiskey and cake.

2003   *Sarasota (*Florida*) Herald-Tribune* (Nexis) 8 June 11   Don Gunn points out the selection of art and the use of pecky pecan to warm the large social room.

  **4.**

**a.** Marked or characterized by friendliness, geniality, or companionship with others; enjoyed, taken, carried out, etc., in the company of others.

(a) Of communication, interaction, an activity, etc.

1576   T. ROGERS *Philos. Disc. Anat. Minde* sig. Aaiij   The last kinde of freendship is called Sociall or Fellowly freendship.

1611   E. ASTON tr. J. Boemus *Manners, Lawes, & Customes* II. viii. 93   They [*sc.* the Indians] ought to eate and drinke all at one houre, for such things they coniecture doe best dispose them to social & ciuil conuersation.

1667   J. MILTON *Paradise Lost* VIII. 429   Thou in thy secresie although alone, Best with thy self accompanied, seek'st not Social communication.

1695   J. HOWE *Disc. Much-lamented Death Queen Mary* 35   Unless one would..reduce joynt, social Worship, wherein all are..to express their Unanimity and Consent, unto that which is meerly Solitary and Single.

1773   J. BOSWELL *Jrnl.* 30 Aug. in *Jrnl. Tour Hebrides* (1785) 142   His benevolent, gay, social intercourse.

1794   A. RADCLIFFE *Myst. of Udolpho* III. xi. 375   The spacious fire-places, where no mark of social cheer remained.

1810   A. BOSWELL *Edinburgh* 25   When met, to drink a social cup of tea.

1864   C. DICKENS *Let.* Mar. (1998) X. 370   They want social rest and social recreation for themselves and their families.

1887   *Brit. Med. Jrnl.* 2 Apr. 754/1   To call twice in one week, under the pretence..of a social visit.

1946   L. P. HARTLEY *Sixth Heaven* iii. 67   We saw him chattering away... He loves the social round.

1959   B. BERNARDI *Mugwe* i. 6   Social intercourse between the main section of the Tharaka and the Thagichu has never been broken off.

1993   *Albuquerque (New Mexico) Jrnl.* 17 May (Insert) 3/4   The people whose buzz makes work a social activity as well as a commercial one.

2007   *Richmond (Va.) Times Dispatch* (Nexis) 14 Oct. G2   Women of the 19th century placed importance in the tradition of tea as a way to..engage in social conversation.


(b) Of an event or function.

1719   G. SEWELL *Epist. from Hampstead* 6   Lowly I sing in legendary Lays..'Till Fortune shall our social Nights renew.

1785   R. GRAVES *Eugenius* I. x. 56   Having heard the doctor..pronounced the life of every social meeting, I made his character my particular study.

1857   C. DICKENS *Little Dorrit* II. xiv. 441   He took pains, on all social occasions, to draw Mr Sparkler out.

1877   *Independent* 8 Feb. 4/3   The social event of the season!

1915   F. M. HUEFFER *Good Soldier* III. iv. 178   He would dine and pass the evening..at social functions of one kind or another.

1973   *Washington Post* 13 Jan. C2/3   Washington Post reporter Dorothy McCardle was excluded from five previous social events involving President and Mrs. Nixon.

2003   I. STEWART *Rough Guide Ibiza & Formentera* (ed. 2) iii. 123   The Day of the Drums is a spectacular occasion, and one of the premier social celebrations for Ibiza's hippy denizens.


†**b.** Expressive of or proceeding from sympathy; sympathetic. *Obsolete.*

1726  W. Broome in A. Pope et al. tr. Homer *Odyssey* IV. xvi. 236   The Prince..Hung round his neck, while tears his cheek bedew; Nor less the father pour'd a social flood.

1747  W. Collins *Odes* 35   Where'er from Time Thou court'st Relief, The Muse shall still, with social Grief, Her gentlest Promise keep.

**c.** Of or relating to (the activities of) fashionable or wealthy society. Cf.

society *n.* 7c.

1741  S. Boyse in G. Ogle et al. tr. G. Chaucer *Canterbury Tales* II. 19   Go boast thee of the Style, Whose social Titles sordid Thoughts defile.

1785  *Asylum for Fugitive Pieces* (new ed.) 227   Where dames undone at social ruin smile.

1844  *Chambers's Edinb. Jrnl.* 22 June 385/1   The pride of class and individual state tend to make many members of the social scene appear extremely unimportant.

1873  A. Trollope *Eustace Diamonds* III. lxxviii. 331   The police..had..succeeded in sending two scoundrels out of the social world, probably for life.

1925  *Ladies' Home Jrnl.* Apr. 163/3   After you married Jack Hollsworth you went into a sort of social eclipse and almost kept out of things entirely.

1977  G. Scott *Hot Pursuit* v. 51   Little country towns where the social calendar revolved gently around race meetings and the seasons.

2000  *Independent* (Nexis) 30 Aug. 10   What does one of life's most hard-bitten losers do when suddenly he's being feted as the chattering classes' social darling?

**5.**

**a.** Of or relating to society, as ***social background***, ***social climate***, ***social duty***, ***social fabric***, ***social issue***, ***social question***, ***social virtue***, etc.

1579  J. Stubbs *Discouerie Gaping Gulf* sig. D8   According to that one great social law among others, which is, that frends and enemies must be common.

1603  P. Holland tr. Plutarch *Morals* 1335   Needs there must be beside and without him, other gods and other worlds, unto whom and which he may extend those sociall vertues that he hath.

1695  J. Locke *Some Thoughts conc. Educ.* (ed. 3) 191   Careful guard ought to be kept over them [*sc.* children]; and every least slip in this great social vertue taken notice of and rectified.

1726  Bp. J. Butler *15 Serm.* i. 23   The Nature of Man considered in his..social Capacity leads him to a right Behaviour in Society.

1751  S. Johnson *Rambler* No. 180. ¶5   He that devotes himself to retired study naturally sinks from omission to forgetfulness of social duties.

1792  tr. J. Necker *Ess. True Princ. Executive Power Great States* vi. 81   The English nation was not willing that the essential foundations of the social fabric should be shaken at every interval.

1796  H. Hunter tr. J.-H. B. de Saint-Pierre *Stud. Nature* (1799) II. 411   The social reason quickly recals him to personal interest.

1801  M. Edgeworth *Belinda* II. xvi. 135   His social prejudices were such as..to supply the place of the power and habit of reasoning.

1836  A. Combe *Physiol. Digestion* Pref. p. ix   The degree to which its morbid derangements undermine health, happiness, and social usefulness.

1857  *Edinb. Rev.* **106** 223  Goethe's early experiences at first led him to view the whole social fabric with contempt.

1872  J. MORLEY *Voltaire* i. 9  Pale unshapen embryos of social sympathy.

1899  *Folk-Lore* Mar. 75  Races world-divided in their range and their social conceptions.

1920  *Fort Wayne (Indiana) News & Sentinel* 13 Sept.  Watson is a non-descript in politics, an extremist in his social views.

1938  L. MACNEICE *I crossed Minch* ix. 130  A mind must be conditioned by education and social context.

1940  *Economist* 5 Oct. 428/1  More than two decades of extremely divergent developments in contrasting social climates had to be undone.

1969  R. A. SOLOWAY *Prelates & People* vi. 205  The Bishop of London..had generally remained silent on social questions throughout the remainder of the decade.

1990  *New Scientist* 28 July 56/4  I noticed more of Wallace's equal interest in man and social issues in parallel with his account of the natural history.

2007  *Vancouver Sun* (Nexis) 3 Feb. c4  It used to be that social background or family money determined one's educational and career advancement.

**b.** Of life or a way of living: characterized by association in groups or communities. Cf. sense A. 6a.

1689  tr. B. de Spinoza *Treat. Theol. Polit.* iv. 90  This Divine natural Law, is understood only in consideration of human Nature, and we may as well conceive it in any other Man as in Adam, and as well in a Man who lives a solitary, as in one that leads a social Life.

1736  Bp. J. BUTLER *Analogy of Relig.* I. i. 28  When we go out of this World, we may pass into..a new State of Life and Action... And this new State may naturally be a social one.

1765  M. AKENSIDE *Pleasures Imag.* II. 82  Science herself: on whom the wants and cares Of social life depend.

1774  O. GOLDSMITH *Hist. Earth* V. 56  In their native deserts,..it is probable they [*sc.* ostriches] live chiefly upon vegetables, where they lead an inoffensive and social life.

1861  J. S. MILL *Utilitarianism* iii. 46  The social state is..so natural, so necessary, and so habitual to man.

1868  J. E. T. ROGERS *Man. Polit. Econ.* xiv. 183  The condition of social life is that different persons should be engaged in different pursuits.

1935  T. N. CARVER *Essent. Factors Social Evol.* v. 137  Certain anatomical features of the human body have evolved in connection with a social mode of life. Vocal organs, for instance.

1974  tr. W. F. Wertheim *Evol. & Revol.* 91  In looking for the structural features of social life we look first for the existence of social groups of all kinds.

**c.** Of an institution or mechanism: of, belonging to, or concerned with the organization of society; that constitutes society, as ***social apparatus***, ***social framework***, ***social institution***, etc. Cf. *social structure n.* at Compounds 2.

Recorded earliest in *social system n.* at Compounds 2.

1742  tr. *Medit. Marcus Aurelius Antoninus* ix. 217  As you are a completing part of a social system [Gk. πολιτικοῦ συστήματος], so also let every action of your's be a completing part of a social life [Gk. ζωῆς πολιτικῆς].

1784  R. HEY *Diss. Duelling* II. 30  The Principle..upon which they [*sc.* violent individuals] proceed, is directly subversive of every social Institution.

1841   T. CARLYLE *On Heroes* v. 157   Surely there is no kind of government, constitution, revolution, social apparatus or arrangement, that I know of in this world, so promising to one's scientific curiosity as this.

1911   J. R. MACDONALD *Socialist Movement* iv. 80   Co-operation on the largest and most complete scale was the social mechanism through which alone Christianity could work.

1949   M. FORTES *Social Struct.* 55   The British House of Commons is a familiar instance of growth in social institutions and organization.

1983   K. W. BACK in R. F. Kidd & M. J. Sacks *Adv. in Appl. Social Psychol.* II. i. 14   Workers in applied social psychology have been aware that they work within a social framework.

2007   *Daily Tel.* 27 Mar. 15/2   We have a society in which the connections between young people and parents, school and other social institutions have become more tenuous.

**d.** Of, referring, or relating to a person's status in society.

(a) Of rank, position, class, etc., as **social class**, **social equality**, **social scale**, etc.

1756   T. RUTHERFORTH *Inst. Nat. Law* II. iv. 90   As there is a natural equality amongst mankind, before they unite in civil society, so there is a social equality amongst them, after they are united.

1794   C. PIGOTT *Female Jockey Club* 61   Men, since their formation into social classes, have certainly lost sight of the grand object—the greater good.

1814   M. BIRKBECK *Notes Journey through France* 22   The labouring class here is certainly much higher, on the social scale, than with us.

1840   J. S. MILL in *London & Westm. Rev.* Mar. 262   The demoralizing effect of great inequalities in wealth and social rank.

a1876   H. MARTINEAU *Autobiogr.* (1877) I. 297   Norwich..has now no claims to social superiority.

1901   *Amer. Jrnl. Sociol.* 7 399   He makes a better home and moves upward in the social scale, perhaps, faster than the immigrant from any other country.

1967   A. L. LLOYD *Folk Song in Eng.* ii. 86   The medieval peasant..his illiteracy, his social inferiority.

1973   *Listener* 28 June 863/2   The Industrial Revolution..became in time a social revolution and established that social equality on which we all depend.

2000   M. BARROWCLIFFE *Girlfriend 44* xii. 314   The only friend I had whose dad was not of my social class..had been to a comprehensive where he'd told people his dad was a brickie.

(b) Of a person with respect to his or her rank in society, as **social equal**, **social outcast**, **social superior**, etc.

1788   *Columbian Mag.* Aug. 449/1   The next order of social beings which demands our attention, is the numerous and ambosexual order of tatlers.

1869   E. A. FREEMAN *Hist. Norman Conquest* III. 78   The rulers of other European states were ready to receive him as their social peer.

1888   E. BELLAMY *Looking Backward* xi. 164   Who are willing to be domestic servants..where all are social equals?

1917   N. DOUGLAS *South Wind* xxxix. 453   Her home broken up; her child a bastard; herself and Meadows— social outcasts.

1934   M. V. HUGHES *London Child of Seventies* xiii. 159   One must never suppose that any other people whatsoever are one's social superiors.

1948   'G. ORWELL' in *Observer* 28 Nov. 4/4   The social misfit..should learn to be contented in his own station.

2007  *Hindustan Times* (Nexis) 27 Nov.   Middle-class folks cite such use of language as proof that their social inferiors are inherently racist.

**e.** Chiefly *Social Sciences*. Developing from or involving the relationships between human beings or social groups that characterize life in society, as ***social behaviour***, ***social integration***, ***social intercourse***, ***social norm***, etc.

1788  T. Reid *Ess. Active Powers Man* v. vi. 664   I call those operations social which necessarily imply social intercourse.

1840  J. S. Mill in *Edinb. Rev.* Oct. 5   By Democracy M. de Tocqueville understands..the absence of all aristocracy, whether constituted by political privileges, or by superiority in individual importance and social power.

1878  W. James *Let.* 25 Nov. in R. B. Perry *Thought & Char. W. James* (1935) II. 35   Their only weakness would lie in the fact of their social environment not recognizing this as the ultimate interest.

1920  W. I. Thomas & F. Znaniecki *Polish Peasant Europe & Amer.* IV. p. xii   Many individuals..consider the social isolation and relatively low cultural level of the peasant communities an undesirable phenomenon.

1936  M. Sherif *Psychol. of Social Norms* 3   We shall consider customs, traditions, standards, rules, values, fashions, and all other criteria of conduct which are standardized as a consequence of the contact of individuals, as specific cases of 'social norms'.

1949  M. Mead *Male & Female* i. 10   None of these powers—to kill individuals, to destroy the social integration of groups..are new.

1973  H. L. Nieburg *Culture Storm* ix. 188   The conventions of the funny and the laugh-worthy are ritualized as are all forms of social behavior.

1999  M. Shoard *Right to Roam* iii. 113   An increasingly formal pattern of social intercourse based on the country seats was accompanied by the annual ritual of the London Season.

**f.** *Zoology*. Developing from or involved in the relationships between individual animals or within animal groups.

1874  C. Hodge *What is Darwinism?* 39   He teaches that man's moral nature has been evolved by slow degrees from the social instincts common to many animals.

1914  *Science* 25 Sept. 445/2   The pigeons whose social behavior was under investigation were destroyed.

1939  T. L. Green *Pract. Animal Biol.* I. 152   The widespread distribution of the rabbit and its extreme commonness result in a general knowledge of its habits, its colonial or social life, feeding habits and life history.

1975  E. O. Wilson *Sociobiol.* II. vii. 160/1   Although the development of 'social behavior' has not been analyzed in these animals, the visible responses are..elementary and stereotyped.

1999  *Canad. Geographic* Jan. 73/2   Apex predators (wolves, grizzlies, sharks, orcas and polar bears) are charismatic animals, with elaborate social interactions.

**6.**

**a.** Of a human being: living or disposed to live in groups or communities; naturally inclined to be in the company of others. Also of a person's nature: characterized by a need to live in groups or communities.

1611  W. Cowper *Anat. Christian Man* III. 273   Neyther in this life nor in the life to come, hath God ordained man to liue alone. By his first creation he was made a social creature.

1644  S. Rutherford *Lex, Rex* i. 2   God hath made man a sociall creature.

1722  W. Wollaston *Relig. of Nature* vii. 145   Man is a Social creature: that is, a single man, or family, cannot subsist, or not well, alone out of all Society.

1744  J. Harris *Three Treat.* III. I. 157   Let this then be remember'd,..that Man by Nature is truly a Social Animal.

1792  J. Sturges *Disc.* ii. 27   That distinguishing character of man, his social nature, is what most extends the field of his affections.

1832  *Gentleman's Mag.* Sept. 251/2   The aggregation of a society is begun by the mutual attraction of the social qualities of men.

1853  R. C. Trench *On Lessons in Proverbs* 127   Man not being merely accidentally gregarious, but essentially social.

1875  B. Jowett in tr. Plato *Dialogues* (ed. 2) IV. 279   In the use of the senses, as in his whole nature, man is a social being.

1907  *Philos. Rev.* **16** 223   The well-defined recognition of certain duties incumbent on us as social beings.

1935  T. N. Carver *Essent. Factors Social Evol.* v. 135   Do men hang together because of social feeling or because they see that if they do not they will, as Franklin suggested, hang separately?

1997  A. Oldenquist in A. Schmitt et al. *New Aspects Human Ethol.* 214   Humans are innately social, which includes the bases for language, pair bonding, and genetic predisposition to be socialized.


**b.** *Zoology.* Of an animal: living or tending to live in communities of individuals of the same species which cooperate with one another to their mutual or collective benefit; of or relating to such animals; *esp.* designating insects (such as ants and bees) or other animals which live in highly organized associations, often with adaptation of individuals to distinct roles or activities (cf. eusocial *adj.*).

1658  J. Rowland tr. T. Moffett *Theater of Insects* in *Topsell's Hist. Four-footed Beasts* (rev. ed.) 929   Authors describe it [*sc.* Tenthredo] to be in colour like a Wasp..and in communication of labour like all other social winged Insects [L. *ἀγελαῖα quae vis aligera insecta*].

1739  D. Bellamy tr. N. A. Pluche *Nature Delineated* I. xii. 247   These beavers are social Creatures, and a whole Body of them will sometimes reside together under one Roof.

1774  O. Goldsmith *Hist. Earth* VIII. Index sig. Mm1   *Wasps*..the social wasps gather no honey themselves, though fond of sweets.

1831  *Insect Miscellanies* 412/1   Social leaf-mining caterpillars.

1859  C. Darwin *Origin of Species* iv. 87   In social animals it [*sc.* natural selection] will adapt the structure of each individual for the benefit of the community.

1865  J. G. Wood *Homes without Hands* xxiii. 444   Another well-known British insect which constructs social habitations is the Gold-tailed Moth (*Porthesia chrysorrhœa*).

1927  F. Balfour-Browne *Insects* viii. 196   The Buff-tip Moth Caterpillars (*Pygæra bucephala*) are social during the first stage or two of their life, but after that they give up spinning a carpet.

1988  A. H. Buss *Personality* i. 8   Less social mammals tend to display only the rudiments of the behavioral features that are fully developed in highly social animals.

2000  *Sci. Amer.* Mar. 56/2   This collective behavior that emerges from a group of social insects has been dubbed 'swarm intelligence'.

**c.** *Botany*. Of plants: growing in a wild state in clumps, patches or masses with other members of the same species, typically so as to cover a large area.

1674   W. BATES *Harmony Divine Attributes* viii. 152   Resemblance is the common Principle of Union in Nature: Social Plants thrive best when near together: Sensitive Creatures associate with those of their kind.

1811   J. BLACK tr. A. von Humboldt *Polit. Ess. New Spain* II. 455   With the exception of a few gigantic arundinaceous which are *social plants*, the gramina appear in general infinitely rarer in the torrid zone than in the temperate zone.

1855   A. PRATT *Flowering Plants & Ferns Great Brit.* III. 268   One of the plants which the botanist terms *social* because never found growing singly, but always in numbers.

1890   W. FLAGG *Year Among Trees* 169   One of the most common of these social plants is the sweet-fern, universally prized for its fragrance.

1905   *New Phytologist* **4** 100   *Calluna*-Association: Social Species: Dominant, *Calluna Erica* 40—50 p.c... Sub-dominant, *Festuca ovina*.

1966   *Castanea* **31** 159   The only pure stand occupying this habitat type was *Stereodon imponens*, usually a highly social plant.

2003   *Amer. Fern Jrnl.* **93** 134   Allopolyploidy..is common in 'social' species, typically aquatics of temperate or tropical temperate regions.

**d.** In the names of various birds and mammals thought of as being gregarious. Cf. SOCIABLE *adj.* 1b.

1781   T. PENNANT *Hist. Quadrupeds* II. 459   The Social Rat..inhabits the Caspian desert.

1801   G. SHAW *Gen. Zool.* II. I. 93   The Social Mouse is a native of the Caspian deserts.

1850   R. GORDON-CUMMING *Five Years Hunter's Life S. Afr.* I. xi. 233   Many of them [*sc.* trees] were inhabited by whole colonies of the social grosbeak.

1869   *Galaxy* Aug. 173   The social-sparrow, *alias* 'hair-bird',..is the smallest of the sparrows.

1920   P. J. FRYER *Insect Pests & Fungus Dis. Fruit & Hops* viii. 39   The maggots of Flies and Sawflies show a fair amount of variation. They may be almost colourless or distinctly marked, as in the Social Pear Sawfly, without feet or with six middle pairs of sucker feet (e.g. Apple Sawfly).

1979   *Auk* **96** 214   One minor slip appears in the Social Plover.., which is said to be identifiable by the presence of an undepicted hind toe.

1999   *Nature Conservancy* Sept. 42/2   By winter, the social bat, as it's more aptly known, roosts shoulder-to-shoulder on the ceilings of cool caves in tightly packed clusters.

**e.** *Zoology*. Of an ascidian: compound or colonial; *spec.* composed of zooids which are connected to each other but retain individual incurrent and excurrent siphons.

1849   E. BLYTH et al. *Cuvier's Animal Kingdom* (new ed.) 670   The latter are simply adherent to each other by little suckers, not being organically united like the compound and social Ascidians.

1860   *Chambers's Encycl.* I. 466/2   In some kinds (Social Ascidians), the peduncles of a number of individuals are connected by a tubular stem.

1877   T. H. Huxley *Man. Anat. Invertebrated Animals* x. 610   In the compound or social *Tunicata*, many ascidiozooids..are united by a common test.

2004   *Evolution* **58** 1210/2   Colonial (i.e., compound and social) ascidians produce adult zooids by asexual reproduction.

†**7.**

**a.** Associated, related, combined. *Obsolete.*

1620   T. Granger *Syntagma Logicum* 20   The former is called the Sole, solitary,..absolute Cause: the latter sociall Causes.

1645   H. Hammond *View Infallibility* 64   'Tis strange you should couple them together as so sociall things which are so distant and separable.

1686   R. Plot *Nat. Hist. Staffs.* ii. 80   There may be subjoyned another social cause that may contribute not a little to the elevating water above its owne Level.

1700   E. Young *Wisdom of Believing* ii. 60   Let any one say whether it be harder to believe, That the Divine Essence did from everlasting emanate or flow into Three Social and Co-eternal Subsistences, than to believe, That in the Beginning of Time All things were made out of Nothing.

**b.** *poetic.* Of a group of people: united by a common bond; associated. *Obsolete.*

1717   A. Pope tr. Homer *Iliad* III. xi. 339   The social Shades the same dark Journey go.

1718   A. Pope tr. Homer *Iliad* IV. xvi. 985   Patroclus yields to fear, Retires for Succour to his social Train.

1783   J. Hoole tr. L. Ariosto *Orlando Furioso* III. xxv. 214   Agramant, with all his social train, Had hop'd assistance from their arms in vain.

**8.**

**a.** Of a theory, philosophy, etc.: concerned with the constitution of human society; *spec.* concerned with the issues and problems that affect human society and their resolution.

Recorded earliest in Social science *n.*

a1770   M. Akenside *Poems* (1772) 309   England spurns her Gothic chain, And equal laws and social science reign.

1773   F. Gentleman *Introd. Shakespeare's Plays* 13   He should be able to break thro', with ease, the cobwebs of sophistry, and above all, enjoy that grand ingredient recommended by Cicero, social philosophy.

a1832   A. Polson *Eng. Law* in *Encycl. Metrop.* (1845) II. 802/1   Social Economy.—Laws which directly consult the health, wealth, convenience or comfort of the public, may properly be referred to this head.

1837   J. S. Mill in *London & Westm. Rev.* **28** 100   These men raised the cry of social reform.

1887   B. Webb *My Apprenticeship* (1926) 418   Seeking justification in social research.

1920   W. R. Sorley *Hist. Eng. Philos.* xii. 265   Maurice's..work, both in social reform and in religion, derived stimulus and direction from philosophical ideas.

1957   P. Coveney *Poor Monkey* iv. 54   The social novel of Disraeli, E. C. Gaskell, and Kingsley..represents something essential to the literary consciousness of the age.

1979   A. Easson *Elizabeth Gaskell* ii. 61   *Mary Barton* and *North and South* are often spoken of in the context of social fiction.

2006  *Daily Tel.* 30 Aug. 19/3   A return to on-site hospital training would attune it more to nursing and less to social theory.

**b.** Of an activity or policy: carried out to improve the condition of society or for the benefit of society as a whole.

1783  J. Hanway *Let. to Governors Maritime-school* 32   After all our social efforts and generous toils, let not our school drop into oblivion!

1830  J. S. Mill *Let.* 27 Aug. in *J. S. Mill & French Thought* (1956) i. 20   All the great questions of legislation, education, & social improvement in general will be brought on the tapis successively.

1885  W. Harris *Hist. Radical Party* xvii. 415   The old characteristic of Whig rule was thus revived, the Ministry being in form willing to adopt administrative and social improvements.

1941  *Amer. Jrnl. Sociol.* **46** 482   The wage-raising and social spending policies of the 'moderate' socialists.

1973  *Listener* 1 Mar. 287/2   Love of the poor needs social legislation to stiffen it up.

2004  H. Kennedy *Just Law* (2005) iii. 94   Good nursery education for our most disadvantaged children is the best social investment of all in preventing crime, mental illness and anti-social behaviour.

**c.** Of a person or organization: concerned with or interested in the issues and problems that affect human society and their resolution.

1829  J. P. Thomas *Treat. Universal Jurispr.* (ed. 2) ii. iv. 197   Often does it require the utmost skill of the social philosopher, to detect the artful chicane of the false witness.

1833  J. S. Mill in *Monthly Repository* **7** 269   An error which many..of our social reformers, habitually fall into.

1859  G. A. Sala *Twice round Clock* 36   I am glad to observe, for the edification of social economists.

1898  *Daily News* 12 Oct. 4/4   The Church had always been social and humanitarian.

1919  V. Branford & P. Geddes *Coming Polity* (ed. 2) iii. i. 223   Compound these three insurgent types of social critic..and you have the disorders of Revolution.

1965  *Ann. Amer. Acad. Polit. & Social Sci.* **357** 49/1   An almost inexhaustible number of separate yet related problems, the cumulative impact of which is numbing..to the social activist and public official.

1970  *Guardian* 7 Aug. 10/5   [Notting Hill's] over-exposure is the result of the number of social agencies and sheer do-gooders that have moved into the area.

2002  R. J. Richards *Romantic Conception Life* ii. 53   Schlegel..wished himself to shine as a social writer.

**9.** *Psychology.* Of a mental process: dependent upon interaction with other people.

Used only by and in discussions of Thomas Reid.

1785  T. Reid *Ess. Intellect. Powers* 72   Some operations of our minds, from their very nature, are social, others are solitary.

1788  T. Reid *Ess. Active Powers Man* v. vi. 664   I call those operations social which necessarily imply social intercourse.

1989  C. A. J. Coady in M. Dalgarno & E. Matthews *Philos. Thomas Reid* 227   Certainly requests, commands and entreaties are social operations and do not express propositions but such social operations as accusations, warnings and reports certainly do.

**B.** *n.*

†**1.** A companion, an associate. *Obsolete*. *rare*.

1604   R. Cawdrey *Table Alphabet.  Sociall*, or *sociable*, fellowe like, one that wil keepe company, or one with whom a man may easily keepe company.

1632   W. Lithgow *Totall Disc. Trav.* x. 426   O Socials! we're not ignorant of losses.

*a*1770   T. Cradock *Maryland Eclogues* x, in *Poet. Writings* (1983) 200   Meanwhile, Scotch-Irish shall my socials be.

1925   T. A. Cook *Sunlit Hours* ii. 42   George Wharton..was the Precentor, and his 'Socials' enjoyed the privilege of two sitting-rooms.

**2.** Originally *North American*. An informal social gathering or party, *esp.* one organized by the members of a particular club or group.

   *box social, church social*: see the first element.

1857   *Cayuga (*Fort Atkinson, Wisconsin*) Chief* 4 Mar. 1/1   The winter was gliding away in the midst of whist parties and socials.

1870   *Mainland Guardian (*New Westminster, Brit. Columbia*)* 8 Jan. 3/4   A very pleasant Social was given by the ladies and friends in our new mission church.

1893   *The Month* Aug. 157   The social given by the ladies of the Altar Society was a grand success.

1941   V. Walker in J. F. Dobie et al. *Texian Stomping Grounds* 33   A pie supper is a community social to which each lass and lady carries a choice bit of meringue, crust, and filling.

1974   H. Secombe *Twice Brightly* 127   'A church social?' Wally was indignant. 'Not on your nelly, boy.'

2007   *Sacramento (*Calif.*) Bee* (Nexis) 13 July E2   An ice cream social will be held from noon to 4 p.m., and the park's regular attractions will be operating.

**3.** *colloquial*. Also with capital initial.

**a.** Chiefly *British*. Money paid out by social security; (also) a social security programme.

1966   J. Smith *Ornament of Grace* 56   We haven't met since I was on Social, just after the twins were born.

1981   *Times* 20 May 3/8   I'm getting two wages, one from prison, and one from the social.

1983   J. Wainwright *Their Evil Ways* 26   She applied for extra 'social'. She was..sure she was *entitled* to some extra.

2008   *Sunday Mail* (Nexis) 10 Feb. 17   A cliche like Shettleston Man—unemployed, deprived, poor, lives off the social, drinks and smokes too much..and lucky to live beyond 63.

**b.** *North American*. A social security number.

1992   H. Childress *Reality Bites* (film script) (O.E.D. Archive) 114   *Vickie walks over to an employee whose back is to us... Vickie.* Hey, I still need your social.

2000   J. W. Huston *Flash Point* (2001) 573   'What's your Social?' 'Five six three, three three, five seven seven eight.'

2008   *Kingston (*Ont.*) Whig-Standard* (Nexis) 27 Dec. H21   In recent years, I have been asked to provide my 'social' when I contact a bank or other financial institution.

### COMPOUNDS

**C1.** In combination with other adjectives.

**a.** Forming adjectives with the sense 'social and ——', as ***social-cultural***, ***social-economic***, ***social-emotional***, ***social-ethical***, ***social-philosophical***, ***social-political***, etc. Cf. SOCIAL DEMOCRATIC *adj.*, SOCIO- *comb. form* 3.

1848   *Glasgow Herald* 4 Aug. 1/6   A new 'cercle' is about to be formed by M. Olivier (Démosthènes) and others of the social-democratic party.

1890   C. GROSS *Gild Merchant* I. 163   At Barnstaple..the Gild Merchant seems to have been transformed into a social-religious gild.

1899   *Daily News* 21 June 4/3   Parliament is at last tired of social-political experiments.

1919   M. BEER *Hist. Brit. Socialism* I. i. v. 71   A serious contribution to social-economic speculation.

1940   K. MANNHEIM *Ideol. & Utopia* 35   The discovery of the social-situational roots of thought at first, therefore, took the form of unmasking.

1951   T. PARSONS et al. in T. Parsons & E. A. Shils *Toward Gen. Theory Action* I. i. 18   Fundamentals of behavior psychology..primary viscerogenic and possibly social-relational needs, cognition and learning.

1956   J. KLEIN *Study of Groups* viii. 118   Social-emotional behaviour.

1960   C. S. LEWIS *Stud. in Words* i. 22   Thus from the very first the social-ethical meaning, merely by existing, is bound to separate itself from the status-meaning.

1977   A. GIDDENS *Stud. in Social & Polit. Theory* viii. 291   Durkheim..was very critical of some features of Comte's social-philosophical writings.

2005   D. HOWARD-PITNEY *Afr. Amer. Jeremiad* (rev. ed.) Concl. 225   His forte is moralistically addressing social-cultural issues.

**b.** Forming (chiefly parasynthetic) adjectives with the sense 'concerned with social issues', as ***social-minded***, ***social-conscious***, etc.

1833   C. CUSHING *Rev. Late Revol. France* II. xi. 262   A social minded King and a youthful Queen promised new scenes to the courtier.

1852   R. CHAMBERS *Life & Wks Robert Burns* III. 260   A social-spirited, impressionable man like Robert Burns.

1939   A. HUXLEY *After Many a Summer* II. v. 229   For these..'normality' in sexual behaviour would be quite different from what it was for the more social-minded.

1942   C. HIMES *Black on Black* (1973) 183   His social-conscious protestations of hurt had leapt the bounds of amateur sincerity.

2000   J. KLAIBER in A. Hastings et al. *Oxf. Compan. Christian Thought* 378/1   At the same time that the Catholic church experienced a new awakening following Vatican II, some Latin American Protestants also turned more ecumenical and social-minded.

**C2.**

**social action**  *n. (a)* deliberate action that results or is intended to result in a change in the institutions or conditions of social life; an instance of this;  *(b)* (*Sociology*) action that takes place in a social context; action involving or oriented towards one or more other individuals; an instance of this.

*a*1746  F. Hutcheson *Syst. Moral Philos.* (1755) I. i. ix. 181   There may be abundant enjoyments to some orders of beings without social action.

1853  H. Martineau *Positive Philos. of Comte* II. viii. 246   Its distinctive social action..was well represented by the noble Fabricius.

1873  H. Spencer *Study Sociol.* i. 2   Minds in which the conceptions of social actions are thus rudimentary, are also minds ready to harbour wild hopes of benefits to be achieved by administrative agencies.

1929  T. Parsons in *Jrnl. Polit. Econ.* **37** 33   Weber does not exclude 'values' from his consideration, but the whole point of his method is to analyze social action in terms of them.

1985  E. W. Soja in D. Gregory & J. Urry *Social Relations & Spatial Structures* vi. 90   To be alive is to..be shaped by a constantly evolving spatiality which constitutes and concretises social action and relationship.

2004  D. A. Hardcastle et al. *Community Pract.* i. 9   Social action to change the law..will be more effective than after-the-fact rape counseling in sparing women the..traumas of rape.


**social assistance**  *n.* a programme or programmes providing assistance to people in need; (*Canadian*) = social security *n.*

1907  *N.Y. Times* 11 May 6/5   The Social Assistance people (strictly unofficial) feed about 16,000 people.

1915  E. M. Borchard *Diplomatic Protection Citizens Abroad* xxxviii. 81   The laws of the United States, Great Britain and France are among the most liberal in this respect, for aliens are admitted to the various forms of social assistance and poor relief.

1938  *Winnipeg Free Press* 10 Mar. 1/4   To accept the proposal now, said the minister, would mean a serious dislocation in existing arrangements for social assistance.

2001  J. Waterman *Arctic Crossing* ii. 174   Inuit collect social assistance checks as a means to continue hunting.


**social audit**  *n.* (originally) an audit of social aspects of the operations of an institution or organization; (now chiefly) a formal assessment of a company's operations with respect to social issues such as working conditions or environmental impact.

1906  *Manitoba Morning Free Press* 1 June 8/4   In his social audit of the city's finances, Mr. J. H. Menzies..reports all books, etc., in first-class condition.

1936  *N.Y. Times* 11 June 5/1   This 'social audit' will have the double purpose of lopping from the lists cases which do not belong there and of standardizing the administration of relief in the bureau's forty-four district offices.

1966  *Amer. Jrnl. Econ. & Sociol.* **25** 257   Once in every three years the trustees would appoint experts to conduct a social audit and report to the annual meeting on how well the company had discharged its responsibilities to workers, consumers, and the community.

2008  *Times of India* (Nexis) 16 Mar.   The plans aim to institute a 'social audit' which makes manufacturing processes in industries likely to be found violative of child labour laws subject to external scrutiny.

**social benefit**  *n.  (a)* a benefit to society, frequently resulting from technological advancement;  *(b)* a benefit payable under a social security system.

1735  'Philoveritas' *Ess. on Relig.* 80   All mankind are then to acknowledge all good Offices done by, and social Benefits received from Mankind.

1872  'G. Eliot' *Middlemarch* III. vi. lvi. 241   Your neatly-carved argument for a social benefit which they [*sc.* rustics] do *not* feel.

1963  J. R. Sargent in M. Shanks *Lessons of Public Enterprise* xv. 250   A balancing of social benefits against social costs.

1972  *Guardian* 30 Dec. 4/1   From Monday every citizen of the nine nations..is entitled to the same pay and..social benefits..as fellow Europeans.

2002  M. Kurlansky *Salt* (2003) xxi. 354   Hundreds of workers are undeclared so that the salt traders can avoid paying them social benefits.

**social butterfly**  *n.* frequently *depreciative* a person who goes to many social events; a person most comfortable in social situations; a socialite.

1837  *Amer. Q. Rev.* June 403   He has too much *goodness of heart* to engage in the breaking of social butterflies upon the wheel of ridicule.

1910  A. E. Housman *Let.* 4 Mar. (1971) 108   People are asking me out a great deal too often..I am not a social butterfly.

2003  *City News (*Austral.*)* (Nexis) 30 Oct. 32   For some, Melbourne Cup day is about the horses and racing. But for social butterflies, it's all about buying a stylish new outfit and being seen at an exclusive luncheon.

**social capital** *n.* the interpersonal networks and common civic values which influence the infrastructure and economy of a particular society; the nature, extent, or value of these.

1835  *Western Messenger* Aug. 104   [They] would gladly engraft on an earnest, healthy state of society, the follies and the vices of a luxurious and decaying monarchy. Although none of the social capital is in such hands or heads.

1886  *Science* 24 Sept. 283/1   A great city is a corporation, a body politic. This complex organization..suffers waste which is dead loss of social capital and resource.

1961  J. M. Jacobs *Death & Life of Great Amer. Cities* 138   These networks are a city's irreplaceable social capital.

1991  *European Sociol. Rev.* 7 197/1   This holds both for getting their offspring through the system by meritocratic means, as well as making use of the family's total social capital through alternative channels.

2001  J. G. Stein *Cult of Efficiency* i. 14   Robert Putnam..has argued that civic engagement—citizens coming together to participate in public space on public issues—is a precondition for the creation of 'social capital'.

**social care**  *n.* the provision by society of what is necessary for the health and welfare of a person or group of people; *spec.* any of various types of support or supervision provided by social workers and allied professionals, typically (esp. opposed to *health care*) excluding the medical treatment of existing conditions; (also, in later use) such provision considered as a profession or a subject for academic study.

1846  *Commerc. Rev. South & West* Sept. 147   How essential, then, to continue to impress upon men the knowledge of the laws which are necessary for the preservation of these, the greatest of the objects of social care—which teach the fathers of the family the obligations which they owe their children and their wives, and which government owes them.

1902  *Amer. Jrnl. Sociol.* **7** 502   The first article treats the general assumptions of social care of the poor.

1938  H. Macmillan *Middle Way* iii. 36   We have added enormously to our expenditure on social care..and sought new methods of financing it, both out of increased taxation and by the adoption of the contributory system.

1966  G. W. Brown et al. (*title*)   Schizophrenia and social care.

1998  *Community Care* 30 Apr. 39/1 (*advt.*)   Working closely with a committed and enthusiastic group of staff who work flexibly and creatively with vulnerable people at the sharp end of the interface of Health and Social Care.


**social casework**  *n.* = casework *n.*[2]

1916  *Amer. Econ. Rev.* **6** 431 (*title*)   Some uses of social case work in medical training.

2001  L. M. Healy *Internat. Social Work* iv. 95   Social casework is the common method in [Japanese] welfare offices, hospitals and healthcare centers.


**social caseworker**  *n.* = caseworker *n.*[2]

1917  M. E. Richmond *Social Diagnosis* 5   The ground which all social case workers could occupy in common.

2007  R. Ericson *Crime in Insecure World* iii. 119   Welfare benefits fraud is a conundrum because of the limitations of social caseworker knowledge as to whether a person receiving welfare benefits has other viable means of support.


**social causation**  *n.* the theory that phenomena, such as illness or criminal behaviour, may be explained in terms of social causes; the fact of causing phenomena in this way.

1848  *Christian Reformer* **4** 137   He very imperfectly comprehends..states of society and mental influences which..have to be gathered and learnt from general principles of social causation.

1896  F. H. Giddings *Princ. Sociol.* i. 20   Thus the cycle of social causation begins and ends in the physical process.

1964  J. Gould & W. L. Kolb *Dict. Social Sci.* 647/1   There has been much discussion about the relationship between ideas of social causation and the problem of the freedom of the individual will.

2006  M. C. Lennon in C. L. M. Keyes & S. H. Goodman *Women & Depression* iv. xiii. 317   An alternative interpretation of the association between employment and depression is given by the social causation explanation.

**social centre**  *n.* a place in which people gather for communal and recreational activities; (now chiefly) a building designed for this purpose.

1869  *Belfast News-let.* 23 Feb.   The club itself is a sort of social centre for the comfort and recreation of well-to-do West End shopkeepers.

1901  *Amer. Jrnl. Sociol.* **7** 206   Is there not room for the school..in providing accessible and agreeable social centers?

1978  J. ANDERSON *Angel of Death* v. 42   The main saloon..was the social centre of the yacht.

2003  C. BIRCH *Turn again Home* iv. 61   As vice-chairman of the Sutton Estate Social Centre, Uncle Edmund organised children's outings.

**social change**  *n.* a change in the customs, institutions, or culture of a society, esp. due to ideological or technological factors; also as a mass noun.

1822  *Country Constit. Guardian & Lit. Mag.* **1** 198/2   It [*sc.* this excessive licentiousness of the press] will put to imminent hazard the results of this great social change.

1952  H. H. GERTH & D. A. MARTINDALE in tr. M. Weber *Anc. Judaism* p. xviii   A second sociological issue of concern to Weber is the examination of social changes due to territorial organization and urbanization.

2007  *Heidelberger (Austral.)* (Nexis) 21 Feb. 2   A free public seminar, exploring cultural activism and the role of the arts in social change.

**social chapter**  *n.* (also with capital initials) the section of the Maastricht Treaty dealing with policy on social matters such as workers' rights and welfare (cf. MAASTRICHT *n.*).

1991  *Independent* 5 Dec. 12/6   The treaty's social chapter is probably the single most difficult area.

1998  A. FORNA *Mother of All Myths* (1999) viii. 244   Labour's commitment to the parental leave directive in the EC Social Chapter..is certainly to be welcomed.

2005  *Sunday Times* (Nexis) 11 Dec. 17   Howard stipulated that Major should not sign up to..the range of new workplace rights called the social chapter.

**social character**  *n.* the collective essential traits of a society or group of people, arising from common experience, education, etc.

1754  S. JOHNSON *Elem. Philos.* (ed. 3) I. 208   My third Relation is to my Fellow Creatures, and especially those of my own Species,..which obliges me..to behave suitably to the social Character.

1895  *Science* 17 May 541/2   Scientific method..has added organizability to the social character, and by virtue of this it has dynamically contributed to the advance in social progress.

2002  *Jrnl. Black Stud.* **32** 506   Inevitable, therefore, is the tragic undermining of individuals' humanity and warping of the social character.

**social charter**  *n.* (also with capital initials) a document establishing or dealing with policy on social matters such as workers' rights and welfare; *spec.* a charter signed by eleven European Union member states in 1989, which later formed the basis of the Maastricht Treaty's social chapter (cf. *social chapter n.*).

1940   *Times* 11 July 3/1   A social charter will be created to assure employers and workers the means of earning a livelihood with dignity.

1989   *Independent* 31 Oct. 1/4   Britain yesterday lost all hope of recruiting last-minute allies in its fight against the European Community's proposed Social Charter.

1992   *Globe & Mail (*Toronto*)* 1 Feb. A1/1   Two of Canada's business leaders became unexpected supporters yesterday of a 'social charter' in a rewritten Constitution.

2005   *Age (*Melbourne*)* (Nexis) 3 May 21   The architect of the EU 'social charter' in 1989..was the French socialist, Jacques Delors.


**social chauvinism**  *n.*  [after Russian *social-šovinizm* (1915 (in Lenin) or earlier)] *derogatory* (chiefly in the phraseology of communism and socialism) the action or practice of supporting one's own non-socialist government during wartime, rather than pursuing the overthrow of capitalism through a proletarian revolution.

1919   *Times* 22 Dec. 16/2   This is an axiom which is only disputed by the conscious upholders of Social-Chauvinism.

1930   M. J. Olgin tr. V. Lenin *Coll. Wks.* XVIII. 226   Social-chauvinism, being in practice a defence of the privileges..of 'one's own' (or any other) imperialist bourgeoisie, is a total betrayal of all Socialist convictions.

2003   L. Selezneva in R. Fawn *Realignments in Russ. Foreign Policy* 11   The doctrine in foreign policy itself has changed radically. It can be described as a mixture of neo-imperialism, liberalism and social-chauvinism.


**social chauvinist**  *n.* and *adj.*  [as noun after Russian *social-šovinist* (1915 (in Lenin) or earlier); as adjective after Russian *social-šovinistskij* (1917 (in Lenin) or earlier)] *derogatory  (a) n.* a socialist who supports his or her own non-socialist government during wartime;  *(b) adj.* of, relating to, or characterized by social chauvinism.

1918   J. W. Hartmann & A. Tridon tr. V. Lenin *Proletarian Revol. Russia* II. 120   What it wants to know is the historical origin, the significance and the strength of the social-chauvinist movement.

1919   tr. V. Lenin *State & Revol.* IV. i. 28   'The proletariat needs the State,' a phrase repeated by all the Opportunists, Social-Chauvinists and Kautskians, who assure us that this is what Marx taught.

1934   tr. N. N. Popov *Outl. Hist. Communist Party of Soviet Union* I. 335   The majority of the writers..followed in the footsteps of Plekhanov and adopted a social-chauvinist position.

1957   R. N. C. Hunt *Guide to Communist Jargon* xliv. 147   The social chauvinists are the socialist leaders who were supporting their bourgeois governments in prosecuting the war as one of national defence.

2005   N. Redfern *Class or Nation* iii. 108   The invasion of the Soviet Union by Germany in June 1941 precipitated the CP into openly social-chauvinist support of the British war effort.

**social cleansing**  *n.* the removal by a dominant social group of other (esp. disadvantaged) social groups which it regards as undesirable (cf. ETHNIC CLEANSING *n.*). Cf. CLEANSING *n.*

1976   D. J. OLSEN *Growth of Victorian London* iv. 147   Long before the very rich began to covet converted workmen's cottages the social cleansing of Chelsea had begun.

1986   *Los Angeles Times* 12 Oct. 6/5   Lifton suggests various explanations for the ability of men who regarded themselves as healers to administer death. There was, of course, the ideology of social cleansing; for us, at least, a special case, and a remote one.

1994   *Independent on Sunday* 30 Jan. 15/1   In growing numbers, the unemployed and homeless, thieves, street children, tramps, prostitutes and homosexuals are being murdered by the police and hired death squads. Colombians call it 'social cleansing'... Amnesty puts the numbers killed by social cleansing in the thousands.

2001   *Evening Standard* (Nexis) 29 Mar. 18   They fear that his plans for urban renaissance will lead to the 'social cleansing' of Western cities and the sweeping away of the poor.


**social column**  *n.* = *society column n.* at SOCIETY *n.* Compounds 2.

1871   *Trewman's Exeter Flying Post* 18 Oct. 5/2   Shirley Brooke used to write a light, sparkling, literary and social column for a West Country journal.

1952   M. ALLINGHAM *Tiger in Smoke* i. 9   Every social column in the country had announced that she was about to marry him.

2007   *Age (*Melbourne*)* (Nexis) 29 Nov. 24   The Geelong car dealer's daughter..married an English peer then used the title as a byline on a social column for the Melbourne scandal rags.


**social columnist**  *n.* = *society columnist n.* at SOCIETY *n.* Compounds 2.

1935   *Lethbridge (*Alberta*) Herald* 23 Feb. 6/7   It just goes to show that grocers will presently be forced to adopt the 'S for Sam' and 'F for Frank' lingo of the social columnist.

2006   *Africa News* (Nexis) 2 Dec.   To be the social columnist of Style was to be all-powerful and fawned upon by many.


**social commentary**  *n.* commentary on society or social issues; an instance of this.

1847   J. RICHARDSON *Eight Years in Canada* 39   This is a book in which..the important and the trivial, the stern political stricture and the lively social commentary, are intended to be placed in juxtaposition.

1935   *Amer. Econ. Rev.* **25** 804   He has rather compiled a social commentary.

2007   *Toronto Star* (Nexis) 21 Aug. L8   It's tough to judge love songs and social commentary from a convicted rapist.


**social commentator**  *n.* a person who writes or delivers social commentary.

1859   *Southern Literary Messenger* Mar. 175/1   They present what is after all the true *desideratum* of the social commentator or historian—the actual life and personages of the times with which they deal.

1923   *Bull. Metrop. Mus. Art* **18** 44   He..played the rôle of a social commentator, devoting his attention to wit, the depiction of costumes, and the manners of the students, the midinettes, and the vagabonds.

2001   *Big Issue* 2 July 44/4   The book marks a return to the function of the writer as social commentator.

### social compact *n. Philosophy* = SOCIAL CONTRACT *n.* 2.

1660   R. L'ESTRANGE *Apol. with Short View* 104   Every man is every Bodies Enemy: but when we come to finde, that safety, better secured by social Compact..under the Regiment of some certain Lawes directing to the Common benefit of all.

1799   R. SOUTHEY *Nondescripts* i, in *Poet. Wks.* (1838) III. 59   If we act the governor, and break The social compact.

1881   *Spectator* 30 Apr. 573   Locke's doctrine of a tacit social compact.

2007   *Financial Times* (Nexis) 2 Apr. 12   Where the people are given an effective voice in the political process, the social compact will remain.

### social conscience *n.* a sense of responsibility or concern for the problems and injustices that affect society.

1795   P. S. DUPUY tr. J.-C. Gorgy *Sentimental Tablets* 99   The cause of those [writings], whose authors wrote from principle; upon the strongest conviction; directed thereto by a kind of social conscience [Fr. *conscience sociale*].

1883   B. POTTER *Let.* July in *Lett. Sidney & Beatrice Webb* (1978) I. 16   So ends the London Season! and I shall return with clear social conscience to my dowdy dress.

1925   A. HUXLEY *Those Barren Leaves* I. iii. 35   When our dividends came rolling in..we did, it is true, feel almost a twinge of social conscience.

2004   *fRoots* Dec. 35/1   Like his Bob-ness, Seydina is known for writing songs with a social conscience.

### social consciousness *n.* awareness of and concern for the problems and injustices that affect society; an instance of this.

1848   *N. Brit. Rev.* Aug. 274/2   What might be called *social consciousness* is that which distinguishes the civilized communities of modern times.

1897   *Amer. Jrnl. Sociol.* **3** 343   As we say in sociological language, there was a very low degree of social consciousness.

1955   T. WILLIAMS in S. J. Kunitz *20th Cent. Authors* Suppl. I. 1088/1   We suddenly discovered there were two kinds of people, the rich and the poor, and that we belonged to the latter... It was the beginning of the social-consciousness which I think has marked most of my writing.

2000   *N.Y. Times* 31 Dec. II. 1/2   In the 1990's, Rage Against the Machine..gave hope to anyone convinced of pop music's ability to raise social consciousness.

### social control *n.* control of a person or group by wider society in order to enforce social norms, through socialization, policing, laws, or similar measures.

1831   *Olio* 5 Feb. vi. 72/2   They naturally imbibe ideas of independence, which spurn at all social control.

1898   F. H. GIDDINGS *Elements Sociol.* xix. 217   Social control, manifesting itself in the authoritative organization of society as the state, and acting through the organs of government, is sovereignty.

1951   N. ANNAN *Leslie Stephen* vii. 218   The field of what is now called social control. How do law, custom, religion and moral codes govern men's actions?

2004   H. KENNEDY *Just Law* (2005) xii. 249   We are seeing the replacement of due process in the courts by public shaming as a mean of social control of abhorrent behaviour.

**social cost**  *n.*  *(a)* the cost to society of a policy or innovation, considered in terms of illness, pollution, effort, etc.;  *(b)* the cost to society of a social problem, considered in terms of violence, crime, lack of security, etc.

1862   J. E. CAIRNES *Slave Power* Contents p. xiv (*title*)   Social cost of the system.

1927   G. D. H. COLE *Econ. Syst.* vii. 62   Social cost simply cannot be measured in terms of money, but only in the last resort in terms of human effort and destruction of natural resources.

1931   *Univ. Pennsylvania Law Rev. & Amer. Law Reg.* **80** 825   Little attention is paid to the social costs of crime.

1977   *N.Y. Rev. Bks.* 31 Mar. 21/2   Rehabilitation [of housing]..has proved to be cheaper in social costs.

2002   *Contemp. Econ. Policy* Jan. 38   Personalized guns..could make existing firearms regulations more effective and reduce the social costs associated with gun misuse.

**social cycle**  *n. British* (now *historical*) a four-wheeled pedal cycle seating two or three people side by side.

1961   *B.S.I. News* Nov. 11/2   The new regulations..also lay down requirements about the lights to be carried on four-wheeled 'social cycles', now common in holiday areas.

2002   *Best of Brit.* Nov. 36/1   One of the delights of a holiday camp stay fifty years ago was an outing on a social cycle. These machines were made for two or three with the riders on the outside doing the pedalling.

**social Darwinism** *n.* originally *Sociology* (also with capital initial in the first element) the theory that societies, classes, and races are subject to and a product of Darwinian laws of natural selection.

Often used to justify political conservatism, imperialism, and racism.

1877   *Trans. Royal Hist. Soc.* **5** 250   I can find nothing in the Brehon laws to warrant this theory of social Darwinism.

1936   *Amer. Sociol. Rev.* **1** 457   Interest Hozumi defined according to social Darwinism: that which aids the struggle for survival.

1972   P. B. MEDAWAR *Hope of Progress* 71   Social Darwinism in the form expounded by Haeckel provided a theoretical justification for the great biological crimes of Fascism.

2007   *Daily Tel.* (Nexis) 21 Aug. 18   We now imagine that if anything is worth having then it is worth competing for in a very public way... Social Darwinism is currently top of the pops when it comes to guaranteed television success stories.

**social Darwinist**  *n.* and *adj.* originally *Sociology* (also with capital initial in the first element)  *(a) n.* a person who advocates social Darwinism;  *(b) adj.* of or characterized by social Darwinism; relating to or advocating social Darwinism.

> 1903   *Q. Jrnl. Econ.* **17** 448   The master error of the social Darwinists is to see in the economic struggle a twin to the 'struggle for existence' that plays so fateful a part in the modification of species.
>
> 1945   *Amer. Anthropologist* **47** 449   The Marxist tradition itself..is nevertheless equally profoundly a social Darwinist development.
>
> 1981   J. Sutherland *Bestsellers* iv. 57   There is no room for..cosiness in Hailey's social-Darwinist universe.
>
> 1992   R. Wright *Stolen Continents* (1993) xii. 265   He was a social Darwinist 'liberal' committed to the most ruthless forms of modernization.
>
> 2003   R. Dawkins *Devil's Chaplain* i. 9   An opposite response to the callousness of natural selection is to exult in it, along with the Social Darwinists and—astonishingly—H. G. Wells.

**social deprivation**  *n.* hardship caused by a lack of the ordinary material benefits of life in society; (also) denial of interaction with other people.

> 1827   B. Tempest *Vallies* I. 40   A comparison between positive wretchedness and mere social deprivation.
>
> 1958   *Jrnl. Abnormal & Social Psychol.* **56** 49 (*title*)   The effect of brief social deprivation on behaviors for a social reinforcer.
>
> 1979   W. J. Fishman *Streets of E. London* 52/2   The social deprivation inherent in East End life.
>
> 2007   *Observer* (Nexis) 23 Dec. 25   I am now in the parish of Knightsbridge.., a place where social deprivation means not being invited to the German ambassador's Christmas party.

**social dialect**  *n.* (originally) a language or language variety used in social situations; (now chiefly *Linguistics*) a language variety used by a particular social group or class (cf. sociolect *n.*).

> 1852   *N.-Y. Daily Times* 28 Dec. 2/5   Their social dialect..was the Italian,..but now..French..has taken its place.
>
> 1911   *Amer. Anthropologist* **13** 634/1   The Todas..have three special religious languages, an *argot*, and a social dialect.
>
> 1949   H. Kurath *Word Geogr. Eastern U.S.* 7   This leveling of social differences inevitably entailed a leveling of social dialects.
>
> 1975   F. West *Way of Lang.* 50   Social dialects may reflect different levels of education, wealth, social position.
>
> 2001   E. Finegan & D. Biber in P. Eckert & J. R. Rickford *Style & Sociolinguistic Variation* xiv. 241   We believe that certain features of social dialect arise from this differential access to the full range of registers among social groups.

**social dialectologist**  *n. Linguistics* an expert in or student of social dialectology.

> 1965   *College Eng.* **26** 260/1   The social dialectologist is needed, but so are practical rhetoricians.
>
> 1977   *Publ. Amer. Dial. Soc. 1974* LXI./ LXII. 4   Social dialectologists in recent years have made numerous attempts to describe the speech of black Americans.

1997  *Eng. World-Wide* **18** 107   Women's role in relation to sound change has been discussed by social dialectologists for decades.

**social dialectology**  *n. Linguistics* the study of social dialects; the study of linguistic variation between social groups or classes.

1960  *Current Anthropol.* **1** 392/3   I want to start developing a course (and publications by the way) in social dialectology.

1976  *General Linguistics* **16** 32   *Rustic* is an example of social dialectology at its thoroughly honest best.

2008  *Daily Tel. (Austral.)* (Nexis) 29 Jan. 16   Professor Paul Kerswill, from Lancaster University's department of linguistics and English language, an expert in social dialectology, has researched change in speech in different communities.

**social differentiation**  *n. Sociology  (a)* the process by which the different roles and functions of the members of a society become institutionalized; the result of this process;  *(b)* the process by which groups or communities disperse to form separate or distinct societies.

1872  H. SPENCER in *Contemp. Rev.* **20** 317   The primary social differentiation which we have noted between the [society's] regulative part and the operative part, is presently followed by a distinction..between the internal arrangements of the two parts.

1903  L. F. WARD *Pure Sociol.* II. x. 202   I propose to use..the sufficiently vague..term *race*..for all the different kinds of social groups that were formed during the process of social differentiation.

1926  C. C. NORTH *Social Differentiation* i. 5   It is essential to any proper understanding of social differentiation that some effort be made to distinguish between the biological and the social in the sources or causes of social distinctions.

1971  F. R. ALLEN *Socio-cultural Dynamics* iii. 72   Social differentiation as a major view of change.

2000  B. F. RESKIN in M. S. Kimmel & A. Aronson *Gendered Society Reader* 262   Social differentiation is achieved through norms that set dominate and subordinate groups apart in their appearance (sumptuary rules) or behavior.

**social disease**  *n. (a)* any problem or issue that adversely affects society; *(b)* (*U.S.*) a sexually transmitted disease.

1825  *Examiner* 19 June 1/1   We deem it..useful, as illustrative of what may be termed a social disease to complete the record by the addition of companies formed since our first enumeration.

1871  *Jrnl. Social Sci.* **4** 3   There are now social diseases among us—chronic diseases, which..if they existed, were only occasional.

1907  *Amer. Jrnl. Sociol.* **13** 20 (*title*)   Prophylaxis of social diseases.

1970  *Guardian* 28 Apr. 10/1   Hard drugs addiction..is a contagious social disease.

1978  R. LUDLUM *Holcroft Covenant* xxvii. 314   She was probably an ODESSA agent and you've come down with a social disease, as planned.

2007  *Pasadena (Calif.) Star-News* (Nexis) 3 Oct.   A new city group hopes to curb violence by viewing the problem as a social disease that can be cured.

**social disorganization** *n.* chiefly *Sociology* the disintegration of social institutions, regarded as leading to increased social problems, such as poverty and criminality.

1797   in J. Gifford *Let. T. Erskine* 12   The incalculable expences of the war would supply them [*sc.* the Jacobins] with innumerable means for effecting that social disorganization, in the midst of which they hoped to establish their empire.

1854   *Jrnl. Statist. Soc.* **17** 6   Emigration is also the natural consequence of social disorganization, political convulsions, and religious excitement.

1958   J. M. Argyle *Relig. Behaviour* xi. 136   The evidence showing how the level of mental disorder increases with social disorganization.

1999   J. Arnott *Long Firm* v. 287   I mentioned the Chicago School and their studies of urban environments and social disorganisation.

**social document** *n.* a work or record, esp. a literary composition, embodying an authentic and informative description of the social conditions of its time.

1883   *N.Y. Times* 7 Aug. 4/4   The future historian..will have a social document of great value in the accounts of the number and enthusiasm of the spectators.

1921   S. Lewis *Let.* 12 July in C. Mackenzie *My Life & Times* (1966) V. 199   Your book..was..at once a Social Document, and an opiate.

1959   I. Opie & P. Opie *Lore & Lang. Schoolchildren* p. v   This pioneer work and social document of first importance is..something of a curiosity.

1991   D. Tomas in M. Benedikt *Cyberspace* (1993) 32   His novels and short stories are noteworthy social documents because they 'show..the hidden bulk of an iceberg of social change'.

**social dumping**  *n.* a process whereby a country with poor labour standards and low manufacturing costs is able to export goods at lower prices than its international rivals, to the social and economic disadvantage of competing countries with higher employment standards and costs.

1929   *N.Y. Times* 20 Apr. E7/3 (*heading*)   German business on the defensive. Industrialists say they are not planning campaign of 'social dumping'.

1988   *Times* (Nexis) 14 Oct.   The Commission fears that once internal barriers have tumbled and the EEC is a single market, companies based in Northern Europe could move their operations South to take advantage of cheaper labour and looser regulations. This has spawned a new EEC jargon phrase, 'social dumping'.

1995   C. Dunn *Canad. Polit. Debates* vi. 247   One approach is to regulate international trade to prevent 'social dumping', that is, the gaining of comparative advantage by other countries through substandard wages and working conditions.

**social dynamics** *n. Social Sciences* (with *plural* agreement) the factors that influence social change; (with *singular* agreement) the study of this; cf. *social statics n.*

1843   J. S. Mill *Syst. Logic* II. IV. x. 604   The consideration of the successive order is..predominant in the study of social dynamics, of which the aim is to observe and explain the sequences of social conditions.

1893   L. F. Ward *Psychic Factors Civilization* xxxviii. 313   The other branch of social dynamics, that which embraces the influence of those active or positive forces heretofore described, necessarily connects the study of these forces with the *art* of applying them.

1938   B. Russell *Power* i. 11   The laws of social dynamics are laws which can only be stated in terms of power, not in terms of this or that form of power.

1994   T. L. Karl in J. A. Hall *State* III. IV. liii. 373   The internal social dynamics produced by a mineral-based insertion into the international economy.

**social entrepreneur** *n.* a person who undertakes or establishes an enterprise with the aim of solving social problems or effecting social change.

1948   L. P. Crespi in E. G. Boring et al. *Found. Psychol.* xxv. 612   The social entrepreneurs are angry about the status quo and are trying vehemently to change it.

1964   *Amer. Jrnl. Sociol.* **70** 204/2   Such a situation is likely to incite a 'social entrepreneur' within the ethnic group to try to organize something for the new immigrants in need.

2006   *Fast Company* May 104   Some of the most effective antihunger and antipoverty programs in developing nations are small-scale projects run by local or regional social entrepreneurs innovating in ways governments can't.

**social entrepreneurship** *n.* the application of entrepreneurial principles to solving social problems or effecting social change; the work of a social entrepreneur.

1959   N. J. Smelser *Social Change in Industr. Revol.* xi. 294   Thus the movement from agitation to investigation to actual legislation is an example of social entrepreneurship, in which the sponsor of new institutional forms has to 'meet the test' of public acceptance or rejection.

1987   *Washington Post* 1 May A22/5   Let's look at what I call social entrepreneurship... The power of an idea and one determined person can accomplish so much.

2008   *Church Times* 14 Mar. 29/4   It is unfortunate that current initiatives such as the new localism, social entrepreneurship, and..social cohesion are all ignored.

**social evening** *n.* an informal evening gathering or party, frequently with some form of entertainment; an evening on which this is held.

1844   *Metrop. Mag.* June 137   The social evenings were enlivened by the charms of Louise's singing, in which she was a proficient.

1943   G. Greene *Ministry of Fear* III. ii. 193   Haven't we met—?.. On one of the doctor's social evenings.

2002   *Jewish Chron.* 2 Aug. 19/3   The B'nai B'rith hall reverberated to the sound of the anklung at a social evening.

**social evil** *n.* any problem or issue that adversely affects society; *spec.* (frequently with *the*) prostitution (now *archaic*).

1732  *Man & Woman* 29   Undue Copulations have evidently been the grand Seminaries of most social evils.

1851  A. B. RICHARDS *Poems, Ess. & Opinions* I. 156   The state of our streets is a disgrace to any Capital. It is a disgrace to England. But it is not in this matter that the social evil is to be remedied.

1888  *Q. Jrnl. Econ.* **2** 444   Many others have felt the social evil, of a purely manufacturing civilization, of huge mills and factory towns.

1901  *Contemp. Rev.* Mar. 323   These slums have become a pandemonium of drunkenness and the social evil.

2000  S. J. MORSE in W. C. Heffernan & J. Kleinig *From Social Justice to Criminal Justice* v. 154   Poverty, racism, abuse, neglect, and other social evils compromise the dignity and life chances of too many citizens.

**social evolution**  *n.* the development of human societies, esp. when considered progressive in nature; (also) the evolution of social behaviour in animals.

1853  H. MARTINEAU *Positive Philos. of Comte* II. VI. vi. 156   The elements of our social evolution [Fr. *évolution sociale*] are connected, and always acting on each other.

1907  J. LONDON *Iron Heel* viii. 131   You fellows have studied business..but you have not studied social evolution at all.

1923  *Sci. Monthly* Mar. 328   In termites the amount of degeneration accompanying social evolution is..much greater than in the ants.

1993  *N.Y. Times Bk. Rev.* 19 Sept. 13/2   The authors lay out the magazine's enlightened liberalism, with its built-in belief in social evolution, its utopian yearnings and its unabashed wishful thinking.

**social exclusion**  *n.* exclusion from human society (or from a specific milieu); *spec.* exclusion or isolation from the prevalent social system and its rights and privileges, esp. as a result of poverty or membership of a particular social group.

1831  *Addr. Different Parts Ireland 1828–9* 224   The spirit of political monopoly and social exclusion.

1874  H. SIDGWICK *Methods of Ethics* (ed. 6) II. v. 151   The hope of praise and liking and services from one's fellowmen, and the fear of forfeiting these and incurring instead aversion, refusal of aid, and social exclusion.

1945  *Jrnl. Politics* May 196   Germany..adamantly maintained barriers of social exclusion long after the ghettos had passed.

1998  *Town & Country Planning* **67** 7/3   Deliberately under-planning for new homes is a social exclusion issue: the poor will have to squash up, take on the burden of care of the elderly, and live where there is no work.

**social fact**  *n.* chiefly *Sociology* a thing originating in the institutions or culture of a society which affects the behaviour or attitudes of an individual member of that society.

1843  J. S. MILL *Syst. Logic* II. IV. v. 273   There is hardly a single name, expressive of any moral or social fact calculated to call forth strong affections.., which does not carry with it..a connotation of those strong affections.

1887  S. MOORE & E. AVELING tr. K. Marx *Capital* I. i. 44   The mutual exchangeability of all kinds of useful private labour is an established social fact.

1938   S. A. Solovay & J. H. Mueller tr. E. Durkheim *Rules Sociol. Method* p. liii   We gave a definition of social facts as ways of acting or thinking with the peculiar characteristic of exercising a coercive influence on individual consciousnesses.

2005   *Sociol. Theory* **23** 295   Languages and cultural traditions are the most fundamental example of a Durkheimian social fact, for they not only preexist the individual..but..are actually constitutive of her.

**social fund**  *n.*  †*(a)* a collective fund to which a number of people, companies, etc., contribute and which is held in common (*figurative* in quot. 1795) (*obsolete*); *(b)* a fund from which loans or grants are made to people in need; *esp.* (*British*, also with capital initials) a government-administered social security fund established in 1986.

1795   'Citizen Randol' *Polit. Catech. Man* 12   I deposit a party of those rights in the social fund, in trust for the joint use and benefit of myself, and society.

1812   W. Cranch *Rep. Supreme Court U.S.* **6** 247   Previous to the commencement of their partnership, Lynn had contracted a debt,..which..it was mutually agreed to transfer to the new concern, and the debt..should become a debt chargeable on the social fund.

1846   *Daily News* 29 Jan. 3/5   A certain number of these [companies] had united their subscriptions to form the total of their social fund.

1848   *Times* 15 May 8/7   A social fund of 15 milliards of francs..should be formed by the wealthy classes for the relief of the poorer branches of the community.

1985   *Daily Tel.* 4 June 6/6   The social fund is to be administered by local DHSS offices so that help can be given quickly to those in genuine need.

2004   H. Kennedy *Just Law* (2005) xi. 235   Since then people have had to take a loan from the Social Fund to pay for these necessities.

**social geographer**  *n.* an expert in or student of social geography.

1918   *Greater N.Y.* 14 Oct. 22/2   The Society center of Manhattan Island, as fixed by the expert social geographers, is now half way between Sixty-sixth and Sixty-seventh Streets on Fifth Avenue.

2007   *N.Z. Herald* (Nexis) 30 June   According to Jacques Levy, a social geographer at Lausanne University, the real 'lower classes' in France are often now found in the countryside.

**social geography**  *n.* a branch of human geography dealing with social relationships and structures, and the interrelations between these; the environment of a place or region, as it relates to or is affected by society and social factors.

1828   *Oriental Herald* **17** 40   They [*sc.* statistics] relate only to that which springs from the administration; they are, properly speaking, Social Geography.

1849   *Chambers's Information for People* (new ed.) II. 571/2   He will study [England's]..social geography, including its national character, language, literature, arts and sciences, manufactures and commerce.

1907   G. W. Hoke in *Geogr. Jrnl.* **29** 67   In addition to the physiographical group of factors which are by common consent held to be fundamental, the sociological factors are no less fundamental to social geography.

1955 *Geogr. Jrnl.* **121** 149   The present study..seeks to determine the part played by ethnic factors in the social geography of this multi-racial city.

1999 D. HERBERT in M. Pacione *Appl. Geogr.* xxx. 414   Segregation and discrimination are key words in the lexicon of social geography.

**social gospel**  *n.* *(a)* a message of salvation for society;  *(b)* an interpretation of the gospel as having a particularly social application; *spec.* (originally *U.S.*) (the name of) a Protestant movement, particularly prominent in the late nineteenth and early twentieth centuries, that advocated social reform through the Christian gospel.

1844 *Aristocracy of Britain* 208   That memorable night [of the French Revolution],..when..was proclaimed the social gospel of the new world.

1874 J. E. P. DOYLE *Plymouth Church & Pastor* 40   Mrs. Tilton..calmly replied: 'I am prepared for it. If the new social gospel must have its martyrs, and if I must be one of them, I am prepared for it.'

1917 W. RAUSCHENBUSCH *Theol. for Social Gospel* i. 1   We have a social gospel. We need a systematic theology large enough to match it.

1954 in *Amer. Catholic Sociol. Rev.* (1955) **16** 120   [Psychology] appears to be both a scientific discipline and a social gospel.

1958 J. M. ARGYLE *Relig. Behaviour* v. 45   A small college at which it seems that a modernistic and social gospel was widely held among the staff.

1996 *United Church Observer* Jan. 31 (*caption*)   A product of United Church teaching and the social gospel, Lloyd Axworthy is adjusting social programs for long-term survival.

**social group**  *n.* a number of individuals associated or aggregated together to a greater or lesser degree, either because they share certain features, as class, ethnicity, etc., or (esp. *Social Sciences*) because they are bound together by patterns of interaction.

1831 tr. J. W. von Goethe in *Times* 15 Nov. 2/5   Incidents of every kind; individual character and social groups, —are all treated with the same clear perception, the same easy unaffected grace.

1856 'G. ELIOT' in *Westm. Rev.* **10** 70   The study of at least one social group—namely, the factory operatives.

1924 H. E. BARNES *Sociol. & Polit. Theory* iv. 53   From the earliest days the 'process of history' has consisted chiefly in the struggle between social groups for the advancement of their economic interests.

1966 *McGraw-Hill Encycl. Sci. & Technol.* (rev. ed.) VI. 255/2   If points represent people and lines their interrelationships, then a graph may be used to depict the structure of a social group.

2001 C. KELLY *Russ. Lit.* v. 80   Intellectual life expanded to include a much broader range of social groups, in particular ambitious male provincials from the middle ranks of Russian society.

**social housing** *n.* chiefly *British* = *public housing n.* at PUBLIC *adj.* and *n.* Compounds 1b.

1928 *Ann. Amer. Acad. Polit. & Social Sci.* **140** 291   Outstanding social housing experiments are the Schmidlapp houses in Cincinnati, [etc.].

1963 *Times* 5 Aug. 12 (*caption*)   The strongest recent trends in European housing policies are towards more government expenditure on social housing.

2006   *Build It* May 152/2 (*advt.*)   Three pairs of semi detached houses, nine detached houses and a terrace of eight houses for social housing.

**social historian**   *n.* an expert in or student of social history.

1854   J. E. Cooke *Virginia Comedians* I. vii. 45   The question is submitted to the future social historians of the Old Dominion.

1912   A. Conan Doyle in *Strand Mag.* Dec. 603/1   There are few social historians of those days who have not told of the long and fierce struggle between..Sir Charles Tregellis and Lord Barrymore.

2007   *Chicago Tribune* (Nexis) 11 July   More and more American women expect to be gorgeous and sexual athletes into their 80s, says social historian Joan Jacobs Brumberg.

**social-historical** *adj.* of or relating to social history; (also) social and historical.

[In quot. 1858   after German *kultur-historisch*.]

1858   *Musical World* **36** 135/2   Herr Meidinger..announces: *Mozart, an Artist's Life: A Social Historical Romance in six volumes, by Heribert Rau.*

1937   *Burlington Mag.* June 310/1   The historical section..is sketchy..and its lack of concentration results in an apparent insufficiency of social-historical facts to explain stylistic changes.

1977   A. Wilson *Strange Ride R. Kipling* vii. 342   I prefer..a social-historical description of long generations of Evangelical belief ending in post-Darwinian doubt.

2007   *Toronto Star* (Nexis) 19 Mar. A7   The book offers a complex social-historical explanation of First Nations' alcohol problems.

**social history**   *n.*   *(a)* the history of society or of social behaviour; history with an emphasis on social structures;   *(b)* the background and circumstances of a social worker's client.

1814   *Gentleman's Mag.* June 587/2   He meets them in the recency and warmth of events, the most interesting..in the political and social history of Man.

1877   L. H. Morgan *Anc. Society* ii. i. 50   It represents a striking phase of the ancient social history of our race.

1950   McDougall & Cormack in C. Morris *Social Casework in Great Britain* ii. 40   The social history..is the essential basis of constructive help. It does not follow from this that..every client's story must be fully investigated.

1970   D. C. Gibbons *Delinquent Behaviour* iii. 48   The social history document prepared by the probation officer..looms large in the disposition of the case.

2006   *Smithsonian* Sept. 38/1   Many who study tipping points in social history contend that the oft-noted generation gap spontaneously erupted in the mid-1960s.

**social inquiry report**   *n.* a report made by a probation officer or social worker on a person's character and circumstances, which may be required by a court before sentencing.

1965   *Times* 11 Oct. 6/7   In all except the most trivial cases, we feel that social inquiry reports should be provided for the youth court by the probation service.

1977   *Grimsby Evening Tel.* 27 May 13/1   The case had been adjourned for social inquiry and psychiatric reports.

2008   *Press & Jrnl.* (Aberdeen) (Nexis) 17 Jan. 7   Sentence was deferred until yesterday for a social inquiry report and a community service assessment.


**social insurance**  *n.* a state-run scheme of compulsory contribution to enable the provision of assistance in sickness, unemployment, etc.; cf. NATIONAL INSURANCE *n.*

1890   *Q. Jrnl. Econ.* **4** 436   The Danish project so far is evidence only of the growing strength of the movement for public regulation of social insurance.

1922   S. A. QUEEN *Social Work in Light of Hist.* xii. 209   The ideal purpose of social insurance is to prevent, and finally to eradicate poverty and the consequent need of relief by meeting the problem at its origin.

1996   W. HUTTON *State we're In* (rev. ed.) x. 264   The welfare structure..is designed so that firms can hang on to workers during a recession with part of their wages paid by social insurance, keeping their workforces intact.


**social justice**  *n.* chiefly *Politics* and *Philosophy* justice at the level of a society or state as regards the possession of wealth, commodities, opportunities, and privileges; cf. *distributive justice n.* at DISTRIBUTIVE *adj.* 3b.

   Much of the debate surrounding social justice has been concerned with the precise nature of fair distribution, and to what extent this may conflict with individual rights of acquisition and ownership.

1824   W. THOMPSON *Inq. Princ. Distrib. Wealth* iv. 314   The first principle of social justice, that 'the sole object of all institutions and laws ought to be to promote the happiness of the whole of the community, or..that the happiness of the greater number should be always preferred to that of the lesser'.

1861   J. S. MILL in *Fraser's Mag.* Dec. 672/1   Society should treat all equally well who have deserved equally well of *it*... This is the highest abstract standard of social and distributive justice.

1915   T. C. NIXON *Ess. Social Justice* vi. 171   Distribution according to worth, usefulness or service is the only sound principle for society to follow;..this is the principle of social justice.

1982   R. SCRUTON *Dict. Polit. Thought* 245/1   Robin Hood acts unjustly (by taking what he has no right to take) in order to bring about social justice (through redistribution).

2002   *Daily Tel.* 28 Jan. 21/1   He forced the philosophical advocates of egalitarian social justice onto the defensive, by showing how the state cannot be justified as the redistributor of wealth without violating the rights of the individual.


**social ladder**  *n.* (usually in figurative context) the hierarchical structure of society; the social scale.

1817   S. T. COLERIDGE *Blessed are Ye that Sow* 110   Alas! that some of the intermediate rounds in the social ladder have been broken and not replaced, is itself one of the results.

1835   H. REEVE tr. A. de Tocqueville *Democracy in Amer.* I. p. xix   The noble has gone down on the social ladder, and the *roturier* has gone up.

1932   N. COWARD *Three White Feathers* in B. Day *N. Coward: Compl. Lyrics* (1998) 151/1   I've scaled the social ladder And I've never had a head for heights.

2004   J. Denby *Billie Morgan* xiii. 97   Confident, long-time party girls hoping to score a steady fella and a boost up the social ladder.

**social liar**   *n.* a person who tells social lies.

1844   'Rhode Islander' *Might & Right* xvi. 311   We can never become a truly great Nation, until the time arrives when..an official liar will be just as mean as a domestic, or social liar.

1976   R. Harris *Three Candles for Dark* iv. 27   I'm not a liar, or not a real one. A social liar, maybe, like everyone else.

**social library**   *n. North American* (now *historical*) a member-owned library maintained by subscription or by the purchase of shares.

c1765–80   in *New Eng. Hist. & Gen. Reg.* (1868) **22** 446   We the Subscribers being desirous of purchasing a *Social Library*..do severally promise and engage to pay Four Dollars a piece for this purpose.

1835   *Southern Literary Messenger* **1** 272   *Lectures* and *social Libraries*..are among the chief glories of New England.

1910   A. E. Bostwick *Amer. Public Libr.* 7   The joint-stock form of library is in its simplest form a book club, as in the so called 'social libraries' of Massachusetts.

1999   *Jrnl. Higher Educ.* **70** 395   The social library that arose in De Funiak Springs, Florida, shortly after the establishment of the independent Chautauqua there in 1884.

**social lie**   *n.* an untrue statement intended to ease social relations; a white lie.

1839   A. Bywater *Sheffield Dial.* (new ed.) 271   They told em at if they let it they shud braik ther contract. Nah that were just a social lie; becos't landlord told t' young men he'd nooa daht at they'd let it em, an even went we em to see.

1941   W. H. Auden *New Year Let.* iii. 64   And yet although the social lie Looks double to the dreamer's eye.

2003   *New Republic* (Nexis) 3 Nov.   Nothing can make of Kafka a bad writer, but there were things that lay outside his ken. The communal, the shared, the necessary social lie.

**social life**   *n.* a person's social interactions and activity considered as a whole; (also) the social activity of a place considered as a whole. Cf. sense A. 5b.

1812   *New Ann. Reg. 1811* Literary Select. & Retrospect 98/2   His conversation was never associated with licentious freedoms or any sorts of oaths... His social life was an example of morality.

1894   *Sat. Rev.* 1 Sept. 234   A desire to plank down..University men in the midst of the social life of East London.

1932   E. Waugh *Black Mischief* vii. 257   The Envoy Extraordinary finished his second cup of coffee.., and avoiding the social life of the lawn, pottered round by the back way to the Chancery.

1957   *Pract. Wireless* **33** 727/2 (*advt.*)   You get a welcome break from the usual routine, with sports, games and a great social life.

1996   J. Whedon in *Buffy the Vampire Slayer: Script Bk.* (2000) 1st Season I. 51   *Giles.* The vampire's not dead? *Buffy.* No, but his social life is on the critical list.

**social listening**  *n.* (in marketing contexts) the action or activity of monitoring and analysing social media content relevant to one's product or brand, as a means of improving market knowledge, customer outreach, product development, etc.; originally and frequently as a modifier, as in **social listening strategy**, **social listening tool**, etc.

> Occasionally in other contexts, such as journalism, politics, and the social sciences, with reference to similar monitoring and analysis of social media content related to a particular subject.

2007  @AlbertMaruggi 7 Dec. in *twitter.com* (accessed 30 June 2021)   Owyang on social media monitoring tools..space is open for mid size social listening application.

2012  *B2B Marketing Mag.* (Nexis) 13 June   One activity that any brand can easily engage in is that of social listening to identify those who are talking about them, and then follow them to establish an on-going relationship.

2019  D. Rowles & C. Rogers *Podcasting Marketing Strategy* 76   Social listening tools..allow you to monitor a number of different social channels to look for activity around certain phrases or topics.


**social market**  *n.* *(a)* a society regarded as a marketplace, esp. as an arena for the acquisition of information or exchange of ideas;  *(b) Politics* and *Political Economy* short for *social market economy n.*   (usually *attributive*).

1846  T. Brown *Lect. Philos. Mind* IV. 269   Can we expect fidelity of a mind that thinks only of what is to be gained by vice, in the great social market of moral feelings.

1936  *Internat. Jrnl. Ethics* **46** 356   Most of the remedies current in the political and social market today leave the people cold because they do not show any appreciation of the difficulties which their acceptance involves.

1975  *Times* 11 Feb. 13/1   Such a policy ought to be modelled on the one successful postwar anti-inflationary economic policy, Dr. Erhard's social market policy, a label which has been given to Sir Keith Joseph's policies.

1992  *Daily Tel.* 24 July 17/2   Hunt says he has always believed in the social market, which he defines as 'one-nation Conservatism with teeth'.

1995  M. Lind *Next Amer. Nation* v. 196   Each First World country has had its own 'social market contract' between labor, capital, and the government, a contract that replaces free-market capitalism, to varying degrees, with 'social market' capitalism.


**social market economy**  *n.* [after German *soziale Marktwirtschaft* (A. Müller-Armack 1948, in *Ordo* **1** 148)] *Politics* and *Political Economy* an economic system based on a free market operated in conjunction with state provision for those unable to sell their labour, such as the elderly or the unemployed (cf. *market economy n.* at market *n.* Compounds 2).

> Originally applied to the set of economic policies employed in the Federal Republic of Germany after the Second World War.

1950  *Amer. Polit. Sci. Rev.* **44** 1075   Miksch, Leonard, et al. *Der Schutz der Wettbewerbs in der Sozialen Marktwirtschaft*... Report of a German conference on the problem of cartels and competition in the German 'social market economy'.

1975  R. Lewis *Margaret Thatcher* xiii. 157  The 'social market economy' as the alternative to Socialism... In essence it means the economy of free market capitalism for the strong..backed by a compassionate state which caters for the weak.

2006  *Foreign Affairs* Sept. 168/2  Comparing the performances of liberal market economies (in Ireland, the United Kingdom, and the United States) and the social market economies (in Austria, Germany,..and the Nordic countries).

**social marketing**  *n.* the application of commercial marketing techniques and strategies to a campaign for social change, esp. to enhance the effectiveness of health education programmes.

1971  P. Kotler & G. Zaltman in *Jrnl. Marketing* **35** No. 3. 3/2  Some persons would be heartened because of the many good causes in need of an effective social marketing strategy... Social marketing is a promising framework for planning and implementing social change.

1988  *Health Policy & Planning* **3** 183/2  In Indonesia, social marketing improved nutrition knowledge.

1996  *Health Educ. Res.* **11** 260/1  Although market segmentation techniques are frequently applied to the promotion of consumer products, there are precedents for their use in social marketing contexts.

**social media**  *n.* websites and applications which enable users to create and share content or to participate in social networking.

1994  *Online* Jan. 94/1  What attracted librarians to the Internet? For some cybernauts, USENET, IRC, and the other social media of the net are the hooks.

2002  *Wall St. Jrnl.* 14 Oct. A11/2  America Online is focusing on developing what it calls 'social media', meaning the ability to interact about a topic online.

2004  *PR Newswire* (Nexis) 8 June  Chris Shipley..today announced BlogOn 2004: The Business of Social Media, a conference for technology executives, investors, and bloggers who wish to know more about the rapidly growing opportunities in blogging and social networking.

2008  *N.Y. Times* (National ed.) 14 Feb. E2/3  One of the main reasons people embrace social media—Facebook, for instance—is to create identities for themselves and control other people's perceptions of them.

2018  *Daily Tel.* (Nexis) 11 Jan. 5  The Duchess of Cambridge has warned that social media can become 'so addictive', saying it is 'hard to break away from'.

**social medicine**  *n.* *(a)* a branch of science concerned with social and economic aspects of health, disease, and medical care; *(b)* health care that is funded or administered by a governmental or public body (cf. earlier *socialized medicine n.* at SOCIALIZED *adj.* Compounds).

1896  *Lancet* 16 May 1398/2  Hygiene (including Sanitary Statistics, Social Medicine, Epidemiology, Epizootology, and Technical Sanitary Science).

1925  F. L. Dunham *Approach to Social Med.* i. 14  A need arises in welfare work for a field of preventive science to which social science, psychology, psychiatry and various other departments shall contribute... It may be called *Social Medicine*.

1952  *Let.* in *Amer. Jrnl. Nursing* **52** 394/3  It is certainly marvelous not to have to worry in case one gets sick. So I am all for social medicine.

1953   *Social Forces* **32** 52/1   The importance of social medicine lies in the recognition of the individual as a unit of society, and not as a self-sufficing organism.

1994   R. Dingwall in J. Gabe et al. *Challenging Med.* iii. 56   The argument, then, is that social medicine is an aspect of the governmentality that produced the welfare state.

**social mobility**   *n.*   [originally after German *volksthümliche Beweglichkeit* (1847 in the passage translated in quot. 1860)] chiefly *Sociology* = MOBILITY *n.*[1] 5.

1860   E. C. Otté tr. A. Von Humboldt *Cosmos* II. Summary p. xvi   With the Roman national spirit perished social mobility, publicity, and the maintenance of individuality.

1906   F. J. Turner in *Amer. Hist. Rev.* **11** 304   The ideal of the West was its emphasis upon the worth and possibilities of the common man, its belief in the right of every man to rise to the full measure of his own nature, under conditions of social mobility.

2007   *Big Issue* 15 Jan. 6/3   Universities will enable and encourage greater social mobility.

**social mobilization**   *n.*   *(a)* the process by which individuals or sections of society mobilize in order to effect social change;   *(b)* (*Sociology*) the process by which individuals or sections of society migrate owing to social changes such as industrialization or urbanization.

1919   H. F. Ward *New Social Order* iii. 109   In the conflict which must be waged against its own nature if life is to be advanced..mankind will need..all its capacity for social mobilization.

1953   K. W. Deutsch *Nationalism & Social Communication* vi. 114   If there is economic growth, social communication will probably spread and social mobilization will progress.

1972   *Ann. Amer. Acad. Polit. & Social Sci.* **402** 33/1   Even great leadership can run into problems sustaining mass social mobilization equal to the task.

1994   W. Connor *Ethnonationalism* ii. 35   That social mobilization need not lead to a transfer of primary allegiance from the ethnic group to the state is therefore clear.

2008   *Star (*S. Afr.*)* (Nexis) 17 Apr. 5   We need to commit to social mobilisation to stop violence against women and children.

**social morphology**   *n.*   [after French *morphologie sociale* (E. Durkheim 1898, in *L'Année sociologique* **2** 520)] *Sociology* (the study of) the various forms of social structure and the changes that govern or take place in them.

1899   *Amer. Jrnl. Sociol.* **5** 124   The main divisions of the material are placed [by Durkheim] under the heads: Sociology: (1) general, (2) religious, (3) moral, (4) juridical, (5) criminal, (6) economic, (7) social morphology.

1958   *Land Econ.* **34** 124/2   Specialization in a particular economic function can affect the social morphology of the community either directly or indirectly.

2004   J. R. Short *Global Metrop.* ix. 120   These transnational spaces have profoundly marked the urban landscape of global cities, transforming their social morphology in the process.

**social network**  *n.* a system of social interactions and relationships; a group of people who are socially connected to one another; (now also) a social networking website; the users of such a website collectively; cf. *social networking n.*

1845  J. B. GOUGH *Autobiogr.* I. 35   I again became involved in a dissipated social network.

1958  *Los Angeles Times* 4 Dec. IV. 16/1   It's not where you live, it's the 'social network' to which you belong which determines your drinking habits.

1993  M. IGNATIEFF *Scar Tissue* 65   Patients with a strong will to live and a supportive social network are likely to survive traumatic illness better than those who are fatalistic and alone.

1998  *Business Wire* (Nexis) 26 Jan.   Visitors can form online communities by exchanging information and experiences in chat rooms, forums, and online social networks.

2007  *Guardian* 17 Nov. 17/5   The hundreds of millions of people using the booming..social networks such as MySpace, Bebo and Facebook.

**social networking**  *n.* the use or establishment of social networks or connections; (now *esp.*) the use of websites which enable users to interact with one another, find and contact people with common interests, etc. (frequently *attributive*).

1973  *Public Admin. Rev.* **33** 529/1   Through the process of consciousness raising and social networking, he becomes aware of the organization and environmental forces impinging upon him.

1998  *Boston Globe* (Nexis) 24 May E4   Venture capitalists ponied up money for..a provider of Internet-based social networking services.

2008  *Nature* 10 Jan. 128/3   Social networking sites such as MySpace have allowed artists to promote their music without a record label intermediary.

**social order**  *n.  (a)* orderliness within society;  *(b)* the way in which society is organized, the network of human relationships in society.

1703  tr. S. von Pufendorf *Of Law of Nature & Nations* II. v. 143/1   In resisting by Natural Right, this Exception is always understood, unless the Social Order [L. *ordo socialis*] be infring'd by my present resisting.

1792  tr. J. Necker *Ess. True Princ. Executive Power Great States* vi. 81   These doubts are the natural result of the extreme weakness of executive power, and the authors of the new social order in France have no right to take offence at them.

1817  *Cobbett's Weekly Polit. Reg.* 25 Jan. 110   The old charge, that we are *seeking* to produce *riot* and *confusion*, and to destroy 'Social Order'!

1955  M. GLUCKMAN *Custom & Confl. Afr.* i. 17   What emerges, I think, is that if there are sufficient conflicts of loyalties at work, settlement will be achieved..and social order maintained.

2005  I. McEWAN *Saturday* IV. 276   Beware the utopianists, zealous men certain of the path to the ideal social order.

**social ownership**  *n.* a form of collective ownership in which the control and organization of an industry, company, etc., are shared, esp. by its workers or by the community at large.

1892   C. O. WARD *Labor Catech. of Polit. Econ.* (rev. ed.) xii. 255   We understand that this nationalizing the machinery of labour..means with you, their social ownership, management and impartial yield.

1961   *Encounter* May 63/1   Of the alternative forms of social ownership, the Co-operative Movement is potentially the most attractive.

2004   *Evening Chron. (Newcastle)* (Nexis) 18 June 6   Foundation hospitals are about social ownership, local governance and greater empowerment of local people.

**social partner**   *n.* (chiefly in industrial relations) a party, esp. a labour or business organization, viewed as a stakeholder in a cooperative effort.

1946   W. J. SMITH *Spotlight on Labor Unions* v. ixx. 130   Granting the trade union..the right to stand on a par with management as a social partner in a mutual, cooperative enterprise.

1975   *Times* 25 June p. ii/1   The TUC is now accepted by the Wilson Government as a mature social partner.

2006   *N.Y. Rev. Bks.* 11 May 41/2   These changes required an entire year of talks with the 'social partners'— unions, insurance groups, and the public administrations.

**social phobia**   *n.* *(a)* an irrational fear held by a society as a whole (*rare*); *(b) Psychiatry* a disorder characterized by extreme anxiety about, and usually avoidance of, specific social situations or general social contact, esp. because of fear of possible embarrassment or criticism; (also) a specific fear of a social situation held by a person with this disorder.

1917   *Jrnl. Philos., Psychol. & Sci. Methods* **14** 412   Consciousness of ends is the cure of social phobias, because consciousness of ends is the key to self-control, in the state as in the individual.

1967   *Jrnl. Psychosomatic Res.* **11** 272   Patients with social phobias. The anxiety experienced by these patients was provoked by social situations e.g. eating in public,..speaking in public and being engaged in conversation by strangers.

2001   *Observer* 25 Mar. (Life Suppl.) 15/1   He was diagnosed with 'social phobia' and learned through therapy that he had developed a deep-rooted fear of being ridiculed in public.

**social planner**   *n.* an expert in or advocate of social planning.

1926   *N.Y. Times* 11 July vii. 6/4   The formidable millions voted by the Board of Estimate..represent..the fruition of some of the plans which social planners have been making for twenty years or more..and in many cases the removal of actual obstacles now in the way of the able and devoted nurses and doctors in the difficult and exacting service of the city's poor.

1941   J. S. HUXLEY *Uniqueness of Man* xi. 251   Our social planners would undoubtedly benefit from a study of the evolution of individuality in animals.

2003   S. ALPAY *Trade & Environm.* xiii. 193   Let us assume that the contributions of every country to global environmental protection are determined by a social planner.

**social planning**   *n.* originally *U.S.* the designing or controlling of urban or economic development, esp. with an emphasis on improving the condition of society as a whole; cf. SOCIAL ENGINEERING *n.* 1.

1913   I. M. Rubinow *Social Insurance* xviii. 284   Before workingmen's insurance becomes a subject of social planning and legislation.

1927   H. W. Odum *Man's Quest for Social Guidance* xxx. 514   No complete program of social planning can neglect the suburban areas, main-line towns, and garden villages.

1964   J. M. Argyle *Psychol. & Social Probl.* xvi. 202   Another objection to social planning is that it is felt to increase the power of the state and restrict individual freedom.

1999   *Birmingham Post* (Nexis) 11 Sept. 60   Squalor and hypocrisy were set openly within a city which offered at the same time model architecture and advanced social planning.


**social problem**  *n.  (a)* any aspect of society that requires alteration or development, esp. through some form of social engineering;  *(b)* (frequently in *plural*) a difficulty in forming or maintaining relationships based on interaction.

1807   *Anti-Jacobin Rev. & Mag.* **25** 470   To find a place for the discontented, is certainly one of its [*sc.* government's] greatest difficulties. To offer to their imaginations prospects which will occupy their thoughts..is..one solution of this social problem.

a1873   J. S. Mill *Draft Autobiogr.* (1961) 173   The social problem of the future we considered to be, how to unite the greatest individual liberty of action with an equal ownership of all in the raw material of the globe & an equal participation of all in the benefits of combined labour.

1927   F. M. Thrasher *Gang* p. xi   Village gangs..ordinarily do not become a social problem.

1937   W. de B. Hubert in C. P. Blacker *Social Probl. Group?* vi. 122   It is not at present known with certainty what proportion of families showing *both* mental defect and social problems..contribute to the total number of problem families.

1978   *Bookseller* 17 June 3186/3   A school with only 170 children, a high percentage of whom have severe social problems.

1995   *Internet World* Aug. 82/1   We can't solve social problems by top-down rules imposed from above.


**social process**  *n.* a pattern of growth and change in a society over a number of years.

1789   D. Williams *Lect. Educ.* III. xlviii. 212   It may be easy to imagine various social processes to produce inequality of wealth.

1835   H. Reeve tr. A. de Tocqueville *Democracy in Amer.* II. x. 429   If republican principles are to perish in America, they can only yield after a laborious social process.

2002   *Foreign Policy* July–Aug. 82/3   Global social processes are selectively redefined and adapted to suit local cultural exigencies.


**social promotion**  *n.  (a)* advancement in social class or standing;  *(b) Education* (chiefly *U.S.*) the promotion of a pupil to a more advanced class based on his or her age or behaviour, despite a lack of appropriate academic achievement.

1840   R. Mudie *Man, in his Relations to Society* iii. 107   The only alternative to the begging is obtaining the social promotion by fraud.

1907  'M. Twain' *Christian Sci.* II. vii. 201   She once prized money for the ease and comfort it could bring, the showy vanities it could furnish, and the social promotion it could command.

1948  *Washington Post* 16 Sept. 10/5   And too many high schools either cannot or do not teach at the level they should. Due to social promotion or mass education, the students get no basis.

1975  *N.Y. Times* 18 Mar. 23/2   Social promotion has meant that fewer children are held back, making the test group at each grade younger than it used to be.

1998  S. Ferchiou in R. A. Lobban *Middle Eastern Women & Invisible Econ.* III. ix. 194   Women's work remains depreciated and affords them no possibility of social promotion.

2001  D. Milbank *Smashmouth* I. iii. 30   His solutions for these big goals, not surprisingly, are small proposals —an end to social promotion here, a mentoring program there.

### social psychiatric *adj.* of or relating to social psychiatry; specializing in social psychiatry.

1927  E. Johnson (*title*)   An Analytical Study of Social Psychiatric Work in the United States.

1966  G. Tannenbaum in S. Arieti *Amer. Handbk. Psychiatry* xxxv. 577/1   The social psychiatric model is based on public health principles rather than on the traditional clinical prototype.

1998  *Milbank Q.* **76** 510   As a social-psychiatric epidemiologist, he is interested in the consequences of social inequality on the health and well-being of disadvantaged people.

### social psychiatrist  *n.* an expert or specialist in social psychiatry (in quot. 1920 *figurative*: a psychiatrist for society).

1920  C. H. Parker *Casual Laborer & Other Ess.* i. 50   We blindly trust that a ten per cent wage increase will cure that breakdown which a sympathetic social psychiatrist might, if given all power, hope merely to alleviate.

1964  *Observer* 23 Aug. 1/1   The social psychiatrists..believe that the answers to mental health can only be found by..studying the patient in relation to the groups he moves in.

2003  *Independent* 24 Nov. I. 16/7   Marius Romme, a Dutch social psychiatrist, has formed a national organisation for people in Holland who hear voices, many of whom live productive lives without clinical intervention.

### social psychiatry  *n.* a branch of psychiatry concerned with the social, cultural, and economic aspects of mental health and illness and of psychiatric treatment; cf. *social medicine n.* (a).

1924  *Amer. Jrnl. Psychiatry* **81** 149   The Round Table Conferences..were well attended..36 formed the group which discussed problems of social psychiatry.

1976  B. H. Kaplan et al. (*title*)   Further explorations in social psychiatry.

2004  *Lancet* 15 May 1652/3   Social psychiatry must have a renaissance, and professional curricula development and public education are needed.

**social reality**  *n.* (as a count noun) a reality or fact of life peculiar to a particular society; *spec.* a phenomenon, such as social class, religion, etc., as experienced by a particular social group; (as a mass noun) reality as conceived by a particular society or social group, dependent on their customs and beliefs.

1824  *Lit. Magnet* **2** 142   An Editor, whose heart..is open to the social realities of life.

1859  D. Masson *Brit. Novelists* iv. 308   It may be that the representation of social reality is..the proper business of the Novel.

1949  W. L. Warner in M. Fortes *Social Struct.* 4   Agreement among the informants assures the status analyst that the social class system derived from their statements is..an ever present..social reality.

1978  *Language* **54** 449   It may be noted that O's social realities of the West German job market refer more to the over-employment of the 1960's than to the under-employment of the 1970's.

2000  K. Deaux & B. Major in M. S. Kimmel & A. Aronson *Gendered Society Reader* 84   The active role of observers in maintaining or creating social reality through their cognitions or behaviors toward a particular individual.

**social recession**  *n.* a period of widespread deterioration in quality of life among members of a community, especially due to reduced interactions and weakened social bonds.

Formed by analogy with *economic recession*: see *economic recession n.* at ECONOMIC *n.* and *adj.* Compounds.

1930  *Binghamton (N.Y.) Press* 27 Oct. (City ed.) 5/5   The problems of agriculture of national character are those that portend a social recession of colossal significance.

1960  E. Hobsbawm in *Sci. & Society* **24** 97   It is now commonly admitted that there was, for several decades in the seventeenth century, a period of major economic and social recession.

2020  *Straits Times (Singapore)* (Nexis) 25 Mar.   Long-term isolation, it has been argued, can cause a 'social recession' akin to the economic problems caused by the pandemic. Such isolation deprives people of the everyday companionship of friends and colleagues that helps to reduce stress, which texting, video calls and telephone conversations can only mitigate.

**social register**  *n.* originally and chiefly *U.S.* (usually with capital initials) (the name of) a directory of persons who are socially prominent (also as *adj.*); (also in extended use) a union blacklist (*rare*).

[1874  *N.Y. Times* 30 Jan. 4/7   The first two are names of financial magnates of the first water… They are A1, gilt-edged, in the financial and social register.]

1886  (*title*)   Social Register, New York.

1939  C. Boothe *Kiss Boys Good-bye* Introd. p. xvi   The 'slumming' social-register aristocrats, now a little wearied of Marx's 'shocking-pink' which goes so badly with complexions that are beginning to be a touch green.

1945  *Seafarers' Log* 6 July 6/4   The crew recommended that the 'advantages' of the social register be extended to William Chance and J. D. Bell, both trip carders.

1949  *Sat. Evening Post* 15 Oct. 142/3   The student body..has a heavy sprinkling of millionaires' sons and Social Register families.

1981   *Newsweek* 20 July 24/3   Martha von Bulow was pure Social Register, born into wealth, educated in the best private schools, and married for a time to an Austrian prince.

1992   M. ANDERSON *Impostors in Temple* v. 124   The kind of people who prefer the company only of those listed in the Social Register and who rarely associate with those whom they consider lesser men and women.

**social releaser**  *n.* = RELEASER *n.* 3.

1948   N. TINBERGEN in *Wilson Bull.* **60** 6 (*title*)   Social releasers and the experimental method required for their study.

1953   N. TINBERGEN *Herring Gull's World* ii. 13   Colour can act as a 'social releaser' by releasing a response in another individual just as a call often does.

2000   *Routledge Internat. Encycl. Women* 1693   The mother provides emotional support and containment for the child and the child performs behaviors (social releasers) such as crying or clinging that evoke the care behavior of the mother.

**social role**  *n.* the characteristic or expected social function of a person or thing, esp. in a particular situation or environment; cf. ROLE *n.* 4.

1898   G. SIMMEL in *Amer. Jrnl. Sociol.* **3** 834   The vital power and cohesion which they [*sc.* German community associations] had possessed by virtue of the importance of their former social rôle.

1928   *Psychol. Abstr.* **2** 889   Social role of language.

1949   R. K. MERTON *Social Theory* iii. 110   A conception basic to sociology holds that individuals have multiple social roles and tend to organize their behavior in terms of the structurally defined expectations assigned to each role.

1977   C. A. B. WARREN & B. PONSE in J. D. Douglas & J. M. Johnson *Existential Sociol.* x. 274   Instead, they have been concerned with social roles, role sets, and so on.

2002   *Financial Express* (Nexis) 21 Dec.   Dany calls into question many a notion about the patricentric institution of the family and the social roles of the father and the husband.

**social secretary**  *n.* a person who arranges the social activities of a person, workplace, or organization.

1892   *Lima (*Ohio*) Daily Times* 6 June   The young man is employed on salary, with expenses paid, by Senator Brice, of Ohio, and he is known as the senator's 'social secretary'.

1931   *Daily Express* 13 Oct. 5/2   When I got my job as social secretary..I got a large salary and lived in luxury.

2007   *Bristol Evening Post* (Nexis) 26 July 60   The Bristol branch of the Motorcycle Action Group (MAG) needs a new social secretary.

**social skills**  *n.* skills required for successful social interaction.

1923   *School Rev.* **31** 116   The extra-curricular activities..furnish an excellent laboratory for the development of social skills.

2004   *Daily Tel.* 17 May 7/6   Lack of social skills and common sense leave him bewildered by daily life and vulnerable to bullying and exploitation.

**social statics** *n. Sociology* (the study of) the organization and structure of a stable society or social group; opposed to *social dynamics*.

1843   J. S. MILL *Syst. Logic* II. IV. x. 604   The derivative laws of social statics are ascertained by analyzing different states of society,and comparing them with one another, without regard to the order of their succession.

1958   A. R. RADCLIFFE-BROWN *Method in Social Anthropol.* I. v. 128   For social anthropology the task is to formulate and validate statements about the conditions of existence of social systems (laws of social statics) and the regularities that are observable in social change (laws of social dynamics).

2002   *Sociol. Theory* **20** 239   Durkheim is often considered to have focused on social statics to the neglect of social dynamics.

**social status**   *n.* a person's position, standing, or relative importance in society; cf. STATUS *n.* 3a.

1833   *Tait's Edinb. Mag.* Nov. 237   The vain attempts of the operatives..to escape from the evils of misgovernment, and to raise their social status up to its just and proper level.

1901   G. B. SHAW *Socialism for Millionaires* in *Fabian Tract* No. 107. 15   A millionaire does not really care whether his money does good or not, provided he finds his conscience eased and his social status improved by giving it away.

2000   K. SHAMSIE *Salt & Saffron* (2001) xxii. 213   What if, because of his social status, Mariam never even considered him a possibility?

**social stratification**   *n.* the division of society into strata based on social position or class.

1850   *Littell's Living Age* 23 Nov. 337/2   So much for the aptitudes..of a geological professor to report upon the social stratification of the great North American republics.

1966   W. LABOV (*title*)   The social stratification of English in New York City.

1979   G. RITZER et al. *Sociol.* ix. 238   Their contention that because social stratification is universal, it must be a functional necessity.

2005   *New Internationalist* July 19/1   Sunni Muslims of the Swat region in northern Pakistan have a system of social stratification.

**social stratum**   *n.* a level or class to which people are assigned according to their social status, education, or income.

1838   W. FISK *Trav. Europe* xxviii. 573   In England..society is formed and maintained on such an artificial principle, that every layer in the social strata is compelled, in a great measure, to keep its position.

1902   L. STEPHEN *Stud. of Biographer* IV. vii. 261   The habit of reading spread to a lower social stratum.

1927   P. A. SOROKIN *Social Mobility* 141   There has never existed a society in which..the transition from one social stratum to another has had no resistance.

1997   G. HOSKING *Russia* (1998) III. vi. 268   These young people mostly came from privileged social strata.

**social structural** *adj.* of or relating to social structure.

1902  *Amer. Jrnl. Sociol.* **8** 231   There is no way of making the intimacy and complexity and interdependence of social structural and functional relations so vivid as by making biological structures and functions illustrate them.

1972  P. LASLETT *Househ. & Family in Past Time* 58   In the relations of children to servants we may..find..important and revealing social structural differences.

**social structure**  *n.* (a set of) interdependent customs, relationships, and institutions that compose a social system.

1804  W. PATTERSON *Observ. Climate Ireland* 111   In regard to morals, politici, and all social structures, particular and general labours must concur, to advance them to their capable excellence.

1835  H. REEVE tr. A. de Tocqueville *Democracy in Amer.* I. v. 69   The Constitution of the United States..consists of two distinct social structures, connected, and..encased one within the other.

1852  *Money* (Relig. Tract Soc.) iii. 61   We see here another illustration of the simplicity which reigns throughout the social structure.

1872  H. SPENCER in *Contemp. Rev.* **20** 311   Social influences which..facilitate further aggregation with consequent further complexity of social structure.

1968  C. JACOBSON tr. C. Lévi-Strauss *Struct. Anthropol.* I. xv. 277   Studies in social structure have to do with the formal aspects of social phenomena.

2001  *Archaeology* Mar. 48/1   Rather than tear up the Guaraní social structure..they used the Indian *caciques*, or chiefs, to run the missions.

**social studies** *n.* (frequently with *singular* agreement; also with *the* and occasionally in *singular* form) various aspects or branches of the study of human society, now esp. considered as an educational discipline including the study of politics, economics, sociology, history, etc.

1853  H. MARTINEAU *Positive Philos. of Comte* II. 112   The subordination of social science to biology is so evident that nobody denies it in statement, however it may be neglected in practice. This contrariety between the statement and practice is due to something else, besides the faulty condition of social studies.

1926  B. WEBB *My Apprenticeship* v. 217   A subtle combination of quantitative and qualitative analysis is a necessary factor in social studies.

1973  I. SCHEFFLER *Reason & Teaching* viii. 102   The current state of social study is in a much more primitive state than physical science.

2006  *N.Y. Times* 26 Mar. (Washington Final ed.) 1/4   Many schools that once offered rich curriculums [are] now systematically trimming courses like social studies, science and art.

**social survey**  *n.* a comprehensive examination of some aspect of the social life, history, problems, etc., of a particular locality.

1844  *Medico-chirurg. Rev., & Jrnl. Pract. Med.* **41** 102   We felt, in fact, that a Census ought to be a Social Survey, not a bare Enumeration.

1910  *Amer. Polit. Sci. Rev.* **4** 430   A social survey of the city of Los Angeles is planned.

1997  L. ROSTENBERG *Beginnings* in L. Rostenberg & M. Stern *Old Books, Rare Friends* (1998) 143   It is both an economic and social survey of a good portion of England during the second half of the eighteenth century. Rare First Edition.

**social system**  *n.* a set of interdependent relationships, customs, and institutions that constitute a society.

1742 Social system [see sense A. 5c].

1853  H. MARTINEAU *Positive Philos. of Comte* II. VI. i. 11   The passage from one social system to another can never be continuous and direct.

1917  R. KIPLING *Diversity of Creatures* 335   I cannot think it right that any human being should exercise mastery over others in the merciless fashion our tom-fool social system permits.

1997  T. MACKINTOSH-SMITH *Yemen* (1999) vi. 154   Scores of colonial officials from Africa who were used to a totally different social system.

**social table**  *n.* a small, kidney-shaped wine table with four legs, often with a receptacle or compartment for wine bottles.

1793  *Cabinet-makers' London Bk. Prices* (ed. 2) 102 (*heading*)   A Gentleman's Social Table.

1830  *Liverpool Mercury* 26 Feb. 68/4   Stock of a cabinet-maker, deceased, consisting of a variety of Dining and Drawing-room Chairs,..elegant Gothic and Plain Card Tables, Social Table, [etc.].

2003  *Western Morning News (Plymouth)* (Nexis) 27 Sept. (Features section) 8   With a semi-circular open top and drop-leaf flap to each end is a George III hunt or social table, the ends being united by a brass rail centred by a pivoting arm fitted with a mahogany bottle holder.

**social tea**  *n.* an informal gathering or tea party, usually held in the afternoon.

1852  *To-day (*Boston*)* 24 Apr. 263/2   Recently, the musician..collected in his room several of his colleagues of the orchestra, under pretence of a social tea.

1926  D. D. C. TAYLOR *Good Housek. Menu & Recipe Bk.* 106   Social Tea..Bridge Rolls and Cress, White and Brown Bread and Butter.

1999  M. LANG *Women who made News* iii. 98   She attended one of the Toronto press club's social teas, where she met the *Globe*'s women's editor.

**social unit**  *n.* an individual, group, or community, considered as a discrete constituent of a society or larger group.

1832  *Eclectic Rev.* 7 290   Even the American theory of free government does not affect to concede to each social unit this hypothetical share of legislative power.

1907  W. JAMES *Pragmatism* vi. 232   Must my thoughts dwell night and day on my personal sins and blemishes..or may I sink and ignore them in order to be a decent social unit?

2004  *Washington Post* 17 Oct. (Home ed.) D2/4   People who are living together in a romantic partnership must also be treated as a social unit.

**social weaver**  *n.* (also **social weaver bird**) any of various small, colonially-nesting African weaver birds, esp. (usually) the sociable weaver, *Philetairus socius*, and (less commonly) either of two birds of the genus *Pseudonigrita*, *Ps. arnaudi* and *Ps. cabainisi.*

1840   R. M. Zornlin *Recreations Physical Geogr.* xviii. 305   But the nest of the publican, or social weaver bird, is yet more curious.

1900   *Auk* **17** 190   Nests..are often exceedingly elaborate, retort-shaped affairs, or massed into compound structures.., as in the case of the Social Weaver Bird.

1963   *Times* 3 Aug. 7/7   Social weavers, Cape buntings, and wagtails flitted around the camp.

1996   *Guardian* 17 Sept. I. 16/7   The most obvious were the large colonies of social weavers and their huge, many-chambered nests woven into the branches of the camelthorn acacia tree.

**social welfare**   *n.* the well-being of a community or society, esp. with regard to health and economic matters.

1720   M. Lowman *Serm. preach'd to Societies for Reformation of Manners* 7   God himself; who is a God of Order, and must certainly will the Peace and Social Welfare of Mankind.

1802   J. Stephen *Crisis Sugar Colonies* ii. 54   In the negro, the self-dependency of a rational being, the close connection between his conduct and his natural, or social welfare, are ideas perfectly new.

1912   F. G. D'Aeth in H. Bosanquet *Social Conditions in Provincial Towns* iv. 50   A Local Committee of Social Welfare..consists of clergy, ministers, and social workers.

1999   D. Haslam *Manchester, Eng.* ix. 224   Entrepreneurs like Taylor and Makonnen were also in the vanguard of social welfare and pro-African activism.

† **social whale**   *n. Obsolete* = *pilot whale n.* at Pilot *n.* and *adj*. Compounds 2.

1842   J. E. De Kay *Zool. N.-Y.* IV. 133   It is called Black Whale-fish, Howling Whale, Social Whale, and Bottle-head.

*a*1862   H. D. Thoreau *Cape Cod* (1865) vii. 130   In the summer and fall sometimes, hundreds of blackfish (the Social Whale..)..are driven ashore.

1884   G. B. Goode in G. B. Goode et al. *Fisheries U.S.: Sect. I* 11   *Globicephalus svineval*,..also called Black Whale, Social Whale.

**social will**   *n.* the collective desires and intentions of a society or group as expressed by its members in general; cf. *political will n.* at Political *adj.* and *n.* Compounds 2.

1853   E. P. Smith *Man. Polit. Econ.* Introd. 19   The progress of intelligence..tends to substitute certainty for doubt in regard to the conduct of communities, [and] to make the private will and the social will correspond.

1911   J. Ward *Realm of Ends* vi. 118   Is there in any exact sense a social spirit, a social will, a social end, a social conscience?

2004   J. Thomas *Archaeol. & Modernity* i. 23   The polarisation of the individual will and the social will had the effect of enhancing the growing dichotomy between the person and the community.

This entry has been updated (OED Third Edition, September 2009; most recently modified version published online June 2022).

Copyright © 2022 Oxford University Press. All rights reserved.



# Exhibit NTG-5



# WEBSTER'S NEW WORLD™

# COMPUTER DICTIONARY

### NINTH EDITION

*The Best Computer Dictionary in Print*

Completely revised and updated

Contains extensive coverage of Internet and multimedia terms

More than 4,500 words, phrases, abbreviations, and acronyms

BRYAN PFAFFENBERGER

WE DEFINE YOUR WORLD™

Webster's New World™ Computer Dictionary, Ninth Edition

Copyright © 2001 by Hungry Minds, Inc.

Hungry Minds, Inc.
909 Third Ave.
New York, NY 10022
www.hungryminds.com

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the Publisher.

For general information on Hungry Minds' products and services please contact our Customer Care department; within the U.S. at 800-762-2974, outside the U.S. at 317-572-3993 or fax 317-572-4002. For sales inquiries and reseller information, including discounts, bulk sales, customized editions, and premium sales, please contact our Customer Care department at 800-434-3422.

A Webster's New World™ Book

WEBSTER'S NEW WORLD DICTIONARY is a registered trademark of Hungry Minds, Inc.

Library of Congress Control Number: 2001091950

ISBN 0-7645-6325-4

Cataloging-in-publication information available upon request.

Manufactured in the United States of America

5   4   3   2   1



**p2p**  Abbreviation for peer-to-peer. In the Internet context, this term is used to refer to a family of emerging technologies that enable users to share data by means of transient, decentralized networks, such as Gnutella. Such networks do not require a centralized server.

**package**  In Microsoft Windows, an icon created by Object Packager that contains a linked object, embedded object, file, or part of a file. See *OLE.*

**packaged software**  Application programs commercially marketed, unlike custom programs privately developed for a specific client.

**packet**  In a packet-switching unit, a unit of data of a fixed size—not exceeding the network's maximum transmission unit (MTU) size—that has been prepared for network transmission. Each packet contains a header that indicates its origin and its destination. Synonymous with datagram. See *packet-switching network.*

**packet driver**  On a local area network (LAN), a program that divides data into packets (transmission units of fixed size) before sending them out on the network.

**Packet Internet Groper (PING)**  A diagnostic program that is commonly used to determine whether a computer is properly connected to the Internet.

**packet radio**  A method of exchanging TCP/IP data by means of VHF radio transmissions linking two or more computers. First developed for military applications during the development of ARPANET, packet radio is now most widely used among radio hobbyists. Packet radio transmissions are limited by line of sight (approximately 10 to 100 miles, barring obstructions).

**packet sniffer**  A program designed to search the data packets coursing through an Internet line for some predetermined pattern, such as a password, Social Security number, or credit card number; these are often transmitted via the Internet in cleartext. The ability of computer criminals to intercept such data is a fundamental security shortcoming of the Internet and explains why use of the network is inherently insecure unless encryption is used.

**packet switching**  See *packet-switching network.*

**packet-switching network**  One of two fundamental architectures for the design of a wide area network (WAN); the other is a circuit-switching network. In a packet-switching network such as the Internet, no effort is made to establish a single electrical circuit between two computing devices; for this reason, packet-switching networks are often called connectionless. Instead, the sending computer divides a message into a number of efficiently sized units called packets, each of which contains the address of the destination computer. These packets are simply dumped onto the network. They are intercepted by devices called routers, which read each packet's destination address and, based on that information, send the packets in the appropriate direction. Eventually, the packets arrive at their intended destination, although some may have actually traveled by different physical paths. The receiving computer assembles the packets, puts them in order, and delivers the received message to the appropriate application. Packet-switching networks are highly reliable and efficient, but they are not suited to the delivery of real-time voice and video.

270

# Akl Decl.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT, | ) ) ) | |
| Plaintiff, | ) | C.A. No. 21-cv-01117-MN-CJB |
| | ) | C.A. No. 21-cv-01119-MN-CJB |
| v. | ) | C.A. No. 21-cv-01120-MN-CJB |
| | ) | |
| NETGEAR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF DR. ROBERT AKL, D.Sc.

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND AND QUALIFICATIONS ...................................................... 2

III.    LEVEL OF ORDINARY SKILL IN THE ART ................................................. 6

IV.     MATERIALS RELIED UPON ........................................................................... 7

V.      LEGAL STANDARDS RELATING TO CLAIM CONSTRUCTION .............. 8

VI.     THE '096 PATENT DISPUTED CLAIM TERMS ............................................ 9

        A.      "Discriminating transmissions of said first and said second data on a
                downlink in said radio frequency communication based on a special
                dimension" (Claim 1) ............................................................................. 10

        B.      "Substantially concurrently" (Claim 1) ................................................. 11

VII.    THE '630 PATENT DISPUTED CLAIM TERMS .......................................... 14

        A.      "Control packets" (Claims 1, 2, 4, and 10) ........................................... 14

VIII.   ADDITIONAL REMARKS ............................................................................... 16

I, Robert Akl, D.Sc. of Dallas, Texas, declare that:

## I.   INTRODUCTION

1.     My name is Robert Akl, and I have been retained by counsel for Defendant NETGEAR, Inc. ("NETGEAR" or "Defendant") as an expert witness to provide assistance regarding claim construction of certain terms found in the asserted claims of U.S. Patent No. 7,512,096 ("the '096 Patent") and U.S. Patent No. 7,551,630 ("the '630 Patent").  I have personal knowledge of the facts and opinions set forth in this declaration and believe them to be true.  If called upon to do so, I would testify competently thereto.

2.     I am being compensated for my time at my standard consulting rate of $750 per hour.  I am also being reimbursed for expenses that I incur during the course of this work.  My compensation is not contingent upon the results of my study, the substance of my opinions, or the outcome of any proceeding involving the challenged claims.  I have no financial interest in the outcome of this matter or on the pending litigation between Plaintiff and Defendant. No part of my compensation depends on the outcome of this case or on the opinions that I render.

3.     My analysis here is based on my years of education, research and experience, as well as my investigation and study of relevant materials, including those cited herein.

4.     I may rely upon these materials, my knowledge and experience, and/or additional materials to rebut arguments raised by the Plaintiff.  Further, I may also consider additional documents and information in forming any necessary opinions, including documents that may not yet have been provided to me.

5.     My analysis of the materials produced in this proceeding is ongoing and I will continue to review any new material as it is provided.  This declaration represents only those opinions I have formed to date.  I reserve the right to revise, supplement, and/or amend my opinions

stated herein based on new information and on my continuing analysis of the materials already provided.

## II.     BACKGROUND AND QUALIFICATIONS

6.     I am an expert in the field of wireless communication systems and networked systems.  I have studied, taught, practiced, and researched this field for over 28 years.  I have summarized in this section my educational background, work experience, and other relevant qualifications.  Attached hereto as Appendix A, is a true and correct copy of my curriculum vitae describing my background and experience.

7.     I earned my Bachelor of Science degrees in Electrical Engineering and Computer Science *summa cum laude* with a grade point average of 4.0/4.0 and a ranking of first in my undergraduate class from Washington University in St. Louis in 1994.  In 1996, I earned my Master of Science degree in Electrical Engineering from Washington University in St. Louis with a grade point average of 4.0/4.0.  I earned my Doctor of Science in Electrical Engineering from Washington University in St. Louis in 2000, again with a grade point average of 4.0/4.0, with my dissertation being on "Cell Design to Maximize Capacity in Cellular Code Division Multiple Access (CDMA) Networks."

8.     While a graduate student, from 1996 through 2000, I worked at MinMax Corporation in St. Louis, where I designed software packages that provided tools to flexibly allocate capacity in a CDMA communications network and maximize the number of subscribers. I also analyzed and simulated different audio compression schemes.  I also validated the hardware architecture for an Asynchronous Transfer Mode (ATM) switch capable of channel group switching, as well as performed logical and timing simulations, and developed the hardware architecture for the ATM switch.  I also worked with Teleware Corporation in Seoul, South Korea,

where I designed and developed algorithms that were commercially deployed in a software package suite for analyzing the capacity in a CDMA network implementing the IS-95 standard to maximize the number of subscribers.

9.    After obtaining my Doctor of Science degree, I worked as a Senior Systems Engineer at Comspace Corporation from October of 2000 to December of 2001.  At Comspace, I designed and developed advanced data coding and modulation methods for improving the reliability and increasing the available data rates for cellular communications.  I coded and simulated different encoding schemes (including Turbo coding, Viterbi decoding, trellis coded modulation, and Reed-Muller codes) and modulation techniques using amplitude and phase characteristics and multi-level star constellations.  This work further entailed the optimization of soft decision parameters and interleavers for additive white Gaussian and Rayleigh faded channels. In addition, I also extended the control and trunking of Logic Trunked Radio (LTR) to include one-to-one and one-to-many voice and data messaging.

10.    In January of 2002, I joined the faculty of the University of New Orleans in Louisiana as an Assistant Professor in the Department of Electrical Engineering.  While in this position, I designed and taught two new courses called "Computer Systems Design I and II."  I also developed a Computer Engineering Curriculum with a strong hardware-design emphasis, formed a wireless research group, and advised graduate and undergraduate students.

11.    In September of 2002, I received an appointment as an Assistant Professor in the Department of Computer Science and Engineering at the University of North Texas (UNT), in Denton, Texas.  In May of 2008, I became a tenured Associate Professor in the Department of Computer Science and Engineering.  As a faculty member, I have taught courses and directed research in networking and telecommunications, including 2G, 3G, 4G, 5G, CDMA/WCDMA,

GPS, GSM, UMTS, LTE, ad-hoc networks, antenna design and beamforming, Bluetooth, call admission control, channel coding, channel estimation, communication interfaces and standards, compression, computer architecture, MIMO systems, multi-cell network optimization, network security, packet-networks, telephony, VoIP, Wi-Fi (802.11), 802.15.4, Zigbee, wireless communication, and wireless sensors.  In January of 2015, I was appointed to Associate Chair of Graduate Studies in the Department of Computer Science and Engineering.

12.     I am also the director of the Wireless Sensor Lab ("WiSL") at UNT.  I am a member of the Center for Information and Cyber Security (CICS).  It is the only program in the U.S. to be federally certified by the National Security Agency as a Center of Academic Excellence in Information Assurance Education and Research *and* Cyber Defense Research.  I was also a member of the NSF Net-Centric & Cloud Software & Systems: Industry-University Cooperative Research Center (I/UCRC).  Several of my research projects are funded by industry and the National Science Foundation and published in IEEE conference proceedings and journals.

13.     In addition to advising and mentoring students at UNT, I was asked to join the faculty of the University of Arkansas in Little Rock as an Adjunct Assistant Professor from 2004 to 2008 in order to supervise the research of two Ph.D. graduate students who were doing research in wireless communications.  At UNT, I have advised and supervised more than 250 undergraduate and graduate students, several of whom received a master's or doctorate degree under my guidance.

14.     Further, since 2005, I have received over a million dollars in funding from the State of Texas, Texas Higher Education Coordination Board, the National Science Foundation, and industry to design and conduct robotics, video, and mobile gaming (*e.g.*, Xbox, PC, mobile device) programming summer camps for middle and high school students at UNT.  By using video and

mobile gaming as the backdrop, participants have learned coding and programming principles and developed an understanding of the role of physics and mathematics in video game design.

15.     In addition to my academic work, I have remained active in the communication industry through my consulting work.  In 2002, I consulted for Input/Output Inc. and designed and implemented algorithms for optimizing the frequency selection process used by sonar for scanning the bottom of the ocean.  In 2004, I worked with Allegiant Integrated Solutions in Ft. Worth, Texas, to design and develop an integrated set of tools for fast deployment of wireless networks, using the 802.11 standard.  Among other features, these tools optimize the placement of Access Points and determine their respective channel allocations to minimize interference and maximize capacity.  I also assisted the Collin County Sheriff's Office (Texas) in a double homicide investigation, analyzing cellular record data to determine user location.

16.     I have authored and co-authored over 100 journal publications, conference proceedings, technical papers, book chapters, and technical presentations in a broad array of communications-related technologies, including networking and wireless communication.  I have also developed and taught over 100 courses related to communications and computer systems, including several courses on signals and systems, 4G/LTE and 5G/NR, OFDM, VoIP, Wi-Fi (802.11), 802.15.4, Zigbee, wireless communication, antenna design and beamforming, communications systems, communication interfaces and standards, channel estimation, location management, sensor networks, source coding and compression, network security, computer systems design, game and app design, and computer architecture.  These courses have included introductory courses on communication networks and signals and systems, as well as more advanced courses on wireless communications.  A complete list of my publications and the courses I have developed and/or taught is also contained in my *curriculum vitae*.

17.     My professional affiliations include services in various professional organizations and serving as a reviewer for a number of technical publications, journals, and conferences.  I have also received a number of awards and recognitions, including the IEEE Professionalism Award (2008), UNT College of Engineering Outstanding Teacher Award (2008), and Tech Titan of the Future (2010) among others, which are listed in my *curriculum vitae*.

18.     I have also served as an expert in certain legal proceedings.  A list of cases in which I have testified at trial, hearing, or by deposition (including those during the past five years) is provided in my *curriculum vitae*.  Over the years, I have been retained by both plaintiffs and defendants.

## III.     LEVEL OF ORDINARY SKILL IN THE ART

19.     In rendering the opinions set forth in this Declaration, I was asked to consider the patent claims through the eyes of a person of ordinary skill in the art ("POSITA") at the time of the invention, which I understand is November 24, 2004 for the '096 Patent, and June 13, 2003 for the '630 Patent.  I understand that the factors considered in determining the ordinary level of skill in a field of art include the level of education and experience of persons working in the field; the types of problems encountered in the field; the teachings of the prior art, and the sophistication of the technology at the time of the alleged invention. I understand that a POSITA is not a specific real individual, but rather is a hypothetical individual having the qualities reflected by the factors above. I understand that a POSITA would also have knowledge from the teachings of the prior art, including the art cited below.

20.     Taking these factors into consideration, on or before November 24, 2004, a POSITA relating to the technology of the '096 Patent would have had a Bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and 2-3 years

of experience in the design or development of wireless communication systems, or the equivalent. Additional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education.

21.     Taking these factors into consideration, on or before June 13, 2003, a POSITA relating to the technology of the '630 Patent would have had a Bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and 1-2 years of experience in the design or development of routers, or the equivalent.   Additional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education.

22.     Before 2003/2004, my level of skill in the art was at least that of a POSITA under both set of qualifications.  I am qualified to provide opinions concerning what a POSITA would have known and understood at that time, and my analysis and conclusions herein are from the perspective of a POSITA as of that date.

## IV.     MATERIALS RELIED UPON

23.     In reaching the conclusions described in this Declaration, I have relied on the documents and materials cited herein as well as those identified in this Declaration, including the '096 and '630 Patents, their prosecution histories, the parties' claim construction briefs, and references cited herein.  Each of these materials is a type of document that experts in my field would have reasonably relied upon when forming their opinions. When quoting from these materials, all emphasis is added unless otherwise noted.

24.     I have also relied on my education, training, research, knowledge, and personal and professional experience in the relevant technologies and systems that were already in use prior to, and within the timeframe of the earliest priority date of the claimed subject matter in the '096

Patent, which is November 24, 2004, and in the '630 Patent, which is June 13, 2003.

## V.     LEGAL STANDARDS RELATING TO CLAIM CONSTRUCTION

25.     I am not an attorney or a patent attorney, and offer no opinions on the law.  I have, however, been informed by counsel regarding various legal standards that may apply to this case, and I have applied those standards where necessary in arriving at my conclusions.

26.     I understand that patent claims are construed from the viewpoint of a POSITA of the patent at the time of the invention.  I have been told that patent claims generally should be interpreted consistent with their plain and ordinary meaning as understood by a POSITA in the relevant time period (*i.e.*, at the time of the invention, or the so called "effective filing date" of the patent application), after reviewing the patent claim language, the specification and the prosecution history (*i.e.*, the intrinsic record).

27.     I further understand that a POSITA must read the claim terms in the context of the claim itself, as well as in the context of the entire patent specification.  I understand that in the specification and prosecution history, the patentee may specifically define a claim term in a way that differs from the plain and ordinary meaning.  I understand that the prosecution history of the patent is a record of the proceedings before the U.S. Patent and Trademark Office, and may contain explicit representations or definitions made during prosecution that affect the scope of the patent claims.  I understand that an applicant may, during the course of prosecuting the patent application, limit the scope of the claims to overcome prior art or to overcome an examiner's rejection, by clearly and unambiguously arguing to overcome or distinguish a prior art reference, or to clearly and unambiguously disavow claim coverage.

28.     In interpreting the meaning of the claim language, I understand that a POSITA may also consider "extrinsic" evidence, including expert testimony, inventor testimony, dictionaries,

technical treatises, other patents, and scholarly publications. I understand this evidence is considered to ensure that a claim is construed in a way that is consistent with the understanding of those of skill in the art at the time of the claimed invention. This can be useful for technical terms whose meaning may differ from its ordinary English meaning. I understand that extrinsic evidence may not be relied on if it contradicts or varies the meaning of claim language provided by the intrinsic evidence, particularly if the applicant has explicitly defined a term in the intrinsic record.

29.    I understand that Section 112 of the Patent Laws requires that a patent claim particularly point out and distinctly claim the subject matter that the applicant regards as his or her invention. I understand that a patent is invalid for indefiniteness if its claims fail to inform, with reasonable certainty, a person of ordinary skill in the art about the scope and bounds of the invention. I understand that a claim is indefinite if its scope is not clear enough that a person of ordinary skill in the art could determine whether a particular embodiment infringes the claim or not. I also understand that when considering whether or not a claim is indefinite, a person of ordinary skill in the art will consider both the intrinsic and extrinsic record.

## VI.    THE '096 PATENT DISPUTED CLAIM TERMS

30.    Claim 1 of the '096 Patent reads:

A method for communicating data over a network between an access point having a first and a second antenna and a first and a second mobile station, the method comprising:

weighting a first data at said access point to transmit said first data using said first and second antennas so that said first mobile station only receives said first data; and

weighting a second data at said access point to transmit said second data using said first and second antennas so that said second mobile station only receives said second data;

increasing a first data rate of transmission of said first data and a second data rate of transmission of said second data using a single carrier frequency in a radio frequency communication based on a transmission protocol;

discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension;

applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively;

defining at least one of said access point, said first and second mobile stations, and said downlink at least in part by Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard to establish said network including a wireless local area network;

coupling said access point to said first and second mobile stations through said wireless local area network;

estimating a first radio channel from said access point to said first mobile station over a pilot interval; and

estimating a second radio channel from said access point to said second mobile station over said pilot interval.

**A.** **"Discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a special dimension" (Claim 1)**

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| U.S. Patent No. 7,512,096, Claim 1 | Plain and ordinary meaning.<br><br>Alternatively, if the Court determines that the term can be construed: "differentiating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension." | Indefinite. |

31.     The term "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension" (the

"discriminating step") is found in claim 1 of the '096 Patent, as shown above.

32.     According to the '096 Patent, the "discriminating step" is met by merely using space division multiple access ("SDMA").  The '096 Patent explains that SDMA "has been studied extensively over the past few decades" because "the spatial dimension [allows] discrimination among multiple radio[s]."  '096 Patent, 1:57-2:3.  "In operation, the SDMA downlink 120a may use the spatial dimension to allow discrimination among a first and a second radio frequency transmission 205(1-k) at a data rate of 54 Mbits/s based on space division multiple access in the context of the IEEE 802.11 standard."  *Id.*, 7:26-30.  A POSITA understands that the nature of SDMA is to distinguish transmissions to different mobile stations based on a spatial dimension.

33.     The next limitation in claim 1 of the '096 Patent is "applying a space division multiple access based on said transmission protocol to said transmissions" (the "applying step").  A POSITA understands that the applying step results in the discriminating step.  The specification supports this understanding when it says the spatial dimension "allow[s] discrimination."  *Id.*, 7:26-30.  Because the applying step causes the discriminating step to occur, it is unclear how the discriminating step further limits claim 1 of the '096 Patent.  One skilled in the art would not understand the scope of the discriminating step as it does not appear to add any further limits to claim 1 beyond what is found already in the applying step.

### B.     "Substantially concurrently" (Claim 1)

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| U.S. Patent No. 7,512,096, Claim 1 | Plain and ordinary meaning.<br><br>Alternatively, if the Court determines that the term can be construed: "substantially simultaneously." | Indefinite.<br><br>Alternatively, if the Court determines that the term can be construed: "at the same time" |

34.     The term "substantially concurrently" is found in claim 1 of the '096 Patent. Specifically, it is found in the limitation "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data **substantially concurrently** from said access point to said first and second mobile stations, respectively." This term is only found in claim 1. The specification of the '096 Patent uses the term "simultaneously" instead of "concurrently." These two terms mean the same thing: at the same time.

35.     Claim 1 adds the modifier "substantially" to "concurrently." In the context of this claim, one skilled in the art would not understand the impact of this modifier. As the '096 Patent describes, SDMA is "a tool that uses spatial dimension to **simultaneously transmit** to, or receive from, multiple radios at the same carrier frequency." '096 Patent, 1:57-60. For SDMA, "a communication node, e.g., an access point includes a plurality of antennas that **simultaneously transmit information** on a downlink to a plurality of mobile stations, e.g., laptops or wireless personal digital assistants (PDAs), in a cell over a network including a wireless local area network (WLAN)." *Id.*, 5:19-24. Figures 1 and 7 depict these simultaneous transmissions. *Id.*, 3:62-67, 4:33-38, 5:46-52, 9:33-42. The purpose of SDMA is to transmit data to multiple mobile stations at the same time.

36.     At times, the '096 Patent also uses a different term, "substantially simultaneously," as shown in the examples below.

- "A space division multiple access (SDMA) module may cause a transmission protocol to transmit the first data to the first mobile station on the downlink and transmit the second data to the second mobile station **in parallel** to the transmission of the first data on the downlink. In a telecommunication system, **this substantially simultaneous transmission** of the first and second data using a similar carrier frequency in a radio frequency communication over a wireless local area network (WLAN) may increase throughput of a downlink, for example, by a factor nominally equal to the number of antennas at an access point.." *Id.*, Abstract.

- "In one embodiment, the communication node 105 may transmit the first and said second data 135(1-*k*) ***substantially simultaneously*** at a same carrier frequency in a radio frequency communication. This ***substantially simultaneous transmission*** of the data 135(1-*k*) may increase throughput of the downlink 120 by a factor nominally equal to the number of antennas, i.e., "m", at the communication node 105 or the access point." *Id*., 6:32-39.

- "A communication interface 160 may be coupled to the controller 150 and the memory 155 to transmit the first and second data 135(1-k) ***substantially simultaneously***." *Id*., 6:52-54.

37.     These disclosures, however, do not explain how "substantially simultaneous" transmissions are different than the disclosures of "simultaneous" transmissions.  Indeed, the first example above also describes that the "substantially simultaneous transmission" occurs in "parallel."  In addition, after the last example, the '096 Patent states: "The SDMA module 170 may cause the transmission protocol 160 to transmit the first data 135(1) to the first mobile station 145(1) on the downlink 120 and transmit the second data 135(*k*) to the second mobile station 145(*k*) in ***parallel*** to the transmission of the first data 135(1) on the downlink 120." *Id*., 6:59-64.  A transmission occurring in parallel occurs at the same time.

38.     The '096 Patent also describes an embodiment where transmissions of protocol data units ("MPDUs") do not occur simultaneously.  With respect to Figure 8, the '096 Patent describes adding a time offset between MPDU transmissions, which results in "no simultaneous transmission."    *Id*., 9:65-10:3.   One skilled in the art would understand that this MPDU transmission embodiment would not result in a transmission that occurs "substantially concurrently."  Moreover, this description is related to an initialization process that occurs before the claimed "said first and said second data" are transmitted "substantially concurrently."  For example, see claim 2 adding the further limitation "initializing said transmission protocol ***before starting*** said transmissions of said first and second data over said downlink."

39.     One skilled in the art would not understand the scope of the term "substantially

concurrently" as used in claim 1 of the '096 Patent.  While the term "substantially" is a word of degree, in the context of the SDMA data transmissions described in the '096 Patent, it does not make sense.  The '096 Patent's purpose for using SDMA is to transmit data to two mobile stations at the same time to increase downlink throughput.  *Id.*, 2:61-63.  The '096 Patent does not provide any objective boundaries regarding how its SDMA data transmissions could be altered such that they do not occur at the same time.  Accordingly, the term "substantially concurrently" is indefinite.  While the term "substantially concurrently" is indefinite, to the extent it can be understood, it most likely means "at the same time."

## VII.   THE '630 PATENT DISPUTED CLAIM TERMS

### A.  "Control packets" (Claims 1, 2, 4, and 10)

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| U.S. Patent No. 7,551,630, Claims 1, 2, 4, 10 | No construction is necessary - plain and ordinary meaning | "Packets that contain data necessary to create a forwarding path" |

40.     The term "control packets" is found in claims 1, 2, 4, and 10 of the '630 Patent.

Claim 1 is shown below.

> 1. A router for routing packets in a telecommunication network, said router comprises a plurality of inputs for receiving said packets and a common processor (CP) coupled to said plurality of inputs for processing at least part of said packets according to one or more routing protocols, wherein said router comprises at least one packet marker (M11(M_BGP)), coupled between a first plurality of inputs (IN11, IN12, IN13) of said plurality of inputs and said common processor (CP), for marking incoming ***control packets*** of said at least part of said packets, according to a receiving rate of ***control packets*** received at said first plurality of inputs (IN11, IN12, IN13) and to be processed according to a first routing protocol, said incoming ***control packets*** being received at one of said first plurality of inputs (IN11, IN12, IN13) and to be processed according to said first routing protocol, said marker (M11(M_BGP)) provides thereby marked ***control packets***; and said common processor (CP) comprises a discarder (DIS) for discarding, before said processing, one or more of said marked ***control packets*** according to said marking and according to predefined rules and conditions.

41.     The '630 Patent describes that control "packets comprise the required control data to create the required forwarding path and might possibly be adapted."  '630 Patent, 1:14-16. The '630 Patent contrasts a control packet with "a data packet that only has to follow the forwarding data-path."  *Id.*, 1:22-24.   Thus, the '630 Patent distinguishes packet type by functionality.

42.     The term "packet" has a well-known meaning regarding how data is transmitted over a network.  *See, e.g.*, Exhibit NTG-5.  A packet includes both control information and user data.  *See, e.g.*, Appendix B at 50, 53, 330.  The control information includes the source and destination addresses and error-checking data, while the user data is the transferred content, such as text, images, audio, or video files.  *Id.*  The control information is in the header of the packet, while the user data is in the packet's payload.  *Id.*  The '630 Patent does not describe packets in this generally understood context.

43.     The term "control packet" is not a term of art.  Typically, one skilled in the art would refer to the control information in the header of the packet.  As described by the '630 Patent, however, the "control packets" are the ones that "comprise the required control data to create the required forwarding path and might possibly be adapted."  *Id.*, 1:14-16.  One skilled in the art would understand that this control data is the data typically found in the header of a packet.

44.     While the term "control packet" does not have a plain and ordinary meaning, one skilled in the art would understand that this term means "packets that contain data necessary to create a forwarding path."  This construction is consistent with how one skilled in the art would understand the term in view of the plain and ordinary meaning of "packet" and how the '630 Patent distinguishes "data packets" from "control packets."

## VIII.   ADDITIONAL REMARKS

45.     I currently hold the opinions expressed in this Declaration.  But my analysis may continue, and I may acquire additional information and/or attain supplemental insights that may result in added observations.

46.     I reserve the right to respond to any additional arguments or opinions raised by Plaintiff or Plaintiff's expert(s).  I further reserve the right to respond to any new positions raised by Plaintiff or respond to any further expert declaration provided by Plaintiff regarding claim construction issues.

*        *        *

I hereby declare that all statements made are of my own knowledge are true and that all statements made on information and belief are believed to be true.  I further declare that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this proceeding.

Dated:  September 1, 2022          By:  _____
                                        Dr. Robert Akl, D.Sc
                                        Dallas, Texas

# Appendix A

# Robert Akl, D.Sc.



## Professional Summary

Dr. Akl has over 28 years of industry and academic experience. He is currently a Tenured Associate Professor at the University of North Texas and a Senior Member of IEEE. He has designed, implemented, and optimized both hardware and software aspects of several wireless communication systems for CDMA, Wi-Fi, and sensor networks. Dr. Akl has broad expertise in wireless communication, Bluetooth, CDMA/WCDMA network optimization, GSM, LTE, VoIP, telephony, computer architecture, and computer networks. He is a very active researcher and is well published and cited. He has been awarded many research grants by leading companies in the industry and the National Science Foundation. He has developed and taught over 100 courses in his field. Dr. Akl has received several awards and commendations for his work, including the 2008 IEEE Professionalism Award and was the winner of the 2010 Tech Titan of the Future Award.

Dr. Akl has extensive experience with patents in the wireless and networking industry. In the past ten years, he has worked as a technical expert in dozens of patent related matters, involving thousands of hours of research, investigation, and study. He has repeatedly been qualified as an expert by Courts, and has provided numerous technology tutorials to Courts, and given testimony by deposition and at trial. He has worked with companies large and small, both for and against the validity and infringement of patents, and has also helped counsel and Courts to understand technology that often seems complex. In doing so, he has become familiar with, and actively worked with, the legal principles that underlie patentability and validity and claim interpretation in the wireless and networking industries.

## Areas of Expertise

2G, 3G, 4G, 5G, CDMA/WCDMA, GPS, GSM, UMTS, LTE, Ad-hoc Networks, Antenna Design, Bluetooth, Call Admission Control, Channel Coding, Channel Estimation, Communication Interfaces and Standards, Compression, Computer Architecture, MIMO Systems, Multi-cell Network Optimization, Network Security, Packet-networks, Telephony, VoIP, Wi-Fi, Wireless Communication, Wireless Sensors.

## Education

| Year | College/University | Degree | GPA |
|------|--------------------|--------|-----|
| 2000 | Washington University in Saint Louis | D.Sc. in Electrical Engineering | **4.0 / 4.0** |
| 1996 | Washington University in Saint Louis | M.Sc. in Electrical Engineering | **4.0 / 4.0** |
| 1994 | Washington University in Saint Louis | B.Sc. in Electrical Engineering | **4.0 / 4.0** |
| 1994 | Washington University in Saint Louis | B.Sc. in Computer Science | **4.0 / 4.0** |

Graduated *summa cum laude* and ranked first in undergraduate class.

Dissertation: "Cell Design to Maximize Capacity in Cellular Code Division Multiple Access (CDMA) Networks." Advisors: Dr. Manju Hegde and Dr. Paul Min.

## Litigation Support and Expert Witness Experience

| | | | |
|---|---|---|---|
| L1. | 2022 | **Jenner & Block LLP** | |
| | Case: | WSOU Investments, LLC v. <u>Netgear, Inc.</u> | |
| | | District of Delaware, Case No. 21-cv-01117-MN-CJB, 21-cv-01119-MN-CJB, 21-cv-01120-MN-CJB | |
| | Matter: | Patent infringement, adaptive antennas, routers | |
| | Project: | Declaration regarding claim construction | |

| | | | |
|---|---|---|---|
| L2. | 2022 | **K & L Gates LLP** | |
| | Case: | <u>Entropic Communications, LLC</u> v. DirectV, LLC, AT&T Services, Dish Network Corporation et al. | |
| | | Eastern district of Texas, Marshall division, Case No. 2:22-cv-00075-JRG, 2:22-cv-00076-JRG-RSP | |
| | Matter: | Patent infringement, satellite receivers | |
| | Project: | Infringement consulting | |

| | | | |
|---|---|---|---|
| L3. | 2022 | **Simpson Thacher & Bartlett LLP** | |
| | Case: | XR Communications, LLC. v. <u>Ubiquiti Networks, Inc.</u> | |
| | | Central district of California, Case No. 2:21-cv-1065-DOC(JDE) | |
| | Matter: | Patent infringement, Wi-Fi and adaptive antennas | |
| | Project: | Non-infringement expert report | |

| | | | |
|---|---|---|---|
| L4. | 2022 | **Ropes & Gray LLP** | |
| | Case: | Speir Technologies Ltd. v. <u>Apple Inc.</u> | |
| | | Western district of Texas, Waco division, Case No. 6:22-cv-00077-ADA | |
| | Matter: | Patent infringement, channel estimation | |
| | Project: | Declaration regarding claim construction | |

| | | | |
|---|---|---|---|
| L5. | 2022 | **Fish & Richardson, P.C.** | |
| | Case: | Constellation Designs, LLC v. <u>LG Electronics, Inc. et al.</u> | |
| | | Eastern district of Texas, Marshall division, Case No. 2:21-cv-448 | |
| | Matter: | Patent infringement, channel coding | |
| | Project: | Invalidity consulting | |

| | | | |
|---|---|---|---|
| L6. | 2022 | **Calfee, Halter & Griswold LLP** | |
| | Case: | Resi Media LLC v. <u>BoxCast  Inc.</u> | |
| | | IPR2022-00066; IPR2022-00067 | |
| | Matter: | *Inter Partes* Review, autonomous broadcasting | |
| | Project: | Combined declaration to support Patent Owner's response | |

L7.  2022  **Fish & Richardson, P.C.**
    Case:    <u>FedEx Corporation</u> v. Transcend Shipping Systems, LLC
             IPR2022-01117; IPR2022-01219; IPR2022-01252;
             IPR2022-01261; IPR2022-01314
    Matter:   *Inter Partes* Review, location management
    Project:   Five declarations to support 5 IPR petitions

L8.  2022  **Finnegan Henderson Farabow Garrett & Dunner LLP**
    Case:    <u>Toyota Motor Corp and Continental Automotive Systems.</u> v.
             Intellectual Ventures II, LLC
             IPR2022-00971; IPR2022-00972; IPR2022-00973; IPR2022-00974;
             IPR2022-01130
    Matter:   *Inter Partes* Review, multicarrier communication
    Project:   Five declarations to support 5 IPR petitions

L9.  2022  **Fenwick & West LLP**
    Case:    TrackThings LLC v. <u>Amazon.com, Inc. et al.</u>
             Western district of Texas, Waco division, Case No. 6:21-cv-00720
    Matter:   Patent infringement, mobile ad-hoc networks
    Project:   Invalidity consulting

L10.  2022  **Fenwick & West LLP**
    Case:    Stingray IP Solutions v. <u>Amazon.com, Inc. et al.</u>
             Eastern district of Texas, Marshall division, Case No. 2:21-cv-00193-
             JRG; Case No. 2:21-cv-00194-JRG
    Matter:   Patent infringement, mobile ad-hoc networks
    Project:   Noninfringement consulting

L11.  2022  **Mayer Brown LLP**
    Case:    <u>Pantech Corp.</u> v. Coolpad Group Ltd., et al.
             Eastern district of Texas, Texarkana division, Case No. 5:21-cv00065
    Matter:   Patent infringement, LTE wireless communication systems
    Project:   Infringement consulting

L12.  2022  **Fitch, Even, Tabin & Flannery**
    Case:    <u>L2 Mobile Technologies LLC</u> v. Ford Motor Company
             District of Delaware, Case No. 1:21-cv-01409-JLH
    Matter:   Patent infringement, wireless communication systems
    Project:   Standard essentiality consulting

L13.  2022  **Susman Godfrey LLP**
    Case:    <u>California Institute of Technology</u> v. Samsung Electronics Co., Ltd. et
             al.
             Eastern district of Texas, Marshall division, Case No. 2:21-cv-00446-
             JRG
    Matter:   Patent infringement, low-density parity-check codes

|  |  | Project: | Infringement consulting |
|---|---|---|---|

L14.  2022      **Devlin Law Firm**
     Case:    Dropbox, Inc. v. Motion Offense, LLC; Motion Offense, LLC v. Dropbox, Inc.
                 Western district of Texas, Waco division, Case No. 6:20-cv-00251-ADA; 6:21-cv-00758-ADA
     Matter:  Patent infringement, telecommunication systems and networking
     Project:  Validity consulting

L15.  2022      **Bayes PLLC**
     Case:    Guangdong OPPO Mobile Telecommunications Corp., Ltd. v. Nokia Solutions and Networks Oy
                 IPR2022-00632
     Matter:  *Inter Partes* Review, PDU and SDU
     Project:  Declaration to support IPR petition

L16.  2022      **Finnegan Henderson Farabow Garrett & Dunner LLP**
     Case:    NetApp, Inc. v. Proven Networks, LLC
                 IPR2022-00644
     Matter:  *Inter Partes* Review, allocating resources
     Project:  Declaration to support IPR petition

L17.  2022      **Devlin Law Firm**
     Case:    Motion Offense, LLC v. Google, LLC
                 Western district of Texas, Waco division, Case No. 6:21-cv-00514-ADA
     Matter:  Patent infringement, telecommunication systems and networking
     Project:  Declaration regarding claim construction

L18.  2022      **Jenner & Block LLP**
     Case:    Netgear, Inc. v. WSOU Investments, LLC
                 IPR2022-00516; IPR2022-00606
     Matter:  *Inter Partes* Review, telecommunication systems
     Project:  Two declarations to support 2 IPR petitions

L19.  2022      **Calfee, Halter & Griswold LLP**
     Case:    BoxCast Inc. v. Resi Media LLC
                 Eastern district of Texas, Marshall division, Case No. 2:21-cv-00217-JRG
     Matter:  Patent infringement, autonomous broadcasting
     Project:  Source code review, declaration regarding claim construction, declaration regarding validity, declaration regarding infringement, deposition

L20.  2021  **Fish & Richardson, P.C.**
      Case:   <u>Apple Inc.</u> v. Ericsson Inc.
              IPR2022-00341; IPR2022-00346;
              IPR2022-*To be assigned*; IPR2022-*To be assigned*
      Matter:  *Inter Partes* Review, wireless communication systems
      Project:  Four declarations to support 4 IPR petitions

L21.  2022  **Ropes & Gray LLP**
      Case:   <u>Godo Kaisha IP Bridge 1</u> v. Nokia Corporation, Ericsson Inc. et al.
              Eastern district of Texas, Marshall division, Case No. 2:21-CV-213-
              JRG; Case No. 2:21-CV-215-JRG
      Matter:  Patent infringement, wireless communication systems
      Project:  Declaration to support claim construction

L22.  2022  **Fish & Richardson, P.C.**
      Case:   <u>Apple Inc.</u> v. XR Communication Inc
              IPR2022-00367; IPR2022-01155
      Matter:  *Inter Partes* Review, adaptive antennas
      Project:  Two declarations to support 2 IPR petitions

L23.  2021  **Fitch, Even, Tabin & Flannery**
      Case:   <u>L2 Mobile Technologies LLC</u> v. Google LLC
              Western district of Texas, Waco division, Case No. 6:21-cv-00358-
              ADA
      Matter:  Patent infringement, wireless communication systems
      Project:  Claim construction consulting

L24.  2021  **Morgan Lewis**
      Case:   Intellectual Tech LLC v. <u>Zebra Technologies Corporation</u>
              Western district of Texas, Waco division, Case No. 6:19-cv-00628-
              ADA
      Matter:  Patent infringement, RFID tags
      Project:  Source code review, claim construction consulting, invalidity expert
               report

L25.  2021  **Carter Arnett**
      Case:   <u>Correct Transmission LLC</u> v. Adtran, Inc.
              Northern district of Alabama, Northeastern division, Case No. 5:21-
              cv-00690-LCB
      Matter:  Patent infringement, telecommunication systems
      Project:  Declaration to support claim construction

L26.  2021  **Carter Arnett**
      Case:   Juniper Networks, Inc. v. <u>Correct Transmission, LLC</u>
              IPR2021-00463; IPR2021-00682; IPR2022-00815
      Matter:  *Inter Partes* Review, network communication systems

Project: Two declarations to support 2 Patent Owner's responses, two depositions; declaration to support Patent Owner's preliminary response

L27.   2021   **King & Wood Mallesons LLP**
       Case: ToT Power Control, S.L. v. AT&T Mobility et al.; ToT Power Control, S.L. v. T-Mobile USA, Inc. et al.
       Western district of Texas, Waco division, Case No. 6:21-CV-00107-ADA; 6:21-CV-00109-ADA
       Matter: Patent infringement, WCDMA cellular systems
       Project: Declaration regarding claim construction

L28.   2021   **Finnegan Henderson Farabow Garrett & Dunner LLP**
       Case: Xiaomi Communications Co., Ltd. v. Koninklijke KPN N.V.
       IPR2022-00025
       Matter: *Inter Partes* Review, network communication systems
       Project: Declaration to support IPR petition

L29.   2021   **Carter Arnett**
       Case: Juniper Networks, Inc. v. Smart Path Connections, LLC
       IPR2021-001170; IPR2021-01356; IPR2022-00240; IPR2022-00815
       Matter: *Inter Partes* Review, network communication systems
       Project: Declaration to support Patent Owner's preliminary response, three declarations to support 3 Patent Owner's responses, deposition

L30.   2021   **Devlin Law Firm**
       Case: Dyfan LLC v. Target Corporation
       District of Delaware, Case No. 6:19-cv-00179-ADA
       Matter: Patent infringement, network communications
       Project: Declaration to support summary judgement, deposition

L31.   2021   **Alston & Bird LLP**
       Case: Stingray IP Solutions v. Signify N.V., et al.
       Eastern district of Texas, Marshall division, Case No. 2:21-cv-00043-JRG; Case No. 2:21-cv-00044-JRG
       Matter: Patent infringement, mobile ad-hoc networks
       Project: Declaration to support claim construction

L32.   2021   **Cole Schotz P.C.**
       Case: SkyBell Technologies, Inc. v. Vivint Smart Home, Inc., SimpliSafe, Inc., and Arlo Technologies Inc
       In the Matter of Certain IP Camera Systems Including Video Doorbells and Components Thereof, ITC Investigation No. 337-TA-1242
       Matter: Patent infringement, wireless telecommunication systems

|  | Project: | Source code review, expert report infringement and domestic industry, rebuttal expert report, three-day deposition |

| L33. | 2021 | **Axinn, Veltrop & Harkrider LLP** |
|  | Case: | Koninklijke Philips N.V. v. <u>Thales DIS AIS USA, LLC et al.</u><br>In the Matter of Certain UMTS and LTE Cellular Communication Modules and Products Containing the Same, ITC Investigation No. 337-TA-1240 |
|  | Matter: | Patent infringement, wireless communication systems |
|  | Project: | Expert report regarding non-infringement and no domestic industry, deposition, ITC hearing testimony |

| L34. | 2021 | **Morgan, Lewis & Bockius LLP** |
|  | Case: | SIPCO, LLC v. <u>Aruba Networks, LLC and Hewlett Packard Enterprise Company</u><br>District of Delaware, Case No. 1:20-cv-00537-MN |
|  | Matter: | Patent infringement, wireless communication systems |
|  | Project: | Declaration regarding claim construction |

| L35. | 2021 | **Ropes & Gray LLP** |
|  | Case: | <u>Palo Alto Networks Inc.</u> v. Centripetal Networks, Inc.<br>IPR2021-01150, IPR2021-01151, IPR2021-01155, IPR2021-01156, IPR2021-01270, PGR2021-00108, IPR2021-01520, IPR2021-01521 |
|  | Matter: | *Inter Partes* Review, network security systems |
|  | Project: | Seven declarations to support 7 IPR petitions, declaration to support post grant review, deposition |

| L36. | 2021 | **Devlin Law Firm** |
|  | Case: | <u>CDN Innovations, LLC</u> v. Grande Communications Networks, LLC<br>Eastern district of Texas, Sherman division, Case No. 4:20-cv-653-SDJ |
|  | Matter: | Patent infringement, telecommunication systems |
|  | Project: | Declaration to support infringement contentions |

| L37. | 2021 | **Banner Witcoff** |
|  | Case: | Sisvel International S.A., 3G Licensing S.A. v. <u>ZTE (USA) Inc.</u> et al.<br>Northern district of Texas, Case No. 3:20-cv-01289-M |
|  | Matter: | Patent infringement, wireless communication systems |
|  | Project: | Declaration to support claim construction, deposition |

| L38. | 2021 | **Paul Hastings LLP** |
|  | Case: | G. Holdings Ltd. v. <u>Samsung Electronics Co., et al.</u><br>Eastern district of Texas, Marshall division, Case No. 2:20-cv-00342-JRG |
|  | Matter: | Patent infringement, electronic payment systems |
|  | Project: | Declaration to support claim construction |

L39.   2021    **Morgan, Lewis & Bockius LLP**
       Case:    <u>Aruba Networks, LLC and Hewlett Packard Enterprise Company</u> v.
               SIPCO, LLC
               IPR2021-00787
       Matter:  *Inter Partes* Review, wireless communication systems
       Project:  Declaration to support IPR petition

L40.   2021    **Jenner & Block LLP**
       Case:    Virentem Ventures LLC D/B/A Enounce v. <u>TiVo Corp and Xperi</u>
               <u>Holding Corporation</u>
               District of Delaware, Case No. 20-787-MN
       Matter:  Patent infringement, telecommunication systems
       Project:  Declaration to support claim construction

L41.   2021    **Carter Arnett**
       Case:    <u>Correct Transmission LLC</u> v. Adtran, Inc. and Juniper Networks, Inc.
               Western district of Texas, Waco division, Case No. 6:20-cv-669-ADA
       Matter:  Patent infringement, telecommunication systems
       Project:  Source code review, declaration to support claim construction

L42.   2021    **Fish & Richardson, P.C.**
       Case:    <u>Quectel Wireless Solutions Co. Ltd.</u> v. Koninklijke Philips N.V.
               IPR2021-00558, IPR2021-00559, IPR2021-00561
       Matter:  *Inter Partes* Review, wireless communication systems
       Project:  Three declarations to support 3 IPR petitions, declaration to support
                reply, 2 depositions

L43.   2021    **Goldberg Kohn Ltd**
       Case:    United States ex. rel. <u>Todd Heath</u> v. Wisconsin Bell, Inc
               District of Columbia, Case No. 11-cv-01897
       Matter:  Networking systems
       Project:  Technology consulting

L44.   2021    **Fish & Richardson, P.C.**
       Case:    <u>Samsung Electronics Co. Ltd.</u> v. Ericsson Inc.
               IPR2021-00447, IPR2021-00588, IPR2021-00613, IPR2021-00614,
               IPR2021-00643, IPR2021-00645, IPR2021-00684
       Matter:  *Inter Partes* Review, wireless communication systems
       Project:  Seven declarations to support 7 IPR petitions

L45.   2020    **Kilpatrick Townsend & Stockton LLP**
       Case:    <u>GREE Inc.</u> v. Supercell Oy
               Eastern district of Texas, Marshall division, Case No. 2:19-cv-00413-
               JRG-RSP
       Matter:  Patent infringement, mobile gaming

|        | Project: | Source code review, infringement expert report, supplemental expert report, validity expert report, deposition |
|--------|----------|---|

L46.   2020   **Banner Witcoff**
         Case:     Sisvel International S.A., 3G Licensing S.A. v. <u>ZTE (USA) Inc.</u> et al. Northern district of Texas, Case No. 3:19-cv-01694-N
         Matter:   Patent infringement, wireless communication systems
         Project:  Declaration to support claim construction, deposition

L47.   2020   **Fish & Richardson, P.C.**
         Case:     Cellco Partnership D/B/A Verizon Wireless v. <u>Huawei Technologies Co., Ltd</u>
                   IPR2020-01352, IPR202-01356, IPR2020-01357
         Matter:   *Inter Partes* Review, network communication systems
         Project:  Three declarations to support 3 Patent Owner' responses

L48.   2020   **Kilpatrick Townsend & Stockton LLP**
         Case:     <u>GREE Inc.</u> v. Supercell Oy
                   Eastern district of Texas, Marshall division, Case No. 2:20-cv-00113-JRG-RSP
         Matter:   Patent infringement, mobile gaming
         Project:  Source code review, declaration supporting claim construction, infringement expert report, validity expert report, supplemental report, deposition

L49.   2020   **Kilpatrick Townsend & Stockton LLP**
         Case:     <u>GREE Inc.</u> v. Supercell Oy
                   Eastern district of Texas, Marshall division, Case No. 2:19-cv-00200-JRG-RSP, Case No. 2:19-cv-00237-JRG-RSP, Case No. 2:19-cv-00310-JRG-RSP; Case No. 2:19-cv-00311-JRG-RSP
         Matter:   Patent infringement, mobile gaming
         Project:  Source code review, four infringement expert reports, two supplemental infringement expert reports, four validity expert reports, two supplemental expert reports, two second supplemental expert reports, 3-day deposition, jury trial testimony

L50.   2020   **Sheridan Ross P.C.**
         Case:     <u>Justservice.net LLC</u> v. Dropbox, Inc.
                   Western district of Texas, Waco division, Case No. 6:20-CV-00070-ADA
         Matter:   Patent infringement, computer systems and networking
         Project:  Source code review, declaration regarding claim construction

L51.   2020   **Perkins Coie LLP**
      Case:   <u>Huizhou TCL Mobile Communication Co. Ltd., TCT Mobile (US) Inc., and TCL Mobile Communication (HK) Co., Ltd.</u> v. Wi-LAN Inc.
      Matter:   *Ex Partes* Reexamination, QoS enhancements for wireless IP networks
      Project:   Declaration to support Requesters

L52.   2020   **Perkins Coie LLP**
      Case:   <u>Intel Corporation</u> v. UNM Rainforest Innovations
               IPR2020-01576, IPR2020-01578, IPR2020-*to be assigned*
      Matter:   *Inter Partes* Review, wireless broadband
      Project:   Three declarations to support three IPR petitions

L53.   2020   **Calfee, Halter & Griswold LLP**
      Case:   Motorola Solutions, Inc. v. <u>Hytera Communications Corp. Ltd. et al.</u>
               Northern district of Illinois, Case No. 1:17-cv-01972
      Matter:   Patent infringement, two-way radios
      Project:   Declaration regarding claim construction, deposition

L54.   2020   **Fish & Richardson, P.C.**
      Case:   <u>Huawei Technologies Co., Ltd et al.</u> v. Verizon Communications, Inc. et al.
               Western district of Texas, Waco division, Case No. 6-20-cv-00090
      Matter:   Patent infringement, video communication
      Project:   Source code review, declaration regarding claim construction, infringement expert report, validity expert report, deposition

L55.   2020   **Kilpatrick Townsend & Stockton LLP**
      Case:   <u>GREE Inc.</u> v. Supercell Oy
               Eastern district of Texas, Marshall division, Case No. 2:19-cv-00070-JRG-RSP, Case No. 2:19-cv-00071-JRG-RSP
      Matter:   Patent infringement, mobile gaming
      Project:   Source code review, two infringement expert reports, two supplemental infringement expert reports, two second supplemental infringement expert reports, two rebuttal expert reports on validity, two-day deposition, seven declarations supporting Gree's opposition to Supercell's motions for summary judgement, jury trial testimony

L56.   2020   **Cooley LLP**
      Case:   Saint Lawrence Communications, LLC v. <u>Amazon.com, Inc., et al.</u>
               Eastern district of Texas, Marshall division, Case No. 2:19-cv-00027-JRG
      Matter:   Patent infringement, AMR-WB, speech compression, coding and decoding
      Project:   Invalidity expert report

L57.  2020  **Prince Lobel Tye LLP**
      Case:  Intellectual Ventures I and II LLC v. VMware, Inc.
             Western district of Texas, Austin division, Case No. 1:19-cv-01075-ADA
      Matter:  Patent infringement, networking systems
      Project:  Declaration to support claim construction

L58.  2020  **Gibson, Dun & Crutcher LLP**
      Case:  Cellular Evolution LLC v. T-Mobile US, Inc. et al.
             Eastern district of Texas, Marshall division, Case No. 2:19-cv-232-JRG
      Matter:  Patent infringement, cellular systems
      Project:  Invalidity consulting

L59.  2020  **Faegre Baker Daniels LLP**
      Case:  CommScope, Inc. v. Rosenberger Technology, et al.
             District of New Jersey, Case No. 19-cv-15962-MCA-LDW
      Matter:  Trade secret software, base station antenna design
      Project:  Declaration, deposition

L60.  2020  **Ropes & Gray LLP**
      Case:  Canon, Inc. v. TCL Electronics Holdings Ltd., et al.
             Eastern district of Texas, Marshall division, Case No. 2:18-cv-546-JRG
      Matter:  Patent infringement, communication interfaces
      Project:  Source code review, declaration to support claim construction, deposition

L61.  2019  **Perkins Coie LLP**
      Case:  Huizhou TCL Mobile Communication Co. Ltd., TCT Mobile (US) Inc., and TCL Mobile Communication (HK) Co., Ltd. v. Wi-LAN Inc. IPR2020-00302, IPR2020-00303
      Matter:  *Inter Partes* Review, QoS enhancements for wireless IP networks
      Project:  Two declarations to support two IPR petitions

L62.  2019  **Fish & Richardson**
      Case:  Bell Northern Research v. Huawei, et al.
             Southern district of California, Case No. 3:18-cv-1784-CAB-BLM
      Matter:  Patent infringement, wireless networks
      Project:  Invalidity consulting

L63.  2019  **K & L Gates LLP**
      Case:  EVS CODEC Technologies, LLC and Saint Lawrence Communications, LLC v. ZTE Corporation, et al.
             Northern district of Texas, Dallas division, Case No. 3:19-cv-00385-MBH
      Matter:  Patent infringement, EVS, speech compression, coding and decoding

|  | Project: | Invalidity expert report |
|---|---|---|

L64.  2019  **Feinberg Day Alberti Lim & Belloli LLP**
     Case:  <u>Uniloc 2017 LLC</u> v. AT&T Mobility LLC, et al.
               Eastern district of Texas, Marshall division, Case No. 2:18-cv-00514-JRG
     Matter:  Patent infringement, wireless frequency bands and devices
     Project:  Two declarations to support claim construction, deposition

L65.  2019  **Susman Godfrey LLP**
     Case:  <u>Sol IP, LLC</u> v. AT&T Mobility LLC, et al.
               Eastern district of Texas, Marshall division, Case No. 2:18-cv-00526; 2:18- cv-00527; and 2:18-cv-00528
     Matter:  Patent infringement, Wi-Fi and LTE
     Project:  Validity consulting

L66.  2019  **Ropes & Gray LLP**
     Case:  <u>Huawei Technologies Co. Ltd.</u> v. Harris Global Communications, Inc. IPR2019-01512, IPR2019-01631
     Matter:  *Inter Partes* Review, routing and security in wireless networks
     Project:  Two declarations to support two IPR petitions

L67.  2019  **Ropes & Gray LLP**
     Case:  Harris Corporation v. <u>Huawei Device USA, Inc. et al.</u>
               Eastern district of Texas, Marshall division, Case No. 2:18-cv-00439-JRG
     Matter:  Patent infringement, routing and security in wireless networks
     Project:  Declaration to support claim construction

L68.  2019  **Erise IP**
     Case:  Semcon IP Inc. v. <u>ASUSTeK Computer Inc.</u>
               Eastern district of Texas, Marshall division, Case No. 2:18-cv-00193-JRG
     Matter:  Patent infringement, adaptive power control
     Project:  Non-infringement expert report

L69.  2019  **Cooley LLP**
     Case:  <u>Facebook Inc.</u> v. BlackBerry Corp. et al.
               Northern District of California, Oakland division, Case No. 4:18-cv-05434-JSW
     Matter:  Patent infringement, mobile computing
     Project:  Declaration to support claim construction

L70.    2019    **Sidley Austin LLP**
        Case:   Semcon IP Inc. v. <u>Amazon.com, Inc.</u>
                Eastern district of Texas, Marshall division, Case No. 2:18-cv-00192-JRG
        Matter: Patent infringement, adaptive power control
        Project: Expert report regarding patent marking, rebuttal report regarding patent marking, deposition

L71.    2019    **Oblon, McClelland, Maier & Neustadt, LLP**
        Case:   MV3 Partners LLC v. <u>Roku, Inc.</u>
                Western district of Texas, Waco division, Case No. 6:18-cv-308-ADA
        Matter: Patent infringement, mobile set top box
        Project: Declaration to support claim construction, deposition, Markman hearing testimony

L72.    2019    **Banner & Witcoff, LTD.**
        Case:   <u>Kathrein USA, Inc</u>. v. Fractus S.A.
                IPR2019-00954, IPR2019-00955, IPR2019-00956, IPR2019-00957
        Matter: *Inter Partes* Review, multiband antenna arrays
        Project: Four declarations to support four IPR petitions

L73.    2019    **Fish & Richardson, P.C.**
        Case:   <u>LG Electronics Inc</u>. v. Saint Lawrence Communications LLC
                Southern district of New York, Case No. 1:18-cv-11082-DLC
        Matter: Patent infringement, EVS, speech compression, coding and decoding
        Project: Declaration relating to motion for summary judgment, expert report, deposition

L74.    2019    **Ropes & Gray LLP**
        Case:   SIPCO, LLC v. <u>Emerson Electric Co.</u>
                In the Matter of Certain Wireless Mesh Networking Products and Related Components Thereof, ITC Investigation No. 337-TA-1131
        Matter: Patent infringement, links in wireless networks and remote monitoring
        Project: Source code review, declaration to support claim construction, invalidity expert report, rebuttal expert report regarding non-infringement and no domestic industry

L75.    2019    **Fish & Richardson, P.C.**
        Case:   Maxell Ltd. v. <u>Huawei Technologies Co. Ltd.</u>, <u>ZTE</u>, et al.
                Eastern district of Texas, Texarkana division, Case No. 5:18-cv-0033-RWS
        Matter: Patent infringement, portable computing devices
        Project: Declaration regarding claim construction

L76.    2019    **Ropes & Gray LLP**
        Case:   <u>Emerson Electric Co.</u> v. SIPCO, LLC
                IPR2019-00548, IPR2019-00549
        Matter: *Inter Partes* Review, routing in wireless networks
        Project: Two declarations to support two IPR petitions

L77.    2018    **Mishcon de Reya New York LLP; King & Wood Mallesons LLP**
        Case:   <u>ChanBond, LLC</u> v. Cox Communications, Inc.
                District of Delaware, Case No. 1:15-cv-00849-RGA
        Matter: Patent infringement, wideband signal distribution system
        Project: Validity expert report, deposition, sur-reply expert report, second sur-reply expert report, second deposition, jury trial with settlement mid-trial

L78.    2018    **Fish & Richardson, P.C.**
        Case:   In re: Qualcomm Antitrust Litigation (Client: <u>Apple</u>)
                Southern district of California, Case No. 3:17-cv-00108-GPC-MDD
        Matter: Qualcomm antitrust litigation
        Project: Two expert rebuttal reports, deposition

L79.    2018    **Susman Godfrey LLP**
        Case:   In re: Qualcomm Antitrust Litigation (Client: <u>Class Action</u>)
                Northern district of California, Case No. 5:17-md-02773-LHK
        Matter: Qualcomm antitrust litigation
        Project: Expert declaration on standard essential patents, expert report on deemed essential patents, rebuttal expert report, deposition

L80.    2018    **284 Partners**
        Case:   <u>Federal Trade Commission.</u> v. Qualcomm Incorporated
                Northern district of California, Case No. 5:17-cv-00220
        Matter: Qualcomm antitrust litigation
        Project: Expert report on standard essential patents, expert rebuttal report, deposition

L81.    2018    **Vorys, Sater, Seymour and Pease LLP**
        Case:   <u>Route1 Inc.</u> v. Airwatch LLC
                District of Delaware, Case No. 17-331-RGA
        Matter: Patent infringement, remote access
        Project: Source code review, declaration regarding claim construction, infringement expert report, validity expert report, reply expert report, deposition, three declarations regarding re-exam

L82.    2018    **Sidley Austin LLP**
        Case:   Samsung Electronics Co., Ltd v. <u>Huawei Technologies Co., Ltd.</u>
                IPR2017-01471, IPR2017-01474, IPR2017-01475
        Matter: *Inter Partes* Review, 4G/LTE

|  | Project: | Three declarations to support three Patent Owner's responses, supplemental declaration, deposition |

L83. 2018 **Fitzpatrick Cella Harper & Scinto**
Case: IPC Systems, Inc. v. Cloud9 Technologies, LLC
District of Delaware, Case No. 16-cv-443-GMS
Matter: Patent infringement, telephone stations and trading turrets
Project: Source code review, declaration regarding claim construction, supplemental declaration regarding claim construction

L84. 2018 **Haynes and Boone, LLP**
Case: LG Electronics Inc., et al. v. Wi-LAN Inc., et al.
IPR2018-00673, IPR2018-00674, IPR2018-00704, IPR2018-00705, IPR2018-00709, IPR2018-00710
Matter: *Inter Partes* Review, bandwidth allocation
Project: Six declarations to support six IPR petitions, two depositions, two reply declarations

L85. 2018 **Pillsbury Winthrop Shaw Pittman LLP**
Case: Cellular Communications Equipment v. ZTE, HTC Corporation, et al.
Eastern district of Texas, Case No. 6:16-cv-475-RWS
Matter: Patent infringement, LTE, power control, emergency notification
Project: Invalidity expert report, deposition

L86. 2018 **Finnegan Henderson Farabow Garrett & Dunner LLP**
Case: FanDuel, Inc. DraftKings, Inc., and Bwin.Party Digital Entertainment PLC. v. CG Technology Development, LLC
IPR2017-00902, IPR2017-01333, IPR2017-01491, IPR2017-01532
Matter: *Inter Partes* Review, location-based gaming
Project: Four declarations to support four Patent Owner's responses, two supplemental declarations, four depositions

L87. 2018 **Calfee, Halter & Griswold LLP**
Case: Hytera Communications Corp. Ltd. v. Motorola Solutions, Inc.
Northern district of Ohio, Case No. 1:17-cv-01794-DNC
Matter: Patent infringement, two-way radios
Project: Source code review, declaration regarding claim construction, rebuttal declaration regarding claim construction, deposition, infringement expert report, validity expert report, two-day deposition

L88. 2017 **Covington & Burling LLP**
Case: Sharp Corporation, et al. v. Hisense Co., Ltd., et al.
In the Matter of Certain Wi-Fi Enabled Electronic Devices and Components Thereof, ITC Investigation No. 337-TA-1072
Matter: Patent infringement, Wi-Fi, OFDMA
Project: Declaration regarding claim construction

L89.   2017        **Vorys, Sater, Seymour and Pease LLP**
       Case:        Airwatch LLC and VMWare Inc. v. <u>Route1 Inc.</u>
                    IPR2017-02145
       Matter:      *Inter Partes* Review, remote access
       Project:     Declaration to support Patent Owner's response

L90.   2017        **Arnold & Porter Kaye Scholer**
       Case:        Uniloc USA, Inc. v. <u>Google, Inc.</u>
                    Eastern district of Texas, Marshall division, Case No. 2:17-cv-0214-JRG, 2:17-cv-0224-JRG, 2:17-cv-0231-JRG, 2:17-cv-0465-JRG, 2:17-cv-0466-JRG, 2:17-cv-0467JRG
       Matter:      Patent infringement, VoIP messaging
       Project:     Invalidity consulting

L91.   2017        **Simpson Thacher & Bartlett LLP**
       Case:        XR Communications, LLC. v. <u>Ubiquiti Networks, Inc.</u>
                    Central district of California, Case No. 2:17-cv-02968-AG(JCGx)
       Matter:      Patent infringement, Wi-Fi and adaptive antennas
       Project:     Declaration regarding claim construction, deposition

L92.   2017        **Covington & Burling LLP**
       Case:        <u>Huawei Device USA Inc.</u> v. Hitachi Maxell, Ltd.
                    IPR2018-00209, IPR2018-00210
       Matter:      *Inter Partes* Review, base station selection, GPS/Cellular location
       Project:     Two declarations to support two IPR petitions

L93.   2017        **Calfee, Halter & Griswold LLP**
       Case:        <u>Hytera Communications Corp. Ltd.</u> v. Motorola Solutions, Inc.
                    IPR2018-00128, IPR2017-02183
       Matter:      *Inter Partes* Review, two-way radios
       Project:     Declaration to support IPR petition, deposition, two supplemental declarations, two depositions

L94.   2017        **Finnegan Henderson Farabow Garrett & Dunner LLP**
       Case:        <u>Hytera Communications Corp. Ltd.</u> v. Motorola Solutions, Inc.
                    IPR2017-02179, IPR2017-02183
       Matter:      *Inter Partes* Review, two-way radios
       Project:     Two declarations to support two IPR petitions, deposition

L95.   2017        **Mayer Brown LLP**
       Case:        <u>Silver Spring Networks, Inc.</u> v. Sunrise Technologies, Inc.
                    <u>Silver Spring Networks, Inc.</u> v. Weatherproof Wireless, LLC
                    IPR2017-*To Be Assigned*, IPR2017-*To Be Assigned*
       Matter:      *Inter Partes* Review, power meter
       Project:     Two declarations to support two IPR petitions

L96.  2017  **Covington & Burling LLP**
      Case:  Hitachi Maxell, Ltd. v. <u>Huawei Device USA Inc. et al.</u>
             Eastern district of Texas, Texarkana division, Case No. 5:16-cv-00178-RWS
      Matter:  Patent infringement, 3G/4G
      Project:  Source code review, declaration regarding claim construction, invalidity expert report, non-infringement expert report, non-infringing alternatives expert report, two depositions

L97.  2017  **Finnegan Henderson Farabow Garrett & Dunner LLP**
      Case:  <u>LG Electronics, Inc. et al.</u> v. BLU Products, Inc. and CT Miami, LLC
             In the Matter of Certain LTE Wireless Communication Devices and Components Thereof, ITC Investigation No. 337-TA-1051
      Matter:  Patent infringement, 4G/LTE
      Project:  Declaration regarding claim construction, second declaration regarding claim construction

L98.  2017  **Sidley Austin LLP**
      Case:  <u>Huawei Technologies Co., Ltd.</u> v. Samsung Electronics Co., Ltd.
             IPR2017-01979, IPR2017-01980, IPR2017-01986
      Matter:  *Inter Partes* Review, 4G/LTE
      Project:  Three declarations to support three IPR petitions, deposition

L99.  2017  **Finnegan Henderson Farabow Garrett & Dunner LLP**
      Case:  Motorola Solutions, Inc. v. <u>Hytera Communications Corp. Ltd. et al.</u>
             In the Matter of Certain Two-way Radio Equipment Systems, Related Software and Components Thereof, ITC Investigation No. 337-TA-1053
      Matter:  Patent infringement, two-way radio
      Project:  Source code review, declaration regarding claim construction, invalidity expert report, non-infringement expert report, deposition, ITC hearing testimony

L100. 2017  **Haynes and Boone, LLP**
      Case:  <u>Rackspace US, Inc.</u> v. Realtime Data LLC
             IPR2017-01691
      Matter:  *Inter Partes* Review, data compression
      Project:  Declaration to support IPR petition

L101. 2017  **Pillsbury Winthrop Shaw Pittman LLP**
      Case:  <u>ZTE (USA)</u>, <u>HTC Corporation</u>, et al. v. Cellular Communications Equipment
             IPR2017-01508, IPR2017-01509
      Matter:  *Inter Partes* Review, LTE, power control, emergency notification
      Project:  Two declarations to support two IPR petitions, two depositions

L102.  2017  **Alston & Bird LLP; Womble Carlyle Sandridge & Rice LLP**
   Case: Itron, Inc. and Duke Energy Corp. v. Smart Meter Technologies
      IPR2017-01199
   Matter: *Inter Partes* Review, power meter
   Project: Declaration to support IPR petition, deposition

L103.  2017  **Haynes and Boone, LLP**
   Case: Ericsson Inc. v. Regents of the University of Minnesota
      IPR2017-01186, IPR2017-01200, IPR2017-01213
   Matter: *Inter Partes* Review, OFDM and MIMO
   Project: Three declarations to support three IPR petitions

L104.  2017  **Quinn Emanuel Urquhart & Sullivan, LLP**
   Case: GENBAND US, LLC v. Metaswitch Networks Ltd, et al.
      Eastern district of Texas, Marshall division, Case No. 2:16-cv-582-
      JRG-RSP
   Matter: Patent infringement, Internet protocols and VoIP
   Project: Expert report regarding essentiality

L105.  2017  **Mayer Brown LLP**
   Case: Uniloc USA, Inc. et al. v. Avaya Inc., ShoreTel, Inc., et al.
      Eastern district of Texas, Tyler division, Case No. 6:15-cv-1168-JRG
   Matter: Patent infringement, instant messaging and conference calling
   Project: Source code review, non-infringement consulting

L106.  2017  **Fish & Richardson P.C.**
   Case: Nokia Solutions and Networks US LLC, et al. v. Huawei
      Technologies Co. Ltd., et al.
      Eastern district of Texas, Marshall division, Case Nos. 2:16-cv-753-
      JRG-RSP, 2:16-cv-754
   Matter: Patent infringement, 4G/LTE
   Project: Claim construction, two declarations

L107.  2017  **Rothwell Figg Ernst & Manbeck, PC; Pepper Hamilton LLP**
   Case: Samsung Electronics, et al. v. Rembrandt Wireless Technologies, LP
      IPR2015-00555
   Matter: *Ex Parte* Reexamination, Bluetooth
   Project: Two declarations to support two Patent Owner's responses,
      supplemental declaration to support Patent Owner's reply

L108.  2016      **Sidley Austin LLP**
       Case:     <u>Huawei Technologies Co., et al.</u> v. Samsung Electronics Co, et al. and
                 Samsung Research America v. <u>Hisilicon Technologies Co, LTD</u>
                 Northern district of California, San Francisco division, Case No. 3:16-
                 cv-2787-WHO
       Matter:   Patent infringement, 3G/4G/LTE
       Project:  Source code review, declaration regarding claim construction,
                 declaration opposing summary judgement, infringement expert report,
                 invalidity expert report, non-infringement expert report, validity
                 expert report, two depositions

L109.  2016      **Bragalone Conroy PC**
       Case:     <u>Securus Technologies, Inc.</u> v. Global Tel*Link Corporation
                 CBM2017-00034
       Matter:   Covered Business Method Review, call monitoring and recording
       Project:  Declaration to support CBM petition, deposition

L110.  2016      **Braxton, Hilton & Perrone PLLC**
       Case:     <u>Biosonix, LLC.</u> v. Hydrowave, LLC et al.
                 Eastern district of Texas, Case No. 2:16-cv-139-RC
       Matter:   Patent infringement, underwater transceivers
       Project:  Claim construction, Markman hearing testimony

L111.  2016      **Gray Reed & McGraw**
       Case:     <u>Optis Cellular Technology, LLC and PanOptis Patent Management,</u>
                 <u>LLC.</u> v. Blackberry Corporation, et al.
                 Eastern district of Texas, Marshall division, Case No. 2:16-cv-59-
                 JRG-RSP, Case No. 2:16-cv-61-JRG-RSP, Case No. 2:16-cv-62-JRG-
                 RSP
       Matter:   Patent infringement, LTE
       Project:  Claim construction, three declarations regarding claim construction,
                 deposition

L112.  2016      **Ropes & Gray LLP; Davidson Berquist Jackson & Gowdey**
       Case:     SIPCO, LLC et al v. <u>Emerson Electric Co. et al</u>
                 Eastern district of Texas, Tyler division, Case No. 6:15-cv-907
                 <u>Emerson Electric Co. et al</u> v. SIPCO, LLC et al.
                 Northern district of Georgia, Atlanta division, Case No. 1:15-cv-
                 00319-AT
       Matter:   Patent infringement, links in wireless networks and remote monitoring
       Project:  Source code review, invalidity consulting

L113.  2016      **McKool Smith**
       Case:     Regents of University of Minnesota v. <u>AT&T Mobility LLC</u>, et al.
                 District of Minnesota, Case No. 0:14-cv-04666-JRT-TNL
       Matter:   Patent infringement, LTE and MIMO

|  | Project: | Non-infringement and invalidity consulting |
|---|---|---|

L114. 2016 **EIP US LLP**
    Case: GENBAND US, LLC et al. v. <u>Metaswitch Networks Ltd</u> IPR2015-01456, IPR2015-01457
    Matter: *Inter Partes* Review, media gateways
    Project: Two declarations to support Patent Owner's responses, two depositions

L115. 2016 **Haynes and Boone, LLP**
    Case: Cox Communications, Inc. v. <u>AT&T Intellectual Property I, II, LP</u> IPR2015-01187, IPR2015-01227, IPR2015-01273, IPR2015-01536
    Matter: *Inter Partes* Review, cable networks
    Project: Four declarations to support Patent Owner's responses, four depositions

L116. 2016 **Mayer Brown LLP**
    Case: Odyssey Wireless v. <u>Motorola Mobility LLC</u>
    Eastern district of North Carolina, Western division, Case No. 5:14-cv-491-D
    Southern district of California, Case No. 3:15-cv-01741-H-RBB
    Matter: Patent infringement, LTE
    Project: Source code review, non-infringement consulting

L117. 2016 **Cooley LLP; Finnegan LLP**
    Case: Saint Lawrence Comm. LLC v. <u>Motorola Mobility LLC</u>, <u>ZTE (USA) Inc.</u>, et al.
    Eastern district of Texas, Marshall division, Case No. 2:15-cv-000351-JRG, Case No. 2:15-cv-000349-JRG
    Matter: Patent infringement, speech compression, coding and decoding
    Project: Invalidity expert report, expert report regarding AMR-WB standard, expert report regarding Opus and Silk, supplemental expert report regarding invalidity, two-day depositions, jury trial testimony for Motorola

L118. 2015 **Sidley Austin LLP**
    Case: Evolved Wireless, LLC v. <u>Microsoft Corp, et al.</u>
    District of Delaware, Case No. 15-cv-546
    Matter: Patent infringement, LTE
    Project: Prior art and invalidity consulting

L119.   2015        **McKool Smith**
        Case:      <u>Optis Wireless Technology, LLC and PanOptis Patent Management, LLC.</u> v. ZTE Corporation and ZTE (USA) Inc.
                   Eastern district of Texas, Marshall division, Case No. 2:15-cv-300-JRG-RSP
        Matter:    Patent infringement, cellular messages and multimedia attachments
        Project:   Source code review, claim construction, declaration

L120.   2015        **Fish & Richardson, P.C.**
        Case:      Saint Lawrence Comm. LLC v. <u>LG Elec., Inc. et al.</u>
                   Eastern district of Texas, Marshall division, Case No. 2:14-cv-1055-JRG
        Matter:    Patent infringement, speech compression, coding and decoding
        Project:   Invalidity expert report

L121.   2015        **Finnegan Henderson Farabow Garrett & Dunner LLP**
        Case:      <u>LG Electronics, Inc.</u> v. Cellular Communications Equipment LLC
                   IPR2016-00178
        Matter:    *Inter Partes* Review, LTE
        Project:   Declaration to support IPR petition

L122.   2015        **McKool Smith**
        Case:      <u>AT&T, et al.</u> v. Cox Communication, Inc., et al.
                   District of Delaware, Case No. 14-1106-GMS
        Matter:    Patent infringement, cable networks
        Project:   Claim construction, declaration

L123.   2015        **McKool Smith**
        Case:      <u>Ericsson Inc., et al.</u> v. TCL Communication, et al.
                   Eastern district of Texas, Marshall division, Case No. 2:15-cv-00011-RSP
        Matter:    Patent infringement, wireless devices and systems
        Project:   Source code review, claim construction, declaration, infringement expert report, validity expert report, two-day depositions

L124.   2015        **Foley & Lardner LLP**
        Case:      <u>Kyocera Communications, Inc.</u> v. Cellular Communications Equipment LLC
                   IPR2015-01559, IPR2015-01564
        Matter:    *Inter Partes* Review, LTE, power control, emergency notification
        Project:   Two declarations to support two IPR petitions

L125.   2015        **Fish & Richardson, P.C.**
        Case:      Fairfield Industries Inc. v. <u>Wireless Seismic, Inc.</u>
                   Southern district of Texas, Case No. 4:14-cv-02972-KPE
        Matter:    Patent infringement, wireless sensor networks

|           | Project: | Non-infringement expert report |

**L126.** 2015     **Quinn Emanuel Urquhart & Sullivan, LLP**
Case:     GENBAND US, LLC v. Metaswitch Networks Ltd, et al.
Eastern district of Texas, Marshall division, Case No. 2:14-cv-33-JRG-RSP
Matter:     Patent infringement, Internet protocols and VoIP
Project:     Expert report regarding essentiality, non-infringement expert report, rebuttal expert report regarding non-practice, supplemental rebuttal expert report, three-day depositions, jury trial testimony

**L127.** 2015     **Duane Morris LLP; Foley & Lardner LLP**
Case:     Mobile Telecommunications Technologies, LLC v. Leap Wireless International, Cricket Communications, Inc.
Eastern district of Texas, Marshall division, Case No. 2:13-cv-00885-RSP
Matter:     Patent infringement, OFDM and MIMO
Project:     Non-infringement expert report, deposition

**L128.** 2015     **Hogan Lovells US LLP; Kenyon & Kenyon LLP**
Case:     One-E-Way v. Beats Electronics, LLC, Sony Corporation, et al.
In the Matter of Certain Wireless Headsets, ITC Investigation No. 337-TA-943
Matter:     Patent infringement, wireless communication
Project:     Claim construction, declaration

**L129.** 2015     **McKool Smith**
Case:     Solocron Media, LLC v. AT&T Inc., et al.
Eastern district of Texas, Marshall division, Case No. 2:13-cv-1059-JRG
Matter:     Patent infringement, ringtone download
Project:     Claim construction, invalidity expert report

**L130.** 2015     **EIP US LLP**
Case:     Good Technology Software, Inc. v. Mobile Iron, Inc.
IPR2015-00833, IPR2015-00836, IPR2015-01090
Matter:     *Inter Partes* Review, software management in wireless devices
Project:     Three declarations to support three IPR petitions

**L131.** 2015     **McKool Smith**
Case:     AirWatch LLC v. Good Technology Corp
Northern district of Georgia, Case No. 1:14-cv-02281-SCJ
Matter:     Patent infringement, software management in wireless devices
Project:     Claim construction, declaration

L132. 2015   **Simpson Thacher & Bartlett LLP**
      Case:     IXI Mobile (R&D) Ltd. et al. v. Apple Inc.
               Southern district of New York, Case No. 14-cv-7594-RJS
      Matter:   Patent infringement, PDA and Bluetooth
      Project:  Invalidity consulting

L133. 2014   **Bragalone Conroy PC**
      Case:     Global Tel*Link Corporation v. Securus Technologies, Inc.
               IPR2014-00785, IPR2014-00810, IPR2014-00824, IPR2014-00825, IPR2014-01278, IPR2014-01282, IPR2014-01283
      Matter:   *Inter Partes* Review, VoIP call monitoring and recording, allocating telecommunication resources and information systems
      Project:  Seven declarations to support seven Patent Owner's responses, five depositions

L134. 2014   **Orrick, Herrington & Sutcliffe LLP**
      Case:     Shopkick, Inc. v. Novitaz, Inc.
               IPR2015-00277, IPR2015-00278
      Matter:   *Inter Partes* Review, wireless customer service management
      Project:  Two declarations to support two IPR petitions

L135. 2014   **Paul Hastings LLP**
      Case:     Cellular Communications Equipment LLC v. AT&T, et al.
               Eastern district of Texas, Tyler division, Case No. 6:13-cv-507-LED (Lead Case for Consolidation)
      Matter:   Patent infringement, 3G cellular communication
      Project:  Claim construction, declaration

L136. 2014   **Baker Botts LLP**
      Case:     Orlando Communications LLC v. AT&T, et al.
               M.D. Florida, Case No. 6:14-cv-01021
      Matter:   Patent infringement, 3G/4G cellular communication
      Project:  Non-infringement and claim construction consulting

L137. 2014   **EIP US LLP**
      Case:     Good Technology Software, Inc. v. AirWatch, LLC
               IPR2015-00248, IPR2015-00875
      Matter:   *Inter Partes* Review, software management in wireless devices
      Project:  Two declarations to support two IPR petitions

L138. 2014   **Bragalone Conroy PC**
      Case:     Securus Technologies, Inc. v. Global Tel*Link Corporation
               IPR2015-00153, IPR2015-00155, IPR2015-00156
      Matter:   *Inter Partes* Review, VoIP call monitoring and recording
      Project:  Three declarations to support three IPR petitions, two depositions

L139.  2014    **Andrews Kurth LLP**
Case:    <u>Sony Mobile Communications (USA)</u> v. Adaptix Inc.
IPR2014-01524, IPR2014-01525
Matter:  *Inter Partes* Review, subcarrier selection in LTE
Project: Two declarations to support two IPR petitions, deposition

L140.  2014    **Steptoe & Johnson LLP; Baker & McKenzie LLP**
Case:    <u>VTech Communications, Inc. and Uniden America Corporations</u> v. Spherix Incorporated
IPR2014-01432
Matter:  *Inter Partes* Review, IP telephony
Project: Declaration to support IPR petition, deposition, reply declaration, deposition

L141.  2014    **Steptoe & Johnson LLP; Baker & McKenzie LLP**
Case:    Spherix Inc. v. <u>VTech Telecommunications Ltd., et al.</u>
Spherix Inc. v. <u>Uniden Corp, et al.</u>
Northern district of Texas, Dallas Division, Case No. 3:13-cv-3494 and 3:13-cv-3496
Matter:  Patent infringement, IP telephony
Project: Claim construction, declaration, deposition

L142.  2014    **McKool Smith**
Case:    <u>Good Technology Corp.</u> v. MobileIron, Inc.
Northern district of California, Case No. 5:12-cv-05826-PSG
Matter:  Patent infringement, software management in wireless devices
Project: Claim construction, three declarations, claim invalidity expert report, non-infringement expert report, deposition, jury trial testimony

L143.  2014    **Lee & Hayes**
Case:    Broadcom Corp. v. <u>Ericsson, Inc.</u>
IPR2013-00601, IPR2013-00602, and IPR2013-00636
Matter:  *Inter Partes* Review, ARQ protocols
Project: Three declarations to support Patent Owner's responses, two declarations to support Patent Owner's Motion to Amend, deposition, two reply declarations

L144.  2014    **Sidley Austin LLP**
Case:    Adaptix, Inc. v. <u>Huawei Technologies Co.</u>, et al.
Eastern district of Texas, Case No. 6:13-cv-00438, 439, 440 and 441
Matter:  Patent infringement, subcarrier selection in LTE
Project: Source code review, non-infringement consulting

L145.  2014    **Finnegan Henderson Farabow Garrett & Dunner LLP**
Case:    Cell and Network Selection LLC v. <u>Huawei Technologies Co.</u>, et al.
Eastern district of Texas, Case No. 6:13-cv-00404-LED-JDL

|       |       |                                                                      |
|-------|-------|----------------------------------------------------------------------|
|       | Matter: | Patent infringement, base station selection in LTE                 |
|       | Project: | Non-infringement consulting                                         |

L146.  2014  **Feinberg Day Alberti & Thompson LLP**
Case:  DSS Technology Management, Inc. v. Apple Inc.
Eastern district of Texas, Tyler division, Case No. 6:13-cv-00919-JDL
Matter:  Patent infringement, PDA and Bluetooth
Project:  Claim construction and invalidity consulting

L147.  2014  **Sheppard Mullin Richter & Hampton LLP**
Case:  Digcom Inc. v. ZTE (USA), Inc.
District of Nevada, Case No. 3:13-cv-00178-RCJ-WGC
Matter:  Patent infringement, cellular communication
Project:  Claim construction consulting

L148.  2014  **Lott & Fischer**
Case:  Zenith Electronics, LLC, et al. v. Craig Electronics, Inc.
Southern district of Florida, Case No. 9:13-cv-80567-DMM/DLB
Matter:  Patent infringement, HDTV transmission and reception
Project:  Opening expert report regarding nonessentiality

L149.  2013  **McKool Smith**
Case:  Zenith Electronics, LLC, et al. v. Curtis International Ltd.
Southern district of Florida, Case No. 9:13-cv-80568-DMM/DLB
Matter:  Patent infringement, HDTV transmission and reception
Project:  Claim construction, declaration, deposition

L150.  2013  **Gibson Dunn**
Case:  Straight Path IP Group v. Sharp Corp. and Sharp Electronics Corp.
In the Matter of Certain Point-to-Point Network Communication
Devices and Products Containing Same, ITC Investigation No. 337-TA-892
Matter:  Patent infringement, point-to-point network communication
Project:  Non-infringement consulting

L151.  2013  **Kilpatrick Townsend & Stockton LLP; Cooley LLP**
Case:  Monec Holding AG v. Motorola Mobility LLC, HTC, et al.
District of Delaware, Case No. 1:11-cv-798-LPS-SRF
Matter:  Patent infringement, displaying books on tablets
Project:  Non-infringement expert report for Motorola, non-infringement expert
report for HTC, deposition

L152.  2013  **Gartman Law Group**
Case:  Lone Star WiFi LLC v. Legacy Stonebriar Hotel, Ltd; et al.
Eastern district Of Texas, Tyler, Case No. 6:12-cv-957
Matter:  Patent infringement, levels of access in Wi-Fi networks

|  | Project: | Claim validity consulting |
|---|---|---|

L153. 2013 **White & Case, LLP**
Case: Nokia Corp and Nokia, Inc. v. <u>HTC Corp and HTC America, Inc. and Google, Inc.</u>
In the Matter of Certain Portable Electronic Communication Devices, Including Mobile Phones and Components Thereof, ITC Investigation No. 337-TA-885
Matter: Patent infringement, App download and installation
Project: Non-infringement consulting

L154. 2013 **Heim, Payne & Chorush, LLP**
Case: <u>Rembrandt Wireless</u> v. Samsung Electronics Co., et al.
Eastern district of Texas, Marshall, Case No. 2:13-cv-213-JRG-RSP
Matter: Patent infringement, Bluetooth
Project: Expert report regarding validity, deposition, jury trial

L155. 2013 **Baker Hostetler; Davis Polk & Wardwell LLP**
Case: <u>Comcast</u> v. Sprint; and Nextel Inc.
Eastern district of Pennsylvania, Case No. 2:12-cv-00859-JD
Matter: Patent infringement, SMS/MMS in Cellular Networks
Project: Infringement expert report, validity expert report, reply expert report, declaration, two-day depositions, jury trial testimony

L156. 2013 **McKool Smith**
Case: Samsung Electronics America v. <u>Ericsson Inc.</u>
In the Matter of Certain Wireless Communications Equipment and Articles Therein, ITC Investigation No. 337-TA-866
Matter: Patent infringement, LTE uplink and downlink
Project: Source code review, prior art research, claim construction, claim invalidity expert report, non-infringement expert report, ITC hearing testimony

L157. 2012 **DLA Piper US LLP**
Case: <u>CSR Technology Inc.</u> v. Freescale Semiconductor, Inc.
USDC-San Francisco, Case No. 3:12-cv-02619-RS
Matter: Patent infringement, radio transceivers
Project: Claim construction, declaration

L158. 2012 **Fish & Richardson P.C.**
Case: GPNE Corp. v. <u>Apple, Inc.;</u> et al.
USDC-ND California, Case No. 5:12-cv-02885-LHK
Matter: Patent infringement, resource allocation in wireless networks
Project: Prior art research consulting

L159.  2012       **Polsinelli Shughart PC**
     Case:      <u>Single Touch Interactive, Inc.</u> v. Zoove Corporation
                  Northern district of California, Case No. 3:12-cv-00831-JSC
     Matter:    Patent infringement, abbreviated dialing, information delivery
     Project:   Claim construction, Markman hearing testimony, two declarations

L160.  2012       **K & L Gates**
     Case:      EON Corp. IP Holdings, LLC v. <u>Novatel Wireless, Inc.</u>; et al.
                  DC-Tyler, Texas, Case No. 6:11-cv-00015-LED-JDL
     Matter:    Patent infringement, wireless modem and 3G services
     Project:   Non-infringement expert report, deposition

L161.  2012       **Simpson Thacher & Bartlett LLP**
     Case:      <u>CSR Technology, Inc.</u> v. Bandspeed, Inc.
                  Western district of Texas, Case No. 1:12-cv-297-LY
     Matter:    Patent infringement, packet identification in 2.4 GHz and 5 GHz
     Project:   Source code review, Markman hearing testimony, infringement expert
                  report

L162.  2012       **Sheppard Mullin Richter & Hampton LLP**
     Case:      Wi-LAN v. <u>HTC America, Inc.</u>, et al.
                  Eastern district of Texas, Case No. 6:10-cv-521-LED
     Matter:    Patent infringement, CDMA, Orthogonal Codes
     Project:   Source code review, non-infringement expert report, deposition, jury
                  trial testimony

L163.  2012       **Dechert LLP**
     Case:      <u>Hitachi</u> v. TPV and Vizio, Inc.; and Vizio v. <u>Hitachi, LTD.</u>
                  Eastern district of Texas, Case No. 2:10-cv-260
     Matter:    Patent infringement, HD television transmission and reception
     Project:   Prior art research, claim invalidity consulting

L164.  2012       **Fish & Richardson P.C.; Covington & Burling; Alston & Bird;**
                **Brinks Hofer Gilson & Lione**
     Case:      InterDigital Commc'n, LLC v. <u>Huawei Tech. Co. LTD</u>; <u>LG</u>
                  <u>Electronics, Inc.</u>; <u>Nokia, Inc.</u>; and <u>ZTE (USA) Inc.</u>
                  Certain Wireless Devices With 3G Capabilities and Components
                  Thereof, ITC Investigation No. 337-TA-800
     Matter:    Patent infringement, channel coding in UMTS, HSDPA
     Project:   Non-infringement consulting

L165. 2012 **Fish & Richardson P.C.; Covington & Burling; Alston & Bird; Brinks Hofer Gilson & Lione**
Case: InterDigital Commc'n, LLC v. Huawei Tech. Co. LTD; LG Electronics, Inc.; Nokia, Inc.; and ZTE (USA) Inc.
District of Delaware, Case No. 1:11-cv-00654-UNA
Matter: Patent infringement, channel coding in UMTS, HSDPA
Project: Non-infringement consulting

L166. 2011 **O'Melveny & Myers LLP**
Case: MobileMedia Ideas, LLC v. Apple, Inc.
District of Delaware, Case No. 1:10-cv-00258-SLR-MPT
Matter: Patent infringement, voice control, call rejection in mobile phones
Project: Source code review, prior art research, declaration, claim invalidity expert report, non-infringement expert report, deposition, jury trial testimony

L167. 2011 **Wilmer Cutler Pickering Hale and Dorr**
Case: Apple, Inc. v. Samsung Electronics Co.
Northern district of California, Case No. 5:11-cv-01846-LHK
Matter: Patent infringement, channel coding in CDMA, E-AGCH, TFCI
Project: Prior art research, claim construction consulting

L168. 2011 **Weil, Gotshal & Manges LLP**
Case: Vizio, Inc. v. Renesas Electronics America, Inc.
ITC Investigation No. 337-TA-789
Matter: Patent infringement, HD television transmission and reception
Project: Claim invalidity consulting

L169. 2011 **Shapiro Cohen**
Case: TenXc Wireless Inc. v. Andrew LLC
TenXc Wireless Inc. v. Mobi Antenna Technologies Ltd.
Matter: Patent infringement, antenna design, sectorized cellular network
Project: Claim validity consulting

L170. 2010 **Fish & Richardson P.C.**
Case: Vizio, Inc., v. LG Electronics, Inc.
ITC Investigation No. 337-TA-733
Matter: Patent infringement, HD television transmission and reception
Project: Claim charts, claim construction expert report, deposition

L171. 2010 **Fish & Richardson P.C.**
Case: Vizio, Inc., v. LG Electronics, Inc.
District of Maryland, Case No. 1:09-cv-1481-BEL
Matter: Patent infringement, HD television transmission and reception
Project: Claim charts, claim construction expert report, deposition

L172. 2008      **Kaye Scholer LLP**
     Case:      eBay Inc. v. IDT.
                Western district of Arkansas, Case No. 4:08-cv-4015-HFB
     Matter:      Patent infringement, long distance communication using Internet
     Project:      Prior art research, claim construction consulting

L173. 2008      **Simpson Thacher & Bartlett LLP**
     Case:      Commil USA, LLC v. Cisco Systems, Inc.
                Eastern district of Texas, Case No. 2:07-cv-00341-DF-CE
     Matter:      Patent infringement, two-level wireless protocol
     Project:      Prior art research

L174. 2006      **Woodfill and Pressler**
     Case:      Charles Russell v. Interinsurance Exchange of the Auto Club
                Harris County, Texas, Case No. 2005-19706
     Matter:      House fire and insurance claim
     Project:      Determining user location using cellular phone records, expert report, deposition, jury trial testimony

## Consulting History

From:    5/2022      **Washington Utilities and Transportation Commission**
To:        present     Olympia, WA
         Duties:      Analyze cause(s) of network failure

From:    8/2021      **Carter Arnett (Client: G+ Communications)**
To:        5/2022      Dallas, TX
         Duties:      Analyze patents for essentiality to 4G and 5G standards.

From:    2/2021      **ExpertsDirect Pty Ltd**
To:        3/2021      Australia
         Duties:      Analyze antenna arrays.

From:    11/2020     **Licks Attorneys**
To:        1/2021      Brazil
         Duties:      Analyze patents for essentiality to 4G standards.

From:    6/2019      **Fish & Richardson, P.C. (Client: Huawei)**
To:        5/2022      Dallas, TX
         Duties:      Analyze patents for essentiality to 3G, 4G, and 5G standards.

From:    1/2013      **Heim, Payne & Chorush, LLP**
To:        3/2013      Houston, TX
         Duties:      Analyze patents on wireless technologies.

| From: | 4/2007 | **Collin County Sheriff's Office** |
|---|---|---|
| To: | 5/2007 | McKinney, TX |
| | Duties: | Analyzed cellular record data and determined user location in a double-homicide investigation. |

| From: | 4/2004 | **Allegiant Integrated Solutions** |
|---|---|---|
| To: | 5/2004 | Fort Worth, TX |
| | Duties: | Designed and developed an integrated set of tools for fast deployment of wireless networks. The tools optimize the placement of Access Points and determine their respective channel allocations to minimize interference and maximize capacity. |

| From: | 3/2002 | **Input/Output Incorporated** |
|---|---|---|
| To: | 4/2002 | New Orleans, LA |
| | Duties: | Designed and implemented an algorithm in MATLAB for optimizing the frequency selection process used by sonar for scanning the bottom of the ocean. |

| From: | 6/1998 | **Teleware Corporation** |
|---|---|---|
| To: | 7/1998 | Seoul, South Korea |
| | Duties: | Designed and developed a software package for analyzing the capacity in a CDMA network to maximize the number of subscribers. |

## Employment History

| From: | 1/2015 | **University of North Texas** |
|---|---|---|
| To: | 8/2021 | Denton, TX |
| | Position: | *Associate Chair of Graduate Studies Department of Computer Science and Engineering* |
| | | In charge of all administrative duties related to the Master's and Ph.D. programs in the department. |

| From: | 5/2008 | **University of North Texas** |
|---|---|---|
| To: | Present | Denton, TX |
| | Position: | *Tenured Associate Professor Department of Computer Science and Engineering* |
| | | Conducting research on cellular networks and wireless sensor networks. Teaching wireless communication courses. Advising graduate and undergraduate students. |

| From: | 9/2002 | **University of North Texas** |
|---|---|---|
| To: | 5/2008 | Denton, TX |
| | Position: | *Assistant Professor Department of Computer Science and Engineering* |
| | | Conducting research on WCDMA/UMTS wireless networks. Teaching wireless communication and computer architecture courses. Advising graduate and undergraduate students. |

| From: | 1/2002 | **University of New Orleans** |
|---|---|---|
| To: | 8/2002 | New Orleans, LA |
| | Position: | *Assistant Professor Department of Electrical Engineering* |

Designed and taught two new courses "Computer Systems Design I and II". Developed a Computer Engineering Curriculum with strong hardware-design emphasis. Formed a wireless research group. Advised graduate and undergraduate students.

| From: | 10/2000 | **Comspace Corporation** |
|---|---|---|
| To: | 12/2001 | Coppell, TX |
| | Position: | *Senior Systems Engineer* |

Designed, coded (in Matlab), and simulated Viterbi decoding, Turbo coding, trellis coded modulation (TCM), and Reed-Muller codes. Optimized soft decision parameters and interleavers for additive white Gaussian and Rayleigh faded channels. Extended the control and trunking of push-to-talk Logic Trunked Radio (LTR) to include one-to-one and one-to-many voice and data messaging.

| From: | 8/1996 | **MinMax Corporation** |
|---|---|---|
| To: | 8/2000 | Saint Louis, MO |
| | Position: | *Research Associate* |

Designed software packages that provide the tools to flexibly allocate capacity in a CDMA network and maximize the number of subscribers. Analyzed and simulated different audio compression schemes. Validated, simulated (logical and timing), and developed the hardware architecture for an ATM switch capable of channel group switching.

| From: | 8/1994 | **Washington University** |
|---|---|---|
| To: | 8/2000 | Saint Louis, MO |
| | Position: | *Research and Teaching Assistant* |

Taught, consulted, and graded Circuit Analysis at the undergraduate level and Network Design at the graduate level.

## Publications

**Conference Proceedings**

C1.  U.K. Dey, **R. Akl**, R. Chataut, "Throughput Improvement in Vehicular Communication by Using Low Density Parity Check (LDPC) Code," *IEEE CCWC 2022 The 12th Annual Computing and Communication Workshop and Conference*, January 2022, paper #1570784297, 8 pgs.

C2.  U.K. Dey, **R. Akl**, R. Chataut, M. Robaei, "Selective MIMO in Vehicular Communication for Reliable Safety Services and High Speed Non-Safety

Services," *2021 IEEE 12th Annual Ubiquitous Computing, Electronics & Mobile Communication Conference (UEMCON)*, 2021, pp. 785-790, 6 pgs.

C3.  R. Chataut, **R. Akl**, U.K. Dey, "An Efficient and Fast-convergent Detector for 5G and Beyond Massive MIMO Systems," *2021 IEEE 12th Annual Ubiquitous Computing, Electronics & Mobile Communication Conference (UEMCON)*, 2021, pp. 866-872, 7 pgs.

C4.  M. Robaei, **R. Akl**, "Millimeter-Wave Blockage Modeling And Mitigation," *2021 IEEE International Workshop Technical Committee on Communications Quality and Reliability (CQR 2021)*, 2021, 6 pgs.

C5.  M. Robaei, **R. Akl**, "Characterizing Non-Stationary Millimeter-Wave Communication Using Fuzzy Entropy," *2021 55th Annual Conference on Information Sciences and Systems (CISS)*, 2021, 6 pgs.

C6.  M. Robaei, **R. Akl**, R. Chataut, U.K. Dey, "Adaptive Millimeter-Wave Channel Estimation and Tracking," *2021 23rd International Conference on Advanced Communication Technology (ICACT)*, February 2021, pp. 23-28, 6 pgs.

C7.  U.K. Dey, **R. Akl**, R. Chataut, M. Robaei, "Modified PHY Layer for High Performance V2X Communication using 5G NR," *IEEE UEMCON 11th IEEE Annual Ubiquitous Computing, Electronics & Mobile Communication Conference*, October 2020, pp. 137-142, 6 pgs.

C8.  R. Chataut, **R. Akl**, "An Efficient and Fair Scheduling for Downlink 5G Massive MIMO Systems," *IEEE Texas Symposium on Wireless and Microwave Circuits and Systems*, June 2020, paper no.TSWMCS2020-39, 8 pgs.

C9.  R. Chataut, **R. Akl**, "Efficient and Low-Complexity Iterative Detectors for 5G Massive MIMO Systems," *IEEE DCOSS 2020 International Conference on Distributed Computing in Sensor Systems*, May 2020, pp. 442-449, 8 pgs.

C10. U.K. Dey, **R. Akl**, R. Chataut, "High Throughput Vehicular Communication Using Spatial Multiplexing MIMO," *IEEE CCWC 2020 The 10th Annual Computing and Communication Workshop and Conference*, January 2020, paper no. 1570613408, 6 pgs.

C11. R. Chataut, **R. Akl**, M. Robaei, "Accelerated and Preconditioned Refinement of Gauss-Seidel Method for Uplink Signal Detection in 5G Massive MIMO Systems," *IEEE CCWC 2020 The 10th Annual Computing and Communication Workshop and Conference*, January 2020, paper no. 1570605343, 7 pgs.

C12. M. Robaei, **R. Akl**, "Examining Spatial Consistency for Millimeter-Wave Massive MIMO Channel Estimation in 5G-NR," *IEEE ICCE 2020 The 38th*

*International Conference on Consumer Electronics*, January 2020, paper no. 1570596880, 6 pages.

C13. R. Chataut, **R. Akl**, "Channel Gain Based User Scheduling for 5G Massive MIMO Systems," *IEEE HONET-ICT 2019 The 16th International Conference on Smart Cities: Improving Quality of Life Using ICT & IoT and AI*, October 2019, paper no. 1570565594, 5 pgs.

C14. M. Robaei, R. Akl, "Time-Variant Broadband mmWave Channel Estimation Based on Compressed Sensing," *IEEE UEMCON 2019 The 10th Annual Ubiquitous Computing, Electronics & Mobile Communication Conference*, October 2019, paper no. 1570577430, 7 pages.

C15. R. Chataut, **R. Akl**, U. Dey, "Least Square Regressor Selection Based Detection for Uplink 5G Massive MIMO Systems," *IEEE WAMICON 2019 The 20th Annual IEEE Wireless and Microwave Technology Conference*, April 2019, paper no. 1570524727, 6 pgs.

C16. R. Chataut, **R. Akl**, "Huber Fitting Based ADMM Detection for Uplink 5G Massive MIMO Systems," *IEEE UEMCON 2018 The 9th Annual Ubiquitous Computing, Electronics & Mobile Communication Conference*, November 2018, paper no. 1570492416, 5 pgs.

C17. R. Chataut, **R. Akl**, "Efficient and Low Complex Uplink Detection for 5G Massive MIMO Systems," *IEEE WAMICON 2018 The 19th Annual Wireless and Microwave Technology Conference*, April 2018, paper no. 1570431593, 6 pgs.

C18. R. Chataut, **R. Akl**, "Optimal Pilot Reuse Factor Based on User Environments in 5G Massive MIMO," *IEEE CCWC 2018 The 8th Annual Computing and Communication Workshop Conference*, January 2018, paper no. 1570413394, 6 pgs.

C19. S. Alotaibi, **R. Akl**, "Radio Resource Management in LTE Femtocell Networks," *IEEE NCA '17 International Symposium on Network Computing and Applications*, November 2017, paper no. 117, 5 pgs.

C20. U. Sawant, **R. Akl**, "Subcarrier Allocation in LTE Network Deployment with Mobility," *IEEE UEMCON 2017 8th Annual Ubiquitous Computing, Electronics and Mobile Communication Conference*, October 2017, paper no. 1570349184, 8 pgs.

C21. S. Alotaibi, **R. Akl**, "Packet Scheduling Bandwidth Type-Based Mechanism for LTE," *IEEE UEMCON 2017 8th Annual Ubiquitous Computing, Electronics and Mobile Communication Conference*, October 2017, paper no. 1570394639, 6 pgs.

C22. S. Alotaibi, **R. Akl**, "Dynamic Fractional Frequency Reuse (FFR) Scheme for Two-Tier Network in LTE," *IEEE UEMCON 2017 8th Annual Ubiquitous Computing, Electronics and Mobile Communication Conference*, October 2017, paper no. 1570394969, 6 pgs.

C23. U. Sawant, **R. Akl**, "Evaluation of Adaptive and Non Adaptive LTE Fractional Frequency Reuse Mechanisms," *IEEE WOCC 2017 The 26th Annual Wireless and Optical Communications Conference*, April 2017, paper no. 1570341174, 6 pgs.

C24. S. Alotaibi, **R. Akl**, "Range-Based Scheme for Adjusting Transmission Power for Femtocells in Co-Channel Deployment," *IEEE WTS 2017 The 16th Annual Wireless Telecommunications Symposium*, April 2017, paper no. 1570334744, 5 pgs.

C25. U. Sawant, **R. Akl**, "A Novel Metric to Study the Performance of Sectorized Fractional Frequency Reuse Techniques in LTE," *IEEE WTS 2017 The 16th Annual Wireless Telecommunications Symposium*, April 2017, paper no. 1570338498, 7 pgs.

C26. S. Alotaibi, **R. Akl**, "Dynamic Frequency Partitioning Scheme for LTE HetNet Networks Using Fractional Frequency Reuse," *IEEE WCNC '17 Wireless Communications and Networking Conference*, March 2017, paper no. 1570332420, 5 pgs., demo and poster.

C27. U. Sawant, **R. Akl**, "Performance Evaluation of Network Productivity for LTE Heterogenous Networks with Reward-Penalty Weights Assessment," *IEEE CCWC 2017 The 7th Annual Computing and Communication Workshop Conference*, January 2017, paper no. 1570328396, 6 pgs.

C28. S. Alotaibi, **R. Akl**, "Self-Adjustment Downlink Transmission Power for Femtocells in Co-Channel Deployment in Heterogeneous Networks," *IEEE CCWC 2017 The 7th Annual Computing and Communication Workshop Conference*, January 2017, paper no. 1570326815, 6 pgs.

C29. U. Sawant, **R. Akl**, "Performance Evaluation of Sectorized Fractional Frequency Reuse Techniques Using Novel Metric," *IEEE ISCC 2016 The Twenty-First IEEE Symposium on Computers and Communications*, June 2016, paper no. 1570275270, 7 pgs.

C30. R. Tidwell, S. Akumalla, S. Karlaputi, **R. Akl**, K. Kavi, and D. Struble, "Evaluating the Feasibility of EMG and Bend Sensors for Classifying Hand Gestures," *1st International Conference on Multimedia and Human Computer Interaction*, July 2013, paper no. 63, 8 pgs.

C31. **R. Akl**, K. Pasupathy, and M. Haidar, "Anchor Nodes Placement for Effective Passive Localization," *2011 IEEE International Conference on Selected Topics in*

*Mobile and Wireless Networks (iCOST)*, October 2011, paper no. 1569490799, pp. 127 - 132.

C32. **R. Akl**, P. Kadiyala, and M. Haidar, "Non-Uniform Grid-Based Routing in Sensor Networks," *9th IEEE Malaysia International Conference on Communications*, December 2009, paper no. 1569243649, pp. 536 - 540.

C33. M. Haidar, M. Al-Rizzo, Y. Chan, **R. Akl**, M. Bouharras, "Throughput Validation of an Advanced Channel Assignment Algorithm in IEEE 802.11 WLAN," *ICCSN 2009 – International Conference on Communication Software and Networks*, February 2009, paper no. P385, pp. 801 - 806.

C34. **R. Akl** and D. Keathly, "Robocamp: Encouraging Young Women to Embrace STEM," 4th Annual TETC Best Practices Conference, February 2009, 13 pgs.

C35. M. Haidar, R. Ghimire, M. Al-Rizzo, **R. Akl**, Y. Chan, "Channel Assignment in an IEEE 802.11 WLAN Based on Signal-to-interference Ratio," *IEEE CCECE – Canadian Conference on Electrical and Computer Engineering: Communications and Networking*, May 2008, paper no. 1569092894, pp. 1169 - 1174.

C36. H. Al-Rizzo, M. Haidar, **R. Akl**, and Y. Chan, "Enhanced Channel Assignment and Load Distribution in IEEE 802.11 WLANs," *IEEE International Conference on Signal Processing and Communication*, November 2007, paper no. 1569042132, pp. 768 - 771.

C37. **R. Akl** and Y. Saravanos, "Hybrid Energy-Aware Synchronization Algorithm in Wireless Sensor Networks," *18th Annual IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, September 2007, paper no 692, 5 pgs.

C38. M. Haidar, **R. Akl**, and H. Al-Rizzo, "Channel Assignment and Load Distribution in a Power-Managed WLAN," *18th Annual IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, September 2007, paper no. 463, 5 pgs.

C39. D. Keathly and **R. Akl**, "Attracting and Retaining Women in Computer Science and Engineering: Evaluating the Results," *Proceedings of American Society for Engineering Education: ASEE Annual Conference*, June 2007, paper no. AC 2007-1229, 10 pgs.

C40. M. Haidar, **R. Akl**, H. Al-Rizzo, Y. Chan, R. Adada, "Optimal Load Distribution in Large Scale WLAN Networks Utilizing a Power Management Algorithm," *Proceedings of IEEE Sarnoff Symposium*, May 2007, 5 pgs.

C41. R. Dantu, P. Kolan, **R. Akl,** and K. Loper, "Classification of Attributes and Behavior in Risk Management Using Bayesian Networks," *Proceedings of IEEE Intelligence and Security Informatics Conference*, May 2007, pp. 71-74.

C42. **R. Akl** and A. Arepally, "Dynamic Channel Assignment in IEEE 802.11 Networks," *Proceedings of IEEE Portable 2007: International Conference on Portable Information Devices*, March 2007, pp 309-313.

C43. **R. Akl** and U. Sawant, "Grid-based Coordinated Routing in Wireless Sensor Networks," *Proceedings of IEEE CCNC 2007: Consumer Communications and Networking Conference*, January 2007, pp. 860-864.

C44. **R. Akl** and A. Arepally, "Simulation of Throughput in UMTS Networks with Different Spreading Factors," *Proceedings of IEEE VTC Fall 2006: Vehicular Technology Conference,* September 2006, pp. C1-5.

C45. A. Alhabsi, H. Al-Rizzo, and **R. Akl,** "Parity Assisted Decision Making for QAM Modulation," *International Conference on Mobile Computing and Wireless Communications*, September 2006, paper no. 1568988776, 5 pgs.

C46. **R. Akl** and R. Garlick**,** "Retention and Recruitment of Women in Computer Engineering," *ICEE 2006: International Conference on Engineering Education,* July 2006, paper no. 3318, 5 pgs.

C47. R. Garlick and **R. Akl,** "Intra-Class Competitive Assignments in CS2: A One-Year Study," *ICEE 2006: International Conference on Engineering Education,* July 2006, paper no. 3325, 5 pgs.

C48. **R. Akl**, D. Tummala, and X. Li, "Indoor Propagation Modeling at 2.4 GHz for IEEE 802.11 Networks," *WNET 2006: Wireless Networks and Emerging Technologies,* July 2006, paper no. 510-014, 6 pgs.

C49. P. Chen, K. Kavi, and **R. Akl,** "Performance Enhancement by Eliminating Redundant Function Execution," *Proceedings of IEEE: 39th Annual Simulation Symposium*, April 2006, pp. 143-150.

C50. **R. Akl** and S. Nguyen, "Capacity Allocation in Multi-cell UMTS Networks for Different Spreading Factors with Perfect and Imperfect Power Control," *Proceedings of IEEE CCNC 2006: Consumer Communications and Networking Conference*, January 2006, vol. 2, pp. 928-932.

C51. W. Li, K. Kavi, and **R. Akl**, "An Efficient Non-Preemptive Real-Time Scheduling," *18th International Conference on Parallel and Distributed Computing Systems*, Las Vegas, NV, September 2005, pp. 154-160.

C52. S. Nguyen and **R. Akl**, "Approximating User Distributions in WCDMA Networks

Using 2-D Gaussian," *CCCC20T 05: International Conference on Computing, Communications, and Control Technologies*, July 2005, 5 pgs.

C53. **R. Akl** and S. Park, "Optimal Access Point Selection and Traffic Allocation in IEEE 802.11 Networks," *Proceedings of 9th World Multiconference on Systemics, Cybernetics and Informatics (WMSCI 2005): Communication and Network Systems, Technologies and Applications*, July 2005, vol. 8, pp. 75-79.

C54. **R. Akl**, M. Naraghi-Pour, M. Hegde, "Throughput Optimization in Multi-Cell CDMA Networks," *IEEE WCNC 2005 - Wireless Communications, and Networking Conference*, March 2005, vol. 3, pp. 1292-1297.

C55. **R. Akl**, "Subscriber Maximization in CDMA Cellular Networks," *Proceedings of CCCT 04: International Conference on Computing, Communications, and Control Technologies*, August 2004, vol. 3, pp. 234-239.

C56. **R. Akl** and A. Parvez, "Global versus Local Call Admission Control in CDMA Cellular Networks," *Proceedings of CITSA 04: Communications, Information and Control Systems, Technologies and Applications*, July 2004, vol. 2, pp. 283-288.

C57. **R. Akl** and A. Parvez, "Impact of Interference Model on Capacity in CDMA Cellular Networks," *Proceedings of SCI 04: Communication and Network Systems, Technologies and Applications*, July 2004, vol. 3, pp. 404-408. Selected as **best paper** of those presented in the session: Tele-Communication Systems, Technologies and Application II.

C58. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Call Admission Control Scheme for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Wireless Communications and Networking Conference*, September 2000, vol. 1, pp. 465-470.

C59. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Cell Placement in a CDMA Network," *IEEE Wireless Communications and Networking Conference*, September 1999, vol. 2, pp. 903-907.

C60. **R.G. Akl**, M.V. Hegde, P.S. Min, "Effects of Call Arrival Rate and Mobility on Network Throughput in Multi-Cell CDMA," *IEEE International Conference on Communications*, June 1999, vol. 3, pp. 1763-1767.

C61. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Flexible Allocation of Capacity in Multi-Cell CDMA Networks," *IEEE Vehicular Technology Conference*, May 1999, vol. 2, pp. 1643-1647.

## Journal Publications

J1.   R. Chataut, **R. Akl**, U.K. Dey,  M. Robaei, "SSOR Preconditioned Gauss-Seidel

Detection and Its Hardware Architecture for 5G and beyond Massive MIMO Networks," *Electronics 2021 ISSN 2079-9292*, 10(5), 578, *Special Issue MIMO for Next Generation Wireless Systems,* March 2021, 17 pgs.

J2.  R. Chataut, **R. Akl**, "Massive MIMO Systems for 5G and Beyond Networks – Overview, Recent Trends, Challenges, and Future Research Direction," *Sensors 2020*, 20(10), 2753, May 2020.

J3.  R. Chataut, **R. Akl,** "Massive MIMO Systems for 5G," *Encyclopedia 2020*, doi:10.32545, 2020, (ISSN 2309-3366).

J4.  S. Alotaibi, **R. Akl**, "Range-Based Scheme for Adjusting Transmission Power of Femtocell in Co-Channel Deployment," *International Journal of Interdisciplinary Telecommunications and Networking*, IJITN Vol. 10, No. 4, pgs. 14-24, 2018.

J5.  U. Sawant, **R. Akl**, "Adaptive and Non Adaptive LTE Fractional Frequency Reuse Mechanisms Mobility Performance," *Advances in Science, Technology and Engineering Systems Journal*, ASTES Vol. 3, No. 3, 02-11, 11 pgs., 2018.

J6.  M. Haidar, H.M. Al-Rizzo, **R. Akl**, and Z. Elbazzal, "The Effect of an Enhanced Channel Assignment Algorithm in an IEEE 802.11 WLAN," *World Scientific and Engineering Academy and Society Transactions on Communications*, WSEAS, Vol. 8, Issue 12, December 2009.

J7.  **R. Akl**, P. Kadiyala, and M. Haidar, "Non-Uniform Grid-Based Coordinated Routing in Wireless Sensor Networks," *Journal of Sensors*, article ID 491349, volume 2009, 11 pages.

J8.  M. Haidar, M. Al-Rizzo, Y. Chan, **R. Akl**, "User-Based Channel Assignment Algorithm in a Load-Balanced IEEE 802.11 WLAN," *International Journal of Interdisciplinary Telecommunications & Networking (IJITN)*, April-June 2009, 1(2), pp. 66-81.

J9.  **R. Akl**, D. Keathly, and R. Garlick, "Strategies for Retention and Recruitment of Women and Minorities in Computer Science and Engineering," *iNEER Special Volume: Innovations 2007- World Innovations in Engineering Education and Research*, 9 pgs., 2007.

J10. R. Garlick and **R. Akl**, "Motivating and Retaining CS2 Students with a Competitive Game Programming Project," *iNEER Special Volume: Innovations 2007- World Innovations in Engineering Education and Research*, 9 pgs., 2007.

J11. **R. Akl** and S. Nguyen, "UMTS Capacity and Throughput Maximization for Different Spreading Factors," *Journal of Networks*, July 2006, vol. 1, issue 3, pp. 40-49. ISSN: 1796-2056

J12. W. Li, K. Kavi, and **R. Akl**, "A Non-preemptive Scheduling Algorithm for Soft Real-time Systems," *Journal of Computer and Electrical Engineering,* 2006, vol. 32, 18 pgs. ISSN: 0045-7906

J13. **R. Akl**, A. Parvez, and S. Nguyen, "Effects of Interference on Capacity in Multi-Cell CDMA Networks," *Journal of Systemics, Cybernetics and Informatics*, 2006, vol. 3, no. 1, p825612, 7 pgs. ISSN: 1690-4524

J14. **R.G. Akl**, M. Hegde and M. Naraghi-Pour, "Mobility-based CAC Algorithm for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Transactions on Vehicular Technology,* March 2005*,* vol. 54, no. 2, pp. 639-651.

J15. **R.G. Akl**, M.V. Hegde, M. Naraghi-Pour, P.S. Min, "Multi-Cell CDMA Network Design," *IEEE Transactions on Vehicular Technology*, May 2001, vol. 50, no. 3, pp. 711-722.

## Technical Papers

T1. J. Williams, **R. Akl**, et al, "Flight Control Subsystem," *The Eagle Feather*, Special Section: Undergraduate Research Initiative in Engineering, University of North Texas, Vol. 7, 2010.

T2. **R.G. Akl**, M.V. Hegde, A. Chandra, P.S. Min, "CDMA Capacity Allocation and Planning," Technical Document, Washington University Department of Electrical Engineering WUEE-98, April 1998.

## Book Chapters

B1. R. Akl, Y. Saravanos, and M. Haidar, "Chapter 18: Hybrid Approach for Energy-Aware Synchronization in Sensor Networks," *Sustainable Wireless Sensor Networks*, December 2010, pgs. 413-429, ISBN: 978-953-307-297-5.

B2. K. Kavi, **R. Akl** and A. Hurson, "Real-Time Systems: An Introduction and the State-of-the-Art," *Encyclopedia of Computer Science and Engineering*, John Wiley & Sons, Volume 4, January 2009, pgs. 2369-2377.

B3. **R. Akl** and K. Kavi, "Chapter 12: Modeling and Analysis using Computational Tools," *Introduction to Queuing Theory: Modeling and Analysis*, Birkhauser Boston, December 2008, pgs. 295-320.

## Technical Presentations

P1. "Bio-Com Project," Raytheon, Richardson TX, May 2012, (invited).

P2. "Bio-Com Project," Net-Centric Software and Systems I/UCRC Meeting, Denton TX, December 2011, (invited).

P3. "Student Outreach Report: Robocamp," College of Engineering Advisory Board Meeting, Denton TX, May 2011, (invited).

P4. "Robocamp: Encouraging Young Women to Embrace STEM," 4th Annual TETC Best Practices Conference, Austin TX, February 2009, (invited).

P5. "Self-Configuring Wireless MEMS Network (demo)," Southern Methodist University, Dallas TX, January 2008, (invited).

P6. "Energy-aware Routing and Hybrid Synchronization in Sensor Networks," *Southern Methodist University,* Dallas TX, September 2007, (invited).

P7. "Retention and Recruitment of Women in Computer Engineering," *ICEE 2006: International Conference on Engineering Education,* Puerto Rico, July 2006, (refereed).

P8. "Capacity Allocation in Multi-cell UMTS Networks for Different Spreading Factors with Perfect and Imperfect Power Control," *IEEE CCNC 2006: Consumer Communications and Networking Conference*, Las Vegas, NV, January 2006, (refereed).

P9. "Research, Teaching, and Outreach," CSE Advisory Council Meeting, *UNT Research Park*, Denton, TX, December 2005, (invited).

P10. "Wi-Fi and WCDMA Network Design," *University of Arkansas*, Little Rock, AR, April 2005, (invited).

P11. "Wi-Fi and WCDMA Network Design," *Southern Methodist University*, Dallas, TX, March 2005, (invited).

P12. "Current Research in Wireless at UNT," *Nortel Networks*, Richardson, TX, October 2004, (invited).

P13. "Subscriber Maximization in CDMA Cellular Networks," *International Conference on Computing, Communications, and Control Technologies*, Austin, TX, August 2004, (refereed).

P14. "Global versus Local Call Admission Control in CDMA Cellular Networks," *International Conference on Cybernetics and Information Technologies, Systems and Applications*, Orlando, FL, July 2004, (refereed).

P15. "Impact of Interference Model on Capacity in CDMA Cellular Networks," *8th World Multi-Conference on Systemics, Cybernetics, and Informatics*, Orlando, FL, July 2004, (refereed).

P16. "CDMA Network Design," IEEE Communications Society – New Orleans Chapter, New Orleans, LA, May 2002, (invited).

P17. "Cell Design to Maximize Capacity in CDMA Networks," Louisiana State University, Baton Rouge, LA, April 2002, (invited).

P18. "Call Admission Control Scheme for Arbitrary Traffic Distribution in CDMA Cellular Systems," *IEEE Wireless Communications and Networking Conference*, Chicago, IL, September 2000, (refereed).

P19. "Cell Placement in a CDMA Network," *IEEE Wireless Communications and Networking Conference*, September 1999, (refereed).

P20. "Effects of Call Arrival Rate and Mobility on Network Throughput in Multi-Cell CDMA," *IEEE International Conference on Communications*, June 1999, (refereed).

P21. "Flexible Allocation of Capacity in Multi-Cell CDMA Networks," *IEEE Vehicular Technology Conference*, May 1999, (refereed).

P22. "CCAP: A Strategic Tool for Managing Capacity of CDMA Networks," Teleware Co. Ltd., Seoul, South Korea, 1998, (invited).

## Courses Developed

- CSCE 5933: LTE Physical Layer Using MATLAB.
  Research issues in the design of LTE physical layer and simulate using MATLAB. Topics include modulation and coding, OFDM, channel modeling, MIMO, and link adaption.

- CSCE 6590: Advanced Topics in Wireless Communications & Networks: 4G/LTE. Research issues in the design of next generation wireless networks: cellular systems, medium access techniques, signaling, mobility management, control and management for mobile networks, wireless data networks, Internet mobility, quality-of-service for multimedia applications, caching for wireless web access, and ad hoc networks.

- CSCE 5933: Fundamentals of VoIP.
  Fundamentals of VoIP, with emphasis on network infrastructure implementation and security. Topics include IP protocol suite, SS7, speech-coding techniques, quality of service, session initiation protocol, and security issues.

- CSCE 5540: Introduction to Sensor Networks.
  Topics include: design implications of energy (hardware and software), and otherwise resource-constrained nodes; network self-configuration; services such as routing under network dynamics, localization, time-synchronization and calibration;

distributed data management, in-network aggregation and collaborative signal processing, programming tools and language support.

- CSCE 5510. Wireless Communication.
  Point-to-point signal transmission through a wireless channel, channel capacity, channel encoding, and multi-user transmissions. First, second, and third generation cellular systems, and mobility management.

- CSCE 3510. Introduction to Wireless Communication.
  Fundamentals of wireless communications and networking, with emphasis on first, second, and third generation cellular systems. Topics include point-to-point signal transmission through a wireless channel, cellular capacity, multi-user transmissions, and mobility management.

- CSCE 3020. Communications Systems.
  Introduction to the concepts of transmission of information via communication channels. Amplitude and angle modulation for the transmission of continuous-time signals. Analog-to-digital conversion and pulse code modulation. Transmission of digital data. Introduction to random signals and noise and their effects on communication. Optimum detection systems in the presence of noise.

- ENEE 3583. Computer Systems Design I (UNO).
  The design process of digital computer systems is studied from the instruction set level, system architecture level, and digital logic level. Topics include machine organization, register transfer notation, processor design, memory design, and input/output considerations. Includes semester project.

- ENEE 3584. Computer Systems Design II (UNO).
  The design and evaluation of contemporary computer systems are analyzed to compare the performance of different architectures. Topics include performance metrics, computer arithmetic, pipelining, memory hierarchies, and multiprocessor systems.

- ENEE 3514. Computer Architecture Laboratory (UNO).
  Selected experiments examining programmable logic, VHDL and logic synthesis, and including a final design project, to accompany and complement the lecture course ENEE 3584. Three hours of laboratory.

## Courses Taught

Fall 2022
- CSCE 3010.1: Signals and Systems (no evaluation yet)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2022
- CSCE 3020.1: Communication Systems (4.2 / 5.0)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2021
- CSCE 3010.1: Signals and Systems (4.6 / 5.0)
- CSCE 5933.1: LTE Physical Layer Using MATLAB (5.0 / 5.0)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2021
- CSCE 2610.2: Computer Organization (4.0 / 5.0)
- CSCE 3020.1: Communication Systems (4.2 / 5.0)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2020
- CSCE 3010.1: Signals and Systems (4.1 / 5.0)
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2020
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2019
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.3 / 5.0)
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2019
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6940.743: Software Defined Radios (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2018
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.8 / 5.0)
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2018
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6940.743: Jitter-buffer Management and Interference in VoIP (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2017
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.9 / 5.0)
- CSCE 6940.743: 5G MIMO Systems (no evaluation done)
- CSCE 6940.743: VoLTE and VoWiFi (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2017
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2016
- CSCE 5933.3: LTE Physical Layer Using MATLAB (4.7 / 5.0)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2016
- CSCE 5950.743: Thesis (no evaluation done)

- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2015
- CSCE 3010.1: Signals and Systems (5.7 / 7.0)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2015
- CSCE 5934.743: Directed Study (no evaluation done)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2014
- CSCE 3010.1: Signals and Systems (3.32 / 4.00)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)
- CSCE 6590.1: Advanced Topics in Wireless Communications & Networks: 4G/LTE (3.79 / 4.00)

Spring 2014
- CSCE 3510.1: Intro to Wireless Communication (808 – Highly Effective)
- CSCE 5510.1: Wireless Communications (808 – Highly Effective)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2013
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)
- CSCE 6590.1: Advanced Topics in Wireless Communications & Networks: 4G/LTE (804 – Highly Effective)

Spring 2013
- CSCE 4890.743: Directed Study (no evaluation done)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6940.743: Individual Research (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Fall 2012
- CSCE 3010.1: Signals and Systems (793 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (814 – Highly Effective)
- CSCE 5950.743: Thesis (no evaluation done)
- CSCE 6950.743: Dissertation (no evaluation done)

Spring 2012
- CSCE 3020.1: Communication Systems (809 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (811 – Highly Effective)
- CSCE 5510.1: Wireless Communications (817 – Highly Effective)
- EENG 3810.1: Communication Systems (801 – Highly Effective)

Fall 2011
- CSCE 3010.1: Signals and Systems (793 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (824 – Highly Effective)

Spring 2011

- CSCE 3020.1: Communication Systems (820 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (812 – Highly Effective)
- CSCE 5510.1: Wireless Communications (812 – Highly Effective)
- EENG 3810.1: Communication Systems (826 – Highly Effective)

Fall 2010
- CSCE 3010.1: Signals and Systems (857 – Highly Effective)
- CSCE 5540.1: Intro to Sensor Networks (831 – Highly Effective)

Spring 2010
- CSCE 3020.1: Communication Systems (792 – Highly Effective)
- CSCE 3510.1: Intro to Wireless Communication (793 – Highly Effective)
- CSCE 5510.1: Wireless Communications (834 – Highly Effective)
- EENG 3810.1: Communication Systems (854 – Highly Effective)

Fall 2009
- CSCE 3010.1: Signals and Systems (4.40 / 5.00)
- CSCE 5540.1: Intro to Sensor Networks (4.70 / 5.00)
- EENG 2620.1: Signals and Systems (4.40 / 5.00)

Spring 2009
- CSCE 3020.1: Communication Systems (4.87 / 5.00)
- CSCE 3510.1: Intro to Wireless Communication (4.65 / 5.00)
- CSCE 5510.1: Wireless Communications (4.79 / 5.00)

Fall 2008
- CSCE 3010.1: Signals and Systems (4.91 / 5.00)
- CSCE 5540.2: Intro to Sensor Networks (4.10 / 5.00)
- EENG 2620.3: Signals and Systems (4.91 / 5.00)

Spring 2008
- CSCE 3020.1: Communication Systems (4.68 / 5.00)
- CSCE 3510.1: Intro to Wireless Communication (3.96 / 5.00)
- CSCE 5510.1: Wireless Communications (4.75 / 5.00)

Fall 2007
- CSCE 3010.1: Signals and Systems (4.57 / 5.00)
- CSCE 5540.2: Intro to Sensor Networks (4.01 /5.00)

Summer 2007
- CSCE 3020.1: Fund. of Communication Theory (no evaluation done)
- EENG 3810.1: Communication Systems (no evaluation done)

Spring 2007
- CSCE 5510.2: Wireless Communications (4.75 / 5.00)
- CSCE 5933.6: Fundamentals of VoIP (4.70 / 5.00)

Fall 2006
- CSCE 3010.1: Signals and Systems (4.58 / 5.00)
- CSCE 5540.1: Intro to Sensor Networks (4.70 / 5.00)
- EENG 2620.1: Signals and Systems (4.58 / 5.00)

Summer 2006
- CSCE 3020.1: Fund. of Communication Theory (no evaluation done)
- CSCE 3510.21: Intro to Wireless Communications (no evaluation done)

- CSCE 5510.21: Intro to Wireless Communications (no evaluation done)
- EENG 3810.1: Communication Systems (no evaluation done)

Spring 2006
- CSCE 2610.2: Computer Organization (3.69 / 5.00)
- CSCE 3010.1: Signals and Systems (4.41 / 5.00)
- EENG 2620.1: Signals and Systems (4.41 / 5.00)

Fall 2005
- CSCE 3510.1: Intro to Wireless Communications (4.52 / 5.00)
- CSCE 5510.1: Wireless Communications (4.46 / 5.00)
- CSCE 5933.6: Intro to Sensor Networks (4.60 / 5.00)

Summer 2005
- CSCE 3010.21: Signals and Systems (no evaluation done)
- CSCE 3510.21: Intro to Wireless Communications (no evaluation done)

Spring 2005
- CSCE 3510.02: Intro to Wireless Communications (4.46 / 5.00)
- CSCI 3100.02: Computer Organization (4.14 / 5.00)

Fall 2004
- CSCE 3510.01: Intro to Wireless Communications (4.15 / 5.00)
- CSCI 4510.01: Machine Structures (4.55 / 5.00)
- CSCI 5330.02: Intro to Wireless Communications (4.05 / 5.00)

Summer 2004
- CSCI 4330.22: Intro to Wireless Communications (no evaluation done)
- CSCI 4330.23: Intro to Wireless Communications (no evaluation done)
- CSCI 5330.22: Intro to Wireless Communications (no evaluation done)

Spring 2004
- CSCI 3100: Computer Organization (4.64 / 5.00)
- CSCI 4330: Intro to Wireless Communications (4.22 / 5.00)

Fall 2003
- CSCI 4510: Machine Structures (4.49 / 5.00)
- CSCI 5330: Intro to Wireless Communications (4.83 / 5.00)

Summer 2003
- CSCI 3100: Computer Organization (no evaluation done)

Spring 2003
- CSCI 3100: Computer Organization (3.84 / 5.00)

Fall 2002
- CSCI 4510: Machine Structures (4.38 / 5.00)

## Funded Proposals

R1.   "I/UCRC Industrial Membership - Ashum Corp," 2020. Krishna Kavi (PI), Robert Akl (co-PI), **$52,000.**

R2.   "I/UCRC Industrial Membership - Ashum Corp," 2019. Krishna Kavi (PI), Robert Akl (co-PI), **$60,900.**

R3.  "I/UCRC Industrial Membership - Ashum Corp," 2018. Krishna Kavi (PI), Robert Akl (co-PI), **$57,700.**

R4.  "Robotics and App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $11,727. Submitted 5/5/17. Robert Akl (PI), **$11,727.**

R5.  "I/UCRC Industrial Membership - Ashum Corp," 2017. Krishna Kavi (PI), Robert Akl (co-PI), **$50,000.**

R6.   "UNT GenCyber Summer Program: Inspiring the Next Generation of Cyber Stars in North Texas," National Security Agency (NSA). Requested amount is $85,000. Submitted 11/4/2016. Robert Akl (co-PI), **$85,000**.

R7.  "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $12,900. Submitted 5/6/16. Robert Akl (PI), **$12,900.**

R8.  "I/UCRC Industrial Membership - Ashum Corp," 2016. Krishna Kavi (PI), Robert Akl (co-PI), **$65,000.**

R9.  "Robotics, Game and App Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 11/16/15. Robert Akl (PI), **$63,000**.

R10. "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $13,998. Submitted 5/1/15. Robert Akl (PI), **$13,988**.

R11. "I/UCRC Industrial Membership - Ashum Corp," 2015. Krishna Kavi (PI), Robert Akl (co-PI), **$40,000.**

R12. "App Design Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $12,500. Submitted 5/2/14. Robert Akl (PI), **$12,500**.

R13. "I/UCRC Industrial Membership - Ashum Corp," 2014. Krishna Kavi (PI), Robert Akl (co-PI), **$46,000.**

R14. "I/UCRC Industrial Membership - Ashum Corp," 2013. Krishna Kavi (PI), Robert Akl (co-PI), **$38,500.**

R15. "Robotics, Game and App Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 12/14/12. Robert Akl (PI), **$63,000**.

R16. "Bio-Com Project," funded by Raytheon under Net-Centric Software and Systems I/UCRC 2nd year. Requested amount is $30,000. Submitted 5/12/12. Krishna Kavi (PI), Robert Akl (co-PI), **$30,000.**

R17. "Bio-Com Project," funded by Raytheon under Net-Centric Software and Systems I/UCRC. Requested amount is $30,000. Submitted 5/12/11. Krishna Kavi (PI), Robert Akl (co-PI), **$30,000.**

R18. "Game Programming for Xbox 360 Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $20,000. Submitted 3/21/11. Robert Akl (PI), **$20,000**.

R19. "RoboCamps and Game Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 2/17/11. Robert Akl (PI), **$63,000**.

R20. "Game Programming for Xbox 360 Summer Camp" under Texas Higher Education Coordinating Board: Engineering Summer Program. Requested amount is $13,000. Submitted 2/22/10. Robert Akl (PI), **$18,000.**

R21. "Robotics and Game Programming Summer Camps" under Texas Workforce Commission: Summer Merit Program. Requested amount is $63,000. Submitted 10/16/09. Robert Akl (PI), **$63,000**.

R22. "Micro Air Vehicle Design: A Collaborative Undergraduate Project for Electrical Engineering, Computer Engineering, and Computer Science Students," under UNT Undergraduate Research Initiative. Submitted 9/25/2009. Robert Akl (co-PI), **$8,000**.

R23. "Summer Merit Program" under Texas Workforce Commission. Requested amount is $42,000. Submitted 3/20/09. Robert Akl (PI), **$42,000**.

R24. "Robocamp at Stewpot" under Dallas Women's Foundation. Requested amount is $20,000. Submitted 2/23/09. Robert Akl (PI), **$18,600**.

R25. "Robocamp Jump Start" under Motorola Foundation Innovation Generation Grant. Requested amount is $29,852. Submitted 2/12/09. Robert Akl (PI), **$30,700**.

R26. "Engineering Summer Program" under Texas Higher Education Coordinating Board. Requested amount is $7,944. Submitted 2/13/09. Robert Akl (PI), **$11,111**.

R27. "Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $152,393. Submitted 11/10/08. Robert Akl (PI), **$152,393**.

R28. "I/UCRC Center Proposal: Net-Centric Software and Systems," under NSF-07-537: Industry/University Cooperative Research Centers. Requested amount is $349,482. Submitted 9/26/08. Krishna Kavi (PI), Robert Akl (co-PI), **$60,000 per year for 5 years**.

R29. "Robocamp and Beyond" under Motorola Foundation Innovation Generation Grant. Requested amount is $30,000. Submitted 6/20/08. Robert Akl (PI), **$30,000**.

R30. Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $30,000. Submitted 2/27/08. Robert Akl (PI), **$31,500**.

R31. "Robocamp Program for Young Women" under RGK foundation. Requested amount is $30,000. Submitted 11/5/07. Robert Akl (PI), **$15,000**.

R32. "Texas Youth in Technology" under Texas Workforce Commission. Requested amount is $102,514. Submitted 10/22/07. Robert Akl (PI), **$102,514**.

R33. "Women Art Technology" under Hispanic and Global Studies Initiatives Fund. Requested amount is $14,125. Submitted 9/30/07. Jennifer Way (PI), Robert Akl (co-PI), **$12,785**.

R34. "Robocamp Mobile Unit" under Motorola Foundation Innovation Generation Grant. Requested amount is $35,000. Submitted 6/20/07. Robert Akl (PI), **$30,000**.

R35. "ICER: UNT Engineering Challenge Camps" under NSF 0547299. Requested amount is $35,000. Submitted 4/27/07. Oscar Garcia (PI), Robert Akl (senior personnel), **$32,792**.

R36. "I/UCRC-Planning Proposal: UNT Research Site Proposal to join Embedded Systems I/UCRC," under NSF-01-116: Industry/University Cooperative Research Centers. Requested amount is $10,000. Submitted 3/31/07. Krishna Kavi (PI), Robert Akl (co-PI), **$10,000**.

R37. "High-assurance NCCS: Ultra Dependability Integration Engineering," Department of Defense. Requested amount is $20,000. Submitted 3/12/07. Krishna Kavi (PI), Robert Akl (co-PI), **$20,000**.

R38. "Recruiting and Retention Strategies for Computer Science at UNT" under Texas Technology Workforce Development Grant Program – 2005. Requested amount is $163,322. Submitted 3/17/05. Robert Akl (PI), **$125,322**.

R39. UNT Faculty Research Grant for Fall 2003, Robert Akl (PI), $5,000, **$4,000**.

R40. UNT Junior Faculty Summer Research Fellowship for Summer 2003, Robert Akl

(PI), $5,000, **$5,000**.

## Professional Associations and Achievements

### Membership in Professional Organizations

- Senior Member IEEE
- Member, Federation Council of North Texas Universities
- Member, Eta Kappa Nu Electrical Engineering Honor Society
- Member, Golden Key National Honor Society
- Member, Tau Beta Pi Engineering Honor Society

### Offices and Committee Assignments in Professional Organizations

- Technical Program Committee Member, IEEE Wireless Communications and Networking Conference, IEEE WCNC
- Technical Program Committee Member, International Wireless Symposium, IWS
- Technical Program Committee Member, IEEE International Conference on Computational Science, IEEE ICCS
- Technical Program Committee Member, IASTED International Conference on Wireless Communications, WC
- Technical Program Committee Member, WTS Wireless Telecommunications Symposium
- Technical Program Committee Member, Mosharaka International Conference on Computer Science and Engineering, Amman
- Invitation to serve as an NSF reviewer/panelist for Engineering Research Centers (ERC) proposals
- Technical Program Committee Member, 18th IEEE International Symposium on Personal, Indoor and Mobile Radio Communication, Greece
- International Program Committee, IASTED International Conference on Wireless and Optical Communication, Canada
- Program Committee Member, Fifth Annual Wireless Telecommunications Symposium, CA
- Technical Publications Chair, IEEE Vehicular Technology Conference, Dallas TX
- Session Chair, International Conference on Computing, Commun. and Control Tech., Austin TX
- Session Chair, International Conference on Cybernetics and Information Technologies, Orlando FL
- Session Chair, 8th World Multi Conference on Systemics, Cybernetic, and Informatics, Orlando FL

### Additional Responsibilities and Activities

- Reviewer, *Wireless Communications and Mobile Computing*, 2012 – present
- Reviewer, *Journal of Sensor and Actuator Networks*, 2012 – present

- Reviewer, *IEEE Transactions on Vehicular Technology*, 2011 – present
- Reviewer, *Elsevier Journal of Computers & Electrical Engineering*, 2008 – present
- Reviewer, *IEEE Globecom*, 2007 – present
- Reviewer, *IEEE International Conference on Advanced Networks and Telecommunication Systems (ANTS)*, 2008 – present
- Reviewer, *The International Wireless Communications and Mobile Computing Conference*, 2007 – present
- Reviewer, *Journal on Wireless Communications and Networking*, 2007 – present
- Reviewer, *IEEE Transactions on Communications*, 2007 - present
- Reviewer, *International Journal of Communication Systems*, 2007 – present
- Reviewer, *IEEE Communications Magazine*, 2005 – present
- Reviewer, *Journal of Wireless Networks*, 2004 – present
- Reviewer, *IEEE Transactions on Mobile Computing*, 2004 – present
- Reviewer, *IEEE Transactions on Wireless Communications*, 2004 – present
- Reviewer, *ACM Crossroads*, 2004 – present

**Honors and Awards**

- Who's Who in America, 2012 Edition
- Winner of Tech Titan of the Future – University Level Award for UNT Robocamps for Girls, Metroplex Technology Business Council, 2010 with **$15,000 cash prize**.
- IEEE Professionalism Award, Ft Worth Chapter, 2008
- UNT College of Engineering Outstanding Teacher Award, 2008
- Certificate of Appreciation: IEEE Vehicular Technology Conference, Dallas, TX, 2005
- Certificate of Appreciation: Denton County Boosting Engineering, Science and Technology (BEST) Robotics Competition, 2004
- Summa Cum Laude Graduate, Ranked First in Undergraduate Class
- The Computer Science Departmental Award for Academic Excellence, Washington University, 1993
- The Dual Degree Engineering Award for Outstanding Senior, Washington University, 1993
- The 1992 Technical Writing Competition Award, The Society for Technical Communication

# Appendix B



# Copyright

This edition may be sold only in those countries to which it is consigned by Pearson Education International. It is not to be re-exported and it is not for sale in the U.S.A., Mexico, or Canada.

Editorial/production supervision: *Patti Guerrieri*

Cover design director: *Jerry Votta*

Cover designer: *Anthony Gemmellaro*

Cover design: *Andrew S. Tanenbaum*

Art director: *Gail Cocker-Bogusz*

Interior Design: *Andrew S. Tanenbaum*

Interior graphics: *Hadel Studio*

Typesetting: *Andrew S. Tanenbaum*

Manufacturing buyer: *Maura Zaldivar*

Executive editor: *Mary Franz*

Editorial assistant: *Noreen Regina*

Marketing manager: *Dan DePasquale*

© 2003 Pearson Education, Inc.

Publishing as Prentice Hall PTR

Upper Saddle River, New Jersey 07458

All products or services mentioned in this book are the trademarks or service marks of their respective companies or organizations.

All rights reserved. No part of this book may be reproduced, in any form or by any means, without permission in writing from the publisher. Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

Pearson Education LTD.

Pearson Education Australia PTY, Limited

Pearson Education Singapore, Pte. Ltd.

Pearson Education North Asia Ltd.

Pearson Education Canada, Ltd.

During the 1990s, many other countries and regions also built national research networks, often patterned on the ARPANET and NSFNET. These included EuropaNET and EBONE in Europe, which started out with 2-Mbps lines and then upgraded to 34-Mbps lines. Eventually, the network infrastructure in Europe was handed over to industry as well.

### Internet Usage

The number of networks, machines, and users connected to the ARPANET grew rapidly after TCP/IP became the only official protocol on January 1, 1983. When NSFNET and the ARPANET were interconnected, the growth became exponential. Many regional networks joined up, and connections were made to networks in Canada, Europe, and the Pacific.

Sometime in the mid-1980s, people began viewing the collection of networks as an internet, and later as the Internet, although there was no official dedication with some politician breaking a bottle of champagne over a fuzzball.

The glue that holds the Internet together is the TCP/IP reference model and TCP/IP protocol stack. TCP/IP makes universal service possible and can be compared to the adoption of standard gauge by the railroads in the 19th century or the adoption of common signaling protocols by all the telephone companies.

What does it actually mean to be on the Internet? Our definition is that a machine is on the Internet if it runs the TCP/IP protocol stack, has an IP address, and can send IP packets to all the other machines on the Internet. The mere ability to send and receive electronic mail is not enough, since e-mail is gatewayed to many networks outside the Internet. However, the issue is clouded somewhat by the fact that millions of personal computers can call up an Internet service provider using a modem, be assigned a temporary IP address, and send IP packets to other Internet hosts. It makes sense to regard such machines as being on the Internet for as long as they are connected to the service provider's router.

Traditionally (meaning 1970 to about 1990), the Internet and its predecessors had four main applications:

1. **E-mail.** The ability to compose, send, and receive electronic mail has been around since the early days of the ARPANET and is enormously popular. Many people get dozens of messages a day and consider it their primary way of interacting with the outside world, far outdistancing the telephone and snail mail. E-mail programs are available on virtually every kind of computer these days.
2. **News.** Newsgroups are specialized forums in which users with a common interest can exchange messages. Thousands of newsgroups exist, devoted to technical and nontechnical topics, including computers, science, recreation, and politics. Each newsgroup has its own etiquette, style, and customs, and woe betide anyone violating them.
3. **Remote login.** Using the telnet, rlogin, or ssh programs, users anywhere on the Internet can log on to any other machine on which they have an account.
4. **File transfer.** Using the FTP program, users can copy files from one machine on the Internet to another. Vast numbers of articles, databases, and other information are available this way.

Up until the early 1990s, the Internet was largely populated by academic, government, and industrial researchers. One new application, the WWW (World Wide Web) changed all that and brought millions of new, nonacademic users to the net. This application, invented by CERN physicist Tim Berners-Lee, did not change any of the underlying facilities but made them easier to use. Together with the Mosaic browser, written by Marc Andreessen at the National Center for Supercomputer Applications in Urbana, Illinois, the WWW made it possible for a site to set up a number of pages of information containing text, pictures, sound, and even video, with embedded links to other pages. By clicking on a link, the user is suddenly transported to the page pointed to by that link. For example, many companies have a home page with entries pointing to other pages for product information, price lists, sales, technical support, communication with employees, stockholder information, and more.

Numerous other kinds of pages have come into existence in a very short time, including maps, stock market tables, library card catalogs, recorded radio programs, and even a page pointing to the complete text of many books whose copyrights have expired (Mark Twain, Charles Dickens, etc.). Many people also have personal pages (home pages).

rate per month, no matter how many programs you watch. It could have been designed with pay-per-view as the basic concept, but it was not, due in part to the expense of billing (and given the quality of most television, the embarrassment factor cannot be totally discounted either). Also, many theme parks charge a daily admission fee for unlimited rides, in contrast to traveling carnivals, which charge by the ride.

That said, it should come as no surprise that all networks designed by the telephone industry have had connection-oriented subnets. What is perhaps surprising, is that the Internet is also drifting in that direction, in order to provide a better quality of service for audio and video, a subject we will return to in Chap. 5. But now let us examine some connection-oriented networks.

### X.25 and Frame Relay

Our first example of a connection-oriented network is X.25, which was the first public data network. It was deployed in the 1970s at a time when telephone service was a monopoly everywhere and the telephone company in each country expected there to be one data network per country—theirs. To use X.25, a computer first established a connection to the remote computer, that is, placed a telephone call. This connection was given a connection number to be used in data transfer packets (because multiple connections could be open at the same time). Data packets were very simple, consisting of a 3-byte header and up to 128 bytes of data. The header consisted of a 12-bit connection number, a packet sequence number, an acknowledgement number, and a few miscellaneous bits. X.25 networks operated for about a decade with mixed success.

In the 1980s, the X.25 networks were largely replaced by a new kind of network called frame relay. The essence of frame relay is that it is a connection-oriented network with no error control and no flow control. Because it was connection-oriented, packets were delivered in order (if they were delivered at all). The properties of in-order delivery, no error control, and no flow control make frame relay akin to a wide area LAN. Its most important application is interconnecting LANs at multiple company offices. Frame relay enjoyed a modest success and is still in use in places today.

### Asynchronous Transfer Mode

Yet another, and far more important, connection-oriented network is ATM (Asynchronous Transfer Mode). The reason for the somewhat strange name is that in the telephone system, most transmission is synchronous (closely tied to a clock), and ATM is not.

ATM was designed in the early 1990s and launched amid truly incredible hype (Ginsburg, 1996; Goralski, 1995; Ibe, 1997; Kim et al., 1994; and Stallings, 2000). ATM was going to solve all the world's networking and telecommunications problems by merging voice, data, cable television, telex, telegraph, carrier pigeon, tin cans connected by strings, tom-toms, smoke signals, and everything else into a single integrated system that could do everything for everyone. It did not happen. In large part, the problems were similar to those we described earlier concerning OSI, that is, bad timing, technology, implementation, and politics. Having just beaten back the telephone companies in round 1, many in the Internet community saw ATM as Internet versus the Telcos: the Sequel. But it really was not, and this time around even diehard datagram fanatics were aware that the Internet's quality of service left a lot to be desired. To make a long story short, ATM was much more successful than OSI, and it is now widely used deep within the telephone system, often for moving IP packets. Because it is now mostly used by carriers for internal transport, users are often unaware of its existence, but it is definitely alive and well.

### ATM Virtual Circuits

Since ATM networks are connection-oriented, sending data requires first sending a packet to set up the connection. As the setup packet wends its way through the subnet, all the routers on the path make an entry in their internal tables noting the existence of the connection and reserving whatever resources are needed for it. Connections are often called virtual circuits, in analogy with the physical circuits used within the telephone system. Most ATM networks also support permanent virtual circuits, which are permanent connections between two (distant) hosts. They are similar to leased lines in the telephone world. Each connection, temporary or permanent, has a unique connection identifier. A virtual circuit is illustrated in Fig. 1-30.

### Figure 1-30. A virtual circuit.



The *Version* field keeps track of which version of the protocol the datagram belongs to. By including the version in each datagram, it becomes possible to have the transition between versions take years, with some machines running the old version and others running the new one. Currently a transition between IPv4 and IPv6 is going on, has already taken years, and is by no means close to being finished (Durand, 2001; Wiljakka, 2002; and Waddington and Chang, 2002). Some people even think it will never happen (Weiser, 2001). As an aside on numbering, IPv5 was an experimental real-time stream protocol that was never widely used.

Since the header length is not constant, a field in the header, *IHL*, is provided to tell how long the header is, in 32-bit words. The minimum value is 5, which applies when no options are present. The maximum value of this 4-bit field is 15, which limits the header to 60 bytes, and thus the *Options* field to 40 bytes. For some options, such as one that records the route a packet has taken, 40 bytes is far too small, making that option useless.

The *Type of service* field is one of the few fields that has changed its meaning (slightly) over the years. It was and is still intended to distinguish between different classes of service. Various combinations of reliability and speed are possible. For digitized voice, fast delivery beats accurate delivery. For file transfer, error-free transmission is more important than fast transmission.

Originally, the 6-bit field contained (from left to right), a three-bit *Precedence* field and three flags, *D*, *T*, and *R*. The *Precedence* field was a priority, from 0 (normal) to 7 (network control packet). The three flag bits allowed the host to specify what it cared most about from the set {Delay, Throughput, Reliability}. In theory, these fields allow routers to make choices between, for example, a satellite link with high throughput and high delay or a leased line with low throughput and low delay. In practice, current routers often ignore the *Type of service* field altogether.

Eventually, IETF threw in the towel and changed the field slightly to accommodate differentiated services. Six of the bits are used to indicate which of the service classes discussed earlier each packet belongs to. These classes include the four queueing priorities, three discard probabilities, and the historical classes.

The *Total length* includes everything in the datagram—both header and data. The maximum length is 65,535 bytes. At present, this upper limit is tolerable, but with future gigabit networks, larger datagrams may be needed.

The *Identification* field is needed to allow the destination host to determine which datagram a newly arrived fragment belongs to. All the fragments of a datagram contain the same *Identification* value.

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2022, copies of the foregoing were caused to be served upon the following in the manner indicated:

James M. Lennon, Esquire                                    *VIA ELECTRONIC MAIL*
Peter Akawie Mazur, Esquire
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiff*

Jonathan K. Waldrop, Esquire                                *VIA ELECTRONIC MAIL*
Darcy L. Jones, Esquire
Marcus A. Barber, Esquire
ThucMinh Nguyen, Esquire
John W. Downing, Esquire
Heather S. Kim, Esquire
KASOWITZ BENSON TORRES LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA  94065
*Attorneys for Plaintiff*

Shelley Ivan, Esquire                                       *VIA ELECTRONIC MAIL*
Noah P. Dorman, Esquire
Hershy Stern, Esquire
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY  10019
*Attorneys for Plaintiff*

Paul G. Williams, Esquire                                   *VIA ELECTRONIC MAIL*
KASOWITZ BENSON TORRES LLP
1230 Peachtree Street, NE, Suite 2445
Atlanta, GA  30309
*Attorneys for Plaintiff*

*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)

# Bates Decl.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC D/B/A | § | |
| BRAZOS LICENSING AND | § | |
| DEVELOPMENT, | § | |
| | § | C.A. No. 1:21-1117-MN-CJB |
| *Plaintiff*, | § | C.A. No. 1:21-1119-MN-CJB |
| | § | C.A. No. 1:21-1120-MN-CJB |
| v. | § | |
| | § | |
| NETGEAR, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**DECLARATION OF REGIS J. (BUD) BATES, JR. IN SUPPORT
OF PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**

I, Regis J. (Bud) Bates, Jr., declare as follows:

## I.   INTRODUCTION

1.       I reside in Heber, Arizona 85928.

2.       I have been retained as an expert in this proceeding by Kasowitz Benson Torres LLP, counsel for Patent Owner, to offer opinions regarding U.S. Patent Nos. 7,512,096 (the "'096 Patent") and 7,551,630 (the "'630 Patent") ("Asserted Patents") in response to NETGEAR's expert, Dr. Robert Akl regarding the meaning of certain claim terms.  This declaration sets forth the opinions I have reached to date.

3.       I am being compensated by Patent Owner at my standard hourly consulting rate of $350[1] per hour for my time spent on this matter. My compensation is not contingent on the outcome of the proceeding or on the substance of my opinions.

4.       I have no financial interest in any of Petitioners or Patent Owner.

## II.   PROFESSIONAL QUALIFICATIONS, BACKGROUND AND EXPERIENCE

5.       My name is Regis J. (Bud) Bates, Jr. and I am the founder and President of TC International Consulting, Inc. ("TCIC"). Our offices are located at 3413 Ponderosa Loop, Heber, AZ 85928. At TCIC, I have consulted and worked with much of the telecommunications industry since 1989.

6.       I summarize in this section my educational background, career history, publications, and other relevant qualifications. A more detailed account of my work experience, qualifications, and publications is included in my curriculum vitae ("CV"), attached as Appendix A to this declaration.

---

[1] I note that I am being paid by a third party that marks up my hourly rate when billing the client.

7.      I earned a Bachelor of Science (BS) degree in Business Management in 1979 from Stonehill College in Easton, Massachusetts and I completed coursework towards a Masters of Business Administration ("MBA") degree at Lehigh University in Bethlehem, Pennsylvania and St. Joseph's College in Philadelphia, Pennsylvania. I completed all the coursework but not a thesis required for the MBA degree.

8.      Since 1966, I have been involved in designing, building, optimizing and training others in many aspects of telecommunications systems, including multiuser cellular and cable-based systems as well as PBX and computer networks. In that time, I have had an active role in the growth of the telecommunication industry and have personally witnessed, and contributed to, the industry's growth in terms of various technologies, infrastructure, and legal, regulatory and technical services. I have significant professional work experience in telecommunications. I have worked extensively with the technology used in Long-Term Evolution ("LTE") (and earlier 2G, 3G and 4G cellular systems) as well as 802.11 Wi-Fi systems. My experience spans all layers of Open Systems Interconnection ("OSI") model, including the physical, data-link (including media access control) and network layers. For example, in my various professional roles, described below, I have been responsible for implementing telecommunications systems up to the application layer.

9.      I have written numerous books on telecommunications technology, many of which have been best sellers for publisher McGraw-Hill. My textbook titled "Voice and Data Communications Handbook" led McGraw-Hill's sales for three consecutive years and has been used by over 166 colleges and universities around the world. Other books that I have written include "Wireless Networked Communications," "Wireless Broadband Communications," "cdmaOne and cdma2000," "General Packet Radio Services (GPRS)," "Principles of Voice and

Data," "Broadband Telecommunications Handbook" and "Optical Networking and Switching." I am the co-author of a book entitled "Wireless Networks Dictionary" published by Althos Publishing.

10.     I have personally developed curricula and taught telecommunications classes on-site with many of the world's leading manufacturers and providers of telecommunications equipment and services. These have included classes titled or on the following topics "Introduction to Voice Communications," "Hands on Telephony, "Installing and implementing a PBX solution," "Hands on Voice over IP," "Implementing VoIP," "Securing VoIP," "IP PBX Solutions," "Call Center Convergence," "Introduction to Data Communications," "Hands on Data Communications," "LAN and WAN communications," "Introduction to T1 and T3," "Optical Networking and SONET," "Data and Internet Communications, a How to Course for implementing solutions," "Ethernet and Gigabit Ethernet," "Asynchronous Transfer Mode (ATM)," "Frame Relay a Data Communications design," "Wireless Communications," "Hands on Securing Wireless Networks," "Hands on Integrating Wireless Networks," "TCP/IP," "Linking LANs and WANs with Bridging and Routing," "GPRS," "GSM (including WAP and MMS)," "Next Generation Wireless," "Cisco RF Design" and "Cisco Wireless Mesh." As indicated by these names and titles, I have deep experience teaching others about the implementation of use of telecommunications networks at varying levels of generality and at most layers of OSI protocol stack.

11.     I have also been personally involved in developing curricula and teaching courses on the certification of products and services with various technical specifications and standards, including Wi-Fi Certifications (CWNA), Wi-Fi Security Certification (CWSP), and CompTIA

courses on WiMAX certification (Wi-MAX RF Engineer), RFID Certification (RFID+) and Convergence Technologies Professional (CTP) Certification.

12.     Through my decades of close involvement with the telecommunications industry, I have first-hand knowledge regarding the relationship between service providers and carriers on one hand, and their equipment vendors, on the other, including on the extent to which providers and carriers dictate and require that equipment be certified to, or otherwise comply with, standards specifications and other technical requirements. I am also familiar with the extent to, and manner in which, providers and carriers evaluate vendor equipment on technical and business grounds, select certain equipment for use in their network, evaluate the equipment's performance and determine whether to upgrade such equipment or its associated software. I am also familiar with the criteria and methodologies that providers and carriers use to monitor data activities on their network and the extent to which providers and carriers disallow certain types of network activities or traffic patterns.

13.     I developed much of the Fastlane Wireless Curriculum including Wi-Fi Mesh, RF Design, and Wi-Fi Hands on classes. I have additional curricula development for Cisco and Aruba networks (now HPE). I am a registered Cisco, Juniper and Microsoft partner. I am familiar with Cisco routing and switching products, security products and wireless products. I have also developed and implemented RFPs on VoIP systems including Cisco Call Manager and Avaya VoIP Systems.

14.     From 1966 to 1972, I worked as a Captain of the United States Army Signal Corps. In this role, I was immersed in telecommunications technology. I performed communications systems and signal analysis on an almost daily basis and worked in communications system algorithm design, modulation and demodulation techniques and other technical issues often in the

context of rapidly changing and unpredictable network deployment scenarios. For example, while in Vietnam, I worked with mobile and fixed location radio-based systems, and installed a system that spanned over 400 miles for military tactical forces. I was responsible for the operation and control of the Automatic Voice Network (AUTOVON) system in Donnersberg, Germany, and I had operational responsibility for the Pirmasens, Germany Satellite terminal. At Ft. Devens, I ran the Communications Center, which facilitated telex, Teletype and facsimile services for the military. I also participated in a six-month program on communications systems and RF basics. I worked in and with fixed and mobile Radio relay VHF systems, satellite systems, long haul troposcatter and various two-way communications models. Based on my work on these and other projects, I received significant telecommunications system training while working for the Army.

15.    From 1972 to 1974, I was a Telecommunications and Facilities Manager for Damon Corporation. My responsibilities including overseeing voice and data (limited analog dial up) communications for locations across the country. The corporate communications budget was approximately $2.5 million annually.

16.    From 1974 to 1977, I was Manager of Administrative Services for Hills Department Stores in Canton, MA. In this role, my responsibilities included analyzing, selecting and implementing major communications projects in 50 stores spread throughout the east and mid-west of the United States.

17.    From 1977 to 1979, I was Telecommunications Manager for Manufacturing and International Sites for Data General Corporation in Westboro, MA. In this role, I was responsible for selecting equipment (from Bell and competitors) for 100 sites across the world, selecting services (voice, data and fax traffic) from the common carriers and selecting the appropriate means

and protocols to use these goods and services. I installed a T1 network from coast to coast. I was also responsible for the installation of 30 PBXs and 40 key telephone systems.

18.     From 1979 to 1986, I was Telecommunications Manager for Air Products and Chemicals, Inc., with an annual budget of $50 million. In this role, I designed, selected, analyzed and implemented all communications projects for the use of voice and data communications at the corporation's 440 sites around the US and 35 international sites. This included the use of telephone systems, dial up telephony and data, leased lines for voice and data and analog and digital circuits (including T1, T3 and fiber optics). I was also responsible for research, selection and installation of over 250 telephone systems (PBX and Key Systems along with integration systems). I also worked on a project to integrate the company's voice, data, TV-video and local area network (LAN) services into what is now known as a Campus Area Network (CAN). The CAN was on a broadband cable television (CATV) system and implemented a "triple play" service on campus well before CATV companies started offering such services. In connection with this work, I worked with major cable providers on various Data Over Cable Service Interface Specification (DOCSIS) services. I understand that the CAN system was studied and written up as a Harvard Business School case related to the integration scheme and other business aspects.

19.     From 1986 to 1989, I was Chief Information Officer for Pepper, Hamilton and Scheetz law firm in Philadelphia, PA. In that role, I performed complete automation of the firm's multiple offices around the country. I was also responsible for the selection and installation of 10 PBX systems, all with major integration services, and the design, final installation and testing of local area networks (LANs). I also created the WAN access and usage through a network of digital circuits using T1 services from many of the common carriers and new competitors in the industry.

20.    I am currently the President and Founder of TC International Consulting, Inc. ("TCIC"), a consulting company that I founded and where I have worked since 1989. At TCIC, I have consulted and worked with much of the telecommunications industry. I have provided analyses and findings to clients regarding the selection of vendors or products and directly provided training in various technologies including Voice, Telephone Systems, Data Networks, Video, Internet, Wireless, Wireless LAN Technologies, VoIP systems and services, Fiber Optics and Infrastructure. My company has been responsible for selecting and implementing over 100 PBX systems for client companies.

21.    At TCIC, I develop and conduct training for corporate users, manufacturers and telecommunications carriers. I have personally trained individuals at all of the Regional Bell Operating Companies ("RBOCs"), over 150 Competitive Local Exchange Carriers ("CLECs"), LTE carriers, including AT&T, MCI/WorldCom (now Verizon), Sprint (now T-Mobile), MetroPCS and Cellular One, and most of the large telecommunications equipment manufacturers (Nortel-Networks, Lucent (now Nokia), Avaya, Mitel, Siemens, Alcatel (now Nokia), Newbridge, Marconi and Cisco), the United States government and other Fortune 500 companies. I was a badged-contractor for Cisco systems on their Wi-Fi products and the integration of VoIP over wireless technologies.

22.    I have authored approximately 20 books, published numerous articles and papers in magazines, and taught courses and seminars in telecommunications and computers in over a dozen countries globally. I have been a technical editor for IPTV Magazine since 2016. I am a senior member of the IEEE. I have also been a keynote speaker at conferences, events and meetings, including Comdex, the International Communications Association, BICSI, RBOC and annual meetings for Ameritech and PacBell. I have also been the keynote speaker at Disaster

Recovery Journal Annual seminars regarding DR Planning for Telecommunication Networks. 23. Based on my 50+ years of work experience analyzing, implementing and teaching others in telecommunication systems, including multi-user wireless communication systems and cable systems, and the acceptance and recognition of my books, articles and training and consulting services in this technical field, I believe that I am considered an expert in the art of wireless communication systems and VoIP systems, and their associated signal processing and algorithm design, at all layers of the OSI stack. I have extensive experience in the research and development, and implementation, of such systems. I have also been qualified numerous times as an expert, and I have given expert opinion testimony related to many aspects of wired and wireless telecommunications systems. Additionally, I have extensive publications or authored books in related to such telecommunications systems.

## III.   MATERIALS REVIEWED

23.     In forming my opinions, I have reviewed the patents, briefs, and exhibits submitted by the parties regarding claim construction, including the declaration of Dr. Robert Akl and exhibits thereto. In reaching my opinions, I have relied upon my experience in the field and also considered the viewpoint of a person of ordinary skill in the art ("POSITA") at the time of the earliest relevant date of the patent.  I am told that this is at least as early as November 24, 2004 for the '096 Patent and June 13, 2003 for the '630 Patent. As explained below, I am familiar with the level of skill of a POSITA regarding the relevant technology at issue as of that time and meet the requirements of a POSITA described below.  As such, my opinions presented below are through the viewpoint of a POSITA.

## IV.   DESCRIPTION OF THE RELEVANT TIMEFRAME, THE RELEVANT FIELD, AND A PERSON OF ORDINARY SKILL IN THE ART

24.     I have been informed that an assessment of claims should be undertaken from the perspective of a POSITA as of the earliest claimed priority date.

25.     I considered several factors to determine the skill level of a POSITA in the field of the patents during the time of the invention, including the types of problems encountered in the art, the solutions to those problems, the pace of innovation in the field, the sophistication of the technology, and the education level of active workers in the field.

26.     Based on my knowledge, expertise, and the disclosure of the '630 and '096 Patents, it is my opinion that a POSITA would be one in the field of networking with a bachelor's degree in electrical engineering, computer sciences, or telecommunications, along with three to five or more years of practical experience in the field.  A higher level of education makes up for less experience and, similarly, a higher level of experience makes up for a lower level of formal education. For the purposes of this report only, I have applied this standard to my analysis. My analysis is made with an understanding that as time passes the knowledge of one of ordinary skill in the art will increase.

27.     Unless noted otherwise, when I state that something would be known or understood by one skilled in the art, or a skilled artisan, or a POSITA, I am referring to a person with this level of education and experience in or around the time of the invention.

## V.   CLAIM CONSTRUCTION PRINCIPLES

28.     I am not a legal expert or an attorney, and offer no opinions on the law. I understand that claim construction is a matter of law. However, I have been informed by counsel of the legal standards that apply to claim construction, and I have applied them in forming my opinions.

29.     I have been informed that the words of a claim are generally given the ordinary and customary meaning that the term or phrase would have to a POSITA at the time of the invention in view of the surrounding claim language, the specification and the file history (collectively, the "intrinsic evidence"). I also understand that courts may consider extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, but that such extrinsic evidence should be given less weight than the intrinsic evidence.

30.     I have been informed that information incorporated by reference in a patent specification are considered part of the specification as if fully set forth therein and are just as relevant to claim construction as the rest of the specification.

## VI.     OTHER PRINCIPLES

31.     I understand that according to a rule in patent law, the word "a" appearing in a patent claim is generally interpreted to mean "one or more" in claims that are open-ended and include the word "comprising." I understand that exceptions to this rule are uncommon and generally apply only if the other claim language, the specification or the prosecution history of the patent dictate that "a" has a different meaning.

## VII.     DISPUTED CLAIM TERMS

### A.     '096 Patent

32.     I understand that the parties dispute the term "Discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension" in claim 1 of the '096 Patent.  I further understand that the parties propose the following constructions:

| Brazos's Construction | NETGEAR's Construction |
|---|---|
| No construction necessary - plain and ordinary meaning; alternatively, if the Court determines that the term can be construed: "differentiating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension" | Indefinite.  Alternatively, the Court should find that this term does not limit the claim. |

33.     I agree with Brazos' construction and disagree with NETGEAR's proposed construction for the reasons stated herein.

34.     I understand that NETGEAR argues that the claim term is indefinite because it is redundant of the following limitation: "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively."  I disagree.

35.     Brazos' construction is proper because it comports with the claim language itself. For example, the claim uses different language for each step.  A POSITA would understand that different language means different things in the context of the patent.

36.     Additionally, I compared the claim language of the two limitations NETGEAR argues to have the same meaning.  Below is the comparison:

| Ex. 1 ('096 Patent) at Limitation 1[d] | Ex. 1 ('096 Patent) at 1[e] |
|---|---|
| "discriminating transmissions of said first and said second data on a downlink in said radio frequency communication based on a spatial dimension" | "applying a space division multiple access based on said transmission protocol to said transmissions to transmit said first and said second data substantially concurrently from said access point to said first and second mobile stations, respectively" |

Ex. 1 ('096 Patent) at Cl. 1.  A comparison of the claim language not only reveals that the patent uses different language for each limitation, but also that each limitation requires a different action and a different step.  For example, element 1[d] describes "discriminating" whereas element 1[e]

describes "applying." *Id*.   Similarly, element 1[d] is simply discriminating between different transmissions on a downlink, while element 1[e] involves applying a division to transmit data substantially concurrently to the mobile stations.  *Id*.

37.     Brazos' construction also comports with the specification, which contains examples of the "discriminating transmissions…" step.  For example, in one embodiment, transmissions would be differentiated based on a spatial dimension in the first step and the access point may apply the transmission protocol based on the SDMA module to the first and second radio frequency transmissions 205(1-k) in the second step.  *See* Ex. 1 ('096 Patent) at 7:26-30 ("[i]n operation, the SDMA downlink 120a may use the spatial dimension to allow discrimination among a first and a second radio frequency transmission 205(1-k) at a data rate of 54 Mbits/s").  As another example, the patent refers to two articles describing discrimination step.  *See* '096 Patent at 1:60-2:3.  In one of the articles, for example, discrimination can involve modifying the weight vectors of different users.  Ex. 5 (Alastalo) at 398.  The patent itself, similarly describes weighting as a form of discriminating transmissions.  Ex. 1 ('096 Patent) at 8:17-21 ("The access point 105a may weight the first data 135(1) to transmit same using the first and second antennas 110a(1-m) so that the first mobile station 145a(1) only receives the first data 135(1) on the SDMA downlink 120a, as depicted in block 405"); *id*. at Fig. 4; *see also* 8:30-63; Fig. 5.  Similar, in an exemplary embodiment, the patent shows weighting occurring at the Access Point in Fig. 5.



**FIGURE 5**

*Id.* at Fig. 5.  The Access Point, in one example, can then apply space division multiple access a

seen Fig. 2.

38.     I disagree with Dr. Akl's opinions regarding this term.  For example, I disagree

with Dr. Akl's interpretation of the discriminating step as shown in claim 1.   The claim describes:

"discriminating transmissions of said first and said second data on a downlink in said radio

frequency communication based on a spatial dimension."  Ex. 1 ('096 Patent) at Cl. 1.  Dr. Akl

asserts that the discriminating step is met by merely using SDMA.  Akl Decl. at ¶ 32.  Dr. Akl

misses the point.  A POSITA would understand "discriminating transmissions" requires the

recognition of a difference.  While a single component can perform both steps of recognizing a

difference and applying to different mobile stations, these steps are not redundant of one

another.

39.     A POSITA would recognize that a discriminating step involves the ability to assess

and determine the transmissions of a first and said second data on a downlink. The purpose of the

discriminating is to *recognize the difference between the first and second data to be transmitted*. A POSITA should and would understand that there are differences in the two sets of data to be transmitted and before transmitting these data over a downlink in a radio frequency communication which based on spatial dimensions, the transmitter would have to discriminate between data set 1 and data set 2 so that the appropriate data can be assigned to the appropriate spatial dimension (the separation of the channel on the same frequency). Dr. Akl should have recognized that SDMA uses physical separation methods that permit sharing of a carrier frequency (the wireless channel).

40.     Simply put, In order for a single access point (AP) with multiple antennae to transmit data to two different receivers (devices) on the downlink, the AP must differentiate which data will be sent to device 1 and which data will be sent to device 2. Thus, discrimination requires first differentiating the data meant for device 1 and device 2.  Then, he next logical step would be to transmit the differentiated data so that each device will receive the data intended for each device.

41.     Next, Dr. Akl states in paragraph 33 that: "A POSITA understands that the applying step results in the discriminating step.…Because the applying step causes the discriminating step to occur, it is unclear how the discriminating step further limits claim 1 of the '096 Patent. One skilled in the art would not understand the scope of the discriminating step as it does not appear to add any further limits to claim 1 beyond what is found already in the applying step."  Akl Decl. at ¶ 33.  I disagree with this assessment.  In fact, it is my opinion that the applying step logically flows from the discriminating step.  Once the AP has discriminated the data to be sent, it then applies the SDMA transmission of the specific narrow band channel to send the data to the correct receiver.  A POSITA would have to understand that the applying the data to the specific SDMA channel can occur once the discriminating (differentiating) step occurs. The specification cited by Dr. Akl supports my view.  For example, the specification first describes "discrimination among a

first and a second radio frequency transmission" and then describes the separate step of "apply[ing] the transmission protocol 165 based on the SDMA module 170 to the first and second radio frequency transmissions."  Ex. 1 ('096 Patent) at 7:26-33.  As such, a POSITA reading the specification would understand these two different steps are not redundant and Dr. Akl has not shown that they are redundant.

42.     I understand that the parties dispute the term "substantially concurrently" in claim 1 of the '096 Patent.  I further understand that the parties propose the following constructions:

| **Brazos's Construction** | **NETGEAR's Construction** |
|---|---|
| No construction necessary - plain and ordinary meaning; alternatively, if the Court determines that the term can be construed: "substantially simultaneously" | Indefinite.  Alternatively, if the Court determines that the term can be construed: "at the same time" |

43.     I agree with Brazos' construction and disagree with NETGEAR's proposed construction for the reasons stated herein.

44.     I reviewed the specification and find that the term, when read in the context of the patent as whole, is not indefinite.  Indeed, the meaning of the term when read in context would be reasonably ascertainable to a POSITA.

45.     For example, the specification is replete with support providing guidance to a POSITA.  Ex. 1 ('096 Patent) at 9:43-44 (describing "substantial[] overlap in time).  As another example, the specification specifically describes "parallel" transmissions as opposed to transmissions in sequence.  Ex. 1 ('096 Patent) at Abstract, 6:59-64.

46.     Dr. Akl, in paragraph 35, states that Claim 1 adds a modifier "substantially" to "concurrently."  Akl Decl. at ¶ 35.  In this regard, he opines that "one skilled in the art would not understand the impact of this modifier."  *Id*.  I disagree with Dr. Akl.  The word concurrently (or simultaneously) means the same thing as stated in Dr. Akl's declaration.  However, it would be

unnecessary to modify either word if the patentee only wanted to describe transmissions absolutely at the same time. The modifier qualifies the fact that the transmissions occur at approximately the same time but not necessarily exactly starting or ending at exactly the same time.  By sheer nature of the protocols a POSITA would use, there are offsets that may occur by each individual station to receive the data.  In fact the '096 describes stylized representations illustrating time offsets.  Ex. 1 ('096 Patent) at 9:54-62.

47.    Dr. Akl should understand that the transmissions of data from various senders and receivers allows for slight deviations in timing due to distance, backoff algorithms, collisions, etc. Thus, to modify the word simultaneous or concurrent with the modifier "substantially" allows a POSITA to recognize that in wireless communications timing is not absolute.

48.    In paragraph 37 Dr. Akl starts with a comparison of substantially simultaneous and simultaneous as being no different, then compares that to the fact of a parallel transmission being exactly at the same time.  Akl Decl. at ¶ 37.  I disagree with Dr. Akl's statements because parallel transmissions (as opposed to sequential ones) can occur on each of the narrow beams substantially at the same time (*e.g*., side by side) but do not have to be perfectly synchronized.  A POSITA would be able to determine and understand transmission in parallel, does not have to be exactly perfectly timed such the entirety of the transmission timing overlaps. Rather, there may be an offset between the two transmissions.   Notably, the patent even contemplates and describes such offsets in the specification.  Ex. 1 ('096 Patent) at 9:54-58 ("a time-offset (T) between the SDMA transmitted MPDUs (MPDU 1 and MPDU k) for the SDMA transmissions shown in FIG. 5 in accordance with one illustrative embodiment of the present invention"); *see also* Fig. 5 (showing example including at time-offset).

49.    In paragraph 39 Dr. Akl attempts to describe the following: "The '096 Patent does not provide any objective boundaries regarding how its SDMA data transmissions could be altered such that they do not occur at the same time." Akl. Decl. at ¶ 39. Then he professes: "Accordingly, the term 'substantially concurrently' is indefinite. While the term 'substantially concurrently' is indefinite, to the extent it can be understood, it most likely means 'at the same time.'" *Id*. Dr. Akl is attempting to have it both ways. *Id*. The term substantially concurrently is not indefinite by his statement, because he wavers and says it most like means at the same time. As described above, the modifier "substantially" connotes that the timing is not required to be absolutely synchronized.

### a.  '630 Patent

50.    I understand that the parties dispute the term "control packet" in claims 1, 2, 4, and 10 of the '630 Patent. I further understand that the parties propose the following constructions:

| Brazos's Construction | NETGEAR's Construction |
|---|---|
| No construction necessary - plain and ordinary meaning – where the plain and ordinary meaning of control packet means "packets comprising, at least, the necessary control data to create the necessary forwarding path" | ***Original Construction***: "Packets that contain data necessary to create a forwarding path and can be adapted"<br><br>***New Construction***: Packets that contain data necessary to create a forwarding path. |

I agree with Brazos' construction and disagree with NETGEAR's proposed construction for the reasons stated herein.

51.    In the analysis of the '630 Patent, Dr. Akl begins by asserting that there is no term of art that defines control packets. Akl Decl. at ¶ 43. I disagree. He then states that a POSITA would refer to control information in the header of a packet. *Id*. Further he states: "As described by the '630 Patent, however, the 'control packets' are the ones that 'comprise the required control data to create the required forwarding path and might possibly be adapted.' One skilled in the art

would understand that this control data is the data typically found in the header of a packet." *Id*. I do not agree with Dr. Akl's analysis for the reasons described below.

52.    The '630 Patent describes that there are two types of packets in the '630 Patent. Ex. 2 ('630 Patent) at 1:10-22. The patentee took differentiated the two types of packets, the transit traffic packet and the control traffic packet.  The transit traffic packet is described as data packets that are not leaving the forwarding path. The control traffic packet is referred to as the control packet.  The '630 Patent explains that the control traffic packet comprises the required control data to create the required forwarding path and might possibly be adapted.  The control packets are routed to a processor called hereafter, common processor. *See* Ex. 2 ('630 Patent) at 1:10-17.  The '630 Patent then explains that the patent is dealing with the second type, the control traffic packet. Thus, it is my opinion that a POSITA would understand that the plain and ordinary meaning of the term control packets should mean "packets comprising, at least, the necessary control data to create the necessary forwarding path."

53.    I agree with Dr. Akl that column 1:10-22 is relevant to understand the meaning of the term "control packet."  Akl Decl. at ¶ 41.  I do not agree with Dr. Akl that a data packet is a control packet just because control information in a regular data packet is present in a data packet. *Id*. at ¶¶ 41-44. While there is control data in the header of a "data packet" which is used for the processing of that single data packet. The '630 Patent goes beyond that and defines a separate packet that is used for control purposes only. The '630 Patent specifically defines two separate types of packets; one for data and one for control purposes.

54.    Control information is different than control functionality vis-à-vis a control packet.  In telecommunications networks for example, there are data channels and control channels. The data channels carry data, the control channel controls the set up and tear down of

the channel, along with any other specific characteristics of the data flow. A POSITA reading the '630 Patent would recognize the differentiation of the two types of packets; those that deal with data information of the individual packet with some control header information and those packets that deal with controlling the route and set-up/tear down of the path but not carrying data traffic. A POSITA would also recognize that the '630 Patent deals with the handling of the control packets and not the data transit packets. Thus, I disagree with Dr. Akl stating that the description of the control information contained in a data packet and a control packet that is used to set up and /or tear down a path, etc. are the same.  They are not.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief, formed after reasonable inquiry under the circumstances.

Executed on the 7th day of September, 2022, in Heber_, Arizona.

By: _____

Regis J. (Bud) Bates, Jr.

# APPENDIX A

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

## Professional Summary

Regis J. "Bud" Bates has more than 49 years of experience in Telecommunications and Information Services and has long been considered a technology "Guru." He currently contributes to these fields as an author, consultant, expert witness, speaker, course developer and teacher.  He has written numerous books on the technologies, many of which have been best sellers for McGraw-Hill.  His "Voice and Data Communications Handbook" led McGraw-Hill's sales for three consecutive years and has been used by over 166 colleges and universities around the world.  With clients spanning the range of Fortune 100-500 companies, Mr. Bates has been involved in the design of major voice and data networks.  His innovative ideas in implementation have been written up in trade journals and magazines.  Many of his projects deal with multiple sites and countries using Frame Relay, ATM and MPLS architectures.  A significant amount of Mr. Bates' work has been in the wireless communications area both Cellular and Wi-Fi networks.  In his work with venture capitalists, he has consistently been on the mark with his projections for various analyses and studies.

Mr. Bates is known for his dynamic keynote speaking. With a style that is power-packed and a delivery that is exciting, he knows how to captivate, engage and motivate the audience.  He motivates the sales force, customers, management team, and capital investors trying to figure out where the technology is heading for the future and where to invest.  Regis Bates also develops and conducts various public and in-house seminars ranging from a managerial overview to very technical hands-on classes on Voice over IP, VoIP Security, Wi-Fi Networking, WIMAX networking, MPLS, DWDM, Voice & Data, Next Generation Wireless Networking and IPv6.  In the recent past he has focused much of his development and training activities on the convergence of three key areas; VoIP, Security and Wi-Fi.

Mr. Bates is a Cisco Certified Systems Instructor (CCSI #32076) and a registered partner for training and training development with Cisco Training Partners (Fastlane). He developed much of the Fastlane Wireless Curriculum including Wi-Fi Mesh, RF Design, and Wi-Fi Hands on classes. As a registered partner he is very familiar with the Cisco routing and switching products, security products and wireless products. He has also been used as an SME for many other training and development projects in the past.

As an independent Consultant, Mr. Bates regularly lends his expertise to third party assessment companies in the analysis, review and recommendation of technology patents. In particular, Mr. Bates has assessed several portfolios from Nokia, Nortel-Networks, Google and others, and rank ordered the patents and technologies on a technical superiority basis and monetized many of the portfolios so that his clients could acquire a reasonable portfolio for a reasonable price.

## Expertise

- CATV Networks, Protocols and Equipment
- Convergence Technologies
- LAN, WAN, Internet, Ethernet, MPLS, ATM, Frame Relay

- Optical Networks and Equipment
- Project Management for Telecommunications and Wireless Projects
- TCP/IP Protocols and Applications

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

- Telephone equipment & operations
- Voice over the Internet Protocol (VoIP)
- Voice over Wi-Fi
- VoIP Security
- Wired Networks (PBX, Voice, Data, VoIP, Call Centers, 800 services)
- Wireless Networks (Cellular, GSM, 3/4G, LTE, 5G, GPRS, & SMS/MMS)
- Wireless Technologies and Standards (Wi-Fi, Wi-Fi Mesh, WiMAX, Cellular (3/4G), LTE, GSM, GPRS, SMS, MMS, etc., CDMA2000, UMTS

## Education

| Year | College or University | Degree |
|------|----------------------|--------|
| 1979 | Stonehill College, Easton, MA | Bachelor's Degree, Business Management |
| 1985 | Lehigh University, Bethlehem, PA | All coursework towards Masters of Business |
|      | St. Joseph's College, Philadelphia, PA | Administration (Thesis not complete) |

## Professional Experience

From:         October 1989
To:           Present
Organization: TC International Consulting, Inc.
Title:        Founder and President
Summary:      TCIC is a full-service Consulting and Training firm specializing in Communications and Computer Convergence. Mr. Bates' role is to assist his client companies with the analysis of options, selection of vendors or products to meet their strategic goals and the training of technologies including Voice, Telephone Systems, Data, Data Networks, Video, Internet, Wireless, Wireless LAN Technologies, VoIP systems and services, Fiber Optics and Infrastructure. This firm has been responsible for selecting and implementing over 100 PBX systems for their client companies. TCIC develops and conducts training for corporate users, manufacturers and carriers alike.

- Trained at all of the Regional Bell Operating Companies (RBOCs), over 150 Competitive Local Exchange Carriers (CLECs), all of the major Long-Distance Companies (AT&T, SPRINT, MCI/WorldCom [now Verizon]) and most of the large manufacturers (Nortel-Networks, Lucent [now Alcatel-Lucent], Avaya, Mitel, Siemens, Alcatel, Newbridge, Marconi, Cisco), the US Government and Fortune 500 companies.

- Has been involved in and with this industry for more than 47 years and has seen the development and growth of the various technologies, infrastructure, legal, regulatory and technical services.

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

- Developed curriculum and teaches classes that run at manufacturer and Telephone Company training programs teaching students in the operation of the systems, including:
  - Introduction to Voice Communications
  - Hands on Telephony classes
  - Installing and implementing a PBX solution
  - Hands on Voice over IP
  - Implementing VoIP
  - Securing VoIP
  - IP PBX Solutions
  - Call Center Convergence
  - Introduction to Data Communications
  - Hands on Data Communications
  - LAN and WAN communications
  - Introduction to T1 and T3
  - Optical Networking and SONET
  - Data and Internet Communications, a How to Course for implementing solutions
  - Ethernet and Gigabit Ethernet
  - Asynchronous Transfer Mode (ATM)
  - Frame Relay a Data Communications design class
  - Wireless Communications
  - Hands on Securing Wireless Networks
  - Hands on Integrating Wireless Networks (Wi-Fi and Cellular calling)
  - TCP/IP
  - Linking LANs and WANs with Bridging and Routing
  - GPRS
  - GSM (including WAP and MMS)
  - Next Generation Wireless
  - Wi-Fi Certifications (CWNA)
  - Wi-Fi Security Certification (CWSP)
  - Cisco RF Design
  - Cisco Wireless Mesh
  - WiMAX certifications (Wi-MAX RF Engineer)

**Regis J. (Bud) Bates Jr.
Curriculum Vitae**

o   Convergence Technologies Professional (CTP) Certification

o   RFID Certification (RFID+)

| | |
|---|---|
| From: | September 1986 |
| To: | October 1989 |
| Organization: | Pepper, Hamilton and Scheetz, Philadelphia, PA |
| Title: | Chief Information Officer- Major Law Firm |
| Summary: | |

- Performed complete automation of the law firm's multiple offices around the country.

- Chartered with the selection and placement of computer and communications systems in the offices, and providing all the necessary external connections to the rest of the world for long distance, voice and data communications.

- Responsible for the selection and installation of 10 PBX systems all with major integration services.

- Designer of the local area networks (LANs) and the final installation and testing of these systems.

- Created the WAN access and usage through a network of digital circuits using T1 services from many of the common carriers and the new competitors in the industry.

| | |
|---|---|
| From: | September 1979 |
| To: | September 1986 |
| Organization: | Air Products and Chemicals, Inc. (APCI) |
| Title: | Telecommunications Manager |
| Summary: | |

- Designed, selected, analyzed and implemented all communications projects for the use of voice and data communications at the corporation's 440 sites around the US and 35 international sites. This included the use of telephone systems, dial up telephony and data, leased lines for voice and data, analog and digital circuits (including T1, T3 and fiber optics).

- Responsible for research, selection and installation of over 250 telephone systems (PBX and Key Systems along with integration systems).  While at APCI, was one of the major proponents of using a broadband cabling system (such as found in CATV systems- in 1983).

- Spearheaded a project from communications to integrate our voice, data, TV-video and local area network (LAN) services into what is now known as a Campus area network (CAN).  Extended the network using a private fiber optic links to many local sites and private microwave within the Allentown, PA area.

- Implemented a multi-site VSAT data network.  The charter for the organization was to implement the most reliable communications infrastructure at the best available price.  The corporate budget was in excess of $40-50 million annually for telecommunications.

### Regis J. (Bud) Bates Jr.
### Curriculum Vitae

| | |
|---|---|
| From: | April 1977 |
| To: | September 1979 |
| Organization: | Data General Corporation (DGC), Westboro, MA |
| Title: | Telecommunications Manager for Manufacturing and International Sites |
| Summary: | |

- Responsibilities at DGC were to select the best mix of goods and services to be used for the growing corporate needs during a fast development and growth cycle.

- Responsible for selecting equipment (from Bell and competitors) for 100 sites across the world, select services (voice, data and fax traffic) from the common carriers and to select the appropriate means and protocols to use these goods and service in a way that fostered growth and development of the company's revenue.

- Used a private microwave system to interconnect several sites in a cost-efficient manner.

- Installed a T1 network from coast to coast. The corporate operating budget at DGC was approximately $20 million. Was responsible for the selection and installation of 30 PBXs and 40 key telephone systems.

| | |
|---|---|
| From: | September 1974 |
| To: | April 1977 |
| Organization: | Hills Department Stores, Canton, MA |
| Title: | Manager of Administrative Services |
| Summary: | |

- Was responsible for all communications matters including voice, data, fax, telex and Teletype as printed materials (production print shop).

- Responsible for a discount department store's implementation of fast and reliable communications without spending excess corporate funds.

- Responsible for analyzing, selecting and implementing major communications projects in 50 stores spread throughout the east and mid-west. Charter was to minimize cost while maximizing service to the customer.

| | |
|---|---|
| From: | April 1972 |
| To: | September 1974 |
| Organization: | Damon Corporation |
| Title: | Telecommunications and Facilities Manager |
| Summary: | Conglomerate that included Medical-Biological Development, Veterinary Products, Clinical Labs, Security Manufacturing and Hobby Craft. The myriad of different systems and services challenged the ability to meet the diverse needs of a medical and security to a hobby shop environment. The responsibilities included the communications of voice and data (limited analog dial up) for the variety of locations across the country. The corporate communications budget was approximately $2.5 million annually. |

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

From:           September 1966
To:             April 1972
Organization:   US Army Signal Corps
Title:          Captain
Summary:
- The assignments were in many varied locations including an assignment in Viet Nam with a mobile communications environment, as well as a fixed site using radio-based systems as one of the first troposcatter radio systems installed in this environment.  Installed a system that spanned over 400 miles for the military tactical forces.

- As an officer in Germany, was responsible for the operation and control of the Automatic Voice Network (AUTOVON) system in Donnersberg, Germany. Donnersberg was the equivalent of a Central Office (class 3, 4 and 5).  Had the operational responsibility for the Pirmasens, Germany Satellite terminal.

- One additional assignment was at the US Army 108th Military Intelligence Group in Ft. Devens, MA. At Ft. Devens, was responsible for providing fixed (landline and fixed radio) and mobile communications to a MI unit.  Ran the Communications Center, which entailed telex, Teletype and facsimile services for the military.

## Litigation Support Experience

*Bolded represents the client I supported*

*Expert Engagement: -Active*
Type of Matter:   IPR
Law Firm:         McDonnell Boehnen Hulbert & Berghoff LLP
Case Name:        IPR2022-00557 Ericsson Inc., **v. Koninklijke KPN N.V.**
Disposition:      Just started
Date:             4/2022

*Expert Engagement: -Active*
Type of Matter:   Infringement
Law Firm:         Kasowitz Benson Torres LLP
Case Name:        **WSOU Investments, LLC D/B/A Brazos Licensing and Development** vs Netgear C.A No.1 :21-cv-01117-UNA
Disposition:      Just started reviewing materials
Date:             1/2022

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

*Expert Engagement: -Closed*

| | |
|---|---|
| Type of Matter: | IPR |
| Law Firm: | McDonnell Boehnen Hulbert & Berghoff LLP |
| Case Name: | IPR2022-00025 Xiaomi Communications Co. LTD. **v. Koninklijke KPN N.V.** |
| Disposition: | Board denied institution of IPR 4/2022 |
| Date: | 12/2021 |

*Expert Engagement: -Active*

| | |
|---|---|
| Type of Matter: | Infringement |
| Law Firm: | Goldman Ismail Tomaselli Brennan & Baum LLP |
| Case Name: | XR Communications **v Apple, Inc.** |
| Disposition: | Ongoing Research |
| Date: | 10/2021 |

*Expert Engagement: -Active*

| | |
|---|---|
| Type of Matter: | Breach of Contract |
| Law Firm: | THOMPSON & KNIGHT, LLP |
| Case Name: | **Transtelco** v Zayo |
| Disposition: | First report submitted July 2021 pending trial date in 2022 |
| Date: | 5/2021 |

*Expert Engagement: -Closed*

| | |
|---|---|
| Type of Matter: | Infringement |
| Law Firm: | Morgan, Lewis and Bockius |
| Case Name: | Ancora v **LG** |
| | Produced Report 3/2021 |
| Disposition: | Dismissed |
| Date: | 6/2021 |

*Expert Engagement: - Active*

| | |
|---|---|
| Type of Matter: | IPR |
| Law Firm: | Cooley |
| Case Name: | One-E-Way Inc. v. **Apple Inc.** |
| Disposition: | Declaration submitted December 2020. Awaiting further action |
| Date: | 10/2020 |

*Expert Engagement: Active*

| | |
|---|---|
| Type of Matter: | IPRs (9) |
| Law Firm: | Devlin Law Firm |
| Case Name: | **Si**svel International S.A., 3G Licensing S.A., v. Cradlepoint, Inc., etc. |
| Services Provided: | IPRs demanded due to infringement asserted by Sisvel, et al. |
| Disposition: | Declarations submitted, deposed Jan, May, Jun 2021, Jan 2022, Feb 2022 |

### Regis J. (Bud) Bates Jr.
### Curriculum Vitae

Date:                 9/2020

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | Infringement Case |
| Law Firm: | Goldman Ismail Tomaselli Brennan & Baum LLP |
| Case Name: | Uniloc v. **Apple** (No. 3:19-cv-01905-JD) |
| Services Provided: | Infringement asserted by Uniloc regarding LTE network devices |
| Disposition: | Dismissed |
| Date: | 10/2020 |

*Expert Engagement: Stayed Inactive*

| | |
|---|---|
| Type of Matter: | Infringement Case |
| Law Firm: | Arnold and Porter |
| Case Name: | Uniloc 2017 LLC v. **Google LLC**, civil action nos. 2:18-cv-494 and 2:18-cv-498 |
| Services Provided: | Infringement asserted by Uniloc regarding 802.11s and Mesh Networking |
| Disposition: | 2019 case stayed pending IPR review |
| Date: | 2019 |

*Expert Engagement: Stayed Inactive*

| | |
|---|---|
| Type of Matter: | Infringement Case |
| Law Firm: | Cooley |
| Case Name: | Uniloc 2017 LLC and Uniloc USA, Inc. v. **Google, LLC** (2:18-cv-00502) |
| Services Provided: | Infringement asserted by Uniloc regarding 802.11a and HiperLAN |
| Disposition: | 2019 case stayed pending IPR review |
| Date: | 2019 |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | Mediation |
| Law Firm: | Phelps Dunbar LLP |
| Case Name: | Unknown |
| Services Provided: | Dispute over the installation and implementation of a Wi-Fi Mesh Network in Texas. |
| Disposition: | 2019 no further action |
| Date: | 2019 |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | IPR |
| Law Firm: | Hamilton Brook Smith Reynolds |
| Case Name: | IPR2018-00558 LG Electronics, Inc. v. **Koninklijke KPN N.V.** |
| Services Provided: | IPR regarding Patent 9,014,667 on regulating access to a telecommunications network |
| Disposition: | Declaration submitted October 2018, deposed December 2018. Settled |
| Date: | 2018 |

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | IPR |
| Law Firm: | McDonnell Boehnen Hulbert & Berghoff LLP |
| Case Name: | IPR2018-00558 LG Electronics, Inc. **v. Koninklijke KPN N.V.** |
| Services Provided: | IPR regarding Patent 9,014,667 on regulating access to a telecommunications network |
| Disposition: | Declaration submitted May 2018. PTAB filed their report for continuing the IPR. |
| Date: | 2018 see above case extension |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | IPR |
| Law Firm: | Devlin Law Firm |
| Case Name: | IPR2018-00559 LG Electronics, Inc. v. **KPN, N.V.** |
| Services Provided: | IPR regarding Patent 7,995,091on a multichannel access in a communications network |
| Disposition: | Declaration submitted May 2018. PTAB decided not to initiate IPR case closed. |
| Date: | 2018 |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | Infringement and Validity |
| Law Firm: | Latham and Watkins |
| Case Name: | **TC Technologies** v. Sprint |
| Services Provided: | Expert working on patent Infringement in an LTE environment |
| Disposition: | Expert report filed and Validity report completed October 2018. Deposed December 2018 for Infringement and Validity December 2018. Case settled March 2022 |
| Date: | Aug 2017 |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | Declaration Only |
| Law Firm: | Nelson Baumgardner Pc |
| Case Name: | **Network Managing Solutions, LLC** v. AT&T MOBILITY, LLC et al. |
| Services Provided: | Declaration on claim construction terms |
| Disposition: | No further involvement |
| Date: | March 2018 |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | Inequitable Conduct |
| Law Firm: | Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Case Name: | Civil Action No. 3:16-CV-01338-K **Securus Technologies**, Inc. v Global Tel*Link Corporation |
| Services Provided: | Technical expert on Technologies |
| Disposition: | Initial Report Submitted Case settled |

| Regis J. (Bud) Bates Jr. |
| Curriculum Vitae |

Date:                    September 2017

*Expert Engagement:     Closed*
Type of Matter:          Class Action Suit
Law Firm:                Wilson Sonsini Goodrich & Rosati P.C.
Case Name:               Cause No. 1:14-CV-00737-WTL-**DKLLATONYA SIMMS**, on behalf of herself, and all others similarly situated, v. SIMPLY FASHION STORES LTD, and EXACTTARGET, INC
Services Provided:       Consulting Expert on alleged Telecommunications Consumer Protection Act violations
Disposition:             Parties Settled
Date:                    Jun-Jul 2017

*Expert Engagement: Closed*
Type of Matter:          Trade Secret Case
Law Firm:                Quinn Emanuel Urquhart & Sullivan, LLP
Case Name:               Civil Action No. 2:16-cv-582-JRG-RSP Genband US LLC, v. **Metaswitch** Networks Ltd., ET AL
Services Provided:       Testifying expert on trade secret disclosures worked for Metaswitch
Disposition:             Expert Rebuttal report submitted October 2016. Deposed November 2016. Court dismissed the case March 2017.
Date:                    2016-2017

*Expert Engagement: Closed*
Type of Matter:          IPR
Law Firm:                McDonnell Boehnen Hulbert & Berghoff LLP
Case Name:               IPR2016-00808 Samsung Electronics Co., LTD v **Koninklijke KPN N.V.**
Services Provided:       Consulting expert on Validity of a patent for the Plaintiff regarding the Bates reference (GPRS Book)
Disposition:             Declaration submitted June 2016. PTAB found that there was no need for further actions based on the declaration of the author of the GPRS book (me) in September 2016.
Date:                    2016

*Expert Engagement: Closed*
Type of Matter:          Patent Infringement
Law Firm:                Susman Godfrey
Case Name:               Civil Action No. 2:14-cv-1165 **Koninklijke KPN N.V.** v. Samsung Electronics Co., LTD., et al.
Services Provided:       Consulting expert on Validity of a patent for the Plaintiff regarding the Bates reference (GPRS Book)
Disposition:             Consulting completed June 2016. Settled September 2016.
Date:                    2016

<div style="border:1px solid black; text-align:center">

**Regis J. (Bud) Bates Jr.
Curriculum Vitae**

</div>

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | Patent Infringement and IPR on Validity |
| Law Firm: | Nelson Bumgardner Pc |
| Case Name: | Currently involved in Case No. 3:15-cv-00742-TJC-MCR **Patent Asset Licensing, LLC v**. Bright House Networks, LLC. VoIP and Telephony case. |
| Services Provided: | Worked for Plaintiff on both validity and infringement. Preliminary work completed May 2016 on Infringement, declarations on *9 different IPRs* completed October 2016. Submitted reports and declarations to PTAB April 2017. Deposed 3 times in May 2017. Deposed again in August 2017 based on Motions to Amend. Oral arguments presented at PTAB |
| Disposition: | PTAB ruled in favor of opposition |
| Date: | 2016-2018 |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Law Firm: | Cooley; Farney Daniels; Haynes Boone; Kenyon & Kenyon and Le Clair Ryan |
| Case Name: | ITC Case One-E-Way v. **Creative Labs et al. I**nv. No. 337-TA-943, In the Matter of Certain Wireless Headsets including Bluetooth headsets by GN (Jabra), Jawbone, Blue Ant, Creative Labs and Sony. |
| Services Provided: | Worked for Defendants on both invalidity and non-infringement. Submitted reports on invalidity and non-infringement. |
| Disposition: | Patent Invalidated, appealed and revised |
| Date: | Jan 2018 Case settled July 2018 |

*Expert Engagement: Closed*

| | |
|---|---|
| Type of Matter: | VoIP System |
| Law Firm: | Farney Daniels |
| Case Name: | Undisclosed |
| Services Provided: | Consulting expert |
| Disposition: | Parties Settled |
| Date: | 2015 |

*Everything below is Closed and inactive*
*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case dealing with providing message services through a private network and a mobile station. |
| Law Firm: | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. |
| Case Name: | **EST** v. Samsung, Apple, HTC and LG (et al) – ITC Case number 337-TA-925. Interveners were Apple and Google. |
| Services Provided: | Produced infringement reports and validity reports. Deposed in April 2015 |
| Disposition: | Parties Settled |
| Date: | 2015 |

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | ITC case |
| Law Firm: | Latham & Watkins LLP |
| Case Name: | <u>Interdigital</u> v. **Nokia,** ITC Case number 337-TA-613 |
| Services Provided: | Consulting expert for Interdigital on the infringement of cellular phones |
| Disposition: | Case appeared before ALJ Jan 2015 |
| Date: | 2014 – 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case dealing with the data communications |
| Law Firm: | Feinberg Day Alberti & Thompson LLP |
| Case Name: | **<u>Intellectual Ventures I and II</u>** v. Motorola, U.S. District Court Southern District of Florida, Case number 0:3-cv-61358-RSR |
| Services Provided: | Worked as a testifying expert for IV on a GPRS adverse to Motorola |
| Disposition: | Case stayed |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case involving the use of an SMS phone number only system |
| Law Firm: | Devlin Law Firm |
| Case Name: | What'sApp v. **ICC,** U.S. District Court Northern District of California, Case number 13-cv-04272-JST |
| Services Provided: | Working for Defendant, filed Declaration |
| Disposition: | Parties Settled |
| Date: | 2014 – 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Contract Dispute over UMTS/WCDMA 3G Cellular installation and LTE conversion |
| Law Firm: | Crowe & Dunlevy P.C. |
| Case Name: | Pine Telecom v. **Alcatel-Lucent**, Case Number CIV-11-353-JHP |
| Services Provided: | Worked for Alcatel-Lucent. Report submitted Nov 2013, deposed Dec 2013 |
| Disposition: | Court Ruled in favor of ALU |
| Date: | February 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Patent Infringement on local networking products (i.e. local access and PON) |
| Law Firm: | Keker & Van Nest LLP |
| Case Name: | BT v. **Comcast, et al,** Case Number CA No. 11-843(SLR) and 10-658 (SLR) |
| Services Provided: | Invalidity Reports submitted and rebuttals completed. Worked for Comcast on invalidity; deposed July 2013.  One of the two patents was found invalid. Based on Markman Hearing in Jan 2014 using R. J. Bates T1/T3 book as prior art. |
| Disposition: | Case dropped by Plaintiff. |
| Date: | March 2014 |

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Patent ownership case |
| Law Firm: | Hunton Williams |
| Case Name: | Ferguson, et al v. **NTP,** Case Number 08-09767CA |
| Services Provided: | Submitted initial report in 2011, Deposed July 2013 |
| Disposition: | Parties Settled |
| Date: | March 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Patent infringement on several products Wi-Fi, VoIP, CATV Modems etc. |
| Law Firm: | Mayer Brown |
| Case Name: | **Mosaid** v. Cisco |
| Services Provided: | Engaged by attorneys representing Plaintiff |
| Disposition: | Defendant Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Patent interference case dealing with design and development of a Wi-Fi router |
| Law Firm: | Boyle Fredrickson, S.C. |
| Case Name: | Ruckus v. **Netgear**, Patent Interference No. 105,870 (JL) (Technology Ctr. 2400) |
| Services Provided: | Submitted declarations on design issues. |
| Disposition: | Settled in favor of Netgear |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone system |
| Law Firm: | Farney Daniels, representing Plaintiff |
| Case Name: | Undisclosed |
| Services Provided: | Consulting expert |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | MMS |
| Law Firm: | Farney Daniels, representing Plaintiff |
| Case Name: | Undisclosed |
| Services Provided: | Consulting expert |
| Disposition: | Settled |
| Date: | 2013 |

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Breach of contract, good faith and fair dealing, unjust enrichment |
| Case Name: | **Evelyn T. Begay** and Denise Nez, individually and on behalf of all others similarly situated, v. Navajo Communications Co., Inc., a NM corporation, District Court of the Navajo Nation Judicial District of Chinle, Case number CV 141-12 |
| Services Provided: | Submitted declarations and one report in July 2012 |
| Disposition: | No action to date |
| Date: | 2012 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | RFID Technology |
| Law Firm: | Farney Daniels, representing Plaintiff |
| Case Name: | Undisclosed |
| Services Provided: | Consulting expert |
| Disposition: | Settled |
| Date: | 2012 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Patent infringement on several products |
| Law Firm: | Hogan Lovells |
| Case Name: | **Mosaid** v. Cisco, ITC Case Number 337_TA-778 |
| Services Provided: | Submitted expert reports in Dec 2011 and Jan 2012. Deposed Jan 2012 |
| Disposition: | Case dropped to move to new venue |
| Date: | 2012 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Arbitration Case dealing with a contract dispute over the installation and operation of a WiMAX system |
| Law Firm: | Carpenter & Leland LLP |
| Case Name: | **Intralot** v. Gibson Technical Services |
| Services Provided: | Submitted report in October 2012 |
| Disposition: | Settled in favor of Intralot |
| Date: | 2012 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case involving 3G CDMA 2000 technologies |
| Law Firm: | Niro Haller & Niro |
| Case Name: | **MSTG** v. Sprint et al, Case Number 1:09-cv-03684 |
| Services Provided: | Reports on Invalidity and Infringement. Deposed twice |
| Disposition: | Parties Settled |
| Date: | 2010 |

<div align="center">

**Regis J. (Bud) Bates Jr.
Curriculum Vitae**

</div>

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case involving infringement on a paging systems patent |
| Law Firm: | Nixon & Vanderhye |
| Case Name: | **Technology Patents LLC** v. Deutsche Telekom, et al, Case number 8:07-cv-03012-AW |
| Services Provided: | Deposed 2009 and 2010 (Reports on Invalidity and Infringement) |
| Disposition: | Most Parties Settled |
| Date: | 2009 – 2010 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | 3G WCDMA and CDMA technologies and infrastructure |
| Law Firm: | Niro Haller & Niro |
| Case Name: | **MSTG** v. Deutsche Telekom et al (ATT, T-Mobile, Verizon, Cellular One), Case number 08 C 7411 |
| Services Provided: | Deposed in 2009, 2010 and 2011. (Reports on Invalidity and Infringement) |
| Disposition: | Parties Settled |
| Date: | 2009 – 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case involving Central Office and VoIP technologies |
| Law Firm: | Wilmer Hale |
| Case Name: | CenterOne Communications v. **Vonage**, U.S. District Court for the Eastern District of Texas. |
| Services Provided: | Reports on Claim Construction worked for Vonage. |
| Disposition: | Dropped by Plaintiff |
| Date: | 2009 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case involving infringement on a SMS patent |
| Law Firm: | Niro, Haller & Niro |
| Case Name: | **TCS** v. Mobil365, Case number Civil Action No. 3:06-CV-485 (JRS) (E.D. Va.) |
| Services Provided: | Was deposed (Reports on Invalidity and Infringement) and appeared in Jury trial |
| Disposition: | Jury trial awarded to Plaintiff |
| Date: | 2007 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Case involving infringement of an 800 intelligent routing and delivery services |
| Law Firm: | Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A. |
| Case Name: | **800Adept** v. Murex Industries, Case number 6:02-cv-01354-PCF-DAB (M.D. Fla.) |
| Services Provided: | Deposed April 2006.  Reports on Invalidity and Infringement |
| Disposition: | Jury awarded in favor of Plaintiff |
| Date: | 2006 |

## Regis J. (Bud) Bates Jr.
## Curriculum Vitae

## Non-Litigation Consulting Projects

*Training Project:*
Client:                      Aruba Networks (HPE)
Services Provided:           Ongoing TCIC training and certification classes for employees, partners and customers.
Date:                        2007-Present

*Consulting Project:*
Client:                      DoceoTech
Services Provided:           Conducted WIMAX/ Mobile WIMAX training and certification classes, reviewed training materials and added content as needed.
Date:                        2012-2014

*Consulting Project:*
Client:                      United Lex
Services Provided:           Reviewed a Wi-Fi patent as a consultant to describe the technical details of the Wi-Fi networks (specifically the mesh networks). This was a one-time fee for the review. All further actions and projects have ended.
Date:                        March 2020

*Consulting Project:*
Client:                      iRunway
Services Provided:           Worked as technology consultant to assess various patents in different portfolios from Nokia, Nortel-Networks, Microsoft, Google and others. Researched necessary technical issues for iRunway's EE engineers who develop scenarios, claim charts and financial prospectus for various clients. Projects concluded in 2016. *iRunway offered my services to legal firms where they were the intermediary (similar to IMS, Forensis, Thomson Reuters, Rubin Scientific, etc.) and marked my hourly service fees up.*
Date:                        2011 – 2016 Projects concluded in 2016.

*Consulting Project:*
Client:                      University of Arizona South, Continuing Education, Sierra Vista, AZ
Services Provided:           Developed and conducted training sessions for more than a dozen topics and clients in and around Sierra Vista. These sessions were geared toward RFID+ and Convergence + certification classes for CompTIA, MPLS, DWDM, TCP/IP, IPv6, Networking, WLAN, Securing WLAN, WiMAX, VoIP hands on, Wireless Sharp certification, CWNA/CWSP certification and Securing VoIP. ***Conducted***

<div align="center">

**Regis J. (Bud) Bates Jr.
Curriculum Vitae**

</div>

|  |  |
|---|---|
|  | *a special Leadership Session for senior managers/ Officers.* |
| Date: | 2004 – 2018 |

*Consulting Project:*
| Client: | Motorola Solutions |
|---|---|
| Services Provided: | Developed an Advanced Wireless Training class for internal employees and partners. Conducted classes for rollout and turned materials over to client. |
| Date: | 2012 |

*Consulting Project:*
| Client: | Electronic Proving Grounds- Ft Huachuca, AZ |
|---|---|
| Services Provided: | Training on wireless Cellular and WiFi technologies and site surveys for use within a practical environment. |
| Date: | 2007 – 2009 |

*Consulting Project:*
| Client: | Cisco |
|---|---|
| Services Provided: | Conducted hands on classes on the Mobility Services Engine that was used to provide location tracking of Wi-Fi users and active RFID/Wi-Fi enabled tags through a joint venture of Cisco and Aeroscout. The active RFID tags using chokepoints enabled the use of tracking of vehicular traffic, temperature, speed, and other environmental conditions. Also developed RF Engineering and Wireless Mesh Training classes, conducted training and tested students. |
| Date: | 2006 – 2011 |

*Consulting Project:*
| Client: | Element K |
|---|---|
| Services Provided: | An e-learning house that published several wireless courses for Cisco and others. Was the SME that put the content together and developed the hands-on labs. |
| Date: | 2006 – 2008 |

*Consulting Project:*
| Client: | Deep Creek Center- Network Computing Magazine |
|---|---|
| Services Provided: | Conducted training sessions in Boston for Network Computing Magazine on Designing and Securing Wireless Networks. |
| Date: | 2006 |

*Consulting Project:*
| Client: | UTEK-EKMS |
|---|---|
| Services Provided: | Patent research studies for various clients for the purpose of rounding our intellectual property portfolios. Also studies to determine market projections and directions for various wired and wireless needs. A technical consultant on-call to review various technologies for their client portfolios. |

| | |
|---|---|
| **Regis J. (Bud) Bates Jr.** | |
| **Curriculum Vitae** | |

Date:                          2005 – 2006

*Consulting Project:*
Client:                        Airespace Corporation (now Cisco)
Services Provided:             Conducted hands on training for many channel partners, internal employees and
                               customers on their WLAN products. CCSI for Wireless Products and RF
                               Engineering Class.
Date:                          2004 – 2009
*Consulting Project:*
Client:                        Univentures, Phoenix, AZ
Services Provided:             Developed and conducted training for their clients on Network Security,
                               WLANs etc.  Nortel Networks, Cisco and UC Berkeley are the main players.
Date:                          2003 – 2006

*Consulting Project:*
Client:                        University of California, Berkeley
Services Provided:             Developed training materials and conducted training to their students on various
                               topics including networking, WLANs, DR planning and VoIP. As an adjunct
                               professor for this organization, conducted the classes around the globe.
Date:                          2003 – 2004

*Consulting Project:*
Client:                        Andrew Corporation
Services Provided:             Conducting various studies regarding frame relay, VPN studies, Long Distance
                               contract negotiations, Network Operations Center studies, VoIP studies, IP
                               Telephony studies, LAN cabling recommendations and Disaster Recovery
                               Planning
Date:                          1992 – 2006

*Consulting Project:*
Client:                        Global Knowledge
Services Provided:             Developed and conducted classes on myriad topics, also taught many of their
                               existing classes regarding Wired and wireless networks.
Date:                          2001 – 2006

*Consulting Project:*
Client:                        Gerson Lehrman Group
Services Provided:             On call consultant to advise and discuss technologies, trends in the industry and
                               portfolio trends in the telecommunications industry. As one of their top 5%
                               consultants, occasionally go out to clients on a face-to-face basis.
Date:                          2000 – 2006

*Consulting Project:*

> **Regis J. (Bud) Bates Jr.**
> **Curriculum Vitae**

Client:                Molex Corporation
Services Provided:    Consulted on wide area networks, contract negotiations and disaster recovery planning. Renegotiated wide area networking contracts for 85 sites in 20 countries.
Date:                 1999 – 2005

*Consulting Project:*
Client:                Nortel Networks
Services Provided:    Developed and conducted classes on Internet, TCP/IP, Business Aspects of the Internet, VoIP, Data, Routing and switching, Bridging, Routing and Gateways, Wireless Networking, Nortel specific classes, ATM, FR and more. Also consulted with BNR engineers regarding VoIP Protocols and design of SIP vs. H.323 products.
Date:                 1998 – 2003

Additional prior consulting and training clients:

- Patrick Industries
- Mahi Networks
- AFC
- US Army
- Fidelity Investments
- Weyerhauser
- WPVI-TV6 Philadelphia
- Telcordia
- CIA
- FBI
- NSA

<div align="center">

**Regis J. (Bud) Bates Jr.
Curriculum Vitae**

</div>

## Professional Affiliations, Achievements & Awards

- Technical Editor, IPTV Magazine, 2006 – 2020
- ***Senior Member of IEEE***
- Active trainer in the areas of:
  - Telecommunications Wired and Wireless
  - Voice
  - Data and Equipment for companies including Digital Equipment Corp., Global Knowledge, DataTech Institute, CAPE Institute, Fastlane, International Institute of Learning and Telcordia Technologies, Airespace, Aruba Networks and Cisco.

## Publications

Books and seminars have been used by more than 166 colleges and universities around the globe, and Mr. Bates teaches many communications/computer courses and seminars in over a dozen countries globally.

Books

- Securing VoIP, 2014- Syngress Publishing
- Voice and Data Communications Handbook- McGraw-Hill, 1996 first edition
- Voice and Data Communications Handbook- McGraw-Hill, 1998 signature edition
- Voice and Data Communications Handbook-McGraw-Hill, 2000, third edition
- Voice and Data Communications Handbook-McGraw-Hill 2001, fourth edition
- Voice and Data Communications Handbook-McGraw-Hill, 2006, fifth edition (4Q 2006)
- Broadband Telecommunications Handbook-McGraw-Hill, 1999
- Broadband Telecommunications Handbook-McGraw-Hill, 2002, second edition
- Wireless Broadband Communications, McGraw-Hill, 2000
- Nortel Networks Layer 3 Switching Handbook-McGraw-Hill, 2000
- Optical Networking and Switching, McGraw-Hill, 2001
- Wireless Networked Communications, McGraw-Hill, 1994
- General Packet Radio Services (GPRS), McGraw-Hill, 2002
- cdmaOne and cdma2000, McGraw-Hill, 2003

**Regis J. (Bud) Bates Jr.
Curriculum Vitae**

- Disaster Recovery for LANs, McGraw-Hill, 1994
- Disaster recovery for Telecommunications, Data and Networks, McGraw-Hill, 1991
- Introduction to T1/T3 Networking, Artech Publishing, 1992
- Client Server Internetworking, McGraw-Hill, 1998
- Principles of Voice and Data, McGraw-Hill Educational Group, 2006
- Co-author on Wireless Networks Dictionary from Althos Publishing, 2006.

Articles

Mr. Bates has written several articles for different magazines over the years extolling the benefits of convergence, movement of information across broadband networking strategies and user oriented how to documents:

1. IPTV Magazine Home PowerLine Networks- May 2006
2. IPTV Magazine Wireless Premises Distribution Networks- Mar 2006
3. IPTV Magazine Cable Premises Distribution Networks for IPTV –Jan 2006
4. CIO Magazine Pundit "Wireless Carriers Have the Goods" 2002
5. CIO Magazine Pundit "The Fiber Glut Myth" 2002
6. CIO Magazine Pundit "Cable vs DSL" 2002
7. Crisis Magazine "Disaster Recovery Planning 1998
8. International Journal of Management "Managing Telecommunications" 1997
9. Disaster Recovery Magazine "Planning for Telecommunications Disasters" 1997

Excerpts from the File History of U.S. Patent Application No. 13/720,339

# Exhibit E

Attorney Docket No.: P5805US01                                    *Patent*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re Application of: | N. T. KIUKKONEN *et al.* | Confirmation No.: | 4739 |
| Application No.: | 13/720,439 | Examiner: | B. A. KAPLAN |
| Filed: | December 19, 2012 | Group Art Unit: | 2434 |

For:    METHOD AND APPARATUS FOR CONTROLLING ACCESS TO
        RESOURCES

Commissioner for Patents
Alexandria, VA 22313-1450

### RESPONSE UNDER 37 C.F.R. § 1.111

Dear Commissioner:

In response to the Office Action dated February 6, 2015, please amend this application as

follows.

AMENDMENT AND PRESENTATION OF CLAIMS…………………………………….2

REMARKS…………………………………………………………………………………..8

*Patent*

## AMENDMENT AND PRESENTATION OF CLAIMS

Please replace all prior claims in the present application with the following claims.

1. (Currently Amended) A method comprising facilitating a processing of and/or processing (1) data and/or (2) information and/or (3) at least one signal, the (1) data and/or (2) information and/or (3) at least one signal based, at least in part, on the following:

one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof;

a processing of social networking information associated with [th e] the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups; and

a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups.

2. (Original) A method of claim 1, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

a priority hierarchy associated with the at least one user, the at least one device, the one or more social networking groups, or a combination thereof; and

a controlling of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

*Patent*

3. (Original) A method of claim 2, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

a revocation, a prevention, or a combination thereof of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.

4. (Original) A method of claim 3, wherein access of one or more lower-priority other users, one or more lower-priority other devices, or a combination thereof to the one or more resources is revoked, prevented, or a combination thereof based, at least in part, on access by one or more higher-priority users, one or more higher-priority devices, or a combination thereof to the one or more resources.

5. (Currently Amended) A method of claim 2, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

a controlling of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on one or more characteristics associated with the one or more resources; and

a prevention, a revocation, or a combination thereof of access to the one or more resources of the one or more other users, the one or more other devices, or a combination thereof based, at least in part, the priority hierarchy.

6. (Canceled)

Attorney Docket No.: P5805US01                                            *Patent*

7. (Currently Amended) A method of claim [[6]] 5, wherein access to the one or more resources is revoked for one or more lower-priority users, one or more lower-priority devices, or a combination thereof prior to access for one or more higher-priority users, one or more higher-priority devices, or a combination thereof.

8. (Original) A method of claim 5, wherein the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more wireless access points, or a combination thereof.

9. (Original) A method of claim 1, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

 a monitoring of a number of access times at least one other user, at least one other device, or a combination thereof accesses the one or more resources; and

an elimination of access rights to the one or more resources for the at least one other user, the at least one other device, or a combination thereof based, at least in part, on the number of access times.

10. (Original) A method of claim 1, wherein the one or more social networking groups include at least one of a family group, a friends group, a friends of friends group, and an others group.

11. (Original) An apparatus comprising:

at least one processor; and

Attorney Docket No.: P5805US01                                                    *Patent*

at least one memory including computer program code for one or more programs,

the at least one memory and the computer program code configured to, with the at least one

    processor, cause the apparatus to perform at least the following,

        determine one or more resources associated with at least one user, at least one device

            associated with the at least one user, or a combination thereof;

        process and/or facilitate a processing of social networking information associated with the

            at least one user, the at least one device, or a combination thereof to determine one or

            more social networking groups; and

        cause, at least in part, a controlling of access to the one or more resources for one or more

            other users, one or more other devices associated with the one or more other users, or

            a combination thereof based, at least in part, on membership in the one or more social

            networking groups.


12. (Original) An apparatus of claim 11, wherein the apparatus is further caused to:

determine a priority hierarchy associated with the at least one user, the at least one device, the

    one or more social networking groups, or a combination thereof; and

cause, at least in part, a controlling of the access to the one or more resources for the one or

    more other users, the one or more other devices, or a combination thereof based, at least

    in part, on the priority hierarchy.


13. (Original) An apparatus of claim 12, wherein the apparatus is further caused to:

cause, at least in part, a revocation, a prevention, or a combination thereof of the access to the

    one or more resources for the one or more other users, the one or more other devices, or a

    combination thereof based, at least in part, on the priority hierarchy.

Attorney Docket No.: P5805US01                                              *Patent*

14. (Original) An apparatus of claim 13, wherein access of one or more lower-priority other users, one or more lower-priority other devices, or a combination thereof to the one or more resources is revoked, prevented, or a combination thereof based, at least in part, on access by one or more higher-priority users, one or more higher-priority devices, or a combination thereof to the one or more resources.

15. (Original) An apparatus of claim 12, wherein the apparatus is further caused to:

cause, at least in part, a controlling of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on one or more characteristics associated with the one or more resources.

16. (Original) An apparatus of claim 15, wherein the apparatus is further caused to:

cause, at least in part, a prevention, a revocation, or a combination thereof of access to the one or more resources of the one or more other users, the one or more other devices, or a combination thereof based, at least in part, the priority hierarchy.

17. (Original) An apparatus of claim 16, wherein access to the one or more resources is revoked for one or more lower-priority users, one or more lower-priority devices, or a combination thereof prior to access for one or more higher-priority users, one or more higher-priority devices, or a combination thereof.

18. (Original) An apparatus of claim 15, wherein the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users

Attorney Docket No.: P5805US01                                        *Patent*

accessing the one or more wireless access points, a traffic load associated with the one or more

wireless access points, or a combination thereof.


19. (Original) An apparatus of claim 11, wherein the apparatus is further caused to:

cause, at least in part, a monitoring of a number of access times at least one other user, at

    least one other device, or a combination thereof accesses the one or more resources; and

cause, at least in part, an elimination of access rights to the one or more resources for the at

    least one other user, the at least one other device, or a combination thereof based, at least

    in part, on the number of access times.


20. (Original) An apparatus of claim 11, wherein the one or more social networking groups

include at least one of a family group, a friends group, a friends of friends group, and an others

group.


21. (New) A method of claim 1, wherein the controlling of access to the one or more

resources is independent from controlling of configuration settings associated with the one or

more resources.

Attorney Docket No.: P5805US01                                    *Patent*

# REMARKS

By this amendment, claims 1-20 are pending, in which claims 1, 5 and 7 are currently amended, claim 6 is canceled without prejudice or disclaimer with its claimed subject matter included into amended claim 5, and claim 21 is newly presented.   Claim 1 was amended at line 6 to correct a typographical error as "the" was misspelled as "th e".   Claim 5 was amended to include the subject matter of now canceled claim 6.   Claim 7 was amended to change its dependency from claim 6 (now canceled), to claim 5.   New claim 21 depends from claim 1 and includes the claimed subject matter "the controlling of access to the one or more resources is independent from controlling of configuration settings associated with the one or more resources".   Support for the claimed subject matter of new claim 21 may be found at, for example, paragraph [0059] in the pending application as filed.   No new matter is introduced.

The Office Action mailed February 6, 2015 rejected claims 1-8, 10-18 and 20 under 35 U.S.C. § 102(e) as anticipated by *Nath et al.* (US 2011/0258303 A1) (hereinafter "*Nath*"), and claims 9 and 19 as obvious under 35 U.S.C. § 103(a) based on *Nath* in view of *Horn et al.* (US 2010/0157850 A1) (hereinafter "*Horn*").   As noted in the Office Action at page 2, Applicant's representative had contacted the Examiner concerning a cite of the pending application against itself in the Office Action dated October 8, 2014 when *Horn* should have been the cited reference.   This Office Action correctly cites *Horn* in the rejections.

Applicant respectfully traverses these rejections.

### A. CLAIMS 1-8, 10-18 AND 20 ARE NOT ANTICIPATED BY *NATH* UNDER 35 U.S.C. § 102(E)

The Examiner bears the initial burden of establishing a *prima facie* basis to deny patentability to a claimed subject matter under any statutory provision. *Gilbert & P. Hyatt v. Dudas*, 551 F.3d 1307, 1313 (Fed. Cir. 2008); *In re Glaug*, 283 F.3d 1335 (Fed. Cir. 2002*); In re Rijkaert*, 9 F.3d 1531, 1532 (Fed. Cir. 1992); *In re Oetiker,* 977 F.2d 1992*); In re Piasecki*, 745 F.2d 1468 (Fed. Cir. 1984). To anticipate a patent claim, the identical disclosure in a single reference of each element of a claimed subject matter, as those elements are set forth in the claims, such that the claimed subject matter is placed into the recognized possession of one having ordinary skill in the art. *Therasense Inc. v. Becton, Dickinson and Co*., 593 F3d 1325 (Fed. Cir. 2010); *Praxair, Inc. v. ATMI, Inc*., 543 F.3d 1308, (Fed. Cir. 2008); *Dayco Prods., Inc. v. Total Containment, Inc*., 329 F.3d 1358 (Fed. Cir. 2003); *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003), *Crown Operations International Ltd. v. Solutia Inc.*, 289 F.3d 1367 (Fed. Cir. 2002); *Candt Tech Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344 (Fed. Cir. 2001).

Additionally, "[u]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations **arranged or combined in the same way** as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102" (*see*, *Id*. *Therasense* quoting *Net moneyIN, Inc. v. VeriSign, Inc.*, 535 F.3d 1359 (Fed. Cir. 2008)) (emphasis added).

Attorney Docket No.: P5805US01                                                    *Patent*

Although "inherent disclosure" is also a basis of anticipation, (*see, Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999)), it "does not alter the requirement that all elements must be disclosed in an anticipatory reference in the same way they are arranged or combined in the claim" (*see, Id. Therasense,*).   "'[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation.'" (see, *Id.* quoting *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002)).   "'Inherency, however, **may not be established by probabilities or possibilities**.   The mere fact that a certain thing may result from a given set of circumstances is not sufficient'" *(see, Id.* quoting *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)) (emphasis added).

Applicant respectfully urges that the Office Action has not established a *prima facie* case of anticipation under § 102(e).   For each claim 1-8 and 10 rejected, the Office Action cites one or more paragraphs of *Nath* and repeats such paragraph(s) without applying the disclosure to the claimed subject matter.   For example, the Office Action rejects, at least in part, claims 2, 3, 5, 6 and 10 by simply referring to and repeating the entirety of paragraph [0042] without specifying which specific portions, if any, of paragraph [0042] purportedly discloses such claimed subject matter of each such claim.   This makes it difficult for the Applicant to dispute the reasoning of the Office Action in the rejections.

Regardless, Applicant will respond to such rejections as best as is possible.   (It is noted that claim 6 has been canceled with its claimed subject matter incorporated into dependent claim 5 and claim 21 is new.)

*Patent*

Applicant disagrees that the Abstract of *Nath* discloses the claimed subject matter of claim 1:

### Abstract

A system and method is disclosed which may comprise receiving, via a computing device, from a first user having a first personal device, a request for sharing access to a resource or a state of a second personal device of a second user, **the first user and second user having an on-line social network relationship**; and determining whether to grant sharing access to the one of the resource and the state of the second personal device of the second user. **Determining whether to grant sharing access may be based, at least in part, upon the *nature* of the on-line social network relationship**. The method and apparatus may comprise registering, via the computing device, an ownership link for a personal device and an owner having a certified identity within the social network; storing the ownership link; and utilizing the ownership link for determining whether to grant sharing access.   (emphasis added)

For example, the claimed subject matter "a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof **based, at least in part, on membership in the one or more social networking groups**" (emphasis added) is not disclosed by *Nath* (claim 1, lines 9-11).  Instead, *Nath* discloses "the first user and second user having an on-line social network relationship;...Determining whether to grant sharing access may be based, at least in part, upon the nature of the on-line social network relationship." (*Nath*, Abstract)  Applicant urges that *Nath* discloses a first and second user being members of an on-line social network, and a determination whether to grant sharing access may be based upon "the **nature** of the on-line social network relationship", which does **not** disclose the claimed subject matter "based...on **membership** in the one or more social networking groups." (emphasis added) (claim 1, lines 10-

Attorney Docket No.: P5805US01                                          *Patent*

11)   Further, for example, see FIGS. 1-2 of *Nath* wherein in each FIG., all users 12 are each

within SOCIAL NETWORK 18 and thus <u>all</u> users 12 are members of SOCIAL NETWORK 18, and *Nath*

therefore does not disclose this claimed subject matter.

Independent claim 11 includes similar claimed subject matter of varying degree and is

therefore also patentable over the cited art.   Dependent claims 2-8, 10; and 12-18, 20, depend

directly or indirectly, from respective independent claims 1 and 11 and are therefore also

patentable for at least the reasons independent claims 1 and 11 are patentable, as well as for

additional claimed subject matter the claims recite.

For example, new claim 21 recites the claimed subject matter "wherein the controlling of

access to the one or more resources is independent from controlling of configuration settings

associated with the one or more resources."   Applicant urges this claimed subject matter is also

patentably distinct over *Nath* under 35 U.S.C. § 102(e).   Applicant urges *Nath* does not disclose

this claimed subject matter.   For example, paragraph [0039] of *Nath* discloses:

> [0039] In one embodiment, *once a device 14 is registered, it can generates a key pair and a public key certificate*, sometimes referred to as a digital certificate or identity certificate, used in cryptography to bind the public key portion of a key pair to a user 12, which key pair can be stored in the newly added device 14. The public key of the device can then also be stored on the SBone server 40 (shown in FIG. 6), which can act as a certificate authority ("CA"). **In other words, the SBone server is knowledgeable of the public key and private key for each user 12,** ***having perhaps generated one or both***, and keeps the private key securely in a secured server, not for public distribution, but only for distribution to the individual user by some secure communication method. The user can then use the private key to decrypt messages encrypted with the user's public key, distributed publicly to other users, and to encrypt messages to send to others that can then also be decrypted using the public key. (emphasis added)

Attorney Docket No.: P5805US01 *Patent*

Applicant urges this disclosure of *Nath* may actually *teach away* from the claimed invention of, *inter alia*, claim 21. A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant."  *In re Gurley*, 27 F.3d 551, 31 USPQ 1130 (Fed. Cir. 1994).

Accordingly, reconsideration and withdrawal of the rejection are respectfully requested.

**B.    CLAIMS 9 AND 19 ARE NOT RENDERED OBVIOUS BY *NATH* IN VIEW OF *HORN* UNDER 35 U.S.C. § 103(A)**

As stated above, the Examiner bears the initial burden of establishing a *prima facie* basis to deny patentability to a claimed subject matter under any statutory provision.  In rejecting a claim under 35 U.S.C. §103(a), the Examiner is required to provide a factual basis to support the obviousness conclusion.  *In re Warner*, 379 F.2d 1011, 154 USPQ 173 (CCPA 1967); *In re Lunsford*, 357 F.2d 385, 148 USPQ 721 (CCPA 1966); *In re Freed*, 425 F.2d 785, 165 USPQ 570 (CCPA 1970).   Further, in rejecting a claim under 35 U.S.C. §103(a) it is incumbent upon the Examiner to establish the requisite motivation.   As maintained by the Supreme Court of the United States in *KSR Intern. Co. v. Teleflex Inc.*, 127 S.Ct. 1727 at 1741, an obviousness "analysis should be made explicit."   See, *In re Kahn*, 441 F.3d 977, 988 (C.A. Fed. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusions of obviousness").   Indeed, the Examiner is required to make specific factual

*Patent*

findings, not generalizations. *See M.P.E.P. §2144.08 II. Au. 5.*   That initial burden required by

procedural *due process of law* has not been discharged.

The test for determining if a claim is rendered obvious by one or more references for

purposes of a rejection under 35 U.S.C. § 103 is set forth in *KSR International Co. v. Teleflex*

*Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007):

> "Under §103, the scope and content of the prior art are to be determined;
> differences between the prior art and the claims at issue are to be ascertained; and
> the level of ordinary skill in the pertinent art resolved.   Against this background
> the obviousness or nonobviousness of the subject matter is determined. Such
> secondary considerations as commercial success, long felt but unsolved needs,
> failure of others, etc., might be utilized to give light to the circumstances
> surrounding the origin of the subject matter sought to be patented." Quoting
> *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966).

As set forth in MPEP 2143.03, to ascertain the differences between the prior art and the

claims at issue, "[a]ll claim limitations must be considered" because "all words in a claim must

be considered in judging the patentability of that claim against the prior art." *In re Wilson*, 424

F.2d 1382, 1385.   According to the Examination Guidelines for Determining Obviousness

Under 35 U.S.C. 103 in view of *KSR International Co. v. Teleflex Inc.*, Federal Register, Vol. 72,

No. 195, 57526, 57529 (October 10, 2007), once the *Graham* factual inquiries are resolved, there

must be a determination of whether the claimed subject matter would have been obvious to one

of ordinary skill in the art based on any one of the following proper rationales:

> (A) Combining prior art elements according to known methods to yield
> predictable results; (B) Simple substitution of one known element for another to
> obtain predictable results; (C) Use of known technique to improve similar devices
> (methods, or products) in the same way; (D) Applying a known technique to a

Attorney Docket No.: P5805US01                                          *Patent*

known device (method, or product) ready for improvement to yield predictable results; (E) ''Obvious to try''— choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success; (F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art; (G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention. *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007).

Furthermore, as set forth in *KSR International Co. v. Teleflex Inc.*, quoting from *In re Kahn*, 441 F.3d 977, 988 (CA Fed. 2006), "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasonings with some rational underpinning to support the legal conclusion of obviousness."

Therefore, if the above-identified criteria and rationales are not met, then the cited reference(s) fail to render the claims obvious and, thus, the claims are distinguishable over the cited reference(s).

The Office Action cites *Horn* at paragraph [0087] (Applicant notes the reference to "Kiukkonen et al., Paragraph [0087]" at page 14 of the Office Action is meant to be '*Horn*, Paragraph [0087]') as disclosing the claimed subject matter of dependent claim 9 "a monitoring of a number of access times at least one other user, at least one other device, or a combination thereof accesses the one or more resources; and an elimination of access rights to the one or more resources for the at least one other user, the at least one other device, or a combination thereof based, at least in part, on the number of access times."  Applicant respectfully disagrees. Paragraph [0087] of *Horn* recites:

*Patent*

[0087] From a restricted femto access point perspective, a home access terminal may refer to an access terminal that is authorized to access the restricted femto access point (e.g., the access terminal has permanent access to the femto access point). A guest access terminal may refer to an access terminal with temporary access to the restricted femto access point (e.g., limited based on deadline, time of use, bytes, connection count, or some other criterion or criteria). An alien access terminal may refer to an access terminal that does not have permission to access the restricted femto access point, except for perhaps emergency situations, for example, such as 911 calls (e.g., an access terminal that does not have the credentials or permission to register with the restricted femto access point).

Applicant urges this does not disclose the claimed subject matter of claim 9, and therefore claim 9 is patentably distinct over the combination of *Nath* and *Horn* under 35 U.S.C. § 103(a).

Regardless, it is apparent that *Horn* neither discloses nor suggests the claimed subject matter of the invention that are missing from the primary reference to *Nath* as noted above. Therefore, even if, for the sake of argument, the applied references are combined as proposed by the Office Action, and Applicant does not agree that the requisite basis for the asserted motivation has been established, the claimed subject matter recited in dependent claim 9 would not result.

Dependent claim 19 includes similar claimed subject matter of varying degree and is therefore also patentable over the cited art.

Accordingly, reconsideration and withdrawal of the rejection are respectfully requested.

*Patent*

Therefore, the present application, as amended, overcomes the rejections of record and is in condition for allowance.   Favorable consideration is respectfully requested.   If any unresolved issues remain, it is respectfully requested that the Examiner telephone the undersigned attorney at (703) 519-9951 so that such issues may be resolved as expeditiously as possible.

As Applicants' remarks with respect to the Examiner's rejections are sufficient to overcome these rejections, Applicants' silence as to assertions by the Examiner in the Office Action or certain requirements that may be applicable to such rejections (e.g., whether a reference constitutes prior art, ability to combine references, assertions as to patentability of dependent claims) is not a concession by Applicants that such assertions are accurate or such requirements have been met, and Applicants reserve the right to analyze and dispute such assertions in the future.

To the extent necessary, a petition for an extension of time under 37 C.F.R. § 1.136 is hereby made.   Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account 504213 and please credit any excess fees to such deposit account.

Attorney Docket No.: P5805US01                                                        *Patent*

                                        Respectfully Submitted,

                                        DITTHAVONG & STEINER, P.C.


May 6, 2015                             /Stephen G. Stanton/
Date                                    Stephen G. Stanton
                                        Attorney/Agent for Applicant(s)
                                        Reg. No. 35690

                                        Phouphanomketh Ditthavong
                                        Attorney/Agent for Applicant(s)
                                        Reg. No. 44658


44 Canal Center Plaza
Suite 322
Alexandria, VA 22314
Tel. (703) 519-9951
Fax (703) 519-9958

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/720,439 | 12/19/2012 | Niko Tapani KIUKKONEN | P5805US01 | 4739 |

11764        7590        08/31/2015
Ditthavong & Steiner, P.C.
44 Canal Center Plaza
Suite 322
Alexandria, VA 22314

| EXAMINER |
|---|
| KAPLAN, BENJAMIN A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2434 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/31/2015 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

docket@dcpatent.com
Nokia.IPR@nokia.com

PTOL-90A (Rev. 04/07)

| Office Action Summary | Application No. | Applicant(s) |
|---|---|---|
| | 13/720,439 | KIUKKONEN ET AL. |
| | **Examiner** | **Art Unit** | **AIA (First Inventor to File) Status** |
| | BENJAMIN KAPLAN | 2434 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

### Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

### Status

1) ☒ Responsive to communication(s) filed on <u>6 May 2015</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

### Disposition of Claims*

5) ☒ Claim(s) <u>1-5 and 7-21</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) <u>1-5 and 7-21</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

### Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on <u>19 December 2012</u> is/are: a) ☒ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

### Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
    a) ☐ All b) ☐ Some** c) ☐ None of the:
    1. ☐ Certified copies of the priority documents have been received.
    2. ☐ Certified copies of the priority documents have been received in Application No. _____.
    3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
4) ☐ Other: _____.

Application/Control Number: 13/720,439                                                     Page 2
Art Unit: 2434

## DETAILED ACTION

1.      The present application is being examined under the pre-AIA first to invent
provisions.


### *Response to Arguments and Amendments*

2.      Applicants arguments filed 6 May 2015 have been fully considered but were not
persuasive.

3.      Regarding claims 1 and 11 Applicant argues in substance that:

The claimed subject matter "a controlling of access to the one or more resources
for one or more other users, one or more other devices associated with the one or more
other users, or a combination thereof **based, at least in part, on membership in the
one or more social networking groups**" (emphasis added) is not disclosed by Nath
(claim 1, lines 9- 11). Instead, Nath discloses "the first user and second user having an
on-line social network relationship;...Determining whether to grant sharing access may
be based, at least in part, upon the nature of the on-line social network relationship."
(Nath, Abstract) Applicant urges that Nath discloses a first and second user being
members of an on-line social network, and a determination whether to grant sharing
access may be based upon "the **nature** of the on-line social network relationship",
which does **not** disclose the claimed subject matter "based...on **membership** in the one
or more social networking groups." (emphasis added) (claim 1, lines 10-11) Further, for
example, see FIGS. 1-2 of Nath wherein in each FIG., all users 12 are each within

Application/Control Number: 13/720,439                                    Page 3
Art Unit: 2434

SOCIAL NETWORK 18 and thus <u>all</u> users 12 are members of SOCIAL NETWORK 18,
and Nath therefore does not disclose this claimed subject matter.

4.      It would not be possible to have a determination of whether or not to grant
sharing access based, at least in part, upon the nature of an on-line social network
relationship if the users were not member of at least one social network group.

      If "all users 12 are members of SOCIAL NETWORK 18" then they are members
of at least one social network group. Being a member of one social network group is
having membership in <u>one or more</u> social networking groups.

      (Nath et al., Abstract, " A system and method is disclosed which may comprise
receiving, via a computing device, from a first user having a first personal device, a
request for sharing access to a resource or a state of a second personal device of a
second user, the first user and second user having an on-line social network
relationship; and determining whether to grant sharing access to the one of the resource
and the state of the second personal device of the second user. Determining whether to
grant sharing access may be based, at least in part, upon the nature of the on-line
social network relationship. The method and apparatus may comprise registering, via
the computing device, an ownership link for a personal device and an owner having a
certified identity within the social network; storing the ownership link; and utilizing the
ownership link for determining whether to grant sharing access.").

5.      Regarding claims 9 and 19 Applicant argues in substance that:

Application/Control Number: 13/720,439                                   Page 4
Art Unit: 2434

Horn neither discloses nor suggests the claimed subject matter of the invention

that are missing from the primary reference to Nath.

6.      Horn's provides limiting of access based in part on the number of access times

(e.g., limited based on deadline, time of use, bytes, connection count, or some other

criterion or criteria)


7.      In regards to new claim 21 Applicant has argued that Nath et al. would not teach

"wherein the controlling of access to the one or more resources is independent from

controlling of configuration settings associated with the one or more resources." And

cites (Nath et al. Paragraph [0039]) indicating that Nath et al. teaches away from the

new calim. Examiner respectfully disagrees as these are separate concerns from a

setup standpoint "configuration settings" have to do with the general availability or ability

of a resource to made available without regard to a particular user that may attempt

access. The key setup emphasized in (Nath et al. Paragraph [0039]) is a matter of

controlling access but would not take care of the configuration settings that make a

resource available to be accessed in the first place.


### Claim Rejections - 35 USC § 102

8.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> (e) the invention was described in (1) an application for patent, published under section 122(b), by
> another filed in the United States before the invention by the applicant for patent or (2) a patent
> granted on an application for patent by another filed in the United States before the invention by the
> applicant for patent, except that an international application filed under the treaty defined in section
> 351(a) shall have the effects for purposes of this subsection of an application filed in the United States

only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

9.       Claim(s) 1-8, 10-18 and 20 is/are rejected under 35 U.S.C. 102(e) as being anticipated by United States Patent Application Publication No.: US 2011/0258303 A1 (Nath et al.).

**As Per Claim 1:** Nath et al. teaches: **A method comprising facilitating a processing of and/or processing (1) data and/or (2) information and/or (3) at least one signal, the (1) data and/or (2) information and/or (3) at least one signal based, at least in part, on the following:**

**- one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof;**

**- a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups; and**

**- a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on membership in the one or more social networking groups.**

(Nath et al., Abstract, " A system and method is disclosed which may comprise receiving, via a computing device, from a first user having a first personal device, a request for sharing access to a resource or a state of a second personal device of a

Application/Control Number: 13/720,439                                    Page 6
Art Unit: 2434

second user, the first user and second user having an on-line social network relationship; and determining whether to grant sharing access to the one of the resource and the state of the second personal device of the second user. Determining whether to grant sharing access may be based, at least in part, upon the nature of the on-line social network relationship. The method and apparatus may comprise registering, via the computing device, an ownership link for a personal device and an owner having a certified identity within the social network; storing the ownership link; and utilizing the ownership link for determining whether to grant sharing access.").

**As Per Claim 2:** The rejection of claim 1 is incorporated and further Nath et al. teaches:
**- a priority hierarchy associated with the at least one user, the at least one device, the one or more social networking groups, or a combination thereof; and a controlling of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on the priority hierarchy.**

(Nath et al., Paragraph [0042], "In one embodiment, the social network can be represented as a hypergraph, where each edge represents a relationship, such as friend, close friend, family member, sibling, co-worker, etc. Access control policy in SBone 30 can then be specified per user, in the form of a matrix, where, e.g., the rows are the resources vectors and state vectors, and the columns are the relationships. A typical user 12 may have only a limited number of relationship edges of which the user 12 is a part. This way, the number of rules that need to be specified for each device 14

associated with a particular user 12 may be able to be limited to a more manageable

number. Relationships can in some embodiments also inherit other relationships. For

example, the close friend relationship can inherits the simple friend relationship, and the

sibling relationship can inherits the relative/family member relationship. Users can

define a precedence order among relationships, which can then be used between users

who are connected to each other by multiple relationship types.").

**As Per Claim 3:** The rejection of claim 2 is incorporated and further Nath et al. teaches:

**- a revocation, a prevention, or a combination thereof of the access to the one or**

**more resources for the one or more other users, the one or more other devices,**

**or a combination thereof based, at least in part, on the priority hierarchy.**

(Nath et al., Paragraph [0042], "In one embodiment, the social network can be

represented as a hypergraph, where each edge represents a relationship, such as

friend, close friend, family member, sibling, co-worker, etc. Access control policy in

SBone 30 can then be specified per user, in the form of a matrix, where, e.g., the rows

are the resources vectors and state vectors, and the columns are the relationships. A

typical user 12 may have only a limited number of relationship edges of which the user

12 is a part. This way, the number of rules that need to be specified for each device 14

associated with a particular user 12 may be able to be limited to a more manageable

number. Relationships can in some embodiments also inherit other relationships. For

example, the close friend relationship can inherits the simple friend relationship, and the

sibling relationship can inherits the relative/family member relationship. Users can

Application/Control Number: 13/720,439                                    Page 8
Art Unit: 2434

define a precedence order among relationships, which can then be used between users

who are connected to each other by multiple relationship types.").


**As Per Claim 4:** The rejection of claim 3 is incorporated and further Nath et al. teaches:

**- access of one or more lower-priority other users, one or more lower-priority**

**other devices, or a combination thereof to the one or more resources is revoked,**

**prevented, or a combination thereof based, at least in part, on access by one or**

**more higher-priority users, one or more higher-priority devices, or a combination**

**thereof to the one or more resources.**

(Nath et al., Paragraph [0053], "SBone 30 can enable a user 12 to share the

resources, such as of the personal device 14 of the user 12, such as internet

connectivity 60, GPS 62, camera 64, and talktime, with a personal device 14 belonging

to a user friend 12. Some resources, such as 60, 62, 64, can be used simultaneously by

multiple users 12, such as internet connection 60. Other resources, such as 60, 62, 64,

can be used by only one user 12 at a time, such as talk time. For users to share their

resources with others, several user 12 concerns need to be addressed. When the

owner 12 wants to use the sharable resource, SBone 30 can implement a Quality of

Service (QoS) mechanism that can allow, e.g., the user 12 to control the level of

sharing. In the case of a resource that cannot be simultaneously accessed by multiple

users, SBone 30 can implement a scheduling scheme to determine which user 12 can

reserve which resource during, e.g., which time period. Time periods may be

imperceptible to human detection, such as when multiple accessing coding of some

form is used, including time division multiple access ("TDMA") with very short time divisions, code division multiple access, ("CDMA") or frequency division multiple access ("FDMA") as available. In one embodiment, not all users 12 may be altruistic in sharing. Some users 121 may require an incentive model to encourage them to share their resources. To implement an incentive mechanism, SBone 30 may can have an accounting component that logs the resource usage.").

(Nath et al., Paragraph [0054], "In one embodiment, the owner can control the level of sharing of a resource, such as 60, 62, 64. When the owner accesses the shared resource, SBone 30 can give priority to the owner. Further, in one embodiment the owner can have the ability to temporarily disable sharing for a resource, whenever the owner wants sole access to the resource. In one embodiment, if a resource, such as 60, 62, 64 cannot be simultaneously accessed by multiple personal devices 14, other user friends 12 need to have a mechanism with which they can reserve access to the resource. A scheduler running on the personal device 14 of the user 12, or on SBase 30 can be used to ensure that a reservation is followed. In one embodiment, the owner 12 also may be required to abide by a reservation. In one embodiment, an accounting module (not shown) can log the resource usage so that, optionally, a billing scheme can be incorporated. Different metrics can be used, such as time of usage, or a resource specific metric (like bytes downloaded for an internet resource 60, or pictures taken for a camera resource 64).").

**As Per Claim 5:** The rejection of claim 2 is incorporated and further Nath et al. teaches:

Application/Control Number: 13/720,439                                    Page 10
Art Unit: 2434

**- a controlling of the access to the one or more resources for the one or more other users, the one or more other devices, or a combination thereof based, at least in part, on one or more characteristics associated with the one or more resources.**

**- a prevention, a revocation, or a combination thereof of access to the one or more resources of the one or more other users, the one or more other devices, or a combination thereof based, at least in part, the priority hierarchy.**

(Nath et al., Paragraph [0042], "In one embodiment, the social network can be represented as a hypergraph, where each edge represents a relationship, such as friend, close friend, family member, sibling, co-worker, etc. Access control policy in SBone 30 can then be specified per user, in the form of a matrix, where, e.g., the rows are the resources vectors and state vectors, and the columns are the relationships. A typical user 12 may have only a limited number of relationship edges of which the user 12 is a part. This way, the number of rules that need to be specified for each device 14 associated with a particular user 12 may be able to be limited to a more manageable number. Relationships can in some embodiments also inherit other relationships. For example, the close friend relationship can inherits the simple friend relationship, and the sibling relationship can inherits the relative/family member relationship. Users can define a precedence order among relationships, which can then be used between users who are connected to each other by multiple relationship types.").

**As Per Claim 7:** The rejection of claim 6 is incorporated and further Nath et al. teaches:

Application/Control Number: 13/720,439                                   Page 11
Art Unit: 2434

**- access to the one or more resources is revoked for one or more lower-priority users, one or more lower-priority devices, or a combination thereof prior to access for one or more higher-priority users, one or more higher-priority devices, or a combination thereof.**

(Nath et al., Paragraph [0053], "SBone 30 can enable a user 12 to share the resources, such as of the personal device 14 of the user 12, such as internet connectivity 60, GPS 62, camera 64, and talktime, with a personal device 14 belonging to a user friend 12. Some resources, such as 60, 62, 64, can be used simultaneously by multiple users 12, such as internet connection 60. Other resources, such as 60, 62, 64, can be used by only one user 12 at a time, such as talk time. For users to share their resources with others, several user 12 concerns need to be addressed. When the owner 12 wants to use the sharable resource, SBone 30 can implement a Quality of Service (QoS) mechanism that can allow, e.g., the user 12 to control the level of sharing. In the case of a resource that cannot be simultaneously accessed by multiple users, SBone 30 can implement a scheduling scheme to determine which user 12 can reserve which resource during, e.g., which time period. Time periods may be imperceptible to human detection, such as when multiple accessing coding of some form is used, including time division multiple access ("TDMA") with very short time divisions, code division multiple access, ("CDMA") or frequency division multiple access ("FDMA") as available. In one embodiment, not all users 12 may be altruistic in sharing. Some users 121 may require an incentive model to encourage them to share their

Application/Control Number: 13/720,439                                    Page 12
Art Unit: 2434

resources. To implement an incentive mechanism, SBone 30 may can have an accounting component that logs the resource usage.").

(Nath et al., Paragraph [0054], "In one embodiment, the owner can control the level of sharing of a resource, such as 60, 62, 64. When the owner accesses the shared resource, SBone 30 can give priority to the owner. Further, in one embodiment the owner can have the ability to temporarily disable sharing for a resource, whenever the owner wants sole access to the resource. In one embodiment, if a resource, such as 60, 62, 64 cannot be simultaneously accessed by multiple personal devices 14, other user friends 12 need to have a mechanism with which they can reserve access to the resource. A scheduler running on the personal device 14 of the user 12, or on SBase 30 can be used to ensure that a reservation is followed. In one embodiment, the owner 12 also may be required to abide by a reservation. In one embodiment, an accounting module (not shown) can log the resource usage so that, optionally, a billing scheme can be incorporated. Different metrics can be used, such as time of usage, or a resource specific metric (like bytes downloaded for an internet resource 60, or pictures taken for a camera resource 64).").

**As Per Claim 8:** The rejection of claim 5 is incorporated and further Nath et al. teaches:
**- the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more wireless access points, or a combination thereof.**

Application/Control Number: 13/720,439                                      Page 13
Art Unit: 2434

      (Nath et al., Paragraph [0026], "SBone can be used to enable Internet sharing between mobile personal devices. Personal devices, including also phones, laptops, PDAs and other wireless access points, typically can have a desired resource, such as internet connectivity, by means of WiFi. 3G, or 4G interfaces. On the other hand, other personal devices such as phones without a 3G subscription, IPods, TiVo players, and the like, typically do not possess internet connectivity, though they can communicate with other personal devices that do have the internet connectivity resource, though not over the internet. SBone has been shown to allow devices with a desired resource, such as an internet connectivity resource, to share that resource with other personal devices, e.g., through the social network. Once one personal device is connected, e.g., to the social network, other personal devices can find the one personal device by querying to or through the social network.").

**As Per Claim 10:** The rejection of claim 1 is incorporated and further Nath et al. teaches:

**- the one or more social networking groups include at least one of a family group, a friends group, a friends of friends group, and an others group.**

      (Nath et al., Paragraph [0042], "In one embodiment, the social network can be represented as a hypergraph, where each edge represents a relationship, such as friend, close friend, family member, sibling, co-worker, etc. Access control policy in SBone 30 can then be specified per user, in the form of a matrix, where, e.g., the rows are the resources vectors and state vectors, and the columns are the relationships. A

typical user 12 may have only a limited number of relationship edges of which the user

12 is a part. This way, the number of rules that need to be specified for each device 14

associated with a particular user 12 may be able to be limited to a more manageable

number. Relationships can in some embodiments also inherit other relationships. For

example, the close friend relationship can inherits the simple friend relationship, and the

sibling relationship can inherits the relative/family member relationship. Users can

define a precedence order among relationships, which can then be used between users

who are connected to each other by multiple relationship types.").


**As Per Claims 11-18 and 20:** Claims 11-18 and 20 are substantially a restatement of

the method of claims 1-8 and10 and are rejected under substantially the same

reasoning.


### *Claim Rejections - 35 USC § 103*

10.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

11.     Claim(s) 9 and 19 is/are rejected under 35 U.S.C. 103(a) as being unpatentable

over United States Patent Application Publication No.: US 2011/0258303 A1 (Nath et

al.) in further view of United States Patent Application Publication No.: US

2010/0157850 A1 (Horn et al.).

Application/Control Number: 13/720,439                                    Page 15
Art Unit: 2434

**As Per Claim 9:** The rejection of claim 1 is incorporated and further Nath et al. does not explicitly teach the following limitation however Horn et al. in analogous art does teach the following limitation:

**- a monitoring of a number of access times at least one other user, at least one other device, or a combination thereof accesses the one or more resources; and an elimination of access rights to the one or more resources for the at least one other user, the at least one other device, or a combination thereof based, at least in part, on the number of access times.**

(Horn et al., Paragraph [0087], "From a restricted femto access point perspective, a home access terminal may refer to an access terminal that is authorized to access the restricted femto access point (e.g., the access terminal has permanent access to the femto access point). A guest access terminal may refer to an access terminal with temporary access to the restricted femto access point (e.g., limited based on deadline, time of use, bytes, connection count, or some other criterion or criteria). An alien access terminal may refer to an access terminal that does not have permission to access the restricted femto access point, except for perhaps emergency situations, for example, such as 911 calls (e.g., an access terminal that does not have the credentials or permission to register with the restricted femto access point). ").

It would have been obvious to one of ordinary skill in the art at the time of invention was made to incorporate the teachings of Horn et al. in to the method of Nath et al. as Horn et al. provides a basic expansion to the available types of access control.

Application/Control Number: 13/720,439                                        Page 16
Art Unit: 2434

**As Per Claim 19:** The rejection of claim 11 is incorporated and further claim 19 is substantially a restatement of the method of claim 9 and is rejected under substantially the same reasoning.

12.     Claim(s) 21 is/are rejected under 35 U.S.C. 103(a) as being unpatentable over United States Patent Application Publication No.: US 2011/0258303 A1 (Nath et al.).

**As Per Claim 21:** The rejection of claim 1 is incorporated and further Nath et al. does not expressly teach:

**- the controlling of access to the one or more resources is independent from controlling of configuration settings associated with the one or more resources.**

However Examiner is giving official notice that it would have been obvious to one of ordinary skill in the art at the time of invention was made for the controlling of access to the one or more resources to be independent from controlling of configuration settings associated with the one or more resources. As these are separate concerns from a setup standpoint "configuration settings" have to do with the general availability or ability of a resource to made available without regard to a particular user that may attempt access. Nath et al. deals primarily with controlling access.

Application/Control Number: 13/720,439                                          Page 17
Art Unit: 2434

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to BENJAMIN KAPLAN whose telephone number is (571)270-3170. The examiner can normally be reached on 7:30 a.m. - 5:00 p.m. E.S.T..

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Kambiz Zand can be reached on (571) 272-3811. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/BENJAMIN KAPLAN/
Examiner, Art Unit 2434
/KAMBIZ ZAND/
Supervisory Patent Examiner, Art Unit 2434

Attorney Docket No.: P5805US01          *Patent*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re Application of: | N. T. KIUKKONEN *et al.* | Confirmation No.: | 4739 |
| Application No.: | 13/720,439 | Examiner: | B. A. KAPLAN |
| Filed: | December 19, 2012 | Group Art Unit: | 2434 |

For:      METHOD AND APPARATUS FOR CONTROLLING ACCESS TO
              RESOURCES

**MAIL STOP AF**
Commissioner for Patents
Alexandria, VA 22313-1450

### RESPONSE UNDER 37 C.F.R. § 1.116

Dear Commissioner:

In response to the Final Office Action dated August 31, 2015, please reconsider the above-identified application based on the following:

AMENDMENT AND PRESENTATION OF CLAIMS ................................................... 2

REMARKS ........................................................................................................... 8

*Patent*

<u>**AMENDMENT AND PRESENTATION OF CLAIMS**</u>

Please replace all prior claims in the present application with the following claims.


1. (Currently Amended) A method comprising facilitating a processing of and/or processing (1) data and/or (2) information and/or (3) at least one signal, the (1) data and/or (2) information and/or (3) at least one signal based, at least in part, on the following:

one or more resources associated with at least one user, at least one device associated with the at least one user, or a combination thereof;

a processing of social networking information associated with the at least one user, the at least one device, or a combination thereof to determine one or more social networking groups; and

a controlling of access to the one or more resources for one or more other users, one or more other devices associated with the one or more other users, or a combination thereof based, at least in part, on <u>(a)</u> membership in the one or more social networking groups<u>, and (b) on one or more characteristics associated with the one or more resources,</u> <u>wherein the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more wireless access points, or a combination thereof</u>.


2. (Original) A method of claim 1, wherein the (1) data and/or (2) information and/or (3) at least one signal are further based, at least in part, on the following:

*Patent*

a priority hierarchy associated with the at least one user, the at least one device, the one or

more social networking groups, or a combination thereof; and

a controlling of the access to the one or more resources for the one or more other users, the

one or more other devices, or a combination thereof based, at least in part, on the priority

hierarchy.


3. (Original) A method of claim 2, wherein the (1) data and/or (2) information and/or (3) at

least one signal are further based, at least in part, on the following:

a revocation, a prevention, or a combination thereof of the access to the one or more

resources for the one or more other users, the one or more other devices, or a combination

thereof based, at least in part, on the priority hierarchy.


4. (Original) A method of claim 3, wherein access of one or more lower-priority other users,

one or more lower-priority other devices, or a combination thereof to the one or more resources

is revoked, prevented, or a combination thereof based, at least in part, on access by one or more

higher-priority users, one or more higher-priority devices, or a combination thereof to the one or

more resources.


5. (Currently Amended) A method of claim 2, wherein the (1) data and/or (2) information

and/or (3) at least one signal are further based, at least in part, on the following:

~~a controlling of the access to the one or more resources for the one or more other users, the~~

~~one or more other devices, or a combination thereof based, at least in part, on one or more~~

~~characteristics associated with the one or more resources; and~~

a prevention, a revocation, or a combination thereof of access to the one or more resources of

the one or more other users, the one or more other devices, or a combination thereof

based, at least in part, the priority hierarchy.

6. (Canceled)

7. (Previously Presented) A method of claim 5, wherein access to the one or more resources

is revoked for one or more lower-priority users, one or more lower-priority devices, or a

combination thereof prior to access for one or more higher-priority users, one or more higher-

priority devices, or a combination thereof.

8. (Canceled)

9. (Original) A method of claim 1, wherein the (1) data and/or (2) information and/or (3) at

least one signal are further based, at least in part, on the following:

a monitoring of a number of access times at least one other user, at least one other device, or

a combination thereof accesses the one or more resources; and

an elimination of access rights to the one or more resources for the at least one other user, the

at least one other device, or a combination thereof based, at least in part, on the number of

access times.

10. (Original) A method of claim 1, wherein the one or more social networking groups

include at least one of a family group, a friends group, a friends of friends group, and an others

group.

*Patent*

11. (Currently Amended) An apparatus comprising:

at least one processor; and

at least one memory including computer program code for one or more programs,

the at least one memory and the computer program code configured to, with the at least one

 processor, cause the apparatus to perform at least the following,

  determine one or more resources associated with at least one user, at least one device

   associated with the at least one user, or a combination thereof;

  process and/or facilitate a processing of social networking information associated with the

   at least one user, the at least one device, or a combination thereof to determine one or

   more social networking groups; and

  cause, at least in part, a controlling of access to the one or more resources for one or more

   other users, one or more other devices associated with the one or more other users, or

   a combination thereof based, at least in part, on <u>(a)</u> membership in the one or more

   social networking groups<u>, and on one or more characteristics associated with the one</u>

   <u>or more resources,</u>

  <u>wherein the one or more resources include one or more wireless access points, and the</u>

   <u>one or more characteristics include a number of users accessing the one or more</u>

   <u>wireless access points, a traffic load associated with the one or more wireless access</u>

   <u>points, or a combination thereof</u>.

12. (Original) An apparatus of claim 11, wherein the apparatus is further caused to:

determine a priority hierarchy associated with the at least one user, the at least one device, the

 one or more social networking groups, or a combination thereof; and

*Patent*

cause, at least in part, a controlling of the access to the one or more resources for the one or

more other users, the one or more other devices, or a combination thereof based, at least

in part, on the priority hierarchy.


13. (Original) An apparatus of claim 12, wherein the apparatus is further caused to:

cause, at least in part, a revocation, a prevention, or a combination thereof of the access to the

one or more resources for the one or more other users, the one or more other devices, or a

combination thereof based, at least in part, on the priority hierarchy.


14. (Original) An apparatus of claim 13, wherein access of one or more lower-priority other

users, one or more lower-priority other devices, or a combination thereof to the one or more

resources is revoked, prevented, or a combination thereof based, at least in part, on access by one

or more higher-priority users, one or more higher-priority devices, or a combination thereof to

the one or more resources.


15. (Canceled)


16. (Currently Amended) An apparatus of claim [[15]] 11, wherein the apparatus is further

caused to:

cause, at least in part, a prevention, a revocation, or a combination thereof of access to the

one or more resources of the one or more other users, the one or more other devices, or a

combination thereof based, at least in part, the priority hierarchy.

*Patent*

17. (Original) An apparatus of claim 16, wherein access to the one or more resources is revoked for one or more lower-priority users, one or more lower-priority devices, or a combination thereof prior to access for one or more higher-priority users, one or more higher-priority devices, or a combination thereof.

18. (Canceled)

19. (Original) An apparatus of claim 11, wherein the apparatus is further caused to:

cause, at least in part, a monitoring of a number of access times at least one other user, at least one other device, or a combination thereof accesses the one or more resources; and

cause, at least in part, an elimination of access rights to the one or more resources for the at least one other user, the at least one other device, or a combination thereof based, at least in part, on the number of access times.

20. (Original) An apparatus of claim 11, wherein the one or more social networking groups include at least one of a family group, a friends group, a friends of friends group, and an others group.

21. (Previously Presented) A method of claim 1, wherein the controlling of access to the one or more resources is independent from controlling of configuration settings associated with the one or more resources.

Attorney Docket No.: P5805US01                                    *Patent*

# REMARKS

By this amendment, claims 1-5, and 7, 9-14, 16-17, and 19-21 are pending, in which claims 1, 5, 11, and 16 are currently amended, and claims 8, 15, and 18 are canceled without prejudice, with claim 6 having been previously canceled.   The claimed subject matter of claims 8; and 15, 18; have been added to respective independent claims 1; and 11; with claims 8, and 15, 18 having been canceled.   A portion of the claimed subject matter of amended claim 5, now stricken from claim 5, has been added to independent claim 1.   Claim 16 has been amended to change its dependency from now canceled claim 15 to independent claim 11.   No new matter is introduced.

The Final Office Action mailed August 31, 2015 rejected: (1) claims 1-8, 10-18, and 20 under 35 U.S.C. § 102(e) as anticipated by *Nath et al.* (US Pub 2011/0258303 A1) (hereinafter "*Nath*"); (2) claims 9 and 19 as obvious under 35 U.S.C. § 103(a) based on *Nath* in view of *Horn et al.* (US Pub 2010/0157850 A1) (hereinafter "*Horn*"); and (3) claim 21 as obvious over *Nath* under 35 U.S.C. § 103(a).

Applicant respectfully traverses these rejections.

## Telephonic Interview

Applicant greatly appreciates courtesies extended by Examiner Kaplan in granting and conducting a telephonic interview on November 4, 2015 with Applicant's representative.

Attorney Docket No.: P5805US01                                        *Patent*

Proposed amendments to claim 1 were discussed and the Examiner indicated the amendments

overcame the cited art of record, subject to a further search.    No formal agreement was reached.


**A.**   **CLAIMS 1-8, 10-18, AND 20 ARE NOT ANTICIPATED BY *NATH* UNDER 35 U.S.C. § 102(E)**


The Examiner bears the initial burden of establishing a *prima facie* basis to deny

patentability to a claimed subject matter under any statutory provision.  *Gilbert & P. Hyatt v.*

*Dudas*, 551 F.3d 1307, 1313 (Fed. Cir. 2008); *In re Glaug*, 283 F.3d 1335 (Fed. Cir. 2002*); In re*

*Rijkaert,* 9 F.3d 1531, 1532 (Fed. Cir. 1992); *In re Oetiker,* 977 F.2d 1992*); In re Piasecki*, 745

F.2d 1468 (Fed. Cir. 1984).  To anticipate a patent claim, the identical disclosure in a single

reference of each element of a claimed subject matter, as those elements are set forth in the

claims, such that the claimed subject matter is placed into the recognized possession of one

having ordinary skill in the art.  *Therasense Inc. v. Becton, Dickinson and Co*., 593 F3d 1325

(Fed. Cir. 2010); *Praxair, Inc. v. ATMI, Inc*., 543 F.3d 1308, (Fed. Cir. 2008); *Dayco Prods., Inc.*

*v. Total Containment, Inc*., 329 F.3d 1358 (Fed. Cir. 2003); *Schering Corp. v. Geneva Pharm.*,

339 F.3d 1373, 1377 (Fed. Cir. 2003); *Crown Operations International Ltd. v. Solutia Inc.*, 289

F.3d 1367 (Fed. Cir. 2002); *Candt Tech Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344

(Fed. Cir. 2001).


Additionally, "[u]nless a reference discloses within the four corners of the document not

only all of the limitations claimed but also all of the limitations **arranged or combined in the**

**same way** as recited in the claim, it cannot be said to prove prior invention of the thing claimed

*Patent*

and, thus, cannot anticipate under 35 U.S.C. § 102" (*see*, *Id*. *Therasense* quoting *Net moneyIN, Inc. v. VeriSign, Inc.*, 535 F.3d 1359 (Fed. Cir. 2008)) (emphasis added).


Although "inherent disclosure" is also a basis of anticipation, (*see*, *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999)), it "does not alter the requirement that all elements must be disclosed in an anticipatory reference in the same way they are arranged or combined in the claim" (*see*, *Id*. *Therasense,*). "'[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation.'" (see, *Id*. quoting *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002)). "'Inherency, however, **may not be established by probabilities or possibilities**. The mere fact that a certain thing may result from a given set of circumstances is not sufficient'" *(see, Id.* quoting *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)) (emphasis added).


Claim 1 has been amended to include the claimed subject matter of now canceled claim 8 and a portion of amended claim 5 from which claim 8 depended, specifically, *inter alia* "and (b) on one or more characteristics associated with the one or more resources, wherein the one or more resources include one or more wireless access points, and the one or more characteristics include a number of users accessing the one or more wireless access points, a traffic load associated with the one or more wireless access points, or a combination thereof". Applicant urges this, *inter alia*, claimed subject matter is patentably distinct over *Nath* under § 102(e). The Examiner agreed during the November 4, 2015 Telephonic Interview, subject to a further search.

Independent claims 11 includes similar claimed subject matter of varying degree and is therefore also patentable over the cited art.   Dependent claims 2-5, 7, and 10; and 12-14, 16-17 and 19-20; (with claims 6, 8, 15 and 18 being canceled) depend directly or indirectly, from respective independent claims 1; and 11; and are therefore also patentable for at least the reasons independent claims 1, and 11 are patentable, as well as for additional claimed subject matter the claims recite.

Accordingly, reconsideration and withdrawal of the rejection are respectfully requested.

### B.    CLAIMS 9 AND 19 ARE NOT RENDERED OBVIOUS BY *NATH* IN VIEW OF *HORN* UNDER 35 U.S.C. § 103(A)

As stated above, the Examiner bears the initial burden of establishing a *prima facie* basis to deny patentability to a claimed subject matter under any statutory provision. The Supreme Court in *KSR* reaffirmed the familiar framework for determining obviousness as set forth in *Graham v. John Deere Co*., 383 U.S. 1, 148 USPQ 459 (1966) ("*Graham*").   As stated in *Graham* obviousness is a question of law based on underlying factual inquiries, that is a question of law based on underlying factual inquiries. The factual inquiries enunciated by the Court are as follows: (A) determining the scope and content of the prior art; and (B) ascertaining the differences between the claimed invention and the prior art; and (C) resolving the level of ordinary skill in the pertinent art.   *See M.P.E.P. § 2141 2.*   Objective evidence relevant to the issue of obviousness must be evaluated by the examiner. *Graham* at 17-18, 148 USPQ at 467. Such evidence ("secondary considerations") may include evidence of commercial success, long-

*Patent*

felt but unsolved needs, failure of others and unexpected results.   These *Graham* factors were

reaffirmed and relied upon by the Supreme Court of the United States in *KSR Intern. Co. v.*

*Teleflex Inc.*, 127 S.Ct. 1727 (2007).   "Office personnel fulfill the critical role of fact finder

when resolving the *Graham* inquiries. It must be remembered that while the ultimate

determination of obviousness is a legal conclusion, the underlying *Graham* inquiries are factual.

When making an obviousness rejection, Office personnel must therefore ensure that the written

record includes findings of fact concerning the state of the art and the teachings of the references

applied. In certain circumstances, it may also be important to include explicit findings as to how

a person of ordinary skill would have understood prior art teachings, or what a person of ordinary

skill would have known or could have done. Factual findings made by Office personnel are the

necessary underpinnings to establish obviousness." *M.P.E.P. § 2141 II* "The examiner must

provide specific factual findings predicated on sound technical and scientific reasoning to

support his or her conclusion of common knowledge. See *Soli*, 317 F.2d at 946, 37 USPQ at 801;

*Chevenard,* 139 F.2d at 713, 60 USPQ at 241. "The applicant should be presented with the

explicit basis on which the examiner regards the matter as subject to official notice so as to

adequately traverse the rejection in the next reply after the Office action in which the common

knowledge statement was made." *M.P.E.P. § 2144.03 B*.


"Office personnel should consider all rebuttal arguments and evidence presented by

applicants. See, e.g., *Soni*, 54 F.3d at 750, 34 USPQ2d at 1687 (error not to consider evidence

presented in the specification). *C.f., In re Alton,* 76 F.3d 1168, 37 USPQ2d 1578 (Fed. Cir. 1996)

(error not to consider factual evidence submitted to counter a 35 U.S.C. 112 rejection); *In re*

*Beattie,* 974 F.2d 1309, 1313, 24 USPQ2d 1040, 1042-43 (Fed. Cir. 1992) (Office personnel

Attorney Docket No.: P5805US01                                          *Patent*

should consider declarations from those skilled in the art praising the claimed invention and

opining that the art teaches away from the invention.); *Piasecki,* 745 F.2d at 1472, 223 USPQ at

788 ("[Rebuttal evidence] may relate to any of the *Graham* factors including the so-called

secondary considerations.")."   *M.P.E.P. 2145*


The test for determining if a claim is rendered obvious by one or more references for

purposes of a rejection under 35 U.S.C. § 103 is set forth in *KSR International Co. v. Teleflex*

*Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007):


> "Under §103, the scope and content of the prior art are to be determined;
> differences between the prior art and the claims at issue are to be ascertained; and
> the level of ordinary skill in the pertinent art resolved.   Against this background
> the obviousness or nonobviousness of the subject matter is determined. Such
> secondary considerations as commercial success, long felt but unsolved needs,
> failure of others, etc., might be utilized to give light to the circumstances
> surrounding the origin of the subject matter sought to be patented." Quoting
> *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966).


As set forth in MPEP 2143.03, to ascertain the differences between the prior art and the

claims at issue, "[a]ll claim limitations must be considered" because "all words in a claim must

be considered in judging the patentability of that claim against the prior art." *In re Wilson*, 424

F.2d 1382, 1385.   According to the Examination Guidelines for Determining Obviousness

Under 35 U.S.C. 103 in view of *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 415-421,

82 USPQ2d 1385, 1395-97 (2007), once the *Graham* factual inquiries are resolved, there must be

a determination of whether the claimed subject matter would have been obvious to one of

ordinary skill in the art based on any one of the following proper rationales:

(A) Combining prior art elements according to known methods to yield predictable results; (B) Simple substitution of one known element for another to obtain predictable results; (C) Use of known technique to improve similar devices (methods, or products) in the same way; (D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results; (E) ''Obvious to try''— choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success; (F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art; (G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.   *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007).

Furthermore, as set forth in *KSR International Co. v. Teleflex Inc.*, quoting from *In re Kahn*, 441 F.3d 977, 988 (CA Fed. 2006), "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasonings with some rational underpinning to support the legal conclusion of obviousness."

Therefore, if the above-identified criteria and rationales are not met, then the cited reference(s) fail to render the claims obvious and, thus, the claims are distinguishable over the cited reference(s).

Claim 9 depends from claim 1 and is therefore patentably distinct over *Nath*, and Applicant urges that *Horn* was cited for the claimed subject matter of claim 9 and *Horn* does not cure the deficiencies of *Nath* noted above for claim 1 and therefore claim 9 is patentably distinct over *Nath* in view of *Horn* under 35, U.S.C. § 103(a).

*Patent*

Dependent claim 19 depends from claim 11 and therefore includes similar claimed subject matter of varying degree and is therefore also patentable over the cited art.


Accordingly, reconsideration and withdrawal of the rejection are respectfully requested.


### C.    CLAIM 21 IS NOT RENDERED OBVIOUS BY *NATH* UNDER 35 U.S.C. § 103(A)


Claim 21 depends from claim 1 which Applicant urges is not obvious over *Nath* under 35 U.S.C. § 103(a), as agreed with the Examiner during the November 4, 2014 Telephonic Interview, subject to further search, and therefore claim 21 is not obvious over *Nath* under 35 U.S.C. § 103(a).


Accordingly, reconsideration and withdrawal of the rejection are respectfully requested.


Therefore, the present application, as amended, overcomes the rejections of record and is in condition for allowance.   Favorable consideration is respectfully requested.   If any unresolved issues remain, it is respectfully requested that the Examiner telephone the undersigned attorney at (703) 519-9951 so that such issues may be resolved as expeditiously as possible.


As Applicants' remarks with respect to the Examiner's rejections are sufficient to overcome these rejections, Applicants' silence as to assertions by the Examiner in the Office Action or certain requirements that may be applicable to such rejections (e.g., whether a

Attorney Docket No.: P5805US01                                                    *Patent*

reference constitutes prior art, ability to combine references, assertions as to patentability of dependent claims) is not a concession by Applicants that such assertions are accurate or such requirements have been met, and Applicants reserve the right to analyze and dispute such assertions in the future.

To the extent necessary, a petition for an extension of time under 37 C.F.R. § 1.136 is hereby made.   Please charge any shortage in fees due in connection with the filing of this paper, including extension of time fees, to Deposit Account 504213 and please credit any excess fees to such deposit account.

Respectfully Submitted,

DITTHAVONG & STEINER, P.C.

November 5, 2015                /Stephen G. Stanton/
Date                           Stephen G. Stanton
                               Attorney/Agent for Applicant(s)
                               Reg. No. 35,690

                               Phouphanomketh Ditthavong
                               Attorney/Agent for Applicant(s)
                               Reg. No. 44,658

44 Canal Center Plaza
Suite 322
Alexandria, VA 22314
Tel. (703) 519-9951
Fax (703) 519-9958

Case 1:21-cv-01119-MN-CJB   Document 94-15   Filed 07/01/22   Page 57 of 106 PageID 103

US 20110258303A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: US 2011/0258303 A1
Nath et al. (43) Pub. Date: Oct. 20, 2011

(54) **SYSTEM AND METHOD FOR PERSONAL DEVICE SHARING USING SOCIAL NETWORKS**

(76) Inventors: **Badri Nath**, Edison, NJ (US);
**Liviu Iftode**, Princeton, NJ (US);
**Pravin Shankar**, Sunnyvale, CA (US); **Lu Han**, Piscataway, NJ (US)

(21) Appl. No.: **13/074,252**

(22) Filed: **Mar. 29, 2011**

**Related U.S. Application Data**

(60) Provisional application No. 61/318,601, filed on Mar. 29, 2010.

**Publication Classification**

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) U.S. Cl. ........................................................ 709/223

(57) **ABSTRACT**

A system and method is disclosed which may comprise receiving, via a computing device, from a first user having a first personal device, a request for sharing access to a resource or a state of a second personal device of a second user, the first user and second user having an on-line social network relationship; and determining whether to grant sharing access to the one of the resource and the state of the second personal device of the second user. Determining whether to grant sharing access may be based, at least in part, upon the nature of the on-line social network relationship. The method and apparatus may comprise registering, via the computing device, an ownership link for a personal device and an owner having a certified identity within the social network; storing the ownership link; and utilizing the ownership link for determining whether to grant sharing access.





FIG. 1

FIG. 2

Patent Application Publication    Oct. 20, 2011 Sheet 2 of 6    US 2011/0258303 A1

## FIG. 3





FIG. 4

**FIG. 5**



*FIG. 6*

## FIG. 7



US 2011/0258303 A1

Oct. 20, 2011

1

## SYSTEM AND METHOD FOR PERSONAL DEVICE SHARING USING SOCIAL NETWORKS

### CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]    The present application claims priority to U.S. Provisional Patent Application No. 61/318,601, filed on Mar. 29, 2010, entitled, SYSTEM AND METHOD FOR PERSONAL DEVICE SHARING USING SOCIAL NETWORKS, the disclosure of which is hereby incorporated by reference.

### FIELD OF THE INVENTION

[0002]    The disclosed subject matter relates to sharing personal communication and computing device resources and functionalities over a network, e.g., through a social network.

### BACKGROUND OF THE INVENTION

[0003]    Mobile phones and other communication-capable portable personal communication and computing devices, such as Blackberry®, IPod™, Droid™ and the like are among the most popular portable personal devices, with over four billion in use currently worldwide, and increasing rapidly (herein collectively "portable personal devices"). Other personal communication and computing devices, portable and otherwise, include Wii™ game controllers, in-car PCs, GPS devices, tablet PCs (e.g., iPad™) and TiVo® players (herein, collectively with "portable personal devices," "personal devices"). These personal devices feature powerful processors and internet connectivity via, for example, 3G, 4G, and WiFi interfaces, and the like, making personal devices increasingly important as communications and computing platforms.

[0004]    People tend to share their belongings with their friends. For example, people often share books and movies that they own with their friends, co-workers, relatives and the like (herein' collectively "friends"). Carpooling is a common way in which people share, e.g., their cars with their friends, acquaintances and co-workers (herein collectively included within "friends"). With the growth of Online Social Networks (OSNs), such as, Facebook, LinkedIn, Twitter, Google Buzz, on-line personal blogs, etc., people have started sharing personal data, such as stories, experiences, friends, including an increasing cadre of so-called virtual friends, contacts, songs, pictures, videos, and the like (herein, collectively ("information") with their friends, to whom, in many cases, they have become more connected than every before, using the network, such as using sites like Flickr and Youtube (herein collectively "on-line video sharing sites"). OSNs like those noted above, including, e.g., Facebook, LinkedIn, Twitter and Google Buzz (herein collectively with OSNs, "social networks") also allow users to share their whereabouts, the news they learn, and the changes that occur in their lives, among other types of personal information.

[0005]    Improvements in communications between personal devices have been discussed much in the art, including usability issues in home networking as discussed in Shehan, et al., "Home networking and HCI: what hath god wrought?", Proceedings of the SIGCHI conference on Human factors in computing systems (2007), proposed improvements in the usability of device communication, and as is discussed in Allman, "Personal namespaces," Proceedings of ACM SIG-COMM HotNets Workshop (2007) (personal namespaces as

alternatives to device naming), Allman, et al., "Relationship-oriented networking," ICSI Networking Group Technical Report (2008), and MIT's Unmanaged Internet Architecture, as discussed in Ford, et al., "Persistent personal names for globally connected mobile devices," Proceedings of the 7th USENIX Symposium on Operating Systems Design and Implementation (OSDI), (2006) and Ford, et al., "User-relative names for globally connected personal devices," Proceedings of the 5th International Workshop on Peer-to-Peer Systems (IPTPS) (2006) (user-friendly architecture for naming, locating and routing between personal devices), and, finally Banks, et al., "Social links: integrating social networks with internet routing," Proceedings of the ACM SIGCOMM workshop on large scale attack defense, pp. 121-128 (2007) (routing scheme that involves social networks between nodes on the internet). The disclosed subject matter in the present application, on the other hand, relates to enabling device sharing.

[0006]    Systems and methods using models for remote device access have been proposed, e.g., as discussed in Hiro-fuchi, et al. "USB/IPA peripheral bus extension for device sharing over IP network," Proceedings of USENIX Annual Technical Conference, FREENIX Track, pp. 47-60 (2005) (peripheral bus extension over a TCP/IP network to access a remote USB device in a homogeneous environment), XMPP protocol specification. http://xmpp.org/tech/overview.shtml (extended the architecture to support heterogeneous environments), Kong, et al., "Cameracast: Flexible access to remote video sensors," Proceedings of Multimedia Computing and Networking (MMCN) (2007) and Kwon, et al., "Design and implementation of peripheral sharing mechanism on pervasive computing with heterogeneous environment," Software Technologies for Embedded and Ubiquitous Systems, Volume 4761 (2007) (access to a remote video sensor device). Wu, et al., "Composable IO: A novel resource sharing platform in personal clouds," Proceedings of 1st International Conference on Cloud Computing, (2009). All these systems and methods focus on remote access to peripheral 10 devices, while Peek, et al. "EnsemBlue: Integrating Distributed Storage and Consumer Electronics," Proceedings of the 7th USENIX Symposium on Operating Systems Design and Implementation (OSDI) (November 2006) disclose a distributed file system for personal devices that store multimedia. Aspects of the disclosed subject matter of the present application, on the other hand, propose device sharing enabled using relationships between users in on-line social networks, encompassing all aspects of communication including authentication, naming, discovery and access control.

[0007]    Utilizations of location-limited channels, such as an infrared link, USB key, gestures (touching the two devices together), etc. have been proposed to authenticate ad-hoc devices, such as is discussed in Balfanz et al., "Talking to strangers: authentication in ad-hoc wireless networks" Proceedings of Network and Distributed System Security Symposium (NDSS) (2002) (Balfanz I). Balfanz et al., "Network-in-a-box: How to set up a secure wireless network in under a minute," Proceedings of the Usenix Security Symposium (2004) introduced the idea of performing user-friendly wireless authentication by making use of location-limited channels. Asokan, et al., "Visitor access management in personal wireless networks," Proceedings of the Seventh IEEE International Symposium on Multimedia," propose a way to manage access control for visitors to a personal wireless network. Dourish, et al., Security in the wild: User strategies for man-

aging security as an everyday, practical problem," Personal and Ubiquitous Computing, 8(6), pp. 391-401 (2004) highlighted the importance of usability in designing secure systems. Wi-Fi Protected Setup (WPS), http://www.wi-fi.org/wifiprotected-setup/discusses a standard that was established by the Wi-Fi Alliance for easy and secure establishment of a wireless network, by automatically setting up keys.

[0008] Social network sites are commonly used by applications to bootstrap their own authenticated communication channels. Ramachandran, et al., "Authenticated out of band communication over social links," Proceedings of the First ACM SIGCOMM Workshop on Online Social Networks (2008) proposed a framework that allows applications to authenticate and discover peers using social networking sites. The majority of large social networks today support such a functionality, as discussed in OpenID Foundation. http://openid.net/ (Google's OpenSocial) and http://developers.facebook.com/connect.php. (Facebook Connect), utilizing application programming interfaces ("APIs") for web-based social network applications that aim to make applications social networking enabled by letting users bring their identity and connections everywhere. OpenID, as discussed in http://openid.net/. is an open, decentralized standard for authenticating users which can be used for access control, allowing users to log on to different services with the same digital identity where these services trust the authentication body. However, thus far, the social network art has only been proposed as an out-of-band authentication and peer discovery channel for users and applications.

[0009] It has been proposed, e.g., in Tootoonchian, et al., "Better privacy for social networks," Proceedings of the Fifth ACM International Conference on Emerging Networking Experiments and Technologies (CoNEXT) (2009) and Puttaswamy, et al., "Preserving privacy in location-based mobile social applications," Proceedings of Hot-Mobile Workshop (2010) to use a social network as a encrypted data store, and storing user keys in the social network, addressing the goal of protecting user privacy when users share states in a social network, as opposed to the disclosed subject matter relating to enabling device sharing by making use of a social network.

[0010] There are. therefore, many improvements that can be made in this nascent and growing technology of sharing over social networks. The currently ubiquitous use of personal devices can be made to include more seamless sharing, e.g., with less need for support for authentication, access control, device naming and discovery and like requirements.

## SUMMARY OF THE INVENTION

[0011] A system and method is disclosed which comprises receiving, via a computing device, from a first user having a first personal device, a request for sharing access to one of a resource and a state of a second personal device of a second user, the first user having an on-line social network relationship with the second user on an on-line social network; and determining, via the computing device, whether to grant sharing access to the one of the resource and the state of the second personal device of the second user. Determining whether to grant sharing access may be based, at least in part, upon the nature of the on-line social network relationship between the first user and the second user. The method and apparatus may comprise registering, via the computing device, an ownership link for a personal device and an owner having a certified

identity within the social network; storing the ownership link; and utilizing the ownership link for determining whether to grant sharing access.

[0012] The system and method may comprise assigning, while registering, a persistent personal name to the registered personal device, distinct from a personal device network address, that is, e.g., other than a network universal resource locator ("URL"), but rather the on-line social network identifying user name, as an example, thus, the persistent personal name may correspond to the on-line social network user name associated with a certified identity of the user of the personal device. The system and method may comprise setting, via the computing device, at least one access control rule for one of a resource and a state of the personal device of the second user.

[0013] The system and method may further comprise the at least one resource comprising one of an Internet connectivity and a phone calling plan, such as, e.g., talktime, of the second personal device used by the first personal device without the need for real time human intervention. i.e., the linking for sharing is done by the computing device of a system implementing the method. The system and method may also comprise a personal device of the second user registered on the on-line social network being searched by the first personal device of the first user, at least in part based on the on-line social network relationship established between the first user and the second user in the on-line social network.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0014] For a more complete understanding of the present invention, reference is made to the following detailed description of exemplary embodiments considered in conjunction with the accompanying drawings, in which:

[0015] FIG. 1 shows a social graph of users extended with their personal devices. some of which may be connected to the Internet, according to aspects of an embodiment of the disclosed subject matter;

[0016] FIG. 2 shows SBone as an overlay network of users and their personal devices, with SBone mapping to a social network of users, to infer inter-personal relationships among them, according to aspects of an embodiment of the disclosed subject matter;

[0017] FIG. 3 shows a magnified view of a user on SBone with personal devices of the user, according to aspects of an embodiment of the disclosed subject matter;

[0018] FIG. 4 illustrates a possible architecture where owners 12 of devices 14 (A and B as illustrated) are friends, where device A has a sharable internet resource and SBone 30 enables device B to get connected to the internet using device A's connectivity, according to aspects of an embodiment of the disclosed subject matter;

[0019] FIG. 5 shows personal devices 14 sharing state information with each other, according to aspects of an embodiment of the disclosed subject matter;

[0020] FIG. 6 shows an example of an SBone system including an SBone server, an SBone client and an SBone Facebook application, according to aspects of an embodiment of the disclosed subject matter; and,

[0021] FIG. 7 shows an example of a graphical user interface ("GUI") for an SBone Facebook application, where, e.g., users can see the on-line status of their personal device(s), and

the personal device(s) owned by a user friend(s), according to aspects of an embodiment of the disclosed subject matter.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0022] The above noted phenomenon of sharing between and among friends can be extended to the personal devices being used. On these personal devices, owners can store personal data, such as contacts, experiences, songs, pictures and videos, and like information. These personal devices are also capable of sensing environmental information, such as location, commercial and on-line transactions, traffic, temperature, etc., which might be useful to provide participatory sensing, such as is discussed in Burke, et al., "Participatory sensing," Proceedings of World Sensor Web Workshop, ACM Sensys (2006). The state of these devices, such as ring status (vibrate, silent or normal) can help friends to decide when to call, to text or to send mail, and the like. In addition to stored data and state, personal devices also have resources such as internet connectivity, GPS, camera, and talktime, which, today, are available only to their owners. However, owners may want to share these resources with their friends. For example, the owner of a personal device with internet access may want to share the internet connection with a personal device(s) owned by a friend(s), e.g., who is in the same vicinity, such as in a shopping mall, or has common interests, or the like.

[0023] According to aspects of embodiments of the disclosed subject matter, a system and method is disclosed which applicants have denominated "SBone," an architecture that can facilitate sharing of resources and capabilities offered by personal devices among people who are connected, e.g., friends connected through a social network. SBone can be used to establish trusted connections between devices by leveraging the relationships that already exist between their owners, e.g., in the on-line social network.

[0024] According to aspects of embodiments of the disclosed subject matter, the existence of inter-personal trusted relationships can provide a backbone for personal device sharing. By linking devices with users who own and carry them, it is possible to provide better usability, security and trust. Social networks, and the like associations of on-line users, can provide a natural way to connect personal devices of friends. This established connection is useful in curating signals from personal devices in conjunction with the social signals from the already established links among people in online social networks. An increasingly vast majority of people who own personal devices are connected to each other by social networks. Facebook, as an example, reports more than 400 million active users, of which more than 100 million currently access Facebook through their personal devices, including mobile personal devices. On-line social networks have become an extremely popular way for people to maintain on-line identities and trust relationships in the form of links to friends and the like. These social links between users are an alluring asset, which applicants here propose to leverage to provide authentication, naming, discovery and access control between the personal devices, including portable personal devices.

[0025] Using SBone, according to aspects of embodiments of the disclosed subject matter, users can add their devices to the system in a secure manner, and specify access control policies for their friends to share the state, capabilities, resources and the like of these personal devices. A friend's device can read the state of the device that belongs to another friend, family member, colleague, or an acquaintance connected by SBONE. Based on this state, the device can choose to take the appropriate action. If a friend's phone is in silent mode or indicates it is in a location pertaining to a meeting room, then the caller of this friend can be postpone calling or send a message instead so as not to disturb the callee. Personal devices can be assigned personal names, and the users can query the system for devices based on personal names or other attributes and relationships. Providing these features in a scalable and secure way according to the disclosed subject matter can create ways to address challenges in authentication, access control, naming and discovery of devices.

[0026] SBone can be used to enable Internet sharing between mobile personal devices. Personal devices, including also phones, laptops, PDAs and other wireless access points, typically can have a desired resource, such as internet connectivity, by means of WiFi. 3G, or 4G interfaces. On the other hand, other personal devices such as phones without a 3G subscription, IPods, TiVo players, and the like, typically do not possess internet connectivity, though they can communicate with other personal devices that do have the internet connectivity resource, though not over the internet. SBone has been shown to allow devices with a desired resource, such as an internet connectivity resource, to share that resource with other personal devices, e.g., through the social network. Once one personal device is connected, e.g., to the social network, other personal devices can find the one personal device by querying to or through the social network.

[0027] In one aspect, a method implemented utilizing a computing device, such as a server, can include receiving, by the computing device and from a first user having a first personal device, a request to access a resource or state of a second personal device of a second user having a relationship with the first user on or through a social network. Access control rules and policies can be applied, by the computing device, with respect to the second user to permit, manage and implement an access of the resource or state of the personal device of the second user by or through the personal device of the first user. In one embodiment, the computing device can register the first user, such as by registration of the first user or the personal device of the first user and the second user, such as by registration of the second user or the personal device of the second user, e.g., for participation in an SBone system and method, e.g., as part of a registration to participate in the social network or some supplement to such social network registration.

[0028] In one embodiment, the computing device can receive from the personal device of a second user the access control policy. The access control policy can, e.g., specify which other personal devices of other users that have a relationship with the second user in or through the social network can access a capability, resource or state of the personal device of the second user.

[0029] As discussed herein applicants propose an SBone architecture and design for resource and state sharing, such as, Internet resource sharing between personal devices using SBone.

[0030] Turning now to FIG. 1 there is shown a social graph 10 of users 12, i.e. persons, in a social network 18, with their personal devices 14, some of which may be connected to the Internet 20, as illustrated by the dashed lines 16. FIG. 2 illustrates SBone 30 as an overlay network 30' of users 12' and their personal devices 14', with the SBone overlay network

4

30' mapping to a social network 18 of users 12, with inferred inter-personal relationships 22 among them. In the embodiment of FIG. 2, the SBone 30 model and system architecture, in relation to the personal devices 14 and users 12 who own them, shows connections 22 between users 12, representing a social relationship between the respective user(s) 12. Personal devices 14 can be connected to their owners by means of ownership links. Finally, some personal devices are connected (dashed lines 16) to the Internet 20, which is seen as a resource they can share, e.g., with other personal devices 14 which are not so connected.

[0031] The SBone 30 architecture can realize this model by creating an overlay network 30' of users 18' and personal devices 14' on top of a social network 18, as shown in FIG. 2. This overlay network 30', which connects to an on-line social network 18, and performs device naming, discovery, authentication and access control, is herein referred to as an SBone server 40, shown in FIG. 7.

[0032] Turning now to FIG. 3, there is shown the devices that the user 12, John, owns, such as a phone 50, a WiFi application 52 and a digital camera 56. Each device 14 can bee seen to have a set of resources/capabilities, illustrated in circles, such as internet connectivity 60, global positioning system ("GPS") 62 and digital photography 64, along with state information, as illustrated in squares, such as, battery 72, user ring status 74 and network loading 76.

[0033] Each personal device 12 has a set of resources, such as 60, 62, 64 and state information 70, 72 and 74. An embodiment of the set of resources and state information of personal devices 14 is shown in FIG. 3. Examples of resources that devices, as noted above, may share include internet connectivity 60, GPS 62 and digital photography 74, along with e.g., talktime (not shown). The state of a device 14, such as 70, 72 and 74, by way of example, can be either device-specific (such as battery 72, ring status 74) or environment-specific (such as traffic, temperature, not shown). This state, such as 70, 72, 74, can be useful to other devices 14, and can be shared.

[0034] FIG. 4 illustrates a possible architecture where owners 12 of devices 14 (A and B as illustrated) are friends, where device A has a sharable internet resource and SBone 30 enables device B to get connected to the internet using device A's connectivity. In an embodiment of SBone 30 personal device 14 sharing lifecycle can include phases, such as three phases: registration, connection and resource/state sharing. Registration can establish the ownership link for a new device 14 that is to be added to SBone 30. In one embodiment, the connection phase occurs when an SBone 30 device 14 attempts to connect to a network (e.g., the Internet 20). In one embodiment, a connected device 14 enters the sharing phase whenever the sharing phase is available. In one embodiment, registering a new device 14 to SBone 30 links the new device 14 to its owner 12 and assigns the new device 14 a persistent personal name. The user 12 may then set access control policy for the resources, such as 60, 62, 64 and states, such as 70, 72 and 74 for this device 14.

[0035] In one embodiment, device 14 can look continuously to connect to a network (e.g., the Internet 20) using either the user's own network link 60, or a network link of a device 14 of a user friend 12 that is willing to share the internet resource 60 of the personal device 14 of the user friend 12. On finding the latter, the two devices 14 can securely pair with each other using the SBone overlay 30'.

Once a device 14 connects to the Internet 20, the device can be assigned a routable name, which can be used by other devices 14 to reach it.

[0036] In one embodiment, personal devices 14 can discover available resources, such as 60, 62, 64, offered by other devices 14 in the SBone overlay 30', e.g., using queries based on, e.g., social network 18 relationships and attributes. In one embodiment, once devices 14 find each other, secure device-to-device pairing occurs. Unlike the traditional definition of pairing, in one embodiment, device-to-device pairing in the SBone overlay 30' refers not only to near-field communication, but also to the case when the devices communicate to themselves or other devices 14 via the Internet 20.

[0037] An embodiment of resource and state sharing in SBone 30 is illustrated in FIGS. 4 and 5, respectively. In the example shown in FIG. 4, device A has a sharable internet resource. Devices A and B allow resource sharing between each other, since their respective owners 12 are connected to each other by a social relationship 22. The social network connections 22 exist between the users 12 (UA and UB) in the social network 18, and such connections 22' also exist in the SBone overlay 30;' this enables device B to get connected to the Internet 20 using device A's internet resource 60. Devices 14 can also share state information with each other, as illustrated in FIG. 5. Suppose device C wants to know the battery level of device B in order to decide whether to call, text or send mail. Since UB and UC are friends, connected in the social network 18 by a connection 22, which connection exists also in the SBase overlay 30' as connections 22', the two devices 14 are paired, and the SBone overlay 30' enables device C to check device B's battery state.

[0038] In one embodiment, the first step in an SBone 30 device 14 carrying out sharing is to introduce a new device 14 to the SBone 30 network by registering the new device 14 to one or more social networks 18 to which the user 12 belongs. The system can verify that the user 12 owns the device 14. Systems that support mobile clients typically make use of a trusted out-of-band authentication channel, such as short message service ("SMS"), to allow the user 12 to prove that the user 12 possesses the device 14. However, not all devices 14 have the ability to send and/or receive SMSs. In one embodiment, location-limited channels, using defined protocol(s) to establish secure communication channels, such as are discussed in BalFanz I, such as wireless, bluetooth, infrared or USB, can be used to authenticate a device 14 and the owner 12 of the device 14. In one embodiment, for shortrange communication, the social network cannot be used as an end point, so SBone 30 can allow the user 12 to delegate a desktop, laptop or smartphone, or the like as an authentication proxy.

[0039] In one embodiment, once a device 14 is registered, it can generates a key pair and a public key certificate, sometimes referred to as a digital certificate or identity certificate, used in cryptography to bind the public key portion of a key pair to a user 12, which key pair can be stored in the newly added device 14. The public key of the device can then also be stored on the SBone server 40 (shown in FIG. 6), which can act as a certificate authority ("CA"). In other words, the SBone server is knowledgeable of the public key and private key for each user 12, having perhaps generated one or both, and keeps the private key securely in a secured server, not for public distribution, but only for distribution to the individual user by some secure communication method. The user can then use the private key to decrypt messages encrypted with

the user's public key, distributed publicly to other users, and to encrypt messages to send to others that can then also be decrypted using the public key.

[0040] A user **12** may remove a device **14** from the system (say when the device is lost, or the user no longer wants to use it). SBone **30**, therefore, has to also maintain a certificate revocation list ("CRL"). In one embodiment, devices **14** need to have connectivity with the SBone server **40** at all times in order to use a "CRL." Devices owned by multiple users **12** can create a further challenge for the system. It is possible, e.g., that multiple members of a family can share a device **14**. For simplicity, it is assumed that a single personal device cannot have multiple ownership links, i.e., it is presumed that there is only one registered owner, though in reality there may be more than one.

[0041] Once a personal device **14** is registered to the system, the user **12** can then specify that a device **14** of a user **12** friend devices can access the user's device **14** as to a specific resource, such as **60**, **62**, **64** and/or a specific state, such as **70**, **72**, **74** of the device **14** of the user **12**. Specifying access control policy can involve a trade-off between flexibility and usability. In one embodiment, an all-or-nothing policy can be adopted. However, the problem with such an approach is that, other users **12** do not have the same level of trust with all their user **12** friends, such as virtual friends in a social network **18**. A user **12** friend in a social network **18** can refer to an acquaintance or an acquaintance of a friend or acquaintance, a present or former co-worker, a close friend or previous close friend, or a relative, including a sibling or a spouse. In another embodiment, a fine-grained access control is hard to specify for an average user **12**. Typical users in a social network **18** have many friends (social connections), e.g., several hundred, and, as discussed in Sasse, et al., "Transforming the weakest link a human/computer interaction approach to usable and effective security" Proceedings of BT Technology Journal, 19 (3), pp. 122-131 (2001) users **12** may have a difficult time in making complex security decisions.

[0042] In one embodiment, the social network can be represented as a hypergraph, where each edge represents a relationship, such as friend, close friend, family member, sibling, co-worker, etc. Access control policy in SBone **30** can then be specified per user, in the form of a matrix, where, e.g., the rows are the resources vectors and state vectors, and the columns are the relationships. A typical user **12** may have only a limited number of relationship edges of which the user **12** is a part. This way, the number of rules that need to be specified for each device **14** associated with a particular user **12** may be able to be limited to a more manageable number. Relationships can in some embodiments also inherit other relationships. For example, the close friend relationship can inherits the simple friend relationship, and the sibling relationship can inherits the relative/family member relationship. Users can define a precedence order among relationships, which can then be used between users who are connected to each other by multiple relationship types.

[0043] In one embodiment, there can be two steps in the connection policy specification process: first, forming a relationship hypergraph, and second, specifying access control rules. The first step may be performed each time a new friendship link is created in the social network. The second step may be performed whenever a user **12** adds a new personal device **14**. That is, the relationship hypergraph may be relationship driven and the access control rules may be personal device driven.

[0044] To form a relationship hypergraph, the system needs to understand the semantic meaning of an edge between users **12** in a social network **18**. In one embodiment, this can be accomplished using, e.g., a combination of automated and manual techniques. In one embodiment, the system can, e.g., mine the interactions **22** in the social network **18** to infer inter-personal relationships. In one embodiment, the system can present the inferred relationship hypergraph to a user **12**, and user **12** can correct mistakes made by the system, or simply change a relationship designation(s).

[0045] In one embodiment, SBone **30** can identify for each personal device **14** by using a personal name, e.g., that is specified by the owner/user **12** when registering the device **14**. This name may be a unique specifier within the device **14** namespace of the user **12**, such as a user social network name, nickname, personal identifier, etc., or combination of these, that is used to identify the user **12**, e.g., in the social network **18**. Sbone **30** can use, e.g., the combination of a user **12** name and a personal device **14** name to arrive at a globally unique personal name for every device **14**. FIG. **3** illustrates an example of an embodiment of the device namespace for a user **12** "John."

[0046] The personal name for a personal device **14** can be persistent, and can be used to identify the device **14**, but in one embodiment the personal name of the device **14** cannot be used to initiate communication to the device **14**. In such cases, e.g., each time the device **14** is connected, SBone **30** can map the personal name to a routable address for the personal device **14**. An SBone server **40** client, running on the device **14**, can then connect to the SBone server **40**, and specify this mapping.

[0047] If a device **14** is connected to the Internet **20** directly, this mapping can be done trivially. However, most devices **14** are part of, e.g., a home or an enterprise network, and often behind a Network Address Translator (NAT), which can make it difficult for other personal devices **14** to initiate a connection to these networked personal devices **14**. A similar situation can be faced by voice over Internet protocol ("VOIP") personal devices **14**, e.g., also inside home or enterprise networks. In one embodiment, a STUN/TURN server, as is discussed in Rosenberg, et al., "Traversal Using Relays around NAT (TURN), Internet-Draft and Rosenberg, et al., "Session Traversal Utilities for NAT (STUN), RFC 5389, can be used to address this problem, e.g., by discovering the external IP address and port, which can be used to allow direct incoming connections, i.e., a relay server which can relay messages if the personal device is behind an Enterprise NAT.

[0048] In one embodiment, users **12** can access a personal device namespace of a user friend(s) **12**, and browse the personal device **14** of a user friend **12**. Users **12** can also see what resources, e.g., **60**, **62**, **64**, each personal device **14** of a user friend **12** has, and its state vector, e.g., **70**, **72**, **74** subject to the access control policy. In addition to manual browsing, in one embodiment a query interface may be used. This query interface may be used because, for example, the number of user friends **12** a typical user **12** has is on the order of hundreds and the personal devices **12** may seek to directly discover each other without human intervention. In one embodiment, SBone **30** can support a query interface to find other personal devices **14**.

[0049] A query can be formed using different attributes, such as to find personal devices **14** that have a particular internet resource, such as **60**, **62**, **64** and are within a certain distance, such as within some number of miles of the user **12**

personal device **14**. Queries can also be based on relationship, such as to find personal devices **14** owned by a college friend or a current co-worker or the like. In one embodiment, a relationship may also be used for ranking query results. This may rely, e.g., on a defined relationship within the social network as a measure of trust that the user **12** has. Given the choice, a user **12** could normally prefer sharing the resource, e.g., **60**, **62**, **64** of a personal device **14** that belongs to a more trusted person **14**, as defined by the particular relationship, such as a direct family member. Even if a user **12** does not specify a relationship explicitly, the SBone server **40**, as an example, can rank query results based on relationship definitions/levels of likely trust, etc.

[0050] OSNs can have hundreds of millions of users **12**, and each user **12** can have many personal devices **14**. An underlying database querying interface may scale to this large number of devices. Distributed databases such as Cassandra, as discussed in "The apache cassandra project," http://incubator.apache.org/cassandra/ can support transparent scaling. A graph database such as Neo4J, as discussed in neo4j. http://neo4j.org/ is optimized to more rapidly perform queries involving native graph operations. Depending on the type of query, schema-free relational databases and graph databases may be used.

[0051] In one embodiment, once two personal devices **14** find each other, the personal devices **14** can perform secure pairing. Unlike the traditional definition of pairing, device-to-device pairing in SBone **30** can relate not only to near-field communication, but also to the case when the personal devices **14** communicate via the Internet. Personal devices can exchange their public key certificates with each other. SBone **30** can use the public keys stored in the SBone server **40** to perform such device-to-device pairing, such as by sending encrypted messages to the respective personal device **14** using the public key of the respective personal device **14**, and providing the public key of one personal device **14** to the other and vice versa, or communicating with each such personal device with the public key of the respective personal device **14** and using the public key of the other personal device **14** in the pair to establish the pairing.

[0052] SBone **30** can enables users **12** to share the state information, such as **70**, **72**, **74**, of their personal devices **14** with their user friends **12**. If the resource, such as **60**, **62**, **64**, of a personal device **14** is a popular one, repeated queries may place undue strain on the resources of the device **14**. Personal devices **14** may have limited battery or communication bandwidth or the like. When repeated queries are placed on a personal device **14**, the results of the query may be stored, such as by being cached on the SBone server **40**. SBone **30** can maintain a staleness indication to indicate how fresh the state information is, using, for example, the last updated timestamp.

[0053] SBone **30** can enable a user **12** to share the resources, such as of the personal device **14** of the user **12**, such as internet connectivity **60**, GPS **62**, camera **64**, and talktime, with a personal device **14** belonging to a user friend **12**. Some resources, such as **60**, **62**, **64**, can be used simultaneously by multiple users **12**, such as internet connection **60**. Other resources, such as **60**, **62**, **64**, can be used by only one user **12** at a time, such as talk time. For users to share their resources with others, several user **12** concerns need to be addressed. When the owner **12** wants to use the sharable resource, SBone **30** can implement a Quality of Service (QoS) mechanism that can allow, e.g., the user **12** to control

the level of sharing. In the case of a resource that cannot be simultaneously accessed by multiple users, SBone **30** can implement a scheduling scheme to determine which user **12** can reserve which resource during, e.g., which time period. Time periods may be imperceptible to human detection, such as when multiple accessing coding of some form is used, including time division multiple access ("TDMA") with very short time divisions, code division multiple access, ("CDMA") or frequency division multiple access ("FDMA") as available. In one embodiment, not all users **12** may be altruistic in sharing. Some users **121** may require an incentive model to encourage them to share their resources. To implement an incentive mechanism, SBone **30** may can have an accounting component that logs the resource usage.

[0054] In one embodiment, the owner can control the level of sharing of a resource, such as **60**, **62**, **64**. When the owner accesses the shared resource, SBone **30** can give priority to the owner. Further, in one embodiment the owner can have the ability to temporarily disable sharing for a resource, whenever the owner wants sole access to the resource. In one embodiment, if a resource, such as **60**, **62**, **64** cannot be simultaneously accessed by multiple personal devices **14**, other user friends **12** need to have a mechanism with which they can reserve access to the resource. A scheduler running on the personal device **14** of the user **12**, or on SBase **30** can be used to ensure that a reservation is followed. In one embodiment, the owner **12** also may be required to abide by a reservation. In one embodiment, an accounting module (not shown) can log the resource usage so that, optionally, a billing scheme can be incorporated. Different metrics can be used, such as time of usage, or a resource specific metric (like bytes downloaded for an internet resource **60**, or pictures taken for a camera resource **64**).

[0055] Turning now to FIG. **6** there is shown an example of an SBone system **30** including an SBone server **40**, an SBone client **42** and an SBone Facebook application **44**, as illustrated in further detail in FIG. **7** showing an example of a graphical user interface ("GUI") for the SBone Facebook application **44**, where, e.g., users **12** can see the on-line status of their personal device(s) **14**, and the personal device(s) **14** owned by a user friend(s) **12**. The SBone server **40** can be utilized to manage the system **30**, such as the functions of registration, naming and discovery. The SBone client **42** can perform such functions as personal device **14** sharing and lifecycle, e.g., consisting of the registration, connection and sharing phases. The social network application **44** can be used for authentication and access control.

[0056] In one embodiment, the SBone server **40** can maintain a network of users and devices using an Extensible Messaging and Presence Protocol (XMPP) service **46**, such as is discussed in "XMPP protocol specification," http://xmpp.org/tech/overview.shtml. An XMPP service **44** can form an open, XML-based protocol for message-oriented middleware such as Instant Messaging ("IM"), Voice Over IP ("VOIP") and file transfer signaling. Popular deployments like Google's GTalk have demonstrated the scalability of an XMPP service **46**. Due to, e.g., the use of XML, the protocol is extensible. In one embodiment, Jabberd2 can be as the opensource XMPP server **46**. In one embodiment, the SBone server **40** can store the user **12** and personal device **14** information in a Mysql database, such as in database service **48** which can be accessed by the SBase XMPP server **40**.

[0057] In one embodiment, the SBone client(s) **42** can run an XMPP client, which can, e.g., register to the SBone server

**40** using unique identification information, e.g., the Facebook credential(s) of the owner **12**. After registration, the SBone client **42** can connect to the SBone server **40** and send the routable name of the personal device **14** of the owner **12** to the SBone server **40**, which can allow other clients **42** to reach the newly registered personal device **14**. The personal device **14**, now registered as a client **42** can also send its list of shared resources to the SBone server **40**.

[0058] In one embodiment, a social network application used can be Facebook. The SBone social network application **44** can allow a user(s) **12** to visualize the network for the owner **12** personal device **14**. FIG. **7** shows an embodiment of a screenshot of a graphical user interface **80** of the SBone Facebook application **44**. A user(s) **12** can see the list **82** of personal devices **14** owned by the user **12** and lists **84**, **86** of personal devices **14** owned by a respective user friend **12**. A personal device **14** that is currently connected to the Internet **20** can be displayed as online. Users **12** can send a message(s) to a personal device(s) using this graphical user interface **80**. A personal device(s) **14** can send a message(s) to another personal device(s). The XMPP protocol, as an example, can supports XML messages, so the SBase server **40** can be extended to share pictures, audio, video and the like data.

[0059] In one embodiment, SBone **30** can be implemented that allows mobile personal devices **14** to connect to the Internet **20** using an internet resource **60** of a personal device **14** of a user friend **12**. The scenario corresponds to FIG. **4**, where the client devices A and B can be, e.g., Linux laptops, the SBone server **40** can be a Linux server, and the on-line social network can be Facebook. In this example, personal device **14** A has a sharable Internet resource **60**, and personal device **14** B can get connected to the Internet **20** using personal device **14**'s connectivity.

[0060] In one embodiment, Internet connectivity resource sharing functionality **60** can be implemented between personal devices **14** A and B, as described in FIG. **4**, using the SBone server **40**. A can be a Linux laptop running as an SBone client **42** with a WiFi interface **76**, as seen in FIG. **6**, set up as an access point, to provide Internet connectivity **60** sharing with a personal device(s) **14** owned by an owner friend **12** in the same social network. In one embodiment, Internet connectivity sharing can be implemented using a captive portal **90**, also shown in FIG. **6**, which can be built using IPtables. The captive portal **90** can intercept normal network traffic from a portable device **14** of a user **12**, such as newly associated wireless client, personal device **14** B, and diverts it to a website where personal device **4** B can be authenticated. Using IPtables filtering rules, IP traffic can be diverted to a web application running on personal device **14** A.

[0061] In one embodiment, for authentication, the captive portal **90** can use Facebook Connect **92**, as is discussed in Facebook Connect. http://developers.facebook.com/connect.php. Facebook Connect **92** is a set of APIs provided by Facebook, which allow a Facebook user **12** to log-in to the SBone server **40**, e.g., as an external website, using Facebook credentials. In one embodiment, once authenticated, the identity of the user **12** and the identity of social connections of the user **12** can be made available to the SBone server **4** (perhaps requiring the consent of the user **12** and/or user friends **12** of the user **12**). Once B logs in, the SBase server **40** can retrieve UB's Facebook friends list. If UA and UB are related in

Facebook as friends, the SBone server **40** can grant access to user **12** B by adding an exception in the filtering rules of user **12** A.

[0062] A system, as shown in FIG. **6**, according to aspects of an embodiment of the disclosed subject matter may include the SBone server **40** and the SBone client **42**. The SBone server **40** may include a registration handler module **100**, to perform registration functionalities as discussed above, a naming and presence module **102** and a messaging handler module **104**. The SBone server **40** may also include a database service **110** which may store, among other data, a user information data section **112**, storing information identifying users **12**, a devices information data section **114**, storing data regarding personal devices **14** and a access rules section **116**, which may be used to store information regarding access rules to be applied in instances of requested sharing and access as discussed above.

[0063] The SBase client **42** may include an XMPP client **94** for use as discussed above, an authentication module **96**, which may serve to

[0064] encrypt messaging as noted above as part of authentication, a 3G interface **98** for the captive portal **90**, in addition to the WiFi interface **76**, and also a FaceBook connect module **92**.

[0065] Sociologists have studied human relationships, and the factors that influence sharing between humans. With the advent of social media, people have analyzed how users **12** share news and personal data with user friends **12** on social networks, such as on-line social networks. Given a set of personal devices **14**, it can be important to study the structure of networks formed by sharing patterns of the owners **12** these personal devices **14**. Once people start sharing states, such as **70**, **72**, **74** and resources, such as **60**, **62** and **64**, of their personal devices **14** with user friends **12**, aspects of combinations of social networks and computer networks will be developed and examined.

[0066] Personal devices **14** can possess personal information about the owner user(s) **12**, that the owner user(s) **12** may not wish to share with others. State sharing can leak personal information of an owner user **12** to an unintended user(s) **12**. Even if the system **30** provides access control policies, a user(s) **12** may find it difficult to specify fine-grained access control for, e.g., the device state, such as **70**, **72** and **74** of the personal device(s) **14** of the user(s) **12**, and, even when so specifying, may be prone to making mistakes. Designing better and more usable privacy controls for social networks can be an important issue to address, which can become even more relevant as users **12** share state, such as **70**, **72**, **74**, of personal device(s) **14** with each other. Simply inferring trust from a social relationship(s), e.g., in an OSN may not be adequate. Google Buzz contains an auto-follow feature, which can be used to infer that users **12** may want to share a personal state with frequent email contacts. This can raise privacy concerns, since frequent email contacts could still be such as co-workers or other people with whom a user **12** may not necessarily want to share a personal state. Thus it is apparent that privacy concerns have to be addressed for people to share personal state(s), e.g. of their personal devices **14**.

[0067] As an example of an approach to take, not all users **12** may be altruistic in sharing their resources with friends. Some users **12** may require an incentive model to encourage them to share their resources, such as **60**, **62**, **64**. Moreover, in the case of resources that also depend on a service provider's

cooperation, such as internet access, or sharing talktime, the incentive model may need to also provide an incentive to the service provider as well. An embodiment of an internet resource **60** sharing application can make use of, as an example, an http captive portal **90** to authenticate a user(s) **12**. This can work, e.g., for a typical home user(s) **12**, but may not satisfy the security requirements of an enterprise setting, where wireless networks may require encryption. A commonly used enterprise wireless setup can consist of a WPA2 Enterprise mode, with 802.1x authentication using a RADIUS server. In one embodiment, the SBase server **40** can be enhanced to support enterprise settings, using a modified RADIUS server (not shown) that can use a social network to authenticate clients.

[0068]   The SBone server **40** can leverage social relationships from any existing online social network. However, not all OSNs are the same. As an example, users **12** can use Facebook to connect with their user friends **12** and user acquaintances **12**, whereas users **12** may use LinkedIn to connect with user professional **12** contacts. Celebrities or celebrity wannabe users **12** may use sites like Twitter or Facebook Pages to connect with their user followers and worshipers **12**. A link between two users **12** can, therefore, indicate different levels of trust on different OSNs.

[0069]   An architecture was described that allows personal devices to share their resources and states with each other, using a social network for authentication, naming, discovery and access control.

[0070]   As used in this application the term "a computing device," such as may form a part of a system or be utilized to perform method steps as part of a method, according to aspects of an embodiment of the disclosed subject matter for a system and method for sharing personal device uses and states through a network such as an on-line social network, by way of example, may comprise a computer processor or other processor unit capable of obtaining, e.g., fetching, and executing instructions, such as application and operating system software instructions. The processor may be any form of hardware device for executing software instructions which may be stored in and obtained from a storage medium, such as cache memory, main memory, local disc storage and remote disc storage and may reside in different ones of such types of storage media at different times.

[0071]   The processor may be any custom made or commercially available processor, a central processing unit (CPU), an auxiliary processor among several processors associated with the processing unit, a semiconductor based microprocessor (in the form of a microchip or chip set), a macroprocessor, a microcontroller, an array of processors, a networked group or array of computing devices or generally any device or combination of devices for executing software instructions. The processor may comprise a controller, microcontroller, or a hard wired, including firmware, device, or any combination thereof, or any other processor capable of performing logic driven operations, under the control of partly or fully programmable instructions.

[0072]   Software operating on the processor may include one or more separate programs, each of which comprises an ordered listing of executable instructions for implementing logical functions. Software may be in the form of application software and operating system software which is stored in a tangible medium, such as any of the storage media (memories) noted above. The operating system essentially controls the execution of other computer programs by the computing device. Software may be written and compiled as (a) an object oriented programming language, which has classes of data and methods, or (b) a procedure programming language, which has routines, subroutines, and/or functions, such as C, C++, Pascal, Basic, Fortran, Cobol, Perl, Java, and Ada or standard Internet languages, such as XML or HTML.

[0073]   In the context of this disclosure, a tangible computer readable medium may be any electronic, magnetic, optical, or other physical device or means that can contain or store data or a computer program(s) for use by or in connection with a computing device related system or method, and excludes merely transitory signals being propagated unassociated with any tangible computer readable medium, such as defined herein, which shall include a meaning of a non-transitory computer readable medium. The tangible computer readable medium can be, for example, but not limited to, an electronic, magnetic, optical, electromagnetic, infrared, or semiconductor system, apparatus, device, or other non-transitory propagation medium, including, by way of example an electrical connection (electronic) having one or more wires, a portable computer diskette (magnetic), a random access memory (RAM) (electronic), a read-only memory (ROM) (electronic), an erasable programmable read-only memory (EPROM), an electronically erasable programmable read only memory ("EEPROM"), a Flash memory (electronic), an optical fiber memory (optical), a portable compact disc read-only memory (CDROM) (optical), a tape (magnetic), a large disc storage medium (magnetic), etc.

[0074]   For the purposes of this disclosure a module is a software, hardware, or firmware (or combinations thereof) system, process or functionality, or component thereof, that performs or facilitates the processes, features, and/or functions described herein (with or without human interaction or augmentation), as are described herein to be performed by a module. A module can include sub-modules. Software components of a module may be stored on one or more instantiations of a computer readable medium. Modules may be integral to one or more servers, or be loaded and executed by one or more servers. One or more modules may be grouped into an engine or an application.

[0075]   The presently disclosed subject matter as described herein with reference to block diagrams and/or operational illustrations of methods and devices to perform methods according to aspects of an embodiment of the disclosed subject matter (collectively "block diagram"). It is understood that each block of the block diagram can be implemented by means of analog or digital hardware and computer program instructions, such as on a computing device. In some alternate implementations, the functions/acts noted in the blocks or steps can occur out of the order noted in the block diagram. For example, two blocks shown in succession can in fact be executed substantially concurrently, on the same processor or on different processors in parallel or the blocks can sometimes be executed in the reverse order, depending upon the functionality/acts involved.

[0076]   For the purposes of this disclosure the term "server" will be understood to refer to a service point which provides processing, database, and communication facilities. By way of example, and not limitation, the term "server" can refer to a single physical processor with associated communications and data storage and database facilities, or it can refer to a networked or clustered complex of processors and associated network and storage devices, as well as operating software and one or more database systems, and applications software

which support the services provided by the server, all of which may be also referred to as a computing device or a communication device as may be consistent with the context of the system and method being described or claimed.

[0077] Depending upon the context in which described or claimed a communication device may be more than one physical device operating to carry out the communication function described, such as any one of a number of hand held portable personal devices, such as, personal communications devices, such as, a cellular phone, Blackberry®, I-Pod™, Droid™, and the like, or groups thereof, interconnected to communications network stations and facilities, such as cellular phone base stations, the Internet, the public switched network, etc., any or all acting in series or in parallel or combinations thereof, with associated transmitting and receiving equipment, coding and decoding equipment, modulating and demodulating equipment, computing devices, data bases and the like equipment, necessary for and capable of, carrying out the disclosed or claimed communication referenced in the present application.

[0078] Those skilled in the art will recognize that the methods and systems of the present disclosure may be implemented in many manners and as such are not to be limited by the foregoing exemplary embodiments and examples. In other words, functional elements being performed by single or multiple components, in various combinations of hardware and software or firmware, and individual functions, may be distributed among software applications at either the client or server or both. In this regard, any number of the features of the different embodiments described herein may be combined into single or multiple embodiments, and alternate embodiments having fewer than, or more than, all of the features described herein are possible.

[0079] Functionality may also be, in whole or in part, distributed among multiple components, in manners now known or to become known. Thus, myriad software/hardware/firmware combinations are possible in achieving the functions, features, interfaces and preferences described herein. Moreover, the scope of the present disclosure covers conventionally known manners for carrying out the described features and functions and interfaces, as well as those variations and modifications that may be made to the hardware or software or firmware components described herein as would be understood by those skilled in the art now and hereafter.

[0080] While the system and method have been described in terms of one or more embodiments, it is to be understood that the disclosure need not be limited to the disclosed embodiments.

1. A method comprising:
   receiving, via a computing device, from a first user having a first personal device, a request for sharing access to one of a resource and a state of a second personal device of a second user, the first user having an on-line social network relationship with the second user on an on-line social network; and
   determining, via the computing device, whether to grant sharing access to the one of the resource and the state of the second personal device of the second user.

2. The method of claim 1 wherein determining whether to grant sharing access is based, at least in part, upon the nature of the on-line social network relationship between the first user and the second user.

3. The method of claim 2, wherein an application uses the granted shared access of the device state that belongs to the first user and the device state that belongs to the second user.

4. The method of claim 1 further comprising:
   registering, via the computing device, an ownership link for a personal device and an owner having a certified identity within the social network;
   storing the ownership link;
   utilizing the ownership link for determining whether to grant sharing access.

5. The method of claim 2 further comprising:
   registering, via the computing device, an ownership link for a registered personal device and an owner having a certified identity within the social network;
   storing the ownership link;
   utilizing the ownership link for determining whether to grant sharing access.

6. The method of claim 4 wherein registering comprises:
   assigning a persistent personal name to the registered personal device, distinct from a personal device network address.

7. The method of claim 5 wherein registering comprises:
   assigning a persistent personal name to the registered personal device, distinct from a personal device network address.

8. The method of claim 6 wherein the persistent personal name corresponds to an on-line social network user name associated with the certified identity.

9. The method of claim 7 wherein the persistent personal name corresponds to an on-line social network user name associated with the certified identity.

10. The method of claim 1 further comprising:
    setting, via the computing device, at least one access control rule for one of a resource and a state of the personal device of the second user.

11. The method of claim 2 further comprising:
    setting, via the computing device, at least one access control rule for one of a resource and a state of the personal device of the second user.

12. The method of claim 1, wherein the at least one resource comprises one of an Internet connectivity and a phone calling plan of the second personal device used by the first personal device without the need for real time human intervention.

13. The method of claim 1, wherein a personal device of the second user registered on the on-line social network is searched by the first personal device of the first user, at least in part based on the relationship established between the first user and the second user in the on-line social network.

14. A system comprising:
    a computing device configured to receive from a first user having a first personal device, a request for sharing access to one of a resource and a state of a second personal device of a second user, the first user having an on-line social network relationship with the second user on an on-line social network; and
    the computing device configured to determine whether to grant sharing access to the one of the resource and the state of the second personal device of the second user.

15. The system of claim 14 further comprising:
    the computing device configured to determine whether to grant sharing access based, at least in part, upon the nature of the on-line social network relationship between the first user and the second user.

JA0585

**16**. The system of claim **15**, wherein an application uses the granted shared access of the device state that belongs to the first user and the device state that belongs to the second user.

**17**. The system of claim **14** further comprising:

the computing device configured to:

register an ownership link for a registered personal device and an owner having a certified identity within the social network;

store the ownership link; and

utilize the ownership link for determining whether to grant sharing access.

**18**. The system of claim **17** wherein the computing device is configured to register an assigned persistent personal name to the registered personal device, distinct from a personal device network address.

**19**. The system of claim **18** wherein the persistent personal name corresponds to an on-line social network user name associated with the certified identity.

**20**. The system of claim **14** further comprising:

the computing device configured to set at least one access control rule for one of the resource and the state of the personal device of the second user.

**21**. The system of claim **14**, wherein the at least one resource comprises one of an Internet connectivity and a phone calling plan of the second personal device used by the first personal device without the need for real time human intervention.

**22**. A tangible non-transitory machine readable medium storing instructions, the instruction, when executed by a computing device, causing the computing device to perform a method comprising:

receiving from a first user having a first personal device, a request for sharing access to one of a resource and a state of a second personal device of a second user, the first user having an on-line social network relationship with the second user on an on-line social network; and

determining whether to grant sharing access to the one of the resource and the state of the second personal device of the second user at least in part based on the on-line social network relationship.

\* \* \* \* \*